1                                                    The Honorable Ricardo S. Martinez

2

3

4

5

6

7                 IN THE UNITED STATES DISTRICT COURT FOR THE
                        WESTERN DISTRICT OF WASHINGTON
8

9

UNITED STATES OF AMERICA,              )
10                                      )     Case No. 2:15-cv-00102 RSM
             Petitioner,                )
11                                      )     **UNITED STATES' RESPONSE TO**
        v.                              )     **MOTION FOR EVIDENTIARY**
12                                      )     **HEARING**
MICROSOFT CORPORATION, *et al*.        )
13                                      )
             Respondents.               )
14 _____ )

15

16

17

18

19

20

21

22

23

**U.S. Department of Justice**
                                                Ben Franklin Station, P.O. Box 683
                                                Washington, D.C. 20044-0683

## TABLE OF CONTENTS

Pages

BACKGROUND ...........................................................................................................2

    1.  The Issues in the 2004-2006 Examination.................................................2

    2.  The initial phase of the Examination ........................................................4

    3.  The TPO phase of the Examination ..........................................................4

        a.  TPO withdrawal of 30-day letter...........................................................4

        b.  The Examination from mid-2012 through mid-July, 2014 .........................................5

    4.  The involvement of Quinn Emanuel in the examination ................................................7

ARGUMENT ...........................................................................................................11

    I.          Microsoft has not met its burden of establishing entitlement to an evidentiary hearing................................................................................................11

            A.  Legal Standard .........................................................................12

            B.  Microsoft has failed to meet the requirements of Clarke..............................12

                1.  Microsoft's contention that the IRS is attempting to outsource an inherently governmental function presents a legal question.............12

                2.  The IRS's decision to allow Quinn Emanuel to be present and ask questions during a summons interview is legally supported ............14

                3.  The facts and circumstances do not raise a plausible inference that the IRS has "outsourced" the Examination to Quinn Emanuel ..............19

    II.        Microsoft has failed to establish that discovery is warranted ...........................21

CONCLUSION..........................................................................................................24

1    To obtain an evidentiary hearing, Microsoft must show "specific facts and circumstances

2   plausibly raising an inference of bad faith" or improper motive.  Even if Microsoft meets this

3   high burden, however, in order to obtain *discovery*, Microsoft must also make a "substantial

4   preliminary showing of abuse or wrongdoing."  But the "facts" set out by Microsoft do not come

5   close to making either showing.  The gravamen of Microsoft's argument is that the law firm

6   Quinn Emanuel's involvement in the 2004-2006 Examination — which began only in 2014 — is

7   what makes enforcement of these summonses "an abuse of the Court's process."

8    Microsoft contends that it raises two issues of first impression.  The first issue is a purely

9   legal argument:  Microsoft contends that Quinn Emanuel's participation in the Examination

10   violates federal law because allowing Quinn Emanuel attorneys to question witnesses during a

11   summons interview amounts to outsourcing an inherently governmental function.  In furtherance

12   of this argument, Microsoft contends that a temporary Treasury regulation providing for such

13   participation is invalid.  Although Microsoft might want discovery to make this argument, that is

14   not the standard for discovery in a summary summons enforcement proceeding, as Microsoft has

15   not come forward with any evidence that raises factual issues about the validity of the regulation.

16   Second, Microsoft raises another, largely legal argument — with a few factual allegations

17   sprinkled in, based on select terms of the Quinn Emanuel contract, the timing of certain events,

18   and speculation about the IRS's FOIA compliance — to contend there is an inference of abuse.

19   To the extent Microsoft has made any factual showing, the inferences it draws are based solely

20   on reasoning that, because Quinn Emanuel's contract was executed in May 2014, everything that

21   follows is suspect.  This is a logical fallacy.  As shown below, and based on the Second

22   Declaration of Mr. Hoory, the facts are not as Microsoft speculates: Quinn Emanuel was retained

23   simply to provide support to the ongoing IRS examination, and did not begin work on the

1  contract until July 2014.  In light of the actual facts, all of the inferences necessary for

2  Microsoft's arguments for an evidentiary hearing and for discovery disappear.

3                                    **BACKGROUND**

4      *1.   The Issues in the 2004-2006 Examination*

5          The primary remaining areas on which the IRS needs additional information for the

6  2004-2006 Examination are transfer pricing issues[1] involving intangibles and relating to two

7  regional cost sharing arrangements between Microsoft and its affiliates, one between Microsoft

8  and its Puerto Rican affiliate, Microsoft Operations Puerto Rico, LLC[2] ("MOPR") (the

9  "Americas cost sharing arrangement") and the other between Microsoft and its Asian affiliate,

10  Microsoft Asia Island Limited, a Bermuda corporation ("MAIL") (the "APAC cost sharing

11  arrangement").  Second Declaration of Eli Hoory ("Second Hoory Declaration") ¶ 5.

12          Under the Americas cost sharing arrangement, Microsoft divided rights to technology

13  intangibles (*e.g.*, software code) from rights to non-technology intangibles (*i.e.*, everything other

14  than technology intangibles, such as brands, trademarks, and customer/partner relationships).

15  Microsoft and MOPR entered into a technology license agreement under which Microsoft

16  licensed to MOPR — and subsequently treated MOPR as the economic owner of — various

17  rights to technology intangibles used in Microsoft's Americas retail business and, under a cost

18  sharing agreement, MOPR agreed to fund technology research and development ("R&D") costs

---

19  [1] Transfer pricing generally, and as embodied in 26 U.S.C. § 482, refers to the prices that related parties charge one
20  another for goods and services transferred between them.  The most common application of the transfer pricing rules
    is the determination of the correct price for transfers between related entities. The IRS is authorized under section
    482 to allocate income and deductions among commonly controlled or owned entities as necessary to prevent tax
21  avoidance or to clearly reflect the income of such entities.  In particular, when rights to intangible property are
    transferred or licensed between related entities, "the income with respect to such transfer or license shall be
22  commensurate with the income attributable to the intangible."  26 U.S.C. § 482.  "[T]he standard to be applied in
    every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer."  Treas. Reg. § 1.482-1(b)(1).

23  [2] MOPR is owned by a Bermuda holding company and is not a member of Microsoft's U.S. consolidated group.
    Second Hoory Declaration ¶ 5.

United States' Response to                          **U.S. Department of Justice**
Motion for Evidentiary Hearing                      Ben Franklin Station, P.O. Box 683
                          2                          Washington, D.C. 20044-0683

relating to Microsoft's Americas retail business.  Microsoft retained the rights to all non-technology intangibles used in its Americas retail business.  *Id.* ¶ 6.  This ongoing division between technology intangibles and non-technology intangibles is unique to the Americas cost sharing arrangement and is not a feature of the APAC cost sharing arrangement.  *Id.* ¶ 7.  In addition to a technology license agreement and a cost sharing agreement, the Americas-related transactions included a series of other intercompany agreements.  *Id.* ¶ 8.

        In support of the related-party pricing it reported on its returns for purposes of I.R.C. § 482, Microsoft relied on a residual profit split model to value and price the Americas intercompany transactions.  The model set intercompany pricing for intangibles based on a percentage of Americas retail sales of Microsoft products by Microsoft to third-party customers. There were four different sets of payments under the Americas cost sharing arrangement (*id.* ¶ 9)

- Buy-in royalty (for technology intangibles):  MOPR would pay Microsoft a percentage of sales each year, declining from 44.23% of sales in 2006 to 2.56% in 2014, with no buy-in royalty due after 2014.
- R&D costs: MOPR would pay Microsoft for R&D, forecast to equal approximately 11.9% of sales per year.
- Technology payment (for technology intangibles): Microsoft would pay MOPR a royalty equal to 53.68% of sales in 2006 and was forecast to pay MOPR between 53.15% to 50.93% of sales between 2007 and 2015.
- Standard costs: Microsoft would pay MOPR compensation for standard (*e.g.*, manufacturing) costs, forecast to equal approximately 1.3% of sales per year.

Netting these forecast payments between Microsoft and MOPR, the model predicted that MOPR would net approximately $38.58 billion during the period from 2006-2015.  The IRS Examination is investigating whether the intercompany pricing established by Microsoft is consistent with the arm's length standard under I.R.C. § 482.  The value of what Microsoft transferred — the rights to technology intangibles — and the value of what Microsoft kept — the non-technology intangibles — are both at issue. *Id.* ¶ 10.

1

      2.       *The initial phase of the Examination*

2

On May 3, 2011 the IRS examination team issued Microsoft a "30-day" letter, reflecting

3

a notice of proposed adjustment on the Americas cost sharing arrangement (as well as other

4

proposed adjustments, including one with respect to the APAC cost sharing arrangement).[3]  *Id.* ¶

5

12.  The notice did not propose any adjustment to the "transfer price" that Microsoft paid to

6

MOPR after July 1, 2005, thus leaving in place Microsoft's profit split between the technology

7

intangibles it transferred and the non-technology intangibles it retained.  *Id.* ¶ 14.

8

      3.       *The TPO phase of the Examination*

9

In recognition of the complexity of examining transfer pricing issues, the IRS's Large

10

Business & International Division, which oversees the examinations of large corporate taxpayers

11

like Microsoft, established a team of transfer pricing specialists within a new unit, Transfer

12

Pricing Operations ("TPO") in 2011.  *Id.* ¶ 16.  TPO provides IRS agents with centralized

13

support in planning, executing, and resolving transfer pricing examinations.  *Id.*

14

      a.    *TPO withdrawal of 30-day letter*

15

Once TPO began reviewing the IRS's existing transfer pricing inventory, it identified

16

Microsoft's transfer pricing issues as among the largest transfer pricing issues the IRS had,

17

potentially involving tens of billions of dollars in U.S. taxable income.  *Id.* ¶ 17.  Moreover, TPO

18

realized that the issues the original IRS examination team had identified in the 30-day letter did

19

20

21

22

23

---

[3] An IRS 30-day letter to a taxpayer contains a report with proposed adjustments to a taxpayer's return and invites the taxpayer to agree with the proposed changes or, if the taxpayer does not agree, to request a meeting or teleconference with the supervisor of the IRS examination point of contact identified in the letter.  If a disagreement remains after the meeting or teleconference, the 30-day letter invites the taxpayer to request a conference with IRS Appeals.  See, Saltzman, IRS Practice and Procedure ¶ 9.05 (2013); Treas. Reg. § 601.105(c), (d). If a taxpayer does not respond to a 30-day letter or if no agreement is reached at Appeals, the IRS generally issues a statutory notice of deficiency (a "90-day" letter), which reflects a final determination, rather than a proposed adjustment.  I.R.C. § 6212 (providing for issuing a statutory notice of deficiency). After receiving a 90-day letter, a taxpayer may file a petition in Tax Court to dispute the deficiency determination made by the IRS.

United States' Response to
Motion for Evidentiary Hearing

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1  not address some significant aspects of the Americas cost sharing arrangement, including the

2  technology royalty Microsoft was paying.  *Id.* ¶¶ 14, 19, 20. TPO determined that, to understand

3  Microsoft's business better, it needed to consult with non-governmental software industry

4  experts, which the examination team had not done.  *Id.* ¶¶ 18, 19.  After communicating these

5  concerns to Microsoft, TPO withdrew the IRS's 30-day letter in February 2012.  *Id.* ¶ 21.

6                      *b.   The Examination from mid-2012 through mid-July, 2014*

7         As part of its renewed fact-gathering process, between July 2012 and October 30, 2014

8  the IRS continued to issue to Microsoft international-issue information document requests

9  (IDRs).  *Id.* ¶ 71.  The IRS also held informal interviews with Microsoft employees.  *Id.* ¶¶ 26,

10  27.  At the request of Microsoft's tax department, the interviews held during 2012 and 2013 were

11  not recorded.  *Id.* ¶ 28.  As early as 2012, and on more than one occasion during 2013, the IRS

12  expressly informed Microsoft, that it might "pursue more formal interviews" at a later point.  *Id.*

13  ¶¶ 28, 31; see Exhibits B, C.

14         In keeping with its commitment to be as transparent as possible about the progress of the

15  Examination, the IRS prepared and shared with Microsoft its projected timelines for completing

16  the Examination.  *Id.* ¶ 23.  Beginning in mid-2012, TPO also held periodic executive-level

17  conference calls with Microsoft executives. *Id.* ¶ 22.  In addition, separate calls were held

18  between the IRS examination team and Microsoft's tax department to discuss day-to-day

19  examination matters, including regular information document request (IDR) status calls. *Id.*

20         A timeline issued in July 2012 contemplated that the Examination would be resolved or a

21  30-day letter issued by July 1, 2013.  *Id.* ¶¶ 23-25 and Exhibit A.  Subsequently, the IRS

22  prepared — and shared with Microsoft — updated timelines that pushed back this deadline,

23

1  ultimately to April 1, 2014, primarily because the IRS did not receive the information it needed

2  within the anticipated timeframes.[4]  *Id.* ¶ 30 and Exhibits B and C.

3          In January 2014, the IRS made a detailed, in-person presentation of some of its expert

4  reports and its work to date on the Examination to Microsoft executives, including Microsoft's

5  counsel, Baker & McKenzie.  *Id.* ¶¶ 34-37.  At the conclusion of the meeting, based on

6  discussions with Microsoft personnel in attendance, the IRS understood that the parties would be

7  following up on technical issues and also that Microsoft would be making a similar in-person

8  presentation, with Microsoft's views.  *Id.* ¶ 38.

9          Although the parties periodically spoke about the in-person presentation by Microsoft,

10  *see id.* ¶¶ 41, 45, no such presentation was ever scheduled or held.  *Id.* ¶ 39.  On February 17,

11  2014, at an executive-level call with the IRS, Microsoft stated that it would not pursue resolution

12  discussions and would like the IRS to issue a 30-day letter.  *Id.* ¶ 41.  The IRS then turned to

13  completing its factual development, while also continuing to attempt to resolve with Microsoft

14  such issues as math corrections and revenue and expense allocations.  *Id.*

15          To complete its fact-finding, the IRS made additional document requests to Microsoft

16  between January and June 2014.  *Id.* ¶ 46.  The IRS held additional discussions with Microsoft's

17  tax department, in March 2014 and continuing into May, on resolving some of the technical

18  issues.  *Id.* ¶¶ 43-45.  At a March meeting, the IRS also discussed with Microsoft the formal

19  interviews of Microsoft employees, which it estimated would occur in the July through

20  September 2014 timeframe.  *Id.* ¶ 44.

21  _____
[4] The January 2013 timeline noted that the dates had been adjusted because Microsoft was regularly taking four to
22  five weeks to respond to the IRS's document requests, rather than the initially expected two weeks.  *Id.* ¶¶ 29, 30
and Exhibit B.  The May 2013 timeline noted that the dates had been further adjusted, largely due to Microsoft's
requirement that the IRS's outside experts could review software source code only in Microsoft's "clean room"
23  facility in Redmond Washington (instead of at either the experts' or Microsoft's facilities in Massachusetts).  *Id.* ¶¶
30, 32 and Exhibit C.

Consistent with the timeframe the IRS had given Microsoft in March about identifying potential witnesses to interview, the IRS provided Microsoft eleven draft IDRs on July 3, 2014. *Id.* ¶ 47.  On receiving the drafts, Microsoft requested an executive-level conference call with the IRS.  *Id.* ¶ 48.  On that call, held July 9, 2014, a Microsoft executive stated unequivocally that Microsoft had no interest in continuing with any resolution discussions, and repeated Microsoft's preference (expressed earlier, in February 2014) that the IRS issue a 30-day letter.  *Id.*  At this juncture, the IRS fully shifted its focus from possible resolution to completing its fact-finding on all open issues in the Examination.  *Id.*

The IRS issued the eleven IDRs on July 11, 2014.  *Id.* ¶¶ 50-51.  These IDRs sought both documents and identities of Microsoft business units and employees who had historical management and decision-making responsibility in certain subject areas.  *Id.* ¶ 54.  The IRS sought the names of employees in order to determine whom it should interview.  *Id.* ¶ 62.  The IRS also issued six additional document-only IDRs between August and October 2014.  *Id.* ¶¶ 55-57.[5]

### 4.    The involvement of Quinn Emanuel in the examination

Given the fact-intensive valuation issues presented and the number of outside experts involved in the 2004-2006 Examination, TPO concluded that — in addition to the outside software industry experts and additional economics experts whose assistance it had sought — the IRS would also benefit from having an independent analysis from, and examination support by,

---

[5] Although, in response to the IRS's information document requests, Microsoft produced to the IRS, in the time period between July 2012 and July 2014, approximately 1.14 million Bates-stamped pages, approximately 1.13 million of those pages were in response to just two IDRs and, while nominally responsive, were mostly third-party syndicated research to which Microsoft subscribed and which it had apparently collected in an online research library.  *Id.* ¶ 52.  After the IRS expressed concerns that none of the produced information appeared to reflect Microsoft's own research, Microsoft made a supplemental production of approximately 993 documents that included what appears to be Microsoft-commissioned research.  *Id.*  Even this supplemental production was mostly not responsive to the 2004-2006 Examination, however, as it was almost entirely from after 2006 or focused on Microsoft products not covered by the Americas cost sharing arrangement.  *Id.*

1    seasoned commercial litigators who had experience presenting, defending and critiquing fact-

2    intensive and expert-dependent positions.  *Id.* ¶ 76.

3         The IRS awarded a contract to the commercial litigation firm Quinn Emanuel in May

4    2014.  *Id.* ¶ 78.  Quinn Emanuel was not cleared to perform any work for the IRS until July

5    2014, however, as the IRS needed to complete certain procedural and administrative

6    requirements, including performing background checks on Quinn Emanuel personnel before they

7    could start work.[6]  *Id.* ¶¶ 79, 80.  Not until July 15, 2014 did Quinn Emanuel receive from the

8    IRS the initial tranche of information necessary for the firm to start its review and analysis of the

9    examination to date.  *Id.* and Exhibit G.  Accordingly, July 15, 2014 was the first date Quinn

10   Emanuel could, and did, perform any services under the contract.  *Id.* ¶ 80.

11        Quinn Emanuel's role is to provide the IRS examination team and the transfer pricing

12   team members in the TPO with "the services of . . . an expert in commercial litigation" that will

13   "consult with . . . and/or advise the Service" in connection with the 2004-2006 Examination

14   (Contract, p.5 [Docket 36-4, p.7].)  The contract provides that Quinn Emanuel will provide

15   services described as "Evaluation & Case Support."  (*Id.*, p.7 [Docket 36-4, p.9].)  The contract

16   further provides that Quinn Emanuel "will *assist* the Service in preparing, organizing and

17   presenting the factual record and legal analysis of the case" and "will work collaboratively with

18   the Service to *support* the examination."  *Id.*, p.8 [Docket 36-4, p.10].) (emphasis added.)  The

19   contract contemplates that the Service will be making all third-party contacts, and specifically

20   prohibits Quinn Emanuel from making any third-party contacts without express written

21

22

---

23   [6] The Quinn Emanuel contract identifies five attorneys and a paralegal as providing services under the contract.  See Contract p.B-2 [Document 36-8, p.12].

1    permission from the Service.  *Id*., p. 11 [Docket 36-4, p.13].)  The contract also unequivocally

2    prohibits Quinn Emanuel from performing "inherently governmental functions."[7]  *Id.*, p. 16.

3         The July IDRs were drafted, prepared, and issued by IRS employees without any input

4    from Quinn Emanuel.  Second Hoory Declaration, ¶ 81.  Quinn Emanuel's only input on these

5    IDRs was limited to consulting on an August 2014 revision clarifying the scope of one particular

6    IDR.  *Id.*  The IRS — not Quinn Emanuel — identified the need for clarification, due to its

7    concern that Microsoft was construing the original request more narrowly than the IRS intended.

8    *Id.*  The August and October IDRs were also drafted, prepared, and issued by IRS employees

9    without any input from Quinn Emanuel.  *Id.* ¶ 82.

10        In August, for the first time after starting work and conducting an initial review of the

11   materials provided by the IRS, Quinn Emanuel met with IRS personnel to discuss the record to

12   date on the Service's investigation of Microsoft's Americas transaction.  *Id.* ¶ 83.

13        Mr. Hoory disclosed to Mr. Bernard, in Microsoft's tax department, in a letter dated

14   August 28, 2014 [Dkt 37-2, Ex. B, p.4], that the IRS had retained outside counsel from Quinn

15   Emanuel "to assist LB&I in its evaluation and examination" and that Quinn Emanuel attorneys

16   might attend the upcoming interviews.  The disclosure was made prior to the interviews, which

17   was first time Quinn Emanuel attorneys would have any direct contact with Microsoft

18   employees.  In a September 9, 2014 letter to Microsoft, Mr. Hoory clarified that the IRS did "not

19   have an engagement letter with" Quinn Emanuel [Dkt 37-2, Ex. D]; in a letter sent the following

20

21   [7]  The contract states:
           [t]he Contractor shall not have the authority to perform inherently governmental functions as described in
22         OFPP Policy Letter 11-01 including, but not necessarily limited to, any government policy-making,
           decision-making, portraying the Contractor as a representative of the government or performing
           governmental managerial responsibilities
23   *Id.*, p. 16 [Docket 36-4, p.18].)

1    day, September 10, Mr. Hoory provided Microsoft, at its request, a copy of the full scope of

2    work (Section C) of the Quinn Emanuel contract.  [Dkt 37-2, Ex. F.]  As reflected in that letter

3    and in the contract provided to Microsoft, Quinn Emanuel's contract is limited to providing

4    examination support to the IRS.  *Id.* ¶ 90.

5         Quinn Emanuel attended some of the Microsoft employee interviews held in September

6    and October 2014.  *Id.* ¶ 84.  Consistent with the procedures negotiated with Microsoft for these

7    consensual interviews, IRS employees conducted all these interviews, with Quinn Emanuel

8    limited to asking follow-up questions.  *Id.*  In a number of cases, Microsoft's attorneys objected

9    to such follow-up or instructed its employees not to answer further questions from Quinn

10   Emanuel.  *Id.*  Quinn Emanuel also consulted with and provided advice to the IRS personnel

11   conducting the interviews during and between interviews.  *Id.*

12        Following its review of documents provided by the IRS and after participating in and

13   reviewing transcripts of the September and October interviews, Quinn Emanuel completed its

14   independent assessment of the IRS's work to date on the Americas cost sharing arrangement and

15   of Microsoft's transfer pricing position.  In November 2014, Quinn Emanuel's attorneys

16   presented to TPO, IRS Counsel, and IRS executives their evaluation and analysis, as experienced

17   commercial litigators, of the positions taken by the IRS and by Microsoft.  *Id.* ¶ 85.

18        Quinn Emanuel did not prepare initial drafts of any of the summonses the IRS issued.  *Id.*

19   ¶ 86.  For some (but not all summonses), Quinn Emanuel was given an advance copy of a late-

20   stage draft of a summons for documents.  *Id.*  This included, for example, reviewing a draft of

21   the designated summons and providing comments to the IRS drafters.  *Id.*  Quinn Emanuel was

22   not provided with an advance copy of all of the related summonses, several of which focused on

23   the APAC transaction, which was not the focus of Quinn Emanuel's contract.  *Id.*

1    IRS employees identified and selected all candidates for summons interviews.  *Id.* ¶ 87.

2    With respect to the potential interviews, the IRS consulted Quinn Emanuel on prioritizing

3    interviewees from the identified candidate pool, and discussed the subject matter and goals for

4    the various potential interviewees.  *Id.*  IRS employees decided who would be summoned to give

5    testimony.  *Id.*

6                                            **ARGUMENT**

7    **I.    Microsoft has not met its burden of establishing entitlement to an evidentiary**
     **hearing.**

8
     The United States has met its burden of establishing good faith in issuing the summonses
9
     at issue.  The Court found that the United States has made the requisite *prima facie* showing to
10
     obtain enforcement of the summonses at issue by establishing that the factors enunciated in
11
     *United States v. Powell*, 379 U.S. 48, 57-58 (1964), have been met.  *See* Order to Show Cause
12
     and to Set Briefing Schedule (Dkt. 23).  The Court also noted that the burden has shifted to
13
     Microsoft to show cause why the summonses should not be enforced.  *Id.*  Once the government
14
     makes its *prima facie* case for enforcement through submission of the Revenue Agent's
15
     declaration, as has been done here, a "heavy" burden is placed on the taxpayer to defeat
16
     enforcement by showing an "abuse of process" or "the lack of institutional good faith."  *Fortney*
17
     *v. United States*, 59 F.3d 117, 119 (9th Cir. 1995).
18
     Prior to the court ruling on enforcing the summons, however, Microsoft filed the instant
19
     motion for an evidentiary hearing pursuant to *United States v. Clarke*, 134 S. Ct. 2361 (2014).  In
20
     its memorandum in support of its motion, Microsoft contends that it is entitled to an evidentiary
21
     hearing because it alleges that (1) the IRS is attempting to outsource to third-party contractors an
22
     inherently governmental function, questioning a taxpayer and its employees, and (2) the facts
23
     and circumstances raise a plausible inference that the IRS has impermissibly outsourced to the

United States' Response to                              **U.S. Department of Justice**
Motion for Evidentiary Hearing                          Ben Franklin Station, P.O. Box 683
                              11                        Washington, D.C. 20044-0683

1   Quinn Emanuel trial lawyers other key aspects of the IRS's examination of Microsoft.  Neither

2   of these bases plausibly raises an inference of bad faith as to the IRS's issuance of the summons

3   at issue and therefore neither basis supports a conclusion that an evidentiary hearing is

4   warranted.

5       **A.       Legal Standard**

6       "[S]ummons enforcement proceedings are to be 'summary in nature.'" *Clarke*, 134 S. Ct.

7   at 2367 (*quoting United States v. Stuart*, 489 U.S. 353, 369 (1989)).  "[C]ourts may ask only

8   whether the IRS issued a summons in good faith, and must eschew any broader role of

9   'oversee[ing] the [IRS's] determinations to investigate." *Id*. (*quoting Powell*, 379 U.S. at 56).

10  Accordingly, an evidentiary hearing is not automatically or normally held.

11      Instead, a party who seeks an evidentiary hearing must show "specific facts or

12  circumstances plausibly raising an inference of bad faith" or improper motive.  *Id*. at 2367-68.[8]

13  "Naked allegations of improper purpose are not enough . . . [the party] must offer some credible

14  evidence supporting his charge."  *Id*. at 2368.  "That standard will ensure inquiry where the facts

15  and circumstances make inquiry appropriate, without turning every summons dispute into a

16  fishing expedition for official wrongdoing."  *Id*.

17      **B.       Microsoft has failed to meet the requirements of *Clarke***

18              **1.       Microsoft's contention that the IRS is attempting to outsource an
                          inherently governmental function presents a legal question.**

19
20      The first basis on which Microsoft relies to argue it is entitled to an evidentiary hearing is

21  that — by allowing a third-party contractor to question witnesses at summons interviews — the

22  [8] *Clarke* did not change existing law, and the Supreme Court granted certiorari in order to correct the Eleventh
    Circuit's standard that a bare allegation of improper purpose entitled a party to an evidentiary hearing in an IRS
    summons enforcement case.  *Cf. United States v. Ali*, No. PWG-13-3398, 2014 WL 5790996 at *4 (D. Md. Nov. 5,
23  2014).  *Clarke* is consistent with pre-existing Ninth Circuit precedent.  *See Fortney*, 59 F.3d at 121 (requiring "some
    minimal amount of evidence" beyond "mere memoranda of law or allegations"), *cited in Clarke*, *supra*, at 3267 n.2.

1  IRS is attempting to outsource an inherently governmental function, and is enlisting the Court's

2  process to do so.[9]  This contention does not present facts or circumstances plausibly raising an

3  inference of bad faith.  Instead, it presents a legal question that does not properly fit into the

4  framework in determining whether a party is entitled to an evidentiary hearing under *Clarke*.

5  Certain of the  summonses demand interviews.  The IRS intends to allow Quinn Emanuel to

6  receive, review, and use summoned books, papers, records, or other data; be present during

7  summons interviews; question the person providing testimony under oath; and ask a summoned

8  person's representative to clarify an objection or assertion of privilege, all in the presence and

9  under the guidance of an IRS officer or employee.  *See* Treas. Reg. § 301.7602-1T.  Microsoft

10  argues that Quinn Emanuel's participation violates federal law because it claims that such action

11  amounts to outsourcing an inherently governmental function.  Microsoft further contends that, by

12  having the Court enforce these IRS summonses, the IRS is abusing the Court's process.

13       Microsoft has prematurely and inappropriately raised this issue.  The Court will

14  ultimately decide this issue in this case but is not required to, nor should it, do so now.[10]  The

15  issue now is whether Microsoft has presented "specific facts and circumstances plausibly raising

16  an inference of bad faith" or improper motive.  Having Quinn Emanuel be present and ask

17  questions at summons interviews as part of the summons process, in the presence and under the

18  guidance of an IRS officer or employee, does not "plausibly raise an inference of bad faith" or

19

20  [9] Although the summons does not specifically state that the IRS intends to have a third party ask questions at the
    summons interview, the IRS notified Microsoft and the summoned parties that it intended to have its contractors
    present and asking questions of the summoned parties pursuant to the summons. Docket No. 36, ¶ 11, Ex. C.

21
    [10] Microsoft agrees that the Court need not decide this substantive issue at this time.  *See* Microsoft Memorandum in
22  Support, p. 13.  In fact, the briefing schedule in these consolidated cases explicitly provides that the parties will brief
    the common defenses to enforcement of the summonses after the Court rules on Microsoft's motion for an
    evidentiary hearing.  *See* Docket No. 29.  Although the United States provides some discussion as to why Treas.
23  Reg. § 301.7602-1T(b)(3) is valid, *infra* pp. 17-20, this issue will be more fully addressed during the subsequent
    briefing pursuant to the Court's Briefing and Hearing Scheduling Order (Docket No. 29).

United States' Response to                          **U.S. Department of Justice**
Motion for Evidentiary Hearing                      Ben Franklin Station, P.O. Box 683
                          13                        Washington, D.C. 20044-0683

1   improper purpose because it has not been established that the IRS cannot legally do so.  If the

2   Court ultimately rules in favor of the United States on this legal issue and finds that the IRS is

3   not doing anything illegal or improper, then there is no abuse of the Court's process or bad faith.

4   Thus, this argument cannot and should not be considered in determining whether Microsoft is

5   entitled to an evidentiary hearing (and ultimately discovery).  In any event, even if the Court

6   ultimately determines that Quinn Emanuel cannot ask questions or even be present at summons

7   interviews, the Court can still enforce the summonses.  Nothing on the face of the summonses

8   stated or otherwise conditioned their issuance on Quinn Emanuel being allowed to be present and

9   ask questions during the summons interviews.

10          **2.      The IRS's decision to allow Quinn Emanuel to be present and ask
                        questions during a summons interview is legally supported.**

11

12          Notwithstanding Microsoft's premature and inappropriate raising of this issue now, the

13   IRS's decision to allow Quinn Emanuel, as part of the summons process, to be present and ask

14   questions during summons interviews, in the presence and under the guidance of an IRS officer

15   or employee, is fully supported by the law, and no evidentiary hearing is necessary or

16   appropriate.  Congress has delegated to the Secretary the authority to "prescribe all needful rules

17   and regulations for the enforcement" of the Internal Revenue Code.  *See* I.R.C. § 7805(a).  In

18   addition, I.R.C. § 6103(n) provides that the IRS can disclose tax returns and tax return

19   information to any person to the extent necessary to "provid[e] [] other services, for purposes of

20   tax administration" without violating Section 6103(a)'s general ban on disclosure of any such

21   information.  Section 6103(b)(4) defines "Tax administration" broadly as including "the

22   administration, management, conduct, direction, and supervision of the execution and application

23   of the internal revenue laws . . . and [] includes assessment, collection, enforcement, litigation,

publication, and statistical gathering functions under such laws."  And, as with all federal

1    government management, IRS management officials have the authority to "assign work, to make

2    determinations with respect to contracting out, and to determine the personnel by which agency

3    operations shall be conducted."  5 U.S.C. § 7106(a)(2)(B).  Thus, there can be no dispute that

4    Congress has delegated, and intended to delegate, to the IRS the authority to use contractors to

5    assist in the tax enforcement process.

6         It is correct that a contractor cannot perform an inherently governmental function.  *See*

7    Federal Activities Inventory Reform Act of 1998, 31 U.S.C. § 501 Note ("FAIR Act), § 5(2)(A)

8    48 C.F.R. § 7.503(a).  But Microsoft fails to acknowledge that inherently governmental functions

9    do not normally include "gathering information for or providing advice, opinions,

10   recommendations, or ideas to Federal Government officials."  *See* 31 U.S.C. § 501 note, at §

11   5(2)(C)(i); *see also* 48 C.F.R. § 2.101.  That is precisely the role Quinn Emanuel is playing with

12   respect to the IRS's examination of Microsoft:  Quinn Emanuel is assisting in gathering facts and

13   evidence, as well as providing advice, opinions, and recommendations to the IRS to assist the

14   IRS in performing its examination.  Asking questions of witnesses as part of the summons

15   process is part of the fact gathering that occurs during an IRS examination and thus does not

16   amount to an inherently governmental function.  On page 11 of its supporting memorandum,

17   Microsoft cites to an example, set forth in *The Office of Management and Budget, Office of*

18   *Federal Procurement Policy Letter 11-01, Performance of Inherently Governmental and Critical*

19   *Functions*, of representation of the government before administrative and judicial tribunals as an

20   inherently governmental function and then intimates that is what Quinn Emanuel has been

21   contracted to do.  Microsoft's comparison is unfounded.  The contract reveals that Quinn

22   Emanuel is not representing the Government before *any* tribunal.  Instead, the facts demonstrate

23

1  that Quinn Emanuel is merely assisting the IRS during the fact finding process that is part of the

2  IRS's examination.

3         Further legal support for allowing Quinn Emanuel to be present and question witnesses as

4  part of the summons process is found in Treas. Reg. § 301.7602-1T(b)(3), which provides as

5  follows:

6              For purposes of this paragraph (b), a person authorized to receive
               returns or return information under section 6103(n) and §
7              301.6103(n)–1(a) of the regulations may receive and examine
               books, papers, records, or other data produced in compliance with
8              the summons and, in the presence and under the guidance of an
               IRS officer or employee, participate fully in the interview of the
9              witness summoned by the IRS to provide testimony under oath.
               Fully participating in an interview includes, but is not limited to,
10             receipt, review, and use of summoned books, papers, records, or
               other data; being present during summons interviews; questioning
11             the person providing testimony under oath; and asking a
               summoned person's representative to clarify an objection or
12             assertion of privilege.

13  The Treasury issued this temporary regulation on June 18, 2014, pursuant to I.R.C. § 7805(a).

14  Treas. Reg. § 301.7602-1T expressly provides that it applies only to summons interviews

15  conducted on or after June 18, 2014.  *See* Treas. Reg. § 301.7602-1T(d).

16         Microsoft first contends that Treas. Reg. § 301.7602-1T(b)(3) is invalid because it

17  contravenes the unambiguous language of I.R.C. § 7602(a)(3), which provides that the Secretary

18  is authorized to take testimony as part of the IRS's examination process.  Microsoft is wrong.

19  The Internal Revenue Code does not define the phrase "take testimony," and that phrase has been

20  used in many different circumstances.  Further, Section 7602 does not define how an IRS

21  summons interview should be conducted or who may directly participate.  Since the statute is

22  unclear, the Secretary has provided guidance, pursuant to his authority under I.R.C. §§ 7805(a)

23  and 6103(n), as to who is allowed to be present and ask questions during an IRS summons

1    interview.  Because Treas. Reg. § 301.7602-1T(b)(3) is a reasonable interpretation of Section

2    7602, the Court should afford deference to it.  *See Chevron v. U.S.A., Inc. v. Natural Resources*

3    *Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *see also Mayo Found. For Medical Educ. And*

4    *Research v. United States*, 562 U.S. 44, 55-58 (2011).  Temporary Treasury regulations are also

5    afforded *Chevron* deference.  *See Hospital Corporation of America & Subsidiaries v.*

6    *Commissioner*, 348 F.3d 136, 140 (6th Cir. 2003); *UnionBanCal Corp. v. Commissioner*, 305

7    F.3d 976, 983-85 (9th Cir. 2002).

8        Next, contrary to Microsoft's unsupported assertion, Treas. Reg. § 301.7602-1T(b)(3)

9    does not violate the requirements of the Administrative Procedure Act ("APA").  Microsoft

10   contends that the Treasury could not issue Treas. Reg. § 301.7602-1T(b)(3) "without following

11   notice-and-comment procedures" but does not define what it believes those procedures entail.

12   Presumably Microsoft contends that the Treasury was required to provide the public with pre-

13   promulgation notice and comment under the APA, which would have entailed a general notice of

14   rulemaking in the Federal Register (5 U.S.C. § 553(b)) and an opportunity for interested parties

15   to comment on the rulemaking (5 U.S.C. § 553(c)).  This argument ignores the difference

16   between a temporary Treasury regulation and a final Treasury regulation and completely

17   disregards I.R.C. § 7805(e), which specifically addresses the procedural requirements applicable

18   to temporary Treasury regulations.

19       While Microsoft is correct that the APA requires an agency to adhere to notice-and-

20   comment procedures under the APA before promulgating a *final* regulation, there is no such

21   requirement with respect to a temporary Treasury regulation.  I.R.C. § 7805(e) provides that any

22   *temporary* regulation issued by the Treasury shall also be issued as a proposed regulation and

23   that any such temporary regulation is valid for only three years after the date it is issued.

1    Accordingly, a temporary Treasury regulation is not subject to pre-promulgation notice and

2    comment since it is subject to notice-and-comment procedures *after* issuance, due to it being

3    simultaneously issued as a proposed regulation.[11]  "[W]hen Congress sets forth specific

4    procedures that 'express[ ] its clear intent that APA notice and comment procedures need not be

5    followed,' an agency may lawfully depart from the normally obligatory procedures of the APA."

6    *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) (citation omitted).  If the absence of

7    notice and comment renders temporary regulations invalid (as Microsoft contends), then Section

8    7805(e) is meaningless.  Microsoft's argument thus violates the canon of construction that "'a

9    legislature is presumed to have used no superfluous words,'"  *Bailey v. United States*, 516 U.S.

10   137, 145 (1995) (citation omitted), and should be rejected.

11          Lastly, Microsoft argues that Treas. Reg. § 301.7602-1T(b)(3) is arbitrary and capricious

12   because it relies on factors that Congress did not intend the Treasury to consider.  Specifically,

13   Microsoft complains that Congress requires agencies to consider whether delegation of actions to

14   a contractor amounts to delegating inherently governmental functions, and that Treas. Reg. §

15   301.7602-1T(b)(3), allowing contractors to be present and question witnesses at an IRS

16   summons interview, is "substantially the same as" the inherently governmental function of

17   representing the Government before administrative and judicial tribunals.  As discussed above,

18   Treas. Reg. § 301.7602-1T(b)(3) does not delegate to contractors an inherently governmental

19   function.  Further, Microsoft has not pointed to any evidence that the contractor here, Quinn

20   Emanuel, is representing or attempting to represent the Government before *any* tribunal.  Instead,

21

22

23   [11] That is exactly what happened here.  Notice of proposed rulemaking by cross-reference to temporary regulations
     was issued on June 18, 2014, concurrent with issuance of the temporary regulation.  *See* 79 Fed. Reg. 34668-69.
     After issuance of Treas. Reg. § 301.7602-1T(b)(3), the Texas State Bar Association provided comments.

United States' Response to                          **U.S. Department of Justice**
Motion for Evidentiary Hearing                      Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

the facts demonstrate that Quinn Emanuel is assisting the IRS during its fact-finding process as part of the IRS's examination.  Accordingly, Microsoft's argument should be rejected.

### 3. The facts and circumstances do not raise a plausible inference that the IRS has "outsourced" the Examination to Quinn Emanuel.

Microsoft's factual attempts to meet the *Clarke* standard also fall short.  Microsoft argues that the timing of the awarding of the Quinn Emanuel contract gives rise to the inference that Quinn Emanuel was the driving force behind the July (and, presumably, August and October) IDRs, and also behind having the September and October interviews recorded.  Microsoft also argues that the IRS's response to its FOIA requests shows the IRS was attempting to conceal Quinn Emanuel's involvement.  But these are simply temporal correlations; there is not a scintilla of evidence supporting any inference that Quinn Emanuel was directing the Examination.[12]  The IRS was at all times controlling and directing the course of the Examination.

To show alleged impropriety, Microsoft attempts to connect the dots between the IRS awarding the Quinn Emanuel contract in May 2014, and the IRS issuing what Microsoft terms "a flood of new requests" for documents, in July 2014; but there is no connection to be made.  As established in the Second Hoory Declaration, although the contract was formally awarded in May 2014, Quinn Emanuel did not begin its work under the contract until July 15, 2014 — that is, *after* the July 2014 document requests had been issued.  Moreover, as the Second Hoory Declaration makes clear, Quinn Emanuel's role throughout has been simply to provide an advisory and supporting role, given its expertise in fact-intensive and expert-dependent positions. The Second Hoory Declaration also provides a comprehensive look at how the IRS managed the Microsoft Examination from 2012 onwards, and compels the conclusion that all the work Quinn

---

[12] As the Ninth Circuit has cautioned in a different context, the law does not compel a finding of causation based merely on "the 'logical fallacy of *post hoc, ergo propter hoc'* (literally, 'after this, therefore because of this')." *Kozulin v. INS,* 218 F.3d 1112, 1117 (9th Cir. 2000).

1   Emanuel has performed under the contract was completely proper and done under the direction

2   of IRS employees, who at all times made the final determinations, including during the time

3   period from July 15, 2014 onwards, when Quinn Emanuel began work under the contract.

4          Microsoft also purports to find Quinn Emanuel's hand in the fact that the September and

5   October 2014 interviews of current and former Microsoft employees were recorded.  Again,

6   there is no factual support for this assertion.  During an examination the IRS is statutorily

7   permitted to record an interview, 26 U.S.C. § 7521(a)(2), and although the earlier interviews in

8   the Examination were entirely informal and not recorded, that was purely an accommodation to

9   Microsoft to which the IRS acceded.  (Second Hoory Declaration ¶ 28.)  While Microsoft

10  describes the September and October recorded interviews as "an abrupt departure" (Memo, at 5)

11  from the IRS's prior practice, in fact the IRS had been conferring with Microsoft about having

12  recorded interviews since at least March 2014 (*id*. ¶ 44) — that is, well before Quinn Emanuel

13  was retained — and Microsoft was aware as early as 2012 that the IRS might seek to record

14  subsequent interviews for the Examination.  (*Id*. ¶¶ 28, 31, and Exhibits B and C to Second

15  Hoory Declaration.)  And, again, even if Quinn Emanuel did recommend that the IRS record the

16  interviews, that would be the very type of advice that a contractor hired for its expertise in fact

17  investigations would be expected to provide.

18         Microsoft also argues that the IRS delayed disclosing its retention of Quinn Emanuel.

19  But it was Mr. Hoory who disclosed to Microsoft (in a letter to Mr. Bernard of the tax

20  department), on August 28, 2014, that the IRS had retained Quinn Emanuel.  (Bernard

21  Declaration ¶ 16.)  The timing of this disclosure was appropriate, as it was made after the

22  necessary administrative processes were completed and before the upcoming September and

23

October interviews, which was the first time Quinn Emanuel attorneys would have any contact with Microsoft or its employees.

Moreover, regardless of when Microsoft obtained the contract documents, the point remains that the contract documents fail to show any impropriety whatsoever.  Quinn Emanuel was hired to provide advice to the IRS during the course of the Examination; Quinn Emanuel is legally allowed to provide such advice; and it has in fact been providing such advice.

## II.    Microsoft has failed to establish that discovery is warranted

As Microsoft concedes, it is well settled that district courts are not required to permit discovery or conduct evidentiary hearings in proceedings to quash or enforce IRS summonses. *United States v. Stuart*, 489 U.S. 353, 369 (1989); *United States v. Church of Scientology of California*, 520 F.2d 818, 821 (9th Cir. 1975).  This is in recognition of the established principle that summons enforcement proceedings are intended to be summary in nature.  *Chen Chi Wang v. United States*, 757 F.2d 1000, 1004-05 (9th Cir. 1985) (taxpayer's discovery request for production of all documents concerning the creation, formulation, and promulgation of a Treasury regulation in a summons matter was properly denied because of the summary nature of summons proceedings).  "The district court in a summary summons enforcement proceeding has great discretion to restrict or deny discovery; discovery . . . is the exception rather than the rule." *Id.*  "The party resisting enforcement should be required to do more than allege an improper purpose before discovery is granted." *Church of Scientology*, 520 F. 2d at 824.  That is because allowing discovery in what is meant to be a summary proceeding would place undue burdens on the IRS and improperly impede the summons enforcement procedure.  *Id.*  In the Ninth Circuit, limited discovery is allowed in summons enforcement proceedings only if after an evidentiary hearing is held "the taxpayer can make a substantial preliminary showing of abuse or wrongdoing." *United States v. Stuckey*, 646 F.2d 1369, 1374 (9th Cir. 1981).  Conclusory

United States' Response to
Motion for Evidentiary Hearing

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

allegations that the summons was issued for an improper purpose are not sufficient to justify

discovery in a summons proceeding.  *Adamowicz v. United States*, 531 F.3d 131, 160 (2d Cir.

2008).

Microsoft has failed to meet even the evidentiary standard required to warrant an

evidentiary hearing.  That same "evidence" certainly cannot meet the requisite "substantial

preliminary showing" to justify the taking of discovery.  Mere speculation and supposition,

which is the sum total of what Microsoft has offered this Court in its motion, is not sufficient to

meet the burden imposed for discovery in a summons matter.  Rather, the evidence presented by

the United States makes quite clear that enforcement of the summons would not be an abuse of

this court's process because the underlying audit is not being directed by Quinn Emanuel, *supra*

§ I.B.3.  Moreover, the validity of the temporary regulation is a legal question that does not

substantiate the conducting of discovery, *supra* § I.B.2.

Furthermore, Microsoft readily admits that the document discovery it seeks is the same

materials for which it has already made FOIA requests and has also filed suit.[13]  This sort of

litigation tactic is not what prior courts were contemplating when articulating the exceptional

summons enforcement case where discovery is justified.

Finally, even if Microsoft is permitted limited discovery under Rule 34, the United States

would still be entitled to assert the traditional privileges available to a party in discovery.  In this

instance, assuming the United States receives requests for production similar to what Microsoft

has proposed — that is, documents maintained by the IRS relating to the temporary Treasury

---

[13] Microsoft has submitted to the IRS five FOIA requests on matters related to issues it has raised in its pleadings in
this case.   Four of the requests, which were submitted in December 2014, are the subject of a pending FOIA suit,
*Microsoft Corp. v. Internal Revenue Service*, No. 2:15-cv-00369 (W.D. Wash.), filed March 11, 2015.  The first
FOIA request was resolved in *Microsoft Corp. v. Internal Revenue Service*, No. 1:14-cv-01982) (D.D.C.), filed
November 24, 2014.  *See* Declaration of Scott Hovey and Exhibits A-E thereto.

1   regulation at issue (similar to the properly denied discovery request made in *Chen Chi Wang*,

2   757 F.2d at 1004-05); documents exchanged between the IRS and Quinn Emanuel; and internal

3   IRS employee documents about the temporary regulation, the Examination, and the contract with

4   Quinn Emanuel — the United States would object because a large part of that material is

5   protected from production by either the attorney-client privilege or deliberative process privilege.

6   *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975) (deliberative process privilege

7   permits government to withhold documents that "reflect[ ] advisory opinions, recommendations

8   and deliberations comprising part of a process by which governmental decisions and polices are

9   formulated." (quotation marks omitted)); s*ee also Lahr v. Nat'l Transp. Safety Bd.,* 569 F.3d 964,

10  979 (9th Cir. 2009) (deliberative process privilege "shields certain intra-agency communications

11  from disclosure to allow agencies freely to explore possibilities, engage in internal debates, or

12  play devil's advocate without fear of public scrutiny" (internal citation and quotation marks

13  omitted)).  To the extent that Microsoft seeks discovery here because it believes it will receive

14  documents sooner than it will by its FOIA request, that belief is misplaced, as Microsoft would

15  still be required to overcome the United States' assertions of privilege.[14]

16

17

18

19

20

21

22  [14] Even in the FOIA context, an agency is not required to disclose records under 5 U.S.C. § 552(a) that "may be
withheld pursuant to one of the nine enumerated exemptions listed in § 552(b)."  *United States Dept. of Justice v.*
*Tax Analysts*, 492 U.S. 136, 150-51 (1989) (quoting *Department of Justice v. Julian*, 486 U.S. 1, 8 (1988)).   Again,

23  based on the nature of the request proposed by Microsoft in its motion, the United States will likely assert that
several of the statutory exemptions apply to justify withholding documents from disclosure.

United States' Response to                                    **U.S. Department of Justice**
Motion for Evidentiary Hearing                                Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1

**CONCLUSION**

2        Microsoft has failed to present credible evidence that plausibly raises an inference of

3   abuse and has likewise failed to make the "substantial" preliminary showing of abuse necessary

4   in order for it to be permitted to take discovery.  Accordingly, Microsoft's motion for an

5   evidentiary hearing and for discovery should be denied.

6        Dated this 14th day of April, 2015.

7                                          CAROLINE D. CIRAOLO
                                           Acting Assistant Attorney General

8
                                           */s Noreene Stehlik*
9                                          */s Jeremy Hendon*
                                           */s Amy Matchison*
10                                         NOREENE STEHLIK
                                           Senior Litigation Counsel, Tax Division
11                                         JEREMY HENDON
                                           AMY MATCHISON
12                                         Trial Attorneys, Tax Division
                                           U.S. Department of Justice
13                                         P.O. Box 683, Ben Franklin Station
                                           Washington, DC 20044-0683
14                                         Email:  Noreene.C.Stehlik@usdoj.gov
                                                   Jeremy.Hendon@usdoj.gov
15                                                 Amy.T.Matchison@usdoj.gov
                                                   Western.TaxCivil@usdoj.gov
16                                         Telephone:     (202) 514-6489
                                                          (202) 353-2466
17                                                        (202) 307-6422

18                                         ANNETTE L. HAYES
                                           Acting United States Attorney
19                                         Western District of Washington

20                                         *Attorneys for the United States of America*

21

22

23

1

## <u>CERTIFICATE OF SERVICE</u>

2

IT IS HEREBY CERTIFIED that service of the foregoing has been made this 14th day of

3

April, 2015, via the Court's ECF system to all parties and electronically to the following:

4

5

JAMES M. O'BRIEN
james.m.o'brien@bakermckenzie.com

6

ROBERT B. MITCHELL
robert.mitchell@klgates.com

7

dawnelle.patterson@klgates.com

8

DANIEL A. ROSEN
daniel.rosen@bakermckenzie.com

9

10

*/s/ Amy Matchison*
AMY MATCHISON

11

Trial Attorney, Tax Division
U.S. Department of Justice

12

13

14

15

16

17

18

19

20

21

22

23

United States' Response to
Motion for Evidentiary Hearing

25

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683