# EXHIBIT 12



**Part 4. Examining Process**

**Chapter 46. LB&I Guide for Quality Examinations**

**Section 4. Inspection and Fact Finding**

**4.46.4  Inspection and Fact Finding**

- 4.46.4.1  Overview
- 4.46.4.2  Examination Techniques Used to Gather Evidence
- 4.46.4.3  Researching Federal Tax Law
- 4.46.4.4  Information Document Request Management Process
- 4.46.4.5  Penalty Consideration
- Exhibit 4.46.4-1  IDR Management Process
- Exhibit 4.46.4-2  Taxpayer Memorandum of Understanding - IDR Management Process
- Exhibit 4.46.4-3  Form 4564, Information Document Request- First Follow Up
- Exhibit 4.46.4-4  Form 4564, Information Document Request - Second Follow Up
- Exhibit 4.46.4-5  Examination Techniques
- Exhibit 4.46.4-6  Guidance for Examiners and Managers on the Codified Economic Substance Doctrine and Related Penalties

**Manual Transmittal**

November 25, 2011

**Purpose**

(1) This transmits revised IRM 4.46.4, LB&I Guide for Quality Examinations, Inspection and Fact Finding.

**Material Changes**

(1) Added new subsection 4.46.4.5.9 on the Economic Substance Doctrine, requiring DFO approval of penalties applied under IRC section 6662(b)(6).

(2) Added Exhibit 4.46.4-6, "Guidance for Examiners and Managers on the Codified Economic Substance Doctrine and Related Penalties" .

(3) Replaced references to "Large and Mid-Size Business" and "LMSB" with "Large Business and International" and "LB&I" , respectively.

(4) Hyperlinks updated throughout.

**Effect on Other Documents**

This IRM incorporates LB&I directives LMSB-20-0910-024, "Codification of Economic Substance Doctrine and Related Penalties" and LB&I-4-0711-015, "Guidance for Examiners and Managers on the Codified Economic Substance Doctrine and Related Penalties" . IRM 4.46.4 dated December 29, 2009 is superseded.

**Audience**

LB&I Team Managers, Specialist Managers, Specialists, and Revenue Agents.

**Effective Date**

(11-25-2011)

Lavena B. Williams
Acting Director, Pre-Filing and Technical Guidance
Large Business and International Division

**4.46.4.1  (12-29-2009)**
**Overview**

1. LB&I examiners, individually or as a team member, conduct independent examinations and related investigations of the most complex tax returns filed by large businesses, corporations, partnerships, and other organizations, which may include those with extensive subsidiaries, diversified activities, multiple partners, and national or international scope and operations. Examiners must be able to identify areas of noncompliance and factually develop issues to determine the correct tax liability as prescribed by the Internal Revenue Code. Examiners must correctly interpret and apply the law in light of congressional intent, in a fair and impartial manner, based on the facts and circumstances of the case.

2. The examiners must review sufficient documents/information to determine the accuracy of the taxpayer's return. The amount of documents/information to be reviewed and the depth of the examination is a matter of professional judgment. This decision is important because of the prohibitive cost of examining and evaluating all available documents/information.

3. Researching Federal tax law is essential to developing issues and supporting audit determinations. Various authorities should be consulted and cited when resolving issues.

4. The Information Document Request (IDR) Management Process is a formal, structured process to request and secure information from the taxpayer. This process will be used for both Coordinated Industry Cases (CIC) and Industry Cases (IC).

5. The Internal Revenue Code contains numerous civil tax penalties that examiners must address and document during their examinations. Examiners must also be alert to indications of fraud. See 20.1.5.12.1, Indications of Fraud.

**4.46.4.2  (12-29-2009)**
**Examination Techniques Used to Gather Evidence**

1. The following are some of the examination techniques used to gather evidence:

    A. Interviews (IRM 4.10.3.2);

    B. Tours of Business Sites (IRM 4.10.3.3);

    C. Evaluation of the Taxpayer's Internal Controls (IRM 4.10.3.4);

    D. Examining the Taxpayer's Books and Records (IRM 4.10.3.5);

    E. Analyzing Schedules M-1, M-2, M-3 (IRM 4.10.3.6 & Schedule M-3 on the LB&I website for Revenue Agents);

    F. Balance Sheet Analyses (IRM 4.10.3.8);

    G. Testing Gross Receipts or Sales (IRM 4.10.3.9);

    H. Testing Expenses: Cost of Goods Sold (IRM 4.10.3.10);

    I. Testing Expenses: Operational Cost (IRM 4.10.3.11);

    J. Sampling Techniques (IRM 4.10.3.12.1).

2. Further guidelines and procedures that can be used in conducting an effective examination are found in IRM 4.10.3, Examination Techniques. Some of the examination techniques listed in IRM 4.10.3 (such as a bank deposit analysis) are not appropriate procedures for the audit of a LB&I taxpayer. Additional exam techniques can be found in exhibit 4.46.4-5.

### 4.46.4.2.1  (03-01-2006)
### Interviews

1. Section 7602 authorizes the Secretary or a delegate to examine books and records and to take testimony under oath.

2. Interviews provide information about the taxpayer's financial history, business operations, and books and records. They are used to obtain leads, develop facts, and establish evidence. The testimony of witnesses and the confessions or admissions of alleged violators are major factors in resolving tax cases. Cases may be developed through the testimony of witnesses. The record of interviews will usually take one of the following forms:

    A. Transcript of interview;

    B. Question -and-answer statement;

    C. Affidavit;

    D. Memorandum of interview; or

    E. Recording.

### 4.46.4.2.2  (03-01-2006)
### Tours of Business Sites

1. Treasury Regulation 301.7605-1(d)(3)(iii) states: "regardless of where an examination takes place, the Service may visit the taxpayer's place of business to establish facts that can only be established by direct visit, such as inventory or asset verification. The Service generally will visit for these purposes on a normal workday of the Service during the Service's normal tour of duty hours."

2. Tours of business sites should be conducted during examinations of all business entities. Generally, the principal location, and any locations acquired during the period under examination, should be visited. See IRM 4.10.3.3.2, Conducting Tours of Business Sites.

### 4.46.4.2.3  (03-01-2006)
### Evaluation of the Taxpayer's Internal Control

1. The evaluation of internal controls will assist examiners in determining the accuracy and reliability of the taxpayer's books and records. Additionally, the evaluation of internal controls should be part of the decision making process used to determine the scope and depth of the examination.

### 4.46.4.2.4  (03-01-2006)
### Examining the Taxpayer's Books and Records

1. It is important to determine the taxpayer's method of accounting for both book and tax purposes. An accounting method is a system for stating income, expenses, assets, liabilities, and financial position. Taxable income must be computed not only on the basis of a fixed accounting period, but also in accordance with a method of accounting regularly employed in keeping the taxpayer's books that clearly reflects income.

### 4.46.4.2.5  (03-01-2006)
### Analyzing Schedules M-1, M-2, M-3

1. Schedule M-1 or M-3 is a critical schedule for identifying potential tax issues resulting from both temporary and permanent differences between financial and tax accounting.

2. It is important to verify that net income per the taxpayer's books agrees with net income per Schedule M-1 or M-3. It is also crucial to perform a reconciliation of the taxpayer's worldwide net income (or loss) according to the income statement. In addition, the taxpayer's reconciliation of net income per books to net income per Schedule M-1 or M-3 should be obtained.

3. The taxpayer's workpapers should be obtained for all Schedule M-1 or M-3 adjustment calculations and corresponding supporting schedules. Significant Schedule M-1 or M-3 adjustments should be reviewed. Missing Schedule M-1 or M-3 adjustments should be considered when the workpapers are reviewed.

4. Schedule M-2 is used to analyze all changes in the retained earnings account per books during a given accounting period.

5. Retained earnings and their tax effect should be reviewed when material changes are made.

### 4.46.4.2.6  (03-01-2006)
### Balance Sheet Analysis

1. Balance sheet accounts should be reviewed if significant balances and/or material fluctuations occur.

    A. Accounts should be reviewed if they reflect either permanent or timing differences between tax and book.

    B. These accounts should be reconciled with the Schedule M-1 or M-3 adjustments.

**4.46.4.2.7  (03-01-2006)**
**Testing Gross Receipts or Sales**

1. Each examination is unique. The examiner must use techniques which are effective in the conduct of the specific audit. In addition, the examiner should be alert for taxable income which may not appear as income on the taxpayer's books, (accounting methods, timing of recognition, deferred income, constructive receipts, foreign source income, and related foreign transactions). Refer to IRM 4.10, Examination of Returns.

**4.46.4.2.8  (03-01-2006)**
**Testing Expenses: Cost of Goods Sold**

1. Testing the Cost of Goods Sold (COGS) may include reviewing beginning and ending inventories, compliance with the absorption rules in the regulations for sections 263A and 471, and variance accounts when standard costing is used. Refer to IRM 4.10, Examination of Returns.

**4.46.4.2.9  (03-01-2006)**
**Testing Expenses: Operating Expenses**

1. The examiner should scan the expenses per the return and examine those which are large, unusual, or questionable. In addition, the examiner should select issues by understanding the taxpayer's accounting methods and their applications to timing and economic performance, expense versus capitalization, tax shelter write-offs, contingent liability accruals, material write-offs for tax and not for books, net operating loss carryforward and carryback, etc.

**4.46.4.2.10  (03-01-2006)**
**Sampling Techniques**

1. The two basic types of sampling are judgment sampling and statistical sampling.

    A. Judgment sampling requires examiners to use professional judgment in performing the sampling procedure and in evaluating the results of the sample.

    B. Statistical sampling is a procedure used to choose a portion of the whole to make a statement about the entire population. Other terms applied to statistical sampling include probability sampling and random sampling.

2. CAS assistance must be requested for issues involving statistical sampling, whether originated by the IRS or by the taxpayer.

**4.46.4.2.11  (03-01-2006)**
**Additional Guidance on Examination Techniques**

1. IRM 4.10 Examination of Returns, provides further guidelines for procedures that should be used in conducting an effective examination.

**4.46.4.3  (03-01-2006)**
**Researching Federal Tax Law**

1. LB&I examiners must consider the various legal authorities and guidance available to them when developing and resolving issues. Some of these include:

    A. Internal Revenue Code;
    B. Committee Reports;
    C. Treasury Regulations;
    D. Revenue Rulings;
    E. Delegation Orders;
    F. Private Letter Rulings;
    G. "Technical Advice Memoranda/Technical Expedited Advice Memoranda; "
    H. Court Opinions;
    I. Tax Treaties.

2. IRM 4.10, Examination of Returns provides a detailed explanation of each of these sources and the format for citing them in reports.

3. Electronic tax research is recommended using IRS contracted subscription internet services (i.e. Westlaw, LexisNexis or Accurint). You can access information and obtain references for a given topic by searching for specific key words or key word groups.

**4.46.4.4  (03-01-2006)**
**Information Document Request Management Process**

1. The Information Document Request (IDR) Management Process will be used for Coordinated Industry Cases (CIC), as well as Industry Cases (IC). The process will not preclude the examination team from using judgment on a case-by-case basis.

2. The IDR Management Process gives the examination team a structured process to use when gathering information during an examination. The process encourages collaboration between the taxpayer and IRS personnel to agree on and provide information needed to support an examination.

3. Both general procedures and delinquent procedures are part of the IDR Management Process found in Exhibit 4.46.4-1.

#### 4.46.4.4.1  (03-01-2006)
#### General Procedures

1. Form 4564, Information Document Request, or a computer facsimile thereof, should be used to request information from the taxpayer. Four copies of the form should be prepared and distributed as follows:

   A. The original and one copy will be given to the taxpayer, one to be retained in the taxpayer's files and one to be returned with the information requested;

   B. The third copy of the IDR will be filed in the IDR Log (Form 5699 or similar computer listing). The team coordinator (CIC examination) or revenue agent (IC examination) is responsible for maintaining the IDR Log. Appropriate information should be listed in the log as IDRs are issued. The team manager is responsible for ensuring that the IDR Log is properly, accurately, and timely completed;

   C. The fourth copy will be maintained by the issuing agent.

2. It is essential that all IDRs be specific, clear, and concise. Prior to the preparation of an IDR and when appropriate, team members will discuss with the taxpayer the types of information needed in order to determine what records are available. This will ensure that the request is specific.

3. Requests for information should be followed up and documented by the team coordinator (CIC) or revenue agent (IC) in the IDR Log. In instances where delays are encountered in the receipt of information, the team manager will become involved. Where appropriate, specialists' managers and other management officials should become involved when unusual delays are encountered.

4. Team managers and examination teams (team coordinator and team members) will discuss the process for IDR management and collaborate with the taxpayer concerning IDR response times and alternatives during the opening conference of CIC examinations. Response times should be expressed in calendar days. The team manager and the revenue agent will discuss the process for IDR management, including response times, with the taxpayer during the early stages of IC examinations. In addition:

   A. The IDR Management Process will become part of the CIC and IC Examination Plans; and

   B. A Memorandum of Understanding (MOU) signed by the taxpayer and examiner should be used to set a mutually agreed IDR response date and explain the procedures for handling IDRs that are delinquent. Refer to Exhibit 4.46.4-2, Taxpayer Memorandum of Understanding - IDR Management Process for suggested wording of the MOU.

#### 4.46.4.4.2  (03-01-2006)
#### Delinquent Procedures

1. The CIC team coordinator or IC revenue agent should follow up with the taxpayer when the IDR is 15 calendar days delinquent. Problems that exist and reasons for the delay should be discussed and resolved if possible, and the team manager should become involved if necessary. All discussions/actions should be documented. If it appears that the requested information will not be forthcoming, the examination team should:

   A. Evaluate other means or sources for obtaining the needed information;

   B. Prepare and issue a follow up IDR to request the information that remains outstanding, if necessary. The response date for the follow up IDR should be a reasonable date based on discussions with the taxpayer, but generally not more than an additional 15 days from the date of issuing the follow up IDR (30 days from the original response date, or thereabouts); and

   C. Attach the original IDR to the follow up IDR, or incorporate the original IDR wording in the follow up IDR using the same IDR number. Special wording as suggested in Exhibit 4.46.4–3 and Exhibit 4.46.4-4, for the first follow up IDR or for subsequent follow up IDRs may be used at the discretion of the examination team.

2. If the IDR is still delinquent on the 45th day from the original response date, the team manager will meet with the taxpayer and/or representative and the IDR issuer and will take the following steps:

   A. Address the issue and emphasize the importance of factual development;

   B. Ascertain the taxpayer's intention to comply with the request;

   C. Discuss consequences of not responding to the IDR;

   D. Consider issuance of a Form 5701, Notice of Proposed Adjustment;

   E. Consider involving high-level IRS officials (territory manager, etc.) and senior corporate officers; and

   F. Advise the territory manager of the IDR problems and consult with Area Counsel as needed.

3. If the IDR remains delinquent on the 90th calendar day, conduct a joint IDR status meeting to include; senior corporate officers, territory manager, team manager, Area Counsel and IDR issuer. During the meeting:

   A. Address the issue and records needed to make a determination;

   B. Clearly explain the consequences for not complying with the IDR or not abiding by the agreement reached;

   C. Reach agreement on a specific date by which the taxpayer will comply with the IDR; and

   D. Consider the issuance of a summons or formal document request under IRC section 982. Circumstances may warrant issuance of a summons prior to 90 days.

4. In appropriate cases, the examiner should consider the issuance of a Formal Document Request under IRC section 982 when the taxpayer fails to comply with an IDR. See IRM 4.61.2, Foreign Based Books and Records, and IRM 4.61.4 Information Gathering.

#### 4.46.4.4.3  (03-01-2006)
#### Exception Guidelines for the Delinquent Procedures

1. Team managers must document departures from the delinquent procedures outlined in the IDR Management Process on the case visitation log or the Examining Officers Activity Record (Form 9984).

2. The IDR Management Process does not preclude the examination team from using judgment on an issue-by-issue basis. Realistic and cooperatively reached due dates for information requested by an IDR are key to the process. It is a good practice to have a pre-IDR meeting to ensure the IDR responses address the specific needs of the examiner. At this meeting the agent and the taxpayer discuss exactly what is needed and how best to obtain the information in order to eliminate ambiguity. A realistic due date can be mutually agreed upon after the pre-IDR meeting is held. There is latitude for the team coordinator (CIC) or revenue agent (IC) to extend the IDR due date but the following must be adhered to:

   A. There must be continuous dialogue with the taxpayer and follow up on the 15th, 30th, 45th, and 90th day of delinquency. Generally, the delinquency period begins after the original due date. However, when the extension date is established prior to the expiration of the original due date, the delinquency period starts after the extended date;

   B. The examiner should document the case file if follow up is not made during the specified time frames, by including the revised due dates and stating the reason(s). Similarly, the examination team should advise the taxpayer of the status of the IDR response. This includes informing the taxpayer within 15-30 days after receiving the response as to whether the IDR response was sufficient or will require a follow up;

   C. Management should be involved when the IDR approaches the 45th day of delinquency. However, the degree of managerial involvement and at what stage will vary. The decision to deviate from the process is made by the team manager.

3. The following are some factors to consider when deciding whether an exception to the delinquent procedures is appropriate:

   - Taxpayer's history of cooperation and IDR responses;
   - Taxpayer's attitude;
   - Team coordinator (CIC) and revenue agent (IC) experience; and
   - Availability of resources or information that changes the scope and depth of the examination.

### 4.46.4.5  (03-01-2006)
### Penalty Consideration

1. The Service maintains an ongoing effort to develop, monitor and revise programs designed to assist taxpayers in complying with legal requirements and to avoid penalties. As indicated in Policy Statement P-20-1, the Service uses penalties to encourage voluntary compliance.

2. Policy Statement P-20-1 also states that the IRS administers a penalty policy that is designed to:

   A. Ensure consistency;
   B. Ensure accuracy of results in light of the facts and the law;
   C. Provide methods for taxpayers to have their interests heard and considered;
   D. Require impartiality and commitment to achieve the correct decisions;
   E. Allow for prompt reversal of initial determinations when sufficient information has been presented to indicate that the penalty is not appropriate;
   F. Ensure that penalties are used for their proper purpose and not as bargaining points in the development or processing of cases.

### 4.46.4.5.1  (12-29-2009)
### Examiner Responsibility

1. The examiner is responsible for identifying the appropriate penalties, determining whether to assert penalties, and accurately calculating the penalty amount.

2. Examiners must document the manager's involvement on Form 9984, Examining Officer's Activity Record and in the workpapers related to the penalty under consideration.

### 4.46.4.5.2  (03-01-2006)
### Managerial Involvement

1. The team manager must be actively involved with the development of all penalty issues.

   - Coordination with Criminal investigation, and area specialists may be required.

2. The team manager must approve:

   - Any penalty asserted and
   - Any case where there is a substantial understatement of tax and no penalty proposed.

3. For more information, see IRM section 20.1.5.1.6.

### 4.46.4.5.3  (03-01-2006)
### Common Penalties

1. See IRM 20.1, Penalty Handbook, for a list of common civil tax penalties. This list includes the applicable IRC section, penalty amount and description, penalty reference numbers, detailed explanation and computation methods. These penalties include the following:

   A. Estimated tax understatement;
   B. Failure to file;
   C. Failure to pay (on returns secured by LB&I);
   D. Fraud;

  E. Frivolous returns;

  F. Accuracy-related penalties on underpayment, including negligence or disregard of rules or regulations, substantial understatement of income tax, substantial or gross valuation misstatements;

  G. Accuracy-related penalties on understatements with respect to a reportable transaction; and

  H. Failure to include reportable transaction information with a return.

#### 4.46.4.5.4  (03-01-2006)
#### Penalties Relating to International Issues

1. There are very specific penalties relating to international issues. The identification of the appropriate penalties relating to international issues are the responsibility of the international examiner and the international manager. IRM 20.1.9, International Penalties, provides more details.

#### 4.46.4.5.5  (12-29-2009)
#### Fraud

1. A civil fraud penalty case may be developed based on the facts and circumstances of a civil examination or may occur at the completion of a criminal prosecution case. In either situation, the examiner and team manager must contact their local Fraud Technical Advisor when fraud is suspected. The examiner and Fraud Technical Advisor will jointly prepare Form 11661, Fraud Development Recommendation – Examination.

2. Assertion of this civil penalty is a shared responsibility of the examiner, team manager, and Fraud Technical Advisor. Civil fraud determinations no longer require a referral or concurrence by Criminal Investigation. All procedures outlined in IRM 25.1.6 relative to civil fraud cases must be followed.

3. If during the fraud development process, firm indications of fraud exist and criminal criteria is met, a referral via Form 2797, Referral Report of Potential Criminal Fraud, must be prepared and submitted via the Fraud Technical Advisor to Criminal Investigation.

4. Specific guidance on all aspects of both criminal and civil fraud may be found in IRM 25.1, Fraud Handbook. IRM 25.1.10 specifically addresses additional procedures required for LB&I cases. Additional information is available on the LB&I Fraud web site http://lmsb.irs.gov/hq/pqa/Post-filing/fraud_LMSB_home.asp .

#### 4.46.4.5.6  (03-01-2006)
#### Workpaper Documentation on Penalties

1. The case file should fully document the consideration, assertion or non-assertion, and computation of all applicable penalties. An applicable penalty is defined to be one which the legal premise for application is present in the case. The decision to assert penalties must have a legal basis in the Internal Revenue Code or other authority.

2. Penalties should not be asserted without an explanation. The extent of the explanation will depend on the nature of the adjustments and the amounts involved. However, canned statements, such as "negligence penalty applicable" or "negligence penalty deemed to be not applicable " , are not sufficient.

3. Alternative penalty positions should be documented in the workpapers when applicable (e.g., fraud versus negligence penalties, and various components of the accuracy-related penalty).

#### 4.46.4.5.7  (03-01-2006)
#### Burden of Proof Regarding Assessment of Penalties

1. Section 7491(c), which applies only to individuals, states that the IRS has the burden of production in a court proceeding when the issue is a penalty, an addition to tax, or an additional amount imposed by the Internal Revenue Code. The IRS must first present evidence that imposition of the amount is appropriate. Only then must the taxpayer assume the ultimate burden of persuasion to raise appropriate defenses, such as reasonable cause, to the imposition of the penalty.

#### 4.46.4.5.8  (03-01-2006)
#### Definitions

1. The following definitions are related to the burden of proof requirements for assessment of penalties:

  A. "Penalties" include all penalties assessed under Title 26 and/or 31. An example is section 6662 that imposes the accuracy-related penalty;

  B. "Addition to Tax" is any amount computed by reference to the amount of tax. An example is the addition to tax imposed by section 6654 for failure by an individual to pay estimated income tax;

  C. "Additional Amount" refers to an amount that can be assessed by the IRS that is not an addition to tax or penalty. An example is the amount imposed under section 6673 for the sanctions and costs awarded by a court when a taxpayer's position is frivolous. Additional amounts under section 7491(c) do not include excise taxes imposed by Chapters 42 and 43 of the Internal Revenue Code or interest under section 6601.

#### 4.46.4.5.9  (11-25-2011)
#### Economic Substance Doctrine

1. On March 30, 2010, the Health Care and Education Reconciliation Act was enacted. This law amended the Internal Revenue Code to codify the Economic Substance Doctrine under IRC Section 7701(o). It also amended penalty provisions under sections 6662, 6662A, 6664, and 6676.

2. IRC section 6662 was amended to add a new penalty to be applied to any underpayment attributable to transactions lacking economic substance. The new penalty under IRC section 6662(b)(6) applies a 20 percent penalty on noneconomic substance transactions. IRC section 6662(i) increases the penalty to 40 percent if the relevant facts affecting the tax treatment are not disclosed. The penalty will be applicable for transactions entered into after March 30, 2010.

3. **Any proposal to impose an IRC section 6662(b)(6) penalty at the examination level must be reviewed and approved by the appropriate Director of Field Operations before the penalty is proposed in order to ensure consistent administration of the accuracy-related penalty.**

4. The LB&I Commissioner has issued guidance which instructs examiners and their managers on how to determine when it is appropriate to seek the approval of the DFO in order to raise the economic substance doctrine. The examiner is required to develop and analyze a series of inquiries outlined in four steps before obtaining DFO approval when it is determined that the economic substance doctrine is applicable. The four steps are:

  A. **Step one - DOCTRINE LIKELY NOT APPROPRIATE:** The examiners must evaluate a number of factors that tend to show that application of the economic substance doctrine to a transaction is likely not appropriate. If the examiner continues to believe that the doctrine applies, go to step two.

- B. **Step two - DOCTRINE MAY BE APPROPRIATE:** Requires the examiner to evaluate further whether additional circumstances in the case are those that tend to show that application of the doctrine is appropriate.
- C. **Step three - DEVELOPMENT OF CASE FOR APPROVAL:** If the examiner continues to believe the application of the doctrine is warranted after conducting steps 1 and 2, a series of seven inquiries must be made before seeking approval to apply the doctrine.
- D. **Step four - DFO APPROVAL:** If the examiner and his or her manager and territory manager determine that the application of the doctrine is merited, guidance is provided on how to request DFO approval.

Exhibit 4.46.4-6 contains the full guidelines set forth for each step.

5. In addition, the penalties provided in sections 6662(b)(6) and (i) and 6676 are limited to the application of the economic substance doctrine and may not be imposed due to the application of any other "similar rule of law" or judicial doctrine (e.g., step transaction doctrine, substance over form or sham transaction).

**Exhibit 4.46.4-1**
**IDR Management Process**

Information Document Request (IDR) Management Process User Guidelines - IDR Management Process Overview

A formal, structured process has been established to request and secure information from the taxpayer. This process promotes cost effectiveness and quality examinations with the least burden on both the taxpayer and the government. The importance of timely responses is emphasized as it will improve cycle time and currency of cases, while at the same time, focusing on early issue resolution. The following Information Document Request (IDR) Management Process will be used for Coordinated Industry Cases (CIC) and Industry Cases (IC). This process will not preclude the examination team from using judgment on a case by case basis. The IDR Management Process will do the following:

- A. Provide more complete and timely responses to IDRs;
- B. Provide open and meaningful communication between all team members and the taxpayer;
- C. Provide consistent treatment of taxpayers;
- D. Heighten taxpayer awareness of the IDR Management Process;
- E. Improve understanding of expectations;
- F. Improve the timeliness and the quality of documentation received;
- G. Establish a sound foundation for issue development;
- H. Promote earlier issue resolution;
- I. Heighten territory manager's and team manager's involvement;
- J. Promote better written and complete IDRs; and
- K. Improve awareness of outstanding IDRs.

The IDR Management Process requires effective collaboration between the IRS and the taxpayer and begins at the opening conference where the process will be discussed in its entirety. It is essential to conduct meetings with the taxpayer at key points of the IDR Management Process to ensure a more active involvement by all parties. In general, a series of conferences and follow ups with the taxpayer on IDRs will be conducted on the 15th, 30th, and 45th calendar day of the delinquency. This series of conferences would not preclude the examination team from having monthly or quarterly meetings with corporate officials to discuss outstanding IDRs. If the information request is still delinquent on the 90th calendar day, a joint IDR status meeting will be held to include the territory manager, Area Counsel, team manager, IDR issuer and senior corporate officers of the taxpayer to address the issue and records that are needed for making a determination.

**STEPS FOR IMPLEMENTING THE IDR MANAGEMENT PROCESS**
The territory manager and examination team (team manager, team coordinator, and team members) will:

- A. Discuss the process for IDR management and collaborate with the taxpayer concerning IDR response times and alternatives during the opening conference;
- B. Incorporate the IDR Management Process in the Large Case Examination Plan ( Form 4764, Part I) for CIC examinations. Part I will be signed by both the taxpayer and IRS. For IC examinations, a Memorandum of Understanding (MOU) signed by the taxpayer and examiner will be made part of the examination plan. Refer to Exhibit 4.46.4-2 for suggested wording of the MOU;
- C. Analyze potential issues and identify the type of documentation to be requested;
- D. Discuss with the taxpayer and seek the taxpayer's assessment of what records are available to resolve an issue and identify problems and difficulties in retrieving that documentation;

  | (1) | Agree on the records necessary to address the examiner's issues or concerns; |
  |---|---|
  | (2) | Document the mutual understanding of the records to be provided; and |
  | (3) | Identify alternative means of obtaining the records (e.g., computer audit specialist, etc.). |

- E. Consider alternative sources for relevant information, e.g., SEC filings, business articles, etc;
- F. Prepare Form 4564 (Information Document Request) or a computer facsimile in quadruplicate;

  | (1) | Generally, the IDR will be limited to one issue; |
  |---|---|
  | (2) | The team coordinator will review the IDR to ensure that it addresses the issue in a clear and concise manner; |
  | (3) | The IDR issuer and the taxpayer will meet to review the IDR for completeness. The IDR will express the oral agreement between the taxpayer and team member in a written format. |

  (i) After the review, the original and a copy will be given to the taxpayer.

  (ii) The third copy of the Form 4564 will be filed in the IDR Log ( Form 5699 or computer facsimile).

  (iii) The examiner requesting the information will keep the fourth copy of the Form 4564.

G. Upon receipt of the response to the request for information, the requester will timely review the records received for completeness;

| (1) | If the response to the IDR is complete, proceed with the examination process; |
|---|---|
| (2) | If the response to the IDR is incomplete, confer with the taxpayer, clarify the IDR and establish a response date for the missing information. Discuss other means or sources for obtaining needed information (e.g., reconstruction of records, oral testimony, etc.); and |
| (3) | If the response to the IDR is complete, but additional information is needed, prepare and issue a new IDR with a new response date. |

H. Follow up when the IDR response is 15 calendar days delinquent. The examination team must exercise good judgment on a case-by-case basis with respect to the type of follow up performed. For example, a follow up IDR may not be necessary if the information will be received in a reasonable time frame based on the facts and circumstances;

| (1) | Confer with the taxpayer for resolution. Discuss problems that exist and the reasons for the delay. If necessary, consider team manager's involvement. It is essential that the discussion be documented for factual development and verification; |
|---|---|
| (2) | Continue evaluating other means or sources for obtaining the needed information to strive for earlier issue resolution. |

I. Prepare and issue a follow up IDR on the delinquent response to the requests for information if necessary. The response date for the follow up should be a reasonable date based on discussions with the taxpayer, but generally not more than an additional 15 days from the date of issuing the follow up IDR (30 days from the original response date, or thereabouts);

| (1) Maintain the same IDR number; |
|---|
| (2) The follow up IDR must have either the original IDR attached or incorporate the original IDR wording into the follow up; and |
| (3) Special wording as suggested in Exhibit 4.46.4–3 (for the first follow-up) and Exhibit 4.46.4–4 (for subsequent follow up IDRs) may be used at the discretion of the examination team. |

J. If a response to the requests for information continues to be delinquent, follow-up where pursuit of the issue is necessary and insufficient facts exist to resolve the issue;

| (1) Confer with the taxpayer. Define the problem, determine the reasons for the delay and document the file; |
|---|
| (2) Identify possible alternative means to resolve the issue for which the IDR was prepared. Review and discuss potential 3rd party sources for the information and documentation; |
| (3) Identify any extenuating circumstances that may contribute to the delay and document the workpapers for future tracking; and |
| (4) Evaluate the merits of the issue. Consider the issuance of an IDR follow up on the delinquent response to the requests for information, the issuance of a Notice of Proposed Adjustment (Form 5701), or non-pursuit of the issue based on an evaluation of information/documentation currently available. |

K. If the issue still exists and information is lacking for making a determination, prepare and issue a follow up IDR. The response date should be a reasonable date based on discussions with the taxpayer, but generally not more than an additional 15 days from the date of issuing the follow up IDR (or approximately 45 days from the original response date). See (i) above for instructions, but disregard reference to the 30 days.;

L. If on the 45th day from the original response date the taxpayer is still delinquent, follow up, if appropriate. Refer to (i), (j) and (k) above for instructions for the 3rd follow up. In (k), disregard reference to "45 days" ;

M. The team manager should meet with the taxpayer or representative, and the IDR issuer, if the IDR response is 45 days delinquent. The team manager's involvement is important and should be ongoing throughout the process;

| (1) | In this meeting, address the issue and emphasize the importance of factual development. Ascertain taxpayer expectations for complying with the request. |
|---|---|
| (2) | Discuss consequences for not responding to the IDR. |
| | (I) Consider issuance of a Notice of Proposed Adjustment (Form 5701); |
| | (ii) Consider involving high-level IRS officials and senior corporate officers (e.g., territory manager, etc.). |
| (3) | The team manager should advise the territory manager of IDR problems and consult with Area Counsel as needed. |

N. Conduct joint IDR status meeting to include senior corporate officers, territory manager, team manager, Area Counsel and IDR issuer after 90 days delinquent.

| (1) In this meeting, address the issue(s) and the records needed to make a determination. |
|---|
| (2) Reach agreement on a specific date that the taxpayer will comply with the IDR. |
| (3) Clearly state the alternative action that may be appropriate for not complying with the IDR or not abiding by the agreement reached. |
| (4) Consider the issuance of a summons or formal document request under section 982. |

**Exhibit 4.46.4-2**
**Taxpayer Memorandum of Understanding - IDR Management Process**

**DEPARTMENT OF TREASURY**
**INTERNAL REVENUE SERVICE**
**WASHINGTON, DC 20224**

**LARGE BUSINESS AND INTERNATIONAL DIVISION**

**DATE:**
**MEMORANDUM FOR TAXPAYER**
**From:**                           Examination Team
**Subject:**                        Memorandum of Understanding for IDR Management Process Between Taxpayers and Examination Team

1. We agree to a Response Date of _____ days from the date of IDR issuance.
2. For IDRs that are delinquent 15, 30, and 45 days from the original response date, a series of conferences will be conducted and appropriate follow-ups will occur. The examination team will discuss the issue with the taxpayer and seek taxpayer's assessment of what records are available and identify problems and difficulties in retrieving documentation.
3. For IDRs over 90 days delinquent from the original response date, a Joint IDR Status Meeting will be held with the Territory Manager, IRS Counsel, Team Manager, IDR requester, and Senior Corporate Officers of the taxpayer. In this meeting, the circumstances will be evaluated and a determination will be made as to how the examination should proceed.

_____                    _____
Taxpayer's Signature              Date              Examiner's Signature              Date

**Exhibit 4.46.4-3**
**Form 4564, Information Document Request- First Follow Up**

| FORM 4564 | DEPARTMENT OF TREASURY INTERNAL REVENUE SERVICE WASHINGTON, DC 20224 | REQUEST NUMBER |
|---|---|---|
| To: (Name of Taxpayer and | Subject: | |

| Company, Division or Branch) | | Submitted to: | |
| --- | --- | --- | --- |
| | | Date of Previous Requests: | |
| Description of Documents requested: | | | |

**IMPORTANT INFORMATION REQUESTED**

This is the first follow up to Information Document Request (IDR) #_____ , to secure necessary books, papers records and other data relevant to the IRS examiner's inquiry of certain material matters pertinent to ascertaining the correctness of tax return information and reporting. Your presentation of the information sought by the IDR is essential to evaluate the propriety of actions you reported on the return. If you are having difficulty in securing the information sought, please advise of such problems so alternatives may be mutually explored. If the information is not submitted within fifteen (15) calendar days, provide within fifteen (15) days <u>a date certain</u> that you <u>will respond</u> to the request.

<u>Acknowledgement of receipt</u>

|  |  | Signature: |  |
|  |  | Title: |  |
|  |  | Date: |  |
| Information Due by: _____ | | At Next Appointment ___ | Mail In ___ |

| From | **Name and Title of Requestor** | Date: |
| --- | --- | --- |
| | Badge# | |
| | <u>Office Location</u> | Page 1 |
| Form 4564 | | |

**Exhibit 4.46.4-4**
**Form 4564, Information Document Request - Second Follow Up**

| FORM 4564 | | DEPARTMENT OF TREASURY<br>INTERNAL REVENUE SERVICE<br>WASHINGTON, DC 20224 | REQUEST NUMBER |
| --- | --- | --- | --- |
| To: (Name of Taxpayer and Company, Division or Branch) | | Subject: | |
| | | Submitted to: | |
| | | Date of Previous Requests: | |
| Description of Documents requested: | | | |

**IMPORTANT INFORMATION REQUESTED**

This is the second follow up to Information Document Request (IDR) #_____ , issued _____, to secure necessary books, papers records and other data relevant to the IRS examiner's inquiry of certain material matters pertinent to ascertaining the correctness of tax return information and reporting. Your presentation of the information sought by the IDR is essential to evaluate the propriety of actions you reported on the return. If you are having difficulty in securing the information sought, please advise of such problems so alternatives may be mutually explored. If the information is not submitted within fifteen (15) calendar days, provide within fifteen (15) days <u>a date certain</u> that you <u>will respond</u> to the request. Please be advised that action could be taken to have necessary documents available for evaluation by the examiner in accordance with Internal Revenue Code section 7602.

<u>Acknowledgement of receipt</u>

|  |  | Signature: |  |
|  |  | Title: |  |
|  |  | Date: |  |
| Information Due by: _____ | | At Next Appointment ___ | Mail In ___ |

| From | **Name and Title of Requestor** | Date: |
| --- | --- | --- |
| | Badge# | |
| | <u>Office Location</u> | Page 1 |
| Form 4564 | | |

**Exhibit 4.46.4-5**
**Examination Techniques**

(1) The following are some of the examination techniques that can be used to gather information:

- Gain an understanding of the business by reviewing the taxpayer's website, company brochures, articles on the company and industry guides.
- Ask the taxpayer to provide an overview of the business, products, services, foreign operations, changes in corporate structure, etc.
- Take a tour of the business sites.
- Review SEC filings (Form 10K, S-1, 8-K) or financial statements paying particular attention to the footnotes.
- Review other pertinent sources of info, such as Accurint, Westlaw, Capital IQ, Secretary of State filings, etc.
- Review worldwide organization chart, TIG report, yK1 link analysis tools for relationships with flow-through and other entities.
- Review transfer pricing documents for understanding of worldwide operations.
- Review Board of Directors, Executive Committee, Audit Committee and Officer Compensation Committee minutes.
- Review technical advisor's website for Tiered issues, coordinated and emerging issues.
- Perform a 3-year comparative analysis of the tax returns (all schedules) and obtain explanations for significant changes.
- Review M-3 reconciliation of the books with the financial statements and tax return.
- Review Schedule M-1 or M-3 for items that: should be there, should not be there, are too small or too large, or have an incorrect mathematical sign. Examine Schedule M items closely as there are no controls on these items. See the Schedule M3 website for additional techniques.
- Determine if shifting income to related party, e.g. controlled foreign subsidiary in low tax rate country. See Page 1 of Schedule M-3 and Schedule M of Form 5471.
- Audit the enterprise not the tax return. If the taxpayer has a loss, determine why.
- Determine what the taxpayer's revenue recognition policy is. This is usually noted in a document and/or notes to the financial statements. Are there difference between the taxpayer's revenue recognition for tax and GAAP?
- Review the general ledger detail, adjusting journal entries, etc. for unusual entries or balance, e.g. credit balances in accounts receivable, liability accounts for deferral of revenue and debits in income accounts.

- Have the taxpayer walk you through a transaction, e.g. how is the sale or service initiated, what documents are used, what books and records are used to record the transaction, what personnel are involved, what controls are in place to determine all income is recorded and in the correct amount.
- Evaluate the internal controls the taxpayer has to determine the extent of substantive testing. What is the control environment? Who else is auditing the taxpayer? Did they obtain a clean opinion? Do they have an internal audit department? Are there any regulatory authorities looking at them? How are the books and records? Do they reconcile them? Do they have support for transactions? What controls do they have to ensure all income is captured, all Form 1099s are issued, etc.
- Review a sample of source documents.

**Exhibit 4.46.4-6**
**Guidance for Examiners and Managers on the Codified Economic Substance Doctrine and Related Penalties**

Section 1409(a) of the Health Care and Education Reconciliation Act of 2010 (the "2010 Act") codified a conjunctive economic substance test in new section 7701(o). The new statute defines the economic substance doctrine as the common law doctrine under which certain tax benefits are not allowable if the transaction does not have economic substance or lacks a business purpose and states that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if [the legislation] had never been enacted."

The statute further states that "[i]n the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if—

A. the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and

B. the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction."

As a result, enactment of section 7701(o) resolved the longstanding conflict among various circuit courts of appeal regarding how the doctrine should be applied by codifying a two-part conjunctive test.

In addition, the 2010 Act added section 6662(b)(6), which imposes a strict liability penalty of 20 percent (40 percent for undisclosed transactions) of any underpayment attributable to the disallowance of claimed tax benefits by reason of the application of the economic substance doctrine or failing to meet the requirements of any similar rule of law. Amendments to section 6664 make clear that the "reasonable cause" exception is not applicable to this penalty, and a corresponding amendment to section 6676 provides that a strict liability penalty also applies to refund claims, although in that case the penalty is limited to 20 percent.

Section 7701(o) and the related strict liability accuracy-related penalty apply to transactions entered into after March 30, 2010, which was the date of enactment of the 2010 Act.

**PURPOSE OF GUIDANCE**

The purpose of this guidance is to instruct examiners and their managers how to determine when it is appropriate to seek the approval of the DFO in order to raise the economic substance doctrine. Once an examiner determines that raising the doctrine may be appropriate, this directive sets forth a series of inquiries the examiner must develop and analyze in order to seek approval for the ultimate application of the doctrine in the examination.

In addition, the penalties provided in sections 6662(b)(6) and (i) and 6676 are limited to the application of the economic substance doctrine and may not be imposed due to the application of any other "similar rule of law" or judicial doctrine (e.g., step transaction doctrine, substance over form or sham transaction).

This guidance has four steps. First, an examiner should evaluate whether the circumstances in the case are those under which application of the economic substance doctrine to a transaction is likely not appropriate. Second, an examiner should evaluate whether the circumstances in the case are those under which application of the doctrine to the transaction may be appropriate. Third, if an examiner determines that the application of the doctrine may be appropriate, the guidance provides a series of inquiries an examiner must make before seeking approval to apply the doctrine. Fourth, if an examiner and his or her manager and territory manager determine that application of the economic substance doctrine is merited, guidance is provided on how to request DFO approval.

Generally, in applying this guidance, when a transaction involves a series of interconnected steps with a common objective, the term "transaction" refers to all of the steps taken together. However, in certain circumstances, it may be appropriate to apply this guidance separately to one or more steps that are included within a series of arguably interconnected steps. This may be appropriate in situations where an integrated transaction includes one or more tax-motivated steps that bear only a minor or incidental relationship to a single common business or financial transaction. If an examiner wants to apply this guidance separately to one or more steps with a common objective, the examiner is required to seek guidance from their manager and consult with their local counsel before doing so.

An examiner should notify a taxpayer that the examiner is considering whether to apply the economic substance doctrine to a particular transaction as soon as possible, but not later than when the examiner begins the analysis in the steps described below.

**STEP 1: DOCTRINE LIKELY NOT APPROPRIATE**

The following facts and circumstances tend to show that application of the economic substance doctrine to a transaction is likely not appropriate. If some of the factors described in this guidance apply to the transaction, and an examiner continues to believe that the application of the doctrine is appropriate, the examiner should continue to analyze the transaction using the guidance set forth in Steps 2-4.

- Transaction is not promoted/developed/administered by tax department or outside advisors
- Transaction is not highly structured
- Transaction contains no unnecessary steps
- Transaction that generates targeted tax incentives is, in form and substance, consistent with Congressional intent in providing the incentives
- Transaction is at arm's length with unrelated third parties
- Transaction creates a meaningful economic change on a present value basis (pre-tax)
- Taxpayer's potential for gain or loss is not artificially limited
- Transaction does not accelerate a loss or duplicate a deduction
- Transaction does not generate a deduction that is not matched by an equivalent economic loss or expense (including artificial creation or increase in basis of an asset)
- Taxpayer does not hold offsetting positions that largely reduce or eliminate the economic risk of the transaction
- Transaction does not involve a tax-indifferent counterparty that recognizes substantial income
- Transaction does not result in the separation of income recognition from a related deduction either between different taxpayers or between the same taxpayer in different tax years
- Transaction has credible business purpose apart from federal tax benefits
- Transaction has meaningful potential for profit apart from tax benefits
- Transaction has significant risk of loss
- Tax benefit is not artificially generated by the transaction

- Transaction is not pre-packaged
- Transaction is not outside the taxpayer's ordinary business operations

In addition, it is likely not appropriate to raise the economic substance doctrine if the transaction being considered is related to the following circumstances.

- The choice between capitalizing a business enterprise with debt or equity
- A U.S. person's choice between utilizing a foreign corporation or a domestic corporation to make a foreign investment
- The choice to enter into a transaction or series of transactions that constitute a corporate organization or reorganization under subchapter C
- The choice to utilize a related-party entity in a transaction, provided that the arm's length standard of section 482 and other applicable concepts are satisfied.

**STEP 2: DOCTRINE MAY BE APPROPRIATE**

The following facts and circumstances tend to show that application of the economic substance doctrine may be appropriate.

- Transaction is promoted/developed/administered by tax department or outside advisors
- Transaction is highly structured
- Transaction includes unnecessary steps
- Transaction is not at arm's length with unrelated third parties
- Transaction creates no meaningful economic change on a present value basis (pre-tax)
- Taxpayer's potential for gain or loss is artificially limited
- Transaction accelerates a loss or duplicates a deduction
- Transaction generates a deduction that is not matched by an equivalent economic loss or expense (including artificial creation or increase in basis of an asset)
- Taxpayer holds offsetting positions that largely reduce or eliminate the economic risk of the transaction
- Transaction involves a tax-indifferent counterparty that recognizes substantial income
- Transaction results in separation of income recognition from a related deduction either between different taxpayers or between the same taxpayer in different tax years
- Transaction has no credible business purpose apart from federal tax benefits
- Transaction has no meaningful potential for profit apart from tax benefits
- Transaction has no significant risk of loss Tax benefit is artificially generated by the transaction
- Transaction is pre-packaged
- Transaction is outside the taxpayer's ordinary business operations

**STEP 3: DEVELOPMENT OF CASE FOR APPROVAL**

If after applying the guidance set forth above an examiner believes that the application of the economic substance doctrine may be appropriate, the examiner must answer the following series of inquiries before seeking the approval of his or her appropriate DFO to apply the doctrine.

1. Is the transaction a statutory or regulatory election? If so, then the application of the doctrine should not be pursued without specific approval of the examiner's manager in consultation with local counsel.
2. Is the transaction subject to a detailed statutory or regulatory scheme? If so, and the transaction complies with this scheme, then the application of the doctrine should not be pursued without specific approval of the examiner's manager in consultation with local counsel.
3. Does precedent exist (judicial or administrative) that either rejects the application of the economic substance doctrine to the type of transaction or a substantially similar transaction or upholds the transaction and makes no reference to the doctrine when considering the transaction? If so, then the application of the doctrine should not be pursued without specific approval of the examiner's manager in consultation with local counsel.
4. Does the transaction involve tax credits (e.g., low income housing credit, alternative energy credits) that are designed by Congress to encourage certain transactions that would not be undertaken but for the credits? If so, then the application of the doctrine should not be pursued without specific approval of the examiner's manager in consultation with local counsel.
5. Does another judicial doctrine (e.g., substance over form or step transaction) more appropriately address the noncompliance that is being examined? If so, those doctrines should be applied and not the economic substance doctrine. To determine whether another judicial doctrine is more appropriate to challenge a transaction, an examiner should seek the advice of the examiner's manager in consultation with local counsel.
6. Does recharacterizing a transaction (e.g., recharacterizing debt as equity, recharacterizing someone as an agent of another, recharacterizing a partnership interest as another kind of interest, or recharacterizing a collection of financial products as another kind of interest) more appropriately address the noncompliance that is being examined? If so, recharacterization should be applied and not the economic substance doctrine. To determine whether recharacterization is more appropriate to challenge a transaction, an examiner should seek the advice of the examiner's manager in consultation with local counsel.
7. In considering all the arguments available to challenge a claimed tax result, is the application of the doctrine among the strongest arguments available? If not, then the application of the doctrine should not be pursued without specific approval of the examiner's manager in consultation with local counsel.

**STEP 4: DFO APPROVAL**

If an examiner completes the inquiries described above and as a result concludes that it is appropriate to seek approval for the application of the economic substance doctrine, the examiner, in consultation with his or her manager and territory manager, should describe for the appropriate DFO in writing how the analysis described in the guidance above was completed. The DFO in considering an examiner's request for approval should review the written material provided and consult with Counsel before a decision is made. If the DFO believes it is appropriate to approve the request, the DFO should provide the taxpayer an opportunity to explain their position, either in writing or in person (at the DFO's discretion), addressing whether the doctrine should be applied to a particular transaction. Once the DFO has made a final decision, that decision should be conveyed to the examiner in writing.

This guidance is not an official pronouncement of law, and cannot be used, cited, or relied upon as such.

More Internal Revenue Manual