# EXHIBIT 29

1               UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
2                       IN SEATTLE

3   ------------------------------------------------------------

4   UNITED STATES OF AMERICA,        )
                                     )
5              Petitioner,           )   No. CV15-102RSM
                                     )   No. CV15-103RSM
6       v.                           )
                                     )
7   MICROSOFT CORPORATION,           )
    et al.,                          )
8                                    )
               Respondents.          )
9

10  ------------------------------------------------------------

11                    EVIDENTIARY HEARING

12  ------------------------------------------------------------

13

                     August 25, 2015
14

15      BEFORE THE HONORABLE RICARDO S. MARTINEZ
           UNITED STATES DISTRICT COURT JUDGE
16

17
    APPEARANCES:
18
    For the Petitioner:        James Weaver
19                             Jeremy Hendon
                               Amy Matchison
20                             U.S. DEPARTMENT OF JUSTICE

21  For the Respondent:        Philip Beck
                               Brian Prestes
22                             Robert Tannenbaum
                               Sean Gallagher
23                             BARTLIT BECK HERMAN PALENCHAR &
                               SCOTT
24                             Patricia Eakes
                               Andrea Ostrovsky
25                             CALFO HARIGAN LEYH & EAKES

1                          EXAMINATION INDEX

2       EXAMINATION OF                                        PAGE
         ELI HOORY            DIRECT EXAMINATION               38
3                             By Mr. Beck
                              CROSS-EXAMINATION               145
4                             By Mr. Weaver

5

6

7                            EXHIBIT INDEX
        EXHIBITS ADMITTED                                    PAGE
8          16                                                148
           15                                                158
9          41                                                161
           41                                                166
10         13                                                176
           28                                                177
11         29                                                178
           30                                                179
12         23                                                189
           22                                                189
13         21                                                190
           1                                                 193
14

15

16

17

18

19

20

21

22

23

24

25

09:33:49AM 1    THE CLERK:  We are here for an evidentiary hearing

09:33:51AM 2  in the matter of the United States versus Microsoft

09:33:54AM 3  Corporation, Case No. C15-102, assigned to this court, and

09:33:59AM 4  United States versus Craig J. Mundie, et al., Case

09:34:05AM 5  No. C15-103, assigned to this court.

09:34:07AM 6     Counsel, please rise and make your appearance for the

09:34:10AM 7  record.

09:34:10AM 8    MR. WEAVER:  James Weaver on behalf of the United

09:34:12AM 9  States.  With me are Jeremy Hendon and Amy Matchison.

09:34:17AM 10    THE COURT:  Good morning.

09:34:19AM 11    MR. BECK:  Philip Beck on behalf of Microsoft.

09:34:21AM 12    MS. EAKES:  Patty Eakes on behalf of Microsoft.

09:34:24AM 13    MS. OSTROVSKY:  Andrea Ostrovsky on behalf of

09:34:28AM 14  Microsoft, your Honor.

09:34:28AM 15    MR. PRESTES:  Brian Prestes on behalf of

09:34:30AM 16  Microsoft.

09:34:32AM 17    MR. GALLAGHER:  Sean Gallagher on behalf of

09:34:34AM 18  Microsoft.

09:34:35AM 19    MR. TANNENBAUM:  Robert Tannenbaum on behalf of

09:34:37AM 20  Microsoft.

09:34:38AM 21    THE COURT:  Good morning to all of you.  Thank

09:34:40AM 22  you.

09:34:44AM 23     Counsel, we have basically a day for our evidentiary

09:34:50AM 24  hearing that we have scheduled.  The court has other

09:34:52AM 25  matters tomorrow, so we need to be able to get it

09:34:55AM  1    concluded today.

09:34:56AM  2        Let me indicate for purposes of a lot of people that

09:35:00AM  3    are in the courtroom, that may not know exactly what the

09:35:03AM  4    purpose of what is going on in this particular hearing, it

09:35:06AM  5    is actually a quite narrow issue.  In this matter -- this

09:35:14AM  6    is an enforcement matter brought by the IRS against

09:35:17AM  7    Microsoft.  Whenever a taxpayer objects or neglects to

09:35:25AM  8    obey a designated summons, the IRS may bring an

09:35:28AM  9    enforcement action in United States District Court.  That

09:35:32AM 10    is what has happened here.

09:35:33AM 11        In order to obtain the court's enforcement, the IRS

09:35:36AM 12    then has the burden of making the initial showing of its

09:35:39AM 13    good faith by establishing that the investigation that it

09:35:43AM 14    is doing, or has done, will be conducted pursuant to a

09:35:47AM 15    legitimate purpose, that the inquiry may be relevant to

09:35:50AM 16    that purpose, that the information sought is not already

09:35:53AM 17    within the possession of the IRS, and that the

09:35:56AM 18    administrative steps required by the Internal Revenue Code

09:35:59AM 19    have been followed.  In this case the court has already

09:36:02AM 20    made the finding that the IRS has made that prima facie

09:36:06AM 21    showing.

09:36:07AM 22        Once that occurs, once the IRS makes its initial

09:36:10AM 23    showing, then the burden shifts to the taxpayer, in this

09:36:13AM 24    case Microsoft, to demonstrate that enforcement of that

09:36:16AM 25    summons would result in an abuse of the court's process.

09:36:21AM 1    This adversarial enforcement proceeding exists to
09:36:25AM 2  protect against abuse of the power vested in tax
09:36:28AM 3  collectors.  At the same time, enforcement proceedings are
09:36:31AM 4  to be summary in nature; the court is to avoid any broader
09:36:37AM 5  role than simply determining whether or not the IRS issued
09:36:40AM 6  a contested summons in good faith and without an improper
09:36:44AM 7  purpose.
09:36:45AM 8    The Supreme Court has held that a taxpayer is entitled
09:36:48AM 9  to a pre-enforcement evidentiary hearing upon making a
09:36:52AM 10 sufficient threshold showing of a defense or possible
09:36:55AM 11 defense for enforcement.  This showing requires the
09:36:58AM 12 taxpayer to point to specific facts or circumstances
09:37:02AM 13 plausibly raising an inference of bad faith or of another
09:37:06AM 14 appropriate ground in order to quash the summons.  Naked
09:37:11AM 15 allegations of improper purpose are simply not enough.
09:37:14AM 16 The taxpayer must offer some credible evidence supporting
09:37:19AM 17 their charge.
09:37:20AM 18    Use of circumstantial evidence is sufficient to make a
09:37:23AM 19 threshold showing.  Discovery is then warranted if the
09:37:27AM 20 taxpayer, through the hearing, can make a substantial
09:37:30AM 21 preliminary showing of abuse, of wrongdoing.  That's the
09:37:35AM 22 purpose of what we are here to do today.
09:37:38AM 23    My understanding, from looking at the materials
09:37:39AM 24 submitted by both sides, is that there is one live witness
09:37:44AM 25 apparently that will be called.  There may be other

09:37:46AM 1   witnesses, depending on what happens.  But I also

09:37:50AM 2   understand that Microsoft is relying on the declarations

09:37:55AM 3   of several other witnesses.  The court understands that.

09:37:59AM 4       Are we ready?  Since the burden is on Microsoft, I am

09:38:04AM 5   not sure who is going to be starting.  Ms. Eakes.

09:38:07AM 6           MR. WEAVER:  Your Honor, could I raise one

09:38:08AM 7   preliminary matter?

09:38:09AM 8           THE COURT:  Mr. Weaver.

09:38:14AM 9           MR. WEAVER:  Microsoft has identified as potential

09:38:17AM 10  witnesses two attorneys, Daniel Rosen and James O'Brien.

09:38:20AM 11  If they are going to possibly call them in rebuttal to our

09:38:22AM 12  witness, Mr. Hoory, we would ask that the court exclude

09:38:27AM 13  and sequester those witnesses.

09:38:34AM 14          MR. BECK:  We are not going to be calling them,

09:38:37AM 15  your Honor, especially given our need to finish today.

09:38:40AM 16          THE COURT:  All right.  Ms. Eakes.

09:38:41AM 17          MS. EAKES:  Thank you.  Good morning, your Honor.

09:38:44AM 18  As the court has just stated, Microsoft is here today to

09:38:46AM 19  ask the court to order discovery so that there will be a

09:38:49AM 20  complete factual record before the court ultimately

09:38:51AM 21  decides whether enforcing the designated subpoenas or

09:38:54AM 22  summonses would result in an abuse of this court's

09:38:57AM 23  process.

09:38:57AM 24      Now, as the court knows, this case is unusual in that

09:39:01AM 25  it raises a couple of important issues to larger issues of

09:39:04AM 1  tax administration.  It raises issues about whether or not

09:39:08AM 2  the IRS can or cannot use outside lawyers to perform audit

09:39:12AM 3  tasks, to take summon testimony, and to examine taxpayer

09:39:17AM 4  books and records, which are tasks that have historically

09:39:19AM 5  been reserved to the province of government officers and

09:39:24AM 6  employees.  And it raises issues about whether the

09:39:26AM 7  temporary regulation that the IRS enacted weeks after

09:39:29AM 8  retaining Quinn Emanuel, and that purport to allow

09:39:32AM 9  government lawyers -- the non-government lawyers to take

09:39:35AM 10  summon testimony is valid.  Those are the questions that

09:39:38AM 11  the court must ultimately reach.

09:39:40AM 12      But as the court just pointed out, that is not the

09:39:42AM 13  issue today.  The issue today is simply whether or not

09:39:45AM 14  Microsoft has made a substantial preliminary showing the

09:39:49AM 15  enforcement of the subpoenas -- or the summonses would

09:39:51AM 16  abuse this court's process.  We think we are going to make

09:39:54AM 17  that showing today, and as a result we are going to ask

09:39:56AM 18  the court to order some very limited and targeted

09:39:59AM 19  discovery, with the goal being to create a full record.

09:40:03AM 20      Microsoft is expecting today that we are going to

09:40:06AM 21  present evidence on four different issues:  First of all,

09:40:09AM 22  the role that Quinn Emanuel has played in the audit to

09:40:12AM 23  date, the role that Quinn Emanuel will be playing going

09:40:16AM 24  forward in the audit.  We are going to present evidence

09:40:19AM 25  that the procedures used by the IRS to enact the temporary

09:40:23AM  1   regulation are inconsistent with recent decision-making

09:40:27AM  2   and the other requirements of the APA.  We are going to

09:40:31AM  3   present evidence that raises questions and concerns about

09:40:33AM  4   the administrative record that has been put forward by the

09:40:36AM  5   IRS in this case, and that go to its completeness and its

09:40:41AM  6   accuracy.  We think it will require there be additional

09:40:44AM  7   discovery in order to determine what exactly the

09:40:48AM  8   administrative record should be.

09:40:49AM  9       As the court pointed out, we have already made the

09:40:52AM 10   preliminary showing.  I am not going to cover what we have

09:40:56AM 11   already presented to the court, because it sounds like the

09:40:58AM 12   court has reviewed that and is aware of where we already

09:41:02AM 13   stand today.  So let me talk about what we are going to

09:41:04AM 14   put on today or what we expect to put on today.

09:41:06AM 15       First of all, I want to start with the timeline so the

09:41:12AM 16   court kind of understands the key events.  And I do have

09:41:15AM 17   copies of this PowerPoint for the court if you would like

09:41:18AM 18   to have one, a hard copy, or I can provide it to the court

09:41:21AM 19   after we are done.

09:41:23AM 20       First of all, the audit in this case began back in

09:41:27AM 21   January of 2007.  It is an audit of the 2004/2006 tax

09:41:31AM 22   years.  Now, Microsoft was engaging with the IRS from 2007

09:41:36AM 23   all the way forward into 2014.

09:41:39AM 24       And it appeared that the audit was winding down

09:41:43AM 25   towards the end of 2013.  In fact, you will hear that in

09:41:48AM 1  January of 2014 the IRS met with Microsoft and they

09:41:52AM 2  presented their position on the Americas cost-sharing

09:41:55AM 3  arrangement.  Now, that date is not on the timeline, but

09:41:58AM 4  you will hear testimony about that.

09:42:00AM 5      Ordinarily after that meeting it would have been the

09:42:03AM 6  end of the audit.  And that's what Microsoft anticipated,

09:42:07AM 7  was that the audit was winding up after they received the

09:42:11AM 8  presentation from the IRS.  But what Microsoft didn't know

09:42:14AM 9  is that the IRS had an entirely different plan that they

09:42:20AM 10 didn't disclose to Microsoft.

09:42:21AM 11     In fact, we know from the government's timeline that

09:42:24AM 12 starting back in November of 2013 the IRS had engaged with

09:42:30AM 13 Quinn Emanuel, a private outside law firm, with a plan to

09:42:34AM 14 involve them in the audit, and eventually to take the

09:42:37AM 15 underlying tax case to trial.

09:42:39AM 16     They didn't disclose that fact to Microsoft, and in

09:42:42AM 17 fact, through the first half of 2014, the IRS continued to

09:42:47AM 18 engage with Microsoft about the audit, all the while they

09:42:51AM 19 were meeting with Quinn Emanuel.  They were having

09:42:53AM 20 settlement talks with Microsoft, but not advising them

09:42:57AM 21 about Quinn Emanuel being in the wings.  And they entered

09:43:00AM 22 into a contract with Quinn Emanuel.  Again, Microsoft

09:43:03AM 23 didn't know anything about it.

09:43:05AM 24     The IRS also did not disclose that to Microsoft at the

09:43:09AM 25 time in February of 2014, when they asked Microsoft to

09:43:15AM 1    extend the statute of limitations for the audit, which at

09:43:18AM 2    that time was set to expire in June of 2014.  So Microsoft

09:43:21AM 3    agreed to that extension, having no knowledge of the fact

09:43:25AM 4    that Quinn Emanuel was being engaged, or had already been,

09:43:29AM 5    or was on the verge of being hired.

09:43:31AM 6        Microsoft also later learned that simultaneously --

09:43:35AM 7    and, again, they didn't know any of this was happening --

09:43:38AM 8    that the IRS was putting together and enacting a temporary

09:43:41AM 9    regulation that they planned to point to to say that Quinn

09:43:45AM 10   Emanuel could examine Microsoft's books and records and

09:43:48AM 11   take summon testimony pursuant to the designated

09:43:51AM 12   summonses.

09:43:52AM 13       It wasn't until late August, and specifically

09:43:57AM 14   August 28th, 2014, that the IRS finally disclosed the fact

09:44:01AM 15   that they had hired Quinn Emanuel, and that they intended

09:44:04AM 16   to have them present at the upcoming interviews of

09:44:07AM 17   Microsoft employees that were scheduled for September of

09:44:09AM 18   that same year.

09:44:11AM 19       Now, even after that disclosure, the IRS continued to

09:44:16AM 20   hide the ball from Microsoft about what exactly was going

09:44:19AM 21   on.  When Microsoft got notice about Quinn Emanuel they

09:44:22AM 22   asked the IRS, "Hey, give us a copy of your engagement

09:44:26AM 23   letter."  The testimony is going to show that Mr. Hoory

09:44:30AM 24   said, "We don't have an engagement letter with Quinn

09:44:33AM 25   Emanuel."  So Microsoft went, did their own research,

09:44:37AM 1   found that in fact on a government database there was a

09:44:40AM 2   contract between Quinn Emanuel and the IRS.  So they wrote

09:44:42AM 3   to the IRS and said, "Give us a copy of the contract, if

09:44:45AM 4   you don't call it an engagement letter."  The IRS said,

09:44:48AM 5   "Well, okay, there is a contract, and here we are sending

09:44:51AM 6   you the full contract."

09:44:52AM 7       The court is going to hear that in fact the IRS only

09:44:55AM 8   sent a portion of that contract to Microsoft.  The portion

09:45:00AM 9   they chose to withhold from Microsoft was the part that

09:45:03AM 10  showed that in fact they had engaged Quinn Emanuel for the

09:45:06AM 11  purpose of eventually litigating the tax case, among other

09:45:10AM 12  things.

09:45:10AM 13      Let me just talk for a moment about the hiring of

09:45:17AM 14  Quinn Emanuel.  The court is going to hear that the IRS

09:45:23AM 15  engaged Quinn Emanuel as contractors, not as government

09:45:27AM 16  employees.  As contractors, Quinn Emanuel was not bound by

09:45:32AM 17  the conflict and ethics rules that are applicable to

09:45:35AM 18  Treasury Department lawyers.  This is a significant issue,

09:45:38AM 19  and it is not one that just Microsoft was concerned about.

09:45:42AM 20      When the Senate Finance Committee realized that the

09:45:46AM 21  IRS had outsourced an audit to private lawyers, Senator

09:45:51AM 22  Orrin Hatch wrote a letter to the IRS.  This is a copy of

09:45:54AM 23  the letter on PowerPoint now.  He pointed out, "Unlike

09:45:58AM 24  private contractors, Treasury Department officials are

09:46:00AM 25  required to swear an oath to the Constitution and are

09:46:03AM 1   subject to rules of conduct and federal law regulating

09:46:05AM 2   their interactions with taxpayers."  He went on to say,

09:46:08AM 3   "This is one of the core reasons Congress has sought to

09:46:10AM 4   limit certain examination actions to these officials, who

09:46:14AM 5   are accountable to the public, and for whom there is a

09:46:17AM 6   clear chain of command."  And he expressed concern about

09:46:21AM 7   "turning over inherently governmental functions, such as

09:46:24AM 8   conducting an examination, to private contractors, because

09:46:28AM 9   it doesn't protect the rights of taxpayers."

09:46:33AM 10      Now, the concerns about Quinn Emanuel and using a

09:46:36AM 11  private law firm like Quinn Emanuel in this case, in the

09:46:39AM 12  Microsoft audit, were very real.  As the court is going to

09:46:42AM 13  hear, there are a number of conflicts that Quinn Emanuel

09:46:44AM 14  had and that existed at the time the IRS chose to disclose

09:46:48AM 15  confidential taxpayer -- Microsoft's confidential taxpayer

09:46:52AM 16  information to Quinn Emanuel without ever giving Microsoft

09:46:56AM 17  any advance notice to have an opportunity to protect their

09:46:59AM 18  rights.

09:46:59AM 19      The court is going to hear testimony that Quinn

09:47:02AM 20  Emanuel is the primary outside counsel to Google, and that

09:47:05AM 21  Google is one of Microsoft's largest competitors.  In

09:47:09AM 22  fact, at the time -- after Microsoft was aware of the

09:47:16AM 23  hiring of Quinn Emanuel they provided to the IRS a list of

09:47:21AM 24  cases that they had actively against Microsoft at that

09:47:25AM 25  time.  And there were 34 cases that Quinn Emanuel was

09:47:29AM 1    handling that were directly adverse to Microsoft.  And

09:47:34AM 2    they knew that at the time -- or they had these cases at

09:47:37AM 3    the time the IRS was disclosing behind Microsoft's back

09:47:40AM 4    the confidential taxpayer information.

09:47:42AM 5        Now, let me just shift for a minute and tell the court

09:47:48AM 6    what we expect the evidence is going to show with respect

09:47:51AM 7    to Quinn Emanuel and their role that they had been playing

09:47:54AM 8    in this audit.  The evidence is going to show that Quinn

09:47:58AM 9    Emanuel told the IRS what records it wanted, and the IRS

09:48:01AM 10   asked Microsoft to produce them.  Quinn told the IRS who

09:48:07AM 11   they wanted to question and on what topics, and the IRS

09:48:09AM 12   asked Microsoft to make those employees available.  Quinn

09:48:13AM 13   identified who they wanted to have questioned under oath

09:48:15AM 14   pursuant to the designated summonses, and the IRS issued

09:48:18AM 15   those summonses.  Quinn was also involved and participated

09:48:24AM 16   in deciding the content of the designated summonses that

09:48:26AM 17   are before this court.  We also know that the IRS has said

09:48:32AM 18   definitively that if the court enforces these summonses,

09:48:35AM 19   it intends to have Quinn Emanuel do some of the

09:48:38AM 20   questioning of the Microsoft witnesses.

09:48:41AM 21       And even though the IRS has told this court, "Well,

09:48:46AM 22   Quinn Emanuel isn't engaging in any inherently

09:48:49AM 23   governmental functions," in fact, the contract shows that

09:48:54AM 24   in fact the performance of the work involves exactly what

09:48:58AM 25   the temporary regulation says is an inherently

09:49:03AM 1   governmental functions.

09:49:05AM 2       So the Federal Register -- the provision provides that

09:49:09AM 3   one of the things that is inherently governmental function

09:49:12AM 4   is identifying what information must be produced.  And the

09:49:15AM 5   Quinn Emanuel contract shows that is exactly what the IRS

09:49:19AM 6   has asked Quinn Emanuel to do.

09:49:21AM 7       Talking about the temporary regulation now.  Microsoft

09:49:30AM 8   expects that the evidence is going to show that the IRS

09:49:33AM 9   enacted the temporary regulation, at least in part,

09:49:36AM 10  because of the Microsoft audit.  The Microsoft audit is

09:49:40AM 11  being overseen by what is called the LB&I section of the

09:49:45AM 12  IRS, which is the large business and international group.

09:49:47AM 13  The court is going to see evidence that in fact it was the

09:49:51AM 14  LB&I that was the impetus and who initiated the temporary

09:49:55AM 15  regulation.

09:49:58AM 16     You are also going to hear that Mr. Hoory, who is

09:50:01AM 17  going to testify today, is directly overseeing the

09:50:03AM 18  Microsoft audit, and he was aware of the temporary

09:50:06AM 19  regulation, and he weighed in on the wording of the

09:50:10AM 20  temporary regulation and other issues prior to its

09:50:13AM 21  enactment.

09:50:18AM 22     Also, the IRS, in explaining why they needed this to

09:50:22AM 23  be an emergency publication, cited that it was the running

09:50:24AM 24  of the statute of limitations that was the reason they had

09:50:27AM 25  to push this through without the ordinary notice, and

comment, and time for publication, which only makes sense in the context of a particular case or cases, because the statute of limitations are expiring all the time on audits.

And the court will hear testimony that in fact the Microsoft statute of limitations, the audit, was set -- the statute of limitations was set to expire within six months of the enactment of this temporary regulation.

We are also going to present evidence that the temporary regulation -- the big push by the IRS to get this temporary regulation out began on the exact day that Microsoft told the IRS that they were no longer going to engage in settlement negotiations. So you can see here -- this is the declaration of Mr. Bernard, who says that on March 27th they advised the IRS they were ceasing all settlement discussions. On the same day the people at the IRS said we have to get this temporary regulation out by June 1.

You are also going to hear evidence from the administrative file, and I believe from Mr. Hoory, that the IRS anticipated all along that this temporary regulation is going to be used by outside lawyers to perform the questioning and to examine books and records. As you can see, these are just some examples of the documents that are in the administrative file, which the

09:51:56AM 1    court will have, which show that the intent all along was

09:51:59AM 2    to involve private lawyers.

09:52:01AM 3        The court will also hear that the Microsoft audit was

09:52:04AM 4    the only case in which private lawyers had been engaged.

09:52:09AM 5    So you see in the temporary -- you see in the

09:52:12AM 6    administrative file that the IRS is fully anticipating

09:52:14AM 7    having lawyers involved, even though the regulation

09:52:16AM 8    doesn't say that.  And yet Microsoft is the only case

09:52:19AM 9    where we are going to have private lawyers involved in an

09:52:21AM 10   audit.

09:52:23AM 11       There is also going to be evidence that we will

09:52:29AM 12   present today to show that the IRS wasn't transparent with

09:52:32AM 13   the internal stakeholders at the IRS, the Department of

09:52:37AM 14   Treasury, and OMB, about how they intended for this

09:52:40AM 15   temporary regulation to be used.

09:52:42AM 16       The administrative record is full of examples about

09:52:45AM 17   how the IRS drafters of this regulation appeared to be

09:52:50AM 18   trying to hide the ball from those people within the

09:52:53AM 19   agency about exactly what they intended, and that they

09:52:55AM 20   intended to bring private lawyers into the Microsoft

09:52:59AM 21   audit.  I will only show you two examples of those things

09:53:01AM 22   today, but the file consists of more.

09:53:04AM 23       So the internal communications at the IRS about this

09:53:08AM 24   temporary regulation -- again, it was fully intended to

09:53:12AM 25   have lawyers be involved -- told people within the IRS

09:53:15AM 1   that they were implementing the regulation so that people

09:53:18AM 2   such as outside economists, engineers, or consultants

09:53:22AM 3   could participate in the summons interview.  There is not

09:53:26AM 4   one word in the internal documents within the IRS that

09:53:29AM 5   says -- tells people within the agency that they intend to

09:53:33AM 6   use this to have lawyers do the questioning -- outside

09:53:37AM 7   lawyers do the questioning in an audit.

09:53:39AM 8       You are also going to hear that despite the fact that

09:53:43AM 9   there were clear policies within the IRS and the IRM

09:53:47AM 10  manual that require early circulation to internal

09:53:51AM 11  stakeholders of the regulation to give them time for

09:53:54AM 12  consideration of it and to provide feedback, that the

09:53:57AM 13  people behind this regulation only gave five days for

09:54:01AM 14  feedback from the internal people before rushing it into

09:54:05AM 15  publication.  That is on top of the fact that they weren't

09:54:08AM 16  explicitly telling people within the IRS that this

09:54:11AM 17  regulation is intended to be used by lawyers, that we

09:54:14AM 18  intend to have lawyers involved in audits.

09:54:17AM 19      The court is also going to hear testimony that the IRS

09:54:21AM 20  wasn't transparent with the public about the true purpose

09:54:24AM 21  of the regulation.  Now, the IRS, as the court knows,

09:54:29AM 22  issued this as a temporary regulation, which meant that it

09:54:32AM 23  went into effect immediately, and didn't allow for any

09:54:34AM 24  sort of notice and comment period by the public.

09:54:38AM 25      The IRS has typically let the public know about the

09:54:41AM 1    fact that they intend to pass guidance by putting out what

09:54:44AM 2    is called the business plan.  The business plan is a

09:54:46AM 3    public document that says here is everything that we are

09:54:49AM 4    expecting to issue guidance on in the upcoming future.

09:54:54AM 5        This regulation, the 7602 regulation, wasn't on the

09:54:58AM 6    business plan.  And in fact, it only appeared on the

09:55:00AM 7    business plan after the court granted this hearing, and

09:55:03AM 8    after Microsoft disclosed in its exhibits, when we thought

09:55:07AM 9    the hearing was happening in July, that there were

09:55:09AM 10   business plans where this regulation was absent.  After

09:55:13AM 11   all of that happened, suddenly this regulation that the

09:55:16AM 12   IRS had been considering working on since sometime in 2013

09:55:21AM 13   appeared on the business plan.

09:55:22AM 14       And, finally, the other way that the IRS concealed

09:55:27AM 15   from the public what the true purpose of this regulation

09:55:29AM 16   was, was in the wording itself of the regulation.  So what

09:55:34AM 17   was published in the Federal Register, which included the

09:55:37AM 18   published explanation of the regulation itself, refers

09:55:41AM 19   only to contractors throughout the regulation, and never

09:55:46AM 20   once says anything about lawyers, even though that was

09:55:50AM 21   clearly the purpose that the IRS had in mind in passing

09:55:53AM 22   this regulation.

09:55:56AM 23       Now, I want to talk for just a moment about the

09:56:01AM 24   administrative record and the concerns that Microsoft has

09:56:03AM 25   about the administrative record.  I just want to briefly

09:56:05AM 1   kind of recap why we are talking about the administrative

09:56:08AM 2   record here today.  When the court granted the evidentiary

09:56:11AM 3   hearing, you found that there were factual questions that

09:56:15AM 4   went to the validity of the temporary regulation.  And the

09:56:17AM 5   IRS initially said they were going to bring one or even

09:56:21AM 6   more than one witness to testify about why the temporary

09:56:24AM 7   regulation was enacted.

09:56:26AM 8       As you will recall, at that time Microsoft asked the

09:56:29AM 9   court for -- to have the IRS produce Heather Maloy, who

09:56:33AM 10  authorized the temporary regulation, so she could testify

09:56:36AM 11  on the issues that the court had identified.  And the

09:56:39AM 12  court deferred that request from Microsoft on the

09:56:41AM 13  representation that the IRS intended to call a witness who

09:56:44AM 14  had knowledge about the temporary regulation and its

09:56:48AM 15  enactment.

09:56:48AM 16      So then following that telephonic hearing the IRS

09:56:52AM 17  disclosed that they intended to call somebody by the name

09:56:55AM 18  of Tom Vidano.  The IRS then said they wouldn't call

09:57:00AM 19  Mr. Vidano unless Microsoft would agree up front there

09:57:03AM 20  would be no waiver of any known privileges before we ever

09:57:07AM 21  heard anything about his testimony.  And Microsoft simply

09:57:10AM 22  couldn't agree to that.  And so the IRS withdrew

09:57:14AM 23  Mr. Vidano.

09:57:16AM 24      Even though Mr. Hoory has some knowledge about this

09:57:18AM 25  temporary regulation, the IRS is now taking the position

09:57:21AM 1   that the court should only look at what they claim to be

09:57:24AM 2   the administrative record in deciding if the regulation

09:57:26AM 3   was valid.

09:57:27AM 4        And even assuming that is correct for the sake of this

09:57:30AM 5   argument, there are a number of things about the

09:57:34AM 6   administrative record that has been put forward by the IRS

09:57:36AM 7   that causes concern about whether it is complete, and how

09:57:40AM 8   it was put together, and whether or not the court should

09:57:42AM 9   give it the presumption of regularity that would

09:57:45AM 10  ordinarily apply.

09:57:46AM 11       So I am just going to cover those quickly, what the

09:57:50AM 12  issues are in the administrative record.  First of all,

09:57:52AM 13  the case law is clear that the administrative record is

09:57:55AM 14  supposed to contain only what was considered at the time

09:57:58AM 15  prior to the enactment of the temporary regulation, what

09:58:03AM 16  the agency considered.

09:58:07AM 17       Here, the file contains a number of different

09:58:09AM 18  documents that were clearly printed out sometime after the

09:58:13AM 19  regulation went into effect.  So these are just a sample

09:58:18AM 20  of the documents that show -- this was back in July

09:58:22AM 21  of 2015 -- this file was filled with things that were

09:58:23AM 22  printed out at that time.

09:58:27AM 23       Now, initially the IRS, when they first disclosed the

09:58:30AM 24  administrative record, didn't say anything about it.  They

09:58:32AM 25  subsequently offered a declaration amending it, and

09:58:35AM 1    saying, "Well, these might have a print date of July 2015,

09:58:38AM 2    but they were considered at the time."

09:58:39AM 3         But the IRS hasn't offered any sort of explanation to

09:58:42AM 4    the court -- there is nothing in the file to show that

09:58:44AM 5    these things were in fact considered by the agency at the

09:58:47AM 6    time.  There is simply no way for the court to evaluate

09:58:50AM 7    whether or not that representation is accurate.

09:58:52AM 8         Another concern with the administrative record is that

09:58:56AM 9    it has changed.  Initially the administrative record was

09:59:00AM 10   disclosed to Microsoft on July 13th.  And in the first

09:59:04AM 11   administrative record that we received it included this

09:59:07AM 12   document, Microsoft Exhibit 135.  And this was what

09:59:12AM 13   appeared to be a one-page email related to statistics that

09:59:17AM 14   LB&I was providing to support why the temporary regulation

09:59:20AM 15   was necessary.  But then on July 17th, four days later,

09:59:26AM 16   DOJ -- IRS provided an updated administrative record, and

09:59:31AM 17   all of a sudden this one-page document was four pages.

09:59:35AM 18   And there was no explanation.

09:59:36AM 19        And it is concerning, because there was no reason to

09:59:42AM 20   believe that the one-page document was anything more than

09:59:44AM 21   a one-page document.  There wasn't a privilege log.  There

09:59:46AM 22   weren't any redactions.  There was simply no explanation

09:59:50AM 23   other than to think it was a one-page document, that four

09:59:53AM 24   days later morphs into a four-page document, without any

09:59:56AM 25   sort of explanation.  I think it raises concerns about

09:59:58AM 1   whether or not there are things that are missing from the

10:00:01AM 2   administrative record when it is produced in that fashion.

10:00:04AM 3       And we do know that there are missing records from the

10:00:08AM 4   administrative record that the IRS put forward.  As the

10:00:11AM 5   court may recall, Microsoft has made FOIA requests to the

10:00:16AM 6   IRS related to the temporary regulation.  And one of the

10:00:18AM 7   things that we asked for were all documents related to the

10:00:22AM 8   regulatory history of the temporary regulation.  Microsoft

10:00:27AM 9   expected that would yield basically the records that would

10:00:29AM 10  later become the administrative record, that were part of

10:00:32AM 11  the administrative record.

10:00:34AM 12      Well, in the FOIA case, in response to that request,

10:00:37AM 13  Microsoft received over 1,400 pages of documents in

10:00:42AM 14  response to that request.  But the administrative record

10:00:46AM 15  that was produced by the IRS is only 630 pages.  There is

10:00:51AM 16  just no explanation for that discrepancy.

10:00:54AM 17      We can also see from looking at the file itself that

10:00:58AM 18  there are things that are missing.  This email, which is

10:01:03AM 19  part of the administrative record that they submitted to

10:01:06AM 20  the court, refers to the fact that there is a

10:01:08AM 21  representative contract that is being considered by the

10:01:10AM 22  drafters of this regulation.  Clearly it is something that

10:01:15AM 23  was considered by the agency, and yet the attachment isn't

10:01:19AM 24  in the administrative record.

10:01:21AM 25      Well, we know that it exists, because in the FOIA

10:01:24AM 1    action this is what we received, which is the same email,

10:01:28AM 2    with redactions, and an attachment that is fully redacted

10:01:32AM 3    out.  So, again, something missing from the administrative

10:01:35AM 4    record that was clearly considered by the agency.

10:01:38AM 5        But even more importantly, last Friday the IRS

10:01:43AM 6    disclosed this document, which now tells the court that

10:01:48AM 7    the IRS -- the drafters of the regulation considered

10:01:52AM 8    precisely the issue that is before this court, and that is

10:01:56AM 9    whether or not contractors can be treated as IRS employees

10:01:59AM 10    for purposes of 7602.

10:02:02AM 11        Now, we received only this email.  We didn't receive

10:02:07AM 12    the memo.  But what is concerning, and what should concern

10:02:10AM 13    the court, is that neither this email, nor the memo, are

10:02:14AM 14    part of what has been submitted to you as the purported

10:02:17AM 15    administrative record.  So there are a lot of questions

10:02:20AM 16    about what is or isn't in the administrative record, and

10:02:23AM 17    why there is the disconnect between that and the FOIA.

10:02:28AM 18        There is also redaction issues that we think should

10:02:31AM 19    concern the court.  I am just giving you one example of

10:02:35AM 20    that here.  In the summons enforcement case we received

10:02:39AM 21    this document.  That's the executive summary for the

10:02:41AM 22    summons interview regulation.  And yet in the FOIA case,

10:02:45AM 23    we received it completely redacted on the claim of

10:02:50AM 24    deliberative process.

10:02:54AM 25        Again, this just raises an issue, we think, about

10:02:55AM 1    whether there have been improper redactions for those

10:02:57AM 2    things that are actually in the administrative record, and

10:03:00AM 3    whether or not there are wholesale redactions that have

10:03:04AM 4    been done by the IRS, which is information of --

10:03:08AM 5    information that isn't properly privileged or should be

10:03:10AM 6    considered by this court.

10:03:11AM 7         So that's kind of a quick recap of what we expect the

10:03:17AM 8    evidence is going to show today.  I want to take a minute,

10:03:21AM 9    though, and talk about what is not at issue in this

10:03:23AM 10   hearing today.  Microsoft fully expects that the IRS is

10:03:28AM 11   going to try to use this evidentiary hearing to try to

10:03:31AM 12   embarrass Microsoft, to portray the company as a tax

10:03:36AM 13   evader, and to improperly disclose our confidential

10:03:40AM 14   taxpayer information, information that would be

10:03:43AM 15   confidential in an audit, and, but for this hearing, would

10:03:46AM 16   not be disclosable to the public.

10:03:48AM 17        Now, the reason we are concerned is not only because

10:03:51AM 18   of the exhibits that have been identified by the IRS for

10:03:53AM 19   this hearing, which go to the underlying financials and

10:03:57AM 20   the issues that are within the audit, but the IRS has also

10:04:03AM 21   publicly stated they plan to basically punish taxpayers

10:04:06AM 22   who fight summons enforcement proceedings.

10:04:10AM 23        You will see in an article to the press -- this is in

10:04:14AM 24   January of 2015, so after Microsoft had let it be known

10:04:18AM 25   that the company intended to fight the summons enforcement

10:04:21AM 1    proceedings, a senior IRS lawyer told the press, "The

10:04:26AM 2    taxpayers and practitioners should be cautious when asking

10:04:29AM 3    for an evidentiary hearing to prove that a summons was

10:04:31AM 4    issued for an improper purpose."  They warned that, "An

10:04:36AM 5    evidentiary hearing is a two-way street.  It is not simply

10:04:38AM 6    the taxpayer's opportunity to question the agent."  And,

10:04:43AM 7    "The taxpayer should think about whether they want to have

10:04:45AM 8    their officials being examined by the IRS in a public

10:04:48AM 9    courtroom, and whether they want to have a DOJ lawyer

10:04:51AM 10   talking about the underlying tax transactions that the IRS

10:04:54AM 11   is looking at."

10:04:56AM 12       That threat is exactly what Microsoft is concerned is

10:05:01AM 13   going to be attempted to be carried out today.  We believe

10:05:04AM 14   the IRS is trying to punish Microsoft for successfully

10:05:07AM 15   getting this hearing by disclosing our confidential

10:05:11AM 16   taxpayer information, and sending a message to other

10:05:13AM 17   taxpayers not to do what Microsoft has done and gotten in

10:05:17AM 18   this case.  I would urge the court not to permit the IRS

10:05:20AM 19   to do that.  The financial information underlying the

10:05:22AM 20   audit, the positions that the parties have taken is simply

10:05:27AM 21   not relevant to any of the issues before the court today.

10:05:30AM 22       It is fundamentally unfair for the IRS to throw out

10:05:35AM 23   numbers, particularly when they are maintaining they

10:05:38AM 24   haven't actually made a conclusion as to what tax is due,

10:05:42AM 25   in a context where Microsoft can't call experts or dispute

10:05:46AM 1   or explain the numbers that are being thrown out and can

10:05:49AM 2   be misconstrued by people.

10:05:51AM 3       In short, we urge the court not to let the IRS misuse

10:05:55AM 4   this hearing, which is supposed to be about the IRS's

10:05:58AM 5   conduct, to publicize Microsoft's confidential

10:06:02AM 6   information.

10:06:05AM 7       In conclusion, Microsoft believes at the end of today

10:06:09AM 8   that we will show the court that there are troubling

10:06:11AM 9   questions here about the IRS's hiring of Quinn Emanuel and

10:06:15AM 10  their involvement in the Microsoft audit.

10:06:19AM 11      Microsoft, of course, has concerns about what the IRS

10:06:22AM 12  has done, but their concerns are also shared by Congress.

10:06:27AM 13  Both the House Ways and Means Committee, as well as the

10:06:31AM 14  Senate Finance Committee, share the concerns that

10:06:33AM 15  Microsoft has.  We believe at the end of the presentation

10:06:35AM 16  today the court, too, will have even more questions and

10:06:39AM 17  concerns about what the IRS has done.  At that time we

10:06:43AM 18  will ask the court to order some limited discovery so a

10:06:46AM 19  full record can be created before the court decides

10:06:50AM 20  whether or not to enforcement the summonses.  Thank you.

10:06:54AM 21          THE COURT:  Ms. Eakes, thank you very much.

10:06:57AM 22      Mr. Weaver, I don't know if you, the IRS, would like

10:07:00AM 23  to make any preliminary statements before we call the

10:07:02AM 24  first witness, or should we just get into the first

10:07:06AM 25  witness?

27

10:07:07AM 1          MR. WEAVER:  Yes, your Honor, if we could.

10:07:27AM 2      Your Honor, the story of how Microsoft -- excuse me,

10:07:31AM 3  the story of how the IRS came to retain Quinn Emanuel

10:07:34AM 4  begins in 2011.  In June of that year Microsoft submitted

10:07:38AM 5  to the IRS a document called a protest.  In that protest

10:07:43AM 6  Microsoft took issue with certain adjustments that the IRS

10:07:46AM 7  had proposed making to Microsoft's tax returns for the

10:07:52AM 8  2004 through 2006 years, adjustments that would increase

10:07:55AM 9  Microsoft's taxable income by billions of dollars.

10:07:58AM 10     Now, those adjustments arise from two complex

10:08:01AM 11 international arrangements that we will call today the

10:08:05AM 12 Americas transaction and the Asia Pacific transaction.

10:08:09AM 13     In its protest Microsoft claimed that the analysis

10:08:13AM 14 underlying the IRS's notice of proposed adjustments was,

10:08:17AM 15 quote, arbitrary and capricious.  And Microsoft argued

10:08:21AM 16 that the valuation method used by the IRS to figure out

10:08:25AM 17 and measure the income from these transactions was

10:08:28AM 18 improper.  They complained that the IRS should have used a

10:08:32AM 19 different method, and taken a more granular look at the

10:08:36AM 20 transactions.

10:08:38AM 21     In support of its protest Microsoft relied heavily on

10:08:42AM 22 a tax court case called Veritas v. Commissioner, a 2009

10:08:47AM 23 case that did not turn out well for the IRS.  In Veritas

10:08:51AM 24 the tax court found that expert testimony offered by the

10:08:54AM 25 IRS was unsupported and unreliable.  The tax court

10:09:00AM 1    determined that the IRS notice of deficiency, the document

10:09:03AM 2    issued at the conclusion of an audit, was, quote,

10:09:07AM 3    arbitrary and capricious, because the analysis presented

10:09:10AM 4    at trial in Veritas was different than the analysis in the

10:09:16AM 5    exam phase of the case.

10:09:17AM 6        Now, Microsoft's protest is a long document.  You will

10:09:21AM 7    see parts of that document today.  The protest even

10:09:24AM 8    faulted the IRS for relying on, among other things, notes

10:09:28AM 9    of earlier interviews, interviews not under oath, and not

10:09:32AM 10   transcribed.  Microsoft characterized such evidence as,

10:09:36AM 11   quote, of questionable utility.

10:09:39AM 12       Now, starting in late 2011, a relatively new component

10:09:43AM 13   of the IRS called Transfer Pricing Operations, or TPO for

10:09:48AM 14   short, began to coordinate aspects of the Microsoft audit

10:09:53AM 15   that we care about here today.

10:09:55AM 16       And there were several goals in mind for the audit:

10:09:59AM 17   One was to develop facts better; two was to resolve or

10:10:04AM 18   narrow differences, where possible; and three was to make

10:10:07AM 19   greater use of experts of various kinds.

10:10:10AM 20       Now, TPO withdrew the IRS notice of proposed

10:10:14AM 21   adjustment that had generated the protest; and TPO decided

10:10:19AM 22   to take a closer look at the transactions; and of

10:10:24AM 23   particular interest here, the method that Microsoft and

10:10:27AM 24   its advisor KPMG had used to value components of the

10:10:33AM 25   Americas transaction.

10:10:34AM 1      Mr. Hoory, who is here today, a senior advisor with

10:10:38AM 2  TPO, will testify about his understanding that as of July

10:10:42AM 3  2005, Microsoft effectively transferred certain rights and

10:10:46AM 4  software code, such as Windows, to an offshore affiliate

10:10:51AM 5  in Puerto Rico with respect to retail sales in America.

10:10:54AM 6  But Microsoft did not transfer other things, like the

10:10:58AM 7  right to use Microsoft's name, things that you need to

10:11:01AM 8  actually sell product, to the Puerto Rico affiliate.  And

10:11:07AM 9  Microsoft's U.S. affiliates would still be doing the

10:11:10AM 10  selling.

10:11:11AM 11      Now, to better understand the KPMG valuation that

10:11:16AM 12  Microsoft was relying on and the assumptions, TPO engaged

10:11:21AM 13  experts in 2012, in software code, brand and marketing

10:11:27AM 14  valuation, as well as financial and industry experts.  To

10:11:30AM 15  help pull these disparate areas together, and to develop a

10:11:35AM 16  persuasive and coherent framework, TPO decided to try

10:11:39AM 17  something new, obtaining the services of a commercial

10:11:42AM 18  litigator.

10:11:44AM 19      Mr. Hoory, and his boss, Mr. Maruca, reasoned that the

10:11:49AM 20  ultimate goals of the audit, getting to the right numbers

10:11:52AM 21  and supporting those numbers with solid factual and legal

10:11:54AM 22  support, would be well advanced by obtaining the advice

10:11:59AM 23  and assistance of someone with experience in developing

10:12:02AM 24  and evaluating large complex cases.  And TPO reasoned that

10:12:07AM 25  a commercial litigator would also serve as a sounding

10:12:10AM 1    board to provide an independent analysis of the strengths

10:12:14AM 2    and the weaknesses of the audit.

10:12:18AM 3        And make no mistake, Microsoft's audit that we are

10:12:21AM 4    here today about is one of the largest and most

10:12:24AM 5    complicated audits ever undertaken by the IRS.

10:12:28AM 6        To be clear, if the case did not resolve at the exam

10:12:35AM 7    stage, and it went beyond that, then these attorneys might

10:12:38AM 8    also bring experience to the table were a trial to ensue.

10:12:44AM 9        Now, you will learn today that during the second half

10:12:48AM 10   of 2012, TPO first reached out to another law firm, the

10:12:52AM 11   law firm of Boies Schiller.  Mr. Hoory hoped to obtain an

10:12:59AM 12   evaluation of the audit, of the strengths and weaknesses,

10:13:03AM 13   from the law firm before making a presentation to

10:13:05AM 14   Microsoft to try and resolve and narrow their differences.

10:13:10AM 15   Unfortunately, nothing was ever done on that contract

10:13:15AM 16   because of conflicts of interest.

10:13:18AM 17       Mr. Hoory first contacted a representative from Quinn

10:13:25AM 18   Emanuel in late 2013.

10:13:28AM 19       Now, to address one of the concerns in your Honor's

10:13:30AM 20   order, Mr. Hoory made no mention of Microsoft before a

10:13:36AM 21   proper nondisclosure agreement was in place.

10:13:39AM 22       The first meeting with Quinn Emanuel took place in

10:13:42AM 23   late February 2014.  And the purpose of that meeting was

10:13:45AM 24   to ascertain if the firm would be a good fit for the

10:13:48AM 25   anticipated tasks at hand, the provision of legal advice

10:13:54AM 1  regarding the strengths and weaknesses of the case, and

10:13:57AM 2  assistance in developing facts and legal theories during

10:14:00AM 3  the remainder of the exam.

10:14:03AM 4      After that initial meeting in February, the next

10:14:07AM 5  substantive communications between Mr. Hoory and Quinn

10:14:10AM 6  Emanuel did not occur until July 15, 2014.

10:14:16AM 7      Now, during the intervening months between February

10:14:19AM 8  and July, for reasons having nothing to do at all with

10:14:23AM 9  Quinn Emanuel, resolution discussions with Microsoft,

10:14:27AM 10  discussions that Mr. Hoory had tried to get started

10:14:30AM 11  through a presentation in January of 2014, came to a halt.

10:14:36AM 12      Contrary to allegations, Mr. Hoory will confirm that

10:14:39AM 13  he received no input whatsoever from Quinn Emanuel

10:14:43AM 14  regarding the information document requests, the IDRs,

10:14:48AM 15  served on Microsoft in July of 2014.

10:14:53AM 16      And you will learn from Mr. Hoory, far from

10:14:55AM 17  outsourcing the audit, as has been suggested by Microsoft,

10:14:58AM 18  the direction of the audit, the subject matter of the

10:15:02AM 19  IDRs, the subject matters of the interviews that occurred

10:15:05AM 20  in the fall of 2014, and even the necessary follow-up in

10:15:09AM 21  the summonses that are pending here, these lines of

10:15:13AM 22  inquiry and the subject matters addressed were largely

10:15:17AM 23  determined before Quinn Emanuel read a single audit

10:15:21AM 24  document and provided any advice.

10:15:23AM 25      Now, what has become increasingly clear to Mr. Hoory

10:15:27AM 1   is that some of the assumptions underlying the KPMG

10:15:33AM 2   valuation study relied on by Microsoft are highly

10:15:35AM 3   questionable.  And I will get to that in a minute.

10:15:38AM 4       But what about allegations that Quinn Emanuel

10:15:40AM 5   attorneys performed inherently governmental functions?

10:15:45AM 6   Not so, your Honor.  We will look today at Quinn Emanuel's

10:15:47AM 7   contract, and we will look at the prohibition in that

10:15:49AM 8   contract against performing inherently governmental

10:15:53AM 9   functions.  That section of the contract refers to an OPM

10:15:56AM 10  policy letter that sets out what is and what is not

10:16:00AM 11  inherently governmental.  Fact gathering is not inherently

10:16:04AM 12  governmental.  Providing legal advice is not inherently --

10:16:10AM 13  an inherently governmental function.

10:16:13AM 14      Now, appearing before a tribunal is an inherently

10:16:17AM 15  governmental function, but Quinn Emanuel did not do that.

10:16:21AM 16      Well, what about inspecting books and records or

10:16:24AM 17  asking questions, two concerns raised in your Honor's

10:16:28AM 18  order?  If we could put up the one slide I want to use

10:16:34AM 19  here, which is this slide here.  I have put up Section A

10:16:37AM 20  of the summons statute, your Honor, 7602.  And what you

10:16:42AM 21  will see --  I have highlighted -- the highlights are

10:16:45AM 22  mine, the words "authority to summon."  And then down

10:16:49AM 23  below you will see "secretary is authorized."

10:16:51AM 24      Now, what this statute is doing, your Honor, is

10:16:54AM 25  cloaking the secretary with authority to do the things

10:16:57AM 1   listed below, to examine books and records, to summon

10:17:02AM 2   someone to appear before the IRS, to take testimony.  The

10:17:09AM 3   secretary can demand that that occur.  But no one -- no

10:17:11AM 4   one except Microsoft, in its briefing, construes Part

10:17:14AM 5   (a)(1) of this statute here as prohibiting an outside

10:17:20AM 6   expert, properly retained under 6103(n), from assisting

10:17:25AM 7   the IRS in review of books and records.  In fact, it is

10:17:28AM 8   the necessary practice of the IRS to ask outside experts,

10:17:32AM 9   be they financial, economic, scientific, technical, or

10:17:36AM 10  even sometimes legal experts, to review taxpayer books and

10:17:41AM 11  records.

10:17:42AM 12      Were you to bar experts, under contract properly, from

10:17:49AM 13  looking at books and records obtained through summonses,

10:17:51AM 14  you would effectively shut down virtually all complex

10:17:55AM 15  audits in the IRS.  That certainly can't be the proper way

10:17:58AM 16  to interpret the statute.

10:17:59AM 17      Now, your Honor, if the phrase "examine books and

10:18:03AM 18  records" is about who is cloaked with the authority to

10:18:06AM 19  invoke these three things, but is silent on the procedure,

10:18:10AM 20  so too then the phrase in Part 3, "to take such

10:18:14AM 21  testimony," is about who has the authority to require the

10:18:18AM 22  interview, not the procedures of where, or how, or who may

10:18:23AM 23  attend, or even who may speak.

10:18:26AM 24      What about the regulation?  You will hear today that

10:18:32AM 25  the regulation -- the temporary regulation allowing

10:18:35AM 1    contractors to fully participate in interviews, which

10:18:40AM 2    Microsoft claims was rushed through hastily for the Quinn

10:18:45AM 3    Emanuel contract, actually arose out of earlier concerns

10:18:48AM 4    in 2013 related to another audit.

10:18:52AM 5        Now, once in the pipeline, of course TPO wanted to get

10:18:56AM 6    the regulation up and running as soon as possible.  TPO

10:19:00AM 7    had been using experts to attend interviews and advise the

10:19:04AM 8    IRS, and, where appropriate, interpose questions.  But

10:19:08AM 9    there is no improper motive for this regulation.  It

10:19:11AM 10   didn't even start with Microsoft.

10:19:15AM 11       What about the summonses?  The summonses -- the

10:19:20AM 12   summons requests here flow from Microsoft's failure to

10:19:23AM 13   adequately respond to earlier IRS requests.  Only in late

10:19:29AM 14   2014 and 2015, after the summonses were issued, has the

10:19:36AM 15   IRS received details from Microsoft about certain

10:19:39AM 16   financial projections that it has been asking for for some

10:19:42AM 17   time, some of which Microsoft's tax department had

10:19:45AM 18   previously stated either didn't exist or couldn't be

10:19:47AM 19   found.

10:19:48AM 20       It is only after the summonses were issued, your

10:19:51AM 21   Honor, in 2014, that it has become increasingly clear just

10:19:56AM 22   how involved KPMG was, not in just valuing the Americas

10:20:02AM 23   transaction, but in helping Microsoft engineer a

10:20:06AM 24   tax-driven result.  Mr. Hoory now has concerns about the

10:20:09AM 25   independence of KPMG's analysis.

10:20:13AM 1        You will see, we will present evidence today, where

10:20:15AM 2    internal KPMG documents call into question the very

10:20:19AM 3    assumptions they are using in the KPMG valuation of the

10:20:23AM 4    Americas transaction.  In fact, you will see some meeting

10:20:26AM 5    notes where KPMG is concerned that the affiliate in

10:20:29AM 6    Puerto Rico I referred to earlier would not be operational

10:20:32AM 7    for 18 months after this transaction went into effect.

10:20:35AM 8    Someone writes, quote, "What can we do to make this thing

10:20:38AM 9    real?"

10:20:40AM 10       Now, your Honor, that is important, because if the IRS

10:20:45AM 11   has the legitimate purpose and has issued the summonses at

10:20:49AM 12   issue in good faith, then, unless Microsoft can show --

10:20:54AM 13   make a substantial showing of bad faith or wrongdoing with

10:20:58AM 14   respect to the summonses -- not with respect to some

10:21:01AM 15   flawed policy, but with respect to the summonses, then

10:21:04AM 16   Microsoft is simply not entitled to discovery in this

10:21:07AM 17   summons proceeding.

10:21:10AM 18       And, moreover, questions about the role of Quinn

10:21:13AM 19   Emanuel and the timing and the validity of the regulation

10:21:16AM 20   shrink and become secondary.  And why is that?  Because

10:21:20AM 21   they only become relevant about who your Honor may allow

10:21:23AM 22   to attend or to speak at an interview.  But they don't go

10:21:28AM 23   to whether the interviews should themselves go forward.

10:21:32AM 24       Now, your Honor, let me just address quickly a couple

10:21:35AM 25   of points that Ms. Eakes made.  It is true that we had

10:21:38AM 1    hoped in our telephone motions hearing, on the telephone a

10:21:42AM 2    few weeks ago, to produce a live witness to talk about the

10:21:47AM 3    interaction between the Microsoft audit and the

10:21:50AM 4    administrative record, essentially the temporary

10:21:53AM 5    regulation.

10:21:54AM 6        We had someone on our witness list, Mr. Vidano, but he

10:21:59AM 7    is an attorney.  So we said, "Okay, we will produce him,

10:22:02AM 8    but he is an attorney -- an LB&I attorney.  We want you to

10:22:06AM 9    agree, Microsoft, that we will not have a subject matter

10:22:09AM 10   waiver."  That was the proposal.  And Microsoft turned

10:22:12AM 11   that down.

10:22:13AM 12       So what we have done is, we have submitted the

10:22:16AM 13   administrative record here today, which is clearly put

10:22:20AM 14   together as best we can.  I will address and point the

10:22:23AM 15   court to various parts of that self-authenticating record

10:22:28AM 16   later today.

10:22:31AM 17       Might I add, it is not typical to have a privilege log

10:22:33AM 18   with the submission of an administrative record.

10:22:36AM 19       And what is missing from the administrative record,

10:22:38AM 20   your Honor?  Deliberative communications.  Deliberative

10:22:44AM 21   communications are not supposed to be part of the

10:22:46AM 22   administrative record.

10:22:47AM 23       Ms. Eakes referred to a memo from A.M. Gulas, one of

10:22:53AM 24   the drafters of the regulation.  That is a deliberative

10:22:56AM 25   and privileged document.  So, of course, it is not in an

10:22:59AM 1    administrative record.

10:23:03AM 2        Your Honor, by the end of today we are confident that

10:23:06AM 3    your concerns, the ones expressed in your order, will be

10:23:09AM 4    alleviated, and it will be clear why the IRS legitimately

10:23:13AM 5    needs the additional information it seeks to complete this

10:23:16AM 6    audit.  Thank you.

10:23:20AM 7            THE COURT:  Thank you, Mr. Weaver.  Are we ready

10:23:24AM 8    for our first witness then?

10:23:28AM 9            MR. BECK:  Yes, your Honor.

10:23:29AM 10           THE COURT:  Mr. Beck, you may call your first

10:23:31AM 11   witness.

10:23:32AM 12           MR. BECK:  Microsoft calls Mr. Hoory.

10:23:36AM 13           THE COURT:  Mr. Hoory, good morning.  If I could

10:23:39AM 14   have you make your way around counsel table, come up in

10:23:43AM 15   front of the clerk, raise your right hand and be sworn

10:23:50AM 16   prior to taking the stand.

17                              ELI HOORY

10:24:20AM 18      Having been sworn under oath, testified as follows:

10:24:20AM 19           THE CLERK:  Could you please state your name for

10:24:22AM 20   the record and spell your last name?

10:24:23AM 21           THE WITNESS:  Eli Hoory.  The last name is spelled

10:24:27AM 22   H-O-O-R-Y.

10:24:29AM 23           THE COURT:  Mr. Hoory, what I need from you is to

10:24:31AM 24   answer the questions in a voice loud enough so everybody

10:24:33AM 25   can hear you.  That microphone in front of you amplifies

10:24:38AM 1    only a little bit, but there is a cone, and if you get too

10:24:42AM 2    close, you will get feedback.  Keep your voice up.  If you

10:24:45AM 3    don't understand the question, simply say so, and we will

10:24:47AM 4    get counsel to rephrase it for you.  All right?

10:24:50AM 5              THE WITNESS:  Um-hum.

10:24:51AM 6              THE COURT:  You may inquire.

10:24:54AM 7              MR. BECK:  Thank you, your Honor.

10:24:55AM 8                        DIRECT EXAMINATION

10:24:56AM 9    By Mr. Beck:

10:24:57AM 10   Q.   Mr. Hoory, I would like to start with a discussion

10:24:59AM 11   about the underlying dispute concerning Microsoft's tax

10:25:03AM 12   liability for the years 2004 through 2006.  And I hope we

10:25:08AM 13   can keep it at a fairly general level, simply so the court

10:25:13AM 14   can understand the context in which today's dispute

10:25:17AM 15   arises.

10:25:17AM 16        Does the question that you and Microsoft have been

10:25:27AM 17   struggling over in the underlying audit concern how to

10:25:34AM 18   value intangibles that have been transferred by a U.S.

10:25:39AM 19   company to a foreign affiliate?

10:25:43AM 20   A.   That is part of it.  It is how to do that, as well as

10:25:46AM 21   how to measure relative values between buckets of

10:25:50AM 22   intangibles.  So for that purpose we are actually using

10:25:54AM 23   the same valuation methodology.

10:25:56AM 24   Q.   I am not asking you yet about the methodology.  One

10:25:59AM 25   of the core issues is, as we have heard from Mr. Weaver,

39

10:26:03AM 1    there was intangible property, intellectual property, for

10:26:12AM 2    example, that was transferred from U.S. Microsoft to a

10:26:16AM 3    foreign subsidiary or affiliate.  And one of the questions

10:26:21AM 4    at least is how to put a proper value on the property that

10:26:25AM 5    was transferred, correct?

10:26:27AM 6    A.   That's one.  There is also one other geography, the

10:26:31AM 7    Asia Pacific.  They are similar issues.

10:26:33AM 8    Q.   Now, you agree, don't you, that there is nothing

10:26:38AM 9    inherently improper in a U.S. company transferring

10:26:44AM 10   intangibles or intellectual property to a foreign

10:26:47AM 11   affiliate?

10:26:48AM 12   A.   As long as they pay the arm's length price, that is,

10:26:51AM 13   the price that we pay in the market, then it is allowed.

10:26:54AM 14   Q.   So the question is, have they paid -- did the foreign

10:26:58AM 15   affiliate pay an arm's length transaction-type price for

10:27:02AM 16   the property that was transferred, right?

10:27:05AM 17   A.    That is part of it.  Remember, in this case you have

10:27:08AM 18   the foreign affiliate doing a roundtrip.  They buy the

10:27:11AM 19   intangible property from the United States, and they

10:27:14AM 20   immediately sell it right back to the U.S. affiliates,

10:27:16AM 21   which then have third-party relationships.  So you have

10:27:19AM 22   two prices here, one going out, and then a roundtrip

10:27:22AM 23   coming back into the U.S.

10:27:23AM 24   Q.   And neither of the transfers is inherently improper,

10:27:27AM 25   it is just a question of how to place the proper value on

10:27:30AM 1   the thing that was transferred, right?

10:27:32AM 2   A.   That is true, unless we look beyond at economic

10:27:34AM 3   substance.   So there are provisions that would let us

10:27:37AM 4   disregard the transaction.   In this structure, though,

10:27:39AM 5   thus far, we have been focusing on what is the right price

10:27:42AM 6   if we actually respect the transaction as is.

10:27:44AM 7   Q.   You say you respect the transaction.   And you have

10:27:47AM 8   made no claim whatsoever at any time that this was some

10:27:51AM 9   sort of sham transaction that should be disregarded,

10:27:54AM 10  correct?

10:27:56AM 11        MR. WEAVER:   Objection.   Mischaracterizes his

10:27:58AM 12  testimony.

10:28:02AM 13        THE COURT:   Overruled.   Do you understand the

10:28:04AM 14  question?

10:28:06AM 15        THE WITNESS:   If counsel could repeat it, I would

10:28:09AM 16  appreciate it.

10:28:10AM 17        THE COURT:   Could I have you rephrase, counsel?

10:28:14AM 18        MR. BECK:   Sure.

10:28:14AM 19  By Mr. Beck:

10:28:15AM 20  Q.   I think you said thus far you respected the

10:28:17AM 21  transaction, right?

10:28:18AM 22  A.   I said thus far in our valuation we have tried to

10:28:22AM 23  value it as if the transaction was respected.   So you can

10:28:25AM 24  have alternative positions, as you might know.   We have

10:28:28AM 25  said, "Okay, what if this is a real deal?   What if there

10:28:31AM 1   is actually substance here?  What would the value be

10:28:33AM 2   between arm's length parties if you respected it?"  And we

10:28:37AM 3   basically started with that premise to try to engage in

10:28:39AM 4   productive resolution discussions with the company.

10:28:41AM 5   Q.   Now, this audit has been going on since 2007, right?

10:28:46AM 6   A.   I believe so.

10:28:46AM 7   Q.   We are now in 2015.  My question, sir, before you

10:28:53AM 8   volunteered this on the stand this morning, had anybody

10:28:58AM 9   from the IRS ever communicated to Microsoft any concern at

10:29:03AM 10   all that these transactions were anything other than

10:29:07AM 11   legitimate, and that the question is simply one of valuing

10:29:11AM 12   the thing that was transferred?

10:29:13AM 13   A.   Well, if you look at my January 14 presentation I

10:29:15AM 14   gave the company, there is a number of simplifying

10:29:18AM 15   assumptions in there.  One of those assumptions is, not

10:29:21AM 16   withstanding what we saw as a very little risk in the

10:29:24AM 17   Puerto Rican affiliate, we were going to treat it for

10:29:28AM 18   purposes of the resolution assumptions in that preliminary

10:29:30AM 19   analysis as if they actually were the owner of all, I

10:29:35AM 20   guess, features or rights inherent in the technology that

10:29:38AM 21   they purchased.  So that was a simplifying assumption when

10:29:41AM 22   we presented to the company.

10:29:42AM 23   Q.   Well, what you call now a simplifying assumption, is

10:29:46AM 24   you say, "We are proceeding on the basis that these are

10:29:50AM 25   legitimate transactions, and the only question is how to

10:29:52AM 1    value the thing that was transferred," right?

10:29:54AM 2         MR. WEAVER:  Objection.  Mischaracterizes his last

10:29:57AM 3    answer.

10:29:57AM 4         MR. BECK:  He just was saying yes, your Honor.

10:30:00AM 5         THE COURT:  Overruled.

10:30:02AM 6         THE WITNESS:  Should I answer?

10:30:04AM 7         THE COURT:  Yes.

10:30:05AM 8         THE WITNESS:  Thank you, your Honor.  I was

10:30:06AM 9    pointing out that it actually refers to simplifying

10:30:09AM 10   assumptions in the January 14th meeting.  This is not the

10:30:14AM 11   first time I referred to them.

10:30:15AM 12   Mr. Beck:

10:30:15AM 13   Q.  What you call the simplifying assumptions was, "We

10:30:19AM 14   are treating these transactions as perfectly legit, it is

10:30:24AM 15   how we put a value on the thing transferred," right?

10:30:26AM 16   A.  We were treating them as qualified cost-sharing

10:30:29AM 17   arrangements for purposes of trying to value them.  If we

10:30:32AM 18   had not treated them or looked beyond them at the

10:30:34AM 19   substance of the transaction and treated them as not

10:30:37AM 20   qualified cost-sharing arrangements, on that particular

10:30:39AM 21   point, if we have that premise, I was pointing out the way

10:30:42AM 22   the regs work is we don't have to respect the transfer of

10:30:47AM 23   the intangibles.  You asked me if we had to respect it,

10:30:50AM 24   and that that was the only possible issue.  I was just

10:30:51AM 25   pointing out that it was a simplifying assumption in our

1   presentation that we were respecting the transaction as

10:31:10AM 2   is, notwithstanding --  I was pointing out that it was a

10:31:12AM 3   simplifying assumption in our January 14th meeting.  I

10:31:15AM 4   understood your earlier question to ask me if this was

10:31:19AM 5   permitted.  The answer is, that is offshore transfers of

10:31:25AM 6   intangibles.  That's what I understood you to ask.  I was

10:31:29AM 7   pointing out it is permitted.  We allow it under qualified

10:31:33AM 8   cost-sharing arrangements.  And as a simplifying

10:31:35AM 9   assumption, when we did our valuation, our preliminary

10:31:38AM 10  assessment, which was not complete, it was not final, it

10:31:41AM 11  was supposed to be the starting point of resolution

10:31:44AM 12  discussions with the company, we made a simplifying

10:31:45AM 13  assumption that we were going to respect it as a qualified

10:31:49AM 14  cost-sharing arrangement.

10:31:49AM 15  Q.   Well, lots of big U.S. companies have foreign

10:31:55AM 16  affiliates, right?

10:31:56AM 17  A.   They do.

10:31:57AM 18  Q.   And lots of big U.S. companies transfer intangibles

10:32:00AM 19  to foreign affiliates, correct?

10:32:02AM 20  A.   They do.  But in this case it is unusual, because you

10:32:05AM 21  have the roundtrip motion, where they are transferring it

10:32:07AM 22  out of the United States and then immediately transferring

10:32:09AM 23  it back in.

10:32:10AM 24  Q.   And the transfers of intangibles to foreign

10:32:14AM 25  affiliates is so common in our economy that the IRS has an

10:32:22AM 1    entire group devoted solely to looking at these

10:32:26AM 2    transactions, right?

10:32:27AM 3    A.   Yeah, Transfer Pricing Operations was stood up to

10:32:31AM 4    make sure that when multinationals were making these

10:32:34AM 5    transfers, the prices were arm's length.

10:32:36AM 6    Q.   Right.   The core issue is, when you make these

10:32:38AM 7    transactions, was the price arm's length, right?

10:32:41AM 8    A.   Correct.

10:32:42AM 9    Q.   And you mentioned the Transfer Pricing Operations.

10:32:47AM 10   That's the group that you are in, right?

10:32:48AM 11   A.   It is.

10:32:49AM 12   Q.   Sometimes called TPO for short, right?

10:32:52AM 13   A.   Yes.

10:32:52AM 14   Q.   Now, Mr. Weaver talked about how when intangibles are

10:33:07AM 15   transferred that the value -- the so-called arm's length

10:33:14AM 16   value can be calculated in different ways.   Were you here

10:33:18AM 17   when he talked about that?

10:33:20AM 18   A.   I know --  I don't recall exactly what he said.   I

10:33:23AM 19   know that there is an aim when we value these things to

10:33:27AM 20   use the best method that is the most reasonable, accurate

10:33:30AM 21   way of measuring arm's length price.   And there are

10:33:34AM 22   different methods.   Depending on what your facts are, one

10:33:37AM 23   method may be better than another.

10:33:39AM 24   Q.   And without getting into the details of each method,

10:33:41AM 25   there is something called the residual profit split

10:33:44AM 1    method, right?

10:33:45AM 2    A.   Amongst others.

10:33:46AM 3    Q.   Yes, amongst others.   And one of the others is the

10:33:49AM 4    income method, right?

10:33:50AM 5    A.   That is another option.

10:33:53AM 6    Q.   And depending on which methodology you use, you could

10:33:58AM 7    come up with dramatically different values for the

10:34:04AM 8    intangibles that were transferred, right?

10:34:06AM 9    A.   Of course.   You look for the most accurate one given

10:34:10AM 10   your facts and circumstances.   And, actually, even when

10:34:12AM 11   you are inside a method -- so two people can apply, for

10:34:19AM 12   example, a residual profits split method, sometimes I

10:34:22AM 13   might call it an RPSM for short, and come up with

10:34:26AM 14   different values based on the assumptions they make.

10:34:30AM 15   Q.   Right.   So using different methodologies could come

10:34:33AM 16   up with different values, and even using the same

10:34:36AM 17   methodology, depending on what assumptions or other inputs

10:34:41AM 18   you make, you could come up with dramatically different

10:34:43AM 19   values, right?

10:34:44AM 20   A.   That's true.   But the real question is whether those

10:34:47AM 21   dramatically different values are reasonable.   And if you

10:34:49AM 22   look at all the facts and circumstances, it is possible to

10:34:52AM 23   come up with one or -- you know, some range that is

10:34:55AM 24   reasonable.   And if you use assumptions that are

10:34:57AM 25   inaccurate, or make mistakes in your math computations, as

10:35:01AM 1   happened here, you could come up with values that don't

10:35:03AM 2   make any sense, at least not common sense.

10:35:06AM 3   Q.   And incidentally, you and your group, you are not the

10:35:11AM 4   final arbiter of whether a particular value makes sense or

10:35:16AM 5   makes common sense, are you?

10:35:18AM 6   A.   Well, we determine what the IRS's position is, that

10:35:21AM 7   is, what the IRS thinks is the right number.  And, when

10:35:24AM 8   called for, my group is the one that will say what the

10:35:28AM 9   right number is for purposes of a statutory notice of

10:35:31AM 10  deficiency, if we issue one, or, if it goes to appeals, in

10:35:34AM 11  a 30-day letter.  After that, obviously, a court can weigh

10:35:39AM 12  in at some point in time.  Or if it goes to appeals,

10:35:42AM 13  appeals has an opportunity to consider our analysis and

10:35:47AM 14  enter into a hazards of litigation settlement with

10:35:50AM 15  taxpayers, should they choose, but they are not required

10:35:53AM 16  to.

10:35:53AM 17  Q.   Well, courts don't just weigh in -- the tax court,

10:35:57AM 18  for example, they don't just weigh in after you have made

10:35:59AM 19  a determination.  What happens is, if you make your own

10:36:03AM 20  determination, and the taxpayer has a determination, and

10:36:07AM 21  you two disagree, and you are not able to resolve it

10:36:12AM 22  through negotiations, it is submitted to the tax court,

10:36:16AM 23  and the tax court is the one that decides what the proper

10:36:19AM 24  value is, right?

10:36:20AM 25  A.   Well, they look at our statutory notice of

10:36:22AM 1   deficiency.   Normally we are entitled to --  I guess there

10:36:27AM 2   is a burden of proof.   Normally --  Unless the taxpayer

10:36:30AM 3   can show that we are arbitrary and capricious, the number

10:36:33AM 4   on the statutory deficiency is supposed to basically be

10:36:37AM 5   upheld.

10:36:38AM 6   Q.   How many cases under transfer pricing has the tax

10:36:41AM 7   court decided, where there has been a disagreement between

10:36:45AM 8   the IRS and the taxpayer on the value of the intangibles?

10:36:50AM 9   A.   I am only aware of one recent case.

10:36:53AM 10  Q.   And that would be the Veritas case that Mr. Weaver

10:36:57AM 11  referred to, right?

10:36:58AM 12  A.   Yeah.   That was one of the reasons we wanted to look

10:37:00AM 13  at this closer, so we could take into account the

10:37:02AM 14  arguments that Microsoft made in its protest, including

10:37:05AM 15  factual arguments about them saying RPSM was better.   And

10:37:10AM 16  we wanted to consider that, so that when we came to our

10:37:14AM 17  recent decision about what the right number was, we had

10:37:16AM 18  actually addressed those issues and considered them.

10:37:18AM 19  Q.   Well, in the one case that you are aware of in recent

10:37:21AM 20  years where this kind of issue has been presented to the

10:37:24AM 21  tax court, not only did the tax court disagree with the

10:37:29AM 22  IRS's determination, the tax court said that the IRS had

10:37:35AM 23  acted arbitrarily and capriciously in reaching that

10:37:38AM 24  determination, correct?

10:37:39AM 25  A.   Well, the tax court said that our analysis of the

10:37:43AM 1   facts and circumstances was arbitrary and capricious, and

10:37:45AM 2   they criticized us for relying on one expert.  The

10:37:49AM 3   taxpayer in that case, I think, they had four or five

10:37:52AM 4   experts.  We obviously could do a better job presenting

10:37:55AM 5   complex multifaceted cases, as shown in that court's

10:37:59AM 6   criticisms.

10:38:00AM 7   Q.   I take it you would agree that, even today, when you

10:38:09AM 8   are trying to do a better job, the mere fact that the IRS

10:38:14AM 9   and Microsoft disagree about the value of the intangibles

10:38:20AM 10  that were transferred, and thus the tax liability, that

10:38:24AM 11  doesn't mean that the IRS is right and Microsoft is wrong,

10:38:27AM 12  does it?

10:38:27AM 13  A.   It depends on what you are focusing on.  I have

10:38:31AM 14  identified some things where they are saying inaccurate

10:38:33AM 15  statements in their SEC filings for growth versus what

10:38:36AM 16  they use in their valuation, four percent on their

10:38:39AM 17  valuation versus ten to twelve in their SEC reports.  We

10:38:44AM 18  have identified some errors math, which clearly seem like

10:38:47AM 19  errors on Microsoft's part.  Those are the kinds of things

10:38:50AM 20  we wanted to engage with Microsoft on, and ask them, "Do

10:38:53AM 21  you really think your numbers are right?", or, "Did you

10:38:55AM 22  make the math errors we pointed out?"  "Did you use

10:38:58AM 23  valuation assumptions that were inconsistent with your

10:39:01AM 24  public filings?"

10:39:01AM 25  Q.   Incidentally, Microsoft has pointed out math errors,

10:39:05AM 1   and other errors that you have made, too, right?

10:39:08AM 2   A.   I am aware of one they pointed out at the

10:39:11AM 3   January 14th presentation.  I thanked them and invited

10:39:14AM 4   them to engage on that issue, as well as others.

10:39:15AM 5   Q.   In any event, my question was, at the end of the day,

10:39:22AM 6   if you have come up with a tax liability that is

10:39:26AM 7   substantially larger than what Microsoft not only believes

10:39:31AM 8   its tax liability was, but has already paid, then that

10:39:34AM 9   doesn't mean that you're right and Microsoft is wrong,

10:39:37AM 10  that is up to the tax court to decide, right?

10:39:39AM 11  A.   If it goes to tax court.  But the onus on the IRS in

10:39:44AM 12  the first instance is to say what we think the right

10:39:46AM 13  number is, and to put that right number on a statutory

10:39:48AM 14  notice of deficiency -- or on a 30-day letter first, and

10:39:51AM 15  then on a stat notice if it doesn't get agreed to at

10:39:55AM 16  appeals.  Here, we are still trying to get that right

10:39:57AM 17  number.  And we want to make sure, given the size of this

10:40:00AM 18  case, the largest I am aware of in the IRS's history, at

10:40:04AM 19  least personally, that we actually kick the tires, and put

10:40:08AM 20  the resources in, and ask the questions, and look at the

10:40:10AM 21  information we need to to make sure that when we put a

10:40:13AM 22  number on the page, it is our reasoned judgment based on

10:40:17AM 23  the facts and circumstances that were available.

10:40:19AM 24  Q.   So no matter what someone might say here at the

10:40:26AM 25  lectern about the size of the potential tax liability, you

10:40:32AM 1   haven't even made a determination of that yet, right?

10:40:35AM 2   A.   We are still working on getting to the right number.

10:40:38AM 3   There are some issues we obviously raised and wanted to

10:40:41AM 4   engage on on the Americas.  That was the purpose of the

10:40:44AM 5   January 14th presentation, which was a preliminary

10:40:46AM 6   analysis with some open questions.  And also on the Asia

10:40:50AM 7   Pacific deal, which we never reached resolution

10:40:52AM 8   discussions with the company on, because they shut us down

10:40:55AM 9   on Americas before we could start engaging with them on

10:40:58AM 10  other issues.  Those have significant open factual

10:41:00AM 11  questions, which could materially impact what the right

10:41:03AM 12  number is, which we are still trying to get to that right

10:41:05AM 13  number.

10:41:06AM 14  Q.   Now, Mr. Weaver mentioned the Veritas case, and you

10:41:13AM 15  said it is the one that you knew of that has actually been

10:41:16AM 16  resolved by the tax court.  Are you familiar with the

10:41:19AM 17  Amazon case also?

10:41:20AM 18  A.   I am.  I thought you were referring to decisions, as

10:41:23AM 19  opposed to currently ongoing litigation.

10:41:25AM 20  Q.   I was.  This is a different matter.  The Amazon case,

10:41:29AM 21  that is also about transfer pricing, right?

10:41:32AM 22  A.   It is.

10:41:34AM 23  Q.   Where Amazon transferred intangibles to a foreign

10:41:39AM 24  affiliate, and Amazon said we think the value is X, and

10:41:44AM 25  the IRS said we think the value is some multiple of that,

10:41:47AM 1   right?

10:41:48AM 2   A.   I believe so.   I can't discuss other taxpayers'

10:41:53AM 3   cases.   I am sort of limited to what I know from the

10:41:55AM 4   public filings.

10:41:56AM 5   Q.   We will keep it limited to what you know from the

10:41:58AM 6   public information.   What you do know is that the IRS and

10:42:04AM 7   Amazon were at loggerheads, and they are now in front of

10:42:09AM 8   the tax court, right?

10:42:10AM 9   A.   Certainly.

10:42:11AM 10  Q.   And that Amazon, just like Veritas, is saying that

10:42:17AM 11  the results that the IRS came up with are arbitrary and

10:42:22AM 12  capricious, right?

10:42:23AM 13  A.   I imagine the IRS is holding the same true for

10:42:27AM 14  Amazon's valuation, as being inaccurate and arbitrary as

10:42:29AM 15  well.   People disagree in court.

10:42:32AM 16  Q.   And it is the court that decides it, not the IRS,

10:42:35AM 17  right?

10:42:35AM 18  A.   Well, the IRS isn't a court.   Obviously in this case

10:42:42AM 19  Amazon is before the tax court.

10:42:43AM 20  Q.   Now, we heard from Mr. Weaver that, well, the reason

10:42:54AM 21  that Mr. Hoory and the Transfer Pricing Operations people

10:43:03AM 22  hired Quinn Emanuel is because they really want to make

10:43:10AM 23  sure that the audit was done correctly.   Did you hear him

10:43:16AM 24  say that?

10:43:17AM 25  A.   I don't recall him saying those words.

10:43:19AM 1   Q.   Well, no, not those words.  But didn't you get the

10:43:24AM 2   impression from Mr. Weaver that his story is that the real

10:43:30AM 3   reason that you got Quinn Emanuel involved was because

10:43:35AM 4   there had been foul-ups in the Veritas audit, and they

10:43:39AM 5   hadn't done a good job putting all the facts together, and

10:43:44AM 6   so you wanted to hire a commercial litigator who could do

10:43:48AM 7   a good job of analyzing all these facts during the

10:43:51AM 8   examination, i.e., during the audit?

10:43:54AM 9   A.   What I heard him say, and the way I think about the

10:43:57AM 10  Quinn Emanuel contract, is that we recognize that transfer

10:44:01AM 11  pricing cases are very complex, they deal with very

10:44:04AM 12  complex facts, lots of different issues.  In this case we

10:44:07AM 13  knew that we needed multiple experts to get to what the

10:44:10AM 14  right number was, as well as lots of information.  And we

10:44:13AM 15  thought that a commercial litigator with experience in

10:44:17AM 16  very complex cases could bring some value to the table,

10:44:20AM 17  first in providing a sounding board, a gut check for the

10:44:23AM 18  IRS, look at what we have done to date, and what the

10:44:26AM 19  taxpayer put on the table, and make observations,

10:44:30AM 20  hopefully thoughtful, helpful ones, that would ask good

10:44:33AM 21  questions.  And if we had open areas that we needed to

10:44:35AM 22  develop further, or things that didn't make sense, we

10:44:38AM 23  wanted to know that, and do the best job we could to get

10:44:41AM 24  to the right number.  That is why we hired Quinn Emanuel

10:44:44AM 25  at the examination stage, to provide that kind of legal

| | |
|---|---|
| 10:44:47AM | 1 |

consultation and advice, which it appeared would be

10:44:50AM 2 something that a complex commercial litigator would have.

10:44:55AM 3        THE COURT:  Mr. Beck, let's go ahead and take our

10:44:58AM 4 morning recess for our court reporter at this point in

10:45:00AM 5 time.  We will come back in 15 minutes.

11:06:18AM 6     (Break.)

11:06:18AM 7        THE COURT:  Counsel, we are back in session.

11:06:21AM 8 Mr. Beck.

11:06:24AM 9        MR. BECK:  Thank you, your Honor.

11:06:26AM 10 By Mr. Beck:

11:06:26AM 11 Q.  When we left off we were talking about what

11:06:29AM 12 Mr. Weaver had said and what you had said on the stand

11:06:31AM 13 about what Quinn Emanuel was hired for.  My notes from

11:06:37AM 14 Mr. Weaver's opening, he said that you decided to hire

11:06:42AM 15 some other types of experts in 2012 to help with the

11:06:46AM 16 examination for the audit, right?

11:06:50AM 17 A.  Yes.

11:06:52AM 18 Q.  And that later on you decided that it would also be

11:06:56AM 19 useful in the examination or audit to have the services of

11:07:02AM 20 a commercial litigator, right?

11:07:03AM 21 A.  Correct.  Initially we pursued Boies Schiller.

11:07:08AM 22 Q.  And Boies -- David Boies had some sort of a conflict,

11:07:13AM 23 so I guess your next pick was John Quinn, right?

11:07:16AM 24 A.  Yeah.  We looked for other people with similar

11:07:18AM 25 expertise, because we still saw value in that expertise,

11:07:23AM 1    and eventually we picked Quinn Emanuel.

11:07:25AM 2    Q.   And, again, getting back to what Mr. Weaver said and

11:07:28AM 3    what you said on the stand, you both said that the reason

11:07:31AM 4    that you hired Quinn Emanuel was to reach sound

11:07:36AM 5    conclusions in the examination, in the audit, right?

11:07:40AM 6    A.   That was the initial focus, and that was the contract

11:07:44AM 7    that was actually awarded, was for examination support and

11:07:48AM 8    evaluation.

11:07:48AM 9    Q.   And as I wrote it down, Mr. Weaver said, to be clear,

11:07:53AM 10   if the examination was not resolved at the audit stage,

11:08:01AM 11   these same lawyers might be involved in later litigation?

11:08:06AM 12   A.   That's right.  That is the same as any expert.

11:08:09AM 13   Whenever we hire an expert at the examination stage, we

11:08:12AM 14   always want to make sure that they are someone that we

11:08:14AM 15   would trust, if we were not to reach resolution with the

11:08:17AM 16   taxpayer, and if the case would go forward, whether to

11:08:21AM 17   appeals or to tax court.

11:08:23AM 18   Q.   Actually, sir, wasn't it kind of the other way

11:08:26AM 19   around, where the endgame and core purpose of hiring Quinn

11:08:33AM 20   Emanuel was for them to represent you in the tax court,

11:08:39AM 21   and their involvement at the audit stage was just a way

11:08:44AM 22   for them to take some free pretrial discovery that they

11:08:48AM 23   could never get out of the tax court?

11:08:49AM 24   A.   That is incorrect.

11:08:51AM 25   Q.   Well, who is John Koskinen?  I may be pronouncing

11:09:00AM 1   that incorrectly.

11:09:01AM 2   A.   He is the current commissioner of the IRS.

11:09:03AM 3   Q.   He is like your boss' boss' boss?

11:09:09AM 4   A.   Do you want me to count?

11:09:11AM 5   Q.   Well, he is the top man at the IRS, right?

11:09:13AM 6   A.   Yeah, he is three or four levels above.

11:09:17AM 7   Q.   The top person at the IRS, correct?

11:09:19AM 8   A.   That is my understanding.

11:09:22AM 9   Q.   Let's take a look at what he said on this subject,

11:09:27AM 10  looking at our Exhibit 54, which is an article from Tax

11:09:32AM 11  Notes.

11:09:37AM 12          MR. WEAVER:  Objection.  Foundation, your Honor.

11:09:48AM 13          THE COURT:  I don't know what question you are

11:09:50AM 14  going to ask him, Mr. Beck.

11:09:55AM 15          MR. BECK:  I am going to show him what

11:09:57AM 16  Mr. Koskinen said, and ask him whether he agrees with

11:10:01AM 17  that.

11:10:02AM 18          MR. WEAVER:  If Mr. Hoory recognizes this

11:10:04AM 19  document, that would be fine.  But that assumes that

11:10:06AM 20  Mr. Koskinen said what he said, and Mr. Hoory is familiar

11:10:10AM 21  with this document.

11:10:11AM 22          MR. BECK:  Your Honor, we are also in a hearing,

11:10:13AM 23  the purpose of which is to determine whether we should be

11:10:17AM 24  allowed to take some discovery in this case.

11:10:19AM 25          THE COURT:  Mr. Beck, I'm fine.  Counsel, while

11:10:23AM 1    the rules of evidence obviously apply, they will be

11:10:27AM 2    relaxed to a certain extent simply because of the purposes

11:10:30AM 3    of this particular hearing.   We will allow your

11:10:34AM 4    questioning, Mr. Beck.

11:10:35AM 5            MR. BECK:   Thank you.

11:10:36AM 6    By Mr. Beck:

11:10:39AM 7    Q.   So here in this publication it indicates there in the

11:10:42AM 8    highlighted portion that Commissioner Koskinen was

11:10:48AM 9    speaking in Washington at the Annual Institute on Current

11:10:52AM 10   Issues in International Taxation.   Do you see that?

11:10:58AM 11   A.   I see the sentence.

11:10:59AM 12   Q.   Were you there by any chance?

11:11:02AM 13   A.   I was not.

11:11:03AM 14   Q.   Over here on Page 3, on outsourcing audit work --

11:11:17AM 15   Let me blow that up a little bit.   Speaking with tax

11:11:21AM 16   analysts after the session, Koskinen defended the IRS's

11:11:27AM 17   decision to outsource $2 million of work on Microsoft's

11:11:30AM 18   transfer pricing audit to the law firm Quinn Emanuel.   And

11:11:36AM 19   then down below in the highlighted portion quotes the

11:11:39AM 20   commissioner as saying, "One of the things that we have to

11:11:43AM 21   do is show up in tax court," the commissioner said.   "We

11:11:48AM 22   can't default the government's position simply because we

11:11:51AM 23   have 20 percent fewer members of the Office of Chief

11:11:54AM 24   Counsel than we used to have.   The one place we can't cut

11:11:57AM 25   resources is in tax litigation."

11:12:00AM 1         Now, in fact, sir, wasn't the core purpose and

11:12:04AM 2     justification for spending $2 million on Quinn Emanuel was

11:12:09AM 3     that you wanted them to be your trial lawyers in tax court

11:12:13AM 4     down the road?

11:12:15AM 5     A.   Let me be very clear.   Quinn Emanuel was hired for

11:12:19AM 6     examination support and to help with the evaluation.   We

11:12:22AM 7     knew there was a possibility, just like in any case -- any

11:12:25AM 8     audit, any examination, that there would be a

11:12:28AM 9     disagreement.   And whenever there is a disagreement --   In

11:12:30AM 10    this case that seemed likely, given the past history and

11:12:33AM 11    the size and the difference of issues, notwithstanding

11:12:36AM 12    that we thought we still needed to do work to get the

11:12:38AM 13    right number, and notwithstanding that we wanted to have

11:12:40AM 14    resolution, that we might not agree with the taxpayer at

11:12:43AM 15    the end of the day, and we might not seek resolution.

11:12:45AM 16         In that case --   In every case, the IRS, the

11:12:48AM 17    examination function that I work for, we need to come up

11:12:51AM 18    with the right number and present it well.   And we need to

11:12:54AM 19    make sure that we have the right facts.   The first step is

11:12:57AM 20    always to get to that right number.

11:12:59AM 21         And once we put that right number down on paper,

11:13:01AM 22    whether it goes to appeals or tax court, we have to defend

11:13:03AM 23    it.   If it doesn't go to appeals, and it goes to tax

11:13:07AM 24    court, we have to be prepared to litigate.

11:13:09AM 25         And when we don't develop cases as well as we might

11:13:11AM 1   otherwise have, and we put a number on the paper that

11:13:14AM 2   isn't fully supported by the facts, or we haven't fully

11:13:17AM 3   developed the facts, in those situations we are not ready

11:13:21AM 4   to defend it, whether it is in appeals or in court.  So

11:13:26AM 5   our goal is to get to the right number and be ready for

11:13:28AM 6   whatever comes.

11:13:30AM 7   Q.   In the Veritas case, the lawyers who represented the

11:13:37AM 8   IRS in tax court were lawyers from the IRS Chief Counsel's

11:13:41AM 9   office, right?

11:13:42AM 10  A.   Yes.

11:13:43AM 11  Q.   And before you hired Quinn Emanuel, had you in fact

11:13:52AM 12  discussed with colleagues in the IRS your view that the

11:13:56AM 13  lawyers from the Chief Counsel's office had not done a

11:14:00AM 14  very good job in the Veritas tax court case?

11:14:06AM 15  A.   What I discussed with colleagues was that the Veritas

11:14:10AM 16  tax court case seemed to highlight a number of areas we

11:14:13AM 17  could do better in, particularly our development of the

11:14:17AM 18  facts, us actually diving into the taxpayer's methodology

11:14:23AM 19  and testing it, to look at the activities that the

11:14:26AM 20  companies performed.  In that case they focused a lot on

11:14:30AM 21  sales and marketing activities performed by the European

11:14:34AM 22  affiliate.

11:14:35AM 23      Here, we really needed to dive into the sales and

11:14:37AM 24  marketing activities that the U.S. continued to perform.

11:14:40AM 25  We thought we could do a better job presenting it, and

11:14:44AM 1   bringing better expertise to the table.

11:14:46AM 2       In Veritas we relied, from my understanding at

11:14:47AM 3   least -- and I only know what is in the tax court opinion,

11:14:50AM 4   since I wasn't privy to the case, the IRS relied on a

11:14:53AM 5   single economist expert.  On the other side they had an

11:14:55AM 6   economist, they had a code expert, they had a marketing

11:14:58AM 7   expert, and they had a financial expert.  We clearly could

11:15:02AM 8   do a better job bringing the right expertise to bear and

11:15:07AM 9   developing the facts and presenting them.

11:15:08AM 10      We thought that litigators who have experience with a

11:15:15AM 11  large bandwidth of cases of that variety, that complexity,

11:15:19AM 12  would be more likely, day in and day out, to have

11:15:22AM 13  encountered those kinds of issues and could bring some

11:15:24AM 14  value to the table.

11:15:25AM 15      We don't litigate a lot of transfer pricing cases.  As

11:15:29AM 16  I mentioned, Veritas is the only real fact-intensive case

11:15:34AM 17  that I am aware of having been decided in the last decade

11:15:37AM 18  or so.

11:15:38AM 19  Q.  In all that long answer of yours, that all related to

11:15:40AM 20  what happened in the tax court, right?

11:15:42AM 21  A.  Yeah.  We need to put the right number and support it

11:15:45AM 22  when we issue -- whether it is, frankly, a 30-day letter

11:15:49AM 23  or a statutory notice of deficiency.  So we need to make

11:15:52AM 24  sure we have done our job when we put a number on the

11:15:55AM 25  paper.  If we don't do that, then it is not going to stand

11:15:57AM 1    up in any forum, whether it is appeals or tax court.

11:16:00AM 2    Q.   Please listen to my question carefully and see if you

11:16:03AM 3    can answer it.  Did you talk with colleagues at the IRS

11:16:11AM 4    before you hired Quinn Emanuel about your concern that the

11:16:17AM 5    folks from the Chief Counsel's office of the IRS had not

11:16:20AM 6    done a good enough job in the tax court?

11:16:25AM 7         MR. WEAVER:   Objection, to the extent that the

11:16:27AM 8    question calls for privileged communications with IRS

11:16:32AM 9    counsel or deliberative communications.

11:16:34AM 10        THE COURT:   Are you asking him to state whether or

11:16:38AM 11   not that was his opinion?

11:16:41AM 12        MR. BECK:   I will ask it that way.

11:16:43AM 13   By Mr. Beck:

11:16:43AM 14   Q.   It was your opinion, was it not, sir, setting aside

11:16:50AM 15   any questions about how the audit was conducted, that the

11:16:53AM 16   lawyers from the Chief Counsel's office in the IRS had not

11:16:59AM 17   done a good job in the tax court?

11:17:03AM 18   A.   If you are asking me for my opinion, my opinion,

11:17:07AM 19   looking at the outcome of Veritas, was that the opinion

11:17:11AM 20   highlighted a number of areas that the IRS as a whole

11:17:14AM 21   could do better at.  And one of the key pieces was that we

11:17:20AM 22   switched positions between our examination piece and the

11:17:23AM 23   counsel piece.  Obviously counsel had a role to play in

11:17:27AM 24   that, just like examination had a role to play in the

11:17:29AM 25   outcome of that decision.  We, the IRS as a whole, it

11:17:33AM 1  looked like we could do a better job developing the facts.

11:17:36AM 2  If that means that counsel could have done a better job,

11:17:39AM 3  then, certainly, they could have done a better job as

11:17:41AM 4  well, just like exam could do a better job.  And that's

11:17:46AM 5  what we are trying to do.

11:17:47AM 6  Q.   Did you tell people in the IRS -- not in any

11:17:49AM 7  privileged communication, lawyer-client, did you tell your

11:17:54AM 8  colleagues that we need to bring in David Boies or John

11:17:57AM 9  Quinn, or whomever, because the guys who did the job in

11:18:02AM 10 the tax court fouled it all up and we want first-class

11:18:06AM 11 trial lawyers in the tax court?

11:18:12AM 12 A.   I don't recall ever making those statements.

11:18:14AM 13 Q.   I am not asking word for word.  Did you say that in

11:18:17AM 14 substance to anybody at the IRS, other than if you were

11:18:22AM 15 seeking legal advice?

11:18:25AM 16       MR. WEAVER:  Objection to the extent that the

11:18:29AM 17 question calls for deliberations that are pre-decisional

11:18:32AM 18 in nature.

11:18:35AM 19       MR. BECK:  Your Honor, I guess that doesn't make

11:18:37AM 20 any sense to me.  The idea about whether he told somebody

11:18:40AM 21 that we need good lawyers in the tax court because the

11:18:43AM 22 other guys fouled it up, it is inconceivable to me how

11:18:49AM 23 that could be pre-deliberative as to any decision.

11:18:52AM 24       THE COURT:  The objection will be overruled.

11:18:54AM 25 Mr. Hoory, can you answer the question?  Did you ever make

11:18:56AM 1    that kind of statement?

11:18:57AM 2            THE WITNESS:  I don't believe so.  The kind of

11:18:59AM 3    statements that I recall making are consistent with what I

11:19:01AM 4    just explained, that we thought that people with more

11:19:05AM 5    expertise, more volume of cases, who worked with these

11:19:09AM 6    multifaceted, very complex issues, whether it was

11:19:13AM 7    intellectual property or antitrust, they could bring value

11:19:16AM 8    to the table.  That was the premise.  That was the value

11:19:18AM 9    we saw in bringing a Boies Schiller or a Quinn Emanuel to

11:19:23AM 10   give us their legal advice and consultation, to bring that

11:19:26AM 11   expertise.  Because at the IRS we simply don't deal with

11:19:30AM 12   that volume, we don't litigate that many cases.

11:19:32AM 13   Mr. Beck:

11:19:32AM 14   Q.  And give me the names of the people that you say you

11:19:35AM 15   said that to in case we get discovery and we can inquire

11:19:39AM 16   as to what they recollect you saying.  Who did you have

11:19:44AM 17   these conversations with?

11:19:46AM 18   A.  So obviously we discussed the premise with

11:19:50AM 19   Mr. Maruca.  He is my boss.  We had some discussions, I

11:19:58AM 20   would say, at some point, with Mr. Maruca's boss,

11:20:09AM 21   Mr. Danilack.  At some point we eventually discussed it

11:20:13AM 22   with Ms. Maloy.  On the counsel side, we discussed it

11:20:21AM 23   with, you know, various persons, in counsel as well.

11:20:27AM 24   Q.  Moving on to another subject here.  You understand

11:20:34AM 25   that one of the big questions in whether your summonses

11:20:43AM 1   should be enforced is whether private attorneys at Quinn

11:20:50AM 2   Emanuel can put people under oath and take testimony from

11:20:52AM 3   them, right?

11:20:53AM 4   A.   I understand it to be that whether contractors that

11:20:57AM 5   we hire, whether it is Quinn Emanuel or our substantive

11:21:01AM 6   experts, who were also in attendance at these interviews,

11:21:04AM 7   could ask questions at summons interviews that the IRS has

11:21:08AM 8   requested of taxpayers, or third parties.

11:21:10AM 9   Q.   Well, there are interviews and then there are

11:21:16AM 10  interviews where people are put under oath and give sworn

11:21:19AM 11  testimony.  You understand those are two different

11:21:22AM 12  animals, right?

11:21:22AM 13  A.   Well, there is Q&A and formal Q&A that is not under

11:21:27AM 14  oath, and then there is question and answer that is under

11:21:30AM 15  oath.  The only reason I was distinguishing what you said

11:21:32AM 16  from my understanding was because you suggested, or at

11:21:34AM 17  least I understood you to suggest, that Quinn Emanuel was

11:21:37AM 18  placing these people under oath.  And that is not what

11:21:39AM 19  happens.

11:21:39AM 20  Q.   It is not who places them under oath.  I am trying to

11:21:44AM 21  focus on who is going to be asking the questions.  And

11:21:48AM 22  what you have told Microsoft in no uncertain terms is that

11:21:52AM 23  if these summonses are enforced, Quinn Emanuel can fully

11:21:58AM 24  participate and take the lead, being the people asking the

11:22:04AM 25  questions and taking the testimony, right?

11:22:06AM 1   **A.   What I told them was that all of our experts would be**

11:22:12AM 2   **free, if we asked them to, to attend the interviews and**

11:22:15AM 3   **fully participate by asking questions.   That includes our**

11:22:19AM 4   **industry experts as well.**

11:22:20AM 5   **Q.   I am just asking about Quinn Emanuel.   Didn't you**

11:22:22AM 6   **tell them that if these summonses are enforced, Quinn**

11:22:26AM 7   **Emanuel is going to be, from your point of view, able to**

11:22:30AM 8   **attend all of these depositions or sworn interviews and be**

11:22:36AM 9   **the ones who ask the questions and get the answers?**

11:22:39AM 10   **A.   Amongst other people, yes.   I said that they would**

11:22:44AM 11   **attend if I asked them to, and that they may fully**

11:22:47AM 12   **participate, just like it says in the regulation.**

11:22:49AM 13   **Q.   You said, "like it says in the regulation."   Your**

11:22:52AM 14   **legal basis, justification for saying that Quinn Emanuel**

11:22:59AM 15   **ought to be able to do that is this temporary regulation**

11:23:01AM 16   **you referred to, right?**

11:23:03AM 17         **MR. WEAVER:   Objection.   Calls for legal analysis.**

11:23:05AM 18   **This is a fact witness, your Honor.**

11:23:07AM 19         **THE COURT:   The objection as to the form will be**

11:23:10AM 20   **sustained.**

11:23:13AM 21   **By Mr. Beck:**

11:23:13AM 22   **Q.   When you say as the regulation says, what are you**

11:23:16AM 23   **talking about in your answer to me?   When you volunteered**

11:23:22AM 24   **that this was all as provided for in the regulation, what**

11:23:25AM 25   **are you talking about?**

11:23:26AM 1    A.    It is the same regulation that is referred to in

11:23:29AM 2    correspondence between myself and Mr. Bernard or

11:23:33AM 3    Mr. O'Brien.  I think, if I have it right, it is

11:23:41AM 4    301.7602-1, subparagraph something or other.

11:23:45AM 5    Q.    In fact, you, when writing to Microsoft --  And they

11:23:53AM 6    had objected to Quinn Emanuel participating in any kind of

11:23:57AM 7    asking questions on sworn testimony, right?

11:24:00AM 8    A.    At some point they did, yes.

11:24:02AM 9    Q.    And what you did is, you wrote back and you said, "As

11:24:07AM 10   you no doubt are aware, this is authorized under the

11:24:11AM 11   temporary regulation," right?

11:24:12AM 12   A.    I wanted to make sure they were aware of it, yes.

11:24:14AM 13   Q.    Your position, as you communicated to Microsoft, was

11:24:17AM 14   that the authority for Quinn Emanuel to ask questions and

11:24:24AM 15   take testimony was this temporary regulation, right?

11:24:27AM 16          MR. WEAVER:  Objection, your Honor.  Again, the

11:24:29AM 17   framing of the question calls for legal authority.  It is

11:24:32AM 18   not a fact question.

11:24:35AM 19          MR. BECK:  I asked what he communicated to

11:24:37AM 20   Microsoft.

11:24:37AM 21          THE COURT:  The objection will be overruled.  Is

11:24:40AM 22   that what you told Microsoft?

11:24:42AM 23          THE WITNESS:  I think my letter clearly refers to

11:24:44AM 24   the regulation.  And it says -- assumes that they are

11:24:48AM 25   aware of it, because they are a very sophisticated

11:24:50AM 1    taxpayer, and they are advised by sophisticated tax

11:24:53AM 2    counsel.  If they didn't, it obviously made them aware of

11:24:57AM 3    it.  I don't know if they were or were not aware of it at

11:24:59AM 4    that point.

11:24:59AM 5    Mr. Beck:

11:25:00AM 6    Q.  I didn't ask whether they were aware or not aware of

11:25:02AM 7    it.  What I asked is, when Microsoft objected to Quinn

11:25:08AM 8    Emanuel taking sworn testimony, what you said to Microsoft

11:25:12AM 9    is that the authority for Quinn Emanuel to do that is in

11:25:18AM 10   the temporary regulation; isn't that true?

11:25:21AM 11   A.  I don't remember my exact phrasing.  I certainly said

11:25:23AM 12   that the reg permits our experts to attend and fully

11:25:28AM 13   participate.

11:25:28AM 14   Q.  Well, we will come back to your exact phrasing a

11:25:32AM 15   little later.  Let's take a look at the regulation here.

11:25:57AM 16   Just the title of it says, "Participation of a person

11:26:00AM 17   described in Section 6103(n) in a summons interview under

11:26:06AM 18   Section 7602(a)(2) of the Internal Revenue Code."  Do you

11:26:12AM 19   see that?

11:26:12AM 20   A.  I do.

11:26:13AM 21   Q.  You are familiar with both of these provisions,

11:26:16AM 22   right?

11:26:16AM 23   A.  I can't quote them to you, but basically.

11:26:17AM 24   Q.  But you are familiar with them, aren't you?

11:26:20AM 25   A.  I said "basically."

11:26:21AM 1   Q.   Incidentally, you are a lawyer, right?

11:26:24AM 2   A.   I am an attorney, but I don't work as an attorney in

11:26:28AM 3   my current capacity.

11:26:30AM 4   Q.   You are in fact trained as a tax lawyer, right?

11:26:33AM 5   A.   I have experience as a tax attorney.

11:26:36AM 6   Q.   Years and years of experience as a tax attorney,

11:26:38AM 7   right?

11:26:39AM 8   A.   Probably about ten --  Well, I practiced for six

11:26:44AM 9   years or so.

11:26:45AM 10   Q.   At one of the leading firms in the country, right?

11:26:48AM 11   A.   Thank you.

11:26:52AM 12   Q.   Covington & Burling, right?

11:26:54AM 13   A.   Yes.

11:26:55AM 14   Q.   As a tax attorney all that time, right?

11:26:57AM 15   A.   Yes.

11:26:58AM 16   Q.   Now, do you understand that Section 7602 is about who

11:27:04AM 17   can take testimony in a summons interview?

11:27:18AM 18        MR. WEAVER:  Your Honor, let me just object.  To

11:27:20AM 19   the extent that Mr. Hoory is going to be used as a witness

11:27:23AM 20   to interpret the reg, I believe that is improper.  If it

11:27:29AM 21   is his understanding as it relates to the Microsoft audit,

11:27:32AM 22   fine.  I don't know that it is relevant.  I am worried

11:27:35AM 23   that Mr. Hoory is being set up here, because of his legal

11:27:39AM 24   experience, to somehow now start opining on behalf of the

11:27:42AM 25   IRS about this reg.  That is not appropriate.

11:27:44AM 1      THE COURT:  Thank you.  Mr. Beck, I don't believe

11:27:52AM 2  that is where you are going, right?  We are trying to get

11:27:55AM 3  to the factual answers here, correct?

11:27:58AM 4      MR. BECK:  Yes.  But I think, your Honor, part of

11:28:01AM 5  the question concerning whether there was a proper purpose

11:28:04AM 6  and whether this was abusive requires a basic

11:28:08AM 7  understanding of the statutory scheme, which this

11:28:12AM 8  gentleman clearly did.  And he participated, in fact, in

11:28:16AM 9  reviewing regulations that purported to be based on these

11:28:25AM 10  statutory provisions.  So as a factual matter, he had to

11:28:29AM 11  have some kind of understanding of the statute in order to

11:28:34AM 12  participate in the deliberations concerning the

11:28:36AM 13  regulations.

11:28:36AM 14      THE COURT:  His understanding of the statute is

11:28:38AM 15  not at issue.  It will be up to the court to make that

11:28:42AM 16  determination.  His understanding of the statute as to how

11:28:44AM 17  it affects what he may have done factually is relevant

11:28:49AM 18  here.  If that's the way you want to go, then fine.

11:28:53AM 19  Otherwise, Mr. Weaver's objection is correct.

11:28:56AM 20      MR. BECK:  Well, I actually wanted to kind of

11:29:00AM 21  debate him about the meaning of the statute.

11:29:03AM 22      THE COURT:  I don't see why you want to waste the

11:29:05AM 23  time.  It will be up to me to decide what that statute

11:29:08AM 24  means.

11:29:13AM 25  By Mr. Beck:

11:29:14AM 1    Q.   Let me ask you, 7602 --  And this really is directed

11:29:19AM 2    towards factual testimony.   You heard Mr. Weaver's

11:29:24AM 3    explanation of -- his interpretation of 7602, correct?

11:29:28AM 4    A.   During his opening, yes.

11:29:30AM 5    Q.   Now, for years, the industry experts, like

11:29:38AM 6    economists, and engineers, and accountants had

11:29:42AM 7    participated in summons interviews, right?

11:29:47AM 8    A.   That's my understanding.

11:29:50AM 9    Q.   But is it also your understanding as a factual matter

11:29:55AM 10   that these summons interviews where experts participated

11:30:04AM 11   in were never -- almost never under oath?

11:30:12AM 12   A.   I can only speak to my tenure at the IRS.   What I can

11:30:18AM 13   tell you is that when we stood up TPO and looked at what

11:30:24AM 14   we could do better, one of the things we noticed was that

11:30:27AM 15   we had difficulty referring to interviews because some

11:30:30AM 16   were under oath and some were not.   And particularly on

11:30:34AM 17   the ones that were not, you know, similar to the point

11:30:37AM 18   that Microsoft made in its protest, you know, basically it

11:30:41AM 19   is tough to rely on someone's handwritten notes, what is

11:30:47AM 20   in there, what is not.   Somebody who is not part of the

11:30:49AM 21   examination and not actually at the interview can't really

11:30:52AM 22   evaluate those notes.   If we are trying to develop it and

11:30:55AM 23   give it to another expert that we bring on board later, we

11:30:57AM 24   really need a transcript, if we think we are going to rely

11:31:01AM 25   on that.

11:31:01AM 1       Similarly, if we send the case to appeals, the appeals

11:31:05AM 2   officer really needs a transcript to see what was said.

11:31:08AM 3   So one of the goals we had was, notwithstanding that in

11:31:11AM 4   the past at the examination stage we had not done

11:31:15AM 5   transcripts that often --  In other words, it wasn't that

11:31:17AM 6   it never happened, it just didn't happen that often.  One

11:31:20AM 7   of the pushes was, if you get to the stage that you need

11:31:22AM 8   to talk to people, like after you have just done the

11:31:24AM 9   preliminary back and forth to try to ask intelligent

11:31:28AM 10  questions, if you still have material issues in dispute,

11:31:31AM 11  one of the pushes we started to make was to have them

11:31:34AM 12  under oath on a transcript so there would be a record.

11:31:37AM 13  Q.  Well, you didn't really start to make that push until

11:31:41AM 14  you hired Quinn Emanuel in the Microsoft audit, right?

11:31:45AM 15  A.  That's incorrect.  We made that push in other cases.

11:31:49AM 16  In Microsoft we were trying to use resources efficiently

11:31:54AM 17  and to respect not just our use of our own resources, but

11:31:58AM 18  the company's requests of us, and the fact that the audit

11:32:04AM 19  had gone on for a while, and that we were trying to

11:32:07AM 20  resolve and narrow issues.  Mr. Bernard was actually the

11:32:11AM 21  one who asked me to only use informal interviews very

11:32:17AM 22  early on us reopening the case, withdrawing the 30-day

11:32:18AM 23  letter.  He is the one who said, "Hey, this has worked out

11:32:21AM 24  well for Microsoft in the past, you know, you guys seemed

11:32:23AM 25  to get what you wanted, how about we do this?"  And I

11:32:24AM 1    agreed, subject to the caveat, which is reflected in our

11:32:27AM 2    updated timelines after that occurred, that we reserve the

11:32:31AM 3    right to do formal interviews -- formal under oath

11:32:34AM 4    interviews.

11:32:35AM 5        Once resolution talks broke down and we had not

11:32:38AM 6    narrowed issues, then we knew exactly what was open, what

11:32:41AM 7    issues we thought we had to develop.  And at that point in

11:32:44AM 8    time we thought, "Is it worth investing the energy now on

11:32:49AM 9    our part and on Microsoft's?"  And the answer was clearly

11:32:52AM 10   yes.  This is a huge issue.  We needed to know what their

11:32:54AM 11   businesspeople thought of their various competitive

11:32:58AM 12   advantages, the things that are at issue in the valuation.

11:33:00AM 13       And we had not yet talked to the KPMG people on the

11:33:05AM 14   record, or the internal tax folks on the record, and we

11:33:08AM 15   asked to at the appropriate time, which is when Microsoft

11:33:11AM 16   told us that they did not want to narrow any issues, and

11:33:15AM 17   that we basically had to develop every open issue.  And

11:33:19AM 18   the way to do that with witnesses is to get them on the

11:33:21AM 19   record.

11:33:23AM 20   Q.  Well, focusing on Microsoft, this audit that began in

11:33:29AM 21   2007.  From 2007, 2008, 2009, 2010, 2011, 2012, 2013, all

11:33:42AM 22   the way up until Quinn Emanuel got on the scene, had you

11:33:50AM 23   ever had a single one of the interviews where people were

11:33:55AM 24   put under oath and a court reporter transcribed the

11:34:00AM 25   questions and answers?

11:34:00AM 1   A.   Yes, we did.   I think we had two to three interviews

11:34:04AM 2   under oath in the aQuantive acquisition that we were

11:34:09AM 3   auditing for Microsoft.   Those occurred prior to the

11:34:12AM 4   September and October interviews that took place in this

11:34:14AM 5   case.

11:34:14AM 6   Q.   I am talking now about the transfer pricing audit

11:34:17AM 7   that you were doing.   Is that what you are talking about?

11:34:20AM 8   A.   That was a transfer pricing issue.   It was in the

11:34:24AM 9   07/09 cycle.   That interview occurred on a transfer

11:34:28AM 10  pricing issue, under oath, with several Microsoft current

11:34:31AM 11  or former employees.

11:34:32AM 12  Q.   So now you are talking about a different audit for

11:34:34AM 13  different tax years, right?

11:34:34AM 14  A.   Well, it is related to this one in part, because --

11:34:36AM 15  Q.   Are you talking about a different audit for different

11:34:38AM 16  tax years?

11:34:39AM 17          MR. WEAVER:   Objection, your Honor.

11:34:40AM 18          MR. BECK:   Your Honor, we are never going to get

11:34:42AM 19  done today if I get ten minute answers for yes or no

11:34:45AM 20  questions.

11:34:48AM 21          THE COURT:   Mr. Hoory, I need you to do your best

11:34:50AM 22  to answer his questions in a much shorter fashion.

11:34:54AM 23          THE WITNESS:   I will do my best, your Honor.

11:34:57AM 24          THE COURT:   Ask him another question, counsel.

11:35:01AM 25  By Mr. Beck:

11:35:01AM 1  Q.   Were you just talking about a different audit for

11:35:03AM 2  different tax years?

11:35:04AM 3  A.   I was talking about the 07/09 audit.   It has

11:35:07AM 4  overlapping transfer pricing issues with the 04/06 audit.

11:35:11AM 5  Q.   Different audit, different tax years, right?

11:35:13AM 6  A.   Related audit, different tax years.

11:35:15AM 7  Q.   Now, in the audit that we have been talking about, in

11:35:20AM 8  all these years, '07, '08, '09, '10, '11, '12, '13, and

11:35:28AM 9  the audit that is the subject of this litigation, before

11:35:31AM 10 Quinn Emanuel got involved, had you ever conducted an

11:35:36AM 11 interview where somebody was put under oath and a

11:35:39AM 12 transcript was made of the questions and answers?

11:35:41AM 13 A.   I am not aware of an interview under oath in the

11:35:45AM 14 04/06 cycle prior to the ones in September and October.

11:35:53AM 15 Q.   I think you said that things changed and you decided

11:36:01AM 16 that you wanted people under oath, and I wrote down your

11:36:05AM 17 words, and I am quoting here, "once resolution talks broke

11:36:09AM 18 down."   As I understand it, sir, once it became clear that

11:36:17AM 19 you weren't going to be able to resolve this by agreement,

11:36:22AM 20 and that you were headed to the tax court, that's when you

11:36:27AM 21 and Quinn Emanuel decided that interviews ought to be

11:36:33AM 22 under oath and transcribed, right?

11:36:35AM 23 A.   That's incorrect.   Quinn Emanuel did not make the

11:36:39AM 24 decision, the IRS did.

11:36:40AM 25 Q.   So we will take --   Well, did you talk to Quinn

11:36:47AM 1    Emanuel about it?

11:36:47AM 2    A.   Not about the decision to seek interviews at that

11:36:49AM 3    time.  So I communicated, I believe in February --

11:36:52AM 4    Q.   I am talking about the decision that the interviews

11:36:56AM 5    that took place --  The first time you had people under

11:36:59AM 6    oath and transcribed it was in the fall of 2014, right?

11:37:03AM 7    A.   Yes.  But the decision to seek under oath interviews

11:37:06AM 8    was made long before that.

11:37:08AM 9    Q.   And are you saying that before those interviews took

11:37:13AM 10   place, you never had any conversations with Quinn Emanuel

11:37:16AM 11   about whether people ought to be put under oath and the

11:37:22AM 12   questions and answers ought to be transcribed?

11:37:24AM 13   A.   I don't recall ever discussing whether or not they

11:37:27AM 14   should be transcribed.  What I recall, and you can see

11:37:32AM 15   references in the contract, that we anticipated, long

11:37:35AM 16   before Quinn Emanuel did any substantive work, that we may

11:37:39AM 17   want to do interviews, and that if we did, we may want

11:37:43AM 18   them to be present, just like we would with any expert

11:37:45AM 19   that we hire.

11:37:46AM 20   Q.   In any event, whoever made the decision, and whoever

11:37:49AM 21   you consulted with, your testimony was that you decided

11:37:53AM 22   you wanted under oath transcripts once resolution talks

11:37:59AM 23   broke down, right?

11:38:00AM 24   A.   We identified the need prior to that, but we wanted

11:38:04AM 25   to make sure we only ask for interviews in areas that

11:38:07AM 1    continue to remain open.  Resolution could have narrowed

11:38:10AM 2    the areas, and it could have limited the topics that we

11:38:13AM 3    needed to interview people on.  Once resolution talks

11:38:16AM 4    broke down entirely --  Which the first time that

11:38:20AM 5    Microsoft told us unequivocally that they didn't want to

11:38:23AM 6    talk to us anymore was in July.  Up until that time there

11:38:26AM 7    were still some topics that were on the table that could

11:38:29AM 8    have been resolved.  Once that happened, we had to do a,

11:38:32AM 9    "Look, what are all the open questions?  What are open

11:38:34AM 10   topics?  Who do we need to talk to to get to the right

11:38:38AM 11   number?"

11:38:38AM 12   Q.   So it was after the resolution talks irrevocably

11:38:44AM 13   broke down, which you say was July, that's when you made

11:38:47AM 14   the decision "Now we need to make these under oath and

11:38:54AM 15   transcribed"?

11:38:55AM 16        MR. WEAVER:  Objection.  Mischaracterizes --

11:38:56AM 17        THE COURT:  I think he answered that.  The

11:38:58AM 18   objection will be sustained.

11:38:59AM 19        MR. BECK:  Well, we apparently heard it

11:39:01AM 20   differently, because I thought the answer was yes, and he

11:39:03AM 21   said I mischaracterized it.

11:39:07AM 22        THE COURT:  What he answered, according to our

11:39:10AM 23   transcript, was that the decision had been made earlier.

11:39:15AM 24   Once resolution talks broke down, that narrowed the areas

11:39:21AM 25   in terms of what they needed to actually focus on, but the

11:39:25AM 1    decision to do interviews, and do those under oath, had

11:39:27AM 2    been made earlier.  That's what I understood Mr. Hoory to

11:39:31AM 3    have said.

11:39:32AM 4    Mr. Beck:

11:39:33AM 5    Q.  Is that your sworn testimony, that before --

11:39:34AM 6    A.  Let me clarify clearly, because I think it is a

11:39:37AM 7    little in between the two.  The decision that if we had

11:39:39AM 8    unresolved issues, that we would have to pursue

11:39:41AM 9    interviews, and ask which ones to interview and that they

11:39:44AM 10   would be under oath, that was something that was on the

11:39:46AM 11   table that we discussed with the company long before we

11:39:49AM 12   actually asked for the interviewees.  And that was long

11:39:52AM 13   before July, when they said, "We are not interested in

11:39:55AM 14   talking with you on any subjects whatsoever."

11:39:57AM 15       So when I say there was a decision to pursue under

11:39:59AM 16   oath interviews on any topics that were material, and that

11:40:08AM 17   we were not resolved, that concept, that goal existed and

11:40:13AM 18   was shared with the company.  Certainly I told Mr. Bernard

11:40:16AM 19   the possibility way back in 2012.  But certainly in

11:40:20AM 20   February, when Mr. Sample initially said he didn't want to

11:40:23AM 21   engage in all issues, and then certainly throughout the

11:40:25AM 22   spring when we were still trying to figure out what we

11:40:28AM 23   could still talk about.

11:40:29AM 24       Once they said, "We don't want to talk about

11:40:31AM 25   anything," that's when it made sense for us to shift gears

11:40:35AM 1    from trying to resolve one or more open topics and say,

11:40:38AM 2    "Okay, well, we have this whole bucket of topics that we

11:40:41AM 3    identified in January.  You don't want to talk about any

11:40:43AM 4    of them, so now we have to go out and do interviews."  And

11:40:46AM 5    just like we told the company consistently through the

11:40:49AM 6    spring on all those unresolved items, we anticipated

11:40:52AM 7    that if we identified people that could speak to them,

11:40:54AM 8    that they would be under oath.

11:40:56AM 9    Q.   And one of your goals in putting people under oath

11:41:00AM 10   and having the testimony transcribed in the fall of 2014,

11:41:06AM 11   after the resolution talks had broken down, was to create

11:41:10AM 12   a record that Quinn Emanuel could use in the tax court,

11:41:13AM 13   right?

11:41:14AM 14   A.   Our goal was to create a record that would reliably

11:41:19AM 15   document the facts upon which we based the decision we

11:41:21AM 16   were still working on to get to the right number.

11:41:24AM 17   Obviously that record would help if the case went to tax

11:41:28AM 18   court.

11:41:29AM 19   Q.   Now, are you aware, just as a factual matter, whether

11:41:35AM 20   the tax court routinely allows pretrial discovery?

11:41:42AM 21   A.   I am not.

11:41:45AM 22   Q.   You don't know one way or another whether it is hard

11:41:48AM 23   to get discovery in the tax court?

11:41:51AM 24   A.   I don't have any --

11:41:53AM 25           MR. WEAVER:  Asked and answered.

11:41:54AM 1       THE COURT:  I think he answered it, counsel.

11:41:56AM 2  Mr. Beck:

11:41:57AM 3  Q.  Are you familiar with the tax court rules?

11:41:59AM 4  A.  I have never litigated in tax court, no.

11:42:02AM 5  Q.  Have you ever talked with anybody at the IRS about

11:42:06AM 6  how difficult it is to get discovery in the tax court?

11:42:13AM 7  A.  To the extent I have talked about tax court

11:42:17AM 8  procedure, it has been seeking legal advice from IRS

11:42:22AM 9  counsel.

11:42:22AM 10 Q.  I want to talk about the temporary regulation, which

11:42:55AM 11 I think you agreed you told Microsoft was the authority

11:42:57AM 12 for Quinn Emanuel and others to take testimony -- sworn

11:43:06AM 13 testimony in these interviews.  Because it was a temporary

11:43:16AM 14 regulation rather than a final regulation, were you able

11:43:22AM 15 to pass this or adopt it without the kind of notice and

11:43:27AM 16 comment period that normally would be required?

11:43:30AM 17       MR. WEAVER:  Objection, your Honor.  This gets

11:43:31AM 18 into regulatory procedure.  Mr. Hoory is not here as any

11:43:37AM 19 sort of regulatory expert.  The question isn't directed to

11:43:41AM 20 his experience in the Microsoft audit.

11:43:44AM 21       MR. BECK:  Your Honor, we are the ones who asked

11:43:46AM 22 him to come here.  They didn't decide what the scope of

11:43:48AM 23 his testimony would be.  He was involved in decisions

11:43:54AM 24 concerning the adoption of this temporary regulation, and

11:44:00AM 25 whether that was abusive or legitimate is one of the

11:44:05AM  1     issues in the case.  I am asking him factual questions.

11:44:08AM  2             THE COURT:  You are not asking him as an expert,

11:44:11AM  3     you're asking him --

11:44:11AM  4             MR. BECK:  Yeah, I am asking him factual

11:44:13AM  5     questions.

11:44:13AM  6             THE COURT:  The objection will be overruled.  Why

11:44:15AM  7     don't you rephrase the question for Mr. Hoory?

11:44:17AM  8             MR. BECK:  Sure.

11:44:18AM  9     By Mr. Beck:

11:44:19AM 10     Q.   What you understood in your role there at the

11:44:26AM 11     transfer pricing organization is that one effect of

11:44:34AM 12     adopting a temporary regulation instead of a final

11:44:38AM 13     regulation is that you didn't have to give notice to the

11:44:43AM 14     public and give people an opportunity to comment before it

11:44:47AM 15     went into effect, right?

11:44:49AM 16     A.   Let me be clear.  I didn't -- I certainly don't

11:44:53AM 17     recall having any conversations about what kind of

11:44:56AM 18     regulation was going to be issued.  To the extent I had

11:45:01AM 19     involvement with the reg, it was an opportunity to provide

11:45:06AM 20     comments on the substantive wording, not the procedural

11:45:10AM 21     pieces.

11:45:10AM 22     Q.   You didn't know that it was going to be a temporary

11:45:13AM 23     regulation?

11:45:14AM 24     A.   I don't recall focusing on that particular issue.  It

11:45:17AM 25     is possible that I may have noticed that it had a T next

11:45:20AM 1   to it at some point in time.  But that was not an issue

11:45:23AM 2   that I focused on personally.

11:45:24AM 3   Q.   Well, if it didn't have a T next to it, you wouldn't

11:45:28AM 4   have been able to rely on it when you wrote Microsoft and

11:45:31AM 5   said, "Here is the justification for Quinn Emanuel to be

11:45:36AM 6   participating in these sworn depositions," right?

11:45:40AM 7   A.   I honestly don't know.  I am not an expert.  And I

11:45:44AM 8   don't specialize in the process of promulgating

11:45:48AM 9   regulations.

11:45:49AM 10   Q.   You don't know the difference between a temporary and

11:45:52AM 11   a final regulation?

11:45:53AM 12   A.   One of the differences I do know, as an example, is I

11:45:56AM 13   think temporary regs expire in two years.  But I don't

11:46:01AM 14   know exactly what the differences are between a --  I know

11:46:06AM 15   a regulation is permanent and a temporary regulation is

11:46:10AM 16   temporary.  I know there are different procedures.  I

11:46:13AM 17   don't know what they are.  I haven't had a reason in my

11:46:15AM 18   practice to research the difference between the two.  I

11:46:17AM 19   don't know.

11:46:17AM 20   Q.   And your sworn testimony is you don't know that when

11:46:22AM 21   there is a temporary regulation that is adopted, the IRS

11:46:29AM 22   doesn't have to follow the normal notice and comment

11:46:32AM 23   procedures?  That's your sworn testimony?

11:46:36AM 24           MR. WEAVER:  Asked and answered, your Honor.

11:46:37AM 25           THE COURT:  The objection will be sustained.  Next

11:46:40AM 1    question, Mr. Beck.

11:46:42AM 2    By Mr. Beck:

11:46:43AM 3    Q.   If we get discovery and we can talk to people at the

11:46:46AM 4    IRS, is there anybody, other than getting legal advice,

11:46:50AM 5    that you have ever talked to about this temporary

11:46:57AM 6    regulation?

11:46:57AM 7    A.   I think there is one of the exhibits that I am

11:47:03AM 8    familiar with that you will see I provided some comments

11:47:05AM 9    on a green sheet circulation.  Certainly therein you will

11:47:08AM 10   see the persons to whom I sent those comments.  If I

11:47:14AM 11   recall correctly, there was Howard Berger and Tom Ralph.

11:47:19AM 12   They are colleagues of mine in the transfer pricing

11:47:23AM 13   practice or in the TPO.  One is in TPO, one is in transfer

11:47:26AM 14   pricing practice, or TPP.  They are the persons, it is my

11:47:31AM 15   understanding that -- their case is that the reg project

11:47:35AM 16   originated from, at least of the need for it originated

11:47:37AM 17   from.  I think on that email chain was Sam Maruca, my

11:47:43AM 18   boss, who was obviously interested in the use of experts.

11:47:43AM 19   And Tom Vidano is the other person I recall.

11:47:47AM 20   Q.   And those are names on an email chain.  My question

11:47:50AM 21   is, did you talk to them orally or anybody else at the IRS

11:47:56AM 22   orally about this temporary regulation?

11:47:59AM 23   A.   Yes.

11:48:00AM 24   Q.   Who?

11:48:00AM 25   A.   Those same people.



11:48:03AM 1  Q.  You talked to them, had conversations with them about

11:48:06AM 2  the temporary regulation?

11:48:08AM 3  A.  I remember having conversations with them after the

11:48:12AM 4  reg was issued.  Because --  When the green sheet got

11:48:16AM 5  circulated, I don't recall actually discussing it with

11:48:18AM 6  them.  I recall sending and exchanging email

11:48:22AM 7  communications.

11:48:22AM 8  Q.  When did you first become aware that this temporary

11:48:25AM 9  regulation was in the works?

11:48:27AM 10  A.  I did not learn that the temporary project had

11:48:34AM 11  started or that a reg project had started, because I

11:48:38AM 12  didn't know what variety it was at the time.  So I didn't

11:48:40AM 13  learn about the reg project, to the best of my

11:48:43AM 14  recollection, until sometime in the spring of 2014.  I had

11:48:47AM 15  previously, in 2013, learned about the issue -- just the

11:48:52AM 16  issue about whether experts could participate or not in

11:48:57AM 17  summons interviews, because Mr. Ralph and Mr. Berger had

11:49:01AM 18  brought it to my attention when it arose in their case.

11:49:04AM 19  But at that point in time, to the best of my knowledge,

11:49:06AM 20  there was no reg project.

11:49:08AM 21      I learned about the issue that the reg was addressing

11:49:11AM 22  and clarifying in 2013.  I don't recall learning about --

11:49:16AM 23  that a reg project had started until sometime in 2014.

11:49:19AM 24  Q.  Tell me what they told you in 2013 about how this

11:49:22AM 25  issue had arisen.  What did they tell you?

**A.   So Tom Ralph, he was the central manager for the transfer pricing practice.  He has a large, I guess -- not docket, but number of cases that he supports in transfer pricing.  Howard Berger.  He was a colleague of mine in the transfer pricing operation.  Just like I do, he supported local teams.  In this case he was supporting Mr. Ralph's.  There, my understanding is, from conversations with them, that they had an outside expert. I don't know the exact variety, but my impression was that it was an economist.  And whatever variety of expert it was, they had wanted to schedule some interviews with the taxpayer, to speak to taxpayer employees, just like we are trying to do in the Microsoft case a couple of years later.**

**When they said that their expert would be there, the taxpayer objected.  At that point in time Mr. Ralph and Mr. Berger reached out to their colleagues in transfer pricing, so I can remember them reaching out to myself, Mr. Maruca, and said, "Hey, we have never seen this.  Have you seen this?"  In our collective experience -- not so much me, but if you add my colleagues' experience together, that is multiple decades.  Between the four of us we probably have about 80 years.  We were all flabbergasted and surprised.  We thought that is a creative argument, but one no one ever expected.  At least**

11:50:56AM  1    from our perspectives, we had always assumed that the IRS,

11:51:00AM  2    when it hired experts, that they could ask questions; and

11:51:02AM  3    if those questions are in the format of a summons

11:51:06AM  4    interview, that there was no issue, just like we share

11:51:08AM  5    with experts documents day in and day out so they can

11:51:11AM  6    assist us with their analyses.

11:51:13AM  7    Q.   This interview that they told you about, was this an

11:51:17AM  8    interview where a witness was put under oath and the

11:51:20AM  9    questions and answers were transcribed?

11:51:23AM 10    A.   It is my understanding that is what they were

11:51:26AM 11    seeking, that's correct.

11:51:27AM 12    Q.   And then was your understanding that this entire

11:51:31AM 13    temporary regulation project was geared toward creating

11:51:37AM 14    some authority that you could rely on for allowing outside

11:51:43AM 15    experts or contractors to participate in sworn interviews?

11:51:52AM 16    A.   I wouldn't characterize it that way.  It is close,

11:51:55AM 17    but not exact.  It is my understanding that that initial

11:51:58AM 18    identification of this issue, which surprised all of us,

11:52:02AM 19    didn't make sense to the IRS, and wasn't consistent with

11:52:05AM 20    our understanding of how we could and do use experts.

11:52:08AM 21         And that at some point in time -- and there was a long

11:52:11AM 22    period of time where I didn't hear anything about it, but

11:52:13AM 23    at some point in time someone was presumably working on

11:52:16AM 24    this or thinking about this.  At some point in time in

11:52:19AM 25    2014 I became aware of this reg project, to clarify and

11:52:23AM 1    make clear what the IRS thought and what its position was

11:52:26AM 2    at the time, that our experts are there to help us, they

11:52:29AM 3    are there to look at books and records, and when we do

11:52:32AM 4    interviews they are there to help us ask intelligent

11:52:35AM 5    questions.  We wanted to make sure they were able to do

11:52:38AM 6    so.

11:52:38AM 7    Q.  In your collective 70 or 80 years of experience,

11:52:41AM 8    whatever it was that you mentioned before, had any of you

11:52:48AM 9    ever been involved in a situation where instead of an

11:52:52AM 10   economist or an engineer or an accountant, some sort of

11:52:59AM 11   expert like that, instead of that the IRS had hired

11:53:04AM 12   outside counsel to act as consultants, and for the outside

11:53:13AM 13   counsel to be asking questions of witnesses when they are

11:53:19AM 14   under oath and being transcribed?

11:53:22AM 15   A.  I can't speak to my colleagues' experience --

11:53:26AM 16   Q.  Just yours then.

11:53:27AM 17   A.  My own.  I am aware of cases where the IRS has hired

11:53:32AM 18   outside counsel to advise.  I am not aware of cases where

11:53:34AM 19   they have invited counsel to do under-oath interviews.

11:53:39AM 20   Q.  So far as you know, nobody else had ever done that,

11:53:44AM 21   right?

11:53:45AM 22   A.  As far as I know, with respect to the outside

11:53:49AM 23   counsel.

11:53:49AM 24   Q.  Right, right, the outside counsel.  As far as you

11:53:52AM 25   know, the first time in the history of the universe that

11:53:55AM 1  anybody from the IRS said that outside counsel should be

11:54:02AM 2  allowed to participate as experts or contractors in

11:54:08AM 3  conducting sworn testimony, the first time in the history

11:54:11AM 4  of the universe was when you did it with Quinn Emanuel in

11:54:17AM 5  the fall of 2014, right?

11:54:19AM 6  A.   That is the first instance that I am aware of.  I

11:54:22AM 7  guess I am a trailblazer.

11:54:24AM 8  Q.   And planning to do this, and be this trailblazer, you

11:54:37AM 9  say you weren't tracking closely what was going on with

11:54:40AM 10 this regulation project?

11:54:42AM 11 A.   Give me one moment, please.  I wasn't aware of the

11:54:52AM 12 reg project until the spring of 2014, as I mentioned.  I

11:54:56AM 13 don't know when it started.

11:54:58AM 14 Q.   I would like to shift gears here to what was

11:55:22AM 15 happening during the audit.

11:55:24AM 16      THE COURT:  Counsel, if we are going to shift

11:55:27AM 17 gears here, we are about five minutes before noon, let's

11:55:30AM 18 go ahead and break for our noon recess.  If we could have

11:55:33AM 19 everybody back at ten minutes after 1:00, and then we will

11:55:37AM 20 do our best to start up at 1:15, and hopefully have

11:55:41AM 21 everybody here.  We will be in recess.

01:15:05PM 22      (Lunch break.)

01:15:05PM 23      THE COURT:  Counsel, before we get started, I am a

01:15:08PM 24 little bit concerned about the pacing of how we are going

01:15:11PM 25 today.  Mr. Weaver, let me ask you, how much time does the

01:15:14PM 1    IRS feel that they need for their presentation?

01:15:18PM 2         MR. WEAVER:  Your Honor, I appreciate that.  We

01:15:20PM 3    are going to need an hour and 15 minutes to an hour and a

01:15:23PM 4    half to lay out what I laid out in my opening.  We need

01:15:27PM 5    that much time.

01:15:28PM 6         THE COURT:  Mr. Beck, what that means is, we have

01:15:30PM 7    about two and a half hours left in the afternoon, once we

01:15:33PM 8    factor in our break for our court reporter.  You have

01:15:37PM 9    about an hour, counsel.

01:15:39PM 10        MR. BECK:  Thank you, sir.  I would just ask if

01:15:44PM 11   perhaps the court could request Mr. Hoory, once again, to

01:15:47PM 12   try to keep his answers short and responsive.  That would

01:15:51PM 13   help me get through as much as I can.

01:15:53PM 14        THE COURT:  Mr. Hoory, I would ask -- and I have

01:15:56PM 15   asked this before, just do your best to answer the

01:15:59PM 16   question.  All of the legal arguments will be made at a

01:16:03PM 17   later point in time.  The interpretations of statutes will

01:16:07PM 18   be something the court does.  So from you we just need the

01:16:11PM 19   facts.  All right?

01:16:12PM 20        THE WITNESS:  I understand, your Honor.

01:16:14PM 21        THE COURT:  You may inquire.

01:16:16PM 22   By Mr. Beck:

01:16:16PM 23   Q.  Mr. Hoory, I think you mentioned before the break

01:16:19PM 24   that you commented at some point on the temporary

01:16:24PM 25   regulation?

01:16:26PM  1    A.   I commented on the green sheet circulation.   It

01:16:30PM  2    wasn't a temp reg --  Are you talking about before or

01:16:33PM  3    after, is what I am asking?

01:16:35PM  4    Q.   Did you ever comment on what became the temporary

01:16:38PM  5    regulation?

01:16:39PM  6    A.   I discussed the regs after they were promulgated,

01:16:43PM  7    yes.

01:16:44PM  8    Q.   Didn't you comment before the regulation was adopted?

01:16:50PM  9    A.   If you mean the input I had into the language, that

01:16:55PM 10    was obviously before it was adopted.   If you mean have I

01:16:57PM 11    ever mentioned the regulation after it was adopted,

01:17:00PM 12    obviously I have.

01:17:01PM 13    Q.   No, no, no.   You had input before the regulation was

01:17:05PM 14    adopted, and you wrote a comment, right?

01:17:07PM 15    A.   Correct.

01:17:08PM 16    Q.   Now, I want to show you Exhibit 130.   This is what

01:17:20PM 17    was produced to us in response to our FOIA request.   On

01:17:28PM 18    here somewhere is there an email that is your -- transmits

01:17:34PM 19    your comment?

01:17:35PM 20    A.   I think you will have to scroll down a page or two,

01:17:37PM 21    if this is the email that I am aware of.

01:17:41PM 22    Q.   Here we go, on Page 2.   What we got in response to

01:17:49PM 23    our FOIA request was from Eli Hoory to various people,

01:17:59PM 24    "Re:  Green sheet circulation."   And I don't want to spend

01:18:02PM 25    the time to talk about the green sheet, what that means

01:18:05PM 1   exactly, but it is an opportunity for you to comment

01:18:09PM 2   before a regulation is promulgated, right?

01:18:12PM 3   A.   That's right.  In a fairly late stage, yes.

01:18:15PM 4   Q.   And the question -- the subject that you wrote is,

01:18:22PM 5   "7602."  Again, without getting into the substance, that

01:18:27PM 6   is the statutory provision that says that the secretary or

01:18:31PM 7   the secretary's delegates are allowed to take sworn

01:18:35PM 8   testimony, right?

01:18:36PM 9   A.   Right.  But I didn't write that subject.  I just

01:18:39PM 10  replied to an email.

01:18:41PM 11  Q.   You were replying to an email saying that.  And the

01:18:45PM 12  email says, "Urgent."  And then this "importance high,"

01:18:50PM 13  was that something that you put on there or was that sent

01:18:54PM 14  to you?

01:18:54PM 15  A.   I don't recall.  I can't tell you that every green

01:18:59PM 16  sheet I have ever received says "urgent" next to it.

01:19:02PM 17  Depending upon what your settings are -- sometimes we

01:19:04PM 18  applied them --  I don't know if it was me or them,

01:19:05PM 19  honestly.

01:19:06PM 20  Q.   Then what we were given was, "Tom," and then

01:19:12PM 21  everything else is blacked out?

01:19:14PM 22  A.   Up to, "Thanks for your consideration," yes.

01:19:15PM 23  Q.   I'm sorry?  What?

01:19:17PM 24  A.   Yes.  Up to the bottom, yes.

01:19:19PM 25  Q.   I guess there is something that says "thanks" or

01:19:22PM  1    something at the bottom.  I can't read that part.

01:19:25PM  2         Did you have anything to do with the decision to

01:19:31PM  3    black out your email?

01:19:33PM  4    A.  I did not.

01:19:33PM  5    Q.  So then recently --  Let me show you Exhibit 130-1.

01:19:53PM  6    So recently somebody made a decision to unredact this

01:19:59PM  7    email and to produce it to us in connection with this

01:20:04PM  8    lawsuit.  Have you seen this unredacted version in the

01:20:08PM  9    last couple of weeks?

01:20:09PM 10    A.  I have.  I saw it this week.

01:20:11PM 11    Q.  In connection with preparing for your testimony,

01:20:14PM 12    right?

01:20:15PM 13    A.  Correct.

01:20:16PM 14    Q.  Did you have any role in deciding, notwithstanding

01:20:25PM 15    the claim of deliberative process, that the IRS was going

01:20:28PM 16    to waive deliberative process when it came to your

01:20:31PM 17    comments on the regulation?

01:20:33PM 18    A.  I'm not sure if I can answer the back and forth of

01:20:39PM 19    counsel.

01:20:39PM 20         THE COURT:  Do you understand the question?

01:20:41PM 21         THE WITNESS:  I understand the question.  I will

01:20:42PM 22    ask --

01:20:43PM 23         MR. WEAVER:  To the extent that there was any

01:20:45PM 24    discussion with counsel, we are asserting privilege.

01:20:49PM 25         THE COURT:  You are just looking --  Let me have

01:20:52PM 1    you ask for a specific --

01:20:55PM 2            MR. BECK:  I am not asking for the substance of

01:20:57PM 3    any conversations that he had with counsel.  I am asking

01:21:00PM 4    whether he had any role in the decision to waive the

01:21:05PM 5    deliberative process privilege insofar as it related to

01:21:09PM 6    his comments on this regulation.

01:21:15PM 7            THE COURT:  You can answer yes or no.

01:21:16PM 8            THE WITNESS:  Basically, yes.  I did interpret the

01:21:20PM 9    deliberative process or how it applied, but I commented on

01:21:25PM 10   whether it made sense to unredact or redact.

01:21:28PM 11   By Mr. Beck:

01:21:28PM 12   Q.   You wanted this unredacted?

01:21:29PM 13   A.   I was in favor of it, personally.

01:21:32PM 14   Q.   You thought if you waived the deliberative process as

01:21:37PM 15   to this particular document, that would help the IRS's

01:21:40PM 16   case, right?

01:21:42PM 17   A.   I thought it would allow you and the court to see

01:21:44PM 18   what I wrote and assess the content.

01:21:47PM 19   Q.   And you thought it would help the IRS's cause if you

01:21:52PM 20   waived the deliberative process as to your comments, even

01:21:57PM 21   though they are maintaining it as to everybody else's,

01:22:00PM 22   right?

01:22:00PM 23   A.   I honestly don't know whether it would help or not.

01:22:04PM 24   I think it gives the court information that they wouldn't

01:22:06PM 25   have otherwise had.  If it is helpful for us, it helps us.

01:22:10PM 1   If the court determines it is not, it is not going to help

01:22:13PM 2   us.   I thought it made sense to lay it out and let the

01:22:16PM 3   court decide.

01:22:17PM 4   Q.   Is there some reason why it makes sense to lay it all

01:22:22PM 5   out and let the court decide based on all the facts when

01:22:27PM 6   it comes to your comments, but not as to everybody else's?

01:22:32PM 7   A.   I don't know what other persons' comments are, so I

01:22:34PM 8   can't really evaluate that.

01:22:36PM 9   Q.   Well, if you think that the right thing to do is to

01:22:40PM 10   let the chips fall where they may, whether it is helpful

01:22:43PM 11   or not helpful, just so the judge has all the information

01:22:47PM 12   as to your comments, wouldn't that apply as to everybody

01:22:51PM 13   else's comments?

01:22:53PM 14   A.   I imagine it depends upon the content and whether it

01:22:56PM 15   is covered by privilege.

01:22:57PM 16   Q.   Well, yours were covered by privilege, but you said

01:23:00PM 17   you wanted it unredacted so the judge would have the full

01:23:04PM 18   story, right?

01:23:05PM 19   A.   This is something I wrote --  To the extent I made

01:23:11PM 20   some comments and they are relevant to the matters at

01:23:15PM 21   issue, I would like to know whether or not they are

01:23:18PM 22   helpful or hurtful.  You know, just get it out of the way

01:23:20PM 23   and I can move on with my life and the examination.  Yes,

01:23:24PM 24   I wanted them out.

01:23:31PM 25   Q.   Now, in your comments over on Page 2, where we see

01:23:41PM 1    the unredacted version --  And I am going to try to see if

01:23:48PM 2    I can summarize and shorten it up a little bit.  As I

01:23:52PM 3    understand the substance of your comment, you were

01:23:55PM 4    suggesting that a dependent clause be moved within the

01:24:00PM 5    language of the regulation, because as it was written

01:24:04PM 6    somebody could interpret it to mean that experts couldn't

01:24:10PM 7    even look at documents unless they were under the

01:24:13PM 8    supervision of the -- direct supervision of the IRS, and

01:24:18PM 9    you wanted to make sure that clause removed -- was moved

01:24:24PM 10   so that people understood that experts could look at

01:24:27PM 11   documents on their own, but they couldn't take testimony

01:24:31PM 12   unless they were under the supervision of the IRS?

01:24:34PM 13   A.   Yeah, that is basically it.  I was supporting what we

01:24:37PM 14   understood the status quo to be.

01:24:39PM 15   Q.   And, of course, one of the experts you had in mind

01:24:42PM 16   that would be covered by this was Quinn Emanuel, right?

01:24:45PM 17   A.   Together with every other expert --

01:24:48PM 18   Q.   I said one of the experts was Quinn Emanuel, right?

01:24:51PM 19   A.   Yes, together with every other expert the IRS hires.

01:24:54PM 20   Q.   You didn't want anybody to think that when Quinn

01:24:57PM 21   Emanuel is going over our confidential taxpayer

01:24:59PM 22   information, that they should have to be under the

01:25:02PM 23   supervision of the IRS, right?

01:25:04PM 24   A.   I didn't think they would have to be in the presence

01:25:07PM 25   of the IRS.  Obviously, they are always working for us,

01:25:10PM 1    and they are always supervised by a COR, contracting

01:25:15PM 2    officer's representative, and the POC, the point of

01:25:17PM 3    contract, or a contracting officer.  So I didn't think we

01:25:20PM 4    needed to be physically present when they were looking at

01:25:24PM 5    documents.

01:25:25PM 6    Q.   In fact, you gave them, didn't you, computers that

01:25:29PM 7    had like all of our documents on them?  And you gave Quinn

01:25:32PM 8    Emanuel special computers that were loaded up with all of

01:25:35PM 9    the confidential information that we turned over over

01:25:39PM 10   eight years in this audit process, right?

01:25:41PM 11   A.   That is actually inaccurate.  We gave them laptops at

01:25:45PM 12   some point.  I don't think we had anything preloaded on

01:25:48PM 13   them.  The reason we gave them to them is because the IRS

01:25:51PM 14   computers allow for secure communications.  So it was

01:25:54PM 15   actually to protect the information better, not vice

01:25:57PM 16   versa.

01:25:57PM 17   Q.   Well, these computers, did they have access to the

01:26:01PM 18   servers where all of our confidential information is kept?

01:26:06PM 19   A.   I honestly don't know.

01:26:08PM 20   Q.   Well, how were they going to review all of our stuff

01:26:12PM 21   unless they had access to it on their computers?

01:26:14PM 22   A.   We gave it to them on secure removable media

01:26:17PM 23   originally, encrypted in accordance with the Federal

01:26:19PM 24   Information Protection Standards.

01:26:19PM 25   Q.   And then they put that stuff on their computers,

01:26:22PM  1    right?

01:26:22PM  2    A.   Are you talking about the laptops?  I don't know

01:26:25PM  3    where they put them, honestly.

01:26:27PM  4    Q.   I want to focus actually not so much on your wanting

01:26:31PM  5    to move the clause around as -- introductory statement

01:26:38PM  6    here.  I think you testified that this was the only time

01:26:45PM  7    you commented on the reg, right?

01:26:46PM  8    A.   I didn't say that this was.  I said this instance is

01:26:49PM  9    what I am talking about.  What I am referring to here,

01:26:52PM 10    "One final comment," is there were some exchanges.  There

01:26:55PM 11    is other people on this email, including Howard Berger and

01:26:59PM 12    Tom Ralph, who I referred to earlier.  They had some

01:27:02PM 13    comments previously.  I don't know if it was in this email

01:27:04PM 14    chain or a different one, because we could send things in

01:27:07PM 15    differently.  In other words, you could get the same email

01:27:10PM 16    reply to it, and Mr. Weaver could reply to the same email

01:27:14PM 17    separately.  What I was referring to in, "One more

01:27:18PM 18    comment" was Mr. Berger and Mr. Ralph had made some prior

01:27:22PM 19    comments, I was adding one additional one.

01:27:25PM 20    Q.   You say, "One final comment/suggestion."  You had no

01:27:31PM 21    idea somebody was going to comment after you?

01:27:33PM 22    A.   I am speaking for myself.  This is my last comment.

01:27:36PM 23    Q.   Your last comment.  What I want to know is --  Here

01:27:39PM 24    you have transmitted your last comment.  I want to know

01:27:42PM 25    about your earlier comments.

01:27:44PM 1    **A.**   So, as I mentioned, Mr. Berger and Mr. Ralph had some

01:27:49PM 2    comments previously.  I do -- I don't recall --  I

01:27:52PM 3    remember Mr. Ralph's had to do with the effective date and

01:27:57PM 4    timing, and I remember Mr. Berger's was substantive,

01:28:03PM 5    something stylistic.  I don't remember what they were.

01:28:04PM 6    The only thing I remember prior to this email was me

01:28:08PM 7    seconding Howard's suggestions as things that made sense.

01:28:12PM 8    **Q.**   Where is that?  We haven't seen any other emails from

01:28:15PM 9    you at all commenting on the regulation.  You mean there

01:28:18PM 10   are other emails and we just haven't been given them?

01:28:21PM 11   **A.**   I don't know what you have been given or not.

01:28:23PM 12   **Q.**   I can represent to you that we don't have any other

01:28:25PM 13   emails from you commenting on --

01:28:27PM 14   **A.**   I can tell you --  I don't know at what stage it was,

01:28:30PM 15   but I can tell you that I hit reply at some point with

01:28:35PM 16   regards to comments that either Mr. Ralph or Mr. Berger

01:28:39PM 17   made at some point with respect to this regulation.

01:28:42PM 18   **Q.**   Would you agree --

01:28:43PM 19   **A.**   I think it was all within like a day or two,

01:28:46PM 20   honestly.  I don't know the exact time, though.

01:28:47PM 21   **Q.**   Do you agree that wherever this email is, where you

01:28:52PM 22   hit reply, and then another comment, that we ought to be

01:28:57PM 23   able to look at that, too?

01:28:58PM 24   **A.**   I honestly don't care one way or another.  I will

01:29:02PM 25   leave that to IRS counsel to determine what is or isn't

01:29:05PM 1    privileged.

01:29:05PM 2    Q.   Well, didn't you already decide that your comments --

01:29:14PM 3    you are going to waive the deliberative process privilege?

01:29:17PM 4    Are you saying you decided to --

01:29:19PM 5    A.   I don't make the decision --

01:29:20PM 6    Q.   -- waive it as to one, but not waive it as to others?

01:29:24PM 7    A.   I don't make the decision on what gets waived and

01:29:26PM 8    what isn't.

01:29:27PM 9    Q.   You participated in it, though?  You just said so,

01:29:29PM 10   right?

01:29:29PM 11   A.   Only with respect to this email.

01:29:30PM 12   Q.   So you are saying, as far as you are concerned, you

01:29:34PM 13   wanted the judge to have the full story, but only as to

01:29:37PM 14   this email.  For other emails from you, you want to leave

01:29:40PM 15   it up to counsel to decide, right?

01:29:42PM 16   A.   At the end of the day, IRS counsel or the P&A folks,

01:29:47PM 17   they determine what is privileged or not.  This is the one

01:29:49PM 18   we discussed, because my understanding is it is what made

01:29:53PM 19   it to the administrative file.  Other things --  I don't

01:29:55PM 20   know what is in or out.  I don't make those

01:29:58PM 21   determinations.

01:29:59PM 22   Q.   I want to talk now about some things that happened

01:30:21PM 23   during the audit.  You indicated, I think, that you joined

01:30:30PM 24   the TPO -- what was it, November of 2011?

01:30:34PM 25   A.   I think it was October --  The first time I was

01:30:37PM 1    involved in the Microsoft audit was November.

01:30:41PM 2    Q.   So within a month of joining the TPO.  Did you come

01:30:45PM 3    directly from Covington & Burling?

01:30:47PM 4    A.   I did.

01:30:48PM 5    Q.   Within a month you were involved in the Microsoft

01:30:51PM 6    audit, right?

01:30:52PM 7    A.   Initially at a very high level as an audience.  Over

01:30:55PM 8    time I came to be more involved, yes.

01:30:58PM 9    Q.   In fact, you not only became more involved, you are

01:31:01PM 10   in charge of the Microsoft audit now, right?

01:31:02PM 11   A.   I wouldn't say that.  I would say that I take the

01:31:05PM 12   lead with respect to the transfer pricing issues.

01:31:09PM 13   Q.   Okay.  Fine.  The subject matter we have been

01:31:10PM 14   focusing on, transfer pricing issues, you have taken the

01:31:16PM 15   lead on that on behalf of the TPO, right?

01:31:18PM 16   A.   Certainly.

01:31:19PM 17   Q.   Now, does the TPO have a roadmap -- a general roadmap

01:31:26PM 18   that they follow in transfer pricing audits?

01:31:31PM 19   A.   So as part of standing up TPO, they worked on,

01:31:35PM 20   basically, procedures.  They are not one-size-fits-all.

01:31:42PM 21   There are some goals and things to think about.  But, yes,

01:31:44PM 22   there was a roadmap that was developed.  I think it was

01:31:47PM 23   published sometime in 2014.

01:31:48PM 24   Q.   Is Exhibit 136 the roadmap?

01:31:51PM 25   A.   Looks right to me.

01:31:53PM 1   Q.   And the introductory paragraph here --  Did you have

01:32:01PM 2   input into this roadmap?

01:32:02PM 3   A.   Very limited.   There were other persons who worked on

01:32:06PM 4   that much closely than I did.

01:32:07PM 5   Q.   But you are familiar with it, right?

01:32:09PM 6   A.   Broadly.   I reviewed it for today.

01:32:11PM 7   Q.   I'm sorry?

01:32:11PM 8   A.   I said I reviewed it to make sure I was up to speed

01:32:14PM 9   on it for today.

01:32:15PM 10  Q.   You reviewed it at the time it came out, or in

01:32:19PM 11  preparation for your testimony?

01:32:20PM 12  A.   I reviewed it in preparation for my testimony.   At

01:32:24PM 13  the time it came out I had seen an earlier iteration,

01:32:29PM 14  maybe -- probably a year or two before it came out, but I

01:32:33PM 15  wasn't involved at the time it actually got published.

01:32:34PM 16  Q.   Okay.   But you are up to speed on it for your

01:32:38PM 17  testimony, right?

01:32:38PM 18  A.   Certainly.

01:32:39PM 19  Q.   So we have this introductory language here.   I want

01:32:45PM 20  to move as quickly as I can and focus on the kind of

01:32:52PM 21  time -- the generalized timeline that is on Page 3.   And I

01:32:56PM 22  have highlighted here, "Transfer pricing audit stages and

01:33:00PM 23  timeline."   And then you, you being the IRS, set forth

01:33:06PM 24  kind of a typical sequence and timeline for the different

01:33:10PM 25  stages of a transfer pricing audit, correct?

01:33:13PM 1   **A.   Yes.   But on the first page it basically says there**

01:33:17PM 2   **is no one-size-fits-all.   It says that transfer pricing**

01:33:21PM 3   **cases are very complex, fact specific, and they typically**

01:33:23PM 4   **take two to three years or more.   So this is just a**

01:33:27PM 5   **generic sense.**

01:33:27PM 6   **Q.   Along the way here, and in other parts of the**

01:33:38PM 7   **document, do you identify or the IRS identify who should**

01:33:42PM 8   **be involved at these different stages?**

01:33:44PM 9   **A.   I think there is aspirational statements to that**

01:33:47PM 10  **effect, yes.**

01:33:48PM 11  **Q.   Is there any place in this document that you are up**

01:33:52PM 12  **to speed on where the IRS says, "Here is the point where**

01:33:57PM 13  **we ought to bring in outside counsel to help us complete**

01:34:04PM 14  **the audit, or give us a gut check, or get ready to fight**

01:34:09PM 15  **in the tax court"?**

01:34:10PM 16  **A.   I don't think --  It certainly doesn't use the words**

01:34:15PM 17  **you used.**

01:34:15PM 18  **Q.   Well, is there any place anywhere in the document**

01:34:18PM 19  **that you are up to speed on where the IRS says, "Here is**

01:34:24PM 20  **the stage to bring in outside counsel, because they can be**

01:34:28PM 21  **so helpful in these complicated audits"?**

01:34:32PM 22  **A.   It talks about who is supposed to be involved.   It**

01:34:34PM 23  **doesn't use the words "outside counsel."   It talks about**

01:34:36PM 24  **evaluating, once you know enough about the basic facts,**

01:34:39PM 25  **what kind of expertise you need.   It talks about bringing**

01:34:41PM 1    in internal folks to get up to speed.  It talks about

01:34:44PM 2    consulting with IRS counsel.  It also talks about

01:34:47PM 3    considering whether or not you should hire outside experts

01:34:49PM 4    as well.

01:34:51PM 5    Q.  And you said what kind of expertise ought to be

01:34:55PM 6    involved.  And nowhere in this document, that you are up

01:34:58PM 7    to speed on, does the IRS say, "You know what, one area of

01:35:04PM 8    expertise that is really important in these complicated

01:35:08PM 9    transfer pricing cases is commercial litigation

01:35:12PM 10   expertise," right?

01:35:13PM 11   A.  It does not use those words anywhere in the document.

01:35:16PM 12   Q.  It not only doesn't use those words, it doesn't have

01:35:20PM 13   that concept remotely referred to in the document, does

01:35:23PM 14   it?

01:35:23PM 15   A.  This is a generic roadmap --

01:35:26PM 16   Q.  And in this generic document --

01:35:27PM 17       THE COURT:  Mr. Beck.  I'm sorry.  You have to

01:35:28PM 18   let --

01:35:29PM 19   By Mr. Beck:

01:35:29PM 20   Q.  Go ahead.  It is a generic document.

01:35:31PM 21   A.  Well, it is a generic roadmap.  Every case is

01:35:34PM 22   different.  It says that clearly in here.  You have to

01:35:37PM 23   consider the facts and circumstances in the case, because

01:35:38PM 24   that's what makes or breaks a transfer pricing audit.  We

01:35:42PM 25   also talk about dropping things when we look at them, and

01:35:45PM 1   don't beat the bushes.  If you find something, you decide

01:35:48PM 2   what resources you need.  It is talking about making

01:35:50PM 3   intelligent decisions.  In this case, given its size -- in

01:35:53PM 4   Microsoft's case, given its size and complexity, we

01:35:55PM 5   thought that complex commercial litigation expertise was

01:36:00PM 6   one thing that could add to our resources and make us get

01:36:02PM 7   to a better result, a more reasonable result, and the

01:36:05PM 8   right number.

01:36:05PM 9   Q.   This is the kind of answer I was hoping you would

01:36:08PM 10  give me yes or no on.  My question was, nowhere in this

01:36:11PM 11  document, that you are up to speed on, is there any hint

01:36:18PM 12  that outside lawyers should be hired, because one of the

01:36:21PM 13  areas of expertise that you claim is so important in an

01:36:25PM 14  audit is commercial litigation, right?

01:36:27PM 15  A.   I already told you this does not refer to commercial

01:36:31PM 16  litigators, in my memory.

01:36:33PM 17  Q.   Incidentally, Quinn Emanuel -- John Quinn and John

01:36:43PM 18  Gordon, did they have any tax experience in their

01:36:47PM 19  background?

01:36:48PM 20  A.   I know that John Gordon has -- represents clients on

01:36:54PM 21  tax matters.  I do not know with respect to Mr. Quinn.

01:36:58PM 22  Q.   Well, Mr. Gordon never represented anybody on

01:37:01PM 23  transfer pricing issues, did he?

01:37:03PM 24  A.   Not to my knowledge.

01:37:05PM 25  Q.   Neither Mr. Quinn nor Mr. Gordon, whose expertise you

01:37:12PM 1    say would be so important in working on your audit,

01:37:16PM 2    neither one of them have any experience at all in

01:37:19PM 3    litigating audit questions, have they?

01:37:21PM 4    A.   To the extent the audit questions deal with complex

01:37:27PM 5    experts and items of commercial or IP law, which are

01:37:32PM 6    overlapped here since we are talking about intangibles, or

01:37:36PM 7    interpretation of contracts, representation of valuations,

01:37:39PM 8    I think they do have some of that expertise in their

01:37:43PM 9    either intellectual property or antitrust litigation.  So

01:37:45PM 10   that was the kind of expertise we were looking to

01:37:47PM 11   supplement.  We had very good transfer pricing -- that is,

01:37:51PM 12   the transfer pricing, legal expertise in the IRS.

01:37:53PM 13   Q.   My question is, did either of these gentlemen have

01:37:56PM 14   any experience in litigating tax audit issues?

01:38:00PM 15   A.   It depends on what your definition of what "tax audit

01:38:03PM 16   issues" is.  If you are asking did they have experience

01:38:06PM 17   litigating transfer pricing issues, then my answer is no,

01:38:10PM 18   I don't believe so.

01:38:10PM 19   Q.   Now, the timeline here, the generic timeline, talks

01:38:24PM 20   about when you are going to do things like issue IDRs.

01:38:29PM 21   Those are information document requests, right?

01:38:33PM 22   A.   Correct.

01:38:34PM 23   Q.   And then --  Does it talk about interviews in here

01:38:41PM 24   somewhere?

01:38:42PM 25   A.   There is a number of discussions about interviews.  I

01:38:46PM 1    think in the early stage they talk about talking to the

01:38:49PM 2    businesspeople.  Later on they suggest, you know, thinking

01:38:52PM 3    about whether or not you need to do interviews as well.

01:38:55PM 4    But it is not in here, it is in the meat of the document.

01:38:58PM 5    Q.   And then the final stages are resolution discussions,

01:39:02PM 6    and then final NOPA --  This is on the bottom right-hand

01:39:07PM 7    corner.  What does that stand for?

01:39:08PM 8    A.   Notice of proposed adjustment.  So if we are not

01:39:12PM 9    issuing a statutory notice, we typically issue a notice of

01:39:15PM 10   proposed adjustment.

01:39:16PM 11   Q.   Would that be like a 30-day letter?

01:39:19PM 12   A.   I think it accompanies the 30-day letter, strictly

01:39:22PM 13   speaking.

01:39:23PM 14   Q.   And then case closed, right?

01:39:25PM 15   A.   No.

01:39:27PM 16   Q.   Case closing?  That's what it says, right?

01:39:32PM 17   A.   "Case closing," that means, you know, at some point

01:39:34PM 18   if exam's finished up their stuff, then either it goes

01:39:38PM 19   from a 30-day letter to a stat notice, or from a 30-day

01:39:41PM 20   letter to appeals.

01:39:42PM 21       There is also a note at the last page about continuing

01:39:45PM 22   reevaluating the timeline.  And one of the notes, that

01:39:48PM 23   could happen after this, is, it says, that if the taxpayer

01:39:51PM 24   presents new legal or factual issues, or anything survives

01:39:57PM 25   in the protest, consider pulling the NOPA and reopening

105

01:40:00PM 1    the case.   I think that is in the last page of this

01:40:03PM 2    roadmap.

01:40:03PM 3    Q.   Let's take a look at Exhibit 78.   Was this a proposed

01:40:13PM 4    timeline concerning the Microsoft audit, dated around

01:40:23PM 5    July 12th, 2012?

01:40:27PM 6    A.   Yes.   Basically, when we were meeting with Microsoft

01:40:31PM 7    they asked us if there were milestones, and this was the

01:40:33PM 8    first effort to do so.

01:40:36PM 9    Q.   And the timeline basically contemplated a total of

01:40:41PM 10   about an additional 16 months until closure, right?

01:40:44PM 11   A.   Do you want me to do a map?   This is from July

01:40:50PM 12   until --

01:40:50PM 13   Q.   Well, we are starting July of 2012 --

01:40:53PM 14   A.   It went from the statute extension date.

01:40:57PM 15   October 30th was when the statute was extended to.   We

01:41:00PM 16   just worked backwards.   We knew that we needed at least

01:41:04PM 17   three months, if we didn't reach resolution, to decide

01:41:06PM 18   whether to issue a 30-day letter or a stat notice.   And

01:41:10PM 19   then we just went backwards and tried to fit everything

01:41:13PM 20   else, as best we could, into the remaining time.

01:41:15PM 21   Q.   And so it is starting --   Actually, I overstated it.

01:41:19PM 22   Starting in July of 2012, and you are contemplating that

01:41:28PM 23   you can wrap this thing up in about twelve months,

01:41:34PM 24   resolution of issues or issuance of a 30-day letter,

01:41:37PM 25   right?

01:41:38PM 1   A.   That's what it says.   As I mentioned, we just worked

01:41:41PM 2   back from the statute expiration date.   We knew we needed

01:41:46PM 3   three months if we had to issue a stat notice.   The normal

01:41:48PM 4   course, though, is we don't aspire to issue a stat notice.

01:41:52PM 5   The normal course in every audit is we normally -- just --

01:41:54PM 6   if we have un-agreed issues, we usually do a 30-day

01:41:56PM 7   letter.   A stat notice is a future decision that we make

01:42:00PM 8   after developing the facts and seeing what the taxpayer

01:42:02PM 9   does.

01:42:03PM 10   Q.   You mentioned the statute of limitations date.   Is it

01:42:06PM 11   the case, as of July 12th, 2012, Microsoft had agreed to

01:42:12PM 12   an extension of the statute of limitation that would take

01:42:15PM 13   it out to October 30, 2013?

01:42:18PM 14   A.   I believe so.

01:42:20PM 15   Q.   And your timeline said, "Well, we can get it done

01:42:25PM 16   within that time period," right?

01:42:26PM 17   A.   That was our goal.   There is some notes at the bottom

01:42:32PM 18   that you can't see, but it basically talks about things

01:42:35PM 19   that have to happen for this to actually be successful.

01:42:38PM 20   Q.   Exhibit 79, is this an updated timeline prepared

01:42:46PM 21   July 31, 2013?

01:42:48PM 22   A.   It is.

01:42:49PM 23   Q.   And by this time the dates had slipped somewhat,

01:42:53PM 24   right?

01:42:53PM 25   A.   Yeah.   And there is discussions about why in there.

01:42:58PM 1    Q.   And even with the dates slipping and the discussion

01:43:00PM 2    about why, as of July 31, 2013, your target for wrapping

01:43:08PM 3    this up was just nine months down the road, right?

01:43:11PM 4    A.   Again, we worked back from the statute of

01:43:13PM 5    limitations, which at that point in time was

01:43:15PM 6    December 31st, 2013.

01:43:19PM 7    Q.   Microsoft had, I take it, agreed to still another

01:43:23PM 8    extension of the statute of limitations, right?

01:43:25PM 9    A.   Yeah, they had.  They were interested in hearing, at

01:43:28PM 10   least I understood at that time, where we were.  And we

01:43:32PM 11   had always talked to them throughout this process about

01:43:34PM 12   trying to resolve one or more issues.

01:43:37PM 13   Q.   There was --  Let me just get back here.  There was a

01:43:46PM 14   possibility that you identified that there might be a need

01:43:54PM 15   for some new IDRs, some information document requests,

01:43:58PM 16   right?

01:43:59PM 17   A.   Certainly there is a couple of places referred to

01:44:02PM 18   here.  The top one is focusing on things we need to do to

01:44:08PM 19   get to having intelligent conversation at this resolution

01:44:11PM 20   meeting, where we present our --  Note 1 actually reserves

01:44:14PM 21   on doing interviews and IDRs outside of anything that you

01:44:17PM 22   see in the boxes above.

01:44:19PM 23   Q.   Yeah.  Note 1, let's look at that.  I have

01:44:25PM 24   highlighted some language.  Of course, the audit has been

01:44:29PM 25   going on now for six, seven years, right?

01:44:31PM 1    A.   Yeah.   At this point we are just focusing on the

01:44:35PM 2    focus with the expertise that we didn't previously have on

01:44:39PM 3    the transfer pricing issues, specifically Americas.

01:44:41PM 4    Q.   So tons of information has already been turned over.

01:44:46PM 5    What you say there in Note 1 is, "The majority of

01:44:50PM 6    data-intensive IDRs have been issued already, and based on

01:44:53PM 7    what is currently known, we believe that all reasonably

01:44:56PM 8    anticipated IDRs will be issued by June 30" -- and that

01:45:01PM 9    would be June 30, 2013 -- "and most significantly sooner,"

01:45:08PM 10   right?

01:45:09PM 11   A.   That was our goal.   I think until we identified new

01:45:14PM 12   issues, you know, that weren't resolved after the

01:45:17PM 13   January 14th meeting, we more or less meant that --   The

01:45:21PM 14   caveat was, and I think it is reflected in the next -- in

01:45:25PM 15   either that one or this one, is --   We still had a lot of

01:45:28PM 16   questions on software code.   And that was one of the

01:45:30PM 17   reasons we needed more time, to do a software code

01:45:33PM 18   analysis, and to get some answers about -- like a

01:45:36PM 19   stack-full of reports that the company had given us that

01:45:38PM 20   we didn't have previously, their internal software code

01:45:44PM 21   analysis.

01:45:44PM 22   Q.   Exhibit 134 is a May 2013 update of timeline, right?

01:45:50PM 23   A.   It is.

01:45:52PM 24   Q.   And you had these software issues, other issues.   Now

01:46:01PM 25   you are in the present, which would be May 30, 2013, and

01:46:08PM 1   you are projecting that in less than a year you will be

01:46:14PM 2   able to resolve the issues or issue a 30-day letter,

01:46:18PM 3   right?

01:46:18PM 4   A.   Yeah.   So this was updated after we actually were

01:46:22PM 5   able to schedule our software code visits to the company.

01:46:25PM 6   That is in Note 2.   This reflects that.   And, frankly, we

01:46:29PM 7   were basically on this schedule until the government

01:46:32PM 8   shutdown.   But we had a meeting scheduled with the

01:46:34PM 9   taxpayer, before the shutdown, for the first week in

01:46:37PM 10  December, which was the first availability for both the

01:46:39PM 11  taxpayer's executives and ours.

01:46:41PM 12  Q.   And, once again, at the IRS's request, Microsoft had

01:46:47PM 13  extended the statute of limitations out to June 30, 2014,

01:46:53PM 14  right?

01:46:53PM 15  A.   Yeah, they agreed to.   We told them we wanted to meet

01:46:57PM 16  with them and discuss resolution and narrow issues, and

01:46:59PM 17  they agreed to extend.

01:47:00PM 18  Q.   Also in here, what you were projecting is that within

01:47:24PM 19  just five months you would be able to present your

01:47:28PM 20  conclusions to the taxpayer, and then there would be a

01:47:34PM 21  period of four or five months of discussions, and by April

01:47:41PM 22  of 2014 you thought you would be able to wrap this up,

01:47:43PM 23  right?

01:47:43PM 24  A.   We discussed this at length with Mr. Sample and

01:47:48PM 25  Mr. Bernard on multiple occasions.   They said, "Do you

01:47:51PM 1    really think we are going to be able to resolve all issues

01:47:54PM 2    in two or three months between the presentation and our

01:47:57PM 3    D-Day for decision?"  We told them, "Look, you know, we

01:48:00PM 4    need a place to start, working back from the statute."

01:48:02PM 5    How much we resolved and how much we talked was up to

01:48:05PM 6    them.  We recognized to hit all of the issues would

01:48:07PM 7    probably take more time.  The ball was in their court.

01:48:12PM 8    Q.  And in the event the November 2013 date for the IRS

01:48:20PM 9    presenting their conclusions ended up slipping to, I think

01:48:24PM 10   you said, January 2014, right?

01:48:26PM 11   A.   After the government shutdown it was mutually

01:48:30PM 12   rescheduled for January 14th, correct.  Originally we

01:48:34PM 13   scheduled for December.

01:48:35PM 14   Q.  I only have an hour.  I only asked you whether it

01:48:37PM 15   slipped to January 2014.

01:48:39PM 16   A.   We rescheduled to January 14th, yes.

01:48:41PM 17   Q.  You had a face-to-face meeting with Microsoft, right?

01:48:44PM 18   A.   As well as their attorneys, yes.

01:48:46PM 19   Q.  And you were the lead presenter for the IRS?

01:48:49PM 20   A.   I was.

01:48:50PM 21   Q.  Right?

01:48:53PM 22   A.   I was.

01:48:54PM 23   Q.  You had a big thick slide deck with 60, 65 or so

01:49:00PM 24   slides, right?

01:49:00PM 25   A.   Two reports about 200 pages and a bunch of Excel

01:49:04PM 1    spreadsheets.

01:49:04PM 2    Q.   This was part of the IRS's effort to try to reach

01:49:09PM 3    resolution of the issues, correct?

01:49:10PM 4    A.   It was to intelligently discuss the analysis to date,

01:49:16PM 5    to identify open questions we had, and to propose a path

01:49:19PM 6    towards resolution on those open questions.

01:49:21PM 7    Q.   Can you say yes or no to whether this was part of the

01:49:23PM 8    IRS's effort to try to reach resolution of the issues?

01:49:26PM 9    A.   It was.

01:49:27PM 10   Q.   Thanks.

01:49:29PM 11   A.   You're welcome.

01:49:30PM 12   Q.   Now, in your earlier testimony you said that these

01:49:35PM 13   discussions irretrievably broke down in July of 2014.  Do

01:49:42PM 14   you remember that?

01:49:42PM 15   A.   I do.  That's the first time we were unequivocally

01:49:46PM 16   told that they didn't want to talk to us at all, and said

01:49:50PM 17   finish our case.

01:49:51PM 18   Q.   Actually, you had been told earlier than that that

01:49:54PM 19   Microsoft didn't want to pursue further resolution

01:50:00PM 20   discussions, and in fact wanted you to finally issue that

01:50:03PM 21   30-day letter so they could get on to tax court, right?

01:50:07PM 22   A.   That mischaracterizes the conversations.  As late as

01:50:11PM 23   May we were still talking to Microsoft about at least

01:50:14PM 24   engaging on some of the mechanical issues.

01:50:16PM 25   Q.   On February 17th, 2014, did you and Mr. Maruca of the

01:50:22PM 1    IRS have a conference call with Mr. Sample and Mr. Bernard

01:50:27PM 2    of Microsoft?

01:50:28PM 3    A.   That sounds right.

01:50:29PM 4    Q.   And did Mr. Sample inform you that Microsoft would

01:50:34PM 5    not further pursue dispute resolution discussions?

01:50:37PM 6    A.   What he said at that time is --  He did say that he

01:50:42PM 7    wasn't sure they could pursue it.  We expressed concerns

01:50:46PM 8    and disappointment.  We also left open the door for

01:50:49PM 9    resolution.  They also continued to commit to us to

01:50:51PM 10   provide us feedback on some of the open mechanical

01:50:54PM 11   questions which they had committed to on January 14th.  So

01:50:58PM 12   we left that meeting still with a commitment from

01:51:02PM 13   Microsoft to engage with us on some -- not all, but some

01:51:06PM 14   of the resolution items we had hoped to discuss.

01:51:09PM 15   Q.   I am putting up your sworn declaration, Exhibit 77,

01:51:13PM 16   Paragraph 41.  "On February 17, 2014, on a conference call

01:51:17PM 17   held among Mr. Sample, Mr. Bernard, Mr. Maruca, and me,

01:51:22PM 18   Mr. Sample notified us that he planned to sign a statute

01:51:26PM 19   of extension that week, extending the statute to

01:51:28PM 20   December 31, 2014; that he had decided not to pursue

01:51:35PM 21   resolution discussions; and that he would like a 30-day

01:51:43PM 22   letter."  Now, in your sworn declaration, when you

01:51:51PM 23   summarized what Mr. Sample said, all you said was that he

01:51:55PM 24   decided not to pursue resolution discussions and he would

01:51:58PM 25   like a 30-day letter, correct?

01:52:01PM 1   **A.**   If you look a few down, it says he still remained

01:52:06PM 2   committed on giving us a 60-day feedback, I believe.  And

01:52:09PM 3   on a 60-day feedback, if you have the context of the

01:52:11PM 4   January 14th meeting, and this particular conversation,

01:52:15PM 5   that feedback was on these mechanical issues that we had

01:52:18PM 6   raised questions on, how to identify revenues for

01:52:20PM 7   geographies, how to identify expenses, and how to do

01:52:23PM 8   allocations, and these math errors and judgment calls that

01:52:28PM 9   we wanted to engage on.  That was what the 60-day feedback

01:52:31PM 10  was supposed to focus on.

01:52:33PM 11  **Q.**   Did you issue the 30-day letter like Microsoft asked

01:52:36PM 12  you to?

01:52:36PM 13  **A.**   We did not.

01:52:37PM 14  **Q.**   On March 24, 2014, did you have a meeting with

01:52:42PM 15  Mr. Bernard of Microsoft, I think in Washington, DC?

01:52:49PM 16  **A.**   I did.

01:52:50PM 17  **Q.**   Did he reiterate Microsoft's request for a 30-day

01:52:53PM 18  letter?

01:52:53PM 19  **A.**   He did.

01:52:53PM 20  **Q.**   Did you issue one?

01:52:54PM 21  **A.**   No.

01:52:55PM 22  **Q.**   Ms. Eakes in her opening referred to Exhibit 126.

01:53:06PM 23  And we just talked about March 24, 2014, where they

01:53:12PM 24  reiterated the request for a 30-day letter.  Ms. Eakes

01:53:18PM 25  referred to Exhibit 126, which was a March 28th, 2014

01:53:27PM 1  email, just a few days afterwards, where the folks at the

01:53:36PM 2  IRS are saying we really need to get this temporary

01:53:41PM 3  regulation out by June 1st, 2014.

01:53:47PM 4       Now, my question is simply, did you personally know

01:53:53PM 5  within days of being told by Mr. Bernard that further

01:54:00PM 6  discussions weren't going to work, and that Microsoft

01:54:02PM 7  wanted a 30-day letter, did you know yourself that the IRS

01:54:08PM 8  was putting the hurry-up on this temporary regulation?

01:54:12PM 9  A.   I was not aware of this email or any of these

01:54:16PM 10  comments here.

01:54:17PM 11  Q.   Had you told others in your group, in this timeframe,

01:54:23PM 12  that Microsoft had said further discussions aren't going

01:54:26PM 13  to work and we want the 30-day letter?

01:54:31PM 14  A.   I am sure I made an internal report at some point.

01:54:34PM 15  Q.   Was there anybody in your group who had that

01:54:39PM 16  information, who was dealing with the people who were

01:54:42PM 17  deciding to hurry up the temporary regulation?

01:54:45PM 18  A.   Not to my knowledge.

01:54:45PM 19  Q.   Who in your group would have interfaced with the guys

01:54:50PM 20  working on the temporary regulation?

01:54:54PM 21  A.    I don't know about anyone in my group interfacing

01:54:57PM 22  directly with them until later -- that early June

01:55:02PM 23  timeframe.  So persons in my group who I knew at some

01:55:06PM 24  point -- I don't know when they started to interact with

01:55:10PM 25  the reg, as I mentioned before, were Tom Berger -- I'm

01:55:13PM 1    sorry, Howard Berger, Tom Ralph, and Sam Maruca.

01:55:21PM 2    Q.   I am putting up a timeline that your counsel had

01:55:24PM 3    prepared for use in the case.   According to your timeline

01:55:30PM 4    here, I will just put a little arrow next to the points I

01:55:39PM 5    am talking about, in November/December 2013 is when the

01:55:51PM 6    IRS contacted Quinn Emanuel, right?

01:55:53PM 7    A.   Correct.

01:55:54PM 8    Q.   Did you do the contacting?

01:55:57PM 9    A.   Not initially, but during that timeframe and

01:56:01PM 10   follow-up conversations, yes.

01:56:02PM 11   Q.   Are there records, memos, phone records, that if we

01:56:08PM 12   got discovery we might be able to look at that would tell

01:56:12PM 13   us what it was you discussed with Quinn Emanuel?

01:56:15PM 14   A.   No.   I think at that point in time there would have

01:56:19PM 15   been phone calls and possibly an NDA.

01:56:23PM 16   Q.   What's an NDA?

01:56:25PM 17   A.   A nondisclosure agreement.

01:56:27PM 18   Q.   And you don't think there is any emails or memos that

01:56:33PM 19   say, "Gee whiz, Eli talked to Quinn Emanuel, and here is

01:56:39PM 20   where we look like we are going"?

01:56:42PM 21   A.   Honestly, at that stage we are just reaching out to

01:56:46PM 22   ascertain whether there is interest in them working for

01:56:49PM 23   the IRS.   As things progress we start to talk about the

01:56:55PM 24   contours of expert engagements.   I honestly don't know

01:57:00PM 25   where in time you would start to see some documents

01:57:06PM  1    discussing --

01:57:07PM  2    Q.   Somewhere in time you would start to see some

01:57:09PM  3    documents discussing that, which we could look at if we

01:57:13PM  4    got discovery, right?

01:57:14PM  5    A.   I would imagine so, if they weren't privileged.

01:57:17PM  6    Q.   February 25th, you actually met with Quinn Emanuel.

01:57:22PM  7    Where was that meeting?

01:57:23PM  8    A.   It was in Los Angeles.

01:57:24PM  9    Q.   Did you fly out there and attend it?

01:57:27PM 10    A.   I did.

01:57:28PM 11    Q.   How many people from the IRS were there?

01:57:30PM 12    A.   Three.

01:57:31PM 13    Q.   How many people from Quinn Emanuel were there?

01:57:33PM 14    A.   Three or four, that I can recall.

01:57:37PM 15    Q.   Did you generate any documents, you or your

01:57:41PM 16    colleagues, describing what was talked about in this

01:57:43PM 17    meeting with Quinn Emanuel?

01:57:44PM 18    A.   Not describing what was talked about.  I may have

01:57:50PM 19    used some visual aids there.

01:57:53PM 20    Q.   And if we got discovery, we could look at your visual

01:57:57PM 21    aids, assuming that you don't claim some sort of

01:57:59PM 22    privilege, right?

01:58:00PM 23    A.   Of course.

01:58:00PM 24    Q.   Did you say that they didn't even know that Microsoft

01:58:11PM 25    was the company that they would be helping you go against?

01:58:17PM 1    A.   I did not say that.

01:58:18PM 2    Q.   Okay.  They did know it was Microsoft --

01:58:22PM 3    A.   Once we have executed a nondisclosure agreement.

01:58:26PM 4    That is the first step.  And after we get signed

01:58:28PM 5    nondisclosure agreements, just with respect to the people

01:58:31PM 6    that have executed them, we will inform them of the

01:58:33PM 7    potential taxpayer to eliminate things like conflicts.

01:58:38PM 8    Q.   So when did you get these nondisclosure agreements?

01:58:43PM 9    A.   I don't know exactly.  The first one was probably in

01:58:46PM 10   that November/December timeframe.

01:58:47PM 11   Q.   So way back in November/December they knew right from

01:58:51PM 12   the get-go that they were being asked whether they would

01:58:54PM 13   be interested in helping you go against Microsoft, right?

01:58:58PM 14   A.   At some early point, yes.

01:59:00PM 15   Q.   So then the engagement letter is signed on May 19th,

01:59:06PM 16   2014, right?

01:59:07PM 17   A.   That sounds right.  It was not an engagement letter,

01:59:13PM 18   we had a contract.

01:59:15PM 19   Q.   We will come back to that.  That is another subject

01:59:17PM 20   you are all geared up on for today's testimony, right?

01:59:24PM 21   A.   If you would like to ask me about it, I would be

01:59:28PM 22   happy to answer questions.

01:59:29PM 23   Q.   Oh, I will.  Now, by May 19, 2014, the statute of

01:59:33PM 24   limitations had been extended several times, correct?

01:59:35PM 25   A.   Yes.  Each time agreed to by Microsoft.

01:59:38PM 1   Q.   Right.   You asked and Microsoft agreed, right?

01:59:40PM 2   A.   Yes.

01:59:40PM 3   Q.   And as of late 2013 --  It was set to expire in June

01:59:47PM 4   of 2014, right?

01:59:48PM 5   A.   That sounds right.

01:59:50PM 6   Q.   And around December of '13 did you ask Microsoft for

01:59:57PM 7   still another extension?

01:59:59PM 8   A.   I don't know exactly when that request was made, but

02:00:03PM 9   sometime in December, January, February, yes.

02:00:06PM 10  Q.   Sometime in December, January, February.  Did you

02:00:09PM 11  tell them when you asked for this new extension that you

02:00:13PM 12  had contacted Quinn Emanuel and were in discussions with

02:00:21PM 13  Quinn Emanuel about them helping you out and going against

02:00:24PM 14  Microsoft?

02:00:25PM 15  A.   We did not at that point in time inform them of our

02:00:28PM 16  discussions with Quinn Emanuel.

02:00:30PM 17  Q.   And did you tell them that part of Quinn Emanuel's

02:00:35PM 18  role was -- it was contemplated that they would actually

02:00:41PM 19  appear in tax court against Microsoft?  Did you tell them

02:00:45PM 20  that?

02:00:45PM 21  A.   I did not tell them anything at all with respect to

02:00:49PM 22  Quinn Emanuel at that time.

02:00:51PM 23  Q.   You kept all of that secret, right?

02:00:53PM 24  A.   Well, I am not in the habit of discussing potential

02:00:57PM 25  experts with any taxpayer, Microsoft or otherwise, prior

02:01:00PM 1   to them having a reason to interact with the taxpayer.

02:01:02PM 2   Q.   This is a little different, because you are asking

02:01:05PM 3   somebody to voluntarily extend the statute of limitations,

02:01:08PM 4   and you are concealing from them the fact that for the

02:01:10PM 5   first time ever, in your knowledge, the IRS was hiring an

02:01:14PM 6   outside law firm to help it with the audit, and looking

02:01:19PM 7   forward to representing them in tax court.  You didn't

02:01:22PM 8   tell them that, did you?

02:01:23PM 9   A.   In the last part, if you are asking did I tell them,

02:01:28PM 10   no, I didn't tell them.  The rest of it, I don't think it

02:01:32PM 11   accurately characterizes why we asked for extensions at

02:01:33PM 12   the six-month mark.  We are directed to do that at six

02:01:36PM 13   months under the IRM, the Internal Revenue Manual, it is

02:01:40PM 14   my understanding.  Other people actually handle that,

02:01:42PM 15   people who manage the statutes.  But at the six-month mark

02:01:46PM 16   our instructions say, no later than that, see if you can

02:01:49PM 17   get an extension.  And if we don't, then we have to decide

02:01:52PM 18   what we are going to do to prepare for the statute to

02:01:54PM 19   expire.

02:01:55PM 20   Q.   The meeting in February, where you had like three

02:01:58PM 21   folks from the IRS, three folks from Quinn Emanuel, did

02:02:00PM 22   you discuss with Quinn Emanuel your need to get another

02:02:06PM 23   extension of the statute of limitations if Quinn Emanuel

02:02:11PM 24   was to be able to come onboard?

02:02:13PM 25            MR. WEAVER:  I will object, your Honor, and assert

02:02:17PM 1  the attorney-client privilege.  Quinn Emanuel ended up

02:02:21PM 2  advising the IRS on legal matters.  Although I don't

02:02:25PM 3  really care about this question, I don't want to open the

02:02:28PM 4  door to some subject matter.

02:02:29PM 5          THE COURT:  The objection will be sustained.

02:02:32PM 6  By Mr. Beck:

02:02:38PM 7  Q.  Was it in February of 2014, the same month that you

02:02:42PM 8  met with Quinn Emanuel, that you finally persuaded

02:02:47PM 9  Microsoft to give you still another extension of the

02:02:51PM 10 statute of limitations?

02:02:53PM 11 A.  I am not sure of when they extended it.

02:02:57PM 12 Q.  Exhibit 148.  You can see here, I think, that this

02:03:07PM 13 extension to the end of the year was granted on

02:03:17PM 14 February 28th, 2014.  Do you see that?

02:03:19PM 15 A.  I do.

02:03:20PM 16 Q.  So that was just a few days after your meeting with

02:03:25PM 17 Quinn Emanuel, correct?

02:03:26PM 18 A.  Yes.

02:03:27PM 19 Q.  Then back to our timeline -- your timeline, rather.

02:03:40PM 20 May 19, 2014, that's where your entry says you executed a

02:03:50PM 21 contract with Quinn Emanuel, right?

02:03:51PM 22 A.  That's when the contracting officer awarded the

02:03:55PM 23 contract.

02:03:57PM 24 Q.  Let's take a look now at Exhibit 71.  This is a

02:04:11PM 25 letter from you to Mr. Bernard, dated August 28th, 2014.

02:04:20PM 1   Do you see that?

02:04:21PM 2   A.   I do.

02:04:22PM 3   Q.   And you were talking about logistics for upcoming

02:04:25PM 4   interviews that Microsoft had agreed that they would

02:04:30PM 5   provide their people for, right?

02:04:31PM 6   A.   This was our initial request for those interviews

02:04:34PM 7   from the pool of people that Microsoft identified.

02:04:36PM 8   Q.   Well, you had already been in conversations with

02:04:41PM 9   them, and they had already agreed to make the people

02:04:44PM 10  available before you sent this letter, right?

02:04:46PM 11  A.   Not necessarily.  We had asked them to identify

02:04:50PM 12  persons who could speak to various subject matters for

02:04:55PM 13  purposes of scheduling these interviews.  And once they

02:04:58PM 14  identified that pool, we made that request that these are

02:05:02PM 15  the people and the times we would like to speak to them.

02:05:03PM 16  Q.   Look at your letter.  Your letter says, "Thank you

02:05:06PM 17  for agreeing to make available for interview the below

02:05:09PM 18  listed employees."  They had already agreed, right?

02:05:12PM 19  A.   They had suggested them as possible persons.  So,

02:05:16PM 20  yeah, it is basically feel-good language saying, "Hey,

02:05:19PM 21  thanks for talking to us, thanks for giving us candidates,

02:05:21PM 22  here are the people we are talking to."

02:05:24PM 23  Q.   Actually, you said, "Thank you for agreeing to make

02:05:28PM 24  them available," right?

02:05:29PM 25  A.   I did.  That's what I wrote.

02:05:29PM 1    Q.   When you asked them to make these folks available,

02:05:32PM 2    did you tell them that, incidentally, we have hired

02:05:36PM 3    outside counsel for the first time in the history of the

02:05:39PM 4    universe and Quinn Emanuel is going to be asking some of

02:05:42PM 5    the questions?

02:05:43PM 6    A.   This is the first letter where I informed them --

02:05:47PM 7    Q.   This is the first time, am I right, that you made any

02:05:51PM 8    reference to Microsoft, after they had already agreed to

02:05:55PM 9    these interviews, that Quinn Emanuel would be involved,

02:06:00PM 10   correct?

02:06:00PM 11   A.   Yes, this is the first time I told them about Quinn

02:06:05PM 12   Emanuel.

02:06:05PM 13   Q.   And it was almost like an aside, Page 3, "Oh, by the

02:06:12PM 14   way, in addition to our economist and industry experts,

02:06:14PM 15   this may include outside counsel from Quinn Emanuel

02:06:16PM 16   retained to assist LB&I in its evaluation and examination

02:06:21PM 17   in this matter"?  That was the entire disclosure, right?

02:06:25PM 18   A.   That's what it says.

02:06:26PM 19   Q.   And, of course, you really couldn't delay telling

02:06:30PM 20   them anymore because the statute of limitations was about

02:06:33PM 21   to expire, right?

02:06:34PM 22   A.   Listen, we didn't have Quinn Emanuel hired and on

02:06:39PM 23   board and cleared to do work until the middle of July.  We

02:06:42PM 24   had started discussions with them, with Microsoft, prior

02:06:45PM 25   to that.  As early as May we actually asked them to

02:06:48PM 1   identify people.  This was the first time where we

02:06:51PM 2   actually started to receive the names from Microsoft.  And

02:06:54PM 3   we could say, yeah, we would like to talk to some of the

02:06:57PM 4   people you have identified.

02:06:58PM 5   Q.   Was the statute --

02:06:59PM 6   A.   This was an appropriate time in my mind --

02:07:00PM 7   Q.   Was the statute about to expire?  My question was,

02:07:03PM 8   was the statute of limitations about to expire?

02:07:06PM 9   A.   The statute of limitations was set to expire December

02:07:09PM 10  31st, 2014.

02:07:11PM 11  Q.   And were you concerned that if you showed up with

02:07:13PM 12  Quinn Emanuel completely unannounced before these

02:07:16PM 13  interviews took place, the interviews wouldn't go forward,

02:07:20PM 14  right?

02:07:20PM 15  A.   I told them about a month before we asked for them so

02:07:25PM 16  they had an opportunity to consider them.  Certainly I

02:07:27PM 17  wanted them to know.  And if they had some issues, which

02:07:30PM 18  they did, they were free to raise them, which they did.

02:07:32PM 19  Q.   Let's take a look at how they raised the issues and

02:07:35PM 20  how you responded.  Exhibit 72, this is Mr. Bernard's

02:07:49PM 21  response to you?

02:07:49PM 22  A.   It is.

02:07:50PM 23  Q.   He says we are going to go forward with the

02:07:56PM 24  interviews on a consensual basis, right?

02:08:03PM 25  A.   I suppose so, yes.

02:08:08PM 1    **Q.    Then over on Page 2 he has a discussion of concerns**

02:08:13PM 2    **about Quinn Emanuel, correct?**

02:08:15PM 3    **A.    He does.**

02:08:18PM 4    **Q.    And, again, with time being what it is, I will try to**

02:08:22PM 5    **summarize.   The one thing he asked you was, are you**

02:08:29PM 6    **claiming these guys are going to be expert witnesses, or**

02:08:36PM 7    **are they going to be representing IRS as trial counsel if**

02:08:40PM 8    **this proceeds to go to litigation, right?**

02:08:44PM 9    **A.    That is the sentence.**

02:08:46PM 10   **Q.    And then he says, "We are concerned about their**

02:08:49PM 11   **involvement.   They have been adverse to us in many**

02:08:54PM 12   **matters.   They represent our biggest competitors."   Did**

02:08:57PM 13   **you take any of that into account when you decided that**

02:09:00PM 14   **Quinn Emanuel is the right firm to go against Microsoft?**

02:09:03PM 15   **A.    You mean that they have been --**

02:09:07PM 16   **Q.    That they had 30 open matters adverse to Microsoft,**

02:09:12PM 17   **did you take that into account?**

02:09:13PM 18   **A.    I took into account whether they had the expertise**

02:09:15PM 19   **needed, and whether or not there was a conflict that would**

02:09:18PM 20   **bar them from representing the IRS or bar them from being**

02:09:21PM 21   **adverse to Microsoft.**

02:09:23PM 22   **Q.    Did you take into account they had 30 open matters**

02:09:26PM 23   **against Microsoft when you decided they are the right**

02:09:29PM 24   **people to go against Microsoft on their behalf?**

02:09:33PM 25           **MR. WEAVER:   Objection.   Foundation.**

02:09:34PM 1          THE COURT:  The objection will be sustained.

02:09:35PM 2  By Mr. Beck:

02:09:35PM 3  Q.  Did you make any inquiry as to how many open active

02:09:38PM 4  matters they had against Microsoft?

02:09:42PM 5  A.  I did not ask them the number of matters of which

02:09:45PM 6  they were adverse to Microsoft.

02:09:47PM 7  Q.  Did you later learn that it was 30 or more?  Yes or

02:09:52PM 8  no, did you later learn that it was 30 or more?

02:09:54PM 9  A.  There is a list on the document that was provided to

02:09:57PM 10  Microsoft.  I don't know if those were current matters or

02:10:00PM 11  historical ones.  I don't know how many at any point in

02:10:02PM 12  time they were adverse.

02:10:03PM 13  Q.  You didn't care, right?

02:10:05PM 14  A.  I didn't see it as an issue.  Their being adverse to

02:10:08PM 15  Microsoft in our case has no bearing, in my mind, whether

02:10:11PM 16  they are adverse in another, particularly when those

02:10:14PM 17  attorneys are not working on those other cases that are

02:10:16PM 18  active.

02:10:16PM 19  Q.  Did you ask whether some of the biggest clients of

02:10:22PM 20  Quinn Emanuel also happened to be the biggest competitors

02:10:24PM 21  of Microsoft?

02:10:26PM 22  A.  I had no reason to.

02:10:27PM 23  Q.  It was of no interest to you that the people that you

02:10:32PM 24  were going to be turning all of our confidential

02:10:34PM 25  information over to were like principal outside counsel

126

02:10:39PM 1   for our biggest competitors, Google, Motorola?

02:10:43PM 2         MR. WEAVER:  Objection.  Foundation.

3   By Mr. Beck:

02:10:48PM 4   Q.  Well, you later learned from us --

02:10:48PM 5         THE COURT:  Just a second.

02:10:52PM 6   By Mr. Beck:

7   Q.  You later learned from us, did you not --

02:10:53PM 8       I am withdrawing it and asking a different question.

9         THE COURT:  Thank you.

10   By Mr. Beck:

02:10:55PM 11  Q.  You later learned when we were complaining that one

02:10:57PM 12  of the reasons we didn't like this was because Quinn

02:11:01PM 13  Emanuel is outside counsel for Google and Motorola, two of

02:11:05PM 14  our biggest competitors, right?

02:11:08PM 15  A.  I don't recall the actual names of the competitors

02:11:11PM 16  that were listed.  I do recall Microsoft raising concerns

02:11:15PM 17  that Quinn Emanuel -- other attorneys, not necessarily the

02:11:18PM 18  ones that we hired, but other attorneys at Quinn Emanuel

02:11:20PM 19  were adverse to them.

02:11:21PM 20  Q.  Did you make any inquiry into whether Quinn Emanuel

02:11:25PM 21  had a rather unfortunate recent history in being

02:11:29PM 22  sanctioned for not maintaining the confidentiality of

02:11:33PM 23  documents that had been entrusted in their care?

02:11:36PM 24        MR. WEAVER:  Objection.  Foundation.

02:11:37PM 25        THE COURT:  The objection is sustained.

By Mr. Beck:

Q.   Did you make inquiry?

MR. WEAVER:   The same objection.

THE COURT:   Sustained.

By Mr. Beck:

Q.   Did you make any inquiry at all as to whether Quinn Emanuel had been sanctioned in recent years concerning their handling of confidential information?

A.   No, not as part of the market survey.  We did a background check, we asked questions about the substance, we talked to people we wanted to hire.  That was the kind of things we focused on, did they have the expertise, did they seem like they were professional, did they understand the obligations they would have to protect information if you're hired as IRS contractors.  That was the focus of our inquiry at that stage.

Q.   Did you know from news reports about their troubles in that regard?

A.   No.

Q.   Let's look at Exhibit 73, your response to Mr. Bernard.  Over on Page 3, I want to focus on a couple of the comments.  This second paragraph you say, "Quinn Emanuel has been hired to assist LB&I in its ongoing evaluation and examination."  That means the audit, right?

A.   It does.

02:13:09PM 1   Q.   "As communicated in prior discussions, the IRS has

02:13:12PM 2   not yet made a determination on how to process the agreed

02:13:16PM 3   issues in the fiscal 04/06 cycle, all options remain open,

02:13:24PM 4   and you can anticipate a final decision after the

02:13:26PM 5   interviews scheduled for September and October."  Did that

02:13:30PM 6   mean at long last we were going to get either an all-clear

02:13:33PM 7   or a 30-day letter once these interviews took place?

02:13:37PM 8   A.   No.  As we discussed with Mr. Sample, and

02:13:41PM 9   Mr. Bernard, and as is referred to in Mr. Bernard's

02:13:44PM 10  outline for the March meeting, the options in play at that

02:13:47PM 11  point in time that we discussed with them were a 30-day

02:13:52PM 12  letter, it was a statutory notice of deficiency, or a

02:13:55PM 13  statutory notice of deficiency combined with a designation

02:13:57PM 14  for litigation.

02:13:59PM 15  Q.   Wrap it up one way or another after the meetings in

02:14:04PM 16  September and October, right?

02:14:05PM 17  A.   The same options that are available in every

02:14:07PM 18  examination, yes.

02:14:08PM 19  Q.   And that's what they could anticipate, you told them,

02:14:11PM 20  in this letter, correct?

02:14:12PM 21  A.   Yeah.  We thought that the September and October

02:14:16PM 22  interviews would finish our factual development at that

02:14:19PM 23  point in time based on what we knew then.

02:14:21PM 24  Q.   And you said that -- you assured them that Quinn

02:14:24PM 25  Emanuel had not been retained for litigation support,

02:14:26PM  1    right?

02:14:26PM  2    A.   Well, the contract that was awarded was limited to

02:14:30PM  3    examination support.

02:14:32PM  4    Q.   Well, you didn't say in the specific contract that

02:14:35PM  5    has been awarded it is limited to audit support, you said

02:14:41PM  6    Quinn Emanuel has not been retained for litigation

02:14:43PM  7    support, right?

02:14:43PM  8    A.   Well, if you remember the last letter that you showed

02:14:46PM  9    me, it only gave two options.  It was -- I don't remember

02:14:49PM 10    the first one, but it was basically expert witnesses or it

02:14:52PM 11    was trial litigation counsel.  Well, they were retained to

02:14:56PM 12    provide support, consultation, legal advice, and support

02:14:58PM 13    during the examination.  That was the contract that was

02:15:00PM 14    awarded.  As we discussed previously today, we certainly

02:15:04PM 15    knew there was a possibility that if -- that things might

02:15:08PM 16    go to litigation, that they could, and if the IRS chose,

02:15:10PM 17    we could hire them in a new contract, but not this one,

02:15:14PM 18    because it didn't cover it.

02:15:15PM 19    Q.   Well, you didn't tell them that in this letter.  In

02:15:18PM 20    fact, you told them there was no contract?

02:15:20PM 21    A.   I didn't say there was no contract.

02:15:22PM 22    Q.   The next page.  "The IRS does not have an engagement

02:15:27PM 23    letter with Quinn Emanuel."  That's what you told them,

02:15:30PM 24    right?

02:15:30PM 25    A.   I said no engagement letter.  I did refer to the

02:15:33PM 1    scope of work.

02:15:34PM 2    Q.   Yeah.  But an engagement letter, of course you know

02:15:39PM 3    what that is, when you hire a lawyer it is a contract

02:15:42PM 4    between the client and the lawyer for the provision of

02:15:46PM 5    legal services, right?

02:15:48PM 6    A.   Yeah, it is typically a letter on firm letterhead.

02:15:52PM 7    We don't have that in this case.  We have a contract.

02:15:54PM 8    Now, in hindsight would it have been better to provide a

02:15:57PM 9    contract or make it a little more clear?  Yes.  But

02:16:00PM 10   Microsoft is a sophisticated taxpayer.  And I discussed

02:16:03PM 11   the contracting process.  And I know from past

02:16:04PM 12   conversations with them that they know that we award

02:16:06PM 13   contracts, not engagement letters.  I wasn't ready at this

02:16:09PM 14   point in time to share a document that I was still

02:16:12PM 15   considering whether or not we could share it with them.

02:16:14PM 16   And this bought me some time.

02:16:16PM 17   Q.   You tricked them?

02:16:17PM 18   A.   I don't think I tricked them.  I described the scope

02:16:19PM 19   of work.

02:16:19PM 20   Q.   Let's back up.  They said, "Give us a copy of the

02:16:22PM 21   engagement letter."  And you said, "I don't have an

02:16:25PM 22   engagement letter."  And your explanation is, "They are

02:16:29PM 23   sophisticated.  If they ask for an engagement letter, it

02:16:33PM 24   is fair for me to conceal the fact that I have a contract

02:16:36PM 25   because they didn't use the word 'contract'"?

02:16:38PM 1    **A.**   The contract was public record.   It was published on

02:16:41PM 2    the website.   Mr. Bernard has previously looked at the

02:16:45PM 3    website for other contracts and seen when we --

02:16:47PM 4    **Q.**   Answer my question, will you?

02:16:48PM 5    **A.**   He asked for an engagement letter; we don't have one.

02:16:51PM 6    **Q.**   And you didn't tell him you had a contract, did you?

02:16:53PM 7    **A.**   I told him we had a scope of work.

02:16:58PM 8    **Q.**   Who else was in on the decision to conceal the fact

02:17:02PM 9    that you had a contract?

02:17:04PM 10           MR. WEAVER:   Objection.   Mischaracterizes the

02:17:06PM 11   testimony.

02:17:06PM 12           THE COURT:   The objection will be sustained.

02:17:08PM 13   By Mr. Beck:

02:17:08PM 14   **Q.**   Who else did you talk to in the IRS about how when

02:17:12PM 15   responding to the request for the engagement letter, we

02:17:15PM 16   are going to say there is no engagement letter, and we are

02:17:18PM 17   not going to tell them that we have a contract?

02:17:21PM 18   **A.**   I never discussed with anyone at the IRS not telling

02:17:24PM 19   them we had a contract.   I did discuss with other persons

02:17:28PM 20   whether or not we had -- how we should respond here.   To

02:17:31PM 21   the extent I had those discussions, it would have been

02:17:33PM 22   with IRS counsel.

02:17:35PM 23   **Q.**   So this letter of yours followed discussions where

02:17:40PM 24   you got legal advice from counsel.   Can you tell us which

02:17:44PM 25   lawyers?   Was it Quinn Emanuel?

02:17:47PM 1    A.   I discussed the issues with Bob Ratchford, IRS

02:17:51PM 2    counsel.

02:17:52PM 3    Q.   How about anybody from Quinn Emanuel?

02:17:54PM 4    A.   I made Quinn Emanuel aware that we had notified

02:18:00PM 5    Microsoft in this letter as to their being hired to assist

02:18:06PM 6    us in the examination.

02:18:09PM 7    Q.   So then Mr. Bernard responds.  And what he tells

02:18:21PM 8    you -- what you understood from this paragraph was that

02:18:26PM 9    even though you told them there was no engagement letter,

02:18:29PM 10   he had gone to a website where all government agencies are

02:18:34PM 11   required to post the existence of contracts.  And he

02:18:39PM 12   discovered, notwithstanding what you told them, that in

02:18:42PM 13   fact there was a contract.  He actually had the little

02:18:48PM 14   contract number.  So he wrote back to you and said,

02:18:54PM 15   "Whether you want to call it an engagement letter, a

02:18:57PM 16   contract, an undertaking, give us the document," right?

02:19:01PM 17   A.   He said what he said.

02:19:03PM 18   Q.   So we reiterated, Microsoft did, the request for the

02:19:13PM 19   unredacted copy of the contract, right?

02:19:17PM 20   A.   Yeah.  This was the first time they specifically

02:19:22PM 21   asked for a contract, yes.

02:19:23PM 22   Q.   But even you admit that here he used the language

02:19:31PM 23   where -- he said, "I want the contract."  You had a

02:19:34PM 24   contract.  And he asked for an unredacted one, right?

02:19:37PM 25   A.   Yeah, that is what he asked for.

02:19:38PM 1    Q.   You didn't give him one, though, did you?

02:19:40PM 2    A.   I gave him an unredacted copy of the scope of work,

02:19:44PM 3    which describes all of the substantive work that Quinn

02:19:46PM 4    Emanuel was hired to perform.

02:19:47PM 5    Q.   He asked for the unredacted copy of the contract, and

02:19:50PM 6    you didn't give him an unredacted copy of the contract,

02:19:53PM 7    did you?

02:19:53PM 8    A.   I gave him what I was personally comfortable giving

02:19:56PM 9    him.

02:19:59PM 10   Q.   Is there some reason that you wanted to conceal the

02:20:02PM 11   rest of the contract?

02:20:03PM 12   A.   The reason I gave him the Schedule C was because

02:20:10PM 13   that's what describes the complete scope of work, what we

02:20:13PM 14   had asked them -- or hired them to perform.   The reason I

02:20:14PM 15   didn't give him the rest is that I am not in the habit of

02:20:18PM 16   turning over IRS documents, particularly ones I am not the

02:20:21PM 17   custodian for, in total.   And it is not under my expertise

02:20:25PM 18   what is or is not redacted.

02:20:28PM 19        So normally, my understanding is, when you want -- if

02:20:34PM 20   a taxpayer wants documents, unless someone decides on

02:20:37PM 21   their own to give out some portion of it, and we can

02:20:40PM 22   always make that choice, they go through our disclosures

02:20:43PM 23   office.   They are the ones who know what gets redacted and

02:20:46PM 24   what doesn't.   That is outside of my knowledge.   And I was

02:20:49PM 25   comfortable giving him Schedule C, because that is the

02:20:53PM 1   meat of it, that is what we asked them to do.  I thought

02:20:55PM 2   that would show them the four corners of what they had

02:20:57PM 3   been hired to do under this contract.

02:20:59PM 4   Q.   Did you consult with counsel again on how you were

02:21:04PM 5   going to respond before you wrote this letter?

02:21:07PM 6   A.   I made the decision on what to release myself.   To

02:21:13PM 7   the extent there was ongoing discussions that required

02:21:18PM 8   legal advice, yes, I would have consulted with counsel.

02:21:22PM 9   Q.   And here you not only said Section C contains the

02:21:25PM 10  full and unredacted performance, work statement, scope of

02:21:31PM 11  work, you said that was for all phases of the contract,

02:21:35PM 12  and the contract has one phase only.  That's what you

02:21:39PM 13  represented to them, didn't you?

02:21:40PM 14  A.   Yeah.  And that's the truth.

02:21:42PM 15  Q.   Let's take a look at that.  In any event, before we

02:21:50PM 16  take a look at the actual contract to see whether that is

02:21:52PM 17  the truth, based on these representations that you made,

02:21:57PM 18  Microsoft agreed to go forward with those interviews,

02:22:01PM 19  right?

02:22:02PM 20  A.   So the first week we didn't have Quinn Emanuel

02:22:06PM 21  present, but the interviews went forward.  The second and

02:22:09PM 22  third weeks there were ongoing discussions about

02:22:14PM 23  procedures.  And I don't think they were resolved at this

02:22:17PM 24  point in time.  I don't think they were resolved until

02:22:20PM 25  maybe the 18th.

02:22:25PM 1          THE COURT:  You have ten minutes, Mr. Beck.

02:22:27PM 2          MR. BECK:  Thank you, your Honor.

02:22:29PM 3  By Mr. Beck:

02:22:32PM 4  Q.  After the interviews -- you made this representation

02:22:39PM 5  to us, did you later learn that we had filed a FOIA

02:22:44PM 6  request on September 24, 2014, asking for a full

02:22:51PM 7  unredacted copy of the contract?

02:22:53PM 8  A.  I did.

02:22:54PM 9  Q.  Did you have anything to do with whether that FOIA

02:23:01PM 10 request should be responded to?

02:23:03PM 11 A.  No.

02:23:03PM 12 Q.  We eventually got a full unredacted copy of the

02:23:08PM 13 contract.  Did you learn that?

02:23:10PM 14 A.  I know you got a copy.  I think there might be some

02:23:13PM 15 things that were redacted.  I honestly don't know.

02:23:16PM 16 Q.  Exhibit 64, that's a copy of the contract, right?

02:23:22PM 17 A.  It looks like the first page.

02:23:25PM 18 Q.  Did you negotiate this contract with Quinn Emanuel?

02:23:28PM 19 A.  I don't negotiate contracts.  That is a function that

02:23:31PM 20 the procurement officer does.

02:23:34PM 21 Q.  What was your role in terms of the terms of this

02:23:38PM 22 contract?

02:23:39PM 23 A.  I provided some input on the Schedule C that you saw;

02:23:43PM 24 and I also would have provided comments on F-6, which is

02:23:47PM 25 the delivery schedule; and I also would have provided some

02:23:53PM 1    comments because of the unique character of this with

02:23:55PM 2    respect to -- I think it is H-20.  It is basically where

02:24:00PM 3    we talk about these extra hurdles we have to go through

02:24:03PM 4    because Quinn Emanuel, they were attorneys, they are a law

02:24:07PM 5    firm, and they had to comply with conflicts rules under

02:24:10PM 6    the relevant ethics rules.

02:24:13PM 7    Q.   Let's take a look first over on Page 4.  You gave us

02:24:21PM 8    Schedule C; is that right -- or Section C?

02:24:23PM 9    A.   Yeah.  So it is Section C.  I guess I have been

02:24:27PM 10   talking "schedule."  Originally in my letter I attached

02:24:31PM 11   Section C, yes.

02:24:31PM 12   Q.   That is the only thing you gave us, right, Section C?

02:24:34PM 13   A.   That was the only thing I was personally responsible

02:24:37PM 14   for providing Microsoft, yes.

02:24:38PM 15   Q.   That is the only thing you gave us, right?

02:24:40PM 16   A.   Well, there is descriptions of what they did or

02:24:42PM 17   didn't do, and what their conflicts were, in the letter,

02:24:45PM 18   so it is not the only thing I gave you.

02:24:46PM 19   Q.   So now Section B, something that you didn't give us,

02:24:51PM 20   section B says, "Performance outside of the scope and/or

02:24:55PM 21   above the firm fixed price."  And then it says, "For each

02:25:01PM 22   phase."  Do you see that?"

02:25:02PM 23   A.   I do.  If you look at the schedules there is only one

02:25:04PM 24   phase.

02:25:05PM 25   Q.   You told us there was only one phase, but the

02:25:07PM 1    contract talks about each phase, right?

02:25:09PM 2    A.   Yeah.  So this is pro forma language.  Oftentimes you

02:25:14PM 3    will see references to each phase or look at the phases.

02:25:17PM 4    But then you have to look at the schedule, which I think

02:25:19PM 5    is either the page before or page after this, and then

02:25:23PM 6    Schedule C -- or Section C to see what the phases are.  If

02:25:26PM 7    there is only one phase, then this only applies to one

02:25:29PM 8    phase.

02:25:29PM 9    Q.   And there is a fixed price of $2,185,500, right?

02:25:36PM 10   A.   That sounds right, yep.

02:25:38PM 11   Q.   That was for all phases, though, right?

02:25:40PM 12   A.   For the one and only phase that they had awarded the

02:25:45PM 13   contract for, yes.

02:25:45PM 14   Q.   You said before, you anticipated that that work would

02:25:49PM 15   all get wrapped up before the end of 2014, and you were

02:25:55PM 16   paying Quinn Emanuel over $2 million for the work they

02:26:03PM 17   did, giving you a gut check on the audit between July,

02:26:06PM 18   when you claim they started work, and the end of 2014,

02:26:11PM 19   when you said the audit would be over?

02:26:14PM 20   A.   I think that mischaracterizes some things.  Would you

02:26:19PM 21   like me to explain why?

02:26:21PM 22   Q.   No.  And then it says, "Funding for each of the

02:26:29PM 23   phases is dependent on the litigation schedule of the

02:26:31PM 24   government, the court's scheduling, if required, appeals,

02:26:47PM 25   settlements, and/or final disposition of the taxpayer

02:26:52PM 1    case."  Is it your sworn testimony that this is all just

02:26:55PM 2    boilerplate, and there was nothing contemplated other than

02:27:00PM 3    that work in Phase I?

02:27:03PM 4    A.   Let me be very clear.   There was only one phase

02:27:06PM 5    awarded.   You have that.   It is limited to examination

02:27:09PM 6    support.   There is a schedule before this that specifies

02:27:12PM 7    hours that -- under this not-to-exceed limit on this page.

02:27:16PM 8    That is only one phase.

02:27:17PM 9        My understanding -- and I am not responsible for the

02:27:20PM 10   final contracting, but my understanding is that

02:27:22PM 11   contracting officers work off of templates.   And they are

02:27:25PM 12   doing a lot of cutting and pasting.   And I know for a fact

02:27:30PM 13   that this contracting officer works with experts at the

02:27:33PM 14   trial stage, and also at the examination stage.

02:27:35PM 15       And, frankly, particularly when comparing this to the

02:27:40PM 16   Boies Schiller contract, this has a lot of sloppy language

02:27:43PM 17   in there that looks like it is artifacts or copy-and-paste

02:27:46PM 18   errors that should not apply here.   Quinn Emanuel was not

02:27:49PM 19   hired to be an expert witness, and that phrase doesn't

02:27:53PM 20   appear in the Boies contract.

02:27:54PM 21   Q.   I have to ask you to stop.   I don't have that much

02:27:57PM 22   time, and you are not responding.

02:27:58PM 23       Over on "period of performance," you say that

02:28:01PM 24   Phase I was going to end at the end of 2014, but the

02:28:05PM 25   contract extended through the end of 2016.   Do you see

02:28:10PM 1   that?

02:28:10PM 2   A.   I didn't say Phase I was the end.   If you went to F-6

02:28:14PM 3   you will see what I saw as --   First of all, this, while

02:28:17PM 4   we are looking at this, this clearly has typos in it.

02:28:21PM 5   Someone has this period of performance right in the middle

02:28:23PM 6   of this other paragraph, and the sentences don't make

02:28:25PM 7   sense.   So there is clearly something going on in there

02:28:28PM 8   that has got some editing artifacts.   If you go to F-6,

02:28:32PM 9   which on the next page, it actually says the period of

02:28:34PM 10  performance is through December 31st of 2015.   And it

02:28:37PM 11  describes one phase.   And right below this, F-5, it

02:28:40PM 12  actually says 18 months.   And if you add 18 months to when

02:28:44PM 13  the contract was awarded, that actually gets you, roughly

02:28:48PM 14  speaking, to December of 2015, not 2016.   So this

02:28:52PM 15  obviously could have been drafted better.   If you look at

02:28:55PM 16  F-6, that's what I understood the schedule to be, which is

02:28:58PM 17  on the next page of this contract.

02:29:00PM 18  Q.   Time is running short, so I will try to cut to the

02:29:03PM 19  chase here.   The truth is that -- with Quinn Emanuel, the

02:29:11PM 20  deal was that if and when this got to the tax court, Quinn

02:29:21PM 21  Emanuel was committed to being trial counsel in the tax

02:29:25PM 22  court, but the IRS retained the authority to say we don't

02:29:30PM 23  want you after all; isn't that true?

02:29:33PM 24  A.   There is no obligation under this contract for that

02:29:36PM 25  to happen, but the IRS -- as we mentioned, we sort of

02:29:40PM 1  contemplated that we might get to tax court; and if we

02:29:43PM 2  did, we might want Quinn Emanuel to assist.  If that did

02:29:46PM 3  happen, it would have to be subject to a new contract.

02:29:48PM 4  Those were certainly consistent with the discussions we

02:29:51PM 5  had early on.

02:29:51PM 6  Q.   You are awfully familiar with every page of this

02:29:55PM 7  contract.  Don't you know that this contract says that

02:30:00PM 8  Quinn Emanuel commits that they will act in the capacity

02:30:04PM 9  of special government employee, which is something they

02:30:08PM 10 would have to do to be in the tax court, that they will

02:30:11PM 11 resolve all conflicts in order to be able to get into the

02:30:15PM 12 tax court, and that the contract is non-severable on these

02:30:23PM 13 different stages, and that Quinn Emanuel must agree to act

02:30:29PM 14 in the tax court, but you have the right to say you don't

02:30:31PM 15 want them?

02:30:32PM 16 A.   That is actually not what the contract says.  It says

02:30:35PM 17 they have to preserve their ability to be special

02:30:37PM 18 government employees.  It doesn't require them to.  You

02:30:39PM 19 can't force someone to be an employee under a contract.

02:30:42PM 20 That would be a future decision for the IRS.  And they

02:30:46PM 21 weren't preserving the ability to do -- just like we want

02:30:48PM 22 any expert we hire, to make sure that they are available

02:30:51PM 23 wherever a case goes, regardless of whether the audit goes

02:30:54PM 24 to trial or to appeals.

02:30:55PM 25 Q.   You do now agree that the contract contemplates not

02:31:01PM 1    just what you call Phase I, but it contemplates at least

02:31:07PM 2    another phase where Quinn Emanuel would be involved in the

02:31:10PM 3    tax court, right?

02:31:12PM 4         MR. WEAVER:  Objection.  Mischaracterizes

02:31:14PM 5    testimony and the document.

02:31:16PM 6         THE COURT:  Overruled.  Do you agree or not?

02:31:17PM 7         THE WITNESS:  I disagree with that statement.

02:31:20PM 8    By Mr. Beck:

02:31:20PM 9    Q.  And you claim that the contract doesn't address

02:31:23PM 10   whether Quinn Emanuel is going to participate in the tax

02:31:27PM 11   court?

02:31:28PM 12   A.  It does not say whether they will or won't.  It asks

02:31:32PM 13   them to preserve their ability to become special

02:31:34PM 14   government employees and to preserve -- to avoid conflicts

02:31:40PM 15   that may prevent that.  There is only one phase of this

02:31:43PM 16   contract.  We do not go outside of contracts and perform

02:31:46PM 17   work outside of them.  That would be illegal.  We would

02:31:48PM 18   have to have a new contract for post-examination support

02:31:51PM 19   if we were paying them hourly.  And if we did hire them at

02:31:54PM 20   some point --  Could the IRS say, "We want to hire you as

02:31:57PM 21   special government employees"?  Certainly.

02:32:00PM 22   Q.  Are there written side deals here that you haven't

02:32:03PM 23   told us about with Quinn Emanuel?

02:32:05PM 24   A.  There are no other contracts other than the one you

02:32:07PM 25   have with Quinn Emanuel.

02:32:08PM 1    Q.   Now, that makes me a little nervous.  I asked for

02:32:11PM 2    "side deals," and you said "contracts."  If we asked for

02:32:16PM 3    an engagement letter, you say that is not the same thing

02:32:19PM 4    as a contract.  Are there any side deals?

02:32:23PM 5    A.   There is no written deals, no.  There is nothing

02:32:24PM 6    binding on the IRS, there is nothing binding on Quinn

02:32:27PM 7    Emanuel.  I am not sure what your characterization of

02:32:30PM 8    "side deal" is.  If you want to give me a definition, I

02:32:33PM 9    will answer your question better.

02:32:34PM 10   Q.   You say there is nothing in writing.  You had

02:32:36PM 11   discussions with Quinn Emanuel, and you said, "Here is the

02:32:39PM 12   deal, John:  We will give you $2 million as a contractor,

02:32:47PM 13   and you will participate in what we are calling Phase I.

02:32:52PM 14   And then later on, when it comes time for the tax court,

02:32:57PM 15   you are going to have to take a big haircut, because when

02:33:00PM 16   you act as an SGE, you don't get paid very much.  But the

02:33:06PM 17   deal is we will front end load it, give you $2 million for

02:33:09PM 18   Phase I.  Later on we will enter into the agreement for

02:33:13PM 19   the tax court, and you are going to have to take a

02:33:17PM 20   haircut."  You had those conversations with John Quinn,

02:33:19PM 21   didn't you?

02:33:19PM 22   A.   What you just described does not accurately reflect

02:33:22PM 23   any conversations I had with John Quinn.

02:33:23PM 24   Q.   Why don't you tell us about the conversations you had

02:33:27PM 25   with John Quinn where you talked about how you were going

02:33:31PM 1    to manage the fact that they later on would be in the tax

02:33:35PM 2    court?

02:33:36PM 3    A.   It wasn't "would be," it was a possibility.

02:33:38PM 4    Q.   Tell us what you said, what Quinn said.

02:33:41PM 5    A.   I can't tell you specifically.  But if you are asking

02:33:45PM 6    me about what was the concept, the concept as we

02:33:49PM 7    approached them was, "We would like to get your assistance

02:33:52PM 8    at this examination stage."  As reflected in the contract,

02:33:55PM 9    there was two types of assistance we thought we wanted.

02:33:59PM 10   It was, "Give us a gut check, a sounding board on our

02:34:01PM 11   analysis and the taxpayer's, and to the extent new things

02:34:06PM 12   are identified, continue the case on development and

02:34:09PM 13   support."  We told them that we hoped to engage the

02:34:12PM 14   taxpayer on resolution.  We didn't know if that would be

02:34:14PM 15   successful.  Remember, we are talking to them before

02:34:16PM 16   Microsoft says get lost.

02:34:18PM 17   Q.   And remember, I asked you about a conversation you

02:34:22PM 18   had concerning how you are going to handle how they get

02:34:25PM 19   hired to come into the tax court?

02:34:27PM 20   A.   I am trying to give you the conversation that you

02:34:29PM 21   have asked me about.  Then it was, "Well, what happens if

02:34:33PM 22   you don't?  What if Microsoft doesn't want to resolve,

02:34:35PM 23   what would you do?"  We said, "Well, at that point in time

02:34:38PM 24   the IRS would have to make some decisions.  We have

02:34:40PM 25   different options.  We could do a 30-day letter, we could

02:34:43PM 1   do a 90-day letter, we could do a 90-day letter and

02:34:46PM 2   designation."

02:34:47PM 3       Potentially --  Certainly --  Could this wind up in

02:34:50PM 4   tax court?  Yeah, just like any examination.  And at that

02:34:52PM 5   point in time the IRS would have to say, "We want you to

02:34:55PM 6   be available.  If we are both happy with each other on the

02:34:58PM 7   front end, maybe we will award another contract for a

02:35:01PM 8   trial phase."

02:35:02PM 9       And initially the concept was that there would be

02:35:04PM 10  another contract ordered with hourly rates.  And it was

02:35:08PM 11  contemplated at some point in time there may be a need for

02:35:11PM 12  them to become special government employees.  But there

02:35:14PM 13  was potentially, as conceived, examination support under

02:35:17PM 14  the contract that was awarded.  That was all that was

02:35:20PM 15  awarded.  A potential for a new contract if this ever left

02:35:25PM 16  examination's jurisdiction and went to Counsel's

02:35:28PM 17  jurisdiction.  Counsel has jurisdiction over tax court

02:35:32PM 18  cases, not the examination side of the IRS.

02:35:34PM 19      And then at some even further future point, if a bunch

02:35:37PM 20  of things fell into place, and the IRS wanted to pursue

02:35:40PM 21  it, there was a possibility the IRS may say, "Hey, you

02:35:43PM 22  will need to become an SGE."  That was what was discussed.

02:35:46PM 23  Q.  And if they came in as SGEs, special government

02:35:49PM 24  employees, they wouldn't be able to charge a thousand

02:35:52PM 25  dollars an hour, or even what their paralegals charge,

02:35:56PM  1  $300 an hour, right?

02:35:58PM  2  A.   My understanding is that there is caps.  I don't

02:36:01PM  3  think it is an hourly wage, though.  I don't know

02:36:04PM  4  exactly --

02:36:05PM  5  Q.   It is way, way lower.  You know that, don't you, sir?

02:36:08PM  6  A.   I know they are lower.  I am just pointing out I

02:36:11PM  7  don't know how it is calculated.

02:36:14PM  8          MR. BECK:  I guess my time is up, your Honor.

02:36:18PM  9  Just for the record, given the length of his answers and

02:36:20PM 10  things, I feel like I was constrained here and didn't get

02:36:26PM 11  to some of the subjects that I would have like to have

02:36:29PM 12  gotten to.  On the other hand, I appreciate your patience.

02:36:33PM 13          THE COURT:  Thank you, Mr. Beck.

02:36:35PM 14      Mr. Weaver, we will go ahead and take our break for

02:36:38PM 15  our court reporter.  When we come back, you can begin your

02:36:42PM 16  examination at that point.

02:50:11PM 17      (Break.)

02:50:11PM 18          THE COURT:  Mr. Weaver, you may inquire.

02:50:22PM 19          MR. WEAVER:  May I proceed, your Honor?

02:50:23PM 20          THE COURT:  You may begin.

02:50:25PM 21                      CROSS-EXAMINATION

02:50:25PM 22  By Mr. Weaver:

02:50:28PM 23  Q.   Mr. Hoory, could you briefly tell us what the

02:50:31PM 24  transfer pricing operations objectives were for the

02:50:34PM 25  Microsoft examination when you came into the picture in

02:50:36PM 1   late 2011?

02:50:37PM 2   A.   It was really to take another look at the facts, to

02:50:41PM 3   consider the items like with the taxpayer Veritas, about

02:50:47PM 4   us being arbitrary and capricious, not addressing the

02:50:50PM 5   right facts, and to take a closer look at the residual

02:50:53PM 6   profit split model that Microsoft used in its valuation to

02:50:56PM 7   see whether if the inputs were reasonable or not, to see

02:50:59PM 8   if we could apply it in a more reasonable manner, and also

02:51:03PM 9   recognizing that there was an interaction between the

02:51:05PM 10  technology transfer price that was paid by the United

02:51:09PM 11  States to Puerto Rico and the buy-in that Puerto Rico paid

02:51:13PM 12  to the United States.   We wanted to test the transfer

02:51:16PM 13  price as well.

02:51:17PM 14      So regardless of our methodology for the outbound

02:51:20PM 15  transfer of intangibles, we knew it was impacted by the

02:51:23PM 16  transfer price on the inbound sale of the technology IP by

02:51:27PM 17  Puerto Rico.   We knew that the RPSM model impacted the

02:51:51PM 18  transfer price on the inbound sale by Puerto Rico of

02:51:55PM 19  technology in the United States, and whatever that

02:51:56PM 20  transfer price, also would impact the value it was before

02:52:00PM 21  this transaction, or that is set, when the U.S. sold it to

02:52:05PM 22  Puerto Rico.   So we knew the two were related.   We needed

02:52:08PM 23  to test the methodology.

02:52:09PM 24  Q.   Did you at the outset, when you became involved, seek

02:52:13PM 25  to resolve issues where possible?

02:52:16PM  1   **A.   At the outset we certainly raised questions we had,**

02:52:20PM  2   **and we let the company know on the front end that we**

02:52:23PM  3   **always were working towards engaging with them to see if**

02:52:26PM  4   **there was room for resolution, and that we wanted to talk**

02:52:29PM  5   **to them before developing a final number, when the ink was**

02:52:33PM  6   **still wet, was the term that Mr. Maruca used.**

02:52:37PM  7   **Q.   Let's turn to Exhibit 16, Page 1, please.  Do you**

02:52:42PM  8   **recognize Exhibit 16?**

02:52:43PM  9   **A.   I do.**

02:52:45PM 10   **Q.   And what is it?**

02:52:46PM 11   **A.   It is the cover letter for the protest that Microsoft**

02:52:49PM 12   **filed on January 29th (sic).**

02:52:51PM 13   **        MR. WEAVER:  Your Honor, I would move the protest,**

02:52:53PM 14   **Exhibit 16, into evidence.**

02:52:55PM 15   **        MS. EAKES:  Your Honor, Microsoft does object to**

02:52:58PM 16   **that.  This is a document that we have been trying to**

02:53:00PM 17   **resolve issues with respect to redactions.  We would**

02:53:04PM 18   **object to the wholesale admission of it because of the**

02:53:07PM 19   **remaining issuing unresolved.  With respect to No. 16, it**

02:53:10PM 20   **is my understanding that Mr. Weaver agreed we can take**

02:53:11PM 21   **that up at a later point.  So we would object to its**

02:53:14PM 22   **admission now.  We don't object to the reference to this**

02:53:17PM 23   **particular page.**

02:53:18PM 24   **        MR. WEAVER:  Your Honor, what I would propose, and**

02:53:20PM 25   **I talked with Mr. Beck about this before I got up here, is**

02:53:22PM 1   that we move it into evidence.  I am only going to refer

02:53:26PM 2   to three or four pages.  This is a long document.  And

02:53:28PM 3   that after the document is in evidence, and I want it to

02:53:33PM 4   be in the record, there are four numbers in this document

02:53:36PM 5   that we have agreed to redactions on.  Otherwise, you see

02:53:39PM 6   a ton of redactions that we have agreed to, Microsoft

02:53:41PM 7   wanted to make.  And if the court will allow us, before we

02:53:45PM 8   make the exhibits public, we will agree to the remaining

02:53:48PM 9   four redactions.

02:53:49PM 10        THE COURT:  All right.  With that understanding,

02:53:51PM 11  we will go ahead and admit 16, Madam Clerk.

02:53:57PM 12     (Exhibit No. 16 was admitted.)

02:53:57PM 13  By Mr. Weaver:

02:53:57PM 14  Q.   Mr. Hoory, let's turn to the part of the protest

02:54:00PM 15  addressing the Americas transaction, page 37 of Part 3,

02:54:05PM 16  please.  What you will see referred to here is a reference

02:54:14PM 17  to Veritas in the protest.  Do you recall that Mr. Hoory?

02:54:18PM 18  A.   I do.

02:54:18PM 19  Q.   How did this reference -- and if we were to look

02:54:22PM 20  through pages a repeated reference -- to Veritas impact

02:54:24PM 21  the way that the exam was going to be conducted going

02:54:27PM 22  forward?

02:54:27PM 23  A.   We basically are responding to the concerns I

02:54:31PM 24  discussed with Veritas earlier.  We knew we needed to

02:54:35PM 25  really kick the tires, make sure we developed the facts

02:54:37PM 1   and circumstances correctly, and respond to some of the

02:54:40PM 2   allegations here about the IRS being arbitrary and

02:54:43PM 3   capricious.  We also knew that we needed to actually look

02:54:46PM 4   at the inputs into the residual profit split model that

02:54:50PM 5   Microsoft had used, and to test them fully.

02:54:52PM 6   Q.  Let's turn to Page 61 of Part 3, please.  Look at the

02:55:03PM 7   heading here, "The Service's buy-in determination is

02:55:06PM 8   arbitrary, capricious and unreasonable."  Did the

9   characterization of the audit work as arbitrary and

02:55:14PM 10  capricious have an impact on how the audit was going to

02:55:17PM 11  proceed?

02:55:18PM 12  A.  It certainly did.  It meant we really had to look at

02:55:20PM 13  the facts and circumstances and bring in the expertise we

02:55:23PM 14  needed, in this case, software industry expertise.

02:55:26PM 15  Because prior to this, just like we did in Veritas, all we

02:55:30PM 16  had was an economist, with no industry experts.

02:55:33PM 17  Q.  Now, let's turn to Page 45.  And if you could blow up

02:55:39PM 18  Footnote 90, please.  I will start reading from here.  "As

02:55:49PM 19  support, the Service cites internal memoranda summarizing

02:55:53PM 20  non-transcribed interviews of Microsoft employees from the

02:55:56PM 21  2000 to 2003 audit and resulting MITRE expert report

02:56:02PM 22  opining that software had perpetual useful lives if

02:56:07PM 23  'maintenance' R&D were performed.  Such evidence is of

02:56:11PM 24  question utility," et cetera.  Mr. Hoory, did this have

02:56:14PM 25  any impact on how you wanted to proceed?

02:56:16PM 1  **A.    Certainly.  We knew that if we did have to rely on**

02:56:19PM 2  **statements by Microsoft, that we would have to get them on**

02:56:21PM 3  **the record if they were important or material, and if they**

02:56:25PM 4  **were in areas that we were unable to resolve issues with**

02:56:28PM 5  **the company.**

02:56:28PM 6  **Q.    Now, let's turn to Page 18 of this part of the**

02:56:31PM 7  **protest, and look at the top part of the page, please.**

02:56:37PM 8  **Let's blow up that top paragraph.  It talks about taxpayer**

02:56:43PM 9  **engaging KPMG to value certain things with respect to the**

02:56:49PM 10 **buy-in license.  And then if you go on down, it also**

02:56:52PM 11 **refers to KPMG determining a transfer price.  What was**

02:56:59PM 12 **your understanding when you read this early in the audit,**

02:57:04PM 13 **when you were involved, 2011/2012, of the role that KPMG**

02:57:08PM 14 **was playing in this audit?**

02:57:10PM 15 **A.    My understanding was that KPMG was responsible for**

02:57:13PM 16 **preparing the valuation that Microsoft relied on to set**

02:57:16PM 17 **the arm's length price for both the outbound sale of**

02:57:20PM 18 **technology rights to Puerto Rico, and then for the inbound**

02:57:23PM 19 **sale of technology IP to the United States.**

02:57:25PM 20 **Q.    Now, let's digress very briefly.  If you can put**

02:57:29PM 21 **Exhibit 18 up, please?  Mr. Hoory, I am referring you to**

02:57:40PM 22 **Exhibit 18.  Do you recognize the numbers on this diagram?**

02:57:42PM 23 **A.    I do.  They are my understanding of KPMG's valuation,**

02:57:47PM 24 **the numbers they arrived at.**

02:57:48PM 25 **Q.    And you pulled these numbers from where?**

02:57:49PM 1   **A.    I pulled them from the KPMG model, including their**

02:57:54PM 2   **structured rate analysis.**

02:57:55PM 3   **Q.    And were these numbers, with one correction, in your**

02:57:58PM 4   **declaration?**

02:57:59PM 5   **A.    There was.   In my declaration I had transposed the**

02:58:02PM 6   **15.56 billion for the technology license at the top and**

02:58:08PM 7   **the 15.35 billion for the R&D funding.**

02:58:11PM 8   **Q.    Recognizing that our time is limited, could you tell**

02:58:14PM 9   **me --**

02:58:15PM 10       **Well, first, I will move this into evidence, your**

02:58:18PM 11  **Honors, as a demonstrative.**

02:58:21PM 12       **MR. BECK:   Well, your Honor, demonstratives don't**

02:58:22PM 13  **get received in evidence, they are just demonstratives.**

02:58:26PM 14       **THE COURT:   That's fine.**

02:58:29PM 15  **By Mr. Weaver:**

02:58:29PM 16  **Q.    Let's take a look at the bottom gray part.   Can you**

02:58:31PM 17  **explain the flow of what is going on here in terms of what**

02:58:35PM 18  **is represented?**

02:58:35PM 19  **A.    Sure.   So on the left you have Microsoft Corporation,**

02:58:38PM 20  **that is the U.S. parent and its U.S. affiliates.   In the**

02:58:42PM 21  **bottom, the oval, you have the third parties.   That's**

02:58:44PM 22  **where they collect the money from.   So these are people**

02:58:47PM 23  **that are not related to Microsoft, other large**

02:58:50PM 24  **corporations and entities, some resellers, some**

02:58:52PM 25  **redistributors.   The only person or the only entities that**

02:58:55PM 1   have these third-party contracts, that enter into

02:58:57PM 2   contracts with these third parties, it is Microsoft U.S.

02:59:01PM 3   Before and after this transaction, those third-party

02:59:03PM 4   relationships collecting the money, is through the United

02:59:06PM 5   States affiliates, not Puerto Rico.

02:59:08PM 6   Q.   Very briefly, can you describe the green arrows going

02:59:13PM 7   to and from Microsoft U.S. and Microsoft Puerto Rico?

02:59:16PM 8   A.   Sure.  So in the green you have a technology license

02:59:19PM 9   from the United States of software code rights to

02:59:22PM 10  Puerto Rico.  Puerto Rico agrees to pay the United States

02:59:26PM 11  15.56 billion, not immediately, but in the future, as a

02:59:30PM 12  percentage of future sales.  In the red, in the middle,

02:59:33PM 13  you have Puerto Rico agreeing to pay the R&D associated

02:59:37PM 14  with software code thereafter.  Over the next ten years

02:59:41PM 15  they are expected to pay 15.35 billion.  So those

02:59:45PM 16  numbers -- they are both what they expected to pay the

02:59:47PM 17  U.S. and what they expect in the next ten years.

02:59:50PM 18  Q.   This is what KPMG projected in its model?

02:59:54PM 19  A.   Yes, it is the numbers they based their valuation on.

02:59:57PM 20  Q.   What are the blue lines at the bottom there?

02:59:59PM 21  A.   The bottom in blue you have --  Remember, Microsoft

03:00:04PM 22  U.S., they are the ones that are selling everything to

03:00:06PM 23  third parties.  They are the only ones with the

03:00:09PM 24  third-party licenses and royalties.  So the United States

03:00:11PM 25  agrees to remit to Puerto Rico a percentage of every

03:00:15PM 1  dollar they collect, about 55¢ on the dollar, roughly.

03:00:20PM 2  And they are basically paying Puerto Rico as the treater

03:00:22PM 3  (sic) of the software code that Puerto Rico just bought.

03:00:25PM 4  So it is a roundtrip.  You have Puerto Rico buying

03:00:28PM 5  software code rights, agreeing to pay for R&D, it adds up

03:00:32PM 6  to about 30 billion.  And over the next ten years --  And

03:00:35PM 7  that is over ten years, too.  And then over the next ten

03:00:38PM 8  years the U.S. plans to turn around and pay Puerto Rico

03:00:41PM 9  about 67.8 billion for the software code that Puerto Rico

03:00:45PM 10  is treated as owning.  The net impact of all this is, over

03:00:48PM 11  ten years, Microsoft expected to report $38 billion less

03:00:54PM 12  in taxable income in the United States.  Instead, that

03:00:57PM 13  income would be sitting in Puerto Rico where it is not

03:00:59PM 14  taxed, at least for domestic tax purposes.

03:01:02PM 15  Q.  Now, with the aid of this diagram can you very

03:01:05PM 16  succinctly describe for the court the primary area of

03:01:07PM 17  information that you are still seeking in this audit to

03:01:11PM 18  get to the right number?

03:01:12PM 19  A.  So we are looking for the revenue, and information

03:01:15PM 20  about the revenue and expense it puts on this, and the

03:01:17PM 21  split between technology intangibles as the software code

03:01:21PM 22  on the one hand, and non-technology intangibles on the

03:01:25PM 23  other.  So we are talking about the customer

03:01:26PM 24  relationships, the trademarks.  The United States has all

03:01:28PM 25  the non-technology intangibles after this deal, and

03:01:32PM 1  Puerto Rico has purchased the software codes.  So you need

03:01:34PM 2  to know what the relative amounts are.  That impacts --

03:01:36PM 3  Q.   Why do you need to know the relative amounts?

03:01:38PM 4  A.   You need to know the relative amounts because

03:01:41PM 5  Puerto Rico is paying the United States for the value of

03:01:43PM 6  the software code they purchased.  Obviously, depending on

03:01:47PM 7  how important software code is to their business, it could

03:01:50PM 8  be worth more or less than the buy-in.  It is also

03:01:53PM 9  critically important in the bottom under the technology

03:01:55PM 10  transfer price --

03:01:56PM 11  Q.   You are talking about the 67 billion transfer price?

03:01:59PM 12  A.   I am.  That 68 billion, that is supposed to be

03:02:02PM 13  reflective of how valuable the software code is to the

03:02:05PM 14  business.  If marketing intangibles, if customer

03:02:09PM 15  relationships, if all these things that Microsoft does,

03:02:12PM 16  the corporation in the United States, are more important,

03:02:15PM 17  then that 67.8 billion should go down.  So we are looking

03:02:19PM 18  at the inputs, revenues, and expenses that KPMG used to

03:02:23PM 19  model this and the assumptions they made.

03:02:26PM 20  Q.   Back to 2012.  During the first part of 2012, did you

03:02:29PM 21  hire a number of industry experts to take a look at this

03:02:32PM 22  transaction?

03:02:32PM 23  A.   We did.  For the first time we brought on a number of

03:02:35PM 24  software industry experts, a marketing expert, and a

03:02:39PM 25  finance expert.  Previously all we had was an economist.

03:02:42PM 1    We also had an outside economist expert as well to help us

03:02:45PM 2    with this, look at KPMG's process.

03:02:48PM 3    Q.   Now, we are not going to look at it in any detail,

03:02:51PM 4    but was there another transfer pricing arrangement that

03:02:53PM 5    you were also looking at?

03:02:55PM 6    A.   There was.  They had a deal in the Asia Pacific

03:02:58PM 7    region.  A difference between the Asia Pacific region and

03:03:01PM 8    the United States is the U.S. is a roundtrip.  They sell

03:03:04PM 9    something out of the U.S. and immediately they buy it back

03:03:06PM 10   for more.  In Asia Pacific they sold everything to their

03:03:09PM 11   foreign affiliate.  However, the split between technology

03:03:13PM 12   and non-technology is still at issue there because of some

03:03:17PM 13   positions that Microsoft took.  Basically we need to know

03:03:20PM 14   what the split is there as well, because they took the

03:03:22PM 15   position, which we don't necessarily agree with, that all

03:03:27PM 16   of the -- in fact, I believe, 95 percent of non-technology

03:03:30PM 17   was owned by their foreign affiliate.  So they didn't have

03:03:34PM 18   to pay for that.  We don't think the foreign affiliate

03:03:37PM 19   owned that much, and we also are also questioning the

03:03:40PM 20   split there as well.

03:03:41PM 21   Q.   Now, in early 2012, did TPO withdraw the notice of

03:03:45PM 22   proposed adjustments?

03:03:46PM 23   A.   We did.

03:03:46PM 24   Q.   Did you tell Microsoft, of course?

03:03:48PM 25   A.   We did before doing so, and at the time we did.

03:03:52PM 1    Q.   And did Microsoft agree to further extensions of the

03:03:55PM 2    statute?

03:03:55PM 3    A.   They did agree to extend the statute.

03:03:57PM 4    Q.   All right.  Let's turn very briefly to Exhibit 15.

03:04:04PM 5    Do you recognize Exhibit 15?

03:04:05PM 6    A.   Yes.  It is a Duff & Phelps report prepared for

03:04:09PM 7    Microsoft.

03:04:09PM 8    Q.   Did you get it as part of the audit?

03:04:11PM 9    A.   We got it after we reopened the audit, effectively.

03:04:15PM 10   It was a December IDR, December of 2012.  It is one of the

03:04:18PM 11   first questions we asked them when we started to look at

03:04:21PM 12   the facts and circumstances more closely.

03:04:23PM 13   Q.   Did you get the backup for it?

03:04:25PM 14   A.   Not initially.  We asked for all documents, and we

03:04:29PM 15   wound up having to issue a follow-up IDR, because all we

03:04:33PM 16   got was the report, none of the cross-referenced

03:04:35PM 17   attachments.

03:04:35PM 18   Q.   So they didn't give you all you needed the first

03:04:37PM 19   time?

03:04:37PM 20   A.   Not immediately.  We eventually got it.

03:04:41PM 21        MR. WEAVER:  I would move this Exhibit 15 into

03:04:43PM 22   evidence, your Honor.

03:04:45PM 23        MR. BECK:  Your Honor, here our objection is not

03:04:49PM 24   as to specific redactions, it really goes to what

03:04:52PM 25   Ms. Eakes addressed in her opening statement.  This has

03:04:58PM 1    nothing to do with the issue before the court, which is

03:05:04PM 2    was Quinn Emanuel -- should these summonses be enforced,

03:05:09PM 3    and can Quinn Emanuel take sworn testimony.  This is in

03:05:12PM 4    fact exactly what the IRS warned would happen if somebody

03:05:17PM 5    dared to oppose them, that they would make a big showing

03:05:23PM 6    and introduce evidence that has nothing to do with the

03:05:27PM 7    subject matter of the hearing, but is calculated to

03:05:30PM 8    inflame by painting us in a bad light.  So that is our

03:05:35PM 9    objection, your Honor.

03:05:36PM 10            THE COURT:  Mr. Weaver, how is this relevant?

03:05:39PM 11            MR. WEAVER:  This is relevant, your Honor, because

03:05:41PM 12   all morning we heard about how Quinn Emanuel has only been

03:05:45PM 13   hired to prepare this case for tax court.  I am leading up

03:05:47PM 14   to how we still need information, with this foundation.

03:05:51PM 15   This is a foundation.

03:05:53PM 16     I am also going to get to in a minute things that have

03:05:55PM 17   come in through the summonses that weren't disclosed to

03:05:58PM 18   the IRS before.  It just goes to the point that this case

03:06:02PM 19   is not being prepared -- the summonses are not to prepare

03:06:05PM 20   the case for tax court, we need legitimate information.

03:06:09PM 21   And I want to build that record.

03:06:11PM 22            MR. BECK:  Your Honor, this is dated 2006, is it?

03:06:19PM 23   And he said --  The last question was, we did get the

03:06:22PM 24   information -- we didn't get it all exactly when we wanted

03:06:25PM 25   it, but then we got it.  And Quinn Emanuel didn't come

03:06:31PM 1    along until May of 2014.  And there is no linkage

03:06:37PM 2    whatsoever between the contents of this document and the

03:06:43PM 3    circumstances of the Quinn Emanuel hiring.  It is truly

03:06:51PM 4    what was warned about in our opening statement.

03:06:54PM 5            MR. WEAVER:  Your Honor, I am laying the

03:06:55PM 6    foundation as to why the IRS needed assistance in this

03:06:59PM 7    audit.  There are major things that were suspicious.  I am

03:07:03PM 8    about to lay a foundation of why the summonses are

03:07:06PM 9    perfectly legitimate, and why the issuance of those

03:07:08PM 10   summonses had nothing to do with the retention of Quinn

03:07:12PM 11   Emanuel or the regulation.

03:07:13PM 12           THE COURT:  All right.  The objection will be

03:07:15PM 13   overruled.  15 will be admitted, Madam Clerk.

03:07:20PM 14       (Exhibit No. 15 was admitted.)

03:07:20PM 15   By Mr. Weaver:

03:07:21PM 16   Q.  Mr. Hoory, I would now turn your attention very

03:07:23PM 17   briefly to Page 14.  Mr. Hoory, there is a number of

03:07:32PM 18   $30 billion at the bottom there.  Can you explain to me

03:07:35PM 19   how this impacted on the audit and your need for

03:07:39PM 20   expertise?

03:07:39PM 21   A.  Sure.  So this says 30 billion for MACSH, that is

03:07:46PM 22   MOPRs, Puerto Rico's parent.  When we look at the backup

03:07:51PM 23   for this, it was prepared using the exact same profit and

03:07:55PM 24   loss forecast that KPMG relied on.  This was for tax

03:07:58PM 25   purposes.  It used the exact same information, which was

03:08:01PM 1   effective as of July 1st, because that's what the P&L

03:08:04PM 2   started with, July 1, 2005, notwithstanding this was a few

03:08:06PM 3   months later.  So this was based on a forecast, the same

03:08:18PM 4   forecast KPMG used for the July 1st, 2005 effective

03:08:33PM 5   valuation.  The $30 billion here is based on the same

03:08:36PM 6   information KPMG used, the same forecast.  And it

03:08:39PM 7   basically says that when Duff & Phelps looked at this and

03:08:44PM 8   asked what the right value was for this for a tax

03:08:46PM 9   transaction that occurred nine months later, they said it

03:08:50PM 10  was $30 billion.  Because that information was the same

03:08:53PM 11  information KPMG relied on as of July 1st, 2005, they are

03:08:58PM 12  effectively saying a company that was worth nothing or a

03:09:02PM 13  nominal amount on June 30th, 2005, was worth 30 billion

03:09:06PM 14  one day later.

03:09:07PM 15  Q.   And did you want to pursue this through additional

03:09:11PM 16  expertise?

03:09:12PM 17  A.   We did.

03:09:12PM 18  Q.   Let's move on to Exhibit 41.  Mr. Hoory, a few

03:09:28PM 19  minutes ago you described your knowledge about KPMG as

03:09:32PM 20  having done valuation work in connection with the Americas

03:09:36PM 21  transaction.  Did there come a time when your view of

03:09:42PM 22  KPMG's role in this transaction that is under audit

03:09:46PM 23  changed?

03:09:46PM 24  A.   Yes.  Through the summonses that were issued to KPMG,

03:09:51PM 25  and one of the IDRs to Microsoft in the fall of 2014, we

03:09:58PM 1    learned that KPMG had also helped them -- at least

03:10:01PM 2    provided input on structuring the transaction.

03:10:04PM 3    Q.   And you learned this information essentially within

03:10:08PM 4    the last year, even though the audit has been going on for

03:10:12PM 5    a number of years?

03:10:13PM 6    A.   Correct.

03:10:13PM 7    Q.   So we are on Exhibit 41.   And I will just highlight

03:10:22PM 8    this.   We can blow it up.   Quote, "New company won't even

03:10:27PM 9    have a chart of accounts for probably 18 months.   Shadow

03:10:30PM 10   books necessary."   Did that catch your eye when you read

03:10:34PM 11   this document recently?

03:10:35PM 12   A.   It did.   It seemed to reflect concerns that the

03:10:37PM 13   Puerto Rican entity that was immediately worth $30 billion

03:10:41PM 14   one day later, that when they set this up, it wasn't going

03:10:43PM 15   to be doing much more for 18 months, and didn't have any

03:10:46PM 16   accounts.

03:10:46PM 17   Q.   Let's turn to Page 2.   Blow that paragraph up.   "What

03:10:58PM 18   can we do to make this thing real?   Notify third parties,

03:11:01PM 19   at a minimum."   It goes on about maybe entering into some

03:11:05PM 20   sort of insurance.   What did this mean to you when you

03:11:07PM 21   read it?

03:11:08PM 22   A.   It basically confirmed the bells that had been

03:11:10PM 23   ringing for us, Puerto Rico doesn't have third-party

03:11:14PM 24   contacts, it doesn't make sales, and here they are looking

03:11:18PM 25   at ways they could make -- to make this deal look like it

03:11:21PM 1    is a real business deal as opposed to something that they

03:11:24PM 2    just did for tax purposes.

03:11:25PM 3    Q.   Let's go back out and go to the top of the first page

03:11:29PM 4    of this exhibit, please.  The first page.  This appears to

03:11:33PM 5    be a Microsoft preplanning meeting, March 31, 2005.  Do

03:11:37PM 6    you recognize the folks listed at the top there?

03:11:39PM 7    A.   I do.  They look like the persons from KPMG that were

03:11:43PM 8    performing the valuation for Microsoft.

03:11:45PM 9    Q.   And this came in through the summons that -- one of

03:11:48PM 10   the summonses at issue, or the one that preceded that; is

03:11:51PM 11   that correct?

03:11:51PM 12   A.   It was.  I think we received this, actually, this

03:11:54PM 13   year, from KPMG.

03:11:56PM 14         MR. WEAVER:  I would move Exhibit 41 into

03:11:58PM 15   evidence.

03:11:58PM 16         MR. BECK:  The same objection, your Honor.  There

03:12:00PM 17   has been no linkage whatsoever.  It is a mudslinging

03:12:03PM 18   campaign, and it is objectionable.

03:12:08PM 19         THE COURT:  Thank you.  That will be overruled.

03:12:10PM 20   41 will be admitted.

03:12:12PM 21      (Exhibit No. 41 was admitted.)

03:12:12PM 22   By Mr. Weaver:

03:12:13PM 23   Q.   One more, Exhibit 40.  Let's turn to Exhibit 40,

03:12:17PM 24   please.  Do you recognize Exhibit 40, Mr. Hoory?

03:12:21PM 25   A.   I do.  It is the second set of notes.  This one has

03:12:25PM 1    attendees from Microsoft, as well as KPMG.

03:12:29PM 2    Q.   The attendees from Microsoft, are they Microsoft tax

03:12:33PM 3    department folk?

03:12:34PM 4    A.   Yes, including David Guenther and Glen Cogswell, two

03:12:38PM 5    of the persons identified at Microsoft as having

03:12:41PM 6    participated in structuring this deal.

03:12:43PM 7    Q.   I want to refer you to Page 2 of this document,

03:12:48PM 8    please.

03:12:48PM 9         MR. BECK:  Your Honor, before we go on, could I

03:12:51PM 10   just make a foundational objection?  I would at least like

03:12:54PM 11   to know when they first received this document.

03:12:57PM 12        THE COURT:  Can you answer that, Mr. Hoory?

03:13:00PM 13   By Mr. Weaver:

03:13:00PM 14   Q.   Mr. Hoory, do you know when you received this

03:13:02PM 15   document?

03:13:02PM 16   A.   This was received in response to the KPMG summons

03:13:06PM 17   that we issued.  We had a September summons, and then

03:13:09PM 18   repeated in November.  I don't know exactly when this

03:13:15PM 19   Bates number was received.  It would have been sometime in

03:13:18PM 20   the fall of 2014, or early -- I'm sorry, fall of 2014 or

03:13:22PM 21   early 2015.

03:13:24PM 22        MR. BECK:  That is sufficient for my purposes,

03:13:25PM 23   your Honor.  I object.  He promised that all of this had

03:13:29PM 24   to do with why they needed to hire Quinn Emanuel.  Quinn

03:13:33PM 25   Emanuel was hired long before they even get this document.

03:13:37PM 1       MR. WEAVER:  What I said, your Honor, was this has

03:13:39PM 2  to do with the purpose for the summons.  It has nothing to

03:13:43PM 3  do with trying to get the tax work.

03:13:45PM 4       THE COURT:  All right.

03:13:46PM 5  By Mr. Weaver:

03:13:47PM 6  Q.  If we could blow up the paragraph that has to do with

03:13:49PM 7  May '99.  Mr. Hoory, can you explain what this paragraph

03:13:59PM 8  means to you?

03:14:00PM 9  A.  So here they are talking about technology intangibles

03:14:04PM 10 versus non-technology, which they refer to as marketing

03:14:07PM 11 splits.

03:14:07PM 12      MR. BECK:  Your Honor, I have a slightly different

03:14:10PM 13 objection.  That is, he now says it has to do with why we

03:14:15PM 14 issued the summons.  They got the document after they

03:14:18PM 15 issued the summons.  This document came in after Quinn

03:14:24PM 16 Emanuel is hired, after the summons was already issued.

03:14:27PM 17 But they think it makes us look bad.  It has nothing to do

03:14:32PM 18 with either of those issues.

03:14:34PM 19      MR. WEAVER:  Your Honor, it does --

03:14:34PM 20      THE COURT:  It hasn't been moved into evidence

03:14:37PM 21 yet, counsel.  Let Mr. Weaver lay his foundation for his

03:14:40PM 22 questions.  If he moves it into evidence, then we can

03:14:44PM 23 discuss it at that point in time.

03:14:45PM 24      MR. WEAVER:  Thank you, your Honor.

03:14:47PM 25 By Mr. Weaver:

03:14:47PM 1    Q.   Mr. Hoory, what was your understanding when you

03:14:49PM 2    received this document, about this paragraph?

03:14:50PM 3    A.   So my understanding was that the persons at this

03:14:54PM 4    meeting were concerned because they had different splits

03:14:58PM 5    between technology and non-technology in the prior cost

03:15:02PM 6    sharing arrangements that they performed for Europe, the

03:15:05PM 7    Middle East, and Africa, two of those, and the one in

03:15:08PM 8    Asia, versus what they were looking to do in the Americas.

03:15:12PM 9    There were inconsistencies in their technology and

03:15:14PM 10   non-technology splits, the same split that we wanted

03:15:18PM 11   information to more reliably determine.

03:15:20PM 12   Q.   What is the split that you understand KPMG to have

03:15:24PM 13   used in the Americas transaction?

03:15:25PM 14   A.   So in the Americas transaction, if you look at the

03:15:28PM 15   entire timeframe, it is approximately 78 percent towards

03:15:32PM 16   technology, and, using the terminology the taxpayer used

03:15:35PM 17   here, about 22 percent towards marketing.

03:15:38PM 18   Q.   And is that inconsistent with what you are looking at

03:15:41PM 19   here in this 2005 meeting document?

03:15:44PM 20   A.   It is.  Here they have much more -- at least some of

03:15:47PM 21   them are much more favorable towards non-technology, for

03:15:52PM 22   instance, 55 percent tech versus 45 non-tech.

03:15:57PM 23   Q.   Is trying to get down to the bottom of how much to

03:16:00PM 24   allocate to technology versus non-technology at the core

03:16:04PM 25   of most of the pending summonses requests --

03:16:07PM 1    **A.   Absolutely.   It is central to the outbound sale of**

03:16:10PM 2    **software code, and to the inbound payments from -- I'm**

03:16:16PM 3    **sorry, not inbound.   The outbound sale and inbound**

03:16:20PM 4    **payments by Puerto Rico, and then the transfer price that**

03:16:23PM 5    **the United States pays Puerto Rico, that 68 billion.   If**

03:16:27PM 6    **technology is too high, the U.S. is paying Puerto Rico too**

03:16:31PM 7    **much, and there is too little income reported in the**

03:16:33PM 8    **United States.**

03:16:34PM 9            **MR. WEAVER:   Your Honor, I will move on.   First,**

03:16:36PM 10   **let me move for this exhibit's admission into the record.**

03:16:39PM 11           **MR. BECK:   We object, your Honor.   Quinn Emanuel**

03:16:42PM 12   **was hired in May of 2014, the designated summons issued, I**

03:16:52PM 13   **believe, October 30, 2014.   This witness said that this**

03:16:59PM 14   **document was received in November or December.   That's**

03:17:02PM 15   **after Quinn Emanuel is hired.   It had nothing to do with**

03:17:05PM 16   **that.   It was after the designated summons issued.   It had**

03:17:11PM 17   **nothing to do with that.   It is totally irrelevant, and it**

03:17:16PM 18   **is part of what looks pretty clearly like a calculated**

03:17:19PM 19   **effort to disclose confidential information they think**

03:17:24PM 20   **will make us look bad in retaliation for us daring to**

03:17:28PM 21   **oppose the IRS.**

03:17:30PM 22           **MR. WEAVER:   Your Honor, if I may?   We agreed to**

03:17:33PM 23   **the redactions Microsoft wanted to make in this exhibit.**

03:17:37PM 24   **What this goes to is, we are trying to get this same kind**

03:17:41PM 25   **of information through all of the summons requests that**

03:17:45PM 1    have to do with the Americas transaction.  And there are

03:17:48PM 2    things that are just now coming out in 2014 and 2015 that

03:17:52PM 3    completely justify why the requests are pending.  That's

03:17:55PM 4    what this goes to.

03:17:56PM 5          THE COURT:  All right.  41 will be admitted.

03:18:00PM 6      (Exhibit No. 41 was admitted.)

03:18:00PM 7    By Mr. Weaver:

03:18:01PM 8    Q.  Mr. Hoory, let me take you back in time now.  You

03:18:05PM 9    went through three timelines earlier today.  So can you

03:18:10PM 10   very briefly just tell me why, if you started getting

03:18:17PM 11   experts in 2012, it took all the way until, let's say, the

03:18:23PM 12   fall of 2013 before you were even thinking about being

03:18:27PM 13   ready to talk with Microsoft in that third timeline?

03:18:31PM 14   A.  So we needed to learn enough to raise intelligent

03:18:35PM 15   questions and see what we agreed with them on and what we

03:18:39PM 16   didn't.  We needed to have our industry expertise, that

03:18:42PM 17   is, our software industry experts, and our financial

03:18:44PM 18   experts, and in particular our software code expert,

03:18:47PM 19   complete their analysis so that they could provide that to

03:18:49PM 20   our economist, and our economist in turn can do the

03:18:53PM 21   modeling, because each of these people play a different

03:18:56PM 22   role, and the economist's work depends on those other

03:18:58PM 23   experts.

03:18:58PM 24      In particular, with respect to the software code

03:19:00PM 25   expert, it took a while for that to be completed.  For

03:19:05PM 1    about the first six months or so we were getting new

03:19:08PM 2    reports, new reports that we had not previously gotten

03:19:11PM 3    from the company, on their internal code churn or code

03:19:16PM 4    reuse analyses.  So our experts had to talk to the person

03:19:19PM 5    who authored those reports, ask questions, make sure we

03:19:23PM 6    understood them.

03:19:24PM 7        By November of 2012, so about six months in, our

03:19:27PM 8    experts knew enough to begin to request what source code

03:19:30PM 9    they wanted to look at to measure reuse.  So code reuse

03:19:35PM 10   was something that KPMG cited in their evaluation as one

03:19:39PM 11   of their rationales for their short useful life there,

03:19:43PM 12   which impacts the valuation.  Our expert needed to look at

03:19:46PM 13   software code.

03:19:47PM 14       And then from November, for several months, there were

03:19:50PM 15   delays where we went back and forth with the company about

03:19:52PM 16   where and under what conditions our software code experts

03:19:56PM 17   would be allowed to look at the software code.  Eventually

03:19:59PM 18   those were resolved.  Our expert was not able to complete

03:20:01PM 19   their analysis until the end of August in 2013.

03:20:05PM 20   Q.   Let me stop you there.  The software code expert,

03:20:08PM 21   upon which other experts were going to use as input, was

03:20:13PM 22   done in the fall of 2013?

03:20:15PM 23   A.   Yeah.  They completed looking at the code in, I

03:20:17PM 24   think, August, and then they had to have some time to

03:20:20PM 25   prepare their analysis so we could give it to the

03:20:22PM 1    economist.

03:20:22PM 2    Q.   Now, was it your intention to try to then present the

03:20:26PM 3    findings of these experts to Microsoft to resolve issues,

03:20:29PM 4    or at least narrow them?

03:20:30PM 5    A.   Absolutely.  That was the meeting that is reflected

03:20:33PM 6    on all of the timelines.

03:20:34PM 7    Q.   And because I am not sure it is in the record yet,

03:20:37PM 8    did you also want to retain an outside commercial

03:20:39PM 9    litigator to help evaluate the case before you made that

03:20:43PM 10   presentation?

03:20:43PM 11   A.   That was the initial attempt for Boies Schiller.  By

03:20:48PM 12   the time we got looking at Quinn Emanuel, that was

03:20:52PM 13   impractical.  Initially we wanted that input before we

03:20:54PM 14   went to Microsoft so that we could have an independent

03:20:57PM 15   analysis and gut check.

03:21:00PM 16   Q.   And can you recall when the Boies Schiller contract

03:21:05PM 17   that never got worked on was entered into, roughly?

03:21:08PM 18   A.   I think it was awarded sometime towards the end of

03:21:13PM 19   fiscal year 2011.

03:21:15PM 20   Q.   You mean 2013?

03:21:17PM 21   A.   Yes.  I'm sorry, 2013.  I don't remember the exact

03:21:20PM 22   month.  On or about like June 2013, thereabouts.

03:21:23PM 23   Q.   Well, for non-governmental people, end of fiscal

03:21:28PM 24   year --

03:21:28PM 25   A.   September.  The end of the fiscal year is September.

03:21:31PM 1   So sometime between June and September that contract was

03:21:33PM 2   awarded.

03:21:34PM 3   Q.  And just in a sentence or two, why was no work done

03:21:40PM 4   on that contract?

03:21:40PM 5   A.  No work was done because we were unable to clear a

03:21:43PM 6   conflicts of interest issue.

03:21:45PM 7   Q.  Now, did -- after the government shutdown that you

03:21:49PM 8   mentioned earlier today, did you in fact meet with

03:21:52PM 9   Microsoft and try to resolve outstanding issues?

03:21:55PM 10  A.  We did.  We met with them, presented our preliminary

03:21:58PM 11  analysis for them on January 14th, and suggested a number

03:22:01PM 12  of areas where we had open questions, and thought we

03:22:04PM 13  needed more information, and wanted to engage with them.

03:22:07PM 14  Q.  If I could have Exhibit 14 up, please.  Do you

03:22:18PM 15  recognize Exhibit 14?

03:22:19PM 16  A.  I do.  It is the presentation I delivered on

03:22:22PM 17  January 14th, 2014.

03:22:25PM 18       MS. EAKES:  Your Honor, if I may.  We do have

03:22:27PM 19  continuing issues with respect to 14, as well, as it

03:22:31PM 20  relates to redactions.  So if Mr. Weaver is in agreement

03:22:35PM 21  with respect to 16 --  We would like to make sure that is

03:22:38PM 22  what the agreement is before they go into this document.

03:22:40PM 23       MR. WEAVER:  Yes, your Honor.  It is not my plan,

03:22:43PM 24  hopefully, to refer to the page that is not agreed.

03:22:46PM 25       THE COURT:  All right.

03:22:47PM 1   **By Mr. Weaver:**

03:22:47PM 2   **Q.   Mr. Hoory, I think you said you did recognize this.**

03:22:50PM 3   **This was part of the presentation?**

03:22:51PM 4   **A.   Absolutely.**

03:22:52PM 5   **Q.   Let's turn to Page 22.   So with the benefit of this**

03:23:01PM 6   **page, can you in very short order tell me where the areas**

03:23:07PM 7   **of discussion were with respect to revenues?**

03:23:11PM 8   **A.   So on revenues --  These are financial inputs in the**

03:23:14PM 9   **valuation model.   Microsoft assumed very low growth rates**

03:23:18PM 10  **for tax purposes, about four percent, for example, in**

03:23:21PM 11  **2006.   In their SEC reporting they were saying ten to**

03:23:25PM 12  **twelve percent, approximately.   That was a large**

03:23:27PM 13  **difference.   Also, in this CAGR, or compounded annual**

03:23:31PM 14  **growth calculation error -- they had math errors.**

03:23:35PM 15  **Q.   How much was the math error over time?**

03:23:37PM 16  **A.   Over time it understated -- if you believe everything**

03:23:40PM 17  **else, it understated revenues by approximately**

03:23:43PM 18  **$15 billion.**

03:23:44PM 19  **Q.   Can you briefly tell me, very briefly, about where**

03:23:51PM 20  **the areas were for expenses that you wanted to discuss?**

03:23:57PM 21  **A.   For expenses, we had to allocate worldwide expenses**

03:24:00PM 22  **to the region and to the retail channel, what was**

03:24:03PM 23  **applicable for this deal.   We found some math errors**

03:24:07PM 24  **there, some distortions.   There was also open questions**

03:24:10PM 25  **about how to identify geographic revenues and expenses**

03:24:14PM 1   that we hoped to engage with them on.

03:24:16PM 2   Q.   Last, what did you mean by writing, "Deal of the

03:24:20PM 3   century return on investment"?

03:24:23PM 4   A.   This is what our financial expert who worked on Wall

03:24:26PM 5   Street said.  He looked at the return that MOPR,

03:24:29PM 6   Puerto Rico that is, was expected, and it was over

03:24:33PM 7   200 percent per year.  He said that's unheard of.  Maybe

03:24:38PM 8   not for a start-up company, but certainly for an

03:24:41PM 9   established company with an established business as a new

03:24:43PM 10  investor.

03:24:47PM 11  Q.   Now, during the meeting, who was there for Microsoft?

03:24:51PM 12  A.   So they had, I believe, four attorneys from Baker

03:24:54PM 13  McKenzie, which was Jim O'Brien, Salim Rahim, Paul Schick,

03:25:01PM 14  and John Peterson.  There was Bill Sample, and Mike

03:25:05PM 15  Bernard, as well as, I believe, Molly Vlahovich, and David

03:25:08PM 16  Guenther, and Tracy Neighbors from Microsoft.

03:25:11PM 17  Q.   Who ended up asking most of the questions at your

03:25:14PM 18  resolution meeting?

03:25:15PM 19  A.   Most of the questions were posed by Baker & McKenzie

03:25:19PM 20  attorneys.

03:25:19PM 21  Q.   What happened after this meeting?

03:25:21PM 22  A.   After this meeting, we initially broke (sic) with

03:25:23PM 23  them, shook hands.  They said they had to think a little.

03:25:27PM 24  They promised us feedback within 30 to 60 days, at least

03:25:29PM 25  on the mechanical issues.  Eventually, after going back

03:25:32PM 1    and forth a little, in mid to late February, Mr. Sample

03:25:36PM 2    said he wasn't sure that we could meet; he didn't think we

03:25:39PM 3    could do global resolution, but they were still committed

03:25:42PM 4    to giving us 60-day feedback.  Through March, April and

03:25:46PM 5    May, it was sort of a hot/cold message from the company.

03:25:49PM 6    Sometimes it was, "We can't talk to you on anything."  At

03:25:51PM 7    other times, "Oh, we will still talk to you on these

03:25:54PM 8    things."  For example, in May we were still talking about

03:25:56PM 9    engaging on the revenue and expense systems that input the

03:26:02PM 10   dollars and cents for these valuation models.  We shared

03:26:06PM 11   an outline with them.  And they said, "We are still

03:26:10PM 12   looking at your stuff, we are still looking at the

03:26:12PM 13   materials you gave us in January, we need more time."  I

03:26:15PM 14   told Mr. Bernard and Molly Vlahovich, "Well, we are going

03:26:20PM 15   to have to do interviews.  We can't wait a couple more

03:26:22PM 16   months."

03:26:22PM 17   Q.   When did you tell them they were going to have to do

03:26:26PM 18   interviews?

03:26:26PM 19   A.   Repeatedly.  This was specifically focused on May.  I

03:26:29PM 20   believe it was the May 1st meeting where we talked about

03:26:32PM 21   that.  The next week we issued IDRs actually seeking the

03:26:36PM 22   identity of the persons who were responsible for managing

03:26:39PM 23   their accounting systems, the accounting systems that were

03:26:41PM 24   used to input revenues and expenses.  Because if we

03:26:46PM 25   couldn't talk to the tax department in a collaborative

03:26:49PM 1    manner, we needed to talk to the people who held the, I

03:26:52PM 2    guess, keys to the actual systems, the businesspeople.

03:26:54PM 3    Q.   Now, let me just back up for a second.   You testified

03:26:58PM 4    earlier today that you had an initial meeting with Quinn

03:27:02PM 5    Emanuel for the purposes of seeing if you wanted to retain

03:27:04PM 6    them; is that correct?

03:27:05PM 7    A.   That's correct.

03:27:06PM 8    Q.   From that point forward, all the way through July 15,

03:27:10PM 9    when you sent information to them, did you have any

03:27:12PM 10   substantive conversations or did you get any advice from

03:27:16PM 11   Quinn Emanuel?

03:27:16PM 12   A.   No.   The conversations were purely limited to

03:27:20PM 13   procedural issues, logistics, about the contracting

03:27:23PM 14   process.

03:27:24PM 15   Q.   Now, I think it is in one of Microsoft's

03:27:28PM 16   declarations, they talk about your issuing five, quote,

03:27:32PM 17   wrap-up IDRs in the first few months of 2014.   Did you

03:27:37PM 18   consider those to be wrap-up IDRs?

03:27:40PM 19   A.   I considered them to be IDRs on open issues.

03:27:43PM 20   Q.   And did there come a time when you thought that there

03:27:48PM 21   needed to be follow-up with additional IDRs?

03:27:51PM 22   A.   Yes.   Basically we focused initially --  I think only

03:27:56PM 23   four of those five were focused on pure transfer pricing

03:28:01PM 24   issues, one or two on Asia Pacific, and the other two were

03:28:04PM 25   seeking the identities of these people, these managers of

03:28:07PM 1   accounting systems, so we could talk to them.  And then,

03:28:09PM 2   you know, in July, after Mr. Sample said, "We are not

03:28:13PM 3   going to talk to you on anything at all; just finish your

03:28:15PM 4   audit," then we went back and we issued -- well, actually

03:28:21PM 5   July -- before and after he said that, we were preparing

03:28:25PM 6   IDRs on all the topics that we thought were necessary to

03:28:28PM 7   get to the right split, to get to the right number between

03:28:32PM 8   technology and non-technology.  And those were the July

03:28:35PM 9   IDRs.

03:28:35PM 10  Q.   I want to focus on the July IDRs.  Did you start

03:28:40PM 11  preparing those in May and June, before you had any

03:28:41PM 12  conversations with Quinn Emanuel?

03:28:42PM 13  A.   Yes, before I had any substantive conversations with

03:28:44PM 14  Quinn Emanuel.

03:28:45PM 15  Q.   Did Quinn Emanuel have any input whatsoever in the

03:28:48PM 16  July IDRs that were issued to Microsoft?

03:28:50PM 17  A.   They had absolutely no input whatsoever on the July

03:28:54PM 18  11th IDRs or on the July 18th IDR.

03:28:57PM 19  Q.   Did those IDRs essentially ask for some of the same

03:29:00PM 20  information that are being asked for in the pending

03:29:03PM 21  summonses?

03:29:04PM 22  A.   They do.  They are split up by subject matter.  They

03:29:07PM 23  are on subject matters we thought would help us with the

03:29:09PM 24  revenue and expense inputs, or with subject areas that

03:29:14PM 25  would be potentially informative as to the split between

03:29:17PM 1    tech and non-tech.

03:29:18PM 2    Q.   And did one of those IDRs ask questions about who

03:29:22PM 3    outside of Microsoft helped plan and draft the Americas

03:29:24PM 4    agreements?

03:29:25PM 5    A.   It did.   IDR IE-2209 asked about background

03:29:30PM 6    information about the Americas planning.

03:29:32PM 7    Q.   And did you get a sufficient response prior to the

03:29:36PM 8    summonses?

03:29:36PM 9    A.   We did not receive any documents in response to that

03:29:40PM 10   IDR until, I believe, October 2nd, although the cover

03:29:45PM 11   letter is dated September 30th.   And we received

03:29:51PM 12   significant and material new information, that had not

03:29:54PM 13   been previously provided, in response to the summonses.

03:29:57PM 14   We are still seeking additional information.

03:29:59PM 15   Q.   Now, the regulation has been referred to here today.

03:30:07PM 16   I just want to ask a follow-up question.   You mentioned

03:30:10PM 17   something about Tom Ralph having handled another case that

03:30:17PM 18   you learned about in 2013.   Did there come a time in 2014

03:30:22PM 19   when Mr. Ralph and you had some discussion about this

03:30:26PM 20   regulation?

03:30:27PM 21   A.   There did.   When the regulation was finally

03:30:31PM 22   promulgated and final, Tom took credit for it, and

03:30:35PM 23   jokingly referred to it as, "It shall be known in the

03:30:39PM 24   future as the Ralph Rule."   That was the joke between

03:30:41PM 25   those of us in Transfer Pricing Operations.

03:30:44PM 1    Q.   Let me turn to the designated summons very quickly.

03:30:59PM 2    That would be Exhibit 13.  Do you recognize Exhibit 13?

03:31:08PM 3    A.   I do.   It is a designated summons issued on

03:31:12PM 4    October 30th.

03:31:13PM 5          MR. WEAVER:   Your Honor, I would move that into

03:31:16PM 6    evidence.

03:31:18PM 7          THE COURT:   Any objection to 13, counsel?

03:31:21PM 8          MR. BECK:   No objection.

03:31:22PM 9          THE COURT:   Thank you.   Madam Clerk, 13 will be

03:31:25PM 10   admitted.

03:31:28PM 11      (Exhibit No. 13 was admitted.)

03:31:28PM 12   By Mr. Weaver:

03:31:29PM 13   Q.   Let me refer you, if I could, Mr. Hoory, to several

03:31:33PM 14   of these requests, several pages in.  I think they are on

03:31:36PM 15   Page 8.  I will refer you to the requests 14 through 17.

03:31:46PM 16   Can you briefly summarize the kind of information that you

03:31:49PM 17   are seeking in the designated summons in 14 through 17?

03:31:53PM 18   A.   So all of these requests focus on forecast or forward

03:31:57PM 19   looking expectations that the company had internally.

03:32:00PM 20   Some of them focus on forecasts or expectations that were

03:32:05PM 21   used for business planning.  And 17 specifically focuses

03:32:08PM 22   on the forecasts that we were aware of, that the company

03:32:10PM 23   had previously given us, as having been prepared in

03:32:12PM 24   connection with their tax deal.

03:32:13PM 25   Q.   Let's flip very quickly now to Exhibit 28.  Do you

03:32:26PM 1    recognize Exhibit 28?

03:32:27PM 2    A.   I do.   It is an IDR issued back in 2008, seeking

03:32:31PM 3    forecast information relevant to the business groups in

03:32:35PM 4    the Americas that were the subject of the Americas

03:32:38PM 5    cost-sharing arrangement.

03:32:40PM 6    Q.   And what is the response from Microsoft here?

03:32:43PM 7    A.    The response refers back to an earlier IDR response.

03:32:48PM 8    Basically they are saying, "Go look at the forecast that

03:32:51PM 9    KPMG used," without providing any additional information.

03:32:52PM 10          MR. WEAVER:   I would move this exhibit into

03:32:54PM 11   evidence, your Honor.

03:32:59PM 12          THE COURT:   Any objection to 28?

03:33:02PM 13   By Mr. Weaver:

03:33:03PM 14   Q.   Let's turn to Exhibit 29.

03:33:04PM 15          MR. BECK:   No objection.

03:33:05PM 16          THE COURT:   28 will be admitted, Madam Clerk.

03:33:07PM 17      (Exhibit No. 28 was admitted.)

03:33:07PM 18   By Mr. Weaver:

03:33:07PM 19   Q.   What is Exhibit 29?

03:33:08PM 20   A.   This is a follow-up IDR that I was involved with in

03:33:11PM 21   2013.   We were seeking information about the forecast that

03:33:19PM 22   they referred to.   That is that 2026 IDR forecast.   We

03:33:24PM 23   basically wanted to know, "Hey, did you look at anything

03:33:27PM 24   else for tax purposes?   If so, give us a copy of it."   And

03:33:30PM 25   we asked if they had any supporting documentation for that

03:33:33PM 1  forecast to explain these low growth rates that they used.

03:33:37PM 2  We also asked who was responsible for preparing that

03:33:39PM 3  forecast for the tax-driven valuation.

03:33:42PM 4  Q.   Let's flip to the third page.  Did they identify

03:33:50PM 5  someone?

03:33:50PM 6  A.   Yes, they basically said that Chris Suh, who was one

03:33:54PM 7  of the people we interviewed in October, prepared it at

03:33:58PM 8  the request of Glen Cogswell, who is also one of the

03:34:01PM 9  people we have issued a summons for, seeking testimony.

03:34:04PM 10 Q.   Did they refer you to a particular document here?

03:34:09PM 11 A.   They referred to the same document that was provided

03:34:11PM 12 in response to IDR IE-2026.  That is the

03:34:21PM 13 2005_0926_MSFT_PL.xls.  In response to our request for any

03:34:25PM 14 backup documentation describing anything -- any of the

03:34:27PM 15 assumptions therein, you know, detail on that forecast,

03:34:30PM 16 they say they couldn't find anything -- or that they would

03:34:32PM 17 look.

03:34:32PM 18 Q.   Let's go to Exhibit --

03:34:35PM 19      MR. WEAVER:  I would move that exhibit into

03:34:37PM 20 evidence, your Honor, 29.

03:34:39PM 21      MR. BECK:  No objection.

03:34:40PM 22      THE COURT:  Madam Clerk, 29 is admitted.

03:34:43PM 23   (Exhibit No. 29 was admitted.)

03:34:43PM 24 By Mr. Weaver:

03:34:44PM 25 Q.   Exhibit 30, please.  What is Exhibit 30?

03:34:52PM 1  A.   Exhibit 30 was issued at the same time as the

03:34:54PM 2  previous one.

03:34:55PM 3  Q.   What does it ask for?

03:34:56PM 4  A.   It asks for a forecast, except this time we are

03:34:59PM 5  focusing on business forecasts, the same thing they used

03:35:02PM 6  for their business planning, as well as any tax forecast

03:35:05PM 7  that they prepared, other than the one relied on by KPMG.

03:35:08PM 8  Q.   And what is the response?

03:35:10PM 9  A.   They say they couldn't find a single forecast of the

03:35:13PM 10 type we described prepared during the entire calendar year

03:35:17PM 11 of 2005.

03:35:18PM 12 Q.   All right.  Let's move to Exhibit 8.

03:35:22PM 13     MR. WEAVER:  First, I would move Exhibit 30 into

03:35:25PM 14 evidence.

03:35:25PM 15     MR. BECK:  No objection.

03:35:26PM 16     THE COURT:  30 will be admitted.

03:35:28PM 17   (Exhibit No. 30 was admitted.)

03:35:28PM 18 By Mr. Weaver:

03:35:29PM 19 Q.   Let's go to Exhibit 8.  What is Exhibit 8?

03:35:31PM 20 A.   Exhibit 8 is the interview transcript for our

03:35:33PM 21 interview of Chris Suh, the same person who was identified

03:35:37PM 22 as having prepared the forecast at the behest of the tax

03:35:41PM 23 department.  So he is an internal person at Microsoft in

03:35:44PM 24 their -- I think it is their financial planning

03:35:46PM 25 department.

03:35:46PM 1    Q.   And who led that interview?

03:35:50PM 2    A.   I did.

03:35:50PM 3    Q.   And let's turn to Page 99.   Can you tell me what is

03:36:01PM 4    going on in this part of the interview, please?

03:36:02PM 5    A.   In Lines 5 through 7, and clarified in 10 through 12,

03:36:06PM 6    I am saying, "Hey, has anyone asked you or contacted you

03:36:10PM 7    with respect to this tax project that you did for Glen

03:36:13PM 8    Cogswell, the project that he did to prepare forecasts

03:36:16PM 9    that KPMG could use?"   And he says, "No, no one has

03:36:20PM 10   contacted me within the last six months."

03:36:24PM 11   Q.   And did you follow up through a summons request for

03:36:27PM 12   this information, the summons request we just looked at a

03:36:30PM 13   few moments ago?

03:36:31PM 14   A.   We did.   17 specifically focuses on the forecast that

03:36:36PM 15   Chris Suh prepared.   He also says in here, not just the

03:36:39PM 16   last six months, but he can't recall any time in the last

03:36:42PM 17   several years, which would encompass those IDRs we looked

03:36:45PM 18   at, when someone at the tax department reached out to him

03:36:48PM 19   and said, "Hey, do you have any materials related to this

03:36:51PM 20   project?"

03:36:51PM 21   Q.   Exhibit 31, please.

03:36:52PM 22        I am only going to refer to the first page here.

03:36:55PM 23   The same deal as the other two things that were not agreed

03:36:58PM 24   to?

03:36:58PM 25              MS. EAKES:   You are only going to refer to the

03:37:01PM 1    first page of Page 31?  You are not going to move for its

03:37:03PM 2    admission?

03:37:05PM 3            MR. WEAVER:  I will move for its admission, but I

03:37:07PM 4    will agree --

03:37:08PM 5            MS. EAKES:  To the other redactions --

03:37:09PM 6            MR. WEAVER:  That you proposed.

03:37:09PM 7            THE COURT:  Hang on.  I want to make sure I

03:37:12PM 8    understand.  This is the same as No. 16?

03:37:14PM 9            MR. WEAVER:  Yes.

03:37:15PM 10           THE COURT:  The parties have not fully agreed on

03:37:17PM 11   the redactions, but before it is released, it will be in

03:37:19PM 12   fact -- the agreement will be reached?

03:37:22PM 13           MR. WEAVER:  Yes, your Honor, that is correct.

03:37:24PM 14           MR. BECK:  We agreed to the first one based on the

03:37:29PM 15   representation that he agrees to the redactions that we

03:37:32PM 16   proposed that they had previously resisted.

03:37:35PM 17           MR. WEAVER:  We are agreeing.

03:37:36PM 18           THE COURT:  Thank you.

03:37:37PM 19           MR. BECK:  So all of our proposed redactions that

03:37:40PM 20   are still in doubt get made?

03:37:42PM 21           MR. WEAVER:  As of the last round, yes.

03:37:46PM 22           MR. BECK:  Good.

03:37:47PM 23           THE COURT:  All right.

03:37:50PM 24       MR. WEAVER:  Before I forget, I would move the Suh

03:37:54PM 25   transcript, Exhibit 8, into evidence.

03:37:56PM 1        MR. BECK:  We object to that, your Honor.  We have

03:37:57PM 2   one page that may be relevant, but it is 100 pages or so

03:38:02PM 3   of a transcript.  I can't sit here and tell you what's in

03:38:06PM 4   there and what is not in there.  I don't think that

03:38:08PM 5   transcripts typically would get moved into evidence

03:38:11PM 6   anyway.  But I don't think there is a need for an entire

03:38:14PM 7   transcript to come in when the subject matter was four or

03:38:19PM 8   five lines of testimony from a particular page.

03:38:22PM 9        MR. WEAVER:  Your Honor, there is another reason

03:38:23PM 10  for that transcript going in.  And if I have time, which I

03:38:27PM 11  may not, there are other transcripts in some of the

03:38:30PM 12  declarations submitted by Microsoft where they

03:38:33PM 13  cherry-picked a few pages in which John Gordon or another

03:38:37PM 14  Quinn Emanuel attorney asked some follow-up questions.

03:38:39PM 15  But if you look at the whole transcript, some of the

03:38:42PM 16  objecting attorneys for Microsoft are speaking more than

03:38:44PM 17  John Gordon spoke in those interviews.  So I do want the

03:38:49PM 18  interviews in the record.  And they have been redacted by

03:38:52PM 19  Microsoft.  We have agreed to the redactions, to redact

03:38:56PM 20  confidential information.  But it shows the volume of

03:38:59PM 21  questions that were asked by Quinn Emanuel as opposed to

03:39:03PM 22  the questions that were asked by IRS.

03:39:05PM 23       MR. BECK:  So it is for an entirely different

03:39:07PM 24  purpose than what it was used for in court; we now find

03:39:10PM 25  why he introduces it.  And, your Honor, the redactions

03:39:13PM 1    just have to do with information that is confidential

03:39:17PM 2    business information that shouldn't be aired in court.  It

03:39:21PM 3    doesn't mean that unredacted material magically becomes

03:39:24PM 4    relevant.  And so we've got a large transcript, and I

03:39:30PM 5    don't know all that is in it.  If he wants to make a

03:39:33PM 6    rhetorical point about how many people made objections and

03:39:36PM 7    how many people said other things, he can do that in a

03:39:40PM 8    post-hearing submission.  But I don't think that an entire

03:39:43PM 9    transcript ought to come into the public record based on

03:39:47PM 10   his representations.

03:39:48PM 11           THE COURT:  That's my concern as well, Mr. Weaver.

03:39:51PM 12   I understand your point.  I also know that you focused on

03:39:55PM 13   the initial page, and I understood Mr. Hoory's testimony,

03:40:00PM 14   so we are not going to admit anything.

03:40:02PM 15           MR. WEAVER:  Fair enough, your Honor.

03:40:04PM 16   By Mr. Weaver:

03:40:05PM 17   Q.   Let's move on to Exhibit 31.  Mr. Hoory, Exhibit 31,

03:40:09PM 18   do you recognize this document?

03:40:10PM 19   A.   I do.  It is an email that was produced to us by

03:40:13PM 20   Microsoft, I believe at the end of December, but it has

03:40:17PM 21   Chris Suh on it, Fabien Mousseau.  Fabien Mousseau, I

03:40:23PM 22   understand from our interview with Mr. Suh, is someone

03:40:24PM 23   that worked with him and helped him with the forecast and

03:40:27PM 24   the exercise with respect to the Americas.

03:40:28PM 25   Q.   December of 2014?

03:40:29PM 1    A.    That's when we received this.  I think the 31st of

03:40:32PM 2    December, if I recall correctly.

03:40:33PM 3    Q.    I am not going to turn to Page 2, but what did you

03:40:38PM 4    learn by receiving this that is relevant to your summons

03:40:41PM 5    requests?

03:40:42PM 6    A.    Well, three things:  First, there is a note that

03:40:46PM 7    refers to the forecasting exercise prepared for Glen

03:40:49PM 8    Cogswell.  And it attaches a fairly robust PowerPoint

03:40:53PM 9    presentation showing a lot of the inputs and assumptions

03:40:56PM 10   that were used in that forecast.  I think it is about 30

03:40:58PM 11   pages.  So that is all the detail that we were seeking in

03:41:01PM 12   2184 that they said they couldn't find.  And even though

03:41:04PM 13   Mr. Suh had this email, he didn't recall having been asked

03:41:08PM 14   for it under his transcript.  And now we got it, but only

03:41:12PM 15   after we issued a summons.

03:41:13PM 16       Number two, there is a reference there to conservative

03:41:16PM 17   forecasts.  And someone is dressing down another Microsoft

03:41:20PM 18   employee who assumed zero growth.  And that is something

03:41:24PM 19   that Microsoft did in the Asia Pacific deal.  We were also

03:41:27PM 20   trying to get forecast information.  Here, I think it was

03:41:31PM 21   Fabien or Chris Suh, or one of their colleagues says,

03:41:35PM 22   "Zero growth isn't the conservative case, it is the

03:41:38PM 23   abysmal case," is what he says.

03:41:41PM 24       And then, finally, we see that there is actually three

03:41:43PM 25   types of forecasts that they performed:  A conservative

03:41:45PM 1    one, which is the lowest one that they performed.  And

03:41:48PM 2    that's what they used in their tax valuation.  There is an

03:41:51PM 3    intermediate one, which is supposed to track market

03:41:54PM 4    expectations.  And then they have a BPR forecast, which is

03:41:58PM 5    the highest one.  And that's expectations if they executes

03:42:02PM 6    all of their strategies successfully.

03:42:03PM 7        What we know from this is no growth is an abysmal

03:42:07PM 8    case, not a conservative case; that the conservative case,

03:42:10PM 9    which is something I tried to get information from Mr. Suh

03:42:13PM 10   on but he couldn't recall, is the lowest forecast.  And

03:42:15PM 11   they actually had a lot of backup to the forecast exercise

03:42:20PM 12   they performed for the tax department, yet we didn't

03:42:23PM 13   receive it until after we issued a summons.

03:42:24PM 14   Q.  And you had been asking for this information for

03:42:26PM 15   years?

03:42:26PM 16   A.  Since 2008, effectively.

03:42:28PM 17   Q.  Now, we are not going to look at all the exhibits.  I

03:42:32PM 18   would like to, but can you tell me what you learned by

03:42:34PM 19   interviewing someone in the fall by the name of Bosco

03:42:37PM 20   Chau?

03:42:38PM 21   A.  Mr. Chau was offered by Microsoft as someone who knew

03:42:42PM 22   about their business investment funds, or BIF, B-I-F,

03:42:47PM 23   program.  And he characterized BIF investments as a sales

03:42:51PM 24   expense.

03:42:51PM 25       Previously in IDRs we had asked about why KPMG and

03:42:55PM 1    Microsoft classified this BIF expense as routine, as

03:42:59PM 2    expenses that they did not treat as creating any

03:43:01PM 3    intangible value.  Leaving those expenses and other costs

03:43:04PM 4    out of those that they would count towards non-technology

03:43:07PM 5    would have had the result of undervaluing the non-tech,

03:43:11PM 6    basically influencing that split.  Microsoft's response to

03:43:16PM 7    our IDR said, "We treated those as routine, including

03:43:19PM 8    business investment funds expenses, as routine, because

03:43:22PM 9    they have no benefit beyond one year."

03:43:24PM 10      When we asked Mr. Chau about them, he said, "Actually,

03:43:27PM 11   BIF funds, they are used to recruit new clients, new

03:43:31PM 12   enterprise clients, clients that are relevant to the Asia

03:43:34PM 13   Pacific and the Americas transactions."

03:43:37PM 14      And when we asked him, "If you successfully deployed

03:43:42PM 15   BIF investments, these business investment fund -- proof

03:43:45PM 16   on concept investments, to get a new client, how long do

03:43:47PM 17   you expect them to last?"  And his answer was, "Three

03:43:49PM 18   years, because they typically award three-year contracts

03:43:52PM 19   to enterprise partners."  That belies the responses in the

03:43:56PM 20   IDRs that said business investment funds have no benefit

03:44:00PM 21   beyond one year.

03:44:00PM 22   Q.  And do the summonses at issue seek more information

03:44:03PM 23   about those kinds of sales and marketing programs?

03:44:06PM 24   A.  They do.  They seek a wide variety of information

03:44:09PM 25   with respect to sales and marketing programs.

03:44:12PM 1    Q.   What did you learn by interviewing somebody by the

03:44:15PM 2    name of Hanson?

03:44:15PM 3    A.   Robert Hanson, as I recall, he was in charge of their

03:44:19PM 4    market research program.  And he had identified three

03:44:21PM 5    classes of market research that he considered large or

03:44:25PM 6    high-profile annual or more often research.  It was

03:44:29PM 7    basically customer satisfaction or CPE surveys, brand

03:44:35PM 8    tracking or image-tracking surveys, and then some

03:44:38PM 9    advertising research.

03:44:40PM 10       We had previously sought information about brands, I

03:44:44PM 11   believe it was in IDR IE-2145, initially.  And we had a

03:44:50PM 12   follow-up to that because we saw some high-level brand

03:44:52PM 13   studies up through 2000, but none between 2000 and 2009.

03:44:56PM 14   So we asked for those in IDR IE-2168, if I recall

03:45:07PM 15   correctly.

03:45:10PM 16       The response we received from Microsoft was they

03:45:12PM 17   couldn't find them; they thought they were discontinued.

03:45:14PM 18   When we asked Mr. Hanson about them, he said that they

03:45:17PM 19   were performed annually.  And we were asking about the

03:45:20PM 20   timeframe between 2000 and 2006.  So he described those

03:45:24PM 21   brand -- high-level brand studies as the types of things

03:45:28PM 22   that he remembers being performed regularly, annually or

03:45:31PM 23   more often.  Yet we didn't receive any after 2000.

03:45:35PM 24   Q.   And the summonses are seeking that kind of

03:45:36PM 25   information?

03:45:37PM 1    A.   We are seeking that, and we are also seeking the CPE,

03:45:40PM 2    customer and partner experience surveys, that Mr. Hanson

03:45:43PM 3    mentioned, and that several other persons mentioned as

03:45:46PM 4    having been used to evaluate persons' performance, whether

03:45:50PM 5    they were successfully deploying sales and marketing

03:45:54PM 6    functions on behalf of Microsoft.

03:45:57PM 7    Q.   Without telling me any specific advice that you may

03:46:00PM 8    have received from Quinn Emanuel, how would you

03:46:03PM 9    characterize overall, at a high level, Quinn Emanuel's

03:46:07PM 10   impact on the designated summons?

03:46:09PM 11   A.   Very, very limited.

03:46:12PM 12   Q.   And let's turn to Exhibit 23.  Do you recognize

03:46:21PM 13   Exhibit 23?

03:46:22PM 14   A.   I do.

03:46:23PM 15   Q.   What is it?

03:46:26PM 16   A.   It is the summons we issued to KPMG on November 17th

03:46:29PM 17   for information relating to their assistance with

03:46:33PM 18   Microsoft's Americas valuation plan.

03:46:37PM 19   Q.   Did Quinn Emanuel have any impact on what was

03:46:40PM 20   requested here?

03:46:41PM 21   A.   I don't recall them providing any input on this

03:46:43PM 22   summons.

03:46:45PM 23        MR. WEAVER:  I would move this into evidence, your

03:46:47PM 24   Honor.

03:46:47PM 25        MR. BECK:  No objection, your Honor.

03:46:48PM 1        THE COURT:  Madam Clerk, 23 will be admitted.

03:46:51PM 2    (Exhibit No. 23 was admitted.)

03:46:51PM 3  By Mr. Weaver:

03:46:52PM 4  Q.  Exhibit 22, please.  What is Exhibit 22, Mr. Hoory?

03:46:58PM 5  A.  A summons issued to E&Y, Ernst & Young, on

03:47:02PM 6  November 17th.  It is focused on Ernst & Young's role with

03:47:05PM 7  respect to the Asia Pacific transaction.

03:47:07PM 8  Q.  And do you recall Quinn Emanuel's input on this

03:47:10PM 9  summons?

03:47:10PM 10  A.  Absolutely none whatsoever.

03:47:13PM 11  Q.  Let's turn to Exhibit 21.

03:47:19PM 12      MR. WEAVER:  I would move Exhibit 22 into

03:47:21PM 13  evidence.

03:47:21PM 14      THE COURT:  Any objection to 22, Mr. Beck?

03:47:24PM 15      MR. BECK:  No objection.

03:47:25PM 16      THE COURT:  Thank you.  22 is admitted.

03:47:29PM 17    (Exhibit No. 22 was admitted.)

03:47:29PM 18  By Mr. Weaver:

03:47:30PM 19  Q.  Exhibit 21, please.  What is Exhibit 21?

03:47:35PM 20  A.  A November 20th summons, a related summons.  It is

03:47:38PM 21  following up on the designated summons issued to Microsoft

03:47:41PM 22  Corporation.

03:47:41PM 23  Q.  And do you recall the input of Quinn Emanuel on this

03:47:44PM 24  document and the request therein?

03:47:47PM 25  A.  I believe this primarily focused on the Asia Pacific

03:47:50PM 1   and some broad categories.  And I do not believe Quinn

03:47:53PM 2   Emanuel had any input whatsoever on this summons.

03:47:56PM 3          MR. WEAVER:  All right.  I will offer this into

03:48:04PM 4   evidence as well.

03:48:04PM 5          MR. BECK:  No objection.

03:48:05PM 6          THE COURT:  Thank you, counsel.  Exhibit 21 will

03:48:09PM 7   be admitted.

03:48:10PM 8       (Exhibit No. 21 was admitted.)

03:48:10PM 9   By Mr. Weaver:

03:48:10PM 10  Q.   Exhibit 20, please.  What is this?

03:48:15PM 11  A.   This is a November 19th summons that we issued to

03:48:19PM 12  Microsoft, a related summons.  Its subject matter focused

03:48:23PM 13  in large part on the Asia Pacific, but it had some cleanup

03:48:27PM 14  items with respect to the Americas as well.

03:48:30PM 15  Q.   And without revealing any advice that you may have

03:48:34PM 16  received from Quinn Emanuel, did Quinn Emanuel have any

03:48:37PM 17  significant role in the questions asked in this summons?

03:48:40PM 18  A.   No.  The only input I recall getting from them were

03:48:44PM 19  the typo corrections on this one.

03:48:46PM 20  Q.   Now, you have also issued summonses for interviews.

03:48:51PM 21  And I think eight are being enforced here through these

03:48:55PM 22  related actions.  Generally, why are you seeking testimony

03:48:59PM 23  of these individuals?

03:49:00PM 24  A.   So we are seeking testimony on the same subject areas

03:49:03PM 25  that were identified, effectively.  We are seeking

03:49:07PM 1    information originally on -- in July.  A number of those

03:49:11PM 2    persons we requested interviews in September and October,

03:49:14PM 3    but then weren't scheduled by Microsoft.

03:49:18PM 4    Q.   And where did these names come from?

03:49:19PM 5    A.   They came from two sources.  They were either already

03:49:22PM 6    identified by Microsoft.  And previously requested

03:49:27PM 7    examples of those would be James Allchin, Jeffrey Raikes,

03:49:31PM 8    Craig Mundie, David Guenther.  We hadn't requested Glen

03:49:36PM 9    Cogswell, because we didn't then know how much he had to

03:49:39PM 10   do with the deal.  After we saw some of the correspondence

03:49:43PM 11   that was produced in documents, probably in October, we

03:49:47PM 12   knew he had a much greater role.  So then we asked for him

03:49:51PM 13   as well, another Microsoft employee.

03:49:54PM 14       The remainder were either mentioned in transcripts or

03:49:57PM 15   we already knew about them and confirmed -- that is, the

03:50:01PM 16   IRS already knew about them based on our pre-July

03:50:04PM 17   research, and we decided that we needed to cover some

03:50:07PM 18   topics that were not sufficiently addressed at the

03:50:10PM 19   September and October interviews.

03:50:13PM 20   Q.   Earlier today you were accused of asking for this

03:50:18PM 21   information in these summonses to essentially prepare for

03:50:21PM 22   tax court litigation.  Is that why these summonses were

03:50:24PM 23   prepared and the information sought?

03:50:27PM 24   A.   No.  We certainly know there is a possibility that

03:50:31PM 25   this will wind up in tax court.  And, obviously, given the

03:50:34PM 1   state of the exam, that likelihood is obviously higher

03:50:37PM 2   than it might be in another case.

03:50:39PM 3       However, the summons is, just like in any examination,

03:50:42PM 4   they are supposed to help us get to the right number.  And

03:50:44PM 5   regardless of the status of an examination, that is always

03:50:47PM 6   our goal at the IRS, and it is here as well, we want to

03:50:50PM 7   get to the right number, something that we can put on a

03:50:53PM 8   stat notice in this case, because we are obviously not

03:50:56PM 9   going the appeals route at this point.  At least it

03:50:59PM 10  doesn't look like it is in the cards.

03:51:00PM 11  Q.   Why is that?

03:51:01PM 12  A.   It is because the number -- we think that the

03:51:04PM 13  valuation relied on by Microsoft was very weak.  There is

03:51:08PM 14  no time left on the statute, so we are actually required

03:51:10PM 15  to issue a stat notice.

03:51:15PM 16      Let me be clear.  This case has not been designated

03:51:18PM 17  for litigation yet.  We are still seeking information to

03:51:20PM 18  get to the right number.  But just from my own

03:51:23PM 19  perspective, we think that there are -- it is such a huge

03:51:31PM 20  divergence in numbers, we think it is a very aggressive --

03:51:37PM 21  this roundtrip, particularly in the Americas, the evidence

03:51:41PM 22  of KPMG and/or Microsoft potentially cherry-picking some

03:51:45PM 23  inputs.  And we have put a lot of energy into it.

03:51:49PM 24      Just like I told Mr. Bernard leading up --  I think we

03:51:52PM 25  had this conversation in March.  I said, "Given the size

03:51:55PM 1  here, we need to think long and hard, and designation is a

03:52:01PM 2  possibility."  I think it continues to be, although that

03:52:04PM 3  is a future decision.

03:52:05PM 4  Q.  Mr. Hoory, one last question.  When you first started

03:52:10PM 5  seeking to retain Quinn Emanuel in late 2013, were you

03:52:13PM 6  committed to trying to resolve this case with Microsoft?

03:52:16PM 7  A.  Absolutely.  That was the whole point of meeting with

03:52:18PM 8  them on January 14th.

03:52:22PM 9          MR. WEAVER:  Your Honor, at this point I don't

03:52:23PM 10  have any more questions, but I do want to now introduce

03:52:27PM 11  the administrative record into evidence, after Mr. Hoory

03:52:34PM 12  steps down.

03:52:42PM 13          THE COURT:  All right.  Anything else other than

03:52:44PM 14  the administrative record?

03:52:45PM 15          MR. WEAVER:  No, your Honor.  That is the balance

03:52:48PM 16  of our case.  I did want to refer your Honor to a few

03:52:52PM 17  pages, though.

03:52:55PM 18          THE COURT:  Please.

03:53:01PM 19          MR. WEAVER:  Your Honor, I would refer you to

03:53:03PM 20  Exhibit 1, the first and second pages.  This is a

03:53:18PM 21  certified administrative record.  And I would offer it

03:53:20PM 22  into admission under Federal Rules of Evidence 803(8),

03:53:25PM 23  902(11).

03:53:34PM 24          THE COURT:  All right.  That will be admitted.

03:53:37PM 25      (Exhibit No. 1 was admitted.)

03:53:37PM 1          MR. WEAVER:  Let me refer your Honor to a few

03:53:39PM 2     pages, just so they are in the record in case I don't get

03:53:42PM 3     to them with the limited amount of time we would have for

03:53:45PM 4     summations.  Let me refer your Honor, maybe for later

03:53:51PM 5     reference in the record, to Page 126, part one.  Can you

03:54:02PM 6     put that up on the screen, please?  Page 126, please.  The

03:54:22PM 7     reason I am going to refer you to that page is that, you

03:54:26PM 8     can see, is redacted.  6103.  It is redacted because it

03:54:31PM 9     refers to another taxpayer there.  We will be referring to

03:54:34PM 10    that either in closing summation or in further briefing as

03:54:38PM 11    evidence that this reg project did not start with

03:54:42PM 12    Microsoft.

03:54:44PM 13        Let me refer your Honor to a few other pages in the

03:54:47PM 14    few minutes I have left.

03:54:49PM 15          THE COURT:  Hang on.  Mr. Beck, do you want to

03:54:53PM 16    make a comment on that?

03:54:54PM 17          MR. BECK:  Yes.  This has nothing to do with the

03:54:56PM 18    examination of Mr. Hoory.  Mr. Weaver just referred to,

03:55:05PM 19    "We can explain this in follow-on briefing."  Given the

03:55:11PM 20    constraints we had today, in terms of timing, I don't

03:55:14PM 21    think that either one of us is going to have time to say,

03:55:17PM 22    "Here is the evidence that we couldn't present through

03:55:20PM 23    Mr. Hoory, but we, nevertheless, want your Honor to

03:55:22PM 24    consider."  We certainly wouldn't have time to do that,

03:55:26PM 25    even if your Honor was going to entertain it.

03:55:29PM 1      What we would suggest, your Honor, and what we

03:55:32PM 2  contemplated was that we were going to be lucky if we were

03:55:35PM 3  to get done with Mr. Hoory today, but that the matter be

03:55:41PM 4  continued so that both parties can make written

03:55:43PM 5  submissions, where they submit the documents that they

03:55:47PM 6  believe the court should consider, as well as argument.

03:55:52PM 7  Your Honor indicated you didn't want to listen to me

03:55:57PM 8  present argument through Mr. Hoory.

03:55:59PM 9      That, or I suppose we could come back another day and

03:56:02PM 10  make our non-live testimony evidentiary presentations.

03:56:07PM 11  Although, I think both of us could probably do a better

03:56:09PM 12  job in writing than we would standing up here referring to

03:56:13PM 13  documents.

03:56:15PM 14          MR. WEAVER:  Your Honor, if I may respond?  My

03:56:18PM 15  intent here is to walk through this in five to ten

03:56:21PM 16  minutes, just so it is in the record.  As far as we are

03:56:25PM 17  concerned, this should be it.  Almost every single

03:56:29PM 18  innuendo and allegation that Microsoft made doesn't bear

03:56:32PM 19  out after you heard Mr. Hoory.  So in terms of whether

03:56:37PM 20  they get discovery, I think that should be wrapped up.

03:56:41PM 21  But I agree on the issues of the reg, it is complicated,

03:56:46PM 22  and we are happy to have post-hearing briefing.

03:56:49PM 23          THE COURT:  Counsel, I think that is the best way

03:56:51PM 24  of handling it.  The administrative record is in the

03:56:54PM 25  record.  It has been admitted, Mr. Weaver.  It has been a

196

03:56:56PM 1    long day.  Mr. Hoory talks a mile a minute, and it was

03:57:00PM 2    hard to follow up on all of that.  Working for the IRS is

03:57:06PM 3    a good job for you.  I think that Mr. Beck's suggestion

03:57:12PM 4    makes the most sense.  It makes the most sense to me.

03:57:15PM 5        I may very well have some very specific questions for

03:57:18PM 6    both sides, in terms of what I want you to brief.  So what

03:57:22PM 7    I propose is this:  Let me think about what we heard today

03:57:26PM 8    in view of the material you have already submitted.  Let

03:57:29PM 9    me see about what I want in terms of very specific

03:57:32PM 10   post-hearing briefing.  We will notify the parties.  Then

03:57:37PM 11   you can do the written submissions, respond to that, and

03:57:40PM 12   if the court feels it is necessary, we can bring you back

03:57:42PM 13   in and do oral argument as well.  Does that make sense?

03:57:45PM 14           MR. WEAVER:  Yes, your Honor.

03:57:47PM 15           MR. BECK:  Yes.  There are subjects that were just

03:57:50PM 16   inappropriate or ruled inappropriate to do with Mr. Hoory,

03:57:59PM 17   such as the circumstances surrounding the adoption of the

03:58:01PM 18   regulation.  Whether you ask questions about that or not,

03:58:05PM 19   that is an important thing that we will want to explain,

03:58:07PM 20   the evidence that we do have on that and what the

03:58:09PM 21   implication of that is.

03:58:10PM 22           THE COURT:  Absolutely.  Some of those issues are

03:58:12PM 23   a matter of law.  They have nothing to do with the facts

03:58:15PM 24   that were presented at the hearing today.

03:58:17PM 25           MR. WEAVER:  Your Honor, if I could just clarify?

03:58:19PM 1    I am happy to brief, but I would ask that your Honor limit

03:58:22PM 2    the presentation of evidence to what got put in the record

03:58:25PM 3    today, so that the evidentiary hearing happens today, and

03:58:32PM 4    then we can brief the meaning of it --

03:58:32PM 5            MR. BECK:  All we had time for today was one

03:58:34PM 6    witness.  I had entire topics, such as all of the IRS

03:58:39PM 7    internal documents concerning the adoption of the

03:58:42PM 8    regulation.  And this witness disclaimed any knowledge on

03:58:47PM 9    that.  We are not able to present through this witness

03:58:54PM 10   documents that your Honor said he is not in a position to

03:58:59PM 11   testify about.  So in order for us to make the evidentiary

03:59:02PM 12   showing on the other documents, we either have to do it in

03:59:06PM 13   writing, which I think makes the most sense, or we have to

03:59:09PM 14   come back another day and we can put on a document show.

03:59:12PM 15           MR. WEAVER:  Your Honor, just let me respond to

03:59:15PM 16   that if I might.  In terms of your order, if you go back

03:59:17PM 17   and look at the questions that deal with the regulation --

03:59:20PM 18   I think there were basically three.  One was whether

03:59:23PM 19   notice and comment provisions had been complied with.

03:59:26PM 20   That is largely a legal issue.  One was --

03:59:28PM 21           MR. BECK:  Largely, but I've got a whole bunch of

03:59:32PM 22   exhibits, internal emails, that we want to present and

03:59:36PM 23   then argue from.

03:59:37PM 24           MR. WEAVER:  Your Honor, that's what today was

03:59:39PM 25   about.

03:59:40PM 1         MR. BECK:  Except I couldn't do it with the

03:59:42PM 2  witness.

03:59:42PM 3         THE COURT:  Hang on a second.

03:59:45PM 4         MR. WEAVER:  Second, there was an issue about

03:59:47PM 5  whether there was a reasoned analysis.  Typically, your

03:59:49PM 6  Honor, unless there has been a showing -- a substantial

03:59:51PM 7  showing of bad faith, then you are supposed to decide

03:59:55PM 8  whether a reg is valid on the administrative record.  And

03:59:58PM 9  in terms of whether there is a reasoned analysis, let's

04:00:02PM 10  argue that on the administrative record.

04:00:04PM 11     In terms of the timing of this reg, you heard from

04:00:07PM 12  Mr. Hoory.  There is nothing but coincidence in terms of

04:00:10PM 13  the hiring of Quinn Emanuel and the reg.

04:00:13PM 14         THE COURT:  Let me do this:  Let me take some time

04:00:19PM 15  to absorb today in view of the documents already

04:00:24PM 16  presented, in view of the exhibits that I have not looked

04:00:28PM 17  at, and I will get back to you fairly quickly about

04:00:33PM 18  whether -- specifically what I want in terms of

04:00:36PM 19  post-hearing briefing.  If the court feels there is

04:00:39PM 20  anything else that may be necessary, we will ask for that

04:00:43PM 21  as well.  There are some issues that I believe are purely

04:00:49PM 22  matters of law.  And that can be argued, as Mr. Beck

04:00:52PM 23  indicates, simply on the record that we already have.  I

04:00:55PM 24  understand that not all of the testimony that Microsoft

04:01:00PM 25  may have wanted may have come in through this particular

199

04:01:02PM 1    witness.   We will see where we stand once I take a breath

04:01:05PM 2    and take a look at all of this.

04:01:06PM 3        All right?   We are done today.   Thank you all very

04:01:12PM 4    much.

5                        (Proceedings adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

200

1                    **C E R T I F I C A T E**

2

3

4       **I, Barry Fanning, Official Court Reporter for the**

5   **United States District Court, Western District of**

6   **Washington, certify that the foregoing is a true and**

7   **correct transcript from the record of proceedings in the**

8   **above-entitled matter.**

9

10

11

12   _____

     **/s/ Barry Fanning**
13   **Barry Fanning, Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25