# EXHIBIT 31

The Honorable Ricardo S. Martinez

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,    )
                             )    Case No. 2:15-cv-00102 RSM
        Petitioner,          )
                             )    **SECOND DECLARATION**
    v.                       )    **OF SENIOR INTERNATIONAL**
                             )    **ADVISOR ELI HOORY**
MICROSOFT CORPORATION, *et al.*  )
                             )
        Respondents.         )
_____ )

I, Eli Hoory, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a Senior International Advisor in Transfer Pricing Operations ("TPO"), a unit in the Large Business & International Division (LB&I) of the Internal Revenue Service ("IRS").

2.      The IRS is conducting an examination of the federal income tax liabilities of Microsoft Corporation and Subsidiaries ("Microsoft") for the taxable years ending June 30, 2004, June 30, 2005, and June 30, 2006 (the "2004-2006 Examination" or "Examination").

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

1

3.     I first became involved in the 2004-2006 Examination starting in November 2011.

4.     The facts set forth in the paragraphs below are based on my work for TPO with respect to the 2004-2006 Examination.  This includes my review of documents produced by Microsoft for the Examination, my review of documents the IRS created in connection with the Examination, my attendance at meetings and calls with Microsoft tax personnel and at interviews of Microsoft employees, and discussions with IRS staff and experts whom the IRS has retained to support the Examination.

### Background:  Transfer Pricing Issues in the 2004-2006 Examination

#### a.  The transfer pricing issues

5.     The focus of the designated summons and related summonses issued by the IRS are transfer pricing issues involving intangibles and related to two regional cost sharing arrangements between Microsoft and its affiliates, one between Microsoft and its Puerto Rican affiliate, Microsoft Operations Puerto Rico, LLC (MOPR), effective July 1, 2005 (the "Americas cost sharing arrangement") and the other between Microsoft and its Asian affiliate, Microsoft Asia Island Limited, a Bermuda corporation (MAIL), effective April 3, 2004 (the "APAC cost sharing arrangement").  MOPR is owned by a Bermuda holding company, and is not a member of Microsoft's U.S. consolidated group.

6.     Under the Americas cost sharing arrangement, Microsoft divided rights to technology intangibles (*e.g.*, software code) from rights to non-technology intangibles (*i.e.*, everything other than technology intangibles, such as brands, trademarks, and customer/partner relationships).  Microsoft and MOPR entered into a technology license agreement under which Microsoft licensed to MOPR — and subsequently treated MOPR as the economic owner of —

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

2

12617742.1

1    various rights to technology intangibles used in Microsoft's Americas retail business and, under

2    a cost sharing agreement, MOPR agreed to fund technology research and development (R&D)

3    costs relating to Microsoft's Americas retail business.  Microsoft retained the rights to all non-

4    technology intangibles used in its Americas retail business.

5         7.     This ongoing division between technology intangibles and non-technology

6    intangibles is unique to the Americas cost sharing arrangement and is not a feature of the APAC

7    cost sharing arrangement.

8         8.     In addition to a technology license agreement and a cost sharing agreement, the

9    Americas related transactions included a series of other intercompany agreements, including

10   distribution agreements, under which: (a) Microsoft would license to MOPR rights to use and

11   replicate Microsoft marks (which were part of the non-technology intangibles retained by

12   Microsoft) for manufacture of products for distribution by Microsoft in the Americas, (b) MOPR

13   would manufacture Microsoft retail products for distribution by Microsoft in the Americas

14   territory, and (c) Microsoft would sell Microsoft products to third-parties in the Americas

15   territory and pay MOPR a transfer price on Microsoft's sales to compensate MOPR both for the

16   technology intangibles MOPR was treated as providing to the Americas retail business and also

17   for MOPR's "standard" costs (*e.g.*, costs to manufacture/supply physical media embodying

18   Microsoft products).

19        9.     In support of the related-party pricing it reported on its returns for purposes of

20   I.R.C. § 482, Microsoft relied on a residual profit split model to value and price the Americas

21   intercompany transactions.  The model set intercompany pricing for intangibles based on a

22   percentage of Americas retail sales of Microsoft products by Microsoft to third-party customers

23
Second Declaration of Senior International Advisor                    **U.S. Department of Justice**
Eli Hoory                                                            Ben Franklin Station
                                                                     P.O. Box 683
                                                                     Washington, D.C. 20044-0683

3

12617742.1

and is summarized below:

- <u>Buy-in royalty paid by MOPR to Microsoft</u>: For the technology intangible rights

  MOPR received (effective July 1, 2005), Microsoft forecast that MOPR would pay

  Microsoft a buy-in royalty totaling approximately $15.35 billion. The buy-in royalty

  MOPR would pay was set as a declining percentage of total sales:

  - 44.23% of sales for 2006
  - 41.67% for 2007
  - 33.16% for 2008
  - 9.38% for 2009
  - 3.49% for 2010
  - 2.56% for 2011 through 2014
  - no buy-in royalty due after 2014

- <u>R&D costs paid by MOPR to Microsoft</u>: During the 10-year period from 2006 to

  2015, Microsoft's valuation forecast that MOPR would fund R&D costs totaling

  approximately $15.56 billion. These R&D costs were forecast to equal

  approximately 11.9% of sales per year.

- <u>Technology payment by Microsoft to MOPR</u>: During the 10-year period from 2006 to

  2015, Microsoft's valuation forecast that Microsoft would pay MOPR a transfer price

  for technology intangibles (hereinafter the "technology royalty") totaling

  approximately $67.81 billion. For 2006, the technology royalty was initially set at

  53.68% of sales. Microsoft's valuation predicted that, in subsequent years, the

  technology royalty would vary between 53.15% and 50.93% of sales.

- <u>Standard costs paid by Microsoft to MOPR</u>: During the 10-year period from 2006 to

  2015, Microsoft's valuation forecast that Microsoft would pay MOPR approximately

  $1.68 billion as compensation for standard (*e.g.*, manufacturing) costs, which was

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

4

forecast to be approximately 1.3% of sales per year.

Netting the model's forecast payments between Microsoft and MOPR, the model predicted that

MOPR would net approximately $38.58 billion during the ten-year period from 2006-2015.

10.     The IRS Examination is investigating whether the intercompany pricing

established by Microsoft is consistent with the arm's length standard under I.R.C. § 482. The

value of what Microsoft transferred — the rights to technology intangibles — and the value of

what Microsoft kept — the non-technology intangibles — are both at issue.

11.     Microsoft relied on a similar residual profit split model to value and price the

intangibles at issue in its APAC cost sharing arrangement.  Because the APAC arrangement did

not create an ongoing split of technology and non-technology intangibles, Microsoft's APAC

valuation model only established a buy-in royalty payable by MAIL to Microsoft for the

intangible rights MAIL received (effective April 3, 2004).   From April 3, 2004 to June 30, 2008,

the APAC buy-royalty was set as 29.10% of APAC retail sales of Microsoft products, with no

buy-in royalty due after June 30, 2008.  The APAC model did not forecast any revenue growth

for the APAC region, instead using flat fiscal year 2003 sales to perform its valuation.

### b. The IRS's issuance of a 30-day letter in May, 2011

12.      On May 3, 2011 – before I was assigned to the Examination – the IRS

examination team issued Microsoft a Letter 950 (a "30-day" letter), reflecting a notice of

proposed adjustment and supporting analysis on the Americas cost sharing arrangement (as well

as other proposed adjustments, including one with respect to the APAC cost sharing

arrangement).

13.     An IRS 30-day letter to a taxpayer contains a report with proposed adjustments to

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

5

12617742.1

a taxpayer's return and invites the taxpayer to agree with the proposed changes or, if the taxpayer does not agree, to request a meeting or teleconference with the supervisor of the IRS examination point of contact identified in the letter.  If a disagreement remains after the meeting or teleconference, the 30-day letter invites the taxpayer to request a conference with IRS Appeals.  If a taxpayer does not respond to a 30-day letter or if no agreement is reached at Appeals, the IRS generally issues a statutory notice of deficiency (a "90-day" letter), which reflects a final determination, rather than a proposed adjustment.  After receiving a 90-day letter, a taxpayer may file a petition in Tax Court to dispute the deficiency determination made by the IRS.

14.     The notice of proposed adjustment on the Americas cost sharing arrangement that accompanied the IRS 30-day letter focused on the arm's length buy-in payment by MOPR to Microsoft in exchange for the technology intangible rights Microsoft licensed to MOPR, as of July 1, 2005.  The notice did not propose any adjustment to the technology royalty that Microsoft paid to MOPR after July 1, 2005, thus leaving in place Microsoft's profit split between the technology intangibles it transferred and the non-technology intangibles it retained.

15.     The proposed adjustment accompanying the 30-day letter used a discounted cash flow income method analysis, not the residual profit split method used by Microsoft.  In its analysis, the IRS relied on a number of simplifying assumptions, including starting with the profit-and-loss forecast Microsoft relied on in its model and also using the post-July 1, 2005 technology royalty adopted by Microsoft, reflecting the technology/non-technology split Microsoft adopted.

### Involvement of the IRS Transfer Pricing Operations in the 2004-2006 Examination

16.     During 2011, the IRS Large Business & International Division — which, as its

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

6

12617742.1

name suggests, is responsible for overseeing tax issues for large business entities such as Microsoft — established a team of transfer pricing specialists within a new unit, Transfer Pricing Operations (TPO).  TPO is responsible for providing IRS agents with centralized support in planning, executing, and resolving transfer pricing examinations.

17.     As part of this new process for providing centralized support for transfer pricing examinations, TPO reviewed the IRS's existing inventory of transfer pricing audits.  TPO identified Microsoft's transfer pricing issues as among the largest transfer pricing issues the IRS had.  Microsoft's Americas buy-in issue stood out in particular, as there were tens-of-billions of dollars in U.S. taxable income unagreed on that issue alone.

18.     Prior to TPO's involvement, and at the time the 2011 30-day letter and supporting analysis were issued, the IRS had retained outside expert economist support for the 2004-2006 Examination, but no software industry experts.

19.     TPO concluded, given the magnitude of the potential adjustments and significant differences between the residual profit split method used by Microsoft and the income method discounted cash flow analysis on which the IRS's proposed adjustment was based, that the America's buy-in issue warranted a closer look.  TPO's goal was to identify one or more outside software industry experts to assist it in better understanding Microsoft's business, and, with that support, consider the reasonableness of the inputs, assumptions and results of Microsoft's residual profit split model.   TPO perceived outside software industry expertise as necessary due to the fact-intensive nature of the model's inputs and technology/non-technology split.

20.     TPO recognized that it was important for the IRS to consider how, if at all, Microsoft's residual profit split model could be applied in a reasonable manner.  TPO also

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

7

12617742.1

recognized that Microsoft's residual profit split model not only impacted the buy-in royalty paid by MOPR to Microsoft, but also the technology royalty paid by Microsoft to MOPR, an interdependence that could have implications for the IRS's May 3, 2011 proposed adjustment.

### *The course of the Examination from mid-2012 through 2013*

21.     After communicating TPO's goals to Microsoft, the IRS in February 2012 withdrew its 30-day letter in order to conduct the additional examination work identified as prudent by TPO.

22.     Periodic executive-level status calls were held thereafter between Microsoft senior tax personnel and the IRS to discuss the Examination.  Participants generally included Microsoft's Global Vice President, Tax, and U.S. Tax Counsel and, for the IRS, the Director, TPO, the International Exam Team Manager and me.  The IRS examination team and Microsoft's tax department also held separate, non-executive-level calls to discuss day-to-day examination matters, including both ad hoc calls and regular (usually weekly or bi-weekly) information document request (IDR) status calls.  In addition to others, Microsoft's U.S. Tax Counsel, the IRS International Exam Team Manager and I also generally participated in these calls.

23.     Shortly after the IRS completed the process to identify and hire several software industry experts and an economist to support the Examination, an executive-level status call was held on July 12, 2012 to discuss an initial anticipated timeline for completing the Examination (Exhibit A).  That July 12, 2012 timeline worked back from the then-current statute of limitations (scheduled to expire June 30, 2013).

24.     The focus of the initial July 12, 2012 timeline was on the Americas buy-in and

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

8

12617742.1

1   transfer pricing issues in the Examination.  TPO recognized, and repeatedly shared with

2   Microsoft on the executive-level status calls, that the Americas and APAC issues had many

3   similarities, and that facts learned and analysis performed on the Americas issues could be

4   applied in a consistent manner to the APAC issue.  Evaluating whether this made sense

5   depended, however, on the IRS first making progress on and evaluating what it learned as a

6   result of the Americas-focused work.  The IRS also expected that resolving one or more factual

7   or computational issues relevant to the Americas issues could inform resolution of similar

8   matters germane to the APAC issue.

9          25.    The July 12, 2012 timeline communicated the IRS's preference "to work

10  proactively and openly with Taxpayer by engaging in direct communications with the

11  appropriate day-to-day operational custodian(s) of the data to help facilitate more efficient and

12  accurate information requests and responses on a real time basis."  The IRS expected that such

13  direct communications would allow the IRS and its experts to get up to speed quickly on topics

14  in order to make more precisely targeted information document requests (IDRs).

15         26.    Consistent with the above, beginning on August 17, 2012 and continuing into

16  2013, the IRS held a number of informal interviews with various Microsoft employees aimed at

17  focusing fact finding and increasing the efficiency of the IDR process.  The Microsoft employees

18  interviewed included employees in marketing and software code developers.  The format of these

19  informal interviews was typically a one-hour conference call.  In addition to the Microsoft

20  employee(s) fielding questions, participants on these calls included IRS employees, software

21  industry and economist experts hired by the IRS, representatives from Microsoft's tax

22  department and, in some cases, Microsoft's counsel, Baker & McKenzie, LLP.

23  Second Declaration of Senior International Advisor          **U.S. Department of Justice**
    Eli Hoory                                                   Ben Franklin Station
                                                                P.O. Box 683
                                                                Washington, D.C. 20044-0683

12617742.1

27.     Some of the informal interview conference calls were follow-up calls with a prior Microsoft interviewee or involved more than one Microsoft interviewee calling in to the same call to field questions as a group.  These repeat or group calls focused on software-code-related issues.

28.     Prior to the first of these informal interviews, Mr. Bernard called me to discuss procedures for the calls.  On that call, Mr. Bernard expressly requested that the calls be limited to an informal question-and-answer (Q&A) session that was not under oath or recorded.  Mr. Bernard explained that keeping these calls informal would allow him to schedule the calls much more easily than if under oath or on the record.  He also expressed the view that informal discussions would facilitate a more open and candid dialogue with Microsoft's employees. Consistent with the purpose of the calls being to focus IDRs and the expectation that the calls would encourage a productive dialogue and potentially narrow open issues, I accommodated his request.  At the same time, however, I also expressly stated to him that my agreement to this request had no impact on whether the IRS would eventually seek formal, under-oath interviews of Microsoft employees and that the IRS may, in due course, consider it necessary to pursue formal interviews to document the facts.  This discussion was referenced in the updated Examination timelines, described below.

29.     The parties initially assumed (as described in Note (1) of the initial July 12, 2012 timeline) that Microsoft would be responding to information document requests (IDRs) within two weeks of each IDR's issuance.  In practice, Microsoft often took longer than two weeks to complete its response.  In some cases, the longer response time was attributable to the scope of the requests.  Recognizing this, the IRS examination team conferred with Microsoft on the time

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

12617742.1

Microsoft needed to respond to requests, and consequently often issued IDRs with longer than a two-week deadline or re-issued an IDR with a revised deadline. In some cases, Microsoft's responses still took longer than the specified response deadlines.

30. As the IRS gained an improved understanding of how much time would be necessary to complete the fact-intensive analysis of the Americas transfer pricing issues, it prepared updated timelines. These timelines were discussed with Microsoft on two executive-level status calls with senior Microsoft tax personnel, one held on January 31, 2013 and the other on May 30, 2013. These timelines are respectively attached as Exhibits B and C.

31. The January 31, 2013 timeline estimated either that the issues would be resolved or the IRS would issue a new 30-day letter by September 1, 2013, allowing time for the IRS to issue a statutory notice of deficiency, if necessary, by December 31, 2013, which was at that time the date to which Microsoft had agreed to extend the statute of limitations on assessment. This timeline expressly noted that the IRS had conducted informal telephone interviews but that it "may, as previously discussed, pursue more formal interviews if deemed appropriate at some point." The timeline also summarized factors that could be expected to affect the timeline, including the production of software source-code information that the IRS's outside software experts needed in order to proceed with their analysis.

32. The May 30, 2013 timeline pushed back the Examination milestones significantly, with an estimated resolution of the issues or issuance of a 30-day letter by April 1, 2014. The delay was due primarily to the IRS's accommodating Microsoft's insistence that its software source code be reviewed only at Microsoft's clean room facility in Redmond, Washington (rather than being delivered to the IRS's expert's facility in Boston, Massachusetts, or, in the alternative,

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

12617742.1

being reviewed at Microsoft's own facility in Cambridge, Massachusetts), requiring the IRS to secure additional expert funding to pay for this additional cost and also delaying completion of the outside experts' analysis to September 2013. The timeline proposed that IRS would present its analysis to Microsoft on November 15, 2013. The revised timeline also reflected a new statute extension date of June 30, 2014, to which Microsoft had agreed.

33. On July 23, 2013, at one of the periodic executive-level status calls held between Microsoft senior tax personnel and the IRS, Microsoft asked whether Microsoft's case would be designated for litigation. To my knowledge, this is the first time that the parties discussed the possibility of designation. Attendees for Microsoft included William Sample, Global Vice President, Tax, Fabrice Georis, General Manager M&A/Controversies and Mr. Bernard. Attendees for the IRS included Samuel Maruca, Director, TPO, and me. Mr. Sample asked if the IRS's recent designation for litigation of another transfer pricing case (Amazon.com v. Commissioner, Tax Court Docket No. 31197-12, as reflected in then-recent case filings) had implications for Microsoft's transfer pricing issues. Mr. Maruca stated that no decision had been made and that the decision point, if it ever became relevant, was a long way off.

34. Consistent with TPO's commitment to transparent discussions of the Americas transfer pricing analysis, all of the timelines contemplated a presentation by the IRS to Microsoft as soon as the IRS had made sufficient progress in its fact-intensive analysis to present the results to-date. The last updated timeline (May 30, 2013 version) set the goal of having this presentation in the first half of November 2013. After taking into account the federal government shutdown in October 2013 and other scheduling factors, the presentation was re-scheduled, by mutual agreement, for January 14, 2014.

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

12

12617742.1

***The course of the Examination in 2014***

> ### a. January 2014 IRS presentation to Microsoft and follow-up

35.    On January 14, 2014, the IRS delivered a detailed presentation of its industry and economist experts' work to-date, accompanied by Q&A to the IRS attendees from Microsoft and its counsel, Baker & McKenzie.  I was the principal IRS presenter.  In advance of this meeting, the IRS provided Microsoft with an expert report on software analysis, an expert report (now superseded by the expert's need to evaluate additional facts discovered during the Examination) on the Americas retail business profit-and-loss forecast, and a detailed preliminary draft economist model.

36.    The IRS presentation, while very detailed, was not a final IRS determination or proposed adjustment.  Rather, the presentation provided Microsoft an in-depth look at the IRS's work to date, identifying not just preliminary draft results, but also open factual questions and concerns on which the IRS hoped to engage Microsoft in a constructive manner.  This was consistent with TPO's repeated commitment to Microsoft to be transparent and engage while work was still being performed to maximize the opportunity for a productive resolution dialogue.

37.    At the January 14, 2014 meeting, the IRS presentation suggested a number of factual and computational issues on which the parties could work productively to narrow differences and potentially resolve the valuation issues, including, *inter alia:*

- Correcting computational errors in Microsoft's model
- Revenue growth assumptions in model (which assumed near-term growth for the Americas retail business of less than half the worldwide growth that Microsoft itself had predicted in its contemporaneous SEC filings)
- Amortization period assumptions
- Feedback on IRS outside expert's preliminary draft modelling
- Reasonable technology vs. non-technology split

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

13

12617742.1

- Reasonable transfer price (technology royalty and standard costs) and buy-in royalty (which the IRS recognized likely presented the greatest challenge in terms of resolution)

38.     Immediately prior to the conclusion of the January 14, 2014 meeting, Mr. Sample and Mr. Bernard spoke with Mr. Maruca and me and acknowledged that, while some issues were more difficult than others, they believed that resolution discussions could prove productive on at least some of the issues identified by the IRS.  They communicated that it was up to Microsoft to consider more closely the information the IRS had provided and, in turn, to give feedback to the IRS.  We agreed that objective factual and computational issues would be the easiest to follow-up on and a logical first step, and Mr. Sample and Mr. Bernard set a 30-day goal for initial feedback on factual issues/questions that Microsoft had identified (*e.g.*, math errors, changes to IDR responses, other "hard" fact corrections).  They also stated that Microsoft "owed" the IRS an in-person response with Microsoft's view on the issues presented and its reaction to the IRS analysis, which they anticipated would be about 60 days later.

39.     Microsoft never set a date for the anticipated in-person meeting to present its views and respond to the IRS, and in the end, no such meeting was held.

40.     In memoranda dated January 27, 2014 and transmitted January 28th, Microsoft requested additional information from the IRS, including reports from various IRS industry experts.  On January 29, 2014, Mr. Bernard and I discussed these memoranda.  I communicated to him that the IRS would consider and likely answer Microsoft's questions for additional detail on the code analysis.  However, consistent with what we had discussed at the conclusion of the January 14 meeting, I told him that the IRS expected Microsoft would be engaging in a constructive dialogue and would not be simply demanding reports from the balance of the IRS's

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

14

12617742.1

1    industry experts at this stage.

2         41.    On February 17, 2014, on a conference call held among Mr. Sample, Mr. Bernard,

3    Mr. Maruca and me, Mr. Sample notified us that he planned to sign a statute extension that week,

4    extending the statute to December 31, 2014; that he had decided not to pursue resolution

5    discussions; and that he would like a 30-day letter.  Mr. Maruca and I explained that, given this

6    shift, the IRS would have to turn from discussion mode to completing all factual development,

7    finalizing its analysis, and fully documenting its position.  While we acknowledged Mr.

8    Sample's preference, we also reminded him that a 30-day letter was only one option available to

9    the IRS.  At the close of the call, Microsoft confirmed that it remained committed to providing

10   the 60-day feedback it had promised in January, and also indicated its openness to continuing to

11   work toward engaging on at least some of the more mechanical modeling issues, such as math

12   corrections and revenue and expense allocations.

13        42.    In early March, Molly Vlahovich, Microsoft's Director, Tax Controversies,

14   contacted me to follow up on Microsoft's January 27 requests for additional information from

15   the IRS.  I explained that it would not respond to requests for information on topics as to which

16   Microsoft had clearly stated it did not want to engage.

17        43.    Mr. Bernard and I met in Washington, D.C. on March 24, 2014, to discuss the

18   status of several issues.  A copy of the agenda that Mr. Bernard sent me in advance of our

19   meeting is attached as Exhibit D; and a copy of his confirming email is attached as Exhibit G.

20        44.    At this meeting, Mr. Bernard repeated Mr. Sample's request for a 30-day letter.

21   Mr. Bernard stated that the only path he could see toward full resolution was if the IRS

22   abandoned the income method entirely.  I, in turn, suggested that there remained room for

23   Second Declaration of Senior International Advisor                    **U.S. Department of Justice**
     Eli Hoory                                                           Ben Franklin Station
                                                                         P.O. Box 683
                                                                         Washington, D.C. 20044-0683

                                            15

constructive dialogue, irrespective of competing valuation methods for the Americas buy-in, and even if full resolution proved out of reach, resolution could be achieved on a number of issues. One item we discussed in detail was how the parties might work together to address revenue and expense allocation issues. At his request, I reviewed each of the options available to the IRS: a 30-day letter, a 90-day letter, or a 90-day letter and designation for litigation. Mr. Bernard also asked me about the review process if the case was designated for litigation; I shared my understanding that a taxpayer could seek review with IRS Counsel in the event the IRS sought designation. Mr. Bernard asked me about the IRS's expectations for formal interviews (under oath and on the record). I told him that the IRS examination team was still considering whom we needed to interview and that I estimated we would identify and seek formal interviews in the July through September timeframe.

45. On May 1, 2014, Mr. Bernard and I participated in a conference call focused on continuing our discussion about engaging collaboratively on the revenue and expense allocations that were central to both Microsoft's and the IRS's valuation models. In anticipation of discussing the allocations, the IRS sent Microsoft a discussion outline, attached as Exhibit E. On our call, Mr. Bernard informed me that Microsoft was working with the financial models that the IRS's software industry financial analyst expert had prepared (and which the IRS had given to Microsoft in advance of the January 14, 2014 meeting) and had scheduled discussions with a number of experts; and that, while Microsoft was not yet prepared to discuss either errors or possible areas of agreement, he anticipated that in about 2-3 months, Microsoft would "probably be prepared to sit down and go through that."

46. Between the January 14, 2014 meeting and June 2014, the IRS issued five transfer

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

16

pricing related IDRs to Microsoft.  Microsoft's responses to two of the IDRs were timely, with

the responses to the other three IDRs ranging from 10 to 38 calendar days after the due date.  The

due dates and responses were as follows:

- IDR IE-2204 was issued on January 27, 2014 with a response due date of February 26, 2014.  Microsoft responded on the due date.
- IDR IE-2205 was issued on February 11, 2014 with a response due date of March 24, 2014.  Microsoft provided a partial response on April 14, 2014 and a supplemental response on May 1, 2014.
- IDR IE-2206 was issued on May 12, 2014 with a response due date of May 23, 2014.  Microsoft responded on June 12, 2014.
- IDR IE-2207 was issued on May 12, 2014 with a response due date of June 2, 2014.  Microsoft responded on June 12, 2014.
- IDR IE-2208 was issued on May 21, 2014 with a response due date June 20, 2014.  Microsoft responded on June 16, 2014.

### b. The July 2014 Information Document Requests (IDRs) to Microsoft

47.     On July 3, 2014, the IRS transmitted to Microsoft eleven draft IDRs for

consideration and discussion at the next IDR status call (an examination-level call), then

scheduled for July 7, 2014.  These draft IDRs requested Microsoft to identify current and former

employees with expertise and decision-making responsibility in various subject areas and to

produce related documents in those subject areas. Seeking to identify interview candidates was

consistent with the rough time estimate I had given Mr. Bernard at our March 24 meeting.

48.     On receiving the draft IDRs, Microsoft requested a senior-level executive call

with TPO and others.  On that call, held July 9, 2014, Mr. Sample expressed unequivocally that

Microsoft had no interest in any resolution discussions whatsoever, even on basic mechanical

issues, and asked the IRS to issue all IDRs and close out the Examination as soon as possible.

He also repeated his preference for a 30-day letter.

49.     Once Microsoft made clear its preference that the IRS should complete its

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

17

12617742.1

examination without any resolution dialogue or receiving feedback from Microsoft on the IRS's preliminary draft analysis presented in January 2014, the IRS fully shifted its focus from possible resolution to effectively documenting facts and completing its evaluation of potential adjustments related to the transfer pricing issues in the Examination.

50.     The regular, non-executive status call between the IRS examination team and Microsoft, to discuss the draft IDRs in detail, was held on Thursday, July 10, 2014.  The discussion included the requests' relevance to the transfer pricing issues under examination.  The draft IDRs were finalized and issued the next day, July 11, 2014.  The IRS issued an additional IDR on July 18, 2014.

51.      On subsequent regularly scheduled IDR status calls, as responses were received, the IRS and Microsoft's tax personnel would discuss whether the responses were complete and, when concerns were identified, how those concerns related to the requests' relevance to the Examination.

52.     Between July 2012 and July 2014, Microsoft produced approximately 1.14 million "MSTP" Bates numbered pages in response to transfer pricing related IDRs. Approximately 1.13 million of those 1.14 million pages (comprising approximately 143 thousand documents) were responsive to just two IDRs, which asked for market research studies commissioned or prepared on Microsoft brands, for documents Microsoft had provided to industry analysts, and for industry analyst reports prepared on Microsoft's products or markets. The intent of the IDRs was to obtain copies of research prepared by or on behalf Microsoft or that Microsoft had relied on for its own business planning research.  Instead of research produced or commissioned by Microsoft, Microsoft produced mostly third-party "syndicated research" to

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

18

which Microsoft subscribed and which it had apparently collected in an online research library. This included approximately 103,888 documents (Bates range MSTP0019011 to MSTP0818129) containing syndicated research reports from industry analysts and approximately 38,732 documents (Bates range MSTP0818131 to MSTP1070397) containing syndicated research by market research firms. After the IRS expressed concerns in IDR status calls that none of the produced information appeared to reflect Microsoft's own research, Microsoft made a supplemental production of approximately 993 documents (Bates range MSTP1070415 to MSTP1146933) that included what appears to be Microsoft-commissioned research. Even this supplemental production was mostly not responsive to the 2004-2006 Examination, however, as it was almost entirely from after 2006 or focused on Microsoft products not covered by the Americas cost sharing arrangement.

53.     Microsoft's IDR responses to requests for documents often included the following or a similar statement that "We do not represent that the enclosed documents represent all responsive records. We reserve the right to supplement this response if additional responsive documents come to our attention." (Example is from the IDR IE-2148 response.) Regular IDR status calls were held between Microsoft and the IRS to discuss the status of outstanding IDRs. When the IRS had concerns about the relevance or scope of documents produced, these concerns were discussed with Microsoft tax personnel. In most cases, the information Microsoft shared about its search efforts was at a very high level, reflecting a verbal commitment that Microsoft tax personnel had made phone or email inquiries to potential custodians. The IRS generally was not provided with the identity of the potential custodians queried or the language of the inquiries made.

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

19

12617742.1

54.     The twelve transfer pricing related IDRs that were issued in July 2014 sought information concerning nine subjects the IRS believed to be relevant to the Americas transfer pricing issues.  One of the nine subjects focused on Microsoft's tax planning and the other eight focused on normal day-to-day business functions at Microsoft.  The business-function IDRs sought documents on some of the subjects and the names of all Microsoft business units and individuals who had historical management and decision-making responsibility in the subject area during the 2000-2005 period, including both current and former employees.

### c.  Additional document IDRs issued in August and October 2014

55.     The IRS issued six transfer pricing related IDRs to Microsoft in August and October 2014.  Four of these IDRs related to an error in Microsoft's transfer pricing accounting practices that had resulted in Microsoft erroneously deducting over a billion dollars of royalty expenses against its domestic income, instead of properly charging these expenses out to its EMEA and APAC affiliates.  Microsoft had first identified the royalty expense charge-out errors to the IRS in July 2014, but the limited information it provided at that time necessitated follow-up questions by the IRS.  The four IDRs sought information to assist the IRS in evaluating the royalty expense amounts at issue.

56.     One of the six IDRs related directly to the APAC cost sharing arrangement and followed up on an earlier IDR to which Microsoft had responded that certain APAC region contracts could be found in a Bates range of previously produced documents.  Upon review of the referenced Bates range, however, the IRS discovered that some of the requested APAC contracts were missing, necessitating this follow-up IDR.

57.     The last of the six IDRs issued in August and October 2014 related to a foreign

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

20

12617742.1

tax credit issue.

### d. The IRS interviews of Microsoft employees in September and October 2014

58.      In addition to seeking documents, the July 2014 IDRs also asked Microsoft to identify persons able to answer questions related to various subject areas.

59.      On IDR status calls regarding the July 2014 IDRs, Microsoft informed the IRS that while it would work to identify former employees in due course, it was first focused on identifying current employees, who it anticipated would be easier to identify and contact.  The IRS agreed that this was reasonable and offered Microsoft additional time to identify former employees (but not current employees).  With a single exception, responses to the IDRs requesting that Microsoft employees be identified were due on August 1, 2014.  Microsoft made its initial responses identifying current employees between August 11 and August 22, 2014.

60.      On later IDR status calls with Microsoft regarding the July IDRs, Microsoft informed the IRS that it had decided to focus on current employees only, except where Microsoft could not identify a current employee knowledgeable about a subject area.  Former employees who were identified included James Allchin and Jeffrey Raikes, as well as a former employee, Richard Berry, who had a continuing relationship with Microsoft as an independent contractor.

61.      In most cases, Microsoft did not identify all historical business units and persons who had day-to-day management and decision-making responsibility in 2000-2005 in each subject area, providing instead the names of one or more current employees identified by Microsoft as able to answer questions about the subject area.

62.      The IRS informed Microsoft of its continued interest both in former employees and in 2000-2005 decision-makers, while recognizing that interviewing the current employees

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

21

12617742.1

who Microsoft had identified would advance the examination process and, perhaps, reduce or eliminate follow-up. Accordingly, the IRS requested interviews based on the pool of individuals whom Microsoft identified as able to speak to each subject area during the 2000-2005 period.

63. In addition to many phone conferences and emails, between the end of August and September 18th, Mr. Bernard and I exchanged numerous letters regarding scheduling of and procedures for the September and October consensual interviews.

64. The interviews conducted in September and October 2014 answered some questions, left some topics open for further development, and identified some new areas necessary to complete factual development. Examples follow.

65. In at least some cases, the Microsoft employees interviewed were not able to speak sufficiently to the time frame or subject-matter areas at issue. For example, one interviewee, offered as the person who had "primary and direct responsibility for managing Microsoft's relationship and account" with some of its largest partners, appeared to manage contract paperwork only, not the relationships and accounts.

66. In some cases, the persons identified appeared to have good subject-matter knowledge, but during the time period at issue they were not in charge of or privy to certain aspects, such as key decision-making, deferring instead to a higher-level executive.

67. Microsoft agreed to schedule some interviews requested in September and October, but in some cases the interviewee was unavailable during that time period (for example, Jeffrey Raikes, a former employee) or the interview was scheduled in a time slot that did not afford the IRS adequate time for the interview, particularly for what were expected to be document-intensive interviews (for example, James Allchin).

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

12617742.1

68.     The IRS requested an interview with Craig Mundie, but due to an apparent oversight, Microsoft did not notify the IRS examination team that Mr. Mundie was available to be interviewed until about an hour beforehand, by which time some of the IRS interview attendees had departed for the airport after the last scheduled interview of the week. Additionally, the IRS employee who was planning to conduct the interview was not in attendance that day and did not have adequate notice to prepare for the interview.

69.     Two interviewees, who were obvious candidates as potential document custodians and whom Microsoft offered as knowledgeable on particular subject matter areas, stated that the Microsoft tax department had not asked them for copies of documents that would have been responsive to past IDR requests in that subject area.  For example, one interviewee stated he had no recollection of having been asked for brand studies, and another stated he had not been asked to produce documents related to the forecasting exercise he performed for the tax department in connection with the Americas cost sharing arrangement.

70.     At least one interviewee's answers suggested that a prior IDR response was inaccurate.  This individual identified three categories of studies being performed at least annually:  customer satisfaction, image and brand measurement, and advertising.   The IRS had requested brand studies, including brand tracking studies specifically, for 2000 and later, but Microsoft did not produce such studies for 2001 or later.  According to Microsoft's tax department, to the best of its knowledge, brand tracking studies had been discontinued.  Through the interviews, the IRS also learned about a new category of documents, customer and partner experience surveys or studies, that it believed would be useful in the Examination.   This new category was similar to market research documents the IRS had requested previously, but had

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

23

12617742.1

1     not specifically requested.

2              ***e. The lead-up to issuance of the designated summons and related summonses***

3         71.     Prior to issuance of the October 30, 2014 designated summons, the IRS issued

4     226 international issue IDRs (some of which were withdrawn) as part of the 2004-2006

5     Examination. By comparison, the 2000-2003 examination of Microsoft, which also involved

6     several large transfer pricing issues, included over 350 international issue IDRs. Of the 226

7     international IDRs issued in the 2004-2006 Examination, 143 were issued prior to July 2012.

8         72.     Many of Microsoft's responses to the document requests contained in the July

9     IDRs were late, in some cases after the interviews to which the documents related. The

10     outstanding IDRs were discussed periodically at IDR status meetings. Microsoft made various

11     statements during these meetings citing one or more reasons for non-production. In some cases,

12     Microsoft said it had looked and found no documents. In some cases, Microsoft cited a 5-year

13     document retention policy, without providing detail on its efforts to the locate documents. In

14     some cases, Microsoft said it was still looking for documents, with little additional information.

15         73.     After unsuccessful attempts through late August to address the outstanding

16     document IDRs in various status meetings, the IRS verbally informed Microsoft that it would

17     have to consider issuing a summons if the requested documents were not produced, and followed

18     by sending Microsoft delinquency notices on September 12, 2014 and a pre-summons letter on

19     October 10, 2014.

20         74.     IDR items that remained outstanding were included in the requests contained in

21     the October 30, 2014 designated summons, with a due date of November 20, 2014. On

22     November 20th, Microsoft provided 30,772 pages (Bates numbered MSTP1152769 through

23

Second Declaration of Senior International Advisor          **U.S. Department of Justice**
Eli Hoory                                    Ben Franklin Station
                                                 P.O. Box 683
                                                 Washington, D.C. 20044-0683

MSTP1183541) responsive to the overdue IDRs that had been incorporated into the summons.
Microsoft labeled these documents as an IDR response, not a summons response. After being
requested by the IRS to produce electronically stored documents in native format, as instructed
in the summons, Microsoft supplemented its response.

75.     In addition to completing factual development generally for the Americas and
APAC transfer pricing issues, the designated and related summonses were also designed to
address questions raised by and gaps left after the September and October 2014 interviews.

### *Involvement of Quinn Emanuel as a contractor to support the Examination*

76.     Given the fact-intensive nature of the valuation issues presented and the number
of outside experts involved in the 2004-2006 Examination, TPO concluded that the IRS would
benefit from having an independent analysis from, and examination support by, seasoned
commercial litigators who had experience presenting, defending and critiquing fact-intensive and
expert-dependent positions.

77.      TPO wanted to have this independent analysis before the IRS made a decision
about how to process any unagreed issues, because the state of the record would inform whether
the IRS was ready to issue a 30-day letter or a 90-day letter or whether additional factual
development was advised prior to the IRS examination team finalizing its position under either
option.

78.     The IRS awarded a contract to the commercial litigation firm Quinn Emanuel in
May 2014. Quinn Emanuel's role is to provide the IRS support on the Americas transaction.
Under the contract, Quinn Emanuel would provide the perspective of seasoned commercial
litigators, including evaluating the existing state of the record and what additional factual

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

25

12617742.1

development the IRS might consider to more reliably establish factual issues relevant to the Americas valuations.

79.     After the contract was awarded, the IRS needed to complete certain procedural and administrative requirements, including performing background checks on Quinn Emanuel personnel before they could start work.  As a result, Quinn Emanuel was not cleared to perform work for the IRS prior to July 2014.

80.     In July 2014, the IRS mailed Quinn Emanuel documents necessary for the firm to start its evaluation and analysis of the examination to date.  Quinn Emanuel received this initial tranche of information on July 15, 2014 (see Exhibit F, email with UPS tracking information and confirmation of receipt by Quinn Emanuel).  Accordingly, July 15, 2014 was the first date Quinn Emanuel could, and did, perform any services under the contract.

81.     The twelve transfer pricing related IDRs that were issued in July 2014 were drafted, prepared, and issued by IRS employees without any input from Quinn Emanuel.  Quinn Emanuel's only input on these IDRs was limited to consulting on an August 28, 2014 revision clarifying the scope of one of the IDRs.  The IRS — not Quinn Emanuel — identified the need to clarify that request, after statements Microsoft tax personnel made to the IRS on an August 27, 2014 IDR status call suggested that Microsoft was construing the original request more narrowly than intended by the IRS.

82.     The six transfer pricing related IDRs the IRS issued in August and October 2014 were drafted, prepared, and issued by IRS employees without any input from Quinn Emanuel.

83.     In August, for the first time after starting work and conducting an initial review of the materials provided by the IRS, Quinn Emanuel met with IRS personnel to discuss the record

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

26

12617742.1

1  to date on the Service's investigation of Microsoft's Americas' transaction.

2       84.    Quinn Emanuel did not attend the Microsoft employee interviews held the week

3  of September 15 because Microsoft and the IRS had not agreed on and were still discussing

4  protocols for Quinn Emanuel's participation at the September and October consensual

5  interviews. Quinn Emanuel attended the Microsoft employee interviews held on the weeks of

6  September 22 and October 6, 2014. Consistent with the procedures negotiated with Microsoft

7  for these consensual interviews, these interviews were conducted by IRS employees, with Quinn

8  Emanuel's direct participation limited to asking follow-up questions. In a number of cases,

9  Microsoft's attorneys objected to such follow-up or instructed its employees not to answer

10  further questions from Quinn Emanuel. Quinn Emanuel also consulted with and provided advice

11  to the IRS personnel conducting the interviews during and between interviews.

12       85.    Following its review of documents provided by the IRS and after participating in

13  and reviewing transcripts of the September and October interviews, Quinn Emanuel completed

14  its independent assessment of the IRS's work to date on the Americas cost sharing arrangement

15  and of Microsoft's transfer pricing position. In November 2014, the Quinn Emanuel attorneys

16  presented to TPO, IRS Counsel and IRS executives their evaluation and analysis, as experienced

17  commercial litigators, of the positions taken by the IRS and by Microsoft.

18       86.    Quinn Emanuel did not prepare initial drafts of any of the summonses. For some

19  (but not all) summonses, Quinn Emanuel was given an advance copy of a late-stage draft of a

20  summons for documents. The IRS sought comments from Quinn Emanuel on the draft

21  designated summons. Quinn Emanuel was not provided with an advance copy of all of the

22  related summonses, in part because some of the summonses focused on the APAC transaction,

23  Second Declaration of Senior International Advisor        **U.S. Department of Justice**
Eli Hoory                                          Ben Franklin Station
                                                                 P.O. Box 683
                                                                 Washington, D.C. 20044-0683

12617742.1

which was not the focus of Quinn Emanuel's contract.

87.     IRS employees identified and selected all candidates for summons interviews. Candidates were either known as having potential relevant knowledge prior to Quinn Emanuel starting work (*e.g.*, KPMG and E&Y personnel who authored reports); had already been identified by Microsoft in its responses to the July IDRs (issued without input from Quinn Emanuel) as having subject-matter knowledge (*e.g.*, James Allchin, Jeffrey Raikes, Craig Mundie); or were identified during the September and October interviews as having potential relevant knowledge that other interviewees did not appear to have (*e.g.*, Steve Ballmer).  Others in the candidate pool were also identified or confirmed by independent research by IRS employees.  Quinn Emanuel was consulted on how to prioritize interviewees from the identified candidate pool and on the possible subject matter and goals for the various potential interviewees.  IRS employees made the decision about who would be summoned to give testimony.

88.     At all times, Quinn Emanuel's work under the contract has been performed under the direction of the IRS.

89.     On September 10, 2014, I provided Microsoft, at its request, a copy of the full scope of work (Section C) of the Quinn Emanuel contract.  This was intended as an accommodation to Microsoft; the official procedure is for a taxpayer under examination to request contract information from the IRS Disclosure unit, not directly from the examination team.

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

28

12617742.1

90.     As stated in my September 10, 2014 letter, and as reflected in the full contract

provided to Microsoft, there are no other phases in the Quinn Emanuel contract, which is limited

to providing examination support.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14_ day of April, 2015.


Eli Hoory
Senior International Advisor

Second Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

29

12617742.1

## **CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing has been made this 14th day of April, 2015, via the Court's ECF system to all parties and electronically to the following:

JAMES M. O'BRIEN
james.m.o'brien@bakermckenzie.com

ROBERT B. MITCHELL
robert.mitchell@klgates.com
dawnelle.patterson@klgates.com

DANIEL A. ROSEN
daniel.rosen@bakermckenzie.com

                                        /s/ Amy Matchison
                                        AMY MATCHISON
                                        Trial Attorney, Tax Division
                                        U.S. Department of Justice

Second Declaration of Senior International Advisor          **U.S. Department of Justice**
Eli Hoory                                                   Ben Franklin Station
                                                           P.O. Box 683
                                                           Washington, D.C. 20044-0683

30

12617920.1