1

The Honorable Ricardo S. Martinez

2

3

4

5

6

7          IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF WASHINGTON

8

UNITED STATES OF AMERICA,            )

9                                                    )     Case No. 2:15-cv-00102 RSM
                        Petitioner,              )

10                                                   )     **UNITED STATES' RESPONSE TO**
               v.                                  )     **MICROSOFT'S BRIEF REGARDING**

11                                                   )     **COMMON DEFENSES TO**
MICROSOFT CORPORATION, *et al.*    )     **ENFORCEMENT OF SUMMONSES**

12                                                   )
                        Respondents.          )     **NOTED ON MOTION CALENDAR:**

13 _____)     **November 6, 2015**
UNITED STATES OF AMERICA,            )

14                                                   )     Case No. 2:15-cv-00103-RSM
                        Petitioner,              )

15                                                   )
               v.                                  )

16                                                   )
CRAIG J. MUNDIE, *et al.*               )

17                                                   )
                        Respondents.          )

18 _____)

19

20

21

22

23

24

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................III

INTRODUCTION.................................................................................................................1

STATEMENT OF FACTS IN SUPPORT OF SUMMONS ENFORCEMENT .....................2

I.   The IRS needs additional information to complete one of the largest income
     tax audits in history ................................................................................................3

II.  Microsoft's 2011 Protest asserted that IRS audit conclusions were "arbitrary
     and capricious".........................................................................................................3

III. The IRS has not completed its analysis or adopted final positions ............................5

IV.  Microsoft forced issuance of the summonses by failing to provide information
     needed to complete the audit...................................................................................6

     A.   Microsoft knew, before extending the limitations period, that the IRS would need
          additional information if discussions broke down ........................................................7

     B.   In May and July 2014 the IRS sought information to formulate well-reasoned
          and well-supported determinations................................................................................7

     C.   The IRS was unable to interview a number of the persons from whom it sought
          testimony during September and October 2014, and new, unanticipated issues
          arose during the interviews that did take place ...........................................................8

V.   Quinn Emanuel's role in the audit is to provide the IRS audit team with advice
     and assistance – services that are not inherently governmental functions..................9

ARGUMENT........................................................................................................................11

VI.  The summonses must be enforced because Microsoft has failed to meet its
     heavy burden of proving improper purpose or bad faith on the part of the IRS ......11

     A.   The IRS has not issued summonses to conduct pretrial discovery...............................12

          i.   QE was not hired to improperly prepare for Tax Court.......................................13

          ii.  QE was in no way "integral" to the issuance of the summonses .........................14

          iii. Developing an evidentiary record in support of audit conclusions does not equate
               to improper preparation for Tax Court................................................................15

          iv.  The summonses did not arise out of improperly obtained extensions of the statute
               of limitations .......................................................................................................16

     B.   QE is not performing "impermissible tax audit functions"; it is providing advice
          and assistance to an audit................................................................................................17

United States' Response to Microsoft's                    **U.S. Department of Justice**
Brief Regarding Common Defenses to                        Ben Franklin Station, P.O. Box 683
Enforcement of Summonses                    i             Washington, D.C. 20044-0683

**VII. Section 7602 confers broad investigatory powers on the Secretary; it does not limit how the Secretary exercises his authority** ............................................................ **18**

    *A.*      *Section 7602 does not place limits or restrictions on how the Secretary chooses to implement his broad investigatory powers* ............................................................ *19*

    *B.*      *The Temporary Regulation clarifies that contractors may assist the IRS in gathering and evaluating information from summoned witnesses* .............................. *22*

         i.    The IRS followed all proper procedures in issuing the temporary regulation ...... 22

             *(a)*    *The IRS has specific authority to issue immediately effective temporary regulations before the notice-and-comment process is completed* ...................... 22

             (b)    *The Temporary Regulation is exempt from the APA's notice-and-comment provisions because it is interpretative* ................................................. 25

         ii.   The Temporary Regulation is valid and entitled to deference ............................ 25

             (a)    *Section 7602 is silent as to how the Secretary is allowed to exercise the authority to summon* ................................................................. 26

             (b)    *The Temporary Regulation is a permissible and reasonable construction of Section 7602* ............................................................................ 26

             (c)    *The Temporary Regulation is not arbitrary or capricious* .......................... 27

**CONCLUSION** ................................................................................................ **30**

**ADDENDUM** .................................................................................................. **31**

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

ii

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Allen v. United States*, 173 F.3d 533 (4th Cir. 1999)...................................................... 24

*American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1992).. 25

*Arthur Young & Co. v. United States*, 465 U.S. 805 (1984)........................................ 19

*Ash v. Comm'r*, 96 T.C. 459 (1991) ............................................................................ 16

*Asiana Airlines v. FAA*, 134 F.3d 393 (D.C. Cir. 1998) .............................................. 24

*Bailey v. United States*, 516 U.S. 137 (1995) .............................................................. 24

*Burks v. United States*, 633 F.3d 347 (5th Cir. 2011) .................................................. 24

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ...................... 25

*Crystal v. United States*, 172 F.3d 1141 (9th Cir. 1999) ............................................ 12

*E. Norman Peterson Marital Trust v. Comm'r*, 78 F.3d 795 (2d Cir. 1996) ................. 23

*Euge v. United States*, 444 U.S. 707 (1980) ................................................................ 20

*Fargo v. Comm'r*, 447 F.3d 706 (9th Cir. 2006) ......................................................... 29

*Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082 (9th Cir. 2003) ....................................... 25

*Int'l Bhd of Teamsters v. United States*, 431 U.S. 324 (1977)..................................... 21

*Intermountain Ins. Serv. of Vail v. Comm'r*, 134 T.C. 211 (2010) .............................. 24

*Judulang v. Holder*, 132 S. Ct. 476 (2011)................................................................. 27

*LeCroy Research Sys. Corp. v. Comm'r*, 751 F.2d 123 (2d Cir. 1984) ....................... 24

*Liberty Fin. Servs. v. United States*, 778 F.2d 1390 (9th Cir. 1985) .......................... 11

*Long v. I.R.S.*, 891 F.2d 222 (9th Cir. 1989)............................................................... 21

*Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44 (2011) ........................ 26

*McDonnell v. United States*, 180 F.3d 721 (6th Cir. 1999) ....................................... 24

*Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225 (D.C. Cir. 1994) .............. 24

*Miller v. United States*, 65 F.3d 687 (8th Cir. 1995) .................................................. 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 27

*Neece v. United States*, 922 F.2d 573 (10th Cir. 1990) .............................................. 20

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

iii

*PAA Mgmt. Ltd. v. United States*, 817 F. Supp. 425 (S.D.N.Y. 1993) ................................. 11, 16

*PAA Mgmt., Ltd. v. United States*, 962 F.2d 212 (2d Cir. 1992) ............................................ 15, 16

*Redlark v. Comm'r*, 141 F.3d 936, 939 (9th Cir. 1998) ................................................................ 24

*Ruckelshaus v. Monsanto Co.,* 467 U.S. 986 (1984) .................................................................... 24

*Schrader v. Idaho Dep't of Health Welfare*, 768 F.2d 1107 (9th Cir. 1985).............................. 21

*SEC v. ESM Gov't Secs.*, 645 F.2d 310 (5th Cir. 1981)................................................................ 12

*Slaven v. BP America, Inc.*, 973 F.2d 1468 (9th Cir. 1992) ......................................................... 21

*Sterling Trading, LLC v. United States*, 553 F. Supp.2d 1152 (C.D. Cal. 2008) .................. 12, 16

*Sugarloaf Funding, LLC v. United States*, 584 F.3d 340 (1st Cir. 2009) .................................... 16

*Truck & Equip. Corp. of Harrisonburg v. Comm'r*, 98 T.C. 141, 1992 WL 18381 (1992) ........ 24

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ....................................................... 21

*UnionBanCal Corp. v. Comm'r*, 305 F.3d 976 (9th Cir. 2002) .................................................... 24

*United States v. Bisceglia*, 420 U.S. 141 (1975)........................................................................... 19

*United States v. Caltex Petroleum Corp.*, 12 F. Supp. 2d 545 (N.D. Tex. 1998)......................... 12

*United States v. Deak-Perera & Co.*, 566 F. Supp. 1398 (D.D.C. 1983) ..................................... 12

*United States v. Gimbel*, 782 F.2d 89, 93 (7th Cir. 1986) ............................................................ 16

*United States v. Jose*, 131 F.3d 1325 (9th Cir. 1997) ..................................................................... 2

*United States v. Lask*, 703 F.2d 293 (8th Cir. 1983)..................................................................... 16

*United States v. McHenry*, 552 F. Supp.2d 571 (E.D. Va. 2008) ................................................. 16

*United States v. Powell*, 379 U.S. 48 (1964) .......................................................................... 11, 20

*United States v. Richey*, 632 F.3d 559 (9th Cir. 2011) ................................................................. 15

*United States v. Stuckey*, 646 F.2d 1369 (9th Cir. 1981).............................................................. 12

*Veritas v. Comm'r*, 133 T.C. 297 (2009)......................................................................................... 3

*Walthall v. United States*, 131 F.3d 1289 (9th Cir. 1997) ............................................................ 24

*Wooden Horse Inv., Inc. v. United States*, 806 F. Supp. 1487 (E.D. Wash. 1992)...................... 12

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    iv

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

## **Statutes**

5 U.S.C. § 553 ................................................................................................ 25

Federal Activities Inventory Reform Act of 1998, 31 U.S.C. § 501 ........................................... 17

I.R.C. § 6201 ............................................................................................ 12, 17

I.R.C. § 7521 ................................................................................................ 20

I.R.C. § 7601 ................................................................................................ 17

I.R.C. § 7602 ............................................................................................ 19, 20

I.R.C. § 7805 ............................................................................................ 22, 23

## **Other Authorities**

H.R. Rep. No. 106-1104, at 217 (1988) (Conf. Rep.) ........................................................ 23

S. Rep. No. 100-309 (1988) ................................................................................. 23

## **Regulations**

Treas. Reg. § 301.7602-1 ................................................................................... 26

Treas. Reg. § 301.7602-1T ............................................................................. 19, 22

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    v

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

## INTRODUCTION

Microsoft is seeking to reboot the same story that it attempted to tell, but failed to prove, during the recent evidentiary hearing. That story, based on speculative inferences, was debunked by the testimony of the sole witness who testified during the hearing: IRS Senior Advisor Eli Hoory.[1] Contrary to Microsoft's speculation, the IRS is not "effectively done" with its audit, nor were summonses issued to improperly prepare for Tax Court. Rather, the IRS is "still seeking information to get to the right number[s]." (Tr. 191:20-193:8).[2]

A summons proceeding is summary in nature, and an evidentiary hearing is rarely afforded to a taxpayer. Now, only after the conclusion of the evidentiary hearing granted to Microsoft, and after Microsoft withdrew its request for discovery that triggered the hearing (prior to the issuance of an opinion that could have addressed the evidence presented), Microsoft submits a plethora of exhibits, many lacking evidentiary foundations, and post-hearing declarations, containing speculative assertions and legal analysis, in support of a story that does not make sense and arguments that would expand the scope of this limited proceeding into a full-scale judicial review of an ongoing income tax audit. And having voluntarily withdrawn its request for discovery, Microsoft has moved past the point of tossing out speculative inferences and possibilities for the consideration of the Court.

Microsoft's consolidated brief jumbles together document summonses and interview summonses. It conflates circumstances surrounding an extension of the statute of limitations in February 2014 with circumstances surrounding the issuance of summonses in late 2014. The brief fails to distinguish between requests for information concerning the Asia-Pacific ("APAC")

---

[1] Microsoft used substantial blocks of its time during the hearing to discuss tangential matters with Hoory. Microsoft declined to call its own employees or representatives as witnesses and failed to introduce a single exhibit into evidence at the hearing.

[2] All citations to the transcript of the evidentiary hearing held on August 25, 2015, refer to the Ex. 29 of the Rosen Declaration. Select exhibits entered into evidence during the hearing are attached to the Declaration of James E. Weaver and cited herein.

| | | |
|---|---|---|
| United States' Response to Microsoft's | | **U.S. Department of Justice** |
| Brief Regarding Common Defenses to | | Ben Franklin Station, P.O. Box 683 |
| Enforcement of Summonses | 1 | Washington, D.C. 20044-0683 |

Transaction and requests concerning the Americas Transaction.  It creates a fictional linkage between the decision to obtain assistance and advice from outside counsel during the course of the audit and the separate decision to request additional information from Microsoft during the summer and autumn of 2014 – a decision made necessary by a breakdown in discussions between the IRS and Microsoft, a looming expiration of the statute of limitations, and an ongoing need for information on open issues.[3] And Microsoft confuses inherently governmental functions, which must be carried out by IRS employees, with advice and support which IRS employees may properly seek from contractors.

By the time Microsoft gets around to addressing its legal challenges to the summonses (what this round of briefing was meant to address), it incorrectly frames the relevant issues. Those issues are whether the IRS may use contractors to assist in its fact-finding functions of the audit and fully participate in summons interviews, whether Temporary Regulation § 301.7602-1T ("Temporary Regulation") is valid, and whether Microsoft has met its heavy burden of disproving "the actual existence of a valid civil tax determination . . . purpose by the Service." *See United States v. Jose*, 131 F.3d 1325, 1328 (9th Cir. 1997) (citation omitted).  None of Microsoft's arguments have merit and the IRS is entitled to enforcement of the summonses.

### STATEMENT OF FACTS IN SUPPORT OF SUMMONS ENFORCEMENT

To evaluate "the actual existence of a valid civil tax determination"  purpose for the summonses, one need not look further than Hoory's testimony on August 25, 2015.  Hoory was examined by adversarial counsel at length, and the Court could observe his demeanor.  The United States supplements that testimony with a declaration from Hoory addressing speculative

---

[3] Notably absent from Microsoft's brief is any reference to Hoory's testimony as to why the IRS needs to drill down into corporate finance and budgeting forecasts and sales initiatives, as well as circumstances surrounding "valuations" by KPMG and E&Y of the two transactions.  (*See* Tr. 69:9-71:19; 74:9-77:18; 173:15-175:14, 176:12-179:11; 179:18-180:20; 183:17-185:16, 185:17-186:25, 187:1-188:6).

assertions contained in post-hearing declarations submitted by Microsoft.

## I.    The IRS needs additional information to complete one of the largest income tax audits in history

The IRS audit of Microsoft's income tax returns for 2004-06 is one of the largest in the history of the IRS.  (*See* Tr. 49:11-23).  Through two international cost sharing arrangements – one of which has received attention from a Subcommittee of the United States Senate[4] – Microsoft has shifted billions of dollars of income overseas.  (Tr. 151:15-154:19; 155:3-20, Ex. 40, Ex. 41).  It is especially important here that IRS professionals be permitted to do their jobs and obtain information needed not only "to get to the right number[s]" but also to support those numbers with a record that will withstand an inevitable cascade of challenges from Microsoft. (Tr. 148:19-149:5; 149:17-150:5; 191:20-193:8).

## II.    Microsoft's 2011 Protest asserted that IRS audit conclusions were "arbitrary and capricious"

On June 30, 2011, Microsoft submitted a "Protest," challenging proposed adjustments to its 2004-06 income tax returns.  (Ex. 16 at US016_Part1_0001).  The Protest alleged that IRS adjustments to "buy-in" payments for the Americas and APAC Transactions were "arbitrary, capricious and unreasonable."[5]  (Tr. 148:12-150:5; Ex. 16 at US016_Part1_0012-17).  In the Protest, Microsoft repeatedly cited to *Veritas v. Commisioner*, a transfer pricing case decided against the IRS.  *Id.*; *see also* 133 T.C. 297, 319-20 (2009) (finding IRS audit determinations "arbitrary and capricious").

During 2011, Transfer Pricing Operations ("TPO"), a new IRS component, assumed responsibility for the audit of the Americas and APAC Transactions.  (Hoory Ex. 2 at ¶¶ 16-19).

---

[4] Hearing on Offshore Profit Shifting and the U.S. Tax Code - Part 1 (Microsoft & Hewlett-Packard) held September 20, 2012. http://www.hsgac.senate.gov/subcommittees/investigations/hearings/offshore-profit-shifting-and-the-us-tax-code.  *See* Memorandum to Members of the Permanent Subcommittee on Investigations, at pages 19-23. http://www.hsgac.senate.gov/download/?id=7B9717AF-592F-48BE-815B-FD8D38A71663.

[5] "Buy-in" payments flow to Microsoft from its offshore affiliates.  For the sake of simplicity, no distinction is made between Microsoft Corporation and its United States-based affiliates.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                              3

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1  After reviewing Microsoft's Protest and the status of the audit, TPO concluded the IRS needed to

2  take a closer look at the transactions and go beyond the valuation work performed in 2011 by the

3  IRS's sole expert, outside economist Michael Heimert.  (Tr. 47:10-18; 148:14-150:19; 145:22-

4  146:23; Hoory Decl. ¶¶ 7-16).  Dr. Heimert had utilized discounted cash flow ("DCF") models to

5  value the "buy-in" payments.[6]  *Id*.  In contrast, Microsoft's valuation experts, KPMG and E&Y,

6  had employed different, more granular "residual profit split" ("RPSM") models.[7]  *Id*.

7         This difference in valuation methodology was more than an arcane distinction.  It was

8  potentially outcome-determinative.  Citing to *Veritas* for support, Microsoft argued in its Protest

9  that the DCF approach employed by Dr. Heimert was improper as a matter of law.[8]  (Ex. 16 at

10  Part 3_0061-72).  Although TPO strongly disagreed, TPO concluded that it made good sense to

11  fully examine and test Microsoft's RPSM models, develop factual information regarding the

12  inputs into those models, and, if appropriate, develop alternative conclusions based on an RPSM

13  approach.  (Tr. 148:14-150:19; Hoory Decl. ¶¶ 12-17, 22-23).  This was especially true with

14  respect to the Americas Transaction, a transaction Hoory described as a "round trip."  (Tr. 155:8-

15  10) ("They sell something out of the U.S. and immediately they buy it back for more").[9]  Given

16  the magnitude of that transaction, it was imperative to conduct a thorough examination and

17  support audit conclusions with a well-developed factual record.  (Tr. 151:15-154:19).

18

19  [6] Dr. Heimert's model for the Americas Transaction attempted to measure the net present value of profits Microsoft
20  would have earned, but for its transfer of software rights to an offshore affiliate in Puerto Rico, Microsoft
    Operations in Puerto Rico ("MOPR"), as of July 1, 2005.  The net present value of expected future profits that
    Microsoft shifted offshore equated to the "buy-in" amount that should have been paid to Microsoft to ensure both
    Microsoft and the offshore affiliate exchanged equal value at arm's length.  (Hoory Decl. ¶8).
21  [7] The RPSM models sought to "split" or assign relative weights to different kinds of intangible assets generating the
    profits.  (Hoory Decl. ¶ 12-14).
22  [8] Microsoft argued "buy-in" income for tax purposes should be a mere fraction of the projected net future profits that
    Microsoft originally expected to earn itself in connection with its technology rights, but instead transferred to its
    offshore affiliates.  (Hoory Decl. ¶ 11).
23  [9] Soon after commencing work on the audit, Hoory obtained a previously undisclosed valuation report prepared for
    Microsoft that, along with supporting documents, suggested Microsoft had shifted more than $30 billion in
24  anticipated net present value to a new offshore affiliate in one fell swoop on July 1, 2005.  (Tr. 158:12-159:17).

United States' Response to Microsoft's                    **U.S. Department of Justice**
Brief Regarding Common Defenses to                        Ben Franklin Station, P.O. Box 683
Enforcement of Summonses                    4             Washington, D.C. 20044-0683

In February 2012, the IRS withdrew the May 2011 30-day Letter, informed Microsoft that it was taking a closer look at issues raised in the Protest, and set about hiring software code, industry, finance, marketing and brand experts, as well as a new economist, Daniel Frisch of the firm Horst Frisch.  (Tr. 145:23-146:23; 149:6-16; 151:16-155:25; Hoory Decl. ¶ 16).  Going forward, Hoory and the Director of TPO, Samuel Maruca, engaged in periodic discussions with Microsoft regarding the status of additional work to be undertaken.  (Hoory Ex. 2 ¶¶ 22-25).  Hoory and Maruca made clear to Microsoft that "we always were working towards engaging with them to see if there was room for resolution," and "wanted to talk to them before developing a final number."  (Tr. 146:24-147:5).

Working backward from an agreed limitations deadline of October 2013, the IRS proposed a timeline for completing its additional analysis by early April 2013.  (Tr. 105:3-106:19).  But the timeline proved to be too ambitious.  The software code experts did not complete their analysis until late August 2013 due to the need to familiarize themselves with new information from Microsoft and to delays involving inspection of the software code.  (Tr. 166:8-168:1).  And only upon completion of this analysis could the new economist, Dr. Frisch, incorporate the analysis into his own modeling.  *Id*.  Accordingly, two updated timelines were prepared.  (Tr. 106:20-110:13).  Throughout this process, the parties understood that the dates in the timelines for resolving audit issues were aspirational.  (Tr. 109:18-110:7).

### III.        The IRS has not completed its analysis or adopted final positions

During a conference call on March 13, 2012, and prior to retaining additional experts, the IRS told Microsoft that Dr. Heimert's 2011 models remained the IRS's most-up-to-date analysis.  (Hoory Decl. ¶ 19).  But Dr. Heimert's 2011 computations suffered from significant limitations.  His model for the Americas Transaction relied on Microsoft's own analysis for two key inputs into his own model:  (1) "transfer price" royalties to be paid by Microsoft to MOPR for

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                             5

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

technology; and (2) revenue and expense forecasts for future sales in the Americas.  (Tr. 145:23-146:23; 151:16-154:19; Hoory Decl. ¶ 9).  Given that new experts would be working to independently test and improve these modeling inputs, it would not have made sense for the IRS's proposed "buy-in" adjustments, as computed in 2011, to be permanently set in stone.[10]

In fact, during a December 2013 status call with Sample and Bernard, Hoory confirmed that although the IRS still believed that the DCF approach was the best method for valuing the "buy-in" income to Microsoft (but not for valuing transfer prices, which relied on splitting out residual profits), any improvements to the method's inputs/assumptions based on IRS's new work would impact the "buy-in" valuation.  (Hoory Decl. ¶ 21).  In contrast, Hoory never stated that the IRS would continue to rely on Dr. Heimert's 2011 DCF computations.  *Id*.

On January 14, 2014, Hoory made a presentation on the Americas Transaction to Microsoft in hopes of resolving or narrowing open questions and areas of disagreement.  (Tr. 169:7-171:20; Hoory Decl. ¶ 23).  The IRS's primary draft analysis consisted of an estimated Americas "transfer price" and a significantly different estimate of the "buy-in" value based on the DCF method (using revised forecasts and newly estimated technology transfer prices). (Hoory Decl. ¶ 23).  No final determinations were presented.  (Hoory Decl. ¶¶ 23-25).

### IV.   Microsoft forced issuance of the summonses by failing to provide information needed to complete the audit.

One of the TPO goals for transfer price audits was to make greater use of transcribed interviews, especially where a witness' testimony might later be relied on by an expert and material issues remained in dispute.  (Tr. 69:9-73:6).  Moreover, in the Protest, Microsoft criticized IRS reliance on nontranscribed interviews as being of questionable utility.  (Tr.

---

[10] In numerous conversations from mid-2012 through early 2014 with Sample and Bernard, the IRS made clear that it was reevaluating both "buy-in" adjustments and the Americas transfer price (for which no adjustment had been previously proposed).  (Hoory Decl. ¶ 20).  Any adjustment to Microsoft's deductions for transfer prices would require adjustment to the "buy-in" income amounts.  *Id*.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    6

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

149:17-150:5).  The IRS knew going forward that it would have to obtain statements from Microsoft interviewees on the record if those statements were important to an unresolved issue. *Id*.  And Hoory put Bernard on notice in 2012 that the IRS might need formal interviews.  (Tr. 76:18-19).  The goal was "to create a record that would reliably document the facts upon which we based the decision we were still working on to get to the right number."  (Tr. 77:9-18).

### A.  Microsoft knew, before extending the limitations period, that the IRS would need additional information if discussions broke down

On February 28, 2014, when Sample signed a consent to extend the statute of limitations, he could not have been under any illusions about the IRS's intent to obtain formal testimony from Microsoft executives if discussions with the IRS broke down.  Hoory relayed this to Bernard in late January 2014.[11]  (Hoory Decl. ¶ 26).  And on February 17, 2014, Sample indicated that he had decided not to pursue resolution discussions.  (Hoory Ex. 2 ¶ 41).

### B.  In May and July 2014 the IRS sought information to formulate well-reasoned and well-supported determinations

In the weeks immediately following Sample's decision to not pursue resolution discussions, the IRS received mixed messages from Microsoft about whether any feedback would be forthcoming that might preclude a need to further investigate all open issues.  (Tr. 171:21-173:2; Hoory Ex. 2 ¶¶ 42-46).  All the while, the limitations clock was running down. Finally, unable to wait any longer, in May and July 2014, the IRS issued Information Document Requests ("IDRs") for additional information.  (Tr. 174:10-175:14; Hoory Decl. ¶ 28-29).  The IDRs sought documents and also asked Microsoft to identify, for each subject area, knowledgeable current and former employees.[12]  *Id*.  These subjects concerned inputs to IRS

---

[11] Hoory was only re-confirming what he had long made clear, throughout the 2012-early 2014 time period:  the IRS reserved the right to conduct formal interviews, taken under oath, to collect information.  (Hoory Decl. ¶ 27).

[12] The subject areas included (1) Microsoft's financial systems used as inputs to its RPSM models; (2) sales and marketing programs and functions potentially relevant to RPSM modeling; (3) the budget decision-making process for prioritizing outlays for sales and marketing versus research and development; and (4) Microsoft's strategy for using its resources to respond to competitive challenges.  (Hoory Decl. ¶ 28).  The July 2014 IDRs also sought information about who helped plan and draft agreements for the Americas Transaction.  *Id*.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    7

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

modeling.  (Tr. 174:19-175:1).

> Once resolution talks broke down and we had not narrowed issues, then we knew
> exactly what was open, what issues we thought we had to develop. And at that
> point in time we thought, "Is it worth investing the energy now on our part and on
> Microsoft's?" And the answer was clearly yes. This is a huge issue. We needed to
> know what their businesspeople thought of their various competitive advantages,
> the things that are at issue in the valuation. . . . And the way to do that with
> witnesses is to get them on the record.

(Tr. 71:5-19; 74:20-77:8).

### C.  The IRS was unable to interview a number of the persons from whom it sought testimony during September and October 2014, and new, unanticipated issues arose during the interviews that did take place

In July 2014, the IRS indicated to Microsoft that all options were on the table for

wrapping up the audit, including issuing (1) a 30-day letter; (2) a statutory notice of deficiency;

or (3) a statutory notice combined with a designation for litigation.  (Tr. 128:8-14; Hoory Decl.

¶ 30). The IRS stated that Microsoft could expect a final decision with respect to these options

after completion of requested interviews.  This assumed that requested interviews would take

place and requested documents would be received in time for use during the interviews.[13]  (Tr.

128:19-23; Hoory Decl. ¶ 31).  Ultimately, Microsoft failed to arrange for all of the interviews

requested and did not timely respond to several IDRs.  (Hoory Decl. ¶ 35).

During the interviews that did occur, new questions arose that the IRS had not anticipated

during discussions with Microsoft in July 2014.  (Hoory Decl. ¶ 36).  The testimony led the IRS

to conclude that Microsoft had not diligently searched for, and responded in good faith, to past

IDR requests for supporting documentation for forecasts and brand studies.[14]  (Tr. 176:13-

---

[13] Microsoft identified approximately 50 individuals as interview candidates with knowledge of subject matters addressed in the July IDRs.  From this pool, the IRS selected the 30 current or former Microsoft employees who appeared to have the most experience during the years in question. (Hoory Decl. ¶ 32).  The IRS also sought to interview two former KPMG employees.  *Id.*  Of the 32 interviews requested, only 21 occurred.  *Id.*
[14] The interviews also identified new categories of relevant documents.  (*See* Hoory Decl. ¶ 36) (listing the categories).  The summonses follow up on this new information and also seek information still needed to value the APAC Transaction on account of Microsoft's prior inadequate responses.  (Hoory Decl. ¶ 37).

United States' Response to Microsoft's                                          **U.S. Department of Justice**
Brief Regarding Common Defenses to                                          Ben Franklin Station, P.O. Box 683
Enforcement of Summonses                          8                          Washington, D.C. 20044-0683

180:20; 183:17-185:16; 185:17-186:25; 187:1-188:6; Hoory Decl. ¶ 36).  This conclusion proved to be spot-on when later partial responses to the ensuing summonses revealed previously-undisclosed, highly relevant information.  (*Id.*; Exs. 31, 40, 41).  The document summonses at issue address the same subjects addressed in the May and July IDRs, as well as earlier IDRs. (Tr. 176:9-24; 180:11-20; 186:22-188:6; 188:7-190:19; Exs. 13, 21, 22, 23; Hoory Decl. ¶¶ 36-37).  The information is needed to complete the granular-level valuations that Microsoft had earlier criticized the IRS for not having done.

Of the thirteen individuals summoned for interviews, six were on the IRS's previous request list.  (Hoory Decl. ¶ 39).  Other summoned individuals were selected based on matters that arose during, or that were not sufficiently addressed by, the interviews that did occur. (Tr. 190:10-191:19; Hoory Decl. ¶¶ 38-41).  In short, Microsoft had no reason to think the interviews had been completed.

### V.   Quinn Emanuel's role in the audit is to provide the IRS audit team with advice and assistance – services that are not inherently governmental functions

In mid-2012, the IRS first initiated discussions with, and later briefly contracted for services with, the law firm of Boies Schiller.  (Tr. 168:7-169:6; Hoory Decl. ¶ 43).  The goal was to obtain an independent evaluation of the Microsoft audit and also to obtain assistance with development of facts and legal theories:

> We clearly could do a better job bringing the right expertise to bear and developing the facts and presenting them.  We thought that litigators who have experience with a large bandwidth of cases of that variety, that complexity, would be more likely, day in and day out, to have encountered those kinds of issues and could bring some value to the table.
>
> * * *
>
> That was the premise. That was the value we saw in bringing a Boies Schiller or a Quinn Emanuel to give us their legal advice and consultation, to bring that expertise.

(Tr. 59:2-14; 62:4-11).

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

9

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

The IRS originally contemplated a two-phased audit contract with Boies Schiller:  one phase for case evaluation and one phase for case assistance.  (Hoory Decl. ¶ 43-45).  The contract ultimately awarded to the firm; however, was pared back to a single, limited evaluation phase, due to budget constraints for the fiscal year in which it was awarded.  *Id*.  No work was performed under the contract due to an unresolved conflict of interest.  (Tr. 168:2-169:6).

The IRS first met with attorneys for Quinn Emanuel ("QE") in February 2014 to ascertain if the attorneys would be a good fit for the contemplated assignment.  (Tr. 116:6-14; 173:3-14).  No substantive communications ensued after the February 25, 2014 meeting until mid-July 2014, when Hoory was first cleared to forward audit materials to QE.  *Id*.

The QE contract is for a single phase, subdivided into two subparts:  evaluation and case support for the audit.  (Rosen Ex. 10 at Microsoft-FOIA00175-77).  The contract specifically prohibits QE from performing inherently governmental functions, as defined in OFPP Letter 11-01.  (*Id*. at 00174-85; OFPP Letter 11-01, included in Ex. 1 at US001_Part2_0016-29).  Importantly, neither providing legal advice nor gathering facts is an inherently governmental function.  (*Id*. at 0017 (Defin. 3(b)(1) & at 0028 (Appx. B.8)).

Contrary to Microsoft's speculation, QE had no input in selecting the topics for the May and July 2014 IDRs which are addressed in the summonses.  (Tr. 173:15-174:18).   The pool of names of potential interview candidates was largely derived from lists supplied by Microsoft, and the remainder by IRS employees.  (Tr. 191:5-19; Hoory Decl. ¶ 29, 32).  QE's role in the September/October 2014 interviews was limited by agreement to asking follow-up questions.  (Hoory Ex. 2 ¶ 84).  The need for summonses was precipitated by Microsoft, not QE.  (*See* Tr. 190:20-191:16; Hoory Decl. ¶¶ 35-42).  And the involvement of QE in the issuance of document summonses was very limited, and in some instances, nonexistent.  (Tr. 188:7-190:19).  As flatly

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                                          10

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1    confirmed by Hoory, the IRS did not issue summonses to improperly prepare for Tax Court.  (Tr.

2    191:20-193:8).

3                                          **ARGUMENT**

4    **VI.**    **The summonses must be enforced because Microsoft has failed to meet its heavy**
              **burden of proving improper purpose or bad faith on the part of the IRS**

5            To obtain enforcement of a summons, the Government need only make an initial showing

6    that the summons was issued in good faith.  *See United States v. Powell*, 379 U.S. 48, 57-58

7    (1964).  The Court has already determined that the United States has made the required initial

8    showing of good faith and met the *Powell* factors.  Microsoft now bears the heavy burden "'to

9    disprove the actual existence of a valid civil tax determination . . . purpose by the Service.'"

10   *Jose,* 131 F.3d at 1328 (citation omitted).

11           A taxpayer "'may challenge [a] summons on any appropriate grounds,' including failure

12   to satisfy the *Powell* requirements or abuse of the court's process."  *Id.* (citation omitted).  As

13   Microsoft notes, the Supreme Court has not articulated an exhaustive list of what constitutes an

14   "abuse of a court's process."  (Msft Brief at 8:14-24).  But that does not mean a taxpayer can

15   transform any grievance with the IRS that may arise during an audit into an "abuse of process."

16   To the contrary, "[s]uch an abuse would take place if the summons had been issued for <u>an</u>

17   <u>improper purpose</u>, such as to harass the taxpayer or to put pressure on him to settle a collateral

18   dispute, or for any other purpose reflecting on the good faith of the particular investigation."

19   *Powell*, 379 U.S. at 58 (emphasis added); *see also Liberty Fin. Servs. v. United States*, 778 F.2d

20   1390, 1392 (9th Cir. 1985) (burden shifts to taxpayer to show "abuse of process, *e.g.*, that the

21   summons was issued in bad faith for an improper purpose."); *see also PAA Mgmt. Ltd. v. United*

22   *States*, 817 F. Supp. 425, 427 (S.D.N.Y. 1993) (narrowly construing the meaning of an abuse of

23   process and applying the doctrine of *ejusdem generis*).

24

United States' Response to Microsoft's                  **U.S. Department of Justice**
Brief Regarding Common Defenses to                      Ben Franklin Station, P.O. Box 683
Enforcement of Summonses                    11          Washington, D.C. 20044-0683

As Microsoft concedes, under Ninth Circuit precedent, "[e]ven the co-existence of an improper purpose would not prevent enforcement of the summons if the existence of a legitimate purpose was not rebutted by the taxpayer." *United States v. Stuckey*, 646 F.2d 1369, 1375 (9th Cir. 1981); *see also Sterling Trading, LLC v. United States*, 553 F. Supp.2d 1152, 1158 (C.D. Cal. 2008) (taxpayer must show "no legitimate purpose"); *Wooden Horse Inv., Inc. v. United States*, 806 F. Supp. 1487, 1491-92 (E.D. Wash. 1992).  Microsoft cannot even come close to meeting this burden.  Here, the IRS seeks information to do exactly what Congress authorized it to do:  make an accurate determination of Microsoft's tax liability.  *See* I.R.C. § 6201(a).

Nor do cases cited by Microsoft alter this analysis.  In *United States v. Caltex Petroleum Corp.*, 12 F. Supp. 2d 545, 555 (N.D. Tex. 1998), a magistrate judge concluded that the IRS sought to obtain software source code that it had no use for in the audit.  In *United States v. Deak-Perera & Co.*, 566 F. Supp. 1398, 1402 (D.D.C. 1983), the IRS was not permitted to obtain information by ruse in a regulatory inspection and use that information as a basis for issuing a summons in a wholly separate income tax investigation.  There is no deception here.  Of course, Microsoft is well aware that the IRS is engaged in a heavily contested audit.  Similarly, in *SEC v. ESM Gov't Secs.*, 645 F.2d 310, 317 (5th Cir. 1981), a case not involving an IRS summons, the Fifth Circuit concluded "fraud, trickery and deceit" could be grounds to deny enforcement of an SEC administrative subpoena.  *ESM* was, in fact, later distinguished by the Ninth Circuit for reasons that also apply here:  the IRS has not deceived Microsoft in order to elicit information.  *See Crystal v. United States*, 172 F.3d 1141, 1147-49 (9th Cir. 1999).

### A.  The IRS has not issued summonses to conduct pretrial discovery

There are two logical questions to ask in evaluating the purpose behind a summons request:  what is requested and why.  Hoory testified in great detail about what the summonses seek and why that kind of granular-level information is needed to complete the audit.  (Tr. 69:9-

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    12

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

71:19; 74:9-77:18; 173:15-175:14, 176:12-179:11; 179:18-180:20; 183:17-185:16, 185:17-186:25, 187:1-188:6; Hoory Decl. ¶¶ 28, 35-37).  This testimony is uncontroverted.  Microsoft skips the "what" question and provides a speculative answer to the "why" question.

> i.   QE was not hired to improperly prepare for Tax Court

The QE contract contains a single phase with two parts:  evaluation and case support (Rosen Ex. 10 at Microsoft-FOIA-00176-77) – as Hoory testified.  (Tr. 134:9-14; 136:19-138:20).[15]  In simple terms, Microsoft contends that the scope of work in the contract does not mean what it says.  (Msft. Brief at 21:17-23:2).  But Microsoft offers only coincidence and speculation in support of its contentions.

Microsoft's attempt to infer a Tax Court purpose from differences between the QE and Boies Schiller contracts is flawed.  (Compare Rosen Exs. 10 & 22).  First, Microsoft overlooks similarities between the contracts.  Both are limited to services to be provided with respect to the same Microsoft audits, as reflected in each respective Section C (performance work statement); Section B (supplies/services schedule); Section F.5 (Deliverables) (Boies Schiller) & Section F.6 (Deliverables) (QE); Delivery schedule in Section F (referring to a single phase); and Exhibit 3 (Performance Requirements Tables) (referring to single phases).  (Rosen Ex. 10 & 22).  Second, the difference in scope between the two contracts (Evaluation versus Evaluation and Case Support) arose out of budget constraints for the Boies Schiller contract, not from some hidden requirement that QE provide services as trial counsel under the contract.  (Hoory Decl. ¶ 43-45).

Microsoft also latches on to stray boilerplate or template fragments making reference to other non-existent phases as "evidence" that QE was retained to provide litigation support.  That speculation is directly contrary to Hoory's testimony.  Hoory confirmed that the contract had but

---

[15] As is clear from the context of the contract, "Case Support" refers to the provision of assistance to the IRS with respect to the audit.  (Rosen Ex. 10 at Microsoft-FOIA-00177).  The contract refers to the Americas Transaction with respect to two audit cycles:  the 2004-06 cycle and the 2007-09 cycle.  (*Id*. at 00174).

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

13

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

one phase. (Tr. 136:19-139:17). Stray template references to other phases were nothing more than drafting errors by IRS contracting personnel. *Id*. Hoory also confirmed that QE was not retained to serve as an expert witness, notwithstanding a stray reference. *Id*. And Hoory explained that the "special government employee" language in the conflicts section of the contract was included to preserve the availability of QE, if the matter did later end up in Tax Court. (Tr. 139:18-141:25).[16]

Finally, Microsoft not only overlooks the plain language of the contract with QE, it dismisses Hoory's unequivocal testimony as to why QE's services could add value to the audit process. (Tr. 59:2-14; 62:4-11; 101:20-102:8; 102:25-103:12).

ii.   QE was in no way "integral" to the issuance of the summonses

Microsoft's speculation that QE was integral to issuance of the summons is also flatly contradicted by the factual record. QE had nothing to do with the timing of IDR requests nor the subject matters raised in May and July 2014 IDRs (or earlier IDRs) – subjects later addressed during September/October 2014 interviews, and, eventually, the summonses at issue. (Tr. 73:15-74:18; 188:7-190:19; Hoory Decl. ¶¶ 32, 35-37). The subject matters for obtaining additional information were determined by events having nothing to do with QE and that preceded the firm's involvement in the audit.

What changed? Four key decision points, each independent of QE's retention, led to issuance of the summonses: (1) Microsoft refused to engage with the IRS; (2) Microsoft refused

---

[16] Microsoft refers the Court to web pages describing the trial skills of QE attorneys as purported evidence that QE has been retained by the IRS "as trial counsel to prepare for Tax Court," notwithstanding the express terms of a contract to the contrary. (Msft Brief at 21:1-9; Rosen Exs. 5, 19-20). In addition to lacking foundation and constituting objectionable hearsay, these websites reveal only that QE touts the trial prowess of its attorneys. The most that can be inferred from such "evidence" is that were audit disputes to wind up in Tax Court, and should IRS Counsel later seek to retain the law firm under a different contract, QE might prove very useful. Additionally, Microsoft takes the meaning of IRS Commissioner Koskinen's statements from a Tax Notes article out of context. (Rosen Ex. 21). It is true that the IRS must show up in Tax Court with a well-developed case to defend a challenged determination. To that end, it is entirely appropriate to seek assistance in creating a well-developed record in support of IRS audit determinations.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    14                U.S. Department of Justice
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

to timely respond to document requests issued in July 2014; (3) Microsoft failed to arrange for interviews of all of the persons it identified and whom the IRS sought to interview; and (4) the September/October 2014 interviews brought to light troubling questions and new information. The IRS has most assuredly not "already made its primary and alternative valuation determinations," as alleged by Microsoft.  Moreover, TPO had made clear for over two years, long prior to speaking with QE, that the IRS would seek formal testimony to properly document the facts.

       iii.  <u>Developing an evidentiary record in support of audit conclusions does not equate to improper preparation for Tax Court</u>

The purpose for a summons differs from the purpose for obtaining discovery.  The summons power permits the IRS "to prepare its case by further examination," whereas the purpose of discovery is to produce evidence in support of a case.  *PAA Mgmt., Ltd. v. United States*, 962 F.2d 212, 219 (2d Cir. 1992).  As Hoory testified, the summonses were not issued to improperly prepare for litigation.  (Tr. 191:20-192:2).  Nevertheless, Microsoft speculates to the contrary based on the timing of the retention of QE.

Several black-letter principles are relevant to this issue.  First, the prospect of an eventual court challenge to an audit determination in no way constrains or deprives the IRS of its authority to summon information.  *PAA Mgmt.*, 962 F.2d at 219.  Second, a summons does not become stale or otherwise unenforceable because the IRS made its determination and issued a statutory notice of deficiency.  As stated in *United States v. Richey*, 632 F.3d 559, 565-66 (9th Cir. 2011):

> [E]ven though the IRS's investigation had ostensibly concluded, the IRS had a legitimate reason to seek documentation essential to establishing the [taxpayers'] tax liabilities.  Thus, as long as the amount the [taxpayers] allegedly owed to the IRS was subject to change, the IRS had a good-faith interest in obtaining [the summoned documents] pursuant to the summons.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses      15

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

*See also Sugarloaf Funding, LLC v. United States*, 584 F.3d 340, 349 (1st Cir. 2009); *PAA Mgmt.*, 962 F.2d at 217-18; *United States v. Gimbel*, 782 F.2d 89, 93 (7th Cir. 1986).

Finally, when a taxpayer challenges a summons alleging that the IRS is seeking to circumvent discovery rules and prepare for litigation, courts may presume the summons is valid, provided it was issued before commencement of Tax Court proceedings, and in the absence of direct evidence to the contrary. *See Sterling Trading LLC*, 553 F. Supp.2d at 1159-60 (disregarding an allegation that IRS Counsel "planned to litigate regardless of the results of the audit"). By applying an objective test, courts do not have to get into the business of "evaluating the efficiency of the [IRS's] investigative process." *PAA Mgmt.*, 817 F. Supp. at 427.

Here, the IRS has not even made determinations or issued a notice of deficiency. As the Tax Court stated in *Ash v. Comm'r*, 96 T.C. 459, 472 (1991):

> The development of additional evidence through the summonses in issue will in fact benefit this Court's processes because it will result in a more fully developed factual background in which to consider petitioner's case. The additional evidence may also lead to the settlement of the case.

> iv.   The summonses did not arise out of improperly obtained extensions of the statute of limitations

The IRS is not conducting pretrial discovery and had no duty or reason to disclose to Microsoft, in February 2014, a *potential* contract for legal advice and audit support. The premise of Microsoft's statute of limitations argument is that it was wrongfully induced into signing a consent to extend. That is false. Moreover, disputes over statutes of limitations fall outside of the scope of the limited purpose served by summons enforcement proceedings. *Cf. United States v. Lask*, 703 F.2d 293, 300 (8th Cir. 1983); *United States v. McHenry*, 552 F. Supp.2d 571, 574-75 (E.D. Va. 2008). Microsoft asks the Court to turn a summons proceeding into the judicial review of an audit by expanding the concept of an "abuse of process." By Microsoft's logic, all of the extensions it signed since mid-2012 would have been "improperly obtained" because TPO

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

16

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

had started discussions with Boies Schiller.  In short, circumstances surrounding the limitations

extension signed in February 2014 are irrelevant here.

### B.   QE is not performing "impermissible tax audit functions"; it is providing advice and assistance to an audit

Microsoft's alternative argument, that QE is conducting the audit and performing

inherently governmental functions, is equally unavailing.  The authority to audit taxpayers rests

solely with the IRS.  *See* I.R.C. §§ 6201(a), 7601(a).  On this, the parties agree.  QE cannot audit

Microsoft and it cannot determine its tax liability.  However, what QE can do – and what it has

been doing in this audit – is assist the IRS in its fact-finding functions by reviewing books and

records, analyzing data, and asking questions in witness interviews.  This assistance is not

inherently governmental.

The Federal Activities Inventory Reform Act of 1998, 31 U.S.C. § 501 Note ("FAIR

Act") (included in Addendum), defines "inherently governmental function" as "a function that is

so intimately related to the public interest as to mandate performance by Government

employees."  *Id*. at § 5(2)(A).  An inherently governmental function does <u>not</u> normally include

"gathering information for or providing advice, opinions, recommendations, or ideas to Federal

Government officials."  *Id*. at § 5(2)(C)(i); *see also* OFPP Policy Letter 11-01.

As if it did not request and receive an evidentiary hearing on this very topic, Microsoft

declares, devoid of citation or further description, that QE's role "almost completely overlaps the

IRS's own designated role." (Msft Brief at 27:11).[17]  This statement, and indeed Microsoft's

entire narrative in this regard, is contrary to the testimony it elicited from Hoory.  (Tr. 73:15-

74:18; 188:7-190:19; Hoory Decl. ¶¶ 32, 35-40).  And, as noted above, Microsoft draws false

---

[17] Microsoft's argument would render useless the budgetary authority of the IRS to contract for services authorized by 5 U.S.C. § 3109 (allowing government agencies when authorized by appropriations to contract for experts and consultants). *See, e.g.*,  https://www.congress.gov/bill/113th-congress/house-bill/5016/text.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

17

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

inferences from the QE contract and provisions from the Internal Revenue Manual to concoct a scenario whereby QE has overstepped its bounds.[18]  (Msft Brief at 27:11-25).  But that is based on argument alone.  The role that QE has played, and will continue to play, is exactly the one contemplated by law: providing advice and gathering information.

Finally, Microsoft makes much of QE's John Gordon identifying himself at witness interviews as "for the IRS."  (Msft Brief at 28:25-29:5).  Gordon was just one of eleven individuals for the IRS in attendance at the interview cited by Microsoft.  (Rosen Decl. ¶ 33 & Ex. 32).[19]  How Gordon identified himself is of no import and has no bearing on what function he was performing.  Furthermore, while the OFPP Letter 11-01 cited in the contract contains examples of inherently governmental functions that contractors should not perform; asking questions in a witness interview is not one of them.  To the contrary, what the OFPP Policy Letter proscribes is "[r]epresentation of the government before administrative and judicial tribunals, unless a statute expressly authorizes the use of attorneys whose services are procured through contract."  11-01, App. A, ¶ 24.  Thus, Gordon's attendance and participation, at any witness interview, under the guidance of an IRS officer or employee does not violate Section 7602, the contract, government policy, the FAIR Act, or the federal acquisition regulations.  Nothing in the manner in which he identified himself alters that.

**VII.    Section 7602 confers broad investigatory powers on the Secretary; it does not limit how the Secretary exercises his authority**

During November 2014, the IRS summoned thirteen individuals seeking their testimony.  Those summonses do not address whether QE attorneys and other contractors assisting the IRS

---

[18] This is just one example of where Rosen's declaration provides legal argument that is not factual support in a summons case.  *See Hintze v. Internal Revenue Service*, 879 F.2d 121, 128 (4th Cir. 1989), *overruled on other grounds*, *Church of Scientology of California v. United States*, 506 U.S. 9, 15 n.8 (1992).

[19] Five of the eleven, including Gordon, were outside experts retained by the IRS.  The remaining six individuals were government employees, three of whom were attorneys.  Microsoft, for its part, had seven individuals in attendance, in addition to the witness.  The questioning was primarily done by Robert Ratchford, an attorney with the IRS Office of Chief Counsel, not Gordon as the quoted statement may suggest.  *Id.*

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    18

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

with the audit will be present or ask questions during the interviews.  But the IRS has indicated QE attorneys may attend, and fully participate in, the interviews.  As reflected in the Temporary Regulation, full participation includes asking questions of witnesses under the guidance of the IRS officer or employee conducting the interview.[20]  As set forth below, Section 7602 does not prohibit such participation by a contractor, or even address the procedures to be followed during a summons interview.  The statute is silent on the matter, and the Temporary Regulation was drafted to provide clarity.  Moreover, the Temporary Regulation was properly promulgated under the law.

### A. Section 7602 does not place limits or restrictions on how the Secretary chooses to implement his broad investigatory powers

Section 7602(a) lays out, in the broadest terms, the IRS's "expansive information-gathering authority[.]"  *Arthur Young & Co. v. United States*, 465 U.S. 805, 816 (1984).  The statute authorizes:  the IRS to examine books and records; issue summonses seeking documents and testimony; and put witnesses under oath and take testimony.[21]  I.R.C. § 7602(a).  Each subsection notes that these three powers are provided in order to obtain information that "may be relevant or material to such inquiry" – which refers back to the purpose contained in the flush language of subsection (a):  "ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . ., or

---

[20] None of Microsoft's arguments about the validity of the Temporary Regulation have merit.  And even if Microsoft could mount a successful challenge to the Temporary Regulation, the IRS would nevertheless be entitled to enforcement of the summonses.

[21] The Supreme Court has stated in *United States v. Bisceglia*, 420 U.S. 141, 145-46 (1975), "[w]e begin examination of these sections against the familiar background that our tax structure is based on a system of self-reporting. There is legal compulsion, to be sure, but basically the Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all information relevant to tax liability.  Nonetheless, it would be naive to ignore the reality that some persons attempt to outwit the system, and tax evaders are not readily identifiable. Thus, § 7601 gives the Internal Revenue Service a broad mandate to investigate and audit 'persons who may be liable' for taxes and § 7602 provides the power to 'examine any books, papers, records, or other data which may be relevant . . . (and to summon) any person having possession . . . of books of account . . . relevant or material to such inquiry.'"

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

19

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

collecting any such liability." *Id*.  The Supreme Court stated in *Euge v. United States*, 444 U.S. 707, 711-12 (1980) that it has:

> consistently construed congressional intent to require that if the summons authority claimed is necessary for the effective performance of congressionally imposed responsibilities to enforce the tax Code, that authority should be upheld absent express statutory prohibition or substantial countervailing policies.  The authority claimed here is necessary for the effective exercise of the Service's enforcement responsibilities; it is entirely consistent with the statutory language; and it is not in derogation of any constitutional rights or countervailing policies enunciated by Congress.

The power to "take testimony" is inherently governmental, but asking questions of a witness (gathering facts) is not.  Similarly, the power to examine books and records is inherently governmental, but the actual review of books and records (gathering facts) is not.  Contrary to Microsoft's argument, the statute does not <u>require</u> that "the Secretary" "take testimony."  In fact, the statute does not require or limit the Secretary to do anything.  It grants him <u>authority</u>.  How he carries out that authority, and whether he may seek assistance in doing so, is simply not addressed in the statute.  *See Neece v. United States*, 922 F.2d 573, 576 (10th Cir. 1990) ("Although [Section 7602(a)] authorizes the IRS to do several things, it does not establish the 'procedures' by which those things may be accomplished.").  Congress has not dictated procedures to be followed during an interview or an examination of books and records in Section 7602.  Where Congress has specific concerns, it has dictated administrative steps to be followed as part of the IRS's investigatory authority.  *See Powell,* 379 U.S. at 58*;* I.R.C. §§ 7521, 7609.

Although Section 7602 does not speak to whether the IRS may seek assistance from a contractor in carrying out the powers granted to the Secretary, federal law does bar governmental agencies from contracting for the performance of inherently governmental functions.  Properly framed then, the issue is whether QE's assistance to the IRS by asking questions during an interview, under the guidance and in the presence of an IRS employee, constitutes an inherently-

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                                     20

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1  governmental function.  As discussed above in Part VI.B, the answer to that question is

2  emphatically no.  QE is simply assisting the IRS in gathering facts – asking questions is not an

3  inherently governmental function.

4      Indeed, the IRS routinely obtains the assistance of contractors when examining books and

5  records.  Were the Court to construe Section 7602(a)(1) as barring contractors from providing

6  this type of assistance, virtually all complex audits would be shut down.  That cannot be a proper

7  interpretation of the statute.  And if contractors may assist the IRS in an activity authorized under

8  (a)(1), then there is no principled reason why a contractor should not also be able to assist in

9  taking testimony from a witness under (a)(3).[22]

10      To be clear, seeking assistance does not equate to delegating an inherently governmental

11  function to a contractor.  That would be improper.  *See e.g., U.S. Telecom Ass'n v. FCC*, 359

12  F.3d 554, 565-68 (D.C. Cir. 2004).  But no such delegation has occurred, or will occur, here

13  merely by virtue of a QE attorney asking questions during an interview.[23]  Notably, Microsoft

14  does not object to such an attorney suggesting questions to an IRS employee who could then

15  parrot the questions.  But that is silliness, promotes inefficiency, and serves only the interests of

16  [22] Microsoft counters that Section 6103(n), which provides that the IRS may disclose to contractors "returns or
return information" in order to carry out their contractual duties, "expressly authoriz[es] the IRS to show books and
17  records to contractors in connection with an audit," and contends this shows "there is no statutory provision
authorizing consultants to take testimony." (Msft Brief at 14).  This is incorrect.  In fact, "returns and return
18  information" are interpreted broadly for purposes of Section 6103.  *See, e.g., Long v. I.R.S.*, 891 F.2d 222, 223 (9th
Cir. 1989). Return information encompasses any information in the IRS's possession about a taxpayer – including
19  any oral statements and testimony by a witness made in conjunction with an audit or investigation.  *See, e.g.,*
*Chamberlain v. Kurtz*, 589 F.2d 827, 840-41 (5th Cir. 1979) (describing witness testimony as part of "return
20  information" under Section 6103).  Moreover, Microsoft has incorrectly equated the words "examine" with
"examination."  Contrary to Microsoft's assertion (Msft Brief at 13-14), the phrase "examine any books, papers,
records" in section 7602(a)(1) does not mean "to conduct an audit," but actually refers to the IRS information-
21  gathering function of reviewing books and records, in order to carry out both its audit and collection functions.
Indeed, Microsoft's argument would suggest that the IRS could not "examine books and records" in order to carry
out its collection function.
22  [23] Microsoft relies on a letter from Senator Hatch (Msft Brief at 11) that is not authority.  *E.g., Int'l Bhd of*
*Teamsters v. United States*, 431 U.S. 324, 354 & n.39 (1977) ("[t]he views of members of a later Congress . . . are
23  entitled to little if any weight.  It is the intent of the Congress that enacted [the statute at issue] that controls.");
*Slaven v. BP America, Inc.*, 973 F.2d 1468, 1475 (9th Cir. 1992) ("'It is well settled that the views of a later
Congress regarding the legislative intent of a previous Congress do not deserve much weight.'") (quoting *Schrader*
24  *v. Idaho Dep't of Health  Welfare*, 768 F.2d 1107, 1114 (9th Cir. 1985)).

1    a taxpayer seeking to hinder or slow the pace of the audit.

2        Microsoft argues that the statutory phrase "take such testimony" is "in the active voice"

3    and thus cannot mean "cause testimony to be taken." (Msft Brief at 14).  What Microsoft misses

4    is the difference between conferring authority, which is inherently governmental, and asking

5    questions, which is not.  This argument also overlooks differing meanings of the verb "take" in

6    the phrase "take testimony."  In ordinary parlance, "taking testimony" can implicate either the

7    *forum* in which the testimony is given, or the actual act of asking questions.  For example, a

8    court is said to "take testimony," when in actuality the court is *receiving* or *hearing* testimony,

9    with the attorneys for the parties, not the judge, asking questions of ("taking testimony from")

10   the witnesses.  Here, the better interpretation is that the statute is authorizing the IRS to *receive*

11   or *hear* the testimony of witnesses.

### B.  The Temporary Regulation clarifies that contractors may assist the IRS in gathering and evaluating information from summoned witnesses

12

13       After the IRS's practice of using contractors to participate in interviews under Section

14   7602(a) was challenged by a taxpayer, the IRS began the process of promulgating a regulation to

15   clarify that the practice was permissible under Section 7602(a).  (Ex. 1 at Part1_0126).

16           i.   The IRS followed all proper procedures in issuing the temporary regulation

17               *(a) The IRS has specific authority to issue immediately effective temporary regulations before the notice-and-comment process is completed*

18

19       Section 7805(a) provides that the Secretary "shall prescribe all needful rules and

20   regulations for the enforcement" of the Internal Revenue Code.  In addition, Section 7805(e)

21   provides specific authority for Treasury to issue temporary regulations before the notice-and-

22   comment process is completed, so long as the temporary regulations are (i) also issued

23   simultaneously as proposed regulations, and (ii) expire in 3 years.  In issuing the Temporary

24   Regulation, the IRS complied with both of those requirements.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    22

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

The requirements contained in Section 7805(e) evince an unmistakable congressional intent to alter the Administrative Procedure Act's ("APA") notice-and-comment procedures for temporary Treasury regulations.  The legislative history of this provision also shows that, at the time Section 7805(e) was enacted, Congress was well aware of the IRS's practice of issuing temporary regulations simultaneously with a notice of proposed rulemaking that requested public comment and made no attempt to eliminate this practice.  To the contrary, the legislative history shows that Congress specifically intended that the IRS be able to continue its practice of issuing immediately effective temporary regulations.  Congress did not give the IRS a blank check, however; Section 7805(e) provides that temporary regulations will expire three years after the date of issuance.  Nevertheless, Congress affirmatively stated that the expiration of the temporary regulations at the end of the three-year period "is not to affect the validity of those regulations" during this period.[24]

When promulgating the Temporary Regulation and the simultaneously published notice of proposed rulemaking, the Treasury Department exercised its longstanding, specific regulatory authority under Section 7805(a) exactly as Congress intended.  The Temporary Regulation followed the procedures required by Section 7805(e).  It was issued in the Federal Register as both a temporary and a proposed regulation, the proposed regulation timely solicited comments, and the Temporary Regulation sunsets three years from the date of issuance.   As stated in *E. Norman Peterson Marital Trust v. Comm'r*, 78 F.3d 795, 798 (2d Cir. 1996): "Until the passage of final regulations, temporary regulations are entitled to the same weight we accord to final regulations.  *Truck & Equip. Corp. of Harrisonburg v. Comm'r*, 98 T.C. 141, 149, 1992 WL

---

[24] The House Conference Report and the Senate Report both recognize that the IRS "issues some regulations as temporary regulations, which generally are effective upon publication and remain in effect until replaced by final regulations.  When the IRS issues temporary regulations, it generally also issues those same regulations in proposed form by cross-reference."  H.R. Rep. No. 106-1104, at 217 (1988) (Conf. Rep.); S. Rep. No. 100-309, at 7 (1988).

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    23

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1    18381 (1992). *Cf. LeCroy Research Sys. Corp. v. Comm'r*, 751 F.2d 123, 127 (2d Cir. 1984)

2    (noting that temporary regulations, unlike proposed regulations, are binding)."[25]

3           Although no court has ruled on the precise argument raised by Microsoft here,[26] the D.C.

4    Circuit has upheld a similar departure from the APA in *Asiana Airlines v. FAA*, 134 F.3d 393,

5    398 (D.C. Cir. 1998).  Observing that Congress specified procedures in a statute that cannot be

6    reconciled with the notice and comment requirements of Section 553 of the APA, the court held

7    that Congress had thereby expressed "'its clear intent that APA notice and comment procedures

8    need not be followed.'"  *Id.* (quoting *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225,

9    1237 (D.C. Cir. 1994)).

10          Just as the FAA statute in *Asiana Airlines* warranted departure from the APA's notice-

11   and-comment requirements, so too does Section 7805(e).  The only logical conclusion from

12   Microsoft's argument is that all temporary Treasury regulations are invalid, due to the absence of

13   a completed notice-and-comment process.  Such a construction would also render Section

14   7805(e) meaningless.  Microsoft's argument rejecting the propriety of temporary regulations thus

15   violates the canon of construction that "'a legislature is presumed to have used no superfluous

16   words,'"  *Bailey v. United States*, 516 U.S. 137, 145 (1995) (citation omitted), and should be

17   rejected.  Where possible, a court has a duty to attempt to harmonize two potentially conflicting

18   statutes dealing with the same basic subjects.  *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986,

19   1018 (1984) (citation omitted).  In any event, as explained below, the Temporary Regulation is

---

20   [25] Courts, including the Ninth Circuit, have upheld the validity of temporary regulations.  *See, e.g.*, *UnionBanCal Corp. v. Comm'r*, 305 F.3d 976, 985 (9th Cir. 2002); *Redlark v. Comm'r*, 141 F.3d 936, 939 (9th Cir. 1998);
21   *Walthall v. United States*, 131 F.3d 1289, 1297 (9th Cir. 1997); *McDonnell v. United States*, 180 F.3d 721, 722-23 (6th Cir. 1999); *Allen v. United States*, 173 F.3d 533, 537-38 (4th Cir. 1999); *Miller v. United States*, 65 F.3d 687, 22   689-90 (8th Cir. 1995).
      [26] Microsoft cites a concurring opinion in *Intermountain Ins. Serv. of Vail v. Comm'r*, 134 T.C. 211, 245 (2010), as 23   judicial authority for the proposition that temporary regulations issued under section 7805(e) are not exempt from the APA's notice-and-comment requirement. This concurring opinion was not the holding of the Tax Court and is wrong.  Nor does the erroneous dicta in *Burks v. United States*, 633 F.3d 347, 360 n.9 (5th Cir. 2011), cited by 24   Microsoft, apply to an analysis of Section 7805(e).

1    exempt from the APA's notice-and-comment provisions.

2           (b) *The Temporary Regulation is exempt from the APA's notice-and-comment*
           *provisions because it is interpretative*

3

4           An exception to the APA's notice-and-comment procedure exists for "interpretative

5    rules, general statements of policy, or rules of agency organization, procedure or practice."  5

6    U.S.C. § 553(b)(3)(A).  The Temporary Regulation is properly characterized as interpretative

7    and therefore excepted from the notice-and-comment procedure under this subsection.

8           The test for determining whether a regulation is substantive (legislative) or interpretive is

9    whether, in the absence of the regulation, there would be a statutory basis for an enforcement

10   action.  This is the test adopted by the Ninth Circuit.  *See Hemp Indus. Ass'n v. DEA*, 333 F.3d

11   1082, 1087 (9th Cir. 2003) (citing *American Mining Congress v. Mine Safety & Health Admin.*,

12   995 F.2d 1106, 1109 (D.C. Cir. 1992)).  *Hemp* says there are three instances in which a rule is

13   legislative, when:  (1) in the absence of the rule there would not be an adequate legislative basis

14   for the enforcement action; (2) the agency explicitly invokes its general legislative authority; and

15   (3) the rule effectively amends a prior legislative rule.  *Id*.  The Temporary Regulation is

16   interpretative in the first instance because it is only enforceable by virtue of the statute.

17   Moreover, it merely fills a gap in the statutory scheme by clarifying that the statute allows

18   contractors to "participate fully" in a summons interview "in the presence and under the

19   guidance of an IRS officer or employee."

20          ii.   The Temporary Regulation is valid and entitled to deference

21          Microsoft seems to agree that the appropriate level of review for the Temporary

22   Regulation is set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837,

23   843-44 (1984).  (Msft Brief at 12).  Under *Chevron*, the first question is "whether Congress has

24   'directly addressed the precise question at issue'" and the second is 'whether the agency's

1    answer is based on a permissible construction of the statute.'" *Mayo Found. for Med. Educ. &*

2    *Research v. United States*, 562 U.S. 44, 52, 54 (2011) (citation omitted).

3              (a) *Section 7602 is silent as to how the Secretary is allowed to exercise the*
                   *authority to summon*
4
5              As discussed above, Section 7602 speaks generally to the Secretary's authority to gather

6    information but is silent as to how he carries out that authority, and whether he may seek

7    assistance in so doing.  Because Congress has not directly addressed this issue, the first step of

     the *Chevron* analysis is met and we must move on to the second step.
8
9              (b) *The Temporary Regulation is a permissible and reasonable construction of*
                   *Section 7602*
10             As discussed above, the Temporary Regulation fills the gaps in Section 7602 and clarifies

11   the proper role of contractors in fact gathering.  It is a reasonable and permissible construction of

12   the statute as discussed in II.B, above.  It reduces the uncertainty of how summons interviews

13   may be conducted and streamlines the interview process by not requiring contractors to whisper

14   questions into the ears of IRS employees conducting the interviews.  Contrary to Microsoft's

15   assertion, this is neither a change in IRS policy or position nor a departure from regulations

16   going back for the last 50 years limiting the taking of testimony to IRS officers and employees.

17   In fact, in 2002 Treasury amended 26 C.F.R. § 301.7602-1(b).  Prior to that change, taxpayers

18   were objecting to the participation of IRS attorneys in summons interviews because at that time

19   Section 301.7602-1(b) limited participation to authorized officers and employees of the IRS and

20   IRS attorneys are employees of the Office of Chief Counsel and not of the IRS.  The amendment

21   clarified that the officers or employees of the Office of Chief Counsel are also included as

22   officers or employees of the IRS for purposes of the regulation.  Because the Temporary

23   Regulation provides a reasonable interpretation of Section 7602, the second step of the *Chevron*

24   analysis is met.

United States' Response to Microsoft's                          **U.S. Department of Justice**
Brief Regarding Common Defenses to                              Ben Franklin Station, P.O. Box 683
Enforcement of Summonses                     26                 Washington, D.C. 20044-0683

1

### (c) *The Temporary Regulation is not arbitrary or capricious*

2    Microsoft applies the "arbitrary and capricious" standard of review[27] to the Temporary

3    Regulation.  (*See* Msft Brief at 17-18, citing to *State Farm*).  *State Farm* is not the correct

4    standard to review this regulation.[28]  However, even under this standard, the Temporary

5    Regulation is valid.  *State Farm* involved technical requirements for passive restraints in

6    automobiles where Congress had specifically directed the Department of Transportation to

7    consider certain data.  *Id.* at 33-34.  In contrast here, there are no detailed factual issues to

8    evaluate.  Instead, the Temporary Regulation involves filling a gap left open by Congress and

9    clarifies procedures to be followed during summons interviews.  Moreover, the relevant factors

10   to consider are substantially different and less detailed than what Congress required of the

11   agency in *State Farm*.

12          Microsoft contends that the IRS failed to engage in "reasoned decisionmaking" for two

13   reasons, neither of which is accurate.  First, Microsoft contends that the explanation for the

14   Temporary Regulation does not try to "square" the Temporary Regulation with Section 7602.

15   This is inaccurate.  The Preamble[29] to the Temporary Regulation articulates the rationale, and

16   provides the reasoned basis, for the proposed regulation.[30]  As the Preamble explains, allowing

17

18   [27] The scope of review is "narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  Further, a court "may not set

19   aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency."  *Id.*  In conducting its review, the court may only look to the administrative record before the court.  *Id.*

20   [28] *Chevron* review relates, most directly, to an agency's application of law and legal judgments, whereas *State Farm*'s "arbitrary and capricious" review under Section 706(2)(A) of the APA relates, most directly, to review of agency factual findings and the exercise of agency discretion.  This is because under *Chevron* deference the court

21   asks "whether an agency interpretation [of a statute or regulation] is 'arbitrary and capricious in substance.'"  *Judulang v. Holder*, 132 S. Ct. 476, 483 n.7 (2011) (quoting *Mayo*).  When an agency action does not involve "an

22   interpretation of any statutory language," however, "the more apt analytical framework . . . is standard arbitrary or capricious review under the APA."  *See Judulang*, 132 S. Ct. at 483 n.7 (internal quotation omitted).

     [29] The Preamble for the Temporary Regulation is found at Ex. 1, Part 1_0018-0019.

23   [30] In addition to the Preamble, the administrative record contains additional evidence of the IRS's consideration regarding the relevant factors.  For example, the administrative record includes a substantial amount of pages

24   concerning previous issues surrounding inherently governmental functions, including statutory provisions and other

1  contractors to provide the IRS assistance by participating fully in a summons interview of a

2  witness "promotes efficient administration and enforcement of laws . . . by providing specialized

3  knowledge, skills, or abilities that the IRS officers or employees assigned to the case may not

4  possess." *See* Ex. 1, Part1_0019.  The Preamble also considers relevant factors to ensure that

5  contractors would not improperly perform inherently governmental functions.[31]  The Preamble

6  explains that the IRS retains ultimate control over the examination process:  "IRS officers and

7  employees remain responsible for issuing summonses and developing and conducting

8  examinations."  *Id.*, Part1_0018.  Further, the Preamble shows that the IRS carefully considered

9  how to delineate "the inherently governmental functions associated with section 7602" from the

10  contractors' supporting role.  *Id.*, Part1_0019.  The Preamble makes clear that IRS employees

11  would continue to perform the "inherently governmental" functions of "deciding whether to

12  issue a summons . . . whom to summon, what information must be produced or who will be

13  required to testify, and issuing the summons."  *Id.*  Finally, the Preamble makes clear that the

14  contractor may perform these functions only "in the presence and under the guidance of an IRS

15  officer or employee."  *Id.*

16          Second, Microsoft contends that the Temporary Regulation "was also a product of a

17  surreptitious and rushed process that is inconsistent with reasoned decisionmaking."  Prior to the

18  legal authority, as well as issues regarding appropriations and the IRS's authority to use such appropriations to hire
   contractors. *See* Ex. 1, Part1_ 0128-0134, 0141-0267 and Part2_0001-0251, 0293-0299.  Specifically, consideration
19  was given to OFPP Policy Letter 11-01 which details performance of inherently governmental functions
   (Part2_0001-0029) as well as contracting out collection of taxes (Part1_0141-0166).  In addition, consideration was
   given to confidentiality of tax returns and return information when the IRS hires contractors and experts.  *See id.*,
20  Part 2_0300-0317

   [31]  Microsoft suggests that in the Preamble the IRS describes the task the contractor would be asked to perform as
21  "tak[ing] testimony" and concludes that the IRS was not viewing the statutory phrase "take such testimony" to
   indicate "who has the authority to require the interview" to take place, as the government argued at the hearing.
22  (Msft Brief at 14).  But this reading takes the quoted sentence from the Preamble out of context and ignores the
   remainder of the Preamble.  In the first paragraph of the Preamble, simply as a means of introducing the subject
   matter of the Temporary Regulation, the regulation is introduced by repeating the "take testimony" language of the
23  statute.  But the remainder of the Preamble, as well as the very title of the Temporary Regulation ("Participation of a
   person described in section 6103(n) in a summons interview under section 7602(a)(2) of the Internal Revenue
   Code"), describe just how a contractor is permitted to participate in a summons interview.

24

United States' Response to Microsoft's                          **U.S. Department of Justice**
Brief Regarding Common Defenses to                              Ben Franklin Station, P.O. Box 683
Enforcement of Summonses                    28                  Washington, D.C. 20044-0683

evidentiary hearing, Microsoft heavily relied on temporal inferences to argue that the IRS created the Temporary Regulation just for use in the Microsoft audit and "rushed" the regulation to completion in only a few months.  The facts belie this speculation, and Microsoft does not cite any authority to support its relevance.  The documents produced to Microsoft and the testimony by Hoory demonstrated that the Temporary Regulation project began in early 2013 due to a different taxpayer and was issued in June 2014, well over a year later.  (Tr. 83:12-85:25).  That is hardly a "rushed process."

Finally, Microsoft contends that the IRS was required to include the Temporary Regulation project on its Priority Guidance Plans ("PGP") but did not do so in an attempt to keep it secret from the public, purportedly demonstrating a lack of reasoned decisionmaking. Discussion of PGPs is found in the Internal Revenue Manual (32.1.1.4.1).  However, "[t]he Internal Revenue Manual does not have the force of law and does not confer rights on taxpayers."  *Fargo v. Comm'r*, 447 F.3d 706, 713 (9th Cir. 2006).  Even if true, not including a discussion of the Temporary Regulation project on a PGP in no way shows a lack of reasoned decisionmaking and there is no legal support for this novel argument.  Further, Microsoft complains that if the IRS had identified the Temporary Regulation project in the PGP, interested stakeholders would have been given notice and an opportunity to comment.  That argument is belied by the fact that at the same time the Treasury Regulation was issued, it was also issued as a proposed regulation with notice, an opportunity to comment, and an opportunity to request a hearing.  *See* Ex. 1, Part 1_0022-0023.  Only one comment was submitted and there were no requests for a public hearing.  Noteworthy, even though Microsoft and its counsel were aware of the situation, they did not submit any comments nor request a hearing.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    29

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1

**CONCLUSION**

2
The IRS has established a legitimate purpose for issuing these summonses and has

3
refuted Microsoft's abuse of process allegations.  Therefore, the summonses should be enforced.

4
Dated this 9th day of October, 2015.

5
CAROLINE D. CIRAOLO
Acting Assistant Attorney General

6
*/s Noreene Stehlik*

7
*/s James E. Weaver*
*/s Jeremy Hendon*

8
*/s Amy Matchison*
NOREENE STEHLIK

9
JAMES E. WEAVER
Senior Litigation Counsel, Tax Division

10
JEREMY HENDON
AMY MATCHISON

11
Trial Attorneys, Tax Division
U.S. Department of Justice

12
P.O. Box 683, Ben Franklin Station
Washington, DC 20044-0683

13
Email:  Noreene.C.Stehlik@usdoj.gov
James.E.Weaver@usdoj.gov

14
Jeremy.Hendon@usdoj.gov
Amy.T.Matchison@usdoj.gov

15
Western.TaxCivil@usdoj.gov
Telephone:     (202) 514-6489

16
(202) 353-2466
(202) 307-6422

17

18
ANNETTE L. HAYES
United States Attorney

19
Western District of Washington

*Attorneys for the United States of America*

20

21

22

23

24

# ADDENDUM

## Table of Contents

Treasury Regulation (26 C.F.R.) § 301.7602-1T……………………………………………………….32

Federal Activities Inventory Reform Act of 1998, 31 U.S.C. § 501 …………………………...…33

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

31

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

**Treasury Regulation § 301.7602–1T Examination of books and witnesses (temporary).**

**(a)** [Reserved].  For further guidance, see § 301.7602–1(a).

**(b) through (b)(2)** [Reserved].  For further guidance, see § 301.7602–1(b) through (b)(2).

**(b)(3) Participation of a person described in section 6103(n).**  For purposes of this paragraph (b), a person authorized to receive returns or return information under section 6103(n) and § 301.6103(n)–1(a) of the regulations may receive and examine books, papers, records, or other data produced in compliance with the summons and, in the presence and under the guidance of an IRS officer or employee, participate fully in the interview of the witness summoned by the IRS to provide testimony under oath. Fully participating in an interview includes, but is not limited to, receipt, review, and use of summoned books, papers, records, or other data; being present during summons interviews; questioning the person providing testimony under oath; and asking a summoned person's representative to clarify an objection or assertion of privilege.

**(c)** [Reserved]. For further guidance, see § 301.7602–1(c).

**(d) Effective/applicability date.**  This section applies to summons interviews conducted on or after June 18, 2014.

**(e) Expiration date.**  The applicability of this section expires on or before June 16, 2017.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                          32                          **U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

## Federal Activities Inventory Reform Act of 1998

Pub. L. 105-270, Oct. 19, 1998, 112 Stat. 2382, as amended Pub. L. 108-271, § 8(b), July 7, 2004, 118 Stat. 814; Pub. L. 109-115, Div. A, Title VIII, § 840, Nov. 30, 2005, 119 Stat. 2505, provided that:

**Sec. 1. Short Title.**

This Act [enacting this note] may be cited as the 'Federal Activities Inventory Reform Act of 1998'.

**Sec. 2. Annual lists of government activities not inherently governmental in nature.**

**(a) Lists required.**--Not later than the end of the third quarter of each fiscal year, the head of each executive agency shall submit to the Director of the Office of Management and Budget a list of activities performed by Federal Government sources for the executive agency that, in the judgment of the head of the executive agency, are not inherently governmental functions. The entry for an activity on the list shall include the following:

**(1)** The fiscal year for which the activity first appeared on a list prepared under this section [this note].

**(2)** The number of full-time employees (or its equivalent) that are necessary for the performance of the activity by a Federal Government source.

**(3)** The name of a Federal Government employee responsible for the activity from whom additional information about the activity may be obtained.

**(b) OMB review and consultation.**--The Director of the Office of Management and Budget shall review the executive agency's list for a fiscal year and consult with the head of the executive agency regarding the content of the final list for that fiscal year.

**(c) Public availability of lists.--**

**(1) Publication.**--Upon the completion of the review and consultation regarding a list of an executive agency--

**(A)** the head of the executive agency shall promptly transmit a copy of the list to Congress and make the list available to the public; and
**(B)** the Director of the Office of Management and Budget shall promptly publish in the Federal Register a notice that the list is available to the public.

**(2) Changes.**--If the list changes after the publication of the notice as a result of the resolution of a challenge under section 3 [of this note], the head of the executive agency shall promptly--

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                    33

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

**(A)** make each such change available to the public and transmit a copy of the change to Congress; and

**(B)** publish in the Federal Register a notice that the change is available to the public.

**(d) Competition required.**--Within a reasonable time after the date on which a notice of the public availability of a list is published under subsection (c), the head of the executive agency concerned shall review the activities on the list. Each time that the head of the executive agency considers contracting with a private sector source for the performance of such an activity, the head of the executive agency shall use a competitive process to select the source (except as may otherwise be provided in a law other than this Act [Federal Activities Inventory Reform Act of 1998, Pub. L. 105-270, Oct. 19, 1998, 112 Stat. 2382], an Executive Order, regulations, or any executive branch circular setting forth requirements or guidance that is issued by competent executive authority). The Director of the Office of Management and Budget shall issue guidance for the administration of this subsection.

**(e) Realistic and fair cost comparisons.**--For the purpose of determining whether to contract with a source in the private sector for the performance of an executive agency activity on the list on the basis of a comparison of the costs of procuring services from such a source with the costs of performing that activity by the executive agency, the head of the executive agency shall ensure that all costs (including the costs of quality assurance, technical monitoring of the performance of such function, liability insurance, employee retirement and disability benefits, and all other overhead costs) are considered and that the costs considered are realistic and fair.

**Sec. 3. Challenges to the list.**

**(a) Challenge authorized.**--An interested party may submit to an executive agency a challenge of an omission of a particular activity from, or an inclusion of a particular activity on, a list for which a notice of public availability has been published under section 2 [of this note].

**(b) Interested party defined.**--For the purposes of this section [of this note], the term 'interested party', with respect to an activity referred to in subsection (a), means the following:
  **(1)** A private sector source that--
    **(A)** is an actual or prospective offeror for any contract, or other form of agreement, to perform the activity; and

    **(B)** has a direct economic interest in performing the activity that would be adversely affected by a determination not to procure the performance of the activity from a private sector source.

  **(2)** A representative of any business or professional association that includes within its membership private sector sources referred to in paragraph (1).

  **(3)** An officer or employee of an organization within an executive agency that is an actual or prospective offeror to perform the activity.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

34

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

**(4)** The head of any labor organization referred to in section 7103(a)(4) of title 5, United States Code, that includes within its membership officers or employees of an organization referred to in paragraph (3).

**(c) Time for submission.**--A challenge to a list shall be submitted to the executive agency concerned within 30 days after the publication of the notice of the public availability of the list under section 2 [of this note].

**(d) Initial decision.**--Within 28 days after an executive agency receives a challenge, an official designated by the head of the executive agency shall--

**(1)** decide the challenge; and

**(2)** transmit to the party submitting the challenge a written notification of the decision together with a discussion of the rationale for the decision and an explanation of the party's right to appeal under subsection (e).

**(e) Appeal.**--

**(1) Authorization of appeal.**--An interested party may appeal an adverse decision of the official to the head of the executive agency within 10 days after receiving a notification of the decision under subsection (d).

**(2) Decision on appeal.**--Within 10 days after the head of an executive agency receives an appeal of a decision under paragraph (1), the head of the executive agency shall decide the appeal and transmit to the party submitting the appeal a written notification of the decision together with a discussion of the rationale for the decision.

**Sec. 4. Applicability.**

**(a) Executive agencies covered.**--Except as provided in subsection (b), this Act [this note] applies to the following executive agencies:

**(1) Executive department.**--An executive department named in section 101 of title 5, United States Code.

**(2) Military department.**--A military department named in section 102 of title 5, United States Code.

**(3) Independent establishment.**--An independent establishment, as defined in section 104 of title 5, United States Code.

**(b) Exceptions.**--This Act [this note] does not apply to or with respect to the following:

**(1) General accounting office.**--The General Accounting Office [now Government Accountability Office].

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                              35

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

**(2) Government corporation.**--A Government corporation or a Government controlled corporation, as those terms are defined in section 103 of title 5, United States Code.

**(3) Nonappropriated funds instrumentality.**--A part of a department or agency if all of the employees of that part of the department or agency are employees referred to in section 2105(c) of title 5, United States Code.

**(4) Certain depot-level maintenance and repair.**--Depot-level maintenance and repair of the Department of Defense (as defined in section 2460 of title 10, United States Code).

**(5)** Executive agencies with fewer than 100 full-time employees as of the first day of the fiscal year. However, such an agency shall be subject to section 2 to the extent it plans to conduct a public-private competition for the performance of an activity that is not inherently governmental.

**Sec. 5. Definitions.**

In this Act [this note]:

**(1) Federal Government source.**--The term 'Federal Government source', with respect to performance of an activity, means any organization within an executive agency that uses Federal Government employees to perform the activity.

**(2) Inherently governmental function.--**

**(A) Definition.**--The term 'inherently governmental function' means a function that is so intimately related to the public interest as to require performance by Federal Government employees.

**(B) Functions included.**--The term includes activities that require either the exercise of discretion in applying Federal Government authority or the making of value judgments in making decisions for the Federal Government, including judgments relating to monetary transactions and entitlements. An inherently governmental function involves, among other things, the interpretation and execution of the laws of the United States so as--

**(i)** to bind the United States to take or not to take some action by contract, policy, regulation, authorization, order, or otherwise;

**(ii)** to determine, protect, and advance United States economic, political, territorial, property, or other interests by military or diplomatic action, civil or criminal judicial proceedings, contract management, or otherwise;

**(iii)** to significantly affect the life, liberty, or property of private persons;

**(iv)** to commission, appoint, direct, or control officers or employees of the United States; or

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses      36

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

**(v)** to exert ultimate control over the acquisition, use, or disposition of the property, real or personal, tangible or intangible, of the United States, including the collection, control, or disbursement of appropriated and other Federal funds.

**(C) Functions excluded.**--The term does not normally include--

**(i)** gathering information for or providing advice, opinions, recommendations, or ideas to Federal Government officials; or

**(ii)** any function that is primarily ministerial and internal in nature (such as building security, mail operations, operation of cafeterias, housekeeping, facilities operations and maintenance, warehouse operations, motor vehicle fleet management operations, or other routine electrical or mechanical services).

**Sec. 6. Effective Date.**

This Act [this note] shall take effect on October 1, 1998.

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses                          37

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

## **CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing, the Declaration of James E. Weaver and supporting exhibits, and the Declaration of Eli Hoory and supporting exhibits has been made this 9th day of October, 2015, via the Court's ECF system to all parties.


*/s/ James E. Weaver*
JAMES E. WEAVER
Senior Litigation Counsel, Tax Division
U.S. Department of Justice

United States' Response to Microsoft's
Brief Regarding Common Defenses to
Enforcement of Summonses

38

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683