The Honorable Ricardo S. Martinez

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 2:15-cv-00102 RSM |
| Petitioner, ) | |
| ) | **THIRD DECLARATION OF IRS** |
| v. ) | **SENIOR INTERNATIONAL** |
| ) | **ADVISOR ELI HOORY** |
| MICROSOFT CORPORATION, *et al*. ) | |
| ) | |
| Respondents. ) | |
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 2:15-cv-00103-RSM |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | |
| CRAIG J. MUNDIE, *et al*. ) | |
| ) | |
| Respondents. ) | |
| _____ ) | |

I, Eli Hoory, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am a Senior International Advisor in Transfer Pricing Operations ("TPO"), a

| | |
|---|---|
| Declaration of Senior International Advisor<br>Eli Hoory | **U.S. Department of Justice**<br>Ben Franklin Station<br>P.O. Box 683<br>Washington, D.C. 20044-0683 |

1

unit in the Large Business & International Division (LB&I) of the Internal Revenue Service ("IRS").

2. Attached, as **Exhibit 1**, is a copy of my declaration dated December 10, 2014, previously submitted in predecessor Case No. 00117-RSM.

3. Attached, as **Exhibit 2**, is a copy of my declaration dated April 14, 2015, previously submitted in the captioned cases.

4. I submit this declaration in support of the United States' Response to Microsoft's Brief Regarding Common Defenses to Enforcement of Summonses.

***The IRS has not made a final determination with respect to Microsoft's 2004-2006 tax years and I have never told Microsoft otherwise.***

5. The IRS has not determined the amount of deficiencies with respect to Microsoft's 2004-2006 tax years. The IRS has not issued a statutory notice of deficiency with respect to Microsoft's 2004-2006 tax years. Microsoft has not filed a Tax Court petition.

6. The IRS has not completed analyzing Microsoft's 2005 Americas cost sharing arrangement ("Americas Transaction") and its 2004 Asia Pacific cost sharing arrangement ("APAC Transaction"). The information requested in the summonses may be relevant to the IRS's examination of the Americas and APAC Transactions.

7. The IRS issued a 30-day Letter with respect to 2004-2006 tax years in May 2011 ("May 2011 30-day Letter"). A 30-day letter is not a final determination by the Internal Revenue Service. In 2012, the IRS withdrew the May 2011 30-day Letter. In addition to other adjustments, the May 2011 30-day Letter proposed increases to the "buy-in" payments Microsoft's offshore affiliates owed to Microsoft (and reportable as Microsoft's taxable income)

Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

2

13201251.1

1. in connection with Microsoft's Americas Transaction and APAC Transaction. The proposed adjustments were based on Michael Heimert's analysis. Dr. Heimert used an income/discounted cash flow ("DCF") method to compute the "buy-in" values. He wrote four expert reports: a primary report and a supplemental critique for each transaction.

8. Dr. Heimert's DCF model for the Americas Transaction attempted to measure the net present value of profits Microsoft would have earned but for its transfer of software rights to an offshore affiliate in Puerto Rico, Microsoft Operations in Puerto Rico ("MOPR"), as of July 1, 2005. Dr. Heimert's calculation attempted to set the "buy-in" equal to the net present value of future profits (expected revenues less expected expenses) that Microsoft shifted to MOPR; in other words, the amount MOPR should have paid to Microsoft to ensure both Microsoft and MOPR exchanged equal value such that each expected to be at least as well off, after entering into the July 1, 2005 transaction, as the two entities were beforehand.

9. Dr. Heimert's Americas Transaction model was limited by resource constraints. Because he was the only outside expert retained by the IRS on the issue, he did not have the benefit of input from concurrently-retained software code, industry, financial, marketing or brand experts. Dr. Heimert ended up relying on Microsoft's valuation modeling for two critical inputs to his valuation: (1) the amount of the "transfer price" royalties to be paid by Microsoft to MOPR for technology (the transfer price was based on Microsoft's split between technology and non-technology); and (2) the expected revenue and expense forecasts for future sales in the Americas (also from Microsoft's model).

10. Dr. Heimert's DCF modeling for the APAC Transaction also did not have the benefit of input from outside experts with complimentary expertise.

Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

13201251.1

1    11.    In its June 2011 Protest, Microsoft contended that the DCF approach used by Dr. Heimert to value the Americas and APAC "buy-in" amounts was improper. Microsoft argued the "buy-in" amounts, and Microsoft's taxable income from such, should be a mere fraction of the projected net future profits that Microsoft originally expected to earn itself in connection with its intangible property ("IP") rights, but instead transferred to its offshore affiliates. The IP rights Microsoft transferred, and the expectation of profits to be derived from those rights, already existed at the time of Microsoft's transactions; but, according to Microsoft, its offshore affiliates had to pay only for a relatively small share of the value of the pre-existing expected profits. Microsoft contended that, after a relatively short initial time period, substantially all of the expected profits from the transferred IP rights would arise solely from offshore affiliates' contributions.

12.    To construct its tax return position, Microsoft employed a more granular "residual profit split method" ("RPSM"). Microsoft's RPSM models sought to separate software technology IP profits from non-technology IP profits and to further parse out the already expected future profits into components, only a fraction of the value of which would be paid for through a "buy-in" by its offshore affiliates.

13.    KPMG assisted Microsoft in creating its RPSM model for the Americas Transaction. E&Y assisted Microsoft in creating its RPSM model for the APAC Transaction. Both KPMG and E&Y relied on modeling inputs provided by Microsoft. The numerical results from the models were driven, in large measure, by four components (each built from more granular pieces): (1) revenue and expense forecasts supplied by Microsoft's Tax Department; (2) historic and forecasted research and development ("R&D") and sales and marketing

Declaration of Senior International Advisor            **U.S. Department of Justice**
Eli Hoory                                              Ben Franklin Station
                                                       P.O. Box 683
                                                       Washington, D.C. 20044-0683

4

13201251.1

("S&M") expenses that were classified as either adding intangible value or not adding intangible value; (3) relative life spans assigned to different types of intangible assets (*e.g.*, the life of software code versus the lives of Microsoft's customer/channel partner/developer relationships and its brand recognition); and (4) the relative contributions that each group of intangible assets made toward the creation of retail sales and profits for Microsoft (*e.g.,* how much of the profit should be attributable to the software code versus the non-technology intangibles and S&M functions that would continue to be provided and performed by Microsoft).

14. Using the KPMG and E&Y RPSM models, Microsoft assigned relative weights to various intangible assets needed to create profits (the "split" in "residual profit split") in its Americas and APAC businesses. For the Americas Transaction, the KPMG model's split was used to compute the projected outgoing "transfer price" royalties to be paid by Microsoft to its Puerto Rican offshore affiliate. In both the APAC and Americas Transactions, Microsoft relied on each RPSM model's split to compute incoming "buy-in" royalties that Microsoft's offshore affiliates would pay to Microsoft.

15. The May 2011 30-day Letter did not proposed any adjustments to the outgoing transfer price royalties computed by KPMG for the Americas Transaction.

16. In February 2012, the IRS withdrew the May 2011 30-day Letter in order to enable TPO to take a closer look at the transactions and, in particular, at Microsoft's RPSM models. The IRS hired software code, industry, financial, marketing and brand experts, as well as a new economist, Daniel Frisch of the firm Horst Frisch. TPO needed the additional experts to fully evaluate Microsoft's granular RPSM modeling and, decide how, if at all, the more granular RPSM approach could be applied accurately. The IRS's new experts started work in mid-2012.

Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

5

13201251.1

17.     As one of the goals supported by its new experts, the IRS set out to evaluate the "transfer price" royalties deducted by Microsoft on its tax returns. The "transfer price" was the amount paid by Microsoft to MOPR under the Americas Transaction. Microsoft's "transfer price" was based on the "splits" computed in KPMG's RPSM model between profits attributable to software code as opposed to Microsoft's other intangible assets such as its brands and its customer, developer and channel partner relationships. Sam Maruca (the then-Director of TPO) and I repeatedly informed Microsoft's Mr. Sample and Mr. Bernard that the IRS was testing both the inbound "buy in" and the outbound "transfer price."

18.     Applying the RPSM approach to the Americas and APAC buy-ins and testing Microsoft's Americas transfer price required that the IRS examine both more detailed and different information than it had considered before issuing its May 2011 30-day Letter.

19.     During a conference call on March 13, 2012, Mr. Maruca and I advised Mr. Sample and Mr. Bernard that the IRS was still working on identifying and hiring experts to review Microsoft's RPSM valuations. Until the necessary experts were on board, and in the absence of new inputs to the DCF analysis (such as new forecast information or adjustments to the transfer price on which Dr. Heimert had relied), we confirmed that the May 2011 proposed buy-in adjustments remained the IRS's then most up-to-date analysis.

20.     In numerous conversations from mid-2012 through early 2014 with Mr. Sample and Mr. Bernard, Mr. Maruca and I made it clear that the IRS was evaluating both the "buy-in" adjustments <u>and</u> the Americas transfer price (for which no adjustment had been previously proposed). On these calls, Mr. Sample observed that Microsoft's Americas RPSM model addressed both "buy-in" and "transfer price" values and that the two values were interrelated.

Declaration of Senior International Advisor  
Eli Hoory

**U.S. Department of Justice**  
Ben Franklin Station  
P.O. Box 683  
Washington, D.C. 20044-0683

13201251.1

1 Mr. Maruca and I agreed, acknowledging to Mr. Sample that the "transfer price" and the "buy-in" values for the Americas Transaction were interrelated and that any adjustment to Microsoft's deductions for transfer prices paid to MOPR would require an adjustment to the "buy-in" income amounts.

21. During a December 2013 status call with Mr. Sample and Mr. Bernard, I confirmed that the IRS still believed that the DCF method, consistent with Dr. Heimert's approach, was the <u>best method</u> for valuing the "buy-in" payments owed to Microsoft (but not for valuing the Americas transfer price royalties, which required splitting residual profits). On the same call, I stated that although the IRS continued to stand by the DCF method with respect to the buy-ins, any improvements to the method's inputs/assumptions would obviously impact the buy-in valuation. I never stated that the IRS was still relying on Dr. Heimert's 2011 DCF calculations or his resulting values.

22. Four days before my meeting with Microsoft on January 14, 2014, I forwarded an Excel workbook (with supporting documents) to Microsoft, containing the updated IRS Americas models prepared by our new outside economist, Dr. Frisch. The workbook contained new "buy-in" computations for the Americas Transaction using an updated DCF analysis and a new "transfer price" based on the IRS's RPSM modeling to date. The first workbook "tab" prominently stated:

> This model is a preliminary working draft that has been produced at the request of the IRS to facilitate its resolution discussions with the taxpayer regarding the subject valuation. This preliminary draft valuation model remains subject to continuing review . . . it is possible that resolution discussions between the IRS and the taxpayer will resolve certain modeling inputs in dispute or identify new information that materially impacts the valuation.

Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

13201251.1

23. On January 14, 2014, I presented to Microsoft the IRS's work to date on the Americas Transaction. Consistent with the Excel workbook and the presentation slides, I stated that my presentation was based on a preliminary working draft analysis, not a final one, and that TPO's goal was to identify questions that we wanted to engage with Microsoft on in hopes of resolving the issues or at least narrowing open questions and areas of disagreement. As the IRS's primary analysis, I presented the newly estimated Americas "transfer price" and a new "buy-in" value. This was the first time that the IRS had presented a position with respect to the transfer price. The new "buy-in" value, still based on a DCF method, also differed significantly from the 2011 Heimert analysis because it was based on the newly-estimated transfer price and the IRS's new financial analyst expert's forecasts. I also presented, as an alternative to the primary DCF buy-in analysis, an estimate of the "buy-in" calculated using an RPSM approach that, while varying its granular inputs, showed the results of following Microsoft's theory for capturing only a fraction of expected profits associated with the transferred technology IP rights. Finally, the presentation also included the "buy-in" result under the DCF method if the IRS used its new forecast analysis, while still using Microsoft's own outbound "transfer price" royalties (instead of the newly estimated IRS "transfer price").

24. During a December 2013 status call with Mr. Sample and Mr. Bernard, I confirmed that, consistent with past discussions, the IRS was working to apply its better understanding gained from its review of the Americas Transaction to its analysis of the APAC Transaction. When asked if the IRS would also address the APAC Transaction during the scheduled January 14, 2014 presentation, Mr. Maruca and I replied that our work on the APAC Transaction was still in process but that the IRS would be willing to deliver an APAC-focused presentation at

Declaration of Senior International Advisor　　　　　U.S. Department of Justice
Eli Hoory　　　　　　　　　　　　　　　　　　　　Ben Franklin Station
　　　　　　　　　　　　　　　　　　　　　　　　　P.O. Box 683
　　　　　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20044-0683

8

13201251.1

some point.  No date was set, and, ultimately, the IRS did not make an APAC Transaction presentation because Microsoft did not respond to questions specific to the APAC Transaction (the subject of January and February 2014 IDRs) before Microsoft decided to end resolution discussions.

25. In short, when we spoke with Mr. Sample and Mr. Bernard, Mr. Maruca and I never told them that the IRS had adopted final positions on or completed analysis of the Americas or APAC Transactions "buy-in" adjustments, or the Americas "transfer price" adjustment.

***Before Microsoft consented to extend the statute of limitations in February 2014, the IRS made clear that it reserved the right to obtain testimony of Microsoft executives under oath and to complete factual development on unresolved issues***

26. On January 29, 2014, I spoke with Mr. Bernard by telephone.  At that time, I was under the impression that Microsoft would engage in good-faith resolution discussions with the IRS and provide responses to the issues raised during the January 14, 2014 presentation.  Subject to a couple of caveats, I indicated that the IRS was willing to commit in writing to not issuing additional IDRs, provided Microsoft would extend the limitations deadline to facilitate constructive dialogue on outstanding issues; but even if Microsoft facilitated a constructive dialogue, I explicitly stated during that call that my offer did not extend to potential testimony that the IRS might seek from company executives on relevant issues if substantive resolution discussions broke down.

27. In this regard, I only re-confirmed what I had said throughout the 2012-early 2014 time period.  The IRS reserved the right to conduct formal interviews, taken under oath, to collect information.  I made this point repeatedly, including in 2012 when Mr. Bernard originally asked that our phone call interviews be kept informal, in the January and May 2013 timelines

Declaration of Senior International Advisor
Eli Hoory

U.S. Department of Justice
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

9

13201251.1

1  that were published after Mr. Bernard made his request, and in discussions during January and

2  February 2014 with Mr. Sample and Mr. Bernard.

3    28. The May and July 2014 IDRs addressed unresolved examination issues, and sought

4  documents, as well as the identity of key persons with knowledge, regarding (1) Microsoft's

5  financials systems used as inputs to its RPSM models (the IDRs focusing on MS Sales and

6  Management Account Reporting Systems ("MARS")), (2) S&M programs and functions (IDRs

7  focusing on Business Investment Funds, MS Partner Programs, Developer Evangelism, Product

8  Support Services, brand licensing and management, and the account managers responsible for

9  maintaining Microsoft's largest customer/partner relationships); (3) the budget decision-making

10 process for planning and prioritizing investments between S&M and R&D; and (4) Microsoft's

11 strategy for using its resources to respond to competitive challenges (IDR on Open Source

12 Strategy).  A July 2014 IDR also sought information and more complete documentation about

13 who helped plan and draft agreements for the Americas Transaction.  Another open topic –

14 forecasts – was the subject of prior IDRs issued in 2013 (and earlier) that had already sought

15 information about the persons who prepared the forecasts used in KPMG's valuation of the

16 Americas Transaction, as well as supporting documentation for those forecasts and any

17 contemporaneous non-tax forecasts prepared in Microsoft's normal course of business.

18   29. The IRS considered picking interviewees unilaterally or giving Microsoft an

19 opportunity to identify the right interview candidates.  Following the later approach, the July

20 IDRs asked Microsoft to identify, in each subject area, the pool of current and former employees

21 who had management responsibility in each area during the relevant time frames.  The July IDRs

22 asked Microsoft to identify both current and former employees with this knowledge so that the

23 Declaration of Senior International Advisor         U.S. Department of Justice
   Eli Hoory                             Ben Franklin Station
                                           P.O. Box 683
                                           Washington, D.C. 20044-0683

13201251.1

1  IRS could make an informed decision from a complete candidate pool about whom to interview
2  in September/October.  After the IDRs were issued, Mr. Bernard communicated to me his
3  decision that Microsoft's Tax Department would focus primarily on identifying current
4  employees and that, only if they could not find a good match from among current employees,
5  would he identify former employees.  This was a unilateral decision on Mr. Bernard's part, and
6  at the time he communicated his decision to me, I informed Mr. Bernard that while I appreciated
7  that current employees might be easier to identify and that the IRS would attempt to work as best
8  we could with whatever names he eventually gave us, the IRS nevertheless still desired a
9  complete list of both current and former employees.  I further explained to him that if Microsoft
10 provided a complete list, the IRS would be more confident that all the topics were covered and
11 the need for interviews fully addressed.

12    30.  In July 2014, Mr. Maruca announced his resignation, effective August 1, 2014.  He
13 did not participate in August calls with Microsoft.  The last management level call that Mr.
14 Maruca and I had with Mr. Sample and Mr. Bernard was on July 9, 2014, during which we told
15 them that all options were on the table for how the IRS would conclude the examination:

16    (1) a new 30-day letter with proposed adjustments and a referral to Appeals (which,
17    as discussed with Mr. Sample and Mr. Bernard, would have required Microsoft to extend
18    the statute of limitations for at least a year before a 30-day letter could be issued to enable
19    IRS Appeals time to consider the issues);

20    (2) a statutory notice of deficiency, reflecting a final determination by the IRS and
21    the option for the taxpayer to file a petition in Tax Court;

22    (3) a statutory notice of deficiency combined with designation for litigation.

Declaration of Senior International Advisor  
Eli Hoory

**U.S. Department of Justice**  
Ben Franklin Station  
P.O. Box 683  
Washington, D.C. 20044-0683

11

13201251.1

These are the same options I discussed with Mr. Bernard during our March 24, 2014 meeting.

31. In July 2014, Mr. Maruca and I indicated that Microsoft could expect a final decision with respect to these options after the (then unscheduled) September/October interviews; however, our statement was predicated on the anticipated interviews (to be selected from the pool of candidates Microsoft had yet to identify) all being scheduled and addressing the open issues and further presumed that documents responsive to our July IDRs (IDRs already shared with Microsoft in draft form) would be received in time to use during the interviews.

*Microsoft's failure to provide requested information on open issues compelled the IRS to issue summonses for testimony and documents*

32. In response to the July IDRs, Microsoft identified approximately 50 interview candidates as persons with knowledge of subject matters covered by the IDRs. In my letters of August 28 and September 9, 2014, the IRS requested a total of 30 current or former Microsoft employees out of those names by selecting candidates from Microsoft's pool who appeared to have the most experience during the years in question. The IRS also sought to interview two former KPMG employees (one of whom was also identified by Microsoft as an interview candidate). Of the expected 32 interviews requested prior to the IRS making its contemplated final audit decision, only 21 occurred. Of the 32 requested, Microsoft scheduled 23 interviews, but two had to be postponed and rescheduled.

33. Before the September/October 2014 interviews commenced, Microsoft attempted to impose unacceptable conditions on the interviews. I wrote in my letters of September 9, 12, 15 and 18, 2014 that summonses would be issued if the requested interviews did not go forward voluntarily.

Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

13201251.1

34. In conversations I had with Mr. Bernard in late August/early September before the September/October 2014 interviews, I never told Mr. Bernard that the IRS "did not envision" Quinn Emanuel ever serving as litigation counsel. What I did tell him was that under their contract with the IRS, Quinn Emanuel's work, just like the IRS's current work, was limited to supporting the ongoing examination. We also discussed the possibility of litigation and what impact, if any, Quinn Emanuel's hiring had on that prospect. I explained to him that if litigation occurred and, whether the IRS decided to contract with Quinn Emanuel to support any such litigation, were decisions for the future. If litigation occurred, I further explained to Mr. Bernard that just as Microsoft might decide to use the services of its own contractors to support litigation if Microsoft was happy with their prior exam work for Microsoft, the IRS would also be free to decide whether it wanted to contract with its current contractors, including Quinn Emanuel.

35. Ultimately, Microsoft did not arrange all of the interviews requested and did not respond in a timely fashion to several document requests addressing subjects to be covered during interviews. The summonses seek the information not provided.

36. In addition, the September/October 2014 interviews raised new questions that were not anticipated during the July conversations with Mr. Sample and Mr. Bernard. Testimony obtained from Mr. Suh, Mr. Hanson, and Mr. Webster led the IRS to conclude that Microsoft had not diligently searched for and responded in good faith to past IDR requests for supporting documentation to the forecasts used for tax purposes, for forecasts prepared in the normal course of business, and for brand studies. The interviews also identified new categories of documents relevant to evaluating customer relationships and S&M activities, such as Customer and Partner Experience ("CPE") surveys used by Microsoft in its business planning

Declaration of Senior International Advisor  
Eli Hoory

U.S. Department of Justice  
Ben Franklin Station  
P.O. Box 683  
Washington, D.C. 20044-0683

13

13201251.1

1  and performance evaluations, enterprise license renewal rates, software attach rates tracked by

2  Microsoft, and product "SKU" bundling and pricing decisions. The summonses follow up and

3  seek this information.

4    37. The summonses also seek documents that may be relevant to valuing the APAC

5  Transaction. Significant outstanding questions remained after Microsoft's 2014 IDR responses

6  failed to adequately address factors needed to determine ownership of non-technology IP

7  supporting its APAC business. This information is relevant because Microsoft's position is that

8  most APAC non-technology IP, apparently even trademarks registered to Microsoft, was already

9  owned by its offshore affiliates, and that the offshore affiliates therefore did not have to pay for

10 this IP when they entered into the APAC Transaction. In addition to other information sought,

11 whether APAC non-technology IP, including registered trademarks, are owned by Microsoft or

12 by its offshore affiliates materially impacts the APAC "buy-in" analysis.

13   38. With respect to the individuals who have been summonsed for interviews,

14 Microsoft itself identified, in response to the July 2014 IDRs, four of its most senior current or

15 former employees, including Mr. Allchin, Mr. Raikes, Mr. Rudder, and Mr. Mundie (all of

16 whom were identified as executive officers in Microsoft's 2003-2005 10-K S.E.C. reports) as

17 potential candidates for the September/October 2014 interviews. In fact, the IRS requested, and

18 Microsoft attempted to arrange, these interviews in September and October, but, with the

19 exception of Mr. Rudder, scheduling issues precluded moving forward with the requested

20 interviews. Because Mr. Allchin, Mr. Raikes and Mr. Mundie continue to have knowledge that

21 may be relevant to the issues under audit, they were summonsed to give testimony.

22   39. In all, six of the thirteen persons summonsed for interviews in November 2014

23 Declaration of Senior International Advisor  **U.S. Department of Justice**
Eli Hoory  Ben Franklin Station
  P.O. Box 683
  Washington, D.C. 20044-0683

13201251.1

1  were originally named among the 32 interviews that the IRS requested in my August 28, and

2  September 9, 2014 letters.  In addition to Mr. Allchin, Mr. Raikes and Mr. Mundie, those persons

3  include David Guenther, Anne Welsh and Brian Burt.

4      40.    The other seven of the thirteen individuals who were summonsed for interviews

5  were selected by the IRS to cover matters not sufficiently addressed by the September/October

6  2014 interviews.

7      41.    Because certain witnesses interviewed in September/October 2014 were evasive

8  or uncooperative, the IRS reserved the option of making a video record of one or more of the

9  summons interviews.  After Microsoft objected to video recording the interviews, I wrote to

10 Microsoft on November 26, 2014, stating that to eliminate the potential dispute, we would not

11 pursue creating a video record.

12     42.    In a discussion with Microsoft during the first week of the September/October

13 2014 interviews that I recall Mr. Bernard attending, Mr. Rosen stated that it was in the best

14 interests of the IRS to agree to the restrictions Microsoft was imposing on interview participation

15 instead of issuing summonses because, in his view, that was the only way the IRS could

16 reasonably hope to complete interviews before the statute of limitations ran as of December 31,

17 2014.  Mr. Rosen raised the possibility that the IRS might issue a designated summons to protect

18 its ability to obtain the information it sought before the statute expired.  Mr. Rosen then

19 volunteered that, based on his recent experience as an IRS attorney, he knew of a designated

20 summons that been issued by the IRS in another taxpayer's audit.  Based on that experience, Mr.

21 Rosen strongly recommended against the IRS issuing a designated summons to Microsoft

22 because Microsoft was prepared to litigate and, even if the IRS was successful in summons

23 Declaration of Senior International Advisor      **U.S. Department of Justice**
Eli Hoory      Ben Franklin Station
    P.O. Box 683
    Washington, D.C. 20044-0683

13201251.1

enforcement, he predicted that the IRS would not get the information it sought for at least nine months, delaying audit completion.

> ***The contracts awarded to Boies Schiller and to Quinn Emanuel were never for trial work, and the difference in scope between the two contracts was due to budgetary constraints.***

43. The contracts awarded to Quinn Emanuel and to Boies Schiller started with the same concept. Discussions with Boies Schiller began in mid-2012, followed by discussions with Quinn Emanuel in late 2013. The IRS considered that at some point after examination work was completed and if litigation occurred, outside counsel might be hired for litigation support. However, with both firms, the IRS decided to pursue a contract that included just examination work. In the event that Microsoft and the IRS examination team did not resolve the unagreed issues, if litigation resulted instead of referral to and settlement by IRS Appeals, and if IRS Counsel decided to retain an outside law firm for trial support, those services would have to be addressed by a future contract. Potentially, at some point if and after IRS Counsel entered into a new contract, Special Government Employee status could become relevant.

44. Examination support was conceived of as potentially consisting of two categories of activities, originally contemplated as two distinct phases: (1) an independent evaluation and assessment phase (eventually the entirety of the Boies Schiller contract and Category A services in the Quinn Emanuel contract) and (2) continued case assistance and support for the IRS's examination of the Americas Transaction (originally conceived of as following the evaluation phase and, later, as Category B services in the Quinn Emanuel contract).

45. Due to budgetary constraints at the time it was awarded, the Boies Schiller contract covered only the most time sensitive goal, a focused independent evaluation. By the

Declaration of Senior International Advisor
Eli Hoory

U.S. Department of Justice
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

16

13201251.1

time the Quinn Emanuel contract was awarded, funding for the full examination concept was available, allowing all desired examination support to be covered by the contract. No trial work was included in either contract. Because of timing factors when the Quinn Emanuel contract was awarded, the IRS recognized that the evaluation services likely would overlap in time with the case support services, and the two phases were collapsed into a single phase, consisting of the Category A and Category B services that make up the contract's scope of work.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __9__ day of October, 2015.

*[signature]*
Eli Hoory
Senior International Advisor

Declaration of Senior International Advisor
Eli Hoory

**U.S. Department of Justice**
Ben Franklin Station
P.O. Box 683
Washington, D.C. 20044-0683

17

13201251.1