1          UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON

3   ─────────────────────────────────────────────────

UNITED STATES OF AMERICA,          )
4                                   )
          Petitioner,               )   No. 2:15-cv-00102-RSM
5                                   )
                                    )
6        vs.                        )   Seattle, WA
                                    )
7   MICROSOFT CORPORATION, et       )
    al.,                            )
8                                   )   Hearing on Petition
          Respondents.             )   November 6, 2015
9   ─────────────────────────────────────────────────

10  UNITED STATES OF AMERICA,          )
                                    )
11        Petitioner,               )   No. 2:15-cv-00103-RSM
                                    )
12                                  )
        vs.                         )
13                                  )
    CRAIG J. MUNDIE, et al.,        )
14                                  )
          Respondents.             )
15  ─────────────────────────────────────────────────

16              VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE JUDGE RICARDO S. MARTINEZ
17                UNITED STATES DISTRICT COURT
    ─────────────────────────────────────────────────
18

19

20

21

22

23

24

25

USA v. Microsoft/Mundie, 11/6/15

1   APPEARANCES:

2   FOR THE PETITIONER:  JAMES EDWARD WEAVER
                         U.S. Department of Justice
3                        P.O. Box 683
                         Ben Franklin Station
4                        Washington, DC 20044-0683
                         james.e.weaver@usdoj.gov
5
                         AMY MATCHISON
6                        U.S. Department of Justice
                         P.O. Box 683
7                        Ben Franklin Station
                         Washington, DC 20044-0683
8                        amy.t.matchison.usdoj.gov

9                        JEREMY N. HENDON
                         U.S. Department of Justice
10                       P.O. Box 683
                         Ben Franklin Station
11                       Washington, DC 20044-0683
                         jeremy.hendon@usdoj.gov

12

13  FOR THE RESPONDENTS: PATRICIA A. EAKES
                         Calfo Harrigan Leyh & Eakes, LLP
14                       999 Third Avenue, Suite 4400
                         Seattle, WA 98104
15                       pattye@calfoharrigan.com

16                       BRIAN S. PRESTES
                         Bartlit Beck Herman Palenchar & Scott, LLP
17                       54 West Hubbard Street, Suite 300
                         Chicago, IL 60654
18                       brian.prestes@bartlit-beck.com

19                       DANIEL A. ROSEN
                         Baker & McKenzie LLP
20                       425 Fifth Avenue
                         New York, NY 10018
21                       daniel.rosen@bakermckenzie.com

22                       JAMES M. O'BRIEN
                         Baker & McKenzie
23                       300 East Randolph Drive, Suite 5000
                         Chicago, IL 60601
24                       james.m.o'brien@bakermckenzie.com

25

USA v. Microsoft/Mundie, 11/6/15

```
 1   Andrea Ramirez, CRR, RPR
     Official Court Reporter
 2   United States District Court
     Western District of Washington
 3   700 Stewart Street, Suite 17205
     Seattle, WA 98101
 4   andrea_ramirez@wawd.uscourts.gov

 5   Reported by stenotype, transcribed by computer

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

USA v. Microsoft/Mundie, 11/6/15

1              THE CLERK:  This is the hearing on the petition to

2    enforce the IRS summons in the cases of the United States vs.

3    Microsoft, and the United States vs. Mundie, et al., Cause

4    Number C15-102 and C15-103, assigned to this court.

5         Will counsel please rise and make your appearances for the

6    record.

7              MR. WEAVER:  James Weaver, Amy Matchison, and Jeremy

8    Hendon, on behalf of the United States.

9              THE COURT:  Good morning.

10             MS. EAKES:  Good morning, Your Honor.  Patty Eakes,

11   on behalf of Microsoft.

12             MR. PRESTES:  Brian Prestes, on behalf of Microsoft.

13             MR. ROSEN:  Good morning, Your Honor.  Daniel Rosen,

14   on behalf of Microsoft.

15             MR. O'BRIEN:  And Jim O'Brien, on behalf of

16   Microsoft, Your Honor.

17             THE COURT:  Good morning, all of you.

18        Counsel, just a couple of comments before we get started.

19        One, I know that all of the electronic equipment in our

20   courtroom is on its very last legs.  We are in the process of

21   getting everything -- everything changed into digital format,

22   which would be the state of the art.  It's not going to happen

23   in my courtroom until the very beginning of next year, but

24   we're already on the way of doing that.  So I apologize in

25   advance if something fails.  Hopefully, we'll have paper

USA v. Microsoft/Mundie, 11/6/15

```
 1    backups so we can keep the argument going.
 2         We've reviewed your briefing materials.  I don't need you
 3    this morning to repeat what's in there.  That doesn't help me
 4    very much.
 5         Here's what I want you to do.  I want you to break it down
 6    to the simplest, basic component parts for me; all right?  Tell
 7    me -- frame the issue from your perspective.  Tell me what the
 8    standard is.  Tell me where that standard comes from.  Are we
 9    talking about the statute, a rule, a regulation, case law?
10    Tell me who has the burden.  And then tell me what the facts
11    show, from your perspective; all right?  That will make the
12    most sense for me.
13         Ms. Eakes, you are going to argue on behalf of Microsoft?
14              MS. EAKES:  I am, Your Honor.
15              THE COURT:  All right.  And Counsel, what we'll do
16    is, after Microsoft is done, we'll take a short break and then
17    come back and do the second half; all right?
18         Ms. Eakes?
19              MS. EAKES:  Thank you, Your Honor.
20         And thank you for saying that.  I know the Court's already
21    reviewed all the extensive briefing.  I'm not going to cover
22    all of the arguments in any great detail, but I intend to do
23    what the Court has already set out.  I'm going to focus on our
24    statutory arguments, talk in short detail about some of the
25    other arguments, and then talk about the broader policy
```

1    concerns that underlie our position.

2        We're here because the IRS has unilaterally decided to

3    hand off the immense power that Congress gave it, the power to

4    audit and the power to compel people to come in and answer

5    questions under oath, under the threat of contempt if the

6    taxpayer fails, to outside contractors.  And the IRS's actions,

7    as the Court knows, are really unprecedented.  And the

8    ramifications of what they've done are significant to every

9    taxpayer in America.

10       Policy concerns about what they have done are these:  By

11   the IRS delegating their power and authority to outside

12   contractors, including lawyers, the IRS is blurring the lines

13   of accountability, and have empowered a private party, who may

14   not share the agency's public vision and perspective, to take

15   action against the taxpayer.  These concerns are concerns that

16   have been expressed in statutes, they're expressed in policy

17   memorandums, and they've been expressed by the various courts,

18   including the court in *U.S. Telecom*, which we cited in our

19   brief.

20       We only need to look at the IRS's own policy statement to

21   really understand why this is a significant issue.  The IRS has

22   been tasked with making impartial determinations of tax

23   liability.  We'll find out now if this is working.

24       When you look at the IRS's policy statement, which I've

25   put up on the screen for Your Honor, it talks about the fact

USA v. Microsoft/Mundie, 11/6/15

1    that the policy is for the IRS to make an impartial

2    determination of tax liability.  And it says that, "An exaction

3    of the United States government, which is not based upon law,

4    statutory or otherwise, is the taking of property without due

5    process of law, in violation of the Fifth Amendment of the

6    United States Constitution.  Accordingly, a service

7    representative, in his or her conclusions of fact or

8    application of law, shall hew to the law and the recognized

9    standards of legal construction.  Importantly, it shall be his

10   or her duty to determine the correct amount of tax, with strict

11   impartiality as between the taxpayer and the government, and

12   without favoritism or discrimination as between taxpayers."

13        So when you look at what the IRS has been tasked with, and

14   what the policy statement is, and when you think about the fact

15   that the IRS in this case has decided to unilaterally hand off

16   that power, this power, to an outside contractor, someone like

17   Quinn Emanuel, there's really no guarantee that that contractor

18   is going to share the same goals or mission, or that they match

19   what the IRS has.  Rather, the contractor's view might be like

20   Quinn Emanuel's here; that their goal in litigation, or their

21   attitude towards litigation, is that there's a winner, and

22   there's a loser, and that they like to win, and that they do

23   win.

24        Now, that's a significant policy issue, from Microsoft's

25   perspective.  And the IRS has characterized what they've done

USA v. Microsoft/Mundie, 11/6/15

1   in this case, in their decision to hire Quinn Emanuel and in

2   effect hand off this power -- and it doesn't just apply to

3   Quinn Emanuel; it applies to all contractors -- as

4   trailblazing.  And, in fact, it is.

5        And Microsoft's position is that if the IRS wants to

6   trailblaze in the way that they've done here, and the way that

7   they intend to continue to do, by letting contractors take

8   compelled testimony and conduct audits, they need to ask

9   Congress's permission first.  But they haven't.

10       We already know that when Congress wants to hand off IRS

11   tasks to outside contractors, they do it explicitly.  And they

12   did that when they passed a law that allowed private debt

13   collection companies, collectors, to collect delinquent taxes.

14   It was an explicit handing off of IRS tasks by Congress.

15       Now, not only does the IRS need to ask Congress, but they

16   really need to do it in the light of day, which they haven't

17   done here.  They need to be transparent about what they're

18   doing, they need to explain why they're doing it, and they need

19   to get Congress's okay for what they're doing.  Again, they

20   haven't done that.  And perhaps they didn't do it in this case

21   because they knew that Congress would say no.  Or if they

22   didn't say no, at the very least they would be very concerned

23   about doing that, for the reasons that Senator Hatch expressed

24   in the letter that the Court has seen from the Senate Finance

25   Committee, who expressed concern about involving private

USA v. Microsoft/Mundie, 11/6/15

1    contractors in what has traditionally been actions that

2    Congress considers to be uniquely governmental functions.  So

3    whatever the reason, the fact remains that the IRS can only

4    trailblaze in the manner that they have done here, and that

5    they want to continue to do, with the consent of Congress.

6        Now, Congress is the one who decided, under 7602, that

7    only the Treasury Secretary and other agency employees could

8    audit and could take -- summon testimony from taxpayers.  And

9    the IRS can't ignore that statute.  7602 exists.  Congress is

10   also the one who decided that only the Chief Counsel can

11   provide legal advice to the IRS.  And the IRS can't ignore that

12   statute either, which is 7803.

13       But instead of asking Congress, the IRS is here asking

14   this court to bless what they've done so far, and what they

15   intend to do in the future.  And to be clear, we're not asking

16   this court to police the IRS or to oversee what they're doing.

17   But we are asking you to use your power and say that you aren't

18   going to bless their actions by enforcing these summonses.

19       Enforcement of an IRS summons, as this court knows, is

20   contingent on the Court's approval.  Summonses are not

21   self-enforcing, and the IRS needs you to bless it before they

22   can proceed.  Congress built this step in, because they wanted

23   to ensure that there was a check on the IRS's power.  And the

24   Supreme Court has made it clear that it's appropriate for the

25   Court to refuse to enforce summonses when it would constitute

USA v. Microsoft/Mundie, 11/6/15

1    an abuse of your process.  So here, our position is, you

2    shouldn't enforce these summonses, because, among other things,

3    it would result in a violation of 7602(a)(3) and (a)(1), and a

4    violation of 7603.

5        So I want to start by talking about these testimonial

6    summonses and our argument with respect to that.  And our

7    argument is actually very simple and straightforward.  And I've

8    put up on the screen, as well as on the board, the statute.

9        Now, the IRS has clearly said that they plan to have

10   contractors fully participate and ask questions in summons

11   interviews if you enforce the testimonial summonses.  But the

12   law doesn't allow that.  The statute is clear.  If you look at

13   it, it says that only the Secretary is authorized to examine

14   books, papers, or records, to summon to appear before the

15   Secretary, and to take such testimony.

16       Now, the statutes also define who the Secretary is.  And

17   that's 7701(a).  And that defines the Secretary as both the

18   Secretary and his delegates, which basically just means the

19   employees of the IRS.

20            THE COURT:  Can it also mean other contractors?

21            MS. EAKES:  No.  It can't be, Your Honor.  If

22   Congress intended for it to be outside contractors, as opposed

23   to employees, they would have said that in the statute.  And

24   there's no cases -- and, in fact, the *U.S. Telecom* case is a

25   perfect example of a place in which a court has said, you can't

USA v. Microsoft/Mundie, 11/6/15

1    be delegating -- you can delegate within, and that's fine,

2    because you maintain the same kind of control over the process,

3    shared vision, accountability, all the things that Congress

4    wants when they give this power.  But you can't delegate

5    outside unless there's been an explicit authorization by

6    Congress.  So, no, it can't apply to contractors.

7         So 7701 is the section that defines who is encompassed in

8    "the Secretary."  And again, it means the Secretary or the

9    employees or the delegates of -- the employees of the IRS,

10   basically.  And the language of the statute is very consistent

11   with what the public policy is that you see in the cases; that

12   certain governmental actions that require the exercise of

13   discretion and judgment should only be done by government

14   employees.

15        And the power that's conferred by 7602 is significant.

16   And it gives the government the power to haul a citizen into

17   court, using a summons, to compel them to answer questions

18   under oath, with the threat of criminal and civil contempt if

19   they don't comply.  That's a really significant power.  And

20   given the awesome power that this statute confers, it only

21   makes sense that the Congress would say that only IRS officials

22   and their employees and government lawyers can do this.

23        So our position is that the language of 7602 is

24   unambiguous, and that's the end of the analysis.  Outside

25   contractors cannot take testimony, pursuant to 7602.  The

USA v. Microsoft/Mundie, 11/6/15

```
1    statute doesn't allow it, and we don't think you even need to
2    reach the issue of the temporary regulation.  There's no gap
3    that was left by Congress.  Their intention is clear and
4    express, and that ends the analysis.
5        But, of course, as the Court knows, the IRS disagrees with
6    Microsoft's reading of the statute.  And they now say that the
7    phrase "take testimony" is ambiguous; and that taking testimony
8    really means hearing the testimony, not actually asking the
9    questions.  And so they enacted a temporary regulation that
10   they say fills the gap, and that their interpretation should
11   get deference from this court.
12       So I want to address each one of their arguments.  First
13   of all, the government's argument that "take testimony" means
14   hear testimony, there are problems with that analysis -- or
15   that interpretation as well.  And if you go back to 7602, the
16   primary problem with the government's claim that "taking
17   testimony" means hearing testimony is that as -- if you take
18   that interpretation, it causes Section 3, 7602(a)(3), to be
19   meaningless.  Because Section 2, to summon, to appear before
20   the Secretary, basically, is already covered by the
21   government's analysis that this actually means just
22   authorization to who hears the testimony, as opposed to who
23   asks the questions.
24       And as the Court knows, it's a real basic tenet of
25   statutory construction that a statute has to be read in a
```

USA v. Microsoft/Mundie, 11/6/15

1    manner that gives meaning to all of its parts, and it should

2    not be read in a way that causes the portions to become

3    meaningless, which is what would happen if this court accepts

4    the reading that the IRS is giving it, that "taking testimony"

5    means hearing testimony.

6         But there's another problem with the IRS's position.  And

7    that's if you look at the contemporaneous documents, you see

8    that what the IRS was saying -- before we ever walked into

9    court and ended up in this litigation, they said that "take

10   testimony" meant ask questions, which is exactly what Microsoft

11   believes the statute means.  So if you look at the temporary

12   regulation and preamble to the temporary regulation, you can

13   see -- and we've highlighted the key portions -- that before

14   this litigation began, and when this regulation was passed, the

15   IRS was saying exactly what we say 7602 means, which is that

16   it's taking testimony by asking questions.

17        And the temporary regulation itself is consistent with

18   Microsoft's interpretation; that "take testimony" means ask

19   questions.  The temporary regulation says that "fully

20   participating" means questioning the person providing testimony

21   under oath.  That's what the statute means, and that's what the

22   IRS thought it meant before we got to this place in litigation.

23   That's what they were saying and what they believed when they

24   passed this temporary regulation.

25        But it's not just the preamble in the temporary

USA v. Microsoft/Mundie, 11/6/15

1    regulation.  If you look at the internal documents of the IRS,

2    again, what they were saying, before anybody was looking,

3    before anybody knew that this was happening, how did they

4    interpret what "take testimony" means?  There's nothing in any

5    of the documents that show that they thought "take testimony"

6    meant hearing testimony at that time.

7        And if you look at -- these are several documents from

8    things that we appended to our brief and to our declarations.

9    The regulatory signature package, again, these are internal

10   documents.  Microsoft has no idea this is happening.  This is

11   all pre-litigation.  And they're talking about taking summoned

12   testimony under oath, using the same construction that means

13   asking questions.

14       Same thing in their justification for the emergency

15   publication, these documents that came out of the

16   administrative file, or what the government says is the

17   administrative file, that "taking testimony" means asking

18   questions of a witness.  That's what they're telling their

19   internal people.  Regulatory information data form, another

20   form that makes it clear that the IRS thought what they needed

21   to interpret was that they were expanding who could take

22   testimony, as opposed to defining that "take testimony" means

23   hearing testimony, which is what they're claiming now.  And

24   similarly, in the executive summary, which is a document that

25   they have to send among the highest levels of branches of the

USA v. Microsoft/Mundie, 11/6/15

1    government in order to pass this temporary regulation, again,

2    consistent with Microsoft's interpretation that 7602, "take

3    testimony," meant asking questions, not hearing testimony.

4        So in short, we think it's clear from the temporary

5    regulation, the preamble to the temporary regulation, and the

6    documents that the IRS has, as well as the language of 7602

7    itself, that it's clear, it's unambiguous, "take testimony"

8    referred to asking questions.

9        But even if the Court disagrees and is concerned that

10   there's some sort of ambiguity in the language of the statute,

11   there is a second important principle that the Court should

12   consider in deciding whether or not "taking testimony" means

13   hearing testimony.  And that principle is that when you're

14   talking about agency delegations of authority, the case law is

15   clear -- and this is the *U.S. Telecom* case -- that even in the

16   face of congressional silence or ambiguity, agencies cannot

17   delegate authority outside of the government without express

18   authorization from Congress.

19       Again, that principle was very clearly articulated in the

20   *U.S. Telecom* case, which I have on the screen.  And the Court

21   said, "We therefore hold, while federal agency officials may

22   sub-delegate their decision-making authority to subordinates,

23   absent evidence of contrary congressional intent, they may not

24   sub-delegate to outside entities, private or sovereign, absent

25   affirmative evidence of authority to do so."

1          Also in *U.S. Telecom*, they talk about whether or not as a

2    result, if there is a delegation outside of the agency, that

3    the agency should not get *Chevron* deference as a result of

4    that.  The mere silence, the *U.S. Telecom* court points out,

5    does not mean that the agency has the authority to contract out

6    or to delegate out their authority, which is precisely what the

7    IRS is doing here by saying that 7602, and their authority to

8    audit and to take testimony, can be given to outside

9    contractors like Quinn Emanuel.

10         The concerns that are expressed -- I just want to talk

11   about the policy concerns behind this, because it's what the

12   *U.S. Telecom* case talks about; that there's concern about that

13   this -- when you do that, when you pass your authority to

14   outside -- people outside the government, you really end up

15   blurring the lines of accountability.  There are concerns about

16   conflicts, and you're concerned about whether or not the

17   contractors are acting with the same type of impartiality

18   that's critical in IRS functions.

19         And all of those concerns are particularly important here

20   when we're talking about Quinn Emanuel.  We know -- and the

21   Court saw evidence -- that there are clear conflicts.  And

22   there are reasons why Microsoft is concerned about Quinn

23   Emanuel not acting with impartiality towards Microsoft,

24   because, among other reasons, they represent our largest

25   competitor, which is Google.

USA v. Microsoft/Mundie, 11/6/15

```
1        Now, I want to talk for a minute about the IRS argument
2    that asking questions in a compelled interview is not an
3    inherently governmental function.  And I'd submit to the Court
4    that they're simply wrong about that fact.  There's nothing
5    more inherently governmental than exercising discretion to
6    question a witness who's been compelled to appear under threat
7    of civil or criminal contempt if they don't comply.
8        Moreover, the IRS's distinction about this really doesn't
9    make any sense.  If the temporary regulation admits that it's
10   an inherently governmental function to do things like deciding
11   what information to be produced -- and that's what it says, in
12   the text, or in the preamble to the temporary regulation, that
13   that's how they -- one of the things they define as being an
14   inherently governmental function.
15       That's exactly what you do when you take sworn testimony
16   from somebody.  It's not getting documents.  The way you get
17   information is, you make a document request, or a summons for
18   documents.  But the second way you get information is, you ask
19   questions.  That's what we do in deposition.  That's what we do
20   in court.  You're making a discretionary decision about what
21   information a person has to produce, albeit verbally, but it's
22   the same concept as actually deciding what information has to
23   be produced by writing it down and submitting the document
24   request.  And again, you're exercising your judgment and your
25   discretion when you do that, which is why that's a function
```

USA v. Microsoft/Mundie, 11/6/15

1    that should only be kept within the government, to IRS
2    Secretary and employees, as Congress has said.
3         And if you look at -- again, back to the contemporaneous
4    documents, and you see, what did the IRS say these things meant
5    at the time, when nobody was looking, and Microsoft wasn't
6    involved, and we weren't involved in this litigation?  They
7    defined, in the temporary regulation, an inherently
8    governmental function, under 7602, included deciding what
9    information had to be produced.  And if you contrast that with
10   the Quinn Emanuel contract, which is what I've done on this
11   slide, you see that they asked Quinn Emanuel to do exactly what
12   we're saying is an inherently governmental function and is
13   improper; identifying additional information that they deem is
14   necessary; identifying and preparing new document requests;
15   that they've asked the contractors to ask if they need
16   additional materials, and the IRS will go out and get those
17   things if they can.  So looking at the contract and the
18   temporary regulation, again, which are contemporaneous
19   documents that were done before we ever got into this
20   litigation, you see that by their own definition, the IRS gave
21   to Quinn Emanuel precisely the functions that 7602 says are
22   supposed to be reserved to the Secretary and to the delegates.
23        So I want to talk for just a minute now about the
24   temporary regulation.  And the Court knows that -- and to be
25   clear, we don't think the statute is ambiguous in any way, and

USA v. Microsoft/Mundie, 11/6/15

1    so you don't ever need to reach it.  But obviously, the IRS

2    says that they plan on relying on the temporary regulation, and

3    that that's their authority for allowing outside contractors to

4    ask questions in these summoned interviews.  That's what they

5    told Microsoft.  That's what they've made it clear that they

6    intend to do.

7         So let's look at the temporary regulation.  And it's our

8    position that it's invalid for three different reasons.  First

9    of all, it fails step one of the *Chevron* test, for all the

10   reasons that we just talked about.  The statute is unambiguous.

11   Therefore, there's no gap to fill.  And therefore, it is

12   invalid; that the temporary regulation -- or excuse me -- that

13   7602 is clear as to who it is that can take the testimony, or

14   take summoned testimony, or ask the questions.  And that's the

15   Secretary and his employees.

16        But even if you assume that there is some sort of an

17   ambiguity there, the temporary regulation still fails *Chevron*

18   step two.  And that's because it is not the product of reasoned

19   decision-making.  Now, the biggest problem is that the

20   temporary regulation doesn't purport to explain that -- how it

21   fits with the statute.  So just on its face, if you look at the

22   temporary regulation and the preamble to it, it makes no

23   attempt to reconcile its language with the language of 7602.

24   And that's a fatal problem.  Because if you can't reconcile it,

25   then on its face there is no reasoned decision-making.

USA v. Microsoft/Mundie, 11/6/15

1      There's also nothing in the temporary regulation that
2  purports to interpret "take testimony" as being hear testimony;
3  so, again, evidence that there isn't reasoned decision-making.
4  Instead, what that temporary regulation says, and the preamble
5  says, is that it's all about who can ask the questions.  It's
6  not about hearing the testimony.  So that's another example of
7  why it isn't reasoned decision-making, and it's invalid.
8      And the third reason why the temporary regulation is
9  invalid is because they violated -- there was no notice and
10  comment, and so they violated the requirement of 5 U.S.C. 553.
11  That requires that there be a notice and comment process, even
12  for this temporary regulation.  And I'll tell the Court that
13  that's not just a technicality.  It's really an important
14  democratic check on agency action.  553 and the notice and
15  comment process is important, because it promotes reasoned
16  decision-making.  It makes executives accountable to people.
17  And it's particularly important here, in this kind of
18  situation, where the IRS admits that it's taking a trailblazing
19  approach, it's trying to do something different.  And the
20  notice and comment provisions set up a system in which the
21  people get to comment on what they're doing and decide whether
22  or not it's a proper extension of their authority.
23      Now, the only time the IRS can get around notice and
24  comment is if there's good cause; on a temporary regulation, if
25  there's good cause.  But that has to be articulated in the

1    preamble, and it isn't here.  There's nothing in there at all

2    about good cause for passing this temporary regulation.  And we

3    know that the IRS knows how to do that, and we cited in our

4    brief some examples of other temporary regulations where

5    they've given a justification for good cause.  And here they

6    simply didn't do that, because there isn't one.

7         The IRS says that 7805(e) exempts them from Treasury --

8    from temporary regulations from good cause requirement.  And

9    that's just wrong.  All that provision does, 7805(e), is that

10   it's a sunsetting provision.  It sunsets the provision for

11   temporary regulations that haven't been finalized after three

12   years.  It did not give the agency unfettered access or

13   unfettered authority to bypass the notice and comment, as every

14   other agency is required to follow.  And the law on this, I

15   think, is actually very clear.  And I'd cite the Court to the

16   *Intermountain* case, which I think makes it very clear that the

17   Treasury still has to comply with the notice and comment

18   provisions of the EPA.

19        Similarly, the IRS's claim that the temporary regulation

20   is exempt because it's interpretive also lacks a legal basis.

21   I think it's clear under Ninth Circuit authority, which is the

22   *Hemp Industries* case, that any regulation promulgated pursuant

23   to an agency's general legislative authority, which is what

24   7805(e) is, is a legislative regulation.  And that's also

25   consistent with the tax court's opinion in the *Altera* case,

USA v. Microsoft/Mundie, 11/6/15

1   which is unusual, because I think it was 14 of the tax court

2   judges who joined in that opinion.

3       The preamble to the temporary regulation tells you that

4   they're using their general authorization under 7805, because

5   that's what they cite to.  And we know that it has the force of

6   law, because that's what Hoory's letter to Microsoft saying --

7   is the basis of authority for why they can have outside

8   contractors ask questions.  And I'd also remind the Court that

9   the IRS can't, you know, propose post hoc grounds to support

10  their notice and comment -- for failure to comply with notice

11  and comment.  All the documents that you have that were done

12  contemporaneous show that they should have and they didn't

13  comply with notice and comment.  So for all of those reasons,

14  we think that the Court should find that the temporary

15  regulation that the IRS passed is invalid and refuse to enforce

16  the subpoenas, to the extent they're relying on that temporary

17  regulation.

18      I want to talk now for just a minute about our improper

19  purpose argument and how we ended up here trying to enforce

20  these -- or asking the Court not to enforce these summonses.

21      But before we do that, I just want to talk for a second

22  about what we perceive to be the IRS's attempts to kind of

23  paint Microsoft in a bad light, that we're scofflaws, that

24  we're tax evaders, that we're doing something that people

25  should be outraged about.

USA v. Microsoft/Mundie, 11/6/15

```
1        Just to be clear, I mean, Microsoft is challenging these
2    summonses because we think they violate the law, and they were
3    issued for an improper purpose, and because we think public
4    policy is against what the IRS is trying to unilaterally
5    outsource their power to outside contractors.
6        This isn't -- case isn't at all and this challenge isn't
7    at all about Microsoft trying to hide anything.  You have to
8    remember that for eight years, prior to these summonses being
9    enforced, the IRS and Microsoft were engaged in this audit
10   process.  From January 2007 until the summonses were issued,
11   Microsoft had been fully cooperating with the IRS in providing
12   documents, answering questions, making witnesses available, as
13   they do in all audits of this nature.
14       This also -- there's -- Microsoft isn't trying to avoid
15   paying its taxes either.  It's totally prepared to pay its fair
16   share of taxes.  They're standing ready to do whatever they're
17   legally obligated to do in terms of the payment of the taxes.
18   But I think it's important, when you think about the improper
19   purpose argument, to think about the facts and the audit
20   itself.
21       So we say that the audit is over, and that these summonses
22   are improper because they're not -- they're not really about
23   the audit and getting to the right number.  They're about
24   helping Quinn Emanuel prepare for litigation.  And the IRS says
25   the audit is over.  They're still trying to get to the -- the
```

USA v. Microsoft/Mundie, 11/6/15

1    audit isn't over -- excuse me.  They're still trying to get to

2    the right number.  And these summonses, requests, are asking

3    for information that they say they need.  And obviously, it's

4    going to be up to the Court to decide who's right and what

5    conclusion the evidence supports.

6         But let's talk about what the facts are, in terms of the

7    audit, as to why Microsoft believes that the audit is over and

8    that these summonses are for an improper purpose.  As I just

9    said, the audit has been ongoing for eight years.  There have

10   been eight agreements by Microsoft to extend the statute of

11   limitations.  There have been 54 consensual interviews, in the

12   United States and Singapore, during that time.  There have been

13   150 transfer pricing information document requests that the IRS

14   has submitted to Microsoft.  There have been 375 total

15   information document requests, and 1.2 million pages of

16   documents that Microsoft has produced.  So that's what the IRS

17   was doing for eight years before these summonses ever came

18   forward.

19        THE COURT:  Counsel, am I not correct, though, that

20   there is still not a number that has been agreed upon between

21   Microsoft and the IRS; correct?

22        MS. EAKES:  Well, there's not an agreed number

23   between the parties.  But certainly, the IRS has said it's

24   reached its numbers and, in fact, has told Microsoft that it

25   has a number.  In fact, they've told them multiple times that

USA v. Microsoft/Mundie, 11/6/15

1   they have a number.  They have both a primary number, that they

2   gave to the IRS -- or excuse me -- that they gave to Microsoft

3   back in 2011, and issued a 30-day letter because they had that

4   number.  Then, granted, they withdrew it.  There was a whole

5   flurry of additional activity.  And then they said, again, that

6   they had a number, which is when they met in January of 2014.

7        So, you know, if you look at why Microsoft continues to

8   say they've already reached their number -- again, they reached

9   the primary number.  They have a secondary position.  When they

10  met -- the last timeline that Microsoft had, from 2013, this is

11  what the IRS said was their timeline.  They were going to be

12  evaluating the information.  They were going to present their

13  conclusions to the taxpayer.  This says November of 2013, and I

14  think you saw from the declarations that that didn't actually

15  happen until January of 2014.  And then after that, they would

16  have a dialogue and see if they could try to resolve it.

17       And when they met in January of 2014, the IRS presented

18  Microsoft with a number.  That was their number.  It was the

19  number on the Americas, and they said that they had a number

20  for APAC, and that they were going to give it to Microsoft in a

21  couple of weeks.  So -- and then, of course, shortly after

22  that, Microsoft said:  Hey, we're not going to engage in any

23  more discussions about settlement.  Just give us the tax bill.

24  Give us the number.  You know, give us the finalization so we

25  can move to the next stage, because this isn't productive.

USA v. Microsoft/Mundie, 11/6/15

1   Whether we're going to tax court, we'll evaluate whether or not
2   we agree with your position, but let's just move to the next
3   step.  You're clearly done.  That's why Microsoft thinks that
4   it's over.
5       And everything that happened during that timeframe was
6   consistent with that.  It was really only after Microsoft said:
7   No, we're not going to engage in settling it.  You've given us
8   your number, but you want us to accept your number, and we're
9   not prepared to do that at that point.  What we later find out
10  is that that's when Quinn Emanuel was engaged.  And it was
11  after that point that suddenly, even though we've been told up
12  to this point, "We've got your primary.  We've got your
13  alternate positions," all of a sudden they're saying, "Here's a
14  bunch of additional information requests.  We still need more
15  information."  And now they come in and tell the Court, "Oh,
16  no, no, no.  We don't have a number, and we never got to a
17  number, and we need this information."  But the only time that
18  the request came was after Quinn Emanuel was engaged, and there
19  was a lot more activity.
20      So we think, you know, using your common sense,
21  circumstantial evidence -- granted, there's no one piece of
22  paper that says that we're right and that the IRS is wrong.
23  But we think all of the evidence supports exactly what we've
24  said, which is that they've had a number.  They've had a couple
25  of numbers, a primary number, a backup number.  And they've

USA v. Microsoft/Mundie, 11/6/15

 1   said that they're done with the APAC.  They have a number for

 2   that, and that it's actually over.

 3       But there's also some evidence to suggest that the

 4   summonses themselves, I would argue, suggest that this isn't

 5   about getting to the right number.  It's about getting a

 6   litigation advantage.  And I think you particularly see that

 7   with respect to the summons that's for Steve Balmer.  I mean,

 8   the Court has to ask itself, after eight years of auditing

 9   Microsoft -- now nine, but eight at that time -- why is it that

10   the exam team, in all of those eight years, with all the people

11   that they interviewed, never thought that Steve Balmer was an

12   important witness for them to talk to?  It's only after Quinn

13   Emanuel comes in, and we start down what appears to be an

14   entirely different path, which is preparing for litigation,

15   that Steve Balmer is suddenly a critical witness in this audit.

16       The Court may know and be familiar with the fact that it's

17   not unusual, in high-stakes litigation, for private law firms,

18   or people involved in high-stakes litigation, to try to put

19   pressure on their opponent by doing things like asking to

20   depose the CEO.  It certainly doesn't seem consistent with the

21   claim that they're still auditing and that they're still trying

22   to get to the right number.

23       But not only that, I think, also, the Court can look at

24   the documents themselves; again, contemporaneous document, done

25   before we got into this litigation, while the IRS thought

USA v. Microsoft/Mundie, 11/6/15

 1   nobody was looking.  And nobody was, frankly, at that time.
 2   What do they say about why they hired Quinn Emanuel?  You can
 3   see -- and this is a document that is in Exhibit 4 to the Rosen
 4   declaration on reply, I believe -- that they said that they're
 5   an outside expert needed to evaluate and help prepare the case
 6   in anticipation of litigation.  That's what Quinn Emanuel is
 7   about.  That's what the summonses are about.  It's about
 8   preparing for the litigation.  And that's an improper purpose,
 9   under the statute, and that's the reason why you shouldn't
10   enforce them.
11       One more point on this in terms of what the evidence
12   shows.  And that's that if you look at who they're actually
13   vetting -- and again, this is in Exhibit 4 to the Rosen
14   declaration on reply -- you'll find that in the IRS's funding
15   request package to get the funds to pay for Quinn Emanuel,
16   there's a market research survey.  And they're vetting five
17   other legal teams that the IRS is considering, and ultimately
18   rejected.  And all of those legal teams involved well-known
19   trial lawyers with courtroom expertise, not tax lawyers, not
20   people who have experience in transfer pricing.  They had David
21   Boise, a self-proclaimed Microsoft slayer; Ted Olson, from
22   Gibson Dunn; Ted Wells, from Paul Weiss; Evan Chesler, from
23   Cravath; and Sullivan & Cromwell.
24       What all of those lawyers shared, and what John Gordon and
25   John Quinn shared, is that they're trial lawyers.  And

USA v. Microsoft/Mundie, 11/6/15

1    that's -- just as you see in this document, Slide 16 -- is

2    exactly what this hiring of outside counsel was about.  It was

3    about in anticipating of litigation.  And these summonses are

4    about getting an advantage and -- in the tax court and

5    preparing the case for tax court.  And that's an improper

6    purpose.

7         So in summary, I would just say that on this point about

8    what the purpose is -- because, again, there's not one piece of

9    evidence that's going to tip the Court one way or another, but

10   I think it's the constellation of evidence that I've just laid

11   out for the Court.  But it's also the fact that in order to

12   believe the IRS's claim, that they really are still auditing,

13   and they really are just trying to get to the right number, you

14   have to believe that when they sat down with Microsoft, back in

15   2011, and, again, most importantly, in January of 2014, and

16   they said, "Here's our number.  We want you to pay it" -- you

17   have to believe that at that time, even though they said that,

18   that -- and they were willing to accept the number that they

19   gave to Microsoft -- that somehow that really wasn't the right

20   number, or that they were really trying to still get to the

21   right number.  And I think that just really stretches

22   credibility, to believe that that's what was happening, and

23   that it was still an open audit and an undetermined number.

24        I want to just shift for a minute and talk about kind of

25   our alternative argument, which is, you know, to be clear, we

USA v. Microsoft/Mundie, 11/6/15

1    think that the summonses were issued for an unlawful purpose

2    and to conduct pretrial discovery.  But even if you give the

3    IRS the benefit of the doubt, there really still is a problem.

4    And that's because if Quinn Emanuel is, in fact, conducting the

5    audit, that too is a statutory violation.

6         I can't remember if I put this slide back in here.

7         Again, if you go back to 7602, you can see that the

8    statute authorizes only the Secretary to examine any books,

9    papers, or records.  And as we've laid out for the Court in the

10   brief, "examine," in IRS parlance, means to audit, basically.

11   And that's what the statute says.  And really, it's not a

12   question as to whether that's what it means, because the IRS

13   concedes it as well.  If you look at Page 20 of their brief,

14   they say that the power to examine books and records is

15   inherently governmental.  That's the power to audit.

16             THE COURT:  Counsel, let me ask you this.

17             MS. EAKES:  Sure.

18             THE COURT:  Are you arguing that any third-party

19   contractors hired by the IRS would be unlawful?

20             MS. EAKES:  No.

21             THE COURT:  They can do that?

22             MS. EAKES:  Yes, they can.

23             THE COURT:  What makes hiring Quinn Emanuel different

24   than any other third-party contractor?

25             MS. EAKES:  Well, it depends on what role they're

1   playing, Your Honor.  And certainly, the IRS can hire outside

2   contractors to get help, and they do, on things like an outside

3   economist.  But there's a difference between having a

4   contractor that is helping you in the process of the audit and

5   someone who's actually stepping into your shoes, which is

6   what's happening here with Quinn Emanuel.

7          THE COURT:  All right.  Well, let me ask you this.

8      Looking at that section right there that you've got, and

9   you've got it on the screen, broken down into three separate

10  pieces; right?

11         MS. EAKES:  Right.

12         THE COURT:  Can a third-party contractor examine any

13  books, papers, records, or other data?

14         MS. EAKES:  Yes.  But they can do that under 6110 --

15  oh, 6103.  Sorry.  Thank goodness I have counsel who knows the

16  numbers better than I do.

17     And we cited that.  I didn't prepare a slide on it here.

18  But 6103 is specifically a statute where Congress said -- or

19  it -- the regulation that allows an outside contractor to

20  examine, meaning to get a copy of it, to look at, to receive

21  it.  So, you know, that 6103 is entirely different than what

22  you're talking about under 7602.  But that hopefully answers

23  the Court's question.  So if the IRS wants to go out and hire

24  an economist, give them copies of the taxpayer's information,

25  so long as they comply with 6103, they can do that, and it's

USA v. Microsoft/Mundie, 11/6/15

1    entirely proper.

2              THE COURT:  Here, can they do the same thing with

3    Quinn Emanuel, let them examine books, papers, records, or

4    other data of Microsoft?

5              MS. EAKES:  They can let them under -- well, if the

6    Court means "examine" in terms of conduct the audit, is what

7    we're saying, can they look at the documents as a contractor,

8    under 6103?  Yes, as long as, again, they comply with

9    everything under that statute.  But what they can't do is

10   examine, meaning they can't perform the audit themselves.

11   That's what we say they're doing.

12             THE COURT:  Can they suggest questions for the IRS to

13   ask?

14             MS. EAKES:  Yes, they can suggest questions.

15             THE COURT:  Can they be in the same room when that

16   examination is taking place?

17             MS. EAKES:  Yes.

18             THE COURT:  So --

19             MS. EAKES:  They just can't ask the questions.

20             THE COURT:  So if you've got a lawyer for the IRS,

21   right, that's one of the delegates of the Secretary in the

22   room, you've got Quinn Emanuel lawyers reviewing all the data,

23   all the documents, they're listening to the testimony, and

24   they've got a notepad, and they write down the questions, and

25   they hand it over to the IRS lawyer, then it would be fine?

USA v. Microsoft/Mundie, 11/6/15

```
 1          MS. EAKES:  Yes.  And let me explain why, because
 2   you're looking at me skeptically.
 3          And I think that the important difference, Your Honor, is
 4   that suggesting questions -- the important check there is that
 5   you still have the IRS lawyer there who is the person who has
 6   to exercise their discretion and judgment as to whether or not
 7   to ask that question.  And that's the difference between
 8   helping and suggesting.  I mean, they can write a question, and
 9   the IRS lawyer, who, again, has a different policy statement, a
10   different mission, that shares the view of what the agency's
11   vision and perception is, that person has to decide:  Do I ask
12   that question or not?  That's the exercise of judgment and
13   discretion that we're talking about here.
14          So, yes, they can sit in the room.  They can write the
15   questions.  But it's not a silly distinction.  It's the
16   difference between helping and the difference between doing.
17   And when you're doing, which is what they want Quinn Emanuel to
18   do here in this situation, under the temporary regulation,
19   you're no longer helping.  You're performing the functions in
20   violation of the statute.
21          So in terms of the issue of whether or not they're
22   participating in the -- or whether or not they're conducting
23   the audit, we think the evidence shows that Quinn Emanuel is
24   actually conducting the audit.  And the reason that we say that
25   is, again, if you look back at the contemporaneous documents,
```

1    and you look at the Quinn Emanuel contract -- and this is the

2    distinction that I'm talking about.  This is -- what's

3    described in the contract is precisely what the IRS has to do.

4    They have to perform a thorough initial factual, economic, and

5    legal assessment of the record and theory.  They're supporting

6    continued development, analysis, and evaluation.  They're

7    assisting with further factual development.  They're

8    identifying and preparing new document requests, and they're

9    preparing for participating in interviews, and they're

10   performing independent research.

11       All of those things are a description of what the IRS has

12   to do in order to perform an audit.  And so if you believe the

13   IRS that the audit is ongoing, the role that Quinn Emanuel is

14   playing in it is a violation of 7602(a)(1).  Because that means

15   that they're not helping with the audit, they're actually

16   performing the audit.

17       Now, we know that the IRS has said, "No, no, no.  They're

18   not doing that.  They're helping, and we're actually

19   supervising them."  But again, I think if you look at the

20   evidence, the contemporaneous evidence, the evidence that

21   happened before we came into court, what you see -- and this is

22   at the Rosen declaration, Exhibits P, Q, and R -- is that John

23   Quinn -- or excuse me -- John Gordon, who's attending these

24   interviews, he isn't being supervised by the IRS.  He's out on

25   his own.  He's representing, first of all, that he represents

```
1    the IRS, which is in direct violation of the law.  But he's
2    also unchecked in terms of the way that he's asking questions;
3    and again, the difference between a situation in which you're
4    helping and a situation in which you're actually performing the
5    tasks.
6        So if you conclude that the summonses weren't for the
7    purpose of preparing for trial, but instead that Quinn
8    Emanuel's conducting the audit, you still shouldn't enforce the
9    summonses, because doing so would result in a further violation
10   of 7602(a)(1), which is the provision about examining or
11   conducting the audit, which restricts the auditing itself to
12   the Secretary and to his employees.
13       And again, I think it's important to talk about the public
14   policy reasons behind that.  The agency's mission -- as we
15   talked about, the IRS's policy and their mission is not to just
16   push the edges of the law, and it's not to maximize the
17   collection for the IRS.  Instead, their mission statement is
18   that they're basically to find the right number, as you can see
19   from the policy statement.  And the reason that is is because
20   the law trusts that government employees, who have the right --
21   or the -- they follow the mandate of what Congress and the
22   government wants.  They trust them with finding the right
23   number, you know, kind of in the same way that you trust
24   prosecutors to be people who are tasked with doing justice, as
25   opposed to just winning.
```

USA v. Microsoft/Mundie, 11/6/15

```
 1          So let me talk for just a minute about our statute of
 2   limitations argument.  Now, Microsoft's position is that the
 3   summonses were the result of the IRS asking and obtaining
 4   statute of limitations extensions from Microsoft, while they
 5   were hiding the fact that they were engaging Quinn Emanuel.
 6   And the IRS's response is, "Hey, the statute of limitations
 7   issues aren't relevant here."  And they think that the law
 8   supports them on that.  And I'd just suggest to the Court that
 9   the IRS really kind of misses Microsoft's point with respect to
10   the statute of limitations, because our point is more
11   fundamental than that.
12          Your Honor, as a starting point, you have to remember that
13   our tax system is largely a voluntary system.  And what I mean
14   by that is that we expect people to determine what their taxes
15   are and to pay it, to report their income properly, and to
16   properly calculate it, and to pay the money that they owe.  You
17   know, said another way, our system is not based on -- most of
18   the taxes don't come in as a result of enforcement.  They come
19   in as a result of voluntary actions by taxpayers.
20          Because it's a voluntary system, Congress understands that
21   there has to be a certain level of trust and respect between
22   taxpayers and the agency.  And you can see that in the letter
23   that we provided to you from Senator Orrin Hatch to the IRS,
24   where he talks about the fact that it's -- the tax system is
25   based on voluntary compliance, and the integrity of the tax
```

USA v. Microsoft/Mundie, 11/6/15

```
 1   administration process and protection of taxpayer rights is of
 2   paramount importance.  It goes on to say, "To those ends,
 3   Congress put in place specific restrictions on government
 4   action in the examination process.  One such restriction is the
 5   requirement that only Treasury officials carry out certain
 6   examination functions, such as taking sworn testimony from
 7   taxpayers."
 8        And he makes the policy point that I keep talking about,
 9   which is that unlike private contractors, the Treasury
10   Department officials are required to swear an oath to the
11   Constitution, and are subject to rules of conduct and federal
12   law regulating their interactions with taxpayers.  It's one of
13   the core reasons, he says, that Congress limited these certain
14   functions to people who are accountable within the government.
15        This principle, that we hold our public servants to a
16   higher standard, is not just something that Senator Hatch says,
17   but something that you also see in the case law.  That's what
18   the ESM and the Deak-Perera case are about, is that they
19   support the same policy, which is that regulatory actions, our
20   citizens are owed a higher duty of candor from our public
21   employees.
22        It's really uncontested here that the IRS was not
23   transparent with Microsoft when they were asking for these
24   statute of limitations extensions.  They don't contest that
25   they got the extensions without telling Microsoft about what
```

USA v. Microsoft/Mundie, 11/6/15

1    they were doing with Quinn Emanuel.  But that's not really --

2    that's not the only deception that the IRS engaged in.

3            THE COURT:  Well, before we move from that one, I

4    just want to make sure.

5        You're not telling me that there's some law, rule, or

6    regulation that would have required the IRS to disclose its

7    plan to use Quinn Emanuel; right?

8            MS. EAKES:  No, I'm not.

9            THE COURT:  All right.  So you keep saying that they

10   kept hiding the ball.  That goes towards, again, constituting

11   bad faith on their part?

12           MS. EAKES:  I would say -- I don't even know that you

13   have to phrase it as bad faith, Your Honor.  I guess our point

14   is that, you know, what the case law recognizes, what the

15   courts require, is just a higher level of candor.  So while

16   they might not technically have a duty to tell Microsoft what's

17   happening and that they've hired Quinn Emanuel, the fact that

18   they didn't tell them is definitely contrary to what the cases

19   recognize in terms of a duty of candor towards citizens or

20   taxpayers, and specifically with the IRS.  The --

21           THE COURT:  How do you say that's equivalent to what

22   happened in *Deak-Perera*?

23           MS. EAKES:  Well, certainly, that case was something

24   more, one would say -- could be considered to be more

25   outrageous conduct.  But I think that, you know, you have to

USA v. Microsoft/Mundie, 11/6/15

1    take the IRS's behavior, not just about the statute of

2    limitations, but you have to combine it with some other things

3    that they've done that I think illustrate the attitude that was

4    there.

5        And that specifically is the fact that, you know, they not

6    only don't tell them at the point they get the statute of

7    limitations, but then even after they continue to not be

8    transparent with Microsoft about what's happening.  When they

9    finally disclose the fact that they've hired Quinn Emanuel, and

10   Mr. Bernard asks, you know, "Do you have an engagement letter?"

11   Their response is, "No, we don't have an engagement letter,"

12   which Mr. Hoory tried to explain to the Court.  But his

13   response was really just, "Well, they're sophisticated.  They

14   know the difference between an engagement letter and a

15   contract.  And they didn't ask for the right thing, and so I

16   didn't tell them."  And I think that, you know, you combine

17   that -- and they asked, you know, "Give us the whole contract.

18   We went out and found there's a contract.  Give us the entire

19   contract."  And instead, they only get a portion of it that

20   doesn't really represent all of what Quinn Emanuel was doing.

21       Now, those things happened, of course, after the statute

22   of limitations request.  But I think that, you know, the point

23   that we're making is that all of that conduct together is

24   troubling.  And it should trouble this court that as government

25   employees, who have this higher duty of candor, that they

USA v. Microsoft/Mundie, 11/6/15

1  weren't candid with Microsoft about what was going on.  And,

2  you know, the law supports the idea that the Court has

3  discretion and authority, in that situation, to decide that

4  you're not going to enforce the summonses because of the

5  behavior of the IRS, in this situation, and not being

6  transparent in the way that we argue that they should have

7  been, even understanding that they didn't have -- that there

8  may not be a technical requirement that they have told.

9       Unless the Court has any other questions on that issue,

10  I'm going to move on to the final issue, which is, I want to

11  talk about our argument with respect to legal advice, which is

12  that our position is that if the Court enforces these

13  summonses, it's going to continue a violation of 7803(b).  And

14  under that law, the Chief Counsel has been vested with the

15  exclusive authority to provide legal advice to the IRS, and to

16  delegate that authority to his employees, whom by statute only

17  report to him.

18       And there are unique and important reasons why the IRS

19  should only get its legal advice from the Chief Counsel, and

20  not from outside lawyers.  First of all, they can't be hired or

21  fired by the IRS.  They're accountable to the Chief Counsel,

22  who reports indirectly to the President.  And importantly, the

23  Chief Counsel doesn't report to the IRS audit team.  They

24  report to the Chief Counsel, who reports to the executive

25  branch.  And there's no question here that the IRS is getting

USA v. Microsoft/Mundie, 11/6/15

1     legal advice from Quinn Emanuel, and not from the Chief

2     Counsel.

3          Sorry.  Lost track of my slides there, Your Honor.  I

4     apologize.

5          You know, like I said, there's no question that they are

6     receiving advice from Quinn Emanuel.  They admitted in their

7     response pleadings, and their contract with Quinn Emanuel, at

8     Page 7, tells them that they are asking Quinn Emanuel to give

9     their legal assessment of the case and their recommendation.

10         And so you might ask, why does it matter where the IRS

11    gets its legal advice from?  And it matters for the same policy

12    reasons that I mentioned before, which are accountability and

13    sharing the same public vision.  If you look at the mission

14    statement of Chief Counsel, you see from this slide that their

15    obligations are that they're required to serve the American

16    taxpayers fairly and with integrity.  They're told that their

17    mission is that they're to provide an impartial interpretation

18    of the IRS laws; and that the reason that they're to interpret

19    the laws impartially is so that taxpayers will have confidence

20    that the tax law is being applied with integrity and fairness.

21    And that's important.  That's a unique feature -- or a unique

22    direction that had been given to the Chief Counsel on behalf of

23    the IRS, who are the exclusive legal adviser to the IRS.

24         And if you contrast that, again, with Quinn Emanuel's

25    statement about who they are, that they think there's a winner

USA v. Microsoft/Mundie, 11/6/15

1   and a loser, and that they know how to win; and that's very

2   different than what the Chief Counsel mission is.  And to be

3   fair, I mean, Quinn Emanuel probably isn't any different than

4   any other private law firm that serves clients and wants to get

5   the best results, and money is involved, of course wants to get

6   either the maximum for their client, or have their client pay

7   the least amount of money.  And while they might be serving the

8   IRS as a client, they have other clients as well.  And those

9   clients may have goals that are inconsistent with the mission

10  of the IRS.

11       And that's really the concern here about the IRS getting

12  legal advice from Quinn Emanuel, as opposed to following the

13  statutory setup, which is supposed to be that they receive all

14  of their legal advice from the Chief Counsel.  It's a very

15  different attitude that Quinn Emanuel has than the mission that

16  you see for the Chief Counsel.  And I analogize it to this,

17  which is, you know, like the Washington state prosecutor, under

18  the RPCs, we know that the prosecutors have the responsibility

19  to be ministers of justice; that it's not simply about being an

20  advocate.  And said another way, the prosecutor's obligation,

21  as you know, is to do justice.  It's not to win.  And of course

22  our prosecutors listen to their victims, and they listen to the

23  law enforcement officers that they're working with and the

24  agencies who have investigated cases.  But in the end, the way

25  the prosecutor exercises their discretion and their judgment is

USA v. Microsoft/Mundie, 11/6/15

1    to make sure that justice has been done, even if that means

2    that they didn't win.  And that's really the structure that

3    Congress has set up in a very similar way for the IRS.  The

4    mandate is to be impartial, not just to maximize the results.

5    And we want our taxpayers to have confidence in the integrity

6    of the system, and that's why it's been set up that way.

7        You can also see that view that Congress has about how the

8    Chief Counsel or the IRS's lawyers are supposed to behave by

9    another statute, which is that they -- 6110(i), which in that

10   statute Congress has said that the advice that Chief Counsel

11   gives to the IRS actually becomes public.  That's a code

12   provision that provides it.  So it's not a situation in which

13   most of the time, in private practice, your advice that you

14   give to clients would never be disclosed.  But Congress has

15   said, specifically with the IRS and the Chief Counsel, that

16   advice, when they give formal advice, it's going to be public.

17   And that's an important public policy concern.

18       And so the problems that exist with the IRS getting their

19   legal advice from Quinn Emanuel, as opposed to getting it from

20   the Chief Counsel, are three things.  It violates the statute,

21   61 -- or excuse me -- the statutes that set up that Chief

22   Counsel is the exclusive legal adviser to the IRS.  It bypasses

23   the regime under 6110, which is to make the advice public,

24   because Quinn Emanuel's advice isn't going to be public.  And

25   most importantly, it eliminates the concept of accountability

USA v. Microsoft/Mundie, 11/6/15

1    that the *U.S. Telecom* case talks about, and what Congress

2    intended when it set up the statutory scheme.

3        So our concern is that if the summonses are enforced, the

4    summoned documents and the testimony is going to be used by

5    Quinn Emanuel to continue to provide legal advice and violate

6    the statute; and so, therefore, enforcing the summonses would

7    be an abuse of this court's process.

8        So I just kind of want to quickly recap our position.  And

9    I've put this up on the board that -- what our arguments are.

10       With respect to the testimonial summonses, the IRS -- or

11   excuse me -- Microsoft believes that they're unenforceable,

12   because they would cause a violation of 7602(a)(3), which

13   restricts the taking of testimony to the Secretary and their

14   defined delegates.  In addition, we believe that all of the

15   summonses are unenforceable, because the purposes of the

16   summonses was improper.  It was to prepare for litigation, as

17   opposed to the statutory reasons why the IRS can use a

18   designated summons.  Secondly, that enforcing it would further

19   a violation of 7602(a)(1), which restricts the auditing to IRS

20   and the Secretary and the defined delegates.  And third, that

21   the summonses resulted from the improper extension of --

22   improper gaining of the statute of limitations extensions.  And

23   fourth, that enforcing the summonses would result in a further

24   violation of 7803(b), which provides for where the IRS can get

25   the legal advice from.

USA v. Microsoft/Mundie, 11/6/15

1      Now, as I said at the outset, the IRS wants to take a
2    trailblazing approach.  And we're not saying that they can't do
3    that.  But when they -- the trailblazing approach involves
4    delegation of governmental power, the law requires the IRS to
5    ask Congress for permission to do that.  That principle is
6    built into 7602, as I've said, that authorizes only the
7    Secretary or his delegates to take testimony and to conduct
8    audits.  And it's built in the concept of 7803, which only
9    allows Chief Counsel to give legal advice.
10      But Microsoft isn't the only one who's concerned about
11   what the IRS is doing in terms of involving contractors in
12   audit functions.  We know that the Senate Finance Committee is
13   concerned about it and -- from the letter that you have from
14   Senator Hatch.  And, you know, just this week we know that
15   other taxpayers are concerned as well.  The media was reporting
16   that taxpayers believe that a ruling for the IRS in this case
17   is going to open the floodgates to contractors meddling in
18   internal revenue functions.  In contrast, refusing to enforce
19   the summonses here, and ruling for Microsoft, would really
20   leave the status quo intact.
21      The concerns that Microsoft has been talking about I think
22   are best summed up in this quote from the *U.S. Telecom* case
23   that I've put on the screen.  And it says that, "When an agency
24   delegates authority to its subordinate, responsibility, and
25   thus accountability, remain with the federal agency.  But when

USA v. Microsoft/Mundie, 11/6/15

```
 1    an agency delegates power to outside parties, lines of
 2    accountability may blur, undermining an important democratic
 3    check on government decision-making.  Also, delegation to
 4    outside entities increases the risk that these parties will not
 5    share the agency's national vision and perspective, and thus
 6    may pursue goals inconsistent with those of the agency and the
 7    underlying statutory scheme."  And that's really at the heart
 8    of what Microsoft is concerned about with the IRS's conduct in
 9    this case.
10         Again, we're not saying that the IRS can't evolve and take
11    novel approaches.  But when congressional approval is needed,
12    as it is here, they need to seek it.  And here they didn't seek
13    Congress's approval.  They didn't even get the necessary public
14    input through notice and comment and rule-making.  Instead,
15    they engaged in what we consider to be a secretive and private
16    process, and now they're asking the Court to give what they've
17    done a stamp of approval.  We don't think that the law allows
18    the IRS to involve contractors in this way, and that's why
19    we're asking the Court to deny the enforcement of the
20    summonses.
21         And unless the Court has any questions, I'll sit down.
22              THE COURT:  Ms. Eakes, thank you very, very much.
23              MS. EAKES:  Thank you.
24              THE COURT:  Mr. Weaver, it's my understanding you'll
25    be the one arguing on behalf of the IRS?
```

USA v. Microsoft/Mundie, 11/6/15

```
 1              MR. WEAVER:  Yes, Your Honor.

 2              THE COURT:  Let's take 15 minutes for our court

 3   reporter, and we'll come back for your presentation.

 4                          (Recess)

 5              THE COURT:  All right.  Counsel, we're back in

 6   session.

 7          Mr. Weaver?

 8              MR. WEAVER:  Yes, Your Honor.

 9              THE COURT:  Mr. Weaver, let me ask you something.

10        At the very outset, I indicated that I wanted the parties

11   to break this down to its component parts.  It helps me

12   conceptualize it all a little better.

13        Ms. Eakes made a very impassioned argument on behalf of

14   her client, pointing out all of the reasons why the IRS hiring

15   Quinn Emanuel to do -- to perform the duties that they've been

16   asked to perform here is bad policy.

17        Is that what I'm looking at today?  Am I supposed to

18   decide whether it's good policy or bad policy?

19              MR. WEAVER:  No, Your Honor, it's not.  And that's

20   one of the things I want to touch on.  There are really three

21   overarching things that I want to emphasize this morning for

22   you.  That's certainly one of them.

23        This is not an audit oversight proceeding.  This is an

24   armchair quarterbacking about how the IRS conducts its audit.

25   So complaints about the length of the audit, complaints about
```

1    the choice of contractors, looking to internal policies, that
2    is inapposite to a summons enforcement proceeding.  And I'll
3    talk about the Chief Counsel statute before I finish.
4         Even looking to that, that doesn't -- that statute, even
5    if the IRS were violating it -- and they're not, because the
6    statute doesn't say that the Chief Counsel is the exclusive
7    attorney for the IRS.  It says it's the attorney.  And I'll
8    explain that later.  But that doesn't give them a right of
9    action, to try to have a summons not enforced by the Court.
10        So that's one of the things I wanted to make sure I
11   emphasized, is that this is, in fact, not an audit oversight
12   proceeding.  In the briefing, they refer to things like
13   priority court guidance plans and internal revenue policies,
14   internal revenue manual.  None of that gives them a right of
15   action to come in and demand that the Court do something about
16   it.
17        Another thing that I want to emphasize, just an
18   overarching theme, is that they have framed the argument --
19   Microsoft has framed the argument, the overall argument, of why
20   we're here incorrectly.  In its reply, Microsoft starts off
21   saying the following.  "The IRS agrees that the summonses are
22   unenforceable if the IRS issued them for an improper purpose,
23   or if enforcing them would otherwise abuse this court's
24   process."  That's wrong.  That's not even the Ninth Circuit
25   precedent, and we certainly didn't say that.

1          What the Ninth Circuit has said is that even the

2    coexistence of an improper purpose would not prevent

3    enforcement of the summons if the existence of a legitimate

4    purpose was not rebutted by the taxpayer.  So that's the

5    standard, Your Honor.  If we have a legitimate purpose, then

6    the summonses should be enforced.  And I'm going to talk a

7    little bit more later on about the cases that are cited below,

8    the Ninth Circuit binding precedent of *Stuckey*.

9          The third thing that I want to just emphasize at the

10   outset is that Microsoft has pieced together things from the

11   record that it could find and speculated about a story that

12   isn't actually true.  And the case law in the Ninth Circuit is

13   very clear; that Microsoft, or any taxpayer seeking to not have

14   a summons enforced, carries a heavy burden of disproving the

15   actual existence of a valid civil tax determination purpose.

16   That's the *Jose* case in the Ninth Circuit.

17         So what we've seen over time in this case is a series of

18   speculation that's been proven inaccurate.  It was originally

19   proposed that the regulation at issue here, one of the things

20   at issue, was created for the Microsoft audit.  That has been

21   demonstrably shown not to be the case.  Originally, I believe

22   there was some suggestion that the IDR requests, from which the

23   summonses flow eventually, that they were crafted with input

24   from Quinn Emanuel.  That turned out not to be correct.  There

25   was a suggestion during the evidentiary hearing that there was

USA v. Microsoft/Mundie, 11/6/15

1   some sort of secret deal, with Quinn Emanuel, to front load its
2   2 million-dollar contract, so that when it later, if it went to
3   trial somehow, they would be compensated up front.  That's
4   incorrect either.  In fact, we will take a look at some
5   documents today along that line.  And in the last round of
6   briefing, Microsoft compared the Boies and the Quinn Emanuel
7   contract and said:  Ah-ha, the Boies contract is different.
8   It's smaller.  It only has to do with case evaluation.
9   Therefore, the Quinn Emanuel contract, which includes case
10  assistance, that must be evidence of improper purpose, of going
11  to litigation.
12      Well, the facts are, and we've put it in the record
13  through Mr. Hoory's declaration -- the facts are that the Boies
14  contract was smaller, not because the IRS wanted it to be
15  smaller at the time, but because that's what they could get in
16  the budget process during that fiscal year.  The Boies contract
17  preceded the Quinn Emanuel contract and was approved in the
18  preceding fiscal year.  So all of this speculation does not
19  meet the heavy burden that Microsoft has, to cause the Court to
20  not enforce the summonses.
21      Now, let me just step back a second.  We're here about
22  enforcing summonses that go to one of the largest audits in the
23  IRS's history.  Billions of dollars are at issue.  You heard
24  Mr. Hoory talk about how the IRS wanted to redouble its efforts
25  and take a different approach in light of Microsoft's protest,

1   which accused the IRS work to that point of being arbitrary and

2   capricious, and in light of the tax court case, *Veritas*, which

3   had criticized an exam of a transfer pricing case, saying that

4   that exam had been arbitrary and capricious.

5        So there is a reason why the IRS is trying to bring

6   resources to this case.  It's an extremely sizable case.  Not

7   only that, but it involves an arcane tax avoidance strategy.

8   Now, it may be appropriate.  It may not be.  That's not why

9   we're here.  But it is certainly, beyond question, an arcane

10  tax avoidance scheme that most Americans can't take advantage

11  of.  Because most small businesses can't go out and hire

12  international tax accounting experts.  They can't set up

13  offshore affiliates.  They can't design purported cost-sharing

14  arrangements to shift profits overseas, and then have much of

15  their sales, under that cost-sharing arrangement, actually

16  occur in the United States, what Mr. Hoory referred to as a

17  round trip.

18       It's a transaction that deserves -- the Americas

19  transaction deserves a lot of scrutiny.  Because in the United

20  States, as Ms. Eakes mentioned, we have a voluntary tax system.

21  And it only works if people who pay taxes have confidence that

22  folks who may be pushing the envelope, or may be taking

23  advantage of legal loopholes, for that matter, are scrutinized,

24  so that everyone has the sense that the tax system is fair.  In

25  fact, one of the transactions that we're looking at was

USA v. Microsoft/Mundie, 11/6/15

1    investigated by a Senate subcommittee.  And we have provided a

2    link in our brief to that subcommittee report.

3         So what I want to just communicate is, the IRS, to do its

4    job, should be looking for every resource that is available to

5    it, and here that includes hiring out expertise that it needed.

6              THE COURT:  Counsel, let me ask you a question.

7         Do you agree with Ms. Eakes that at one point in time the

8    IRS had come up with a specific number for this audit?

9              MR. WEAVER:  No.  That is absolutely not the case.

10             THE COURT:  You would agree with me that if they had,

11   and presented that number, then everything else could very well

12   be for an improper purpose, then?

13             MR. WEAVER:  No.  That's not the standard in the

14   Ninth Circuit.  So let me explain.

15        In 2011, the IRS proposed adjustments with a 30-day

16   letter.  So that is not a final determination that would

17   preclude the IRS from seeking additional information.  The 2014

18   presentation that Microsoft refers to, that -- as Mr. Hoory

19   states in his declaration, and I think he also said things to

20   the same effect during his testimony, that you could see it

21   here -- was a preliminary set of numbers to trigger a

22   discussion towards resolution.  Because by that time, it was

23   pretty clear that Microsoft was using these projections that

24   were way, way different than, for example, if you went out and

25   you looked in their SEC report, in terms of growth rates and so

USA v. Microsoft/Mundie, 11/6/15

1    forth.

2         So it's very clear from Mr. Hoory's declaration that there

3    never were any final numbers with respect to the Americas

4    transaction.  In fact, although we didn't have space to include

5    it in our brief, one of the paragraphs in Mr. Hoory's

6    declaration talks about the spreadsheets that were provided to

7    Microsoft four days before the meeting.  And those spreadsheets

8    have a legend on them saying, "This is preliminary."  Not only

9    that, but they have confused a method, a methodology -- which I

10   don't want to focus much on today, the discounted cash flow

11   method; it's a means of valuing something -- with a number.

12        So, yes, the IRS has said:  The DCF position is our

13   primary position.  And this residual profit split method, that

14   they wanted to look at so they didn't get accused of being

15   arbitrary and capricious, we're looking at that too.  But both

16   of those methods changed -- for among other reasons, the

17   Americas transaction involves transfer pricing, payments going

18   offshore to Puerto Rico for supposedly the software -- or the

19   allocable profit that's allocable in the software that was

20   transferred.  The transfer pricing had not been scrutinized in

21   terms of utilizing or reformulating assumptions by the first

22   expert, Heimert.  He just used what Microsoft had used.  So all

23   the numbers were going to change, and Mr. Hoory made that very

24   clear.

25        So I don't want to overdo it, but, no way.  The numbers

USA v. Microsoft/Mundie, 11/6/15

1    were not final anyway.  But what I really want to emphasize is,

2    take a look at the Ninth Circuit *Richey* case.  That's in our

3    brief, under the part that deals with summonses.  And in that

4    case, a taxpayer actually reached a closing agreement with the

5    IRS.  "We're done.  We agree.  We signed on the dotted line."

6    And yet, the IRS, who had issued a summons a few weeks or

7    months before, was able to enforce that summons on the theory

8    that just because -- even if you issue a stat notice, a notice

9    of deficiency, that is not a determination that would preclude

10   you from seeking more information if you feel you still need

11   more information to get to the right number.

12       And I guess I would wrap this part of my answer up by

13   saying, if you look at the designated summons, and then you go

14   back and you look at Mr. Hoory's Exhibit 1 to his current

15   declaration, which was the declaration submitted earlier, much

16   earlier in the proceeding, and you get to something like

17   Paragraph 34, you're going to see a mantra after almost every

18   single request that he's identifying:  We need this information

19   to get to the relative value between things Microsoft

20   transferred offshore, software technology, and things that

21   Microsoft retained.

22       And that's important, because how you divide these two big

23   things, and then how you weigh them, determines how much money

24   can go offshore.  So if the technology is worth a lot, then a

25   lot of money flows offshore.  But, on the other hand, if the

1    name brand and customer relationships are worth a lot, then not

2    so much money flows offshore.  And Mr. Hoory has been -- along

3    with the IRS -- has been trying to get at that.  And it's a

4    difficult thing to do.  And if you have questions, I'll be

5    happy to address those.  I can come back to that.  But it is a

6    highly complex analysis, and it is in process.

7        And then finally, let's talk about the APAC, the other

8    transaction here at issue.  If you look at Mr. Hoory's

9    declaration, he had conversations with Microsoft, in

10   December 2013, and made clear that they were not in a place to

11   make a presentation even, under that transaction.  In fact,

12   there were outstanding IDRs, at that point, that needed to be

13   answered before they would be ready to do anything.  And

14   Microsoft has never had a presentation on APAC.  So to say that

15   they're done on the APAC transaction, there's just no evidence

16   in the record whatsoever for that.

17       Let me propose -- if I can operate this PowerPoint -- a

18   framework, Your Honor, for how might be a good way to go about

19   analyzing this case.  Because a lot has gotten jumbled up.  And

20   after I'm done with this slide, I am going to go to the

21   statute, because Ms. Eakes spent a lot of time on the statute.

22   And it's a legal issue I want to make sure I address.

23       But in terms of the analysis of how this case should be

24   decided, the summons enforcement case, the first question is,

25   is there a legitimate purpose -- a legitimate purpose -- for

USA v. Microsoft/Mundie, 11/6/15

1    seeking information about APAC?  If the answer is yes, we're

2    done.  We're done except for potentially, maybe, for how the

3    interviews are conducted in terms of -- from what Ms. Eakes

4    said, Microsoft wouldn't care if Quinn Emanuel did anything

5    other than open its mouth.

6        Next question, does the IRS have a legitimate purpose -- a

7    legitimate purpose -- for seeking documents regarding the

8    Americas transaction?  If the answer is yes, then we're done on

9    that.

10           THE COURT:  Let me clarify something.

11           MR. WEAVER:  Yes.

12           THE COURT:  You're not arguing to me that preparing

13   for litigation is -- would be a legitimate purpose?

14           MR. WEAVER:  Actually, I'm going to make a

15   distinction.  Even if -- the case law will show, and I will hit

16   on this.  But the Southern District of New York *PAA Management*

17   case, there were actually two district court cases for *PAA*

18   *Management*, one in the Northern District of Illinois, and

19   another in the Southern District of New York.  And the one in

20   the Southern District of New York went up to the Second

21   Circuit.  And we cited to both the Southern District of New

22   York and the Second Circuit.

23       And in that case, the district court judge has pretty much

24   figured out that the IRS was preparing for litigation, because

25   the auditor, as I recall, basically said something to that --

USA v. Microsoft/Mundie, 11/6/15

```
1    to -- "I'm done."  And the summonses had been issued just a few
2    weeks or maybe a few days before the statute of limitations
3    ran.  So, I mean, all the inferences were there, that this is
4    to prepare for litigation.
5         But what the Court figured out -- and the summonses were
6    enforced -- the Court figured out is, the IRS was in a world of
7    hurt.  Even though that audit had not been effected very well,
8    and had dragged on, and had been muddled up, actually, I think
9    one of the courts concluded, it was clear that ultimately the
10   IRS had just said:  Okay.  We're going to write off -- we're
11   going to disallow a hundred percent of whatever it was at issue
12   in that case.  It was a partnership case.  And the Court
13   figured out:  Gee, the IRS is going into court, tax court,
14   having disallowed a hundred percent of something.  It hasn't
15   done its job.  It doesn't have a supportable case.  And so it
16   was perfectly fine, even in that instance, where clearly they
17   were preparing for tax court, to try to fix their audit to try
18   to get to the right number.  So as long as you're trying to get
19   to the right number, and you've issued a summons before the tax
20   court proceeding starts, it's permissible.
21        Now, just to finish up on the analytic framework here --
22   okay.  Now we're talking about interviews.  Really, it's the
23   same analysis.  But then underneath that, since the IRS has
24   indicated it plans to have Quinn Emanuel participate fully in
25   the interviews, then the question is, does the statute, the
```

USA v. Microsoft/Mundie, 11/6/15

```
 1   summons statute, 7602, permit 6103(n) contractors -- and just
 2   let me emphasize, before I forget this, 6103 is not about
 3   examining books and records.  6103 is a confidentiality
 4   statute.  It's a really long section of code.  But the idea
 5   behind that section of code is, if you look at taxpayer
 6   information, taxpayer return or return information, you can't
 7   start disclosing that to folks.  You have to keep it
 8   confidential.  And there's civil and criminal penalties that
 9   inure if you don't do that.  And IRS attorneys, DOJ attorneys
10   that work on tax cases, we're all bound by these provisions,
11   and so are contractors.  But it has nothing to do with
12   documents versus testimony.  Whatever.  It can be testimony.
13   It can be documents.  6103 says, "Contractor, you have to keep
14   this confidential."
15       But anyway, to finish with the slide, the next question
16   is, does the statute permit it?  And I'm going to argue that if
17   the statute permits what the IRS is proposing to do here, you
18   never need to reach the regulation.  The regulation clarifies
19   the statute, and it puts everyone on notice about what the IRS
20   is planning to do in complicated audits.  Because remember, as
21   Mr. Hoory testified, this regulation had its genesis in a case
22   that was being managed or associated with another colleague in
23   his office by the name of Tom Ralph.  And so, you know, the reg
24   is there to put everyone on notice, and it certainly clarifies
25   what the statute is about.
```

USA v. Microsoft/Mundie, 11/6/15

1      But Your Honor doesn't even need to reach the reg, not

2  because 7602 prohibits what we're planning to do, or seeking to

3  do, but to the contrary, because 7602 permits it.  And that is

4  where I want to turn to next.  So I'm going to go to that

5  section of my argument here.

6      So Section 7602 is an empowering statute.  It empowers the

7  IRS to investigate civil and criminal tax matters.  It's an

8  expansive information-gathering statute, according to the

9  Supreme Court.  It's about scope of authority.  It's not about

10  limits.  And let me just -- if I can operate this -- pull up

11  the statute for a second.

12      Now, Microsoft had the statute up.  I want to emphasize

13  something slightly different here.  The statute is about

14  authority, authority to summons.  And the Secretary is

15  authorized.  What the Secretary is authorized to do are three

16  things:  To examine books and records.  That's (a)(1).  To

17  summon the person.  But then if you keep reading, "to appear."

18  And to do what?  Produce books, papers, and records, and to

19  give testimony.  And then three is to take testimony, which,

20  you know, I'll show you the Court's Ninth Circuit authority for

21  this in a minute.

22      Items 1 and 3 can happen outside of the summons process.

23  In fact, part three here is what took place in September and

24  October of 2014.  Item 1 can happen either informally, through

25  IDR requests or whatever, or through the summons process in

USA v. Microsoft/Mundie, 11/6/15

```
 1    (a)(2).  But I want to emphasize this statute is about
 2    authority.  And I also want to emphasize that we're not
 3    operating in a vacuum here.
 4        I think one of the key cases that we want to refer the
 5    Court to is the Supreme Court case of Euge v. The United
 6    States.  And that case talks about a formidable line of
 7    precedent construing congressional intent to uphold the
 8    enforcement authority of the Service, if such authority is
 9    necessary for the effective enforcement of revenue laws and is
10    not undercut by contrary legislative purposes.
11        Now, Euge gives several examples.  I want to just talk
12    about a few to illustrate how 7602, the summons statute, is an
13    empowering statute that has been construed broadly to permit
14    the IRS to do what it seeks to do, subject to the limits of
15    law.
16        In the seminal case of The United States v. Powell, the
17    issue there was probable cause and whether the IRS needed to
18    demonstrate probable cause for an audit that was occurring
19    after the normal statute of limitations had run, and was based
20    on a theory of fraud.  Did the IRS have to come up with some
21    evidence of fraud?  The Supreme Court says, no, you don't have
22    to meet some sort of probable cause standard.  Mere suspicion
23    is enough.
24        Let's move forward.  There was -- the statute has been
25    clarified by Congress since.  But there was some concern about
```

USA v. Microsoft/Mundie, 11/6/15

1   whether or not the summons authority would authorize criminal

2   investigations.  And it could have gone either way, but the

3   Supreme Court read the statute expansively in *Donaldson* and

4   later in *LaSalle*.

5       In the case of *Bisceglia*, there was a question about

6   whether the IRS could do something called a John Doe summons,

7   which is, there's no particular individual named, but -- you

8   know, let's say you've summoned information from a bank.  And

9   again, the Supreme Court construed the statute broadly.

10      And finally, *Euge* itself was about handwriting exemplars.

11  You'll not find anything in 7602(a)(1), (2), or (3) about

12  producing handwriting exemplars, but the statute was construed

13  broadly.

14      The principle here -- back to *Euge* -- is that if the

15  summons is necessary for the effective performance of the IRS's

16  responsibilities, "That authority should be upheld absent

17  express statutory prohibition or substantial countervailing

18  policies."  Well, let's talk about that for a minute.  Where is

19  the express statutory prohibition?  There is none.  We're going

20  to look at 7602(a) closely.  But that statute, unlike what

21  Ms. Eakes says, doesn't say "only the Secretary."  It says,

22  "The Secretary is authorized."  It does not speak to whether

23  certain aspects of those tasks can be farmed out or contracted

24  out.  In fact, Microsoft, I don't believe, has a problem with

25  farming out (a)(1), examining books and records.  So there is

USA v. Microsoft/Mundie, 11/6/15

1   no statutory prohibition to preclude the IRS from farming out

2   certain aspects of its summons process.  There is one that we

3   will talk about in a minute, but Microsoft does not identify

4   any.

5        Now, I also want to -- and that's -- let me move on.

6        I also want to talk about the history of this statute.

7   The summons statutes -- and this is from the *LaSalle* case --

8   have their genesis back in the Civil War era.  And for a long

9   time, there were separate summons statutes for assessment

10  versus collection.  And then in the 1954 code, we basically

11  have what we have now in 7602(a), with minor tweaks.  And it

12  essentially consolidated Sections 3614, which was an assessment

13  statute, and then collections statutes, 3615 and 3654.  And the

14  legislative history, to the extent there is, as recounted by

15  *LaSalle*, purported not to make any substantive changes.

16       But let me point this out, Your Honor.  If you look at

17  3615, the predecessor statute, it has in that statute a

18  subsection for how you're going to serve the summons and

19  another subsection about how you're going to enforce the

20  summons.  Those sections got split out of the old statute and

21  are now in different sections, 7603 and 7604, in the current

22  statutory regime.  So basically, what I'm saying is, there is

23  no procedural aspect anymore to 7602.  It's an empowering,

24  authorizing statute.

25       Moreover, because there were previously two collections

USA v. Microsoft/Mundie, 11/6/15

1    statutes that talked about -- as does the current statute,

2    talks about, if you look at the title here, "Examination of

3    Books and Witnesses" -- there is no way that under (a)(1), when

4    it talks about examining books and papers, that is not a

5    reference to a general audit.  Because the same -- not the same

6    language, but the same title or similar title appears in the

7    collections statutes.  What examining books and records and

8    papers means is exactly what it says, inspecting books and

9    records and papers.  So when they argue that somehow (a)(1) has

10   a different meaning, that doesn't comport with the statutory

11   history.

12        Finally, let me go back to my PowerPoint here.

13        We have cited to a Tenth Circuit case that specifically

14   says that the 7602 statute does not establish procedures by

15   which the authority granted to the IRS may be exercised.  There

16   are many other statutes in the code that do talk about

17   procedures.  7603 is service.  7609, third party summonses.

18   7611, audits of churches.  There's special restrictions on

19   that.  7612, computer software.  7521, reporting taxpayer

20   interviews.  7602 is not about procedure.

21        Now, Microsoft pointed out in its brief that, "Oh, wait a

22   minute.  *Neece* goes on to talk about the summons power being

23   fettered."  Well, what it's being fettered there by is a right

24   to financial privacy.  Because in that particular case, the IRS

25   was -- I think it was seeking information from a bank.  There

1    are limits.  But the point is, as far as procedure goes,

2    they've not pointed out a statute that limits the scope of

3    7602.

4         Now, there is a Ninth Circuit case that I don't believe

5    was cited by anyone -- so we apologize for that -- that does

6    address 7602.  It's called *Speck vs. U.S*.  I'm going to refer

7    to it for a second, but I brought along copies.  So let me just

8    hand counsel a copy.

9         And may I approach?

10              THE COURT:  You may.

11              MR. WEAVER:  So the *Speck* case is a Ninth Circuit

12   case.  And what the case was about is, there was an

13   investigation by the IRS into possible tax evasion by a taxicab

14   company.  And the IRS sent out circular letters.  And so that

15   was challenged.  And the claim was that 7602 dictated how the

16   IRS could get its information.

17        And if you read through the opinion, the Ninth Circuit

18   concludes, no, that's not right.  Under the better

19   interpretation -- I'm reading from my slide now -- Section 7602

20   provides three separate means of such inquiry; the first one,

21   an informal, non-compulsory means of inquiry; and then two is a

22   summons; and three, they provide mechanisms for formal

23   compulsion.

24        And going back to the statute, you can again see that

25   under two, two covers both one and three, in terms of producing

USA v. Microsoft/Mundie, 11/6/15

```
 1    things at a summons.  There really is no principled reason to
 2    distinguish the way you're going to treat one from three.  And
 3    we'll talk about that more in a minute.
 4         Now, Microsoft is fine with Quinn Emanuel examining books
 5    and records.  But there really is no reason to distinguish
 6    between one and three unless there's some other problem.
 7    Microsoft has concerns that somehow discretion is being
 8    exercised under three.  That's not necessarily the case.  But I
 9    would posit that if Your Honor makes a ruling that contractors
10    can't perform the function under (a)(3), the next thing that
11    we'll see in the courts will be arguments that contractors
12    can't perform (a)(1) either.  These are co-equal prongs of the
13    statute, as the Ninth Circuit opined.
14         And I've already addressed, I think, earlier, why 6103(n),
15    the confidentiality statute, doesn't just cover one.  It covers
16    three as well.  It protects taxpayers from disclosure --
17    unauthorized disclosure of information, whether that
18    information comes in through testimony, or whether it comes in
19    through books and records.
20         Now, what about the argument that 7602(a)(2) and (a)(3)
21    are redundant?  Again, that's really contrary to Speck, and
22    it's also contrary to the plain language of the statute.
23    Because, again, (a)(3) and (a)(1) have a wider scope than does
24    (a)(2).
25         Now, let me talk for a moment about taking testimony.  I
```

USA v. Microsoft/Mundie, 11/6/15

1    want to put that into the context of inherently governmental

2    functions.  Taking testimony certainly does involve asking

3    questions.  You will get no debate from us on that.  It

4    certainly involves that.  It also involves selecting

5    individuals, selecting topics, placing someone under oath,

6    deciding whether something has gone beyond the boundaries of

7    the scope of the interview.

8         And let me refer the Court, just for an example, to

9    Federal Rule of Civil Procedure 28, which is about persons

10   before whom depositions -- now, this is civil procedure.  It's

11   not audit procedure.  But there, in a rule of civil procedure

12   that we deal with, you know, in litigation here, (a)(1)(b)

13   talks about, "A person appointed by the Court where the action

14   is pending to administer oaths and take testimony."  So it is

15   not so clear, to the extent to which there are varying

16   activities or subcomponents of taking testimony.

17        So let's talk about, are there limits here?  Are there

18   limits on what the IRS can subcontract out?  And, yes, there

19   are.  And the limit is the FAIR Act, because it is

20   impermissible for governmental agencies to contract for the

21   performance of inherently governmental functions.  And, in

22   fact, there's a statute, the FAIR Act, that defines what

23   inherently governmental function is, and goes on to indicate

24   that that function does not normally include gathering

25   information, or providing advice, opinions, recommendations, or

1    ideas to federal government officials.

2        Now, that is the statute.  The executive branch has taken

3    that statute -- and I want to spend a little time on this,

4    because I think it's really important.  I think it was in 2011,

5    the Office of Management and Budget published this OMB policy

6    letter to define, essentially, what it meant, what "inherently

7    governmental" meant, and what an inherently governmental

8    function was.  And this wasn't just something they voluntarily

9    did.  If you look in the middle column here, this was done at

10   the direction of the President, and it was also done in

11   accordance with an act, Duncan Hunter Act, to create a single

12   definition for the term "inherently governmental function" that

13   might address deficiencies in what was occurring at the time.

14       And so that's what this letter ended up doing.  And the

15   approach that was taken is to define "inherently governmental"

16   for the executive branch to build on and use the FAIR Act.  So

17   that's what happened.  And let me just go down to the last

18   highlighted bit here.  The definition provided by the policy

19   letter replaces existing definitions, even some of the

20   acquisition regulations.

21       So one of the things that was attached to Microsoft's

22   brief was some sort of JAG court letter talking about what

23   could be performed by attorneys that were not government

24   attorneys.  That's superseded to the degree that it's even

25   authenticated.  I'm not sure -- from Mr. Rosen's declaration,

USA v. Microsoft/Mundie, 11/6/15

1   I'm not even sure where it came from.  But this letter is what

2   you look to for the executive branch's interpretation about

3   what it means to be doing an inherently governmental function.

4        And sure enough, if we turn to Page 10, here's a

5   definition.  It tracks along with the statute, "So intimately

6   related to a public interest as to require performance by

7   federal government employees."  That's pretty broad.  It

8   excludes gathering information or providing advice, opinions,

9   or recommendations.  So it tracks with the FAIR Act.

10       Now, let me go back, before we get to the letter itself.

11  There's analysis that goes with this.  And I would encourage

12  the Court to take a look at that analysis in the table.

13  Because what this does is illustrate how one can break a

14  function down between things that really are inherently

15  government, and cannot be performed by non-government

16  employees, and things that can be.  For example, human

17  resources management, that's an inherently governmental

18  function.  And selecting who you're going to hire in the

19  federal workforce, that's inherently governmental.  But support

20  is not.

21       Now, let me scroll down to help clarify these definitions.

22  OMB came up with a couple of guidelines to help illustrate when

23  something was inherently governmental.  And this is really

24  important.  I think this -- if there's one thing that I would

25  ask Your Honor to consider, it's this set of guidelines here.

USA v. Microsoft/Mundie, 11/6/15

```
1    Because there are two tests.  One is the nature of the

2    function.  And the other, that Microsoft has talked a lot

3    about, is exercise of discretion.

4        So let's first look at the nature of the function.

5    Examples that are inherently governmental include officially

6    representing the United States in an intergovernmental forum or

7    body.  That might be like appearing and representing the United

8    States in court, or something like that.  Quinn Emanuel is not

9    tasked with doing that.  The contract does not permit it to do

10   that.  So the contract, and the relationship that Quinn Emanuel

11   has under the contract, does not violate the nature of the

12   function test.

13       But what I really want to refer to now is the exercise of

14   discretion test.  Because it isn't just exercise of discretion,

15   like picking "A" or "B," apples or oranges.  It's more specific

16   than that.  If the exercise of discretion commits the

17   government to a course of action where two or more alternative

18   courses of action exist, and decision-making is not already

19   limited or guided by existing policies, procedures, et cetera.

20   So it's not just that somebody can decide to ask this question

21   or that question, or follow up on this line of questioning or

22   that questioning.  What's an improper exercise of discretion by

23   a nongovernment employee is something that's committing the

24   government to a course of action.

25       And if we go on down here, it even further illustrates
```

 1    this.  It talks about meaningful oversight.  And then it talks

 2    about a function may be appropriately performed by a contractor

 3    consistent with the restrictions in the section, including

 4    those involving the exercise of discretion that has the

 5    potential for influencing the authority, accountability, and

 6    responsibilities of government officials where the contractor

 7    does not have the authority to decide the overall course of

 8    action, but is tasked to develop options, et cetera.

 9        So "exercise of discretion" has a meaning in this context,

10    and it's committing the government to an overall course of

11    action.  That would be like making an audit determination, or

12    deciding a theory to pursue.  It doesn't mean trying to figure

13    out what questions to ask in an interview.

14        Now, in addition to this, there is an Appendix A and B

15    that are attached to this to help further illustrate.  Let me

16    go to Page 14.  Page 14 starts a list of things that are

17    inherently governmental.  There's Appendix A, examples of

18    inherently governmental functions.  So let's take a look at

19    some of this.

20        "Direct conduct of a criminal investigation."  Okay.  That

21    makes sense, and that's not what Quinn Emanuel is doing here.

22    "Control of prosecutions or adjudicatory functions."  Again,

23    that makes sense, that's inherently governmental.  "The

24    direction and control of federal employees."  Again, Quinn

25    Emanuel is not directing or controlling anyone.  And, in fact,

1   you could probably observe, from listening to Mr. Hoory for

2   several hours, it would be unlikely that Quinn Emanuel would be

3   directing or controlling Mr. Hoory.

4         And then two more -- because Ms. Eakes brought it up --

5   what else is inherently governmental?  "Collection, control,

6   and disbursement of various things, including taxes, unless

7   otherwise authorized."  That's inherently governmental.  And,

8   in fact, if you look in our administrative record that we

9   submitted to the Court, there's a whole section in that

10  administrative record that addresses what developed when

11  Congress made it an express exception to allow contractors to

12  do limited things in that circumstance in terms of private debt

13  collection.  But the point is, the whole function is inherently

14  governmental.

15        And then finally, maybe a key note here, "Representation

16  of government before administrative and judicial tribunals."

17  And this is important, Your Honor.  Hopefully, I'll get to it.

18  But in the contract with Quinn Emanuel, there is a subsection

19  in that contract that says, "Your authority is limited.  You

20  can't do inherently governmental things.  See this document."

21  And so, has Quinn Emanuel represented the government before an

22  administrative tribunal?  Absolutely not.

23        And with respect to John Gordon, Your Honor, let me just

24  make a couple of points.  First, there is absolutely no way

25  Microsoft was fooled into thinking that John Gordon represented

1    the United States in a formal way, because they had negotiated

2    his limited involvement in the interviews in September and

3    October.  I tried to admit into evidence -- and Microsoft

4    objected, and its objection was sustained -- to put into

5    evidence a full transcript, subject to redactions, so that Your

6    Honor could get a flavor for what was really going on in those

7    interviews.  There's no way to read through those interviews

8    and conclude that John Gordon was exercising discretion or

9    running the interview.  He typically, in these interviews, has

10   a few things to ask somewhere in the middle or the end of the

11   interviews.  Now, going forward, that would not necessarily be

12   the case.  But to say that John Gordon for the IRS somehow

13   shows evidence that he's performing an inherently governmental

14   function is just not accurate.

15        Now, let's take a look at functions that are closely

16   associated but not inherently governmental, that may need

17   supervision but are not inherently governmental.  And I just

18   want to point out two.  One, services in support of inherently

19   governmental functions.  And then Number 8, provision of legal

20   advice and interpretations of regulations and statutes to

21   government officials.

22        Bottom line from this to take away is that the one thing

23   that does, in fact, limit contracting authority to contract out

24   segments of either examination of books and records, or taking

25   testimony, is, in fact, whether the function being performed

1   isn't inherently governmental.  The statute itself does not

2   expressly say anything about what can be contracted out for.

3       And I'm about to turn to Microsoft's argument that somehow

4   we've delegated out authority to Quinn Emanuel.  Quite to the

5   contrary.  That's exactly what the IRS did not do.  It did not

6   delegate its authority out.  It's contracted to have a

7   contractor perform non-inherently governmental functions.

8   Specifically in the contract, that's what's contemplated.

9       Now, Microsoft cites to a number of cases for the

10  proposition that the IRS has improperly delegated taking

11  testimony to Quinn Emanuel.  To the extent that asking

12  questions were inherently governmental -- and clearly it's

13  not -- there would be a problem.  But asking questions is not

14  inherently governmental under this test.  So if there is an

15  inherently governmental function to taking testimony, which

16  would be putting somebody under oath, or figuring out who's

17  going to come in to testify, yes, that is not something that is

18  being contracted out.  There is no delegation to Quinn Emanuel.

19  So the cases that are cited in that regard are simply

20  inapposite.

21      Now, let me just mention a couple, the *Halverson vs.*

22  *Slater* case.  It's a D.C. Circuit case.  That involves

23  delegation of authority that included -- if I read the case

24  right -- investigation and prosecution of violations, auditing,

25  and rate-making.  So there's a case that really did involve

USA v. Microsoft/Mundie, 11/6/15

1    inherently governmental functions.

2         The *U.S. vs. Giordano* case, that case involved, if I

3    recall correctly, somebody in the DOJ, an executive assistant,

4    signing a wire tap authorization on behalf of an assistant

5    attorney general.  It's inapposite.  And again, it's a

6    delegation case, and we're not talking about delegation in this

7    context.

8         And finally, much focus was placed on *United States*

9    *Telecom vs. FCC*.  And I would just refer Your Honor to that

10   case.  Because if you read through that case, part of it says,

11   "Second, there is some authority for the view that a federal

12   agency may use an outside entity, such as a state agency or

13   private contractor, to provide the agency with factual

14   information."  And then it goes on and talks about another

15   case, a Ninth Circuit case called *Assiniboine Sioux Tribes vs.*

16   *Board of Oil and Gas*.  And, in fact, there are cases cited in

17   *U.S. Telecom*.  There's a case that upheld a federal certifying

18   agency's decision to hire a private contractor to conduct

19   surveys of residential treatment centers, et cetera, et cetera,

20   et cetera.  So it is not a clear-cut case.  If you're gathering

21   information, and you're not doing something inherently

22   governmental, then there is no bar for contracting it out, as

23   the United States has done here.  By the way, the *Assiniboine*

24   case -- I think it was in a motion to dismiss procedure -- but

25   the allegation there was that the agency was not providing any

USA v. Microsoft/Mundie, 11/6/15

1  meaningful review and was being a rubber stamp.

2       So when I get to the regulation, I'm going to talk about

3  this.  But the regulation specifically has thought about,

4  carefully thought about, how to make sure that a contractor

5  does not veer into performing inherently governmental

6  functions.  There has to be an IRS person there supervising or

7  providing guidance to what's going on.

8       Now, just to wrap up the statute part of my argument, if

9  asking questions in an interview is permitted by the statute,

10  if there's nothing that limits the IRS from doing it -- and no

11  one's identified a statute that says you can't do it -- then

12  there's no abuse of process.  And this is not a case where Your

13  Honor needs to go into the fine points of regulatory

14  administrative law.  Because if there's no abuse of process,

15  then the summonses should be enforced.

16       And it may not be super clear.  It may be debatable.  But

17  the way 7602 has been construed by the courts is, if there is a

18  legitimate purpose here -- and there is, and I'll talk about

19  that.  But essentially, you have contractors.  It's evolved

20  over the years.  First, the audits got more complex, and they

21  needed folks to come in and look at books and records.  And in

22  transfer pricing audits, they were having some of the experts

23  ask questions, and then somebody objected.  So this has evolved

24  over time.  But there's a real purpose and a real benefit to

25  having somebody actually ask the question, instead of take five

USA v. Microsoft/Mundie, 11/6/15

1     minutes to write the questions out on a notepad.

2          And in terms of whether there's an improper exercise of

3     discretion by asking the questions, my recollection is that

4     whenever Quinn Emanuel got into an area that Microsoft's

5     counsel didn't like in these September/October interviews, they

6     made a big deal about it.  And I recall one example, I believe,

7     where Mr. Hoory essentially took over, jumped in, and defused

8     the situation.  So even in that informal setting, there was

9     control over what Quinn Emanuel was doing.  So in short, if

10    permitted by statute, there's no abuse of process.

11         Now, let me touch on the regulation, because Microsoft has

12    identified two different attacks or two reasons why the

13    regulation is improper.  The first one has to do with

14    procedure.  They complained that this regulation did not go

15    through the APA's notice and comment procedure.  And, in fact,

16    of course, it did not, because it was a temporary regulation.

17         So what was the status of temporary regulations in the

18    late '80s?  Well, I have the legislative history here, and I'm

19    going to pull it up.  We cited to this in our brief.  I think

20    Mr. Rosen's declaration attaches the Senate report.  In

21    addition here, what we have is the conference committee report,

22    because that explains a little bit more.  But I believe we have

23    hard copies.  And again, with Your Honor's permission, I'll

24    just hand up a copy.

25              THE COURT:  You may.

USA v. Microsoft/Mundie, 11/6/15

1          MR. WEAVER:  So Your Honor, what I want to refer you

2     to is the fifth page of this document.  I'm going to try to

3     blow it up a little bit.  Not very good at this.

4          But the present law -- there was an amendment to a

5     statute, in 1988, that gave us the current regime that governs

6     temporary regulations.  Prior to 1988, the IRS would issue

7     temporary regulations, and there was no time limit on how long

8     those temporary regulations might last.  But if you read the

9     present course of the law, this -- Congress was aware of this.

10    "Generally, temporary regulations are effective immediately

11    upon publication, and remain in effect until replaced by final

12    regulations."  That's where things were when what Microsoft has

13    referred to, and we've referred to, 7805(e), was added to the

14    statute.

15         And I want to now go to the Senate amendment and refer

16    Your Honor to a couple of things in the Senate amendment part

17    of this, on Page 218 of this Senate report.  "The IRS may

18    continue its present practice of issuing proposed regulations

19    by cross reference at the time temporary regulations are

20    issued."  And then it goes on at the end to say, "The

21    expiration of temporary regulations at the end of the two-year

22    period is not to affect the validity of those regulations

23    during the two-year period."

24         Now, think about that for a minute.  The Congress is

25    specifically contemplating putting a time limit on temporary

USA v. Microsoft/Mundie, 11/6/15

1    regulations, and they're going to require -- and what the
2    statute requires now -- is that when you issue a temporary
3    regulation, you also have to issue a proposed regulation at the
4    same time that is subject to notice and comment.  But during
5    the intervening period, before there's a final regulation -- it
6    can go on as long as a couple years, that later became three
7    years in the conference report, if you look in the middle of
8    the page there.  Two years got changed to three years.
9         But the point being, during that time, the temporary
10   regulation is valid.  Now, how could that be, if temporary
11   regulations are subject to notice and comment?  If they were
12   subject to notice and comment, then they wouldn't be valid,
13   because proposed regulations that are subject to notice and
14   comment, under the APA, don't have validity until the notice
15   and comment period is over and they're turned into final
16   regulations.
17        So the point being, Congress clearly intended that
18   temporary regulations could exist for a limited time period
19   under the statutory change, the statutory regime that was in
20   place and about to be changed by the addition of 7805(e).  They
21   knew what the temporary regs were.  They created a structure
22   that adopted, clearly adopted, IRS practice.  If Congress
23   thought the APA applied, then the temporary regulation would
24   not be valid.  So it's just directly contradictory to the
25   idea -- to say that temporary regulations are subject to notice

USA v. Microsoft/Mundie, 11/6/15

1    and comment is directly contradictory to the clear stated

2    intent of this legislative history.

3         Now, let's take a look at the statute itself.  Here's the

4    statute.  I'll scroll down to part (e), which was added.  Here

5    is the express language of the actual statute.  "Any temporary

6    regulation issued by the Secretary shall also be issued as a

7    proposed regulation."  And then there's a three-year duration

8    for that temporary regulation.  Well, what's a proposed

9    regulation?  Well, that's what the APA addresses in

10   Section 553(b), general notice of proposed rule-making.  Let's

11   go back to 7805.  There's proposed regulation.

12        But a temporary regulation is something different.  This

13   scheme, similar to the *Asiana Airlines* case that we cite to in

14   our brief, does not comport with the APA.  And the Court should

15   not determine that the Congress must have been wrong.  The

16   congressional intent is very clear here.  The statute is clear.

17   This is a structure that is very specific.  And not only that,

18   if Congress wanted to have notice and comment for a temporary

19   regulation, it certainly knew how to do it.  In fact, at the

20   same time that (e) was implemented, another section was

21   implemented, in 1988, requiring certain impact on small

22   businesses be evaluated.  And so the regulation had to be

23   submitted to the Chief Counsel for Advocacy for Small Business

24   Administration for comment.  So, yes, even temporary

25   regulations had to be -- had to go through the SBA process, but

USA v. Microsoft/Mundie, 11/6/15

1   Congress chose not to require temporary regulations to go

2   through the APA notice and comment process.

3        Moreover, I believe, in 1996, Congress changed

4   retroactivity provisions.  Part B, I believe there was a

5   change -- hope I'm right about that -- in 1996.  They could

6   have changed the law then and chose not to.  So temporary

7   regulations have been issued by the IRS over a period of

8   decades, and Congress has never changed the law.

9        Now, Microsoft counters that, well, you have to have good

10  cause.  And, in fact, if you look at 553, there are

11  exceptions -- 559, I think -- exceptions to notice and comment.

12  One of them is the good cause exception.  But there's nothing

13  in the legislative history, and there's nothing in the statute

14  that says you have to show good cause to issue a temporary

15  regulation.  So I would posit it's not the place of the court

16  to write that into the law.  In *Asiana Airlines*, a court

17  concluded that specific procedures differed from those of the

18  APA and couldn't be reconciled with the statute.  And a plain

19  reading here yields the same result.  And where possible,

20  there's a statute -- a principle of statutory construction, a

21  court should attempt to harmonize conflicting statutes.

22       Now, the only logical conclusion to draw from Microsoft's

23  argument is that all temporary regulations must be invalid,

24  because, by definition, they don't have notice and comment.

25  Some have good cause exceptions.  Some don't.  But there's no

1    reason to create that kind of disruption in decades-old

2    practice without clear authority to the contrary.

3         And what is Microsoft's authority?  Microsoft's authority

4    is a concurring opinion in a tax court case, a concurring

5    opinion that didn't need to reach the issue of 7805, but chose

6    to.  But it was two judges out of a whole host of tax court

7    judges.  It's not binding authority, either on account of being

8    a tax court case, and it's not even the holding of a tax court

9    case.  It's a concurring opinion.  It is not precedent.

10        If you look to the Ninth Circuit case law -- and we've

11   cited these in our brief -- there are a number of cases, in the

12   Ninth Circuit and elsewhere, where temporary regulations have

13   been upheld.  Now, I will fully point out that the issue we're

14   presenting here, whether 7805 is an exception to the APA, that

15   issue was not present in those cases.  But the point is, it was

16   a temporary regulation, and it was upheld.  So I would say,

17   given where the landscape of the law is, there's no reason in a

18   summons proceeding to suddenly overturn decades of practice of

19   the IRS, and conclude that a statute doesn't mean what it

20   clearly means.

21        The other authority cited by Microsoft is a case, a Fifth

22   Circuit case called *Burks*.  And there, there's an ambiguous

23   footnote -- I think it's Footnote 9 -- that refers to this

24   idea.  And I think it refers to the idea in the context of a

25   law review article.

USA v. Microsoft/Mundie, 11/6/15

```
 1        Finally, let me just quickly mention the Dickinson vs.
 2   Zurko case.  That case is cited for the proposition that there
 3   has to be an express override of the APA.  And, in fact, the
 4   APA statute says, if you're going to do something different,
 5   you need to make it express.  And I would argue this statute is
 6   express.  There's no other way to interpret it, this statute
 7   being 7805.
 8        But what is Dickinson about?  It's about a standard of
 9   review in Court of Federal Claims cases.  And the conclusion
10   there was that the standard in judicial review wasn't so clear.
11   There wasn't any kind of well-established exception to the APA.
12   So those cases really are inapposite.  And what Microsoft is
13   asking you to do, Your Honor, is to go way out on a limb and
14   interpret 7805 in a way that there's no authority for that.
15        Okay.  Let me quickly turn to the other exception.
16   There's another reason why you don't have to do notice and
17   comment.  And that is, you don't have to do notice and comment
18   if a regulation is interpretive.  And I'll refer Your Honor to
19   the Ninth Circuit case of Hemp, we cited in our brief, where,
20   "In general terms" -- I'm quoting -- "interpretive rules merely
21   explain, but do not add to, the substantive law that already
22   exists in the form of a statute or legislative rule," citing to
23   another Ninth Circuit case.  Then they apply a test, a
24   three-part test, three-prong test, to try to figure out what's
25   legislative and interpretive.  And they freely acknowledge, I
```

USA v. Microsoft/Mundie, 11/6/15

1   think, in that case -- and I think many courts acknowledge --

2   that the interpretive versus legislative distinction is a

3   muddle.  It's not easily teased out.  But the test that's

4   employed in the Ninth Circuit, from the D.C. Circuit, is the

5   part that we are interested in, "when in the absence of the

6   rule there would not be an adequate legislative basis for

7   enforcement action."  Well, here, the enforcement action would

8   not occur under the regulation.  It would occur under the

9   summons statute.  So this regulation is interpretive, and it's

10  another reason why the lack of notice and comment here is not

11  fatal to the rule.

12      We argue that the reg is entitled to deference, under

13  *Chevron*, and the *Chevron* standard is twofold.  Does the reg

14  directly contradict the statute?  For the reasons I've already

15  articulated, no.  The statute is actually silent on the issue.

16  Well, then, the second step in the *Chevron* analysis, is the

17  construction of the statute and the reg permissible?  Is it

18  permissible?  Is there a reasoned -- a reason behind doing it?

19  Doesn't have to be the only reason, or the reason you would

20  choose, but is it permissible?  And the *Chevron* standard

21  applies to Treasury regs.  That was established by the Supreme

22  Court in the *Mayo* case.

23      And *Mayo* cites to another case called *Mead*.  And the *Mead*

24  case, also a Supreme Court case, clearly makes clear that even

25  when there's no notice and comment, *Chevron* deference may be

USA v. Microsoft/Mundie, 11/6/15

1    afforded an agency decision.  And the reference is to the

2    *NationsBank* case.  And I would encourage the Court to read

3    *NationsBank vs. North Carolina* -- or *vs. Variable Annuity Life*,

4    513 U.S. 251, and *Mead*, because those cases are on point here

5    when it comes to *Chevron* deference.

6         Now, Microsoft has argued that *State Farm* arbitrary and

7    capricious standards should apply.  And what I would simply say

8    is, even applying that standard, the regulations still should

9    be upheld, if you get to the point of evaluating the

10   regulation.

11        Let me just quickly turn to the regulation very quickly.

12        The regulation has a reasoned analysis as to what -- why

13   it's doing what it does.  I've highlighted in green the

14   preamble to the regulation.  It talks about taking testimony by

15   asking questions, as Ms. Eakes said.  Asking questions is not

16   inherently governmental.  And then it analyzes how there will

17   be some sort of safeguard so that inherently governmental

18   functions are not performed by a contractor, under this

19   temporary reg.  So the reg itself does address the only limit

20   that is out there on what can happen under 7602.

21        And then let me just turn to the reg itself, because the

22   reg is even clearer.  Yes, there's stray references to taking

23   testimony throughout the administrative record, because "taking

24   testimony" can mean a number of things.  But in the reg itself

25   there are four functions that comprise participating fully in

USA v. Microsoft/Mundie, 11/6/15

1    an interview under the guidance of an IRS officer or employee.

2    And those are receipt review of summons, books, and records.

3    No debate about that.  Being present during the summons

4    interview.  No debate about that.  Questioning the person

5    providing the testimony under oath.  Questioning the person

6    providing the testimony under oath.  That's the language in the

7    reg.  That's permitted.  It's not inherently governmental.  And

8    then asking the summoned person's representative to clarify an

9    objection.  This regulation is designed to clarify for

10   taxpayers what's permitted under 7602.

11        There are other parts of the administrative record that I

12   would refer Your Honor to, to show that the IRS spent a lot of

13   time considering this regulation.  It wasn't rushed through.

14   The reg project, I believe, was opened in the first half of

15   2013.  The OMB policy letter that I took the Court through is

16   identified in Part 2 of the administrative record, Pages 1

17   through 29.

18        There are statistics.  In Part 1, Page 120 through 120(d),

19   there are statistics.  The IRS figured out, there's a lot of

20   these large transfer pricing audits, and there's discussion

21   about the reg in this context.  The reasoning and justification

22   for why the reg is needed, to promote efficient tax

23   administration and to make use -- efficient use of contractors,

24   is addressed on Page 99 of the administrative record.  Other

25   statutes are looked at to compare, on Part 1, Pages 128 through

1   134.

2        And I think I'm giving you PDF pages, Your Honor.  So once

3   we get past Page 120, the actual page is three pages less.  So

4   I'm giving you, I guess, a range.  And my apologies for that,

5   because I was -- if I had more time, I'd be putting the PDFs on

6   screen, but I don't have time.

7        I guess the last thing I would say is that even if Your

8   Honor didn't afford the regulation either *State Farm* or *Chevron*

9   deference, it would still be entitled to an analysis under the

10  *Skidmore* case, and some deference, if you agreed that the

11  regulation was permissible and served a useful purpose.

12       For my -- the remainder of my time, let me go back and

13  address improper purpose and hit some highlights, if I can.

14       I would refer Your Honor to the *Sterling Trading* case that

15  we've cited in our brief.  It's similar factually, in a way, to

16  the Microsoft audit here.  *Sterling* claimed that summonses had

17  issued to obtain documents in advance of litigation and to

18  circumvent more restrictive discovery rules that it would face

19  in tax court.

20       And you can -- when you look at the case, *Sterling* looks

21  at the timing of the summons as a general principle to try to

22  figure out if something has been sought in advance improperly,

23  in advance of litigation.  And the rule is that if the summons

24  is issued before commencement of judicial proceeding, then the

25  summons is generally found to -- not to undermine the discovery

1    process in tax court.

2           THE COURT:  In the absence of direct evidence to the

3    contrary.

4           MR. WEAVER:  In the absence of direct evidence that

5    everything is done, and that there is no legitimate purpose.

6    In fact, there is language in *Sterling* that talks about it's

7    not the only purpose, or something to that effect.  So it

8    stands for the proposition that a purpose is enough.

9       I think I discussed earlier, Your Honor, the Southern

10   District of New York *PAA Management* case.  It stands for the

11   proposition, "Even preparing for tax court is legitimate if the

12   preparation is to formulate a supportable position."  I would

13   also refer Your Honor to the *Wooden Horse* case, where an agent,

14   the Court pretty much concluded, issued a summons in

15   retaliation for refusal to extend limitations.  But there also

16   was a legitimate purpose, and the summons was enforced.

17      All right.  Let me just recap very briefly for Your Honor.

18   Are we legitimately seeking information here?  Mr. Hoory, if

19   you read the transcript from the evidentiary hearing, Pages 176

20   through -85, that alone is enough.  The IRS asked, in 2008, for

21   supporting information for financial projections.  They asked

22   again in 2013 and didn't get any further with respect to backup

23   for the projection.  They interview somebody in the fall of

24   2014 who says, "Oh, I was never asked for this stuff."  And

25   then, eventually through the summons, they start coming up with

USA v. Microsoft/Mundie, 11/6/15

1    information that showed that there's projections for an abysmal

2    zero percent growth case.  I believe zero percent growth --

3    revenue growth is what was assumed in the APAC model Microsoft

4    used.  There's a conservative case.  Then there's the regular

5    case that are market expectations.  That's not what Microsoft

6    used here.  Of course the IRS wants to get this information.

7    And the IRS also needs information as to how to allocate profit

8    between competing and tangible assets.

9         And again, if you look at the designated summonses, that's

10   what most of those requests are about.  And again, during the

11   interviews, the IRS had been told that a program called

12   Business Investment Funds was short term, or that the measure

13   for including something in the basket for being an intangible

14   asset was whether it lasted more than one year.  It turned out

15   during the interviews that this program lasted three years, or

16   had an expected life of three years.  So there are reasons --

17   all you need to do is go back and read the transcript -- why

18   this information is being sought.

19        And when you think about it, when you're trying to figure

20   out what's more important, is it software, or is it the name

21   brand and the customer relationships?  Or what am I going to

22   allocate resources to, going forward?  Who's making those

23   decisions?  The obvious answer is executives.  And I think some

24   of what they found out in the interviews is, lower-level people

25   are always going to be looking to the executives to try to

USA v. Microsoft/Mundie, 11/6/15

1  figure out, how did they look in 2005, 2004, 2006?  What were

2  they looking at, and where were they going to expend resources?

3  And we're dealing with projections here.  So there are plenty

4  of legitimate reasons why this information is needed.

5      What about allegations that the determination has already

6  been made?  I think I've addressed that.

7      I want to make sure there is one correction in the record.

8  In Paragraph 32 of Mr. Hoory's declaration, he referred to

9  requesting 32 interviews in the fall.  Twenty-one occurred out

10  of 23.  There were 32 requests, thirty of Microsoft employees

11  and two of KPMG.  But the numbers should have been 23 out of

12  25.  The mistake came out of a spreadsheet that I think

13  Microsoft circulated that had an error in a formula.  So you go

14  down one, two, three, four, five, six, seven, and all of a

15  sudden it starts over again.  But we can correct that

16  declaration, if need be.  It's 23 out of 25.  Otherwise, the

17  declaration is correct.  And I believe Mr. Rosen's declaration,

18  which talks about requests for 29 interviews, is also

19  incorrect.  If you look at the Bernard Exhibit 3, Hoory

20  August 28 letter, there's 29 requests.  But then there's

21  Bernard Declaration Exhibit 5 that added an additional 30th

22  name, September 9.  Now, I think Mr. Rosen did say requested in

23  August, so technically that's correct.  But there were 30

24  interviews requested.  I want to make sure that's in the

25  record.

USA v. Microsoft/Mundie, 11/6/15

```
1          I also want to briefly address the arguments that
2   Microsoft made in its reply.  What about this duty to disclose
3   the existence of Quinn Emanuel before there's even a contract?
4   The Deak-Perera case is not even close to being authority for
5   Microsoft's claim that the IRS had some sort of duty to
6   disclose somebody it might hire.  Deak-Perera was about
7   somebody essentially misleading a financial institution.  The
8   IRS was supervising a financial institution, and under that
9   guise gathered information that was then used to start going
10  after taxpayers.  It was a ruse, I think the Court called it.
11  That's not what happened here.
12          As a matter of fact, when you think about it, since Quinn
13  Emanuel hadn't even been hired yet, it would be deliberative.
14  It would be something you shouldn't be disclosing at that point
15  in time to somebody, because it was in the decisional --
16  pre-decisional stage.
17          I think Ms. Eakes referred to Mr. Hoory's later
18  correspondence and not turning over a full contract.  There was
19  no need to.  What he referred to in the scope of work, that set
20  out Quinn Emanuel's responsibilities.  So I just want to make
21  sure I hit that.
22          Moreover, when Microsoft signed the statute of limitations
23  extension, Microsoft, what did they know?  They knew that
24  Mr. Hoory wanted to do formal interviews, whether things are
25  resolved or not.  That's in Mr. Hoory's declaration.  As part
```

USA v. Microsoft/Mundie, 11/6/15

```
 1    of this call where Mr. Sample initially says we're not going to

 2    pursue resolution on February 17, the IRS makes clear, okay,

 3    it's going to go gather facts.  That's in Mr. Hoory's

 4    declaration.

 5         The preceding year, in 2013, there had been discussions

 6    about designating the case for litigation.  And the IRS said,

 7    "There's no decision made in that regard."  In fact, Mr. Hoory

 8    and Mr. Maruca didn't have the authority to do that, as I think

 9    Microsoft just pointed out.  What they didn't point out, in the

10    designation for litigation IRM that they attached, is, if you

11    look in there, there's a duty to actually fully prepare a case.

12    If it's going to be designated for litigation, it better be

13    fully, factually developed.  So there is, again, nothing wrong

14    with factually developing your case in the exam phase,

15    especially if it might be designated for litigation.

16         Microsoft accuses the IRS of conducting pretrial discovery

17    on behalf of Quinn Emanuel.  Well, if you look at the actual

18    contract -- and I don't think I have time to pull it up --

19    just, actually, if you read the contract, there are two

20    phases -- or one phase with two parts to that contract.  And

21    that's it.  Now, so when Microsoft refers to a 2013 e-mail

22    referring to five potential phases with Boies Schiller, that

23    never occurred.  Moreover, Mr. Hoory's testimony during the

24    hearing was consistent with that.  Although he wasn't

25    examined -- cross examined at length on this, look to Page 144
```

 1    of the transcript in that regard, and look to Mr. Hoory's

 2    declaration submitted this time around, Paragraph 43, where

 3    ultimately the IRS decided that there would just be a contract

 4    for exam.

 5        The other thing I want to make sure that I address are

 6    some of the exhibits that Microsoft has submitted.  Rosen Reply

 7    Exhibit 3 is a matter assessment and conflict waiver agreement.

 8    They're drawing inferences about the purpose of hiring Quinn

 9    Emanuel from that document.  It's an unsigned document.  It was

10    produced in the FOIA litigation.  It was never executed,

11    because the IRS didn't want to sign it.  So it means nothing.

12        Rosen Reply Exhibit 4, what was referred to was a stray

13    anticipation of litigation phrase in that contract.  But what

14    Microsoft didn't show you were other places in this contract

15    that put it in context.  So if we go to -- I think it's Page 7.

16    If you go back and look, Your Honor, at Page 7 and Page 8,

17    justifying this contract, there's a narrative.  Actually, I

18    guess it's Page -- PDF Page 6 and 7 of the Bates Number ending

19    1658 and 1659.  You'll see that Mr. Hoory's justification for

20    this contract, what's going to happen, is exactly -- pretty

21    much exactly what he testified to during the hearing.  And the

22    gist of it is, given the size of this multi-billion case, it's

23    critical that they get some consistency and tie all the moving

24    parts together.  And they thought, as is their right, as the

25    agency has the discretion to do this, it would be a good idea

USA v. Microsoft/Mundie, 11/6/15

1  to get somebody very experienced in doing just that to assist

2  the IRS in this very large audit.  There's no improper purpose

3  here.

4        There's some inference drawn that somehow Chief Counsel is

5  involved; therefore, it must be litigation.  I believe it's the

6  next page.  Chief Counsel actually has to sign off on all

7  expert contracts over $75,000.  So the fact that Chief Counsel

8  is involved here doesn't mean a whole lot.

9        Then let me just also go to one more page in this

10 contract -- or this set of documents -- and that is this

11 funding request portion of the contract.  What does it say at

12 the bottom?  Unfunded portion of the request.  None for LB&I

13 exam.  That's the contract that did end up getting executed.

14 Post LB&I jurisdictional phases, if any -- if any -- would be

15 the subject of a separate counsel jurisdiction contract.

16 That's not what we're here about.  We're here about an exam

17 contract.  So, sure, is there the thought that we might use

18 these guys if this goes to litigation?  Absolutely.  There's

19 nothing wrong with that.  In fact, you would do that with other

20 experts as well.

21       What about the idea that Quinn Emanuel is somehow

22 improperly conducting the audit?  Well, remember, the test here

23 is whether there is one proper purpose for this audit request.

24 So how the IRS is getting its information is really not the

25 subject of this proceeding.  And what Ms. Eakes didn't show

1    you, when she showed you a part of the contract where they're
2    doing various things, like gathering information or making
3    recommendations, it's preceded on PDF Page 10 of this contract.
4    It always is the contractor's assistance.  Assistance.  It's
5    assistance.  It's not Quinn Emanuel doing the audit.  It's
6    Quinn Emanuel assisting the IRS and making recommendations.
7         And in terms of case evaluation, they pulled language out
8    of the case evaluation section and suggest that somehow the IRS
9    is obligated to go running and find things for Quinn Emanuel.
10   No.  That's -- if Quinn Emanuel asks for something that would
11   help them evaluate the case, okay.  The contract says the IRS
12   will try to go get it.  That doesn't mean that Quinn Emanuel is
13   running the audit.  And a common sense reading of that makes
14   clear that the purpose of that evaluation was to try to figure
15   out and give, essentially, the IRS a sounding board, to see,
16   you know, if -- how their case was developed.  So the actual
17   language of the contract does not support the inferences that
18   Microsoft draws.
19        I also want to address this argument that somehow or other
20   by statute the IRS cannot use anyone other than IRS Chief
21   Counsel for anything.  That is not correct.  The statute
22   doesn't say that.  It doesn't say "exclusively."  It says that
23   Chief Counsel is the adviser.
24        But let's think about that for a second.  DOJ advises the
25   IRS from time to time.  What does the IRS do if there's a

USA v. Microsoft/Mundie, 11/6/15

```
1    question of, like, Swiss bank law, or, you know, some foreign
2    law that really the IRS doesn't have any expertise on?  What
3    about some state matter, state law matter?  There's nothing
4    preventing the IRS from obtaining advice in that regard.  And
5    there are actual contracting statutes.  We cite to one in a
6    footnote in our brief.  I believe it's 5 U.S.C. 3109.  And if
7    you were to go into Westlaw and look at notes of decision,
8    under 3109, you'll see things like some Office of Legal Counsel
9    opinion where Ropes & Gray was hired in 1984 to do some legal
10   work.  There's a case called Boyle, out of the Court of Federal
11   Claims, in the early 1960s.  There is statutory authority for
12   the IRS to manage its budget and to hire contractors as it sees
13   fit.  And this statute that they referred to doesn't address
14   that.
15       I think also Ms. Eakes referred to Section 6110 as
16   requiring that IRS advice be made public.  That's certainly not
17   the case.  Certain advice is made public.  But there would be
18   no attorney-client privilege were all IRS counsel advice made
19   public.  That's just not the case.
20       Then let me also, Your Honor, actually go to the Quinn
21   Emanuel contract, very quickly.  And I just want to make sure I
22   hit this before I end.
23       In this contract, there is an express -- express --
24   limitation on what Quinn Emanuel can do.  The contractor shall
25   not have the authority to perform inherently governmental
```

USA v. Microsoft/Mundie, 11/6/15

1    functions, as described in the OFPP policy letter that we
2    looked at in detail.  That's in the contract.  And so the IRS
3    has put into this contract the safeguards that the regulation
4    actually considers, to make sure that Quinn Emanuel is cabin to
5    doing what it's permitted to do.  Now, it is a law firm.  But
6    like any other contractor, it is required to keep taxpayer
7    information confidential, and safeguards were put into place in
8    that regard under 6103(n).  Nondisclosure agreements were
9    signed.

10        So the bottom line is, Your Honor, Microsoft has a heavy
11   burden to make a case why the IRS lacks an improper purpose.
12   And they haven't carried that burden.  What they've given you,
13   Your Honor, is a lot of speculation, but no hard evidence.

14        Let me circle back for just a minute.  I want to make sure
15   the record is clear, because I began to speed through when I
16   realized my time is slipping away here.

17        It is our position that *Chevron* deference is a standard to
18   be afforded to the reg, if you have to get to the reg, not
19   *State Farm* reasoned analysis.  And the reason for that is that
20   this is a reg that interprets the statute.  It doesn't -- it
21   doesn't have a whole lot of empirical data behind it.  There is
22   a Supreme Court case, *Judulang*, Footnote 7.  I think it's cited
23   in our brief -- it may be cited in Microsoft's brief -- where
24   the Supreme Court has essentially equated *Chevron* deference
25   standard with -- Step 2 of that standard with *State Farm*

USA v. Microsoft/Mundie, 11/6/15

1    analysis, but then goes on to talk about it in that context;

2    that they're going to apply *State Farm*, because the statute

3    isn't really addressed in that case directly, the statute

4    doesn't address what's at issue there.

5        The bottom line is this:  This is a case that, unlike

6    *State Farm* which involved passive restraint standards and

7    oodles of data that were supposed to be considered by the

8    Transportation Safety Board, or whatever it was, as to auto

9    safety standards, this is about who's going to ask questions in

10   an IRS interview?

11       And once again, Your Honor, let me just emphasize that

12   this is a tremendously large audit.  It's an important audit.

13   The transfer pricing cases are important to the IRS.  We want

14   to get it right.  The IRS told -- Microsoft told us, in 2011,

15   that the analysis that was provided with its notice of proposed

16   adjustments, with the IRS's notice of proposed adjustments, was

17   arbitrary and capricious; that the informal interviews were of

18   questionable utility.  So Mr. Hoory and the transfer pricing

19   operations folks have endeavored to do the best job they can,

20   and they looked for assistance from Quinn Emanuel.

21       But let me go back to the analytic framework, Your Honor.

22   If, in fact, Your Honor concurs -- and, you know, you listened

23   to Mr. Hoory at length -- that there is a legitimate purpose

24   here, then the summonses should be enforced, and we should move

25   forward summarily.  Now, I realize there may be particular

USA v. Microsoft/Mundie, 11/6/15

1    objections to privilege, or something like that, with some of

2    the document requests, but the document requests should move

3    forward, summarily.  And with respect to the interviews, if

4    Your Honor agrees that the statute is silent on this, that the

5    statute, the summons statute, is an authority-granting statute,

6    not a limiting statute, then there's no abuse of process to

7    allow the interviews to go forward either.

8        So, Your Honor, I would urge that we get this summons

9    enforcement proceeding case resolved as quickly as possible so

10   that the IRS can do its job and try to do a fair and thorough

11   audit, finish it up with respect to Microsoft's 2004 and 2006

12   tax years.

13           THE COURT:  Mr. Weaver, thank you very, very much.

14       Ms. Eakes, as we discussed during our phone call earlier

15   in the week, you have an opportunity for a short rebuttal.

16           MS. EAKES:  Thank you.

17       Can we take just a couple of minutes so I can set back up

18   the computer?  Would that be okay?

19           THE COURT:  You know, why don't we just go ahead and

20   do that anyway.  I think it's probably a good idea.  But let's

21   just take no more than ten minutes; all right?

22           MS. EAKES:  Thank you, Your Honor.

23                   (Recess)

24           THE COURT:  All right.  Counsel, we're back in

25   session.

USA v. Microsoft/Mundie, 11/6/15

1          Ms. Eakes?

2                 MS. EAKES:  Thank you, Your Honor.

3          I first wanted to start with the issue that you raised

4     right away with Mr. Weaver, about whether or not this is good

5     policy, or whether they say it's good policy or bad policy.

6          And I guess the point I want to make about that is, I

7     get -- Microsoft's point isn't necessarily that it's bad policy

8     or good policy, because that's really not for us to decide.

9     The issue is really what -- Congress is the one who sets

10    policy, and what does Congress say about whether or not it's

11    good policy or bad policy.  So the IRS can say hiring outside

12    counsel, getting people like Quinn Emanuel involved in an

13    audit, is good policy.  Well, and they may be right.  We don't

14    think it makes good policy.  But, obviously, we would take a

15    different position.  The point is that they need to go and ask

16    Congress for authorization to do that, because it really is

17    Congress that sets the policy with respect to taxes and

18    collections here in the U.S.  So that was our point about it.

19         And I think if you look at the *Loving* case, which we cited

20    in our reply brief, you will see that concept.  Because in

21    *Loving*, that was a case in which it was actually pretty clear

22    that it was good policy, what the IRS was trying to do, but the

23    Court found that it was not authorized by Congress.  And that's

24    our point with respect to what they've done here.

25         So I want to go back to 7602 and just address a couple of

USA v. Microsoft/Mundie, 11/6/15

```
 1   points.  First of all, Mr. Weaver said several times, "I don't
 2   think Microsoft disagrees that under 7602(a)(1) that
 3   contractors can examine under this provision."  And, in fact,
 4   we do.  And perhaps I didn't make that clear enough.  Our
 5   position is that this language, under 7602(a)(1), and when it
 6   refers to "examine," they're not talking about look at getting
 7   assistance with contractors.  This is a term of art, and
 8   they're talking about conducting the audit.  And that's what
 9   this provision allows.  And we -- and our position is that
10   enforcing the summonses not only violates, with respect to the
11   testimonial summonses, 7602(a)(3), but Quinn Emanuel's
12   involvement in the audit, to the extent they're actually
13   conducting the audit, or examining, under 7602(a)(1), is a
14   violation of the statute, so just to make that clear.
15        Also, I just wanted to address the point that -- with
16   respect to the distinction and why contractors can look at it.
17   And that's under 6103, which is the statute that talks about
18   confidentiality.  It does allow the IRS to disclose tax return
19   information to contractors.  That's what that statute does.  So
20   that's the statute under which they can get help and give
21   taxpayer information to somebody like an economist to assist
22   them in conducting -- or in their audit function.
23        So if we look back at 6702 -- because the government had a
24   lot to say about inherently governmental function.  But the
25   Court's analysis, in terms of the structure, which is what the
```

USA v. Microsoft/Mundie, 11/6/15

```
 1   Court asked about, starts and ends with the statute, in our
 2   opinion.  The question is whether or not 7602 is ambiguous.
 3   And it's not.  I mean, on its plain language, it does not
 4   authorize contractors, people outside the government, to
 5   perform the functions, including taking testimony and
 6   conducting the audit.
 7        And when I was up here before, the Court had asked a
 8   question about what "the Secretary" means, and whether or not
 9   there is an authorization for contractors there.  But if you
10   look at the term "the Secretary," it means the Secretary, the
11   delegates, and it specifically says it means an officer, an
12   employee, or an agency of the Treasury Department.  So there's
13   just simply nothing in 7602, combined with 7701, that says an
14   outside contractor can do what the IRS is saying can be done
15   here.
16        And the IRS made the point of, this is a statute that goes
17   all the way back to the Civil War.  Well, isn't it curious that
18   in all that time, this has never been interpreted.  There's
19   nothing in the IRS files to say that 7602 and 7701 somehow
20   meant that contractors can be involved in performing either
21   under (a)(1) or (a)(3), or (a)(2) for that matter.
22        One other point I wanted to make with respect to the
23   argument about inherently governmental functions is that the
24   government is saying, "Well, asking questions isn't somehow an
25   inherently governmental function."  And again, you don't ever
```

USA v. Microsoft/Mundie, 11/6/15

1   get to the issue of inherently governmental function.  That

2   doesn't come into play when you first start and look at the

3   statute and say that it's unambiguous.  And they talk about the

4   FAIR Act.

5        Sorry.  I'm just trying to hop ahead here.

6        And the point I would make about that is, if you go back

7   to the temporary regulation -- and I'm sorry.  I don't have

8   that up here on the screen right now.  Let me see if I can find

9   it.

10        Looking back at the temporary regulation, I mean, there

11   was a lot of discussion by Mr. Weaver about what exactly an

12   inherently governmental function means.  But I'd point out that

13   when you look at what they said in the temporary regulation,

14   the IRS at that point, even though they're saying now that

15   fact-gathering is outside of it, outside of inherently

16   governmental functions, and that's all that asking questions is

17   about, but what they said at the time of the temporary

18   regulation is that inherently governmental functions, including

19   deciding -- included deciding what information was supposed to

20   be produced.  And again, asking questions is -- that's exactly

21   what you're doing.  You're just asking the person to produce

22   the information, and you're asking them to produce it verbally.

23        I think there's also -- in the case law that Mr. Weaver

24   cited, it's a distinct difference between going out and having

25   somebody else perform surveys and collect information from

USA v. Microsoft/Mundie, 11/6/15

1    citizens.  That is a nondiscretionary activity.  We've got to

2    keep in mind what we're talking about here is a sworn testimony

3    under oath, where the government can compel somebody to come

4    in -- and it's essentially a one-sided deposition that the IRS

5    gets to take.  And they don't even have to allow the

6    representative from the other side to be able to ask questions.

7    And the compulsion aspect is important, but so is the penalty.

8    The fact of the matter is, under this statute, you're talking

9    about a situation in which the government brings somebody in,

10   and if they don't comply, there are civil and there are

11   criminal penalties that could flow from that.

12        And I make that point also with respect to the question

13   of -- or the issue that was raised by Mr. Weaver about the

14   voluntary interviews.  You know, that's really not relevant to

15   the Court's analysis now, because what Microsoft chose to do,

16   or permit in the course of the voluntary interviews, was

17   completely different.  Because, again, you're not -- you don't

18   have compulsion, and you don't have the threat of contempt.

19   And so that -- the fact that they were able to make it work at

20   that point is entirely different from what they're asking for

21   now.  They're now asking you to say that 7602 -- that that

22   statute says they can bring in any contractor, and they can

23   bring somebody in under a subpoena, and they can allow that

24   contractor to ask the person questions, under oath, with the

25   threat of contempt, and that that is permissible under the

USA v. Microsoft/Mundie, 11/6/15

1    statute.  And we just don't think it allows that.

2         I also want to make the distinction between the fact that

3    there's a difference between improper purpose, which Mr. Weaver

4    spent a lot of time talking about, and the fact that if you

5    violate a statute, it's an abuse of process.  And the law is

6    pretty clear, I think, that abuse of process is not something

7    that has been defined as only encompassing these certain

8    things, but it's a distinct difference.  We are arguing that

9    there is an improper purpose here, but we're also arguing that

10   there's an abuse of process, because you cause statutory

11   violations under (a)(1) and (a)(3), as well as -- I think it's

12   7803 with respect to legal authority -- if you enforce these

13   summonses.  And that constitutes an abuse of process, and

14   that's separate and apart from an improper purpose.

15        With respect to the comment -- the discussion about the

16   notice and comment, I would just point out that there's a

17   presumption that the APA applies, including the notice and

18   comment, unless there's statutory language to the contrary.

19   And there's nothing in the statute here that talks about it.

20   And it's not meaningless to say that the IRS has to comply with

21   notice and comment, because it's an important process in terms

22   of a check on government.  Also, it doesn't render 780 -- I

23   believe it's -- 7805(e) meaningless, because that is simply a

24   sunsetting provision.  And again, the IRS can continue to issue

25   temporary regulations.  There's no question about that.  They

USA v. Microsoft/Mundie, 11/6/15

1   just need to be able to make a finding that there's good cause.
2   And they do do that.  But they're not absolved from the notice
3   and comment provisions of the APA, and I think the case law is
4   pretty clear on that.
5       I just wanted to talk for a second about the issue of the
6   statute of limitations.  One thing I failed to mention in my
7   initial argument, and the Court asked some questions about the
8   statute of limitations, is that it wasn't just a failure to
9   tell us about Quinn Emanuel.  There were affirmative
10  misrepresentations that were made by the IRS in order to get
11  the statute of limitations extension.  And if you look at the
12  Bernard declaration that I have on the screen, it talks about
13  the fact that the IRS was telling them that consistent with
14  their timeline -- which is what I already showed the Court --
15  the audit work was substantially completed, and they had
16  quantified the alternative valuations, and that they would be
17  producing supporting reports.  So they were saying that the
18  audit was over.  This is what they told Microsoft in December
19  of 2013.  They never said that they weren't, until they came
20  into court.
21      Also with respect to the extension, if you look at
22  Mr. Sample's declaration -- and he talks about this December
23  status call.  Again, Mr. Hoory told Mr. Sample, during that
24  time, that he would give the alternative valuation model for
25  the APAC cost-sharing arrangement within several weeks after

USA v. Microsoft/Mundie, 11/6/15

1    the January meeting.  So once again, we have representations

2    that they're done, and that they actually had the numbers -- or

3    had reached the conclusions that they're now saying they

4    haven't reached.

5         I want to quickly address the *PAA Management* case that the

6    the IRS cited.  And we agree that if there's a mixed purpose,

7    the summonses are unenforceable.  But this isn't a case -- this

8    situation isn't one in which there's a mixed purpose.  And I

9    think that the quote that we included in our brief about the

10   distinction that the *PAA* case is drawing is important; that --

11   Judge Learned Hand's distinction between whether an IRS summons

12   seeking information to support a new audit amount, which is

13   proper, and one seeking evidence in support of that amount,

14   which he said was improper.

15        And that's what the distinction is that we're talking

16   about here.  We're not talking about the IRS trying to get to a

17   number.  We're talking about the IRS -- and I think they

18   essentially said as much in the course of Mr. Weaver's argument

19   and when Mr. Hoory testified.  They're trying to get

20   information to support their number so that they can win in

21   court.  And that's an improper purpose under the *PAA* case.

22        That's really all I have to say, unless the Court has any

23   questions.

24        I just think -- well, actually, I should check to make

25   sure.

USA v. Microsoft/Mundie, 11/6/15

```
1          The final thing I wanted to address just very quickly is
2     the issue about legal counsel.  Because Mr. Weaver said, "Well,
3     the statute doesn't say that they can only get advice from the
4     Chief Counsel."  And I think, in fact, it does.  If you look at
5     7803(b), it does say that the Chief Counsel shall report --
6     sorry.  I've got the wrong slide up there.  I apologize.
7          What I wanted to point the Court to is the Department of
8     the Treasury General Counsel Order Number 4.  I think it's
9     clear from the delegation order, which is the controlling
10    document, that the Chief Counsel is the legal adviser to the
11    commissioner of the IRS.  So that is clear within both the
12    statute, I think, when you read the statute in conjunction with
13    this general Treasury order, that that's where they get their
14    legal advice from.
15         Sorry.  One note.
16         Oh, I'm sorry.  The point I guess I was supposed to make
17    was that the statute incorporates the delegation order.  So
18    when you read those in concert, you see that the legal advice
19    has to come from Chief Counsel.  And again, enforcing these
20    summonses, they've already received advice from Quinn Emanuel,
21    received legal advice from Quinn Emanuel.  And the Court can't
22    do anything about that going back.  But certainly going
23    forward, if you enforce these summonses, it will continue to
24    be -- further the violation of the statute.
25         Final thing I would say, Your Honor, is, just, when you
```

 1    think about the statute and what it means, and you're sorting

 2    it out, I think that the key thing that struck me, as I

 3    listened to Mr. Weaver, is that what they didn't really

 4    address, and they don't talk about, is that -- the great

 5    expansion that this really is, if you read the statute in the

 6    way that they say.  You're talking about a statute that we

 7    think clearly says that this power, which is immense, is

 8    limited to the Secretary and the delegates, meaning the

 9    employees of the IRS.

10        The IRS is taking a big step, a huge step, when they say

11    that actually incorporates contractors, and now the statute

12    authorizes us to basically hand it all off to contractors.  I

13    don't think that's a fair reading of the statute.  I don't

14    think that's what public policy says.  And I think *U.S. Telecom*

15    is the cleanest case on that, as well as the statute, when you

16    look at it.  That's not what Congress intended.  Congress did

17    not intend to use this power -- to give this power and say it

18    can simply be handed off.  And I don't think that we're alone

19    in our interpretation of it, because that's why Congress and

20    Senator Hatch is writing a letter.  That's why people are

21    concerned.  This will change the status quo dramatically, if

22    the Court finds that this statute allows contractors to be

23    included within the meaning of 7602.

24        Thank you.

25            THE COURT:  Counsel, thank you very much.

USA v. Microsoft/Mundie, 11/6/15

1        All right.  I want to thank my lower bench for their

2   willingness to stay through our lunch hour.

3        And my standard practice, as I think both sides know, is

4   to take your comments here at oral argument, review your

5   briefing, and take another look at the cases that have been

6   cited.  I certainly understand that both sides want a quick

7   resolution to the issue, and we will attempt to get that to you

8   as soon as we possibly can.

9        Thank you very much.  We'll be at recess.

10                        (Adjourned)

USA v. Microsoft/Mundie, 11/6/15

1

2

3                    C E R T I F I C A T E

4

5

6

7         I, Andrea Ramirez, RPR, CRR, Court Reporter for the

8    United States District Court in the Western District of

9    Washington at Seattle, do hereby certify that I was present in

10   court during the foregoing matter and reported said proceedings

11   stenographically.

12        I further certify that thereafter, I have caused said

13   stenographic notes to be transcribed under my direction and

14   that the foregoing pages are a true and accurate transcription

15   to the best of my ability.

16

17

18        Dated this 16th day of November, 2015.

19

20                        /s/ *Andrea Ramirez*

21                        Andrea Ramirez
                          Official Court Reporter

22

23

24

25