The Honorable Ricardo S. Martinez

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:15-cv-00102 RSM |
| Petitioner, | ) | |
| | ) | **UNITED STATES' RESPONSE TO** |
| v. | ) | **MICROSOFT'S BRIEF REGARDING** |
| | ) | **PRIVILEGED DOCUMENTS STILL** |
| MICROSOFT CORPORATION, *et al.* | ) | **IN DISPUTE** |
| | ) | |
| Respondents. | ) | **NOTED ON MOTION CALENDAR:** |
| _____ ) | | **October 27, 2016** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 2:15-cv-00103-RSM |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRAIG J. MUNDIE, *et al.* | ) | |
| | ) | |
| Respondents. | ) | |
| _____) | | |

# TABLE OF CONTENTS

**Pages**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................... 2

  A.  Microsoft executes a "pure tax play" in Puerto Rico ........................................ 2

  B.  KPMG encouraged Microsoft to "migrate" an expiring tax credit operation in Puerto Rico to a new holding company structure ................................................................. 3

  C.  KPMG provided business planning and services to Microsoft ........................... 8

  D.  The IRS also seeks documents in connection with the examination of Microsoft's Asia-Pacific cost sharing arrangement ................................................................ 10

III.  LEGAL ANALYSIS ......................................................................................... 11

  A.  Microsoft has not met its burden to show the disputed documents are privileged ............. 11

  B.  Microsoft has not asserted valid privilege claims under § 7525 ........................... 13

    1.  Microsoft has not established the elements of the tax practitioner privilege .................. 13

    2.  The tax practitioner privilege does not apply to written communications regarding tax shelters ................................................................ 15

  C.  Microsoft has improperly invoked the work product doctrine ............................ 17

    1. The documents for which Microsoft claims work product protection were not created for use in anticipated litigation ................................................................ 17

    2. The documents for which Microsoft claims work product protection were not created *because of* anticipated litigation ................................................................ 20

      a. Documents responsive to the Designated Summons/IDR 2209 ..................... 20

      b. Documents responsive to the KPMG summons ........................................ 21

      c. Documents responsive to the Related Summonses ..................................... 21

  D.  Microsoft has not asserted valid attorney client privilege claims ...................... 22

  E.  Microsoft has waived privilege ......................................................... 23

VI.  CONCLUSION ................................................................................................ 24

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

i

# TABLE OF AUTHORITIES

**Cases**                                                                   **Pages:**

*Admiral Ins. Co. v. United States Dist. Court for Dist. of Arizona*,
881 F.2d 1486 (9th Cir. 1989) ................................................................................ 18
*Apple Inc. v. Samsung Elecs. Co., Ltd.*, 306 F.R.D. 234 (N.D. Cal. 2015) .................................. 12
*Aristocrat Tech. v. Int'l Game, Tech.*, 2010 WL 3060298 (N.D. Cal. Aug. 3, 2010) .................. 24
*Chandola v. Seattle Housing Auth.*, No. C13-557-RSM, 2014 WL 4685351
(W.D. Wash. Sept. 19, 2014) ........................................................................... 2, 18, 22
*Datel Holdings Ltd. v. Microsoft Corp.*, 2011 WL 866993 (N.D. Cal. Mar. 11, 2011) .............. 12
*Fidelity Intern. Currency Advisor A Fund, L.L.C., v. United States*, 2008 WL 4809032
(D. Mass. April 18, 2008) ................................................................................. 19
*Heath v. F/V* Zolotoi, 221 F.R.D. 545 (W.D. Wash. 2004) ............................................... 20
*Hickman v. Taylor*, 329 U.S. 495 (1947) ................................................................... 18
*In re Chase Bank USA, N.A. "Check Loan" Contract Lit.*, 2011 WL 3268091
(N.D. Cal. July 28, 2011) .................................................................................. 12
*In re Grand Jury, Inv.*, 974 F.2d 1068 (9th Cir. 1992) ............................................. 12, 13
*In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900 (9th Cir. 2003) .. 18, 20
*In re Raytheon Securities Lit.*, 218 F.R.D. 354 (D. Mass. 2003) ........................................ 21
*In re Special Sept. 1978 Grand Jury*, 640 F.2d 49 (7th Cir. 1980) ..................................... 17
*Lambright v. Ryan*, 698 F.3d 808 (9th Cir. 2012) ......................................................... 23
*Matter of Fischel*, 557 F.2d 209 (9th Cir. 1977) ......................................................... 14
*North Pacifica, LLC v. City of Pacifica*, 274 F.Supp.2d 1118 (N.D. Cal. 2003) ....................... 23
*Olender v. United States*, 210 F.2d 795 (9th Cir. 1954) ................................................ 14
*Oracle Am., Inc., v. Google, Inc.*, 2011 WL 3794892 (N.D. Cal. Aug. 26, 2011........................ 23
*Phoenix Technologies Ltd. v. VMware, Inc.*, 2016 WL 3566942 (N.D. Cal. July 1, 2016) ......... 19
*Reisman v. Caplin*, 61-2 U.S.T.C. ¶ 9673 (1961) ........................................................ 14
*Schlicksup v. Caterpillar, Inc.*, 2011 WL 4007670 (C.D. Ill. Sept. 9, 2011) ........................... 17
*SEC v. Roberts*, 254 F.R.D. 371 (N.D. Cal. 2008) .................................................. 23, 24
*Umpqua Bank v. First American Title Ins. Co.*, 2011 WL 997212 (E.D. Cal. Mar. 17, 2011) .... 18
*United States v. Arthur Young & Co.*, 465 U.S. 805 (1984) .............................................. 17
*United States v. Frederick*, 182 F.3d 496 (7th Cir.1999) ........................................... 13, 15
*United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010) .................................................. 22
*United States v. Gurtner*, 474 F.2d 297 (9th Cir.1973) ................................................. 14
*United States v. Judson*, 322 F.2d 460 (9th Cir. 1963) ................................................. 14
*United States v. Kovel*, 296 F.2d 918 (2nd Cir. 1961) .................................................. 14
*United States v. Martin*, 278 F.3d 988 (9th Cir. 2002) ................................................. 22
*United States v. McEligot*, 2015 WL 1535695 (N.D. Cal. Apr. 6, 2015) ................................. 14
*United States v. Nobles*, 422 U.S. 225 (1975) ........................................................... 17
*United States v. Richey*, 632 F.3d 559 (9th Cir. 2011) ............................................. 20, 22
*United States v. Textron, Inc.*, 577 F.3d 21 (1st Cir. 2009) ....................................... 17, 21
*Valero Energy Corp. v. United States*, 2007 WL 4179464 (N.D. Ill. Aug. 23, 2007)................. 19
*Valero Energy Corp. v. United States*, 2008 WL 4104368 (N.D. Ill. Aug. 26, 2008)................. 16
*Valero Energy Corp. v. United States*, 569 F.3d 626 (7th Cir. 2009)....................... 13, 14, 15, 16

United States' Response to                                **U.S. Department of Justice**
Microsoft's Brief Regarding                              Ben Franklin Station, P.O. Box 683
Privileged Documents Still in Dispute                  Washington, D.C. 20044-0683

ii

*Weil v. Inv./Indicators, Research & Mgmt., Inc.,* 647 F.2d 18 (9th Cir. 1981) ............................ 23

**Statutes:**

I.R.C. § 936 .................................................................................................................................. 3
I.R.C. § 6662 ...................................................................................................................... 15, 24
I.R.C. § 7525 .................................................................................................................................. 1
I.R.C. § 7525(a)(1) ...................................................................................................................... 13
I.R.C. § 7525(a)(3)(B) ................................................................................................................ 15
I.R.C. § 7525(b) .......................................................................................................................... 15

**Rules:**

Fed. R. Civ. P. 26(b)(3) .............................................................................................................. 21
Fed. R. Civ. P. 26(b)(5)(A) ........................................................................................................ 11
Fed. R. Evid. 502(a) .................................................................................................................... 24

**Miscellaneous:**

48 F.R.D. 487 .............................................................................................................................. 22

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

iii

# INTRODUCTION

Business records are not privileged. That principle is true even for transactions motivated to a significant degree by tax avoidance. Microsoft, however, seeks a broad exception to this principle, in order to shield from disclosure work performed by accounting firms in connection with large-dollar, tax-driven transactions.

Most of the disputed documents at issue were created by KPMG in the process of designing and implementing a transaction involving the transfer of software rights to a newly-formed company in Puerto Rico that would commence copying the software onto compact discs and DVDs, an operation described by one Microsoft executive as "a pure tax play." Microsoft asserts two grounds for withholding KPMG documents: the tax practitioner privilege found in I.R.C. § 7525 and work product protection. But the tax practitioner privilege does not cover business or accounting advice, and it does not apply at all to communications encouraging or promoting participation in a transaction with a significant tax avoidance purpose. Microsoft now also asserts claims of work product protection, a claim not asserted in its initial logs for KPMG documents. But many of the documents Microsoft claims are work product appear to be presentations, spreadsheets, and email chains – the kinds of documents unlikely to have been created because of litigation. Memoranda, to the extent created by accountants to document the design and implementation of the Americas Transaction (or, in the words of one KPMG professional, to "make this thing real"), also do not qualify for protection on a blanket basis.

Microsoft grounds its claims of privilege on the strength of four largely non-descript privilege logs, a conclusory declaration of one of its attorneys of record, and general declarations of KPMG accountant Brett Weaver, Microsoft vice president William Sample and former in-house corporate attorney, Michael Boyle. Microsoft claims that most of the documents were created at Boyle's request, although Boyle appears in only 3 of Microsoft's 174 log items. But the general averments of Weaver and Boyle conflict with documentary evidence already

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1

1  provided to the IRS and do not address the particular facts and circumstances surrounding each

2  document.  Yet it is on such particulars that privilege disputes turn, and Microsoft has not met its

3  burden to prove its claims.  *Chandola v. Seattle Housing Auth.*, No. C13-557-RSM, 2014 WL

4  4685351 (W.D. Wash. Sept. 19, 2014).  And because in-house counsel is involved, "extra

5  scrutiny is required."  *Id*. at *3.

6  ## STATEMENT OF FACTS

7  ### A.  Microsoft executes a "pure tax play" in Puerto Rico

8  As of July 1, 2005, Microsoft Operations Puerto Rico, LLC ("MOPR") purported to

9  acquire reproduction and retail distribution rights to flagship Microsoft software products.

10  (Declaration of Eli Hoory dated Oct. 12, 2016, ¶¶ 6-13).  On this basis, Microsoft justified

11  shifting to MOPR billions of dollars generated through sales of products in the Americas region.

12  (*Id.,* ¶ 14).  MOPR paid taxes to Puerto Rico on the shifted income at a negligible rate.  (*Id.,*

13  ¶ 16).  By design, flows of dollars into MOPR were, over time, to exceed "buy-in" and

14  "research" dollars that flowed back to Microsoft from MOPR.  (*Id.,* ¶¶ 13-14).  One of

15  Microsoft's advisors computed the value of this excess of inflows to MOPR at more than $30

16  billion.  (*Id.,* ¶ 14 & Ex. 45).[1]

17  Based on information gathered by the IRS, this transfer of rights, and subsequent actions

18  taken by Microsoft with respect to MOPR (the "Americas Transaction"), may have been illusory

19  in nature, serving no material economic purpose.  (*Id.,* ¶ 15; *see also* Ex. 46 ("This was a pure

20  tax play . . . .").  By design, MOPR had no customers except for Microsoft and Microsoft

21  affiliates.  (*Id.,* ¶¶ 8-15 & Ex. 24).  MOPR had no ability to exploit technology rights it received

22  because Microsoft had not transferred to MOPR rights to Microsoft's name, brands or

23  trademarks.  (*Id.*).  Those latter rights resided with MOPR's distribution "customers."  Even cash

24  _____

[1] All numbered exhibits refer to exhibits to the concurrently-filed Declaration of Eli Hoory dated October 12, 2016.

25

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

2

"transferred" to MOPR appears to have returned to a different Microsoft affiliate, through "loans." (*Id.,* ¶ 17; *see also* Exs. 52, 53). And the income from those loans was taxed to MOPR at a rate of a mere 2%. (*See id.*). Tellingly, the cost sharing arrangement involving MOPR could be unwound and cost sharing payments set aside, in the event the IRS adjusted MOPR's "buy-in" obligation beyond a certain threshold. (*Id.,* ¶ 18).

MOPR did copy software onto discs, a "routine" operation not dependent on owning software rights. (*Id.,* ¶ 15; Exs. 7, 32, 44). Indeed, MOPR's predecessor, Microsoft Puerto Rico, Inc. ("MSPR"), had earlier reproduced a major portion of the compact discs earmarked by Microsoft for retail distribution in the Americas without any pretext of owning rights to the software that it copied. (Ex. 7). MOPR's story, and how it facilitated "round trip" flows of products created and sold in the United States, but not fully taxed there, is under IRS examination. (Hoory Decl.*,* ¶¶ 15, 19-20). What has become increasingly clear is that KPMG played a leading role in that story.

**B. KPMG encouraged Microsoft to "migrate" an expiring tax credit operation in Puerto Rico to a new holding company structure**

Before 2005, Microsoft utilized a small operation in Puerto Rico to copy to CDs the majority of its so-called "full package software" sold in the United States and Latin America. Although the operation, owned by MSPR, employed fewer than 100 full-time employees and was not the lowest-cost alternative for making the copies, the operation more than paid for itself by generating annual "possession tax credits" under I.R.C. § 936. (Ex. 7 at 1253448-55).

Congress, however, phased out the § 936 tax credit, eliminating it entirely after 2005. Several years before the tax credit was set to expire, Microsoft began mulling over the future of MSPR's operation in Puerto Rico. An August 2003 internal memorandum evaluated three alternatives and concluded that closing down MSPR and outsourcing its CD operations could save several millions of dollars. (Ex. 7 at 1253453-54, 58-59).

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

3

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1    KPMG had a more ambitious plan in mind, based on its "significant experience assisting

2   Fortune 50 companies migrate 936 company assets to new deferral structures." (Ex. 8 at 22052).

3   As reflected in a presentation dated July 21, 2004, a team of KPMG professionals suggested that

4   "Microsoft should explore U.S. deferral opportunities taking advantage of the existing

5   manufacturing operations in Puerto Rico." (Ex. 8 at 22035, 37).  The presentation touts a KPMG

6   team member who had "previously advised U.S. clients on migrations of this type and

7   successfully negotiated significant tax holidays for U.S. companies with the Puerto Rican

8   government." (Ex. 8 at 22052).  The slides propose scenarios whereby income shifted to Puerto

9   Rico would be taxed at a rate of "2% to 7%." (Ex. 8 at 0022043, 45).  Exactly what followed is

10   unclear:  the ground rules for meeting with Microsoft in August 2004 were "no handouts and no

11   e-mail."  Planning was to happen on a white board.  (Exs. 9, 10).[2]

12    By late August 2004, KPMG was formally engaged "to create [an] IHCo [Intangible

13   Holding Company] structure for MSFT" regarding Puerto Rico.  (Ex. 13 at 2798).  KPMG was

14   to work on "a summary of cost vs. benefits as well as a summary of the structure, [and] product

15   flow and business processes upon which our cost-benefit analysis will be based." (Ex. 13 at

16   2798-99).  KPMG was also to address "tax risks associated with the overall strategy." (*Id.*).

17   KPMG's tax modeling was to address effects of the structure on earnings, tax savings, and cash

18   flows, all factors needed by Microsoft for business purposes.  From the outset of the engagement,

19   it appears, KPMG was to focus on setting up a controlled foreign corporation for purposes of

20   buying into, and sharing costs associated with, "technology intangibles" for software products

21   sold through retail "channels" in the Americas.  (*Id.*).  The engagement does not appear to

22   contemplate litigation preparation or support services.  Rather, the purpose of the engagement

23

24   _____

[2] A modified version of this presentation appears to have been part of a meeting between KPMG professionals and
Microsoft held on or about December 21, 2004.  (Exs. 11,12).

25

was to "develop the information necessary to decide whether moving forward with an IHCo structure at this time is an advisable business decision." (*Id*. at 2799).

By late 2004 and early 2005, KPMG had nearly finished modeling work with respect to proposed alternatives, and had been asked by Microsoft to, as one KPMG professional recounted it, begin "to think about what structural requirements we would need to make this thing work (i.e. realize the modeled benefits)." (Ex. 14 at 15779) (analyzing issues and listing what KPMG would require "to be performed by employees of MSPR in PR. . . ."). Indeed, KPMG was tasked with preparing a detailed work plan for the project. (Exs. 15, 16).

KPMG's modeling apparently went through numerous iterations, with KPMG evaluating a number of assumptions, variables, and, in particular, how to "split" residual profits between technology and marketing intangible assets. (Exs. 17, 18) (excel sheets include forecasts, assumptions and projections of "benefits"). Although Microsoft and KPMG have produced a number of complex models, such as various versions of "PR Based Model Modified Retail" and "PR Modified Retail MBS with Flat BI" spreadsheets (*see id*.), the IRS is entitled to review the entire realm of this modeling to better understand how KPMG fine-tuned and developed the transactional structure. Microsoft's KPMG logs identify two "spreadsheet" descriptions at Ex. C Chron 243/Tab 163; Chron 899/Tab 551 (Exhibits A-D are Microsoft's privilege logs attached the Rosen Declaration), and it is not clear from the logs whether documents generically described as "attachments" are spreadsheets. The same is true for slide presentations. (The IRS has been provided presentations that are aimed at encouraging Microsoft to migrate MSPR to a new and improved IHCo structure.) (Exs. 8, 12).

Clearly, KPMG was a central player in devising the structure. (*See id*.; Ex. 57). For example, while Microsoft's earlier cost sharing arrangements entailed a "non-exclusive license mechanism," KPMG noted the following:

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

5

Conversely, the MS Puerto Rico cost sharing arrangement is quite different as 1) MS Puerto Rico has no marketing intangibles/sales force in place and 2) MS Puerto Rico's only customer is MS Corp, a related party.  As such, if MS enters into a non-exclusive license with Puerto Rico, it would be difficult to argue that the transfer meets the "commercially transferable interest" requirement.  This is because MS must be willing to buy CDs/DVDs from MS Puerto Rico at a price that includes the technology profit component (say $100).  If the license is a non-exclusive arrangement, MS would have the right to purchase CDs/DVDs from anyone they desire.  Further exacerbating this is the fact that by buying from someone other than Puerto Rico the purchase price [Microsoft would pay] is $1 instead of $100, allowing MS to retain all of the profit themselves.  **Under these terms, it is difficult/impossible to say a third party would enter into such a deal.**

**After much deliberation we [KPMG] think we have a workable solution. . . .**

(Ex. 57 at 23296-97) (emphasis added).

In early 2005, the project took on a new urgency, as KPMG and Microsoft sought "to beat the potential cost sharing regs" anticipated to be published by June 30, 2005.  (Ex. 19).  But this push for "early implementation" was problematic.  First, MSPR did not have the capability to copy enough CDs to account for 100% of retail software products to be sold in the Americas (and for which income was to be shifted to Puerto Rico).  (Ex. 58 at 8275).[3]  Second, KPMG and Microsoft had commenced negotiating with authorities in Puerto Rico for a  tax grant, with income tax on a new holding company to range from 0% to 2%.  (Exs. 20, 21).[4]  But the new structure was still in the planning phase.  As KPMG team members realized during a March 31, 2005 meeting, "New company won't even have a chart of accounts for probably 18 months.  Shadow books necessary."  (Ex. 22 at 15151).  Recognizing that there "has to be something substantial behind the idea that PR actually sold the CDs and didn't just get a royalty," someone

---

[3] In Exhibit 58, a slide presentation entitled "MS Puerto Rico Restructuring – "Early Adoption" & Continued Sec. 936 Credit.)," KPMG sets out planning alternatives for Microsoft for this "early adoption."
[4] Microsoft asked KPMG to review its presentation to authorities in Puerto Rico.  And KPMG solved a potential problem with respect to being taxed at 35-40% in Puerto Rico on interest income earned on money loaned by Microsoft's Puerto Rican affiliate to other Microsoft affiliates.  The solution was, apparently, to obtain "investment status" for the Puerto Rican company.  (Ex. 55; *see also* Exs. 52, 53).

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

6

1   on the KPMG team asked the question that would seem to encapsulate the entirety of KPMG's

2   work on the project:  "What can we do to make this thing real?"  (Ex. 22 at 15151-52).

3        Given these problems, Microsoft apparently favored a "ramp up strategy."  (Ex. 23 at

4   16283).  But KPMG team leaders "Brett and George [were] pushing for the move of all

5   intangibles to PR immediately," noting "PR doesn't produce the CDs but they would manage the

6   process."  (*Id*.).  By April 1, 2005, when KPMG team members met with Microsoft

7   representatives, it appears a contemplated structure had been arrived at, as reflected in the flow

8   chart attached to the meeting summary.  (Ex. 24 at 6544).  As summarized by a Microsoft

9   employee discussing the new holding company:

10      They'll never own marketing intangibles. . . . Buy-in calculation based on residual
        profit split:  55% Technology, 45% Marketing.  All technology shifted to PR, and
11      all marketing profits remain in the US . . . . Product flow does not change.  Only
        structure of IP ownership will be altered.  Customers should not experience any
12      change in flow. . . . There is NO contract between 3rd party vendor and PR.  PR
        will have two customers:  MSLI and MS Corp.  Nothing changes.
13
    (Ex. 24 at 6539-40).
14
15       The IRS does not have a clear picture as to what transpired during the compressed time

16  period covering April 2005 through June 2005, when the focus was on rushing a structure into

17  existence that would "work."[5]  MOPR first executed agreements to be effective as of June 1,

18  2005.  (Hoory Decl. ¶¶ 6-13).  But when June 30, came and went, without publication of the

19  anticipated revised regulations, the MOPR and Microsoft affiliates amended and restated the

20  agreements to be effective July 1, 2005.  (*Id.*; *see also* Exs. 19, 42).  Even then, however, the

21

22  [5] One of the most important decisions governing the magnitude of cash flows to Puerto Rico involved assigning
    relative weighting to "technology" intangible rights (transferred to MOPR) as opposed to the other "marketing"
    intangible rights retained by Microsoft.  KPMG documents verify that as of April 1, 2005, Microsoft was
23  contemplating a 55/45 ratio in favor of technology.  (Ex. 24 at 6539).  But through some opaque process, KPMG
    ended up modeling this ratio (and incorporating the modeling into transfer prices reflected in intercompany
24  agreements) at the much more skewed ratio in the neighborhood of 78/22 in favor of technology.  (Hoory Decl. ¶
    19).  The variance between earlier "splits" and the Americas "split" was of potential concern to KPMG.  (Ex. 43).

25

United States' Response to                      **U.S. Department of Justice**
Microsoft's Brief Regarding                 Ben Franklin Station, P.O. Box 683
Privileged Documents Still in Dispute       Washington, D.C. 20044-0683

7

1   terms of the transaction were not final, and remained in a fluid state with respect to "life and lag"

2   assumptions. (Exs. 19, *see also* Ex. 56 at 0003934 ("KPMG report and model won't be finalized

3   till a year from now")).  In fact, KPMG adjusted its modeling based on revised financial

4   forecasts obtained from Microsoft in the second half of 2005.  (Ex. 19 at 15406).  The revisions

5   led Microsoft to amend again already-amended intercompany agreements.  (*Id*.).  Eventually,

6   buy-in rates were fine-tuned and finalized at some point in 2006 or 2007.[6]  (*Id*; Exs. 47, 48, 56).

7       **C.  KPMG provided business planning and services to Microsoft**

8       A formal KPMG engagement letter for "immediate implementation" of the "America's

9   Cost Share" structure or project was issued on April 29, 2005.  (Ex. 25).  The goal:  implement

10  the structure within two months before the end of June 2005.  KPMG was tasked with working

11  on the cost sharing structure, developing a detailed work plan and timeline, ascertaining lines of

12  businesses to be transferred, working on intercompany agreements, providing technical analysis,

13  and providing a preliminary economic analysis.  (Ex. 25 at 4806-07).  The KPMG team for this

14  phase of the project included many of same professionals listed in the earlier feasibility letter,

15  with some additions:  Brett Weaver, Greg George, Steve Lainoff, Manal Corwin, Stephen Bates,

16  Richard Boykin, Brian Burt, Anne Welsh, and Rolando Lopez.  (*Id*.).

17      KPMG's involvement in implementation was comprehensive, apparently involving all

18  phases of the project, including providing valuation services after prevailing in an apparent

19  competition with EY.  (Ex. 26).  From documents already provided to the IRS, KPMG either

20  initiated or was integrally involved in creating some of the form intercompany agreements for

21

22

23  ---

[6] Microsoft retained Joseph Tyrrell with PricewaterhouseCoopers LLP, apparently to work on "Project Olympia," which entailed accelerating buy-in royalties.  In early 2006 Tyrrell computed the effect of altering the royalty structure.  (Ex. 54).  Microsoft's logs contain entries referencing Tyrrell (*see* Ex. D, items 845, 852, 882), but, in light of Ex. 54, it appears that Tyrrell supplied accounting or financial services and not privileged advice.  Privilege may also have been waived as to those items.

24

25

United States' Response to                          **U.S. Department of Justice**
Microsoft's Brief Regarding                         Ben Franklin Station, P.O. Box 683
Privileged Documents Still in Dispute               Washington, D.C. 20044-0683

1  the project, including an "Intercompany Services Agreement."  (Exs. 27, 28; *see also* Ex. 29

2  (regarding drafting of the technology license agreement).[7]

3       In addition to structuring contracts, KPMG created journal entries for MOPR

4  accountants.  (Ex. 30).  One KPMG professional, Philip Mogen, appears to have been involved

5  in accounting issues for MOPR, such as how to figure out MOPR's "inventory."  (Ex. 31).[8]

6  Another professional, Warren Van Orman, created a detailed "process narrative," regarding the

7  overall business and accounting operation of MOPR.[9]  (Ex. 32).  Where "gaps" existed between

8  project requirements and actual implementation efforts, KPMG tracked the "gaps."  (Ex. 35).

9  KPMG was also involved with the shift to "digital distribution" of software (as opposed to

10  physical distribution), and with making recommendations regarding "functions to be moved to

11  MOPR."  (Exs. 36, 37).  KPMG weighed in on the timing for migrating employees from MSPR

12  to MOPR.  (Ex. 44).  Ultimately, it appears that the KPMG team even explored the possibility of

13  lobbying for an agreement with Puerto Rico to protect Microsoft from potential risks that certain

14  characteristics of the structure "might be treated as US ECI [effectively connected income], thus

15  defeating the strategy."  (Ex. 33 at 23073).

16       KPMG also created "advocacy" memos, at least one of which has been provided to the

17  IRS in draft form.  (Exs. 34, 38-41).  Based on that draft, the memos may contain factual

18  information material to the examination not previously provided to the IRS:

19

20  [7] It appears that Intercompany Services Agreements continue to be withheld, based on log descriptions.  (*Id.*, Ex. C
Chron 672/Tab446; Chron 696/Tab465; Chron 696/Tab465).  This kind of work constituted business advice.
Moreover, as Weaver specifically stated, "we're not practicing law."  (*Id.*, Ex. 28).

21  [8] Mogen appears in numerous entries in the privilege logs.  (Ex. C Chron 1326/Tab 790, Chron 1329/Tab 792,
Chron 1330/Tab 297; Chron 1331/Tab 793; Chron 1332/Tab 793; Chron 1407/Tab 832; Chron 1433/Tab 852; Chron

22  1434/Tab 852; Chron 1476/Tab 878, Chron 1477/Tab 878; Chron 1485/Tab 885; Chron 1486/Tab 885; Chron
1492/Tab 891; Chron 1497/Tab 896; Chron 1524/Tab 921; Chron 1632/Tab 992; Chron 1650/Tab 1010; Chron

23  1651/Tab 1011; Chron 1676/Tab 1027; Chron 1677/Tab 1027; Chron 1679/Tab 1028).   The United States requests
that the Court carefully scrutinize those items and the generic claims of privilege attached to them.  Accounting
advice does not fall within the scope of the privileges Microsoft asserts.

24  [9] Van Orman appears in Ex. C at Chron 1558/Tab 942.

25

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

The following documentation evidences (or will evidence when prepared) the parties' consideration of their respective risks and the arm's-length nature of the agreed allocation of FY2006 risks:

• Market analyses for each of the Products prepared for non-federal income tax purposes;
• Financial forecasts for the Products, including profitability analyses prepared for non-federal income tax purposes;
• Short and long-term risk-weighted analyses regarding a range of possible market, financial and profitability outcomes;
• Due diligence studies regarding capitalization, management, and compliance with legal requirements;
• Hazard contingency and business continuity planning related to contractual risk allocations;
• MOPR has (or will shortly) acquire sufficient capital to finance the risks assumed its Cost Sharing Arrangement;
• A business and expansion plan for MOPR setting out its investment in its Puerto Rican manufacturing facility, its targeted head count, and expertise of personnel required to run MOPR's business and participate in the investment of its R&D investments; and
• A study documenting the fact that third parties routinely set fixed royalty rates for period of one year or more that are not subject to renegotiation based on actual results that differ from projected results.  This study will utilize third party comparable agreements as the principal basis for its support.

(*Id.,* Ex. 38 at 0010683-84; *see also* Ex. 41).

## D.  The IRS also seeks documents in connection with the examination of Microsoft's Asia-Pacific cost sharing arrangement

Effective April 3, 2004, Microsoft and its Asian affiliate, Microsoft Asia Island Limited ("MAIL"), entered into a license agreement to transfer to MAIL all intangible property rights in the Asia Pacific retail channel — *both* technology and non-technology rights.  (Hoory Decl. ¶ 21).  The agreement purported to compensate Microsoft for the rights transferred through a buy-in royalty payable by MAIL.  The IRS understands that pricing for the buy-in royalty was premised on Microsoft owning only about four percent of non-technology intangibles (including trademarks) for the Asia Pacific retail channel at the time (with the balance owned by a Microsoft subsidiary incorporated in Singapore).  (*Id*. at ¶¶ 22-23).  To ascertain if this premise is consistent with pre-2004 arrangements, the IRS seeks documents prior to 2004.  In this regard,

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

10

the IRS recently received from EY an April 8, 1999 royalty pricing analysis prepared by Richard Gordon, then with Arthur Andersen.  (*Id.,* Ex. 50).  It appears that Microsoft may be withholding the very same (or related) documents.  (Ex. D, Items 52, 56, 57, 77, 83).  To the extent such documents concern business advice, they should be produced.[10]

## LEGAL ANALYSIS

### A.  Microsoft has not met its burden to show the disputed documents are privileged

Microsoft submits four privilege logs, asserting the attorney-client privilege, tax practitioner privilege under § 7525, and/or work product protection as to the documents.[11] Microsoft agrees that it has the burden of proving that its claims of privilege are valid.  But Microsoft has not met its burden.  A party asserting privilege must "describe the nature of the documents . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).  This can be accomplished through the use of a privilege log, which the Ninth Circuit has said must address:

> (a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated.

*In re Grand Jury Inv.*, 974 F.2d 1068, 1071 (9th Cir. 1992).

The privilege logs are deficient in several respects.  First, many of the entries are generic in nature, simply stating that the document was prepared "in connection with MSFT's request for

---

[10] Several items on Microsoft's logs refer to legal advice from in-house attorney Kevin Fay, who was also the director of MAIL.  (Hoory Decl., ¶ 24).  But based on documents already produced by Microsoft, it appears that Fay was also working on business matters relating to the APAC Transaction.  (*Id.*, Ex. 51) (attaching, among other things, a "Step Plan" for the Asia Cost Share Project).  Since Microsoft has apparently produced "everything we've written to date" from Fay as of December 4, 2003 (*Id.*, Ex. 51), privilege, if any, has been waived.  Fay appears on Ex. D in items 607 and 736.

[11] Microsoft and the United States have narrowed the universe of documents in dispute from over 2,400 to approximately 126 documents, comprising 174 log items.  With respect to some of these remaining documents, counsel for the United States knows more than it can reveal here, on account of having been afforded a "quick peek."  The majority of the disputed documents, however, are ones for which no "quick peek" was offered.

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

11

tax advice on Puerto Rico restructuring" or that the document "[reflects] legal advice rendered by [claimed attorney] regarding transaction structure." These vague attestations do not demonstrate that the documents are privileged. *See, e.g. Apple Inc. v. Samsung Elecs. Co., Ltd.*, 306 F.R.D. 234, 239-40 (N.D. Cal. 2015). Second, there are instances where no attorney is clearly identified, making the determination as to privilege impossible. Third, a large number of the documents identified on the privilege logs are email chains.

> [A] single email of a 'legal nature' does not privilege the entire email thread" and 'subsequent emails in the thread should only be withheld if they reveal legal advice or a request for such, not simply because a topic discussed at some point in the email chain has some legal implications.'

*In re Chase Bank USA, N.A. "Check Loan" Contract Lit.*, 2011 WL 3268091, *6 (N.D. Cal. July 28, 2011); *see also Datel Holdings Ltd. v. Microsoft Corp.*, 2011 WL 866993, *5-6 (N.D. Cal. Mar. 11, 2011) (finding attorney-client privilege only applied to the original email in the chain).

In an effort to meet its *prima facie* burden, Microsoft also relies on several declarations, including a conclusory one submitted by Daniel Rosen, attorney of record in this matter. Although Rosen attempts to address specific documents and log entries, his assertions do not provide any information as to the nature of the documents. Similarly, Microsoft's three other declarations fail to provide the document specific information necessary to support the validity of Microsoft's privilege claims. Accordingly, the Court should find that Microsoft has failed to meet its *prima facie* burden.

Even if the Court finds that Microsoft has met its *prima facie* burden, the Court should nevertheless conduct an *in camera* review of the documents to determine whether the claimed privilege(s) actually applies. The Ninth Circuit has held that *in camera* review of documents is available when the party opposing the privilege "show[s] a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged." *In re Grand Jury Inv.*, 974 F.2d at 1075. This showing is a

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

12

"minimal threshold" and once met, the decision whether to conduct the review lies within the discretion of the Court.  *Id.* at 1074-75.

The United States has met its "minimal threshold" by submitting numerous documents revealing that KPMG was focused on the accelerated implementation of a transaction during the relevant time period.  By comparing log entries with documents submitted with the Hoory Declaration, it appears that Microsoft may be withholding documents addressing transactional implementation, business advice, accounting advice, contract drafting and pricing documents, and business structuring recommendations.  In some instances, it appears that the United States has already been provided similar or possibly identical documents.

**B.  Microsoft has not asserted valid privilege claims under § 7525**

**1.      Microsoft has not established the elements of the tax practitioner privilege**

Under I.R.C. § 7525(a)(1),

> With respect to tax advice, the same common law protections of confidentiality
> which apply to a communication between a taxpayer and an attorney shall also
> apply to a communication between a taxpayer and any federally authorized tax
> practitioner to the extent the communication would be considered a privileged
> communication if it were between a taxpayer and an attorney.

This statutory tax practitioner privilege is "limited" and "no broader than the existing attorney-client privilege."  *Valero Energy Corp. v. United States*, 569 F.3d 626, 630 (7th Cir. 2009).  "Nothing in the statute 'suggests that these nonlawyer practitioners are entitled to privilege when they are doing **other than lawyers' work**....'"  *Id.* (quoting *United States v. Frederick*, 182 F.3d 496, 502 (7th Cir.1999)) (emphasis added).  Since accounting advice is not privileged (whether dispensed by an accountant or attorney), "the success of a claim of privilege depends on whether the advice given was general accounting advice or legal advice."  *Id.*

> "What is vital to the privilege is that the communication be made in confidence
> for the purpose of obtaining legal advice from the lawyer. If what is sought is not
> legal advice but only accounting service, as in *Olender v. United States*, 210 F.2d
> 795, 805-806 (9th Cir. 1954), [*cert. denied*, 352 U.S. 982, 77 S.Ct. 382, 1 L.Ed.2d

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

13

365 (1956)], *see Reisman v. Caplin*, 61-2 U.S.T.C. ¶ 9673 (1961), or if the advice
sought is the accountant's rather than the lawyer's, no privilege exists." *United
States v. Kovel*, 296 F.2d 918, 922 (2nd Cir. 1961); *accord*, *United States v.
Judson*, 322 F.2d 460, 462 (9th Cir. 1963).

*United States v. Gurtner*, 474 F.2d 297, 299 (9th Cir.1973), *see also United States v. McEligot*,
2015 WL 1535695, *6 (N.D. Cal. Apr. 6, 2015).

The same distinction exists with respect to business advice:  an attorney's business advice
is not privileged.  *Matter of Fischel*, 557 F.2d 209, 212 (9th Cir. 1977) (summaries of business
transactions compiled by tax planning attorney not privileged).

For the Americas Transaction, contemporaneous documents make clear KPMG was not
providing legal advice to Microsoft.  (Ex. 27 at 21861 ("legal counsel must review . . . we're not
practicing law"); Ex. 13 at 2800 ("Microsoft should consult with legal counsel to review the
design of the IHCo strategy to determine any potential legal issues that may arise in connection
with its implementation"); *see also* Ex. 25 at 4807).  Rather, KPMG performed detailed and
extensive financial modeling, design, and implementation services in connection with the launch
of the Americas Transaction, going so far as to create sample journal entries for MOPR.  These
kinds of documents are not privileged under § 7525.  As the Seventh Circuit explained,

> Many of these documents consist of worksheets containing financial data and
> estimates of tax liability, while others discuss deductions and the calculations of
> gains and losses. These documents contain the type of information generally
> gathered to facilitate the filing of a tax return, and such accounting advice is not
> covered by the privilege . . . Still other documents raise issues about Valero's
> inventory methods, compensation packages, or general structure, and analyze how
> they affect tax computations. While these documents contain some legal analysis,
> it comes part and parcel with accounting advice, and is therefore also open to the
> government.

*Valero*, 569 F.3d at 631 (internal citations omitted).

The privilege is limited in an additional respect:  it does not cover advice with respect to

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

14

1  taxes imposed by foreign governments. [12]  This calls into question Microsoft's § 7525 claims for

2  items 19, 25, 167, 496 on Ex. D.

3      **2.      The tax practitioner privilege does not apply to written communications
              regarding tax shelters**

4

5      Even if the Court finds that Microsoft has otherwise established the elements of the tax

6  practitioner privilege with respect to any of the withheld documents, it does not apply to written

7  communications made "in connection with the promotion of the direct or indirect participation of

8  [a] person in any tax shelter (as defined in section 6662(d)(2)(C)(ii)." I.R.C. § 7525(b) (post-

9  2004).[13]  Although the United States bears the initial burden to show that a communication does

10  not qualify for the tax practitioner privilege pursuant to the § 7525(b) exception, that burden "is

11  relatively light – [one] need only show that there is some foundation in fact that a particular

12  document falls within the tax-shelter exception." *Valero*, 569 F.3d at 634.  Here, the Statement

13  of Facts demonstrates that "there is some foundation in fact" to invoke the exception.

14      First, the Americas Transaction is unquestionably a "tax shelter" for purposes of § 7525.

15  That term is broadly defined, by reference to I.R.C. § 6662(d)(2)(C)(ii), to encompass any "plan

16  or arrangement, if a significant purpose of such partnership, entity, plan, or arrangement is the

17  avoidance or evasion of Federal income tax."  Accordingly, the United States is not required to

18  disprove potential business purposes.  All that is required is some foundation in fact showing that

19  [12] "Tax advice" between a federally authorized practitioner and a taxpayer is covered only "'to the extent the
communication would be considered a privileged communication if it were between a taxpayer and an attorney.'"
20  *Frederick*, 182 F.3d at 502 (quoting § 7525(a)(1)).  "Tax advice," in turn, is defined as: "advice given by an
individual with respect to a matter which is within the scope of the individual's authority to practice described in
21  subparagraph (A) [of § 7525(a)(3)]." I.R.C. § 7525(a)(3)(B).  A practitioner's authority to practice is addressed in §
7525(a)(3)(A) as a "practice before the Internal Revenue Service if such practice is subject to Federal regulation
under section 330 of title 31, United States Code."  It follows that the privilege applies only to advice regarding
22  federal income taxes, not to advice regarding taxes imposed and administered under any foreign tax law.
[13] Some of the documents at issue are dated prior to October 22, 2004, the effective date for amendments to both
23  § 7525 and 6662 under the American Jobs Creation Act.  But the amendment to § 7525(b) broadened the reach of
the tax shelter exception to include non-corporate taxpayers and the amendment to § 6662 was non-substantive as to
24  the definition of tax shelter.  Therefore, the analysis here is the same under the prior statutes.  Both pre-AJCA and
post-AJCA versions of the statutes are appended to the brief.

25

United States' Response to                                    **U.S. Department of Justice**
Microsoft's Brief Regarding                                   Ben Franklin Station, P.O. Box 683
Privileged Documents Still in Dispute                         Washington, D.C. 20044-0683

tax avoidance was a significant purpose of the transaction.  As articulated by the Seventh Circuit:

> This definition of tax shelter is broad and could, as Valero points out, include some legitimate attempts by a company to reduce its tax burden. But it is not our place to tinker with the unambiguous definition provided by Congress. And even under this definition, tax shelters are not boundless. Only plans and arrangements with a significant—as opposed to an ancillary—goal of avoiding or evading taxes count.

*Valero*, 569 F.3d at 632.  By Microsoft's own admission, the Americas Transaction was "a pure tax play."  (Ex. 46; *see also* Hoory Decl. ¶¶ 13-20).

Second, as in *Valero*, the kind of encouragement offered by KPMG in furtherance of Microsoft's participation falls well within the definition of "promotion."  *Id*. at 632-34 (rejecting argument to limit "promotion" to a sale of tax-shelter product).[14]  KPMG did more than assess the Americas Transaction "in a neutral fashion" or evaluate earlier transactions for "soft spots." *See id*.  KPMG designed key elements of the Americas Transaction, encouraged its accelerated implementation by Microsoft, solved problems that presented obstacles to implementation, and made recommendations to Microsoft.  The *Valero* case is instructive.  As discussed in the district court's opinion, that case also involved privilege disputes that arose in the context of a large accounting firm (there, Arthur Andersen) having been "involved in formulating" or providing "input" with respect to an "intracompany plan" that had a significant tax purpose.  *Valero Energy Corp. v. United States*, 2008 WL 4104368, *14, 18 (N.D. Ill. Aug. 26, 2008).  The facts here are even more compelling than those in *Valero* as to how an accounting firm promoted participation in a transaction with a significant tax avoidance purpose.

---

[14] The Seventh Circuit's interpretation of "promotion" comports with the plain meaning of the term: "furtherance" or "encouragement." *See, e.g.*, *Promotion Definition*, DICTIONARY.COM, http: //dictionary..com/browse/promotion (last visited October 12, 2016).

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

16

### C. Microsoft has improperly invoked the work product doctrine

#### 1. The documents for which Microsoft claims work product protection were not created for use in anticipated litigation

Microsoft's sweeping claims with respect to work product, if credited, have the practical effect of shielding all business planning documents from disclosure.  In fact, by Microsoft's logic, the more suspect and abusive the contemplated transaction, the more reason to hide planning documents under a cloak of protection.  But this should not be, and is not, the law.  *See Schlicksup v. Caterpillar, Inc.*, 2011 WL 4007670, *5 (C.D. Ill. Sept. 9, 2011) (expectation of close scrutiny from IRS did not equate to anticipating litigation—all of Caterpillar's returns were audited); *see also In re Special Sept. 1978 Grand Jury*, 640 F.2d 49, 65 (7th Cir. 1980) (materials prepared with an eye toward IRS administrative proceeding were not work product).  The United States believes that many of the disputed documents cannot be said to have been created because of anticipated litigation.  Spreadsheet modeling, contract drafting, tracking steps to implement a transaction, and slide presentations are not the kinds of document an attorney creates because of litigation.  As the First Circuit has observed with respect to overreaching claims of work product, "[e]very lawyer who tries cases knows the touch and feel of materials prepared for a current or possible (*i.e.,* "in anticipation of") law suit."  *United States v. Textron, Inc.*, 577 F.3d 21, 30 (1st Cir. 2009).  Indeed, even though Microsoft claims that 170 of the 174 documents that remain in dispute are protected by work product, most of those claims were not asserted in the original KPMG logs prepared by Microsoft (Exs. 1-6), but instead were made only after the government challenged Microsoft's other assertions of privilege.

Given the "congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry," privileges are narrowly construed.  *United States v. Arthur Young & Co.,* 465 U.S. 805, 816 (1984).  This includes the work-product doctrine, which is a "qualified privilege."  *United States v. Nobles*, 422 U.S. 225, 237-38 (1975).  Derived from the Supreme

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

17

1    Court's decision in *Hickman v. Taylor*, 329 U.S. 495, the purpose of the work-product doctrine is

2    to protect the adversary process by "prevent[ing] exploitation of a party's efforts in preparing for

3    litigation." *Admiral Ins. Co. v. United States Dist. Court for Dist. of Arizona*, 881 F.2d 1486,

4    1494 (9th Cir. 1989).  Here, the IRS seeks to understand complex business transactions, not to

5    "exploit" work product.

6         "The phrase 'in anticipation of litigation' has both temporal and motivational

7    components."  *Umpqua Bank v. First American Title Ins. Co.,* 2011 WL 997212, *4 (E.D. Cal.

8    Mar. 17, 2011).  At the time the document was prepared, the drafter must have had a subjective

9    belief that litigation was possible and that belief must have been objectively reasonable.  *Id.*

10   Microsoft bears the burden of establishing that each of the 170 documents it seeks to protect

11   from production was prepared in anticipation of litigation and by or for it or its representatives.

12   *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2003)

13   ("*Torf*"); *Chandola*, 2014 WL 4685351 at *4.

14        The documents for which Microsoft claims work product protection span from October

15   2004 to June 2007 and involve individuals both internal to Microsoft as well as attorneys and

16   advisors outside of Microsoft as described in the Declaration of Michael Boyle.  Boyle explains

17   that he hired both EY and KPMG to advise him and his Tax Department because he knew the

18   IRS would challenge the arm's length values determined by both cost sharing arrangements.  *Id.,*

19   ¶ 22.  But Boyle does not explain how, or even if, he communicated this intention to his Tax

20   Department or the firms he hired.  *Id.,* at 7-8.  Boyle does not offer the Court engagement letters

21   that might outline the "litigation preparation" role envisioned, nor does he share any details

22   about any direction he may have provided for how the documents were to be marked or

23   maintained.  Boyle fails to identify when the engagements for "litigation preparation" with EY

24   and KPMG commenced.

25

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

18

1    Further, there is no indication in Microsoft's logs that any of the documents for which it

2    claims protection were actually marked as work product.  And there is no evidence that

3    Microsoft took any action to prevent spoliation of documents that might be necessary for use in

4    its "anticipated litigation."  To the contrary, the United States has discovered through this

5    proceeding that the records of several custodians, including Boyle himself, cannot be located.

6    (Hoory Decl, ¶24).  Despite Microsoft's efforts now to make it appear that it had a subjective

7    belief that litigation with the IRS was likely, little in its actions—at either the inception of these

8    arrangements or more recently—evidence that was actually the case.

9    Even if anticipation of litigation with the IRS could have been subjectively reasonable,

10   that does not mean that the documents for which Microsoft now claims protection were prepared

11   for in connection with possible litigation.  "The mere fact that the taxpayer is taking an

12   aggressive position, and that the IRS might therefore litigate the issue, is not enough" to establish

13   that attorney work product is protected from disclosure to IRS.  *Fidelity Intern. Currency*

14   *Advisor A Fund, L.L.C., v. United States*, 2008 WL 4809032, *13 (D. Mass. April 18, 2008)

15   (finding that attorney opinion letters were not work product because they were drafted to induce

16   investment in a strategy and not because of the threat or prospect of litigation with the IRS).

17   Given that an IRS challenge to a taxpayer's position is always possible and that any advice from

18   a tax lawyer will likely address that possibility, there must be a close nexus between a specific

19   potential claim and the lawyer's advice in order for work product to apply.  *Id*.; *see also Valero*

20   *Energy Corp. v. United States*, 2007 WL 4179464, at *6 (N.D. Ill. Aug. 23, 2007).  Furthermore,

21   in-house counsel on a communication does not automatically confer work product protection and

22   a lack of attorney involvement in a document is a "useful sign" that it is likewise not protected.

23   *Phoenix Technologies Ltd. v. VMware, Inc.*, 2016 WL 3566942, * 4, 7 (N.D. Cal. July 1, 2016)

24   (finding emails circulating draft presentations, internal communications, and non-attorney

25

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

19

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

analysis of agreements not work product because of lack of attorney analysis and involvement and creation was related to business purpose more than litigation).

### 2. The documents for which Microsoft claims work product protection were not created *because of* anticipated litigation

Where a document appears to serve a business purpose, the further question arises whether the documents can also be said to have been prepared "in anticipation of litigation." Under the applicable test, work-product protection may attach to a dual-purpose document only if it "was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation." *Torf*, 357 F.3d at 908.

When applying the "because of" standard, the totality of the circumstances surrounding the document's creation must be considered. *United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011). That means both the "'nature of the document *and* the factual situation of the particular case' are key to a determination of whether work product protection applies." *Torf*, 357 F.3d at 908. "It is well established that documents prepared in the ordinary course of business are not protected by the work-product doctrine because they would have been created regardless of the litigation." *Heath v. F/V* Zolotoi, 221 F.R.D. 545, 549-50 (W.D. Wash. 2004) (citations omitted).

### a. Documents responsive to the Designated Summons/IDR 2209

The privilege log at Exhibit A includes just five documents. All five are Microsoft emails. Only two identify attorneys as authors or recipients, and three include attachments. All five involve advice "regarding cost-sharing and Puerto Rico." Based on these generic descriptions of the subject matter it is impossible to discern whether these emails were created because of anticipated litigation or just in the ordinary course of business. As described above, when some of these emails were drafted, Microsoft was rushing into "immediate implementation" of the Americas Transaction.

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

20

### b.   Documents responsive to the KPMG summons

For reasons articulated in the Statement of Facts, it is likely that documents in dispute contain non-legal business or accounting advice.  Spreadsheets, slide presentations and email chains were not likely created *because of* the threat of litigation with the government.  The same may be true regarding the numerous memoranda appearing on the logs.  Microsoft and KPMG would have had to document implementation of the transaction, irrespective of whether the IRS ever challenged the arrangement.  Two of Microsoft's four privilege logs involve KPMG documents.  (Exs. B & C)[15].

### c.   Documents responsive to the Related Summonses

The fourth log, found at Exhibit D is the privilege log for the two related summonses and includes documents dated October 1998 through June 2006.  This log refers to "tax advice" from advisors both internal and external to Microsoft about issues of domestic and foreign taxation. The United States suspects that some of the disputed documents contain business pricing analysis and advice.  It appears that other items may contain "tax advice" related to compliance proceedings with foreign tax authorities.  Documents created to comply with the law are not protected by the work-product doctrine. *Textron*, 577 F.3d at 29-30, 31-32; *In re Raytheon Securities Lit.*, 218 F.R.D. 354, 359 (D. Mass. 2003); Fed. R. Civ. P. 26(b)(3) (advisory committee notes), 48 F.R.D. 487, 501 (the work-product doctrine does not extend to "Materials

---

[15]For Ex. B, all 10 items share one generic description and none reflect who at Microsoft requested the tax advice. Two of the 10 documents are logged with no author, no recipient, no sender, and no carbon copy.  Five of the entries were sent to no one in particular at Microsoft, just Microsoft writ large.  The larger Ex. C is also defective. None of the log entries reflect who at Microsoft requested the tax advice and there is not enough specificity in the description to determine whether the documents include actual reasoning about anticipated litigation or instead simply discuss logistics or other mechanics of implementation.  These generic descriptions are insufficient to establish that work product protection is appropriate.  The United States suspects that many of these documents contain financial data, projections, and modeling, while others likely discuss differing potential courses of action and the associated calculations of gains and losses.

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

21

1    assembled in the ordinary course of business, or pursuant to public requirements unrelated to

2    litigation, or for other nonlitigation purposes.").

3        **D.  Microsoft has not asserted valid attorney client privilege claims**

4            Although Microsoft has asserted attorney client privilege with respect to 12 documents,

5    its assertions are similarly flawed.  As discussed above, Microsoft's privilege logs are deficient

6    for varying reasons.  Further, Microsoft submitted Rosen's declaration which only cursorily

7    concludes that the documents meet the standard for protection under the attorney client privilege.

8    However, Rosen is Microsoft's attorney in this case and his opinion about whether the

9    documents meet the standard for protection from disclosure is argument and not fact, regardless

10   of the form in which it was submitted.  Accordingly, the Court should disregard Rosen's self-

11   serving arguments in performing its analysis.

12           The attorney-client privilege exists where: "(1) [ ] legal advice of any kind is
             sought (2) from a professional legal adviser in his capacity as such, (3) the

13           communications relating to that purpose, (4) made in confidence (5) by the client,
             (6) are at his instance permanently protected (7) from disclosure by himself or by

14           the legal adviser, (8) unless the protection be waived."

15   *Richey*, 632 F.3d at 566 (quoting *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010)).

16   Microsoft has the burden of "establishing the relationship and privileged nature of the

17   communication."  *Id. (*citation omitted).  "Because it impedes full and free discovery of the truth,

18   the attorney-client privilege is strictly construed."  *United States v. Martin*, 278 F.3d 988, 999

19   (9th Cir. 2002) (quotation omitted).  If the advice sought is not legal advice but instead concerns

20   non-legal issues, such as business advice, the privilege does not apply.  *Richey*, 632 F.3d at 566.

21           "Extra scrutiny is required where in-house counsel is involved, as they often act in both a

22   legal and non-legal business capacity, and communications made in this latter capacity are not

23   privileged."  *Chandola*, 2014 WL 4685351 at *3 (citations omitted).  "'When attempting to

24   demonstrate than an internal communication involving in-house counsel deserves privileged

25

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

22

status, a party therefore must make a clear showing that the speaker made the communication for

the purpose of obtaining or providing *legal* advice.'" *Id*. (citation omitted). "Where legal and

business considerations are intertwined, courts have looked to see whether the 'primary purpose'

of the communication related to seeking legal advice." *Id*. (citing *North Pacifica, LLC v. City of*

*Pacifica*, 274 F.Supp.2d 1118, 1128 (N.D. Cal. 2003)). Simply including in-house counsel on a

communication does not automatically mean the communication is privileged. *Oracle Am., Inc.,*

*v. Google, Inc.*, 2011 WL 3794892 at *4 (N.D. Cal. Aug. 26, 2011). Thus, in the 12 instances

where Microsoft asserts attorney-client privilege, Microsoft bears the burden to show that the

primary purpose of communications with and in the presence of the claimed attorney was to seek

or receive legal advice rather than for administrative or business purposes. This Microsoft has

not done.[16]

### E.  Microsoft has waived privilege

An intentional waiver of a privileged or protected communication may result in waiving

privilege or protection in undisclosed communications or information concerning the same

subject matter, with the burden on the asserting party to show it has not waived the privilege.

*Weil v. Inv./Indicators, Research & Mgmt., Inc.,* 647 F.2d 18, 25 (9th Cir. 1981). The subject-

matter waiver doctrine prevents a party from selectively disclosing communications that support

its position while denying access to communications that do not. *Lambright v. Ryan*, 698 F.3d

808, 823 (9th Cir. 2012). [17]

---

[16] Exhibit A includes two claims of privilege: items 13 & 25. Neither log entry addresses the primary purpose for these communications. In addition, both items reference Microsoft's in-house counsel. The remaining ten documents are found on Ex. D, items 43, 167, 607, 736, 870, 881, and 882. Those items are similarly defective. In addition, Microsoft states that the email chain and attachment at item 167 pertains to a Japanese tax audit. To the extent that Microsoft may have been discussing what to share with the Japanese tax authorities, then there is no intention of confidentiality and thus no privilege applies. Further, for items 792, 794, and 795, the log does not identify the attorney rendering the claimed legal advice and none of the people listed are attorneys.

[17] The courts have eschewed a "bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the (continued...)

United States' Response to
Microsoft's Brief Regarding
Privileged Documents Still in Dispute

23

**U.S. Department of Justice**
Ben Franklin Station, P.O. Box 683
Washington, D.C. 20044-0683

1    Under Federal Rule of Evidence 502(a), when a

2    disclosure is made in a federal proceeding or to a federal office or agency and
     waives the attorney-client privilege or work-product protection, the waiver
3    extends to an undisclosed communication or information in a federal or state
     proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed
4    communications or information concern the same subject matter; and (3) they
     ought in fairness to be considered together."

5
6    The fairness rationale here is that selective disclosure of documents will undermine the ability of

7    the IRS to make an accurate determination of Microsoft's tax liability.  In particular, waiver here

8    may well exist as to items involving the Gordon royalty analysis (*see* p. 11:5-6); Fay "step plan"

9    and related documents (*see* Fnt. 10); and Tyrrell royalty analysis (*see* Fnt. 6); and drafting of

10   agreements.  (*See* page 9: 1-4 & Fnt. 7).[18]  The United States also has reason to believe that an *in*

11   *camera* review of documents, with reference to documents submitted by the United States with

12   the Hoory Declaration, may reveal further instances of waiver.

13                                  **CONCLUSION**

14        For the reasons set forth above, the Court should either order Microsoft to produce the

15   documents identified in its privilege logs or, alternatively, require Microsoft to provide the

16   documents to the Court for an *in camera* review, and, should any documents be determined to

17   not be privileged, then those documents should be produced to the United States.

18

19   _____

20   (… continued)

21   parties of permitting or prohibiting further disclosures" (internal citations and quotations omitted).  *SEC v. Roberts*,
     254 F.R.D. 371, 378 (N.D. Cal. 2008).  "The substantive scope of the waiver is determined by the content of the
     disclosed communications."  *Aristocrat Tech. v. Int'l Game Tech.*, 2010 WL 3060298, *3 (N.D. Cal. Aug. 3, 2010).
22   [18] To the extent that KPMG's work was in furtherance of disclosure obligations under I.R.C. § 6662, privilege
     would not apply or would be waived.  Weaver states that none of the documents identified in the privilege logs were
23   part of the taxpayer's § 6662 documentation.  (Weaver Decl., ¶ 21.)  This misses the point.  If withheld
     communications address the same subject matters as documents disclosed, there may be subject matter waiver.
24   Disclosures under § 6662 would include valuation reports and background documents.  *See* Treas. Reg. § 6662-
     6(d)(2)(iii)(describing documentation requirements).

25

1    Dated this 12th day of October, 2016.

2                                          CAROLINE D. CIRAOLO
                                           Principal Deputy Assistant Attorney General
3
                                           */s Noreene Stehlik*
4                                          */s James E. Weaver*
                                           */s Jeremy Hendon*
5                                          */s Amy Matchison*
                                           NOREENE STEHLIK
6                                          JAMES E. WEAVER
                                           Senior Litigation Counsel, Tax Division
7                                          JEREMY HENDON
                                           AMY MATCHISON
8                                          Trial Attorneys, Tax Division
                                           U.S. Department of Justice
9                                          P.O. Box 683, Ben Franklin Station
                                           Washington, DC 20044-0683
10                                         Email:  Noreene.C.Stehlik@usdoj.gov
                                                   James.E.Weaver@usdoj.gov
11                                                 Jeremy.Hendon@usdoj.gov
                                                   Amy.T.Matchison@usdoj.gov
12                                                 Western.TaxCivil@usdoj.gov
                                           Telephone:     (202) 514-6489
13                                                        (202) 353-2466
                                                          (202) 307-6422
14
15                                         ANNETTE L. HAYES
                                           United States Attorney
16                                         Western District of Washington

17                                         *Attorneys for the United States of America*

18

19

20

21

22

23

24

25

1

## <u>CERTIFICATE OF SERVICE</u>

2        IT IS HEREBY CERTIFIED that service of the foregoing and the Declaration of Eli

3   Hoory and supporting exhibits has been made this 12th day of October, 2016, via the Court's

4   ECF system to all parties.

5

6                                        */s/ Amy Matchison*
                                         AMY MATCHISON
7                                        Trial Attorney, Tax Division
                                         U.S. Department of Justice
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25