| | |
|---|---|
| **From:** | Weaver, Brett A |
| **Sent:** | Tuesday, September 27, 2005 4:44 PM |
| **To:** | Glenn Cogswell (TAX); Nancy Perks (TAX); Tom Sullivan (TAX) |
| **Cc:** | George, Gregory L; Mogen, Philip D; Welsh, Anne A; Weaver, Brett A; tfoss@kpmg.com |
| **Subject:** | CWI & Periodic Payment Adjustment Memo |
| **Attachments:** | America's Project  CWI baw v4.doc |

Here's a redline version of the most recent changes to the memo.  Most of the changes are to cause the example in the memo to reflect the points otherwise made in the memo.

We look forward to reviewing the memo with you on Wednesday.

Thanks


Brett A. Weaver
KPMG
International Corporate Services
Seattle, Washington
206 913 6697 (office)
206 913 4444 (fax)



**Government Exhibit**

38

1

CONFIDENTIAL

To  The Files of Microsoft                                    Date  September 12, 2005

From  Brett Weaver                                           Ref  America's Project  CWI baw v3.doc
      Greg George
      Paul K. Savage

  cc  Steve Lainoff, KPMG Washington National Tax
      Stephen Bates, KPMG Washington National Tax

**Project America's Buy-In Arrangement and Satisfying the Commensurate With
Income Standard**

**\*\*\*DRAFT\*\*\***

**For Discussion Purposes Only**

---

THIS MEMORANDUM DOES NOT CONSTITUTE AN OPINION OF KPMG.  IT IS NOT
INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY ANY
PERSON OR ENTITY FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE
IMPOSED ON ANY TAXPAYER.

---

*This memorandum sets out the merits of Microsoft's position as outlined in the
Issues Section below and does not constitute an opinion by KPMG LLP ("KPMG").
While KPMG did review several relevant documents, we would need to review
further documentation and confirm in writing the factual assumptions set forth
below in order to render a formal tax opinion.  In addition, we would need to do a
more detailed analysis than we have done for purposes of this discussion.  If all
facts and assumptions below were verified and the more extensive analysis did not
reveal anything inconsistent with that reflected below, we would expect to be able to
issue an opinion consistent with the conclusions contained herein.  However, we
cannot guarantee that the Internal Revenue Service would not take a position
contrary to the conclusions contained herein or that such a challenge would not be
upheld based on either the merits of a case as presented to a court or on a
taxpayer's potential inability to meet any applicable burden or proof.  In various*

CONFIDENTIAL                                            KPMG_MS IRS 0010678

*sections of this memorandum, for ease of understanding and as a stylistic matter, we may use language (such as "will" or "should") that might suggest that we are rendering an opinion or have come to a particular level of comfort or conclusion. Such language should not be construed as KPMG providing a level of opinion to Microsoft Corporation or any other person or entity.*

**Facts and Background**

Microsoft Corporation's ("MS Corp" or the "Company") Redmond headquarters house MS Corp's corporate offices, its U.S.-based finance and administrative staff, most of its engineering and software development teams, and some of its sales and marketing personnel.

Microsoft develops, manufactures, licenses, and supports a wide range of software products for a multitude of computing and electronic devices. Microsoft software includes scalable operating systems for intelligent devices, personal computers ("PCs") and servers; server applications for client/server environments; knowledge worker productivity applications; and software development tools. Microsoft's online efforts include the MSN™ network of Internet products and services, and alliances with third party companies involved with broadband access and various forms of digital interactivity. Microsoft also sells hardware devices, provides consulting services, trains and certifies system integrators, and researches and develops advanced technologies for future software products.

"Microsoft" encompasses Microsoft's U.S. company and its subsidiaries included in its U.S. consolidated tax filing (including foreign disregarded entities). Microsoft also owns several "controlled foreign corporations" which are not consolidated with the U.S. entities for tax return filing purposes. The Company has regional operations centers in Ireland, Singapore, Miami, Reno and Redmond. The regional centers support all operations, including information processing, vendor management and logistics by geographical regions. Microsoft also has manufacturing facilities in Puerto Rico and recently formed, "Microsoft Operations Puerto Rico" ("MOPR") for the purpose of co-developing technology and expanding MS Corp's manufacturing capacity for the U.S. market.

Microsoft utilizes several methods of distributing software products in its Retail Channels, including sub-channels for Full Packaged Product ("FPP"), Select, Enterprise Agreements ("EA"), Microsoft Open License Packs ("MOLP") and

CONFIDENTIAL

Microsoft License Packs ("MLP").  Software distributors (or resellers) purchase software from Microsoft and then resell it to other channel members (often retailers).  Distributors and resellers service a variety of customers including retailers, organization customers (including large accounts) and small OEMs.

In retail channels other than FPP, the physical distribution of software often occurs via "welcome kits" which contain disks[1] that allow the customer's IT professionals to make copies of Microsoft programs on multiple computers.  Master site license arrangements provide that these business customers will pay for each software installation, although the exact quantity of installations to be made is generally unknown when the agreement is executed (*i.e.,* under Select, Enterprise Agreement, MOLP and other master site licensing arrangements).  Payments for software are made on a periodic basis and are determined, in part, on the number of additional software copies installed during a given period.  Welcome Kit disks are uniquely designed for installation only with a single customer.

MS Corp generally produces the software program code for most of its products in the United States.  Effective July 1, 2005, MOPR entered into a cost sharing agreement with Microsoft's IP-owning U.S. subsidiary ("MOLC)[2] in accordance with Treas. Reg. § 1.482-7(g) ("Cost Sharing Agreement").  Rights to all technology intangibles developed under the Cost Sharing Agreement within the Americas ("Covered Intangibles") will be the exclusive property of MOPR to the extent those rights are used in the retail, rather than OEM, market.  Effective the same date, MOPR entered into a "Buy-In Agreement" with MOLC to acquire non-exclusive rights to existing technology intangibles of Microsoft.

The provisions of the Buy-In Agreement concerning the consideration to be paid by MOPR for the existing IP rights are as follows:

    4.1    The Parties intend that the royalties payable to MOLC pursuant to this section shall be structured (subject to Section 4.2 below) as flat royalty rates over the primary life of the Existing Covered Intangibles in accordance with the terms of payment set forth on Schedule A.

---

[1] Generally in the form of a CD-ROM, defined as "A compact disk that functions as read-only memory."

[2] MOL Corporation, a Nevada corporation ("MOLC"), is wholly owned by MICROSOFT LICENSING, GP a Nevada general partnership ("MSLI").

CONFIDENTIAL

4.2  In consideration of MOLC's grant of the license rights to the technology, intellectual property rights and confidential information described herein during the period where MOPR expands and completes its production capabilities, MOPR agrees to pay royalties at a rate greater than otherwise required under Section 4.1.  Accordingly, from the Effective Date through June 30, 2006 ("Fixed Rate Period"), MOPR agrees to pay MOLC a fixed royalty rate for each fiscal quarter of the Fixed Rate Period, as set forth on Schedule A.  The royalties payable for the Fixed Rate Period will be payable regardless of the actual profits realized from the sale and distribution of Microsoft Products within the MOPR Territory during such time.  However, from July 1, 2006, through the remainder of the primary economic useful life of the Existing Covered Intangibles, the royalties payable by MOPR to MOLC are to be determined as a flat royalty rate as set forth on Schedule A.  MOPR agrees to pay MOLC additional royalties, as set forth on Schedule A, for all periods subsequent to the cessation of the primary economic useful life of the Existing Covered Intangibles where the Existing Covered Intangibles continue to have substantial commercial economic value.

4.3  The royalty for any year may be adjusted retrospectively or prospectively by mutual agreement of the Parties to the extent that the Parties determine that the royalty payments are not arm's length compensation that is commensurate with the income attributable to the Existing Covered Intangibles.

4.4  Not withstanding Section 4.3 herein, the Parties agree that in accordance with MOPR's willingness to accept the business risk described in Section 4.2 during the Fixed Rate Period, no adjustment under Section 4.3 will be made to any royalties arising during the Fixed Rate Period.

The cost sharing rules allow taxpayers various options in structuring buy-in payments.  Naturally, how these payments are structured will affect the annual profitability (presumably for purposes of computing net income under Generally Accepted Accounting Principles ("GAAP") as well as for U.S. federal income tax purposes) of the two companies involved.  The structure selected by Microsoft anticipates: (a) an initial Fixed Rate Period(s) royalty rate (37.9% from July 1, 2005 through June 30, 2006), (b) a flat royalty rate over the remaining period of the primary life and lag, excluding the "tail period" of the intangibles (20.0% from July

1, 2006 through June 30, 2010), and (c) a substantially reduced royalty rate over the "tail period" (2.1% from July 1, 2010 through June 30, 2014).

Following the execution of the agreements described above, MOPR has responsibility for the manufacture of the disks that will subsequently be sold in the retail channel in the Americas.  MOPR will sell to Microsoft retail disks fully loaded with MOPR's technology IP.  MS Corp will be responsible for packaging the disks into finished product (*e.g.,* shrink-wrapped boxes, welcome kits, etc.). Microsoft will then utilize its own marketing intangibles, marketing programs, and sales force in marketing, selling and distributing the finished product to end-users. Microsoft will be MOPR's primary (and possibly, only) customer and will act as a distributor of MOPR's products.  Under this new retail distribution agreement between Microsoft and MOPR, sales of software other than FPP will be recorded by MOPR when the physical disks are transferred to Microsoft and booked at a "standard cost" price until such time as the quantity of end-user customer installations has been determined.[3]  Once the quantity has been determined, the full arm's-length intercompany price will be invoiced and booked by MOPR.

As indicated in the Buy-in-Agreement provisions referenced above, the parties intend that the payments required under the Buy-in Agreement will reflect an arm's length amount as required under Section 482 of the Internal Revenue Code and the regulations thereunder.  The arm's-length amount determined by the parties necessarily considered the allocation of risks and contractual terms as agreed by the parties.  In recognition of the fact that MOPR had not completed its build-out of its manufacturing operations at the time of entering into the Cost Sharing Arrangement, the parties agreed that MOPR would pay a higher royalty rate in FY2006 and that such amount would not be subject to adjustment, regardless of actual profits realized from the exploitation of the Covered Intangibles during FY2006.  The parties analyzed and understood the business and financial risks associated with fixing the FY2006 royalty rate and concluded that such an allocation of FY2006 risks was acceptable to the parties and consistent with the manner in which third parties would allocate such risks.  In the course of this evaluation of FY2006 risks, the parties analyzed FY2006 projected sales and

---

[3] Financial institutions use similar accounting mechanisms in instances where a purchaser of goods needs preauthorization for a credit transaction, yet the ultimate amount of the charge cannot be determined in advance. The preauthorization booking of the transaction may post a charge of one dollar as a 'place holder' charge until the actual amount is subsequently determined and the completed transaction can be processed.

CONFIDENTIAL   KPMG_MS IRS 0010682

profitability of products utilizing the Covered Intangibles ("Products").  Alternative scenarios of FY2006 sales and profitability utilizing variable assumptions were evaluated and probability weighted or "risk adjusted."  From these probability-weighted scenarios, the parties evaluated the risks they were likely to assume and determined a FY2006 royalty rate that was mutually acceptable.

MOPR employs, or contracts services from related and unrelated parties, employees/agents that participate in the decisions related to R&D spending, plant expansion, intellectual property protection, and anti-piracy.  MOPR's business plan indicates that MOPR will continue to invest in highly skilled personnel to allow MOPR to efficiently operate its business.

The following documentation evidences (or will evidence when prepared) the parties' consideration of their respective risks and the arm's-length nature of the agreed allocation of FY2006 risks:

- Market analyses for each of the Products prepared for non-federal income tax purposes;

- Financial forecasts for the Products, including profitability analyses prepared for non-federal income tax purposes;

- Short and long-term risk-weighted analyses regarding a range of possible market, financial and profitability outcomes;

- Due diligence studies regarding capitalization, management, and compliance with legal requirements;

- Hazard contingency and business continuity planning related to contractual risk allocations;

- MOPR has (or will shortly) acquire sufficient capital to finance the risks assumed its Cost Sharing Arrangement;

- A business and expansion plan for MOPR setting out its investment in its Puerto Rican manufacturing facility, its targeted headcount, and expertise of personnel required to run MOPR's business and participate in the investment of its R&D investments; and

CONFIDENTIAL
KPMG_MS IRS 0010683

- A study documenting the fact that third parties routinely set fixed royalty rates for period of one year or more that are not subject to renegotiation based on actual results that differ from projected results.  This study will utilize third-party comparable agreements[5] as the principal basis for its support.

It is assumed that actual FY2006 profitability will be within the range of the probability-weighted scenarios considered by the parties in their assumption and allocation of risk as reflected in the Cost Sharing Arrangement agreements.  It is further assumed that the projected FY2006 profitability is just as likely to exceed as it is to be exceed by actual profitability, based on the most reliable information available ex ante.

**ISSUES**

Assuming actual financial results for the Fixed Rate Period diverge from projected financial results (and that none of the exceptions of Regulation § 1.482-4(f)(2)(ii) are applicable), may the IRS apply the period adjustment rules of Regulation § 1.482-4(f)(2) to Buy-In payments made during the Fixed Rate Period (FY2006)?

**CONCLUSION**

Based on the facts and assumptions presented herein, the IRS should not be permitted to make periodic adjustments under Reg. § 1.482-4(f)(2) to the Buy-In payments made during the Fixed Rate Period (FY2006)—notwithstanding the possibility that none of the exceptions of Regulation § 1.482-4(f)(2)(ii) will apply.

**DISCUSSION**

**I.      Analysis**

***A.  Cost-Sharing Arrangements are Governed by the Arm's Length Standard Under Section 482***

Cost sharing arrangements in general are subject to the arm's length standard.

---

[5] "Comparable" in the sense that third parties routinely fix payments for the use of intangibles without regard to actual profitability.

CONFIDENTIAL

KPMG_MS IRS 0010684

When Congress amended Section 482 to add the commensurate with income standard in 1986, it clarified that cost sharing arrangements are subject to the arm's length standard.  The legislative history stated:

> In revising section 482, the conferees do not intend to preclude the use of certain bona fide cost-sharing arrangements as an appropriate method of allocating income attributable to intangibles among related parties, if and to the extent such agreements are consistent with the purposes of this provision that the income allocated among the parties reasonably reflect the actual economic activity undertaken by each.[6]

The purpose of the amendments to Section 482 under the Tax Reform Act of 1986 was to clarify that transfers of intangibles were to be subject to the "commensurate with income" (CWI) standard and that such standard was consistent with the arm's length standard (see further discussion of this point below).  Indeed, Treasury viewed the CWI standard as a clarification of existing law.[7]  The legislative history clarifies that cost sharing arrangements are to be governed by the CWI and arm's-length standards.  Treasury's own regulations make this point:  "In determining the true taxable income of a controlled taxpayer, the standard to be applied *in every case* is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer."[8]

In recently proposed cost-sharing regulations under Section 482, the IRS and Treasury once again confirm the applicability of the arm's length standard to cost sharing arrangements: "Thus, in accordance with section 1.482-1(b)(1), the task is to provide guidance relative to cost sharing arrangements regarding 'the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances.'"[9]

---

[6] H.R. Conf. Rep. No. 99-841, at 4726 (1986) [hereinafter "1986 Conf. Rep."].

[7] *See* I.R.S. Notice 88-123, 1988-2 C.B. 458, 472 (1988) [hereinafter referred to as the "White Paper"].

[8] Treas. Reg. § 1.482-1(b)(1) (emphasis added).

[9] 70 Fed. Reg. 51116-01, at 51117 (August 22, 2005) [hereinafter "Proposed Cost Sharing Regulations"].

CONFIDENTIAL
KPMG_MS IRS 0010685

### B. The Arm's Length Standard Applies to "Buy-In Payments" Made Under a Cost Sharing Arrangement.

Buy-in payments made pursuant to a cost sharing arrangement are governed by Section 482 in general and are therefore subject to the arm's length standard.  The regulations state:

> If a controlled participant makes pre-existing intangible property in which it owns an interest available to other controlled participants for purposes of research in the intangible development area under a qualified cost sharing arrangement, then each such other controlled participant must make a buy-in payment to the owner. The buy-in payment by each such other controlled participant is the arm's length charge for the use of the intangible under the rules of §§ 1.482-1 and 1.482-4 through 1.482-6, multiplied by the controlled participant's share of reasonably anticipated benefits (as defined in paragraph (f)(3) of this section).[10]

The Proposed Cost Sharing Regulations also clarify that the general rules of § 482 (including the arm's length standard) apply to buy-in payments, "The arm's length amount charged in a [buy-in] transaction must be determined pursuant to the method or methods under the other provision or provisions of the section 482 regulations, as supplemented by proposed section 1.482-7(g)."[11]

### C. The Arm's Length Standard Under Section 482

Section 482 of the Internal Revenue Code has long been the primary tool for governing transactions between related persons, allowing the Secretary authority to make adjustments or allocations where "necessary in order to prevent evasion of taxes or clearly to reflect the income"[12] of any business.  The Section reads in its entirety as follows:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income,

---

[10] Treas. Reg. § 1.482-7(g)(2).

[11] Proposed Cost Sharing Regulations, at 51118.

[12] I.R.C. § 482.

CONFIDENTIAL                                                                      KPMG_MS IRS 0010686

deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.[13]

Thus, Section 482 authorizes the IRS to allocate gross income, deductions, credits and other allowances among two or more businesses under common control whenever the Secretary of the Treasury (usually by delegation to the Commissioner of Internal Revenue ("Commissioner")) deems it necessary.[14]  In the context of cross-border transactions among related parties (including cost sharing arrangements ), this IRS allocation is commonly referred to as transfer pricing adjustments.[15]

For purposes of this discussion, the delegation of authority under Section 482 is limited to instances where it is determined "necessary … clearly to reflect the income" of the taxpayer(s).[16]  The Treasury duly published regulations confirming the arm's length standard in applying Section 482.[17]  This arm's length standard must be applied "in every case" in order to determine the income allocations between related parties.[18]

---

[13] *Id.*

[14] Similar authority is granted in the context of a consolidated group under I.R.C. § 1502.

[15] *See* Treas. Reg. §§ 1.482-1, 1.482-4 and 1.482-7.

[16] I.R.C. §482.

[17] Treas. Reg. §1.482-1(b)(1).

[18] Treas. Reg. § 1.482-1(b)(1).  Neither legislative history nor the subsequent regulatory history has shown anything other than a firm commitment to this long-standing standard.  Indeed, it might be argued that the standard has endured long enough and prominently enough to be considered embedded within the meaning Section 482 itself by virtue of the "Reenactment Doctrine."  See generally *Samson v. U.S.*, 144 F. Supp. 620 (S.D.N.Y.  1956) and *Cottage Savings Association v. Commissioner*, 499 U.S. 554 (1991) (discussing the Reenactment Doctrine and its applicability to statutes).  Under the Reenactment Doctrine, regulations that have been in effect for a period of time without substantial change, issued in connection with statutes that are unamended or are reenacted without substantial change, are deemed to have received Congressional approval and have the effect of law.  *Cottage Savings Association v. Comm.*, 449 U.S. 554 (1991).  While the Reenactment Doctrine is useful at times in resolving statutory ambiguities, it does not mean that the prior

CONFIDENTIAL

KPMG_MS IRS 0010687

The use of the arm's length standard, "in every case," was again reiterated in a recent Tax Court case regarding whether stock options should be valued and "costs" shared for purposes of a cost sharing arrangement.[19]  The Xilinx court first assumed that the spread and the grant date value are intangible development costs for purposes of Regulation Section 1.482-7(d).  Next, it noted that under Section 482 the government has broad authority to make reallocations of income and deductions to reflect a taxpayer's true income.  However, that authority does have limits.  Under Regulation Section 1.482-1(b), the court concluded the unambiguous language of the regulation states that related-party transactions may only be adjusted to reflect transactions that would occur at arm's length.  The amendments to and regulations interpreting Section 482 for intangible property, according to the court, only supplemented the arm's-length standard.  Under Regulation Section 1.482-1, the arm's-length standard applies to all transactions, including cost-sharing agreements.  As such, the court determined that the government's allocations did not meet the arm's-length standard because there was no evidence that parties dealing at arm's length would allocate the spread or the grant date value relating to employee stock options.

The regulations under Section 482 include specific provisions that govern situations in which two or more related parties enter into an agreement to share the costs and risks of developing intangible property in return for a specified interest in the intangible property that may be produced.

---

construction has become so imbedded in the law that only Congress can effect a change. *McCoy v. U.S.*, 802 F.2d 762, (4th Cir. 1986).  "Congressional reenactment of a statutory provision that is subject to a longstanding administrative interpretation of which Congress was aware at the time of reenactment may well create a presumption that Congress has accepted that interpretation as a permissible one; it does not preclude the administrative agency, in the exercise of its rule making authority, from later adopting some other reasonable and lawful interpretation of the statute." *Id.*  Courts have found the inference of Congressional approval is stronger when legislative history contains some indication that Congress was aware of and approved the administrative construction. *ABC Rentals of San Antonio Inc. v. Comm.*, 142 F.3d 1200 (10th Cir. 1998).  This seems particularly appropriate when the interpretation is in a duly promulgated regulation on an issue that is noticeable and frequently applied. *Casey v. Comm.*, 830 F.2d 1092 (10th Cir. 1987).  The language of Section 482 has been reenacted numerous times with minor changes.  With each of the reenactments since 1935, the regulations have continued to reference the arm's length standard as the tool used for comparing related party transactions.  *See generally* White Paper at 458.

[19] *Xilinx Inc. v. Comm.*, 2005 WL 2082798 (U.S. Tax Ct., August 30, 2005).

CONFIDENTIAL

A cost sharing arrangement that satisfies the regulatory requirements (or is deemed by the Internal Revenue Service ("IRS" or "Service") to satisfy such requirements) is referred to as a "qualified cost sharing arrangement" ("QCSA")[20] and will qualify for the benefits provided for under the regulations, including the restriction of the Service's ability to make Section 482 allocations of income.[21]   Regulation Section 1.482-7(a)(1) defines a QCSA as "an agreement under which the parties agree to share the costs of development of one or more intangibles in proportion to their shares of reasonably anticipated benefits from their individual exploitation of the interests in the intangibles assigned to them under the arrangement."

When Congress enacted the most recent change to Section 482 in 1986 (the context for which is discussed in detail below), the change came simply in the form of an added sentence to the end of the previous statute that states, "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."[22]   This sentence, while adding a new wrinkle through the introduction of the "commensurate with income" language, did not change the remaining wording of the section and applied only to transfers of intangible property.  Indeed, the IRS has taken the position that the amendment that added CWI to Section 482 was merely "a clarification of prior law" and is consistent with the arm's-length standard.[23]   In other words, CWI should not be viewed as a new standard for determining allocations under Section 482, but rather as a congressional exhortation that the arm's length standard be applied more accurately in the context of intangibles.  In fact, Treasury's White Paper stated, "Congress intended the commensurate with income standard to be consistent with the arm's length standard, and it will be so interpreted and applied by the Internal Revenue Service and the Treasury."[24]

---

[20] Treas. Reg. § 1.482-7(a)(1).

[21] Treas. Reg. § 1.482-7(a)(2).

[22] I.R.C. § 482.

[23] White Paper at 472.  This study grew out of a request by the 1986 Conference Committee, which stated: "Congress was aware that many important and difficult issues under section 482 are left unresolved by this legislation.  Congress believed that a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted and that careful consideration should be given whether the existing regulations could be modified in any respect." Joint Comm. on Taxation, General Explanation of Revenue Provisions of the Tax Reform Act of 1986 (P.L. 99-514), at 1016 [hereinafter "1986 Bluebook"].

[24] White Paper at 458.

CONFIDENTIAL

The legislative history shows that the introduction of the CWI language was an attempt by Congress to ease concerns that had been raised by inconsistencies in the application of the arm's length standard in the context of intangibles.[25]   Congress was primarily concerned with selective transfers of high-profit intangibles offshore in exchange for consideration substantially below what third parties would negotiate.[26]   Congress was concerned that taxpayers were justifying the consideration received for the transfer of such intangibles by looking only to limited development of facts and risk allocations at the time of transfer without "consider[ation of] the potential profitability of the transferred intangible (as demonstrated by post-agreement results)."[27]   Congress and Treasury believed that taxpayers relied on purported comparables used in vastly different product and geographic markets, compared short-term and long-term contracts, and drew analogies to transfers where the parties performed entirely different functions in deriving income from the intangible.  In summary, Congress was concerned that appropriate comparables were difficult to find and that taxpayers could easily manipulate facts at the time of the intangible transfer to indicate, at the time of transfer, lower expectations of future profit potential.[28]   Indeed, Treasury notes in its White Paper that the "goal of the commensurate with income standard is, therefore, to ensure that each party earns the income or return from the intangible that an unrelated party would earn in an arm's length transfer of the intangible."[29]

---

[25] 1986 Bluebook at 1014.

[26] White Paper at 472.

[27] *Id.*

[28] In the Proposed Cost Sharing Regulations, Treasury notes in its preamble that "The Commissioner's ability to evaluate controlled participants' deals with regard to high-profit potential intangibles is hampered, not only by the absence of comparables, but by an asymmetry of information vis-a-vis the taxpayer. The taxpayer is in the best position to know its business and prospects. The Commissioner faces real challenges in ascertaining the reliability of the ex ante expectations of taxpayer's initial arrangements in light of significantly different ex post outcomes. While risk and uncertain outcomes are typically the hallmarks of high-profit potential intangibles, significantly different results raise concerns whether the form of the initial arrangement matches its substance. These concerns are particularly problematic given the information asymmetry between taxpayers and the IRS." Proposed Cost Sharing Regulations, at 51128-51129.

[29] White Paper at 472.

CONFIDENTIAL

### D. Criteria Utilized in Determining Whether the Arm's Length and Commensurate With Income Standards are Satisfied

Controlled taxpayers may establish fixed terms for buy-in payments that satisfy the CWI standard provided the associated contractual terms reflect economic substance and are consistent with the manner in which uncontrolled parties would act. Such fixed payments should be immune from the periodic adjustment rules of Regulation § 1.482-4(f)(2), regardless of actual profit derived from the transferred intangibles.

Given the general lack of exact comparables and Congress' concern of information asymmetry, the CWI principle is to be applied by looking (and giving the most weight) to the income derived from the intangibles and then to the functions performed, and the economic costs and risks assumed by each party to the transfer, "so that the allocation of income from the use of the intangible will be made in accordance with the relative economic contributions and risk taking of the parties."[30] Congress and Treasury have made it clear that an analysis of contractual terms and risk allocation is a necessary step in determining a CWI result. Treasury's own regulations providing for periodic adjustments to ensure that a CWI result is achieved confirm this point:

> . . . [T]he consideration charged in each taxable year may be adjusted to ensure that it is commensurate with the income attributable to the intangible. Adjustments made pursuant to this paragraph (f)(2) shall be consistent with the arm's length standard and the provisions of § 1.482-1 [referring to contractual terms and risk allocations].[31]

Regulation § 1.482-1(d)(3) states, "The contractual terms, including the consequent allocation of risks, that are agreed to in writing before the transactions are entered into will be respected if such terms are consistent with the economic substance of the underlying transactions."

In light of the Congressional intent behind the CWI standard, it is clear that a CWI result is achieved where a transfer of intangibles occurs for an amount(s) and under terms that would have been used by uncontrolled parties based on facts knowable at the time of the transfer, subject to the additional constraint that a skeptical reviewer,

---

[30] *Id*; *See also* 1986 Conf. Rep., at 4725.
[31] Treas. Reg. § 1.482-4(f)(2)(i).

CONFIDENTIAL                                                                KPMG_MS IRS 0010691

with knowledge of actual facts and financial results, would conclude that the facts relied upon at the time of the transfer were appropriate.  Thus, for example, where the parties evaluate multiple alternative future outcomes from the exploitation of the transferred intangible(s) as would a third party and, based on their understanding of the risks of achieving the various outcomes, determine risk allocations and contractual terms in writing and in advance of the transfer, the consideration for the intangibles will be commensurate with the income derived from the intangibles.  Particularly where the actual financial results derived from the transferred intangibles are within the band of projected results considered by the parties at the time of the transfer, a skeptical reviewer, with knowledge of actual results and facts, would logically conclude that the payments and terms under the contemporaneous transfer agreement satisfy the CWI standard and the periodic payment adjustment rules are inapplicable to the transfer.

The above understanding of the CWI standard can be illustrated by the following simplified example.  A enters into a buy-in agreement to acquire IP from B.  If A's subscription licensing program is accepted by the market place, the parties believe that the IP will yield a net present value (NPV) 1,000 profit (Scenario1).  If A's licensing program is not accepted by its customers, the parties believe that the IP will yield a NPV 700 profit (Scenario 2).  Using their understanding of the market and industry, the parties assign probabilities to Scenario 1 and 2.  The parties believe that Scenario 2 is more likely than Scenario 1 based on the best information available ex ante.  The parties agree to pay royalties based on a risk-adjusted Scenario 2.  Subsequently, it becomes clear that the market readily accepts A's licensing program and the IP yields an actual NPV 1,000 profit.  Since the parties accurately estimated the outcome of Scenarios 1 and 2 and accurately assigned probabilities to both Scenarios, the parties' agreement should be respected and payments made under the agreement should be considered commensurate with the income derived from the IP.[32]  Thus, no periodic adjustment should be required under Regulation § 1.482-4(f)(2).

---

[32] This example assumes the following four points:  1)  both the NPV of 1,000 profit in Scenario 1 and the NPV of 700 profit in Scenario 2 are based on business projections that were created and used for non-tax purposes; 2) there are no other reasonably probable scenarios that should have been factored into the analysis; 3) the probabilities used to weigh both scenarios are sufficiently verifiable/supportable that an objective third party with knowledge of the industry would conclude that the assigned probabilities were reasonable and supportable based on the information available to the parties at the time; and 4) there is evidence that third parties would not renegotiate terms within the timeframe where the parties fixed the consideration for the transfer of the

CONFIDENTIAL

KPMG_MS IRS 0010692

If a taxpayer can demonstrate (a) that the facts relied upon ex ante consisted of substantially all knowable facts at the time, (b) contractual terms were consistent with terms entered into by uncontrolled parties, (c) risks were allocated between the parties consistent with ex ante facts, contractual terms and economic substance of the underlying transactions (discussed in further detail below), and (d) such allocations of risk and contractual terms were documented, in writing, on a contemporaneous basis, the taxpayer's payments will be considered "commensurate with income" and no period adjustments may be made—regardless of actual financial results from the exploitation of the intangibles.

### a. Periodic Adjustment Rules

Where contractual terms between controlled parties lack economic substance, an intangible transfer price that is commensurate with the income attributable to the intangible must reflect the "actual profit experience realized as a consequence of the transfer."[33]  In such cases, regulations authorize the Service to make periodic adjustments to properly reflect the actual profit experience realized from the transferred intangibles.[34]

The Congressional directive to the Service to make adjustments to intangible returns that reflect the actual profit experience is in part a legislative rejection of *R.T. French v. Comm'r.*[35]  That case endorsed the view that a long-term, fixed rate royalty agreement could not be adjusted under section 482 based on subsequent events that were not known to the parties at the original contract date.  Thus, underlying the directive is perhaps a view that contractual arrangements between unrelated parties – particularly those involving high profit intangibles—are not entered into on a long term basis without some mechanism for adjusting the arrangement if the profitability of the intangible is significantly higher or lower than anticipated.  The fact that the periodic adjustment rules were primarily focused on

---

intangibles (e.g., the parties routinely enter into similar technology license agreements with fixed terms over a similar period of time).

[33] "Congress did not intend…that the inquiry as to the appropriate compensation for the intangible be limited to the question of whether it was appropriate considering only the facts in existence at the time of the transfer. Congress intended that consideration also be given to actual profit experience realized as a consequence of the transfer.  Thus, Congress intended that payments for intangibles be adjusted over time to reflect changes in the income attributable to the intangible." 1986 Bluebook, at 1016.

[34] Treas. Reg. § 1.482-4(f)(2).

[35] 60 T.C. 836 (1973).

CONFIDENTIAL

KPMG_MS IRS 0010693

long-term fixed contracts is emphasized by the Treasury in the White Paper, which states, "It is, therefore, perfectly consistent with the arm's length standard to treat related party license agreements generally as renegotiable arrangements and to require periodic adjustments to the transfer price to reflect substantial changes in the income stream attributable to the intangible."[36]

The White Paper goes on to clarify that periodic adjustments are not applicable where contractual terms are consistent with the economic substance of the transfer:

> It may also be possible in certain other cases [where exact comparables do not exist] to exclude subsequent profit experience from consideration under the arm's length standard.  To do so, the taxpayer would need to demonstrate each of the following to avoid an adjustment based on subsequent profit experience:
>
> 1.  That events had occurred subsequent to the license agreement that caused the unanticipated profitability;
>
> 2.  That the license contained no provision pursuant to which unrelated parties would have adjusted the license; and
>
> 3.  That unrelated parties would not have included a provision to permit adjustment for the change that caused the unanticipated profitability.[37]

Assuming a controlled arrangement lacks economic substance, periodic adjustments are to be made only if (a) a substantial change in actual vs. estimated profits occurs,[38] and (b) a time period equal to a substantial portion of the economic life of the intangible has passed.  As a general rule, annual periodic adjustments would be unwarranted as one year is generally an insufficient time period to determine true economic results—particularly from intangibles with economic lives of multiple years.  Treasury emphasized this point:

---

[36] White Paper at 477.
[37] White Paper at 478.
[38] *See id*

CONFIDENTIAL

KPMG_MS IRS 0010694

> Annual adjustments may not be required to reach the appropriate
> amount of income under the commensurate with income standard. . . .
> For industries that undergo rapid technological change or for products
> that have a relatively short life, this standard may [, nevertheless,]
> dictate annual review.[39]

As a procedural matter, Treasury has clarified that periodic adjustments generally should be made prospectively – *i.e.*, for the taxable year under audit and subsequent taxable years.[40]  This does not preclude the Service from taking into account years prior to the year of examination in computing the amount of prospective periodic adjustments.

#### b.   *Regulatory Exceptions to the Periodic Adjustment Rules*

Further emphasizing the view that periodic adjustments are unwarranted where exact comparables exist, actual vs. estimated profits are immaterial, or fixed payment terms were entered into in accordance with the economic substance of the transfer, the regulations allow for specific safe-harbor exceptions.  These exceptions should be viewed as safe harbor exceptions to the periodic adjustment rules.  They do not change the basic rule that the CWI standard is satisfied, in every case, where the terms and risk allocation of the controlled arrangement has economic substance.

The regulations provide for the following five safe harbor exceptions:

1.  <u>Exact CUT Exception</u>—This exception applies when "the *same* intangible was transferred to an uncontrolled taxpayer under substantially the same circumstances…."[41]

2.  <u>Close CUT/80%-120% Exception</u>—This exception applies where the price/royalty charged in the controlled transaction is supported by a near CUT, the controlled party's actual profits/cost savings are within an

---

[39] White Paper at 478.
[40] White Paper at 479.
[41] Treas. Reg. § 1.482–4(f)(2)(ii)(A).

CONFIDENTIAL                                          KPMG_MS IRS 0010695

80%/120% band of those that were foreseen, and certain other conditions are met.[42]

3.   Arm's-Length First Year/80%-120% Exception—This exception applies where the consideration charged in the first year in which substantial consideration is charged is arm's length, the controlled party's actual profits/cost saving in later years are within an 80%/120% band of those that were foreseen, and certain other conditions are met.[43]

4.   Extraordinary Event Exception—This exception applies if the taxpayer would have qualified for exception 2 or 3, except that "*extraordinary events* that were beyond the control of the controlled taxpayers and that *could not reasonably have been anticipated* at the time the controlled agreement was entered into" push the controlled party's actual profits/cost savings outside the 80%/120% range.[44]

5.   Five Years and Done Exception—If an intangible meets exception 2 or 3 for each of the first five years beginning with the first year in which significant consideration is first paid, the taxpayer's arrangement is respected.[45]

In emphasizing the periodic adjustment trigger for substantial divergence from actual vs. estimated profit, the exceptions place a premium on getting projections right—particularly for taxpayers who get it right for the first five years within a 20% margin of error.[46]

---

[42] Treas. Reg. § 1.482-4(f)(2)(ii)(B).

[43] Treas. Reg. § 1.482-4(f)(2)(ii)(C).

[44] Treas. Reg. § 1.482-4(f)(2)(ii)(D) (emphasis added).

[45] Treas. Reg. § 1.482-4(f)(2)(ii)(E).

[46] Note that the Proposed Cost Sharing Regulations adopt a new materiality threshold by imposing a trigger for period adjustments where the actual return on investment of transferred intangibles experienced by controlled taxpayer exceeds 2 times or is less than ½ the estimated return. Exceptions to the periodic adjustment rules similar to those of the existing regulations are provided. Prop. Reg. § 1.482-7(i)(6), 70 Fed. Reg. 51116, 51129.

CONFIDENTIAL

### E.  *Contractual Terms and Satisfying the Commensurate with Income Standard*

As set out above, where controlled taxpayers enter into arrangements with contractual terms consistent with third party terms and such arrangements are consistent with the economic substance of the transaction, payments under such arrangements should be considered to satisfy the CWI standard and periodic adjustments should be inapplicable.  The following outlines the criteria to be used in evaluating whether controlled party contractual terms are consistent with the economic substance of the transaction.

The preamble to the 1993 Temporary Regulations under section 482 explained the importance of economic substance and the assignment of risk:

> Allocation of risk is potentially subject to manipulation by controlled taxpayers, who may purport to allocate risk inconsistently with the substance of their transactions.  Accordingly, section 1.482-1T(c)(3)(ii)(B) provides that with respect to adequately documented risk . . ., the allocation will be subject to review under the following factors: whether the risks assumed are commensurate with the potential economic benefit from the controlled transaction; whether the controlled taxpayer's capacity to absorb losses attributable to the risk is proportionate to the risk; and whether the controlled taxpayer is engaged in the active conduct of a trade or business to which the risk relates and exercises control over the activities that influence the amount of income or loss to be realized from the controlled transaction. These factors are intended to ensure that a controlled taxpayer only will be considered to have assumed risk in cases where the economic substance of the transactions is consistent with the assumption of such risk.[47]

The language of the 1993 Temporary Regulations and the current regulations regarding risk allocation and economic substance is substantially the same.

---

[47] 58 Fed. Reg. 5263, 5266.

CONFIDENTIAL                                                                      KPMG_MS IRS 0010697

In a heavily redacted Field Service Advice, the Service provided some insight into the economic substance requirement of Regulation § 1.482-1(d)(3)(ii).[48]  The facts of the FSA indicate that the taxpayer entered into sales agent agreements with its subsidiary.  However, the subsidiary acted as a principal in its sales with third parties and actually incurred a loss on its operations in one of two years.  The Service held that the sales agent agreements should be disregarded as the agreements were inconsistent with the economic substance of the controlled taxpayers' activities and actual risks assumed:

> Arguably, the agency agreements failed to shift risks to parties other than Corp. C. For example, it is doubtful whether the Business operators could bear the risks assigned to them by the agreements, because their balance sheets contained virtually no liquid assets. In addition, Corp. C incurred liabilities, made expenditures, supervised personnel, and otherwise acted as if it were conducting the U.S. Business activity on its own behalf. Only by means of entries on Corp. C's general ledger and other year-end accounting reconciliations were the controlled taxpayers placed in the economic position contemplated by the agreements. If functional and risk analysis confirms this view, it may be appropriate for the Service to rely upon the "economic reality" of the underlying transactions, rather than the agency agreements, for purposes of identifying comparable parties or transactions under Section 482.

> Finally, we note that Corp. C generated taxable [losses for one year]. If Corp. C was acting as an agent of the Business operators, it arguably should have earned positive net returns for both years, as a true commission agent operating at arm's length would simply decline to perform if it was likely to generate a net operating loss. See generally National Semiconductor Corp. v. Commissioner, 67 T.C.M. 2849, 2873 (1994) ("[D]ue to the interdependent nature of their relationship, petitioner should not have sustained losses over the years in issue while the Asian subsidiaries maintained high profits and, thus, in order to clearly reflect income, some adjustment needs to be

---

[48] *See* FSA 199913009 (December 21, 1998).

KPMG_MS IRS 0010698

made."). The fact that Corp. C generated a net operating loss in Year 2 is inconsistent with an agency relationship.[49]

Pursuant to the Cost Sharing Arrangement between Microsoft and MOPR, the parties have entered into a five year arrangement with a fixed rate royalty for the first year.  Thereafter, the arrangement calls for adjustments to the royalty payments based on actual profits realized from the exploitation of the transferred intangibles. In essence, the arrangement is a one year license at a fixed term, with a series of annual renewable licenses (due the periodic adjustments as provided by the parties' agreement for FY2007 and forward).  This type of arrangement for high-profit intangibles is consistent with common third party terms.  Expectations of the first years' profits can generally be estimated with much greater accuracy than multiple years' profits.  It is not uncommon to enter into short term fixed license arrangements.

Further the parties evaluated, in detail, estimates of future profits for FY2006, their ability to control the risks they may assume through management participation and financial resources, and entered into clearly defined contractual obligations documenting the risks that the parties agreed to assume.  It is assumed that the parties will conduct their business activities in accordance with their contractual arrangements (e.g., MOPR as a co-developer of intangible property with the rights to manufacture and sell disks) and their books and records will reflect the risks and cost assumed.

Based on these facts, the parties Cost Sharing Arrangement, specifically the Fixed Period royalties under the Buy-in Agreement, should be respected as consistent with the economic substance of the arrangement.  As a result, payments during the Fixed Period should be considered to satisfy the CWI and arm's length standards—even if actual results (either in FY2006 or over the life of the transferred intangible) diverge significantly from estimated results.  No periodic adjustments for FY2006 would be warranted.  This outcome is particularly appropriate where the parties can demonstrate that they appropriately considered the possibility of achieving the actual results (i.e., a scenario considered but discounted as less likely than another scenario), which has been assumed to be true in the instant case.

---

[49] *Id.*

CONFIDENTIAL

### F.   *Analyzing Risk Allocations in Satisfying the Commensurate with Income Standard*

Section 482 and the regulations there under consistently look to the assumption of risk in determining an arm's length result.  Thus, risk assumed by a controlled party that is consistent with the economics substance of that party's behavior should be respected and given due deference in determining the arm's length result of the controlled transaction.

### a.   *Examples Under the Existing Regulations*

The examples of Regulation § 1.482-4, illustrate that the party undertaking the investment in the development of intangible property should receive all the income attributable to such property.[50]  Under the comparable profit split method, the contractual terms "will be a principal determinant of the allocation of functions and *risks . . . .*"[51]  Moreover, comparability "is particularly dependent" on the considerations in §1.482-5(c)(2) – specifically, *"resources employed and risks assumed."* (Emphasis added.)

### b.   *Examples Under the Proposed Services Regulations*

The 2003 proposed regulations related to services transactions further illustrates the key role that risk allocation plays—not only in determining an arm's length result, but in determining whether periodic adjustments should be made.[54]  This may be best illustrated by the Proposed Services Regulations recognition of contingent payment arrangements whereby a service provider may, or may not (depending upon the occurrence of a contingency), be compensated for its services.  The recognition of a contingent services arrangement is conditioned upon there being a written contract specifying the contingency and providing for compensation

---

[50] *See, e.g.,* § 1.482-4(f)(2)(iii), Example (1) and (2).
[51] Treas. Reg. § 1.482-6(c)(2)(ii)(B) (emphasis added).
[51] 68 FR 53448 (Sept. 10, 2003) [hereinafter "Prop. Serv. Reg."].

CONFIDENTIAL                                                                        KPMG_MS IRS 0010700

reflecting the recipient's benefit and the renderer's risk.[55]  The contingency and compensation must also be consistent with the economic substance of the transaction and the conduct of the parties.[56]  Example 1 of Proposed Regulation § 1.482-9(i)(5) illustrates a contingent services arrangement in the context of the pharmaceutical industry.  The risk allocation of the taxpayers was respected due to the fact that the taxpayers arrangement satisfied four separate criteria as set out in the regulations--(i) there is a written agreement; (ii) the contingency (commercial sales) involves a future benefit to the recipient (Company Y) directly related to the contingent service transaction; (iii) the payment reflects the recipient's benefit and the renderer's risks; and (iv) the contingency and payment are "consistent with economic substance." The example applies the economic substance requirement by determining that (a) the parties' conduct has been consistent with the contractual allocation of risk in the agreement; (b) Company X (the service renderer) "has the financial capacity to bear the risk" that the R&D will not be successful and that Company X will not be compensated; (c) Company X exercises managerial and operational control over the R&D such that it is reasonable for it to assume that risk; and (d) the arrangement is consistent with terms that uncontrolled parties would adopt for comparable R&D activities, under similar conditions.[57]  Based on this analysis, the example concludes that the taxpayers' allocation of risk as set out in its contingent payment arrangement should be respected.

### c.  *Examples Under the Proposed Cost Sharing Regulations*

The Proposed Cost Sharing Regulations also defer to the terms of controlled arrangements in determining an arm's length result.  The Proposed Cost Sharing Regulations provide for particular contractual terms and allocations of risk with regard to "buy-in payments" determined no later than the date of the intangible transfer.[58]  Proposed Regulation § 1.482-7(g)(ii) accordingly reiterates the requirement that any method applied at any time for purposes of valuing buy-in payments must be consistent with the applicable contractual terms and allocation of risk under the Cost Sharing Arrangement and Proposed Regulation § 1.482-7 as of the date of the intangible transfer, unless there has been a change in such terms or allocation made in return for arm's length consideration.

---

[55] Prop. Serv. Reg. § 1.482-9(i)(1) and (2).

[56] Prop. Serv. Reg. § 1.482-9(i)(2)(iii) and -9(i)(4).

[57] Prop. Serv. Reg. § 1.482-9(i)(5)(i).

[58] *See, e.g.,* Prop. Reg. § 1.482-7(b)(1)(ii), (b)(3), and (k)(1).

CONFIDENTIAL

## II.     Summary

Based on the facts and assumptions presented herein, the IRS should not be permitted to make periodic adjustments under Reg. § 1.482-4(f)(2) to the Buy-In payments made during the Fixed Rate Period (FY2006)—notwithstanding the possibility that none of the exceptions of Regulation § 1.482-4(f)(2)(ii) may apply.

* * * *

*Our advice in this document is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the above-stated facts, assumptions and representations.  If any of the foregoing facts, assumptions or representations is not entirely complete or accurate, it is imperative that we be informed immediately, as the inaccuracy or incompleteness could have a material effect on our conclusions. In rendering our advice, we may consider, for example, the applicable provisions of the Internal Revenue Code of 1986 and ERISA, as amended, and the relevant state and foreign statutes, the regulations thereunder, income tax treaties, and judicial and administrative interpretations, thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of our conclusions.  We will not update our advice for subsequent changes or modifications to the law and regulations or to the judicial and administrative interpretations thereof.*

CONFIDENTIAL                                                                                          KPMG_MS IRS 0010702