| | | | |
|---|---|---|---|
| To | Microsoft Project Files | Date | May 27, 200527 May 2005 |
| From | Brett Weaver, Seattle | Ref | |
| cc | Glenn Cogswell, Microsoft<br>Greg George, KPMG<br>Anne Welsh, KPMG | | |

**Tax Issues Related to Buy-In Structure**

***DRAFT***

**For Discussion Purposes Only**

The cost sharing rules allow taxpayers various options in structuring buy-in payments. Depending upon how these payments are structured, MOPR may have positive taxable income [that could be effectively connected with MOPR's U.S. trade or business.]] . The following evaluates the various buy-in structures under consideration and summarizes the applicable rules for effectively connected income ("ECI").

### I. Structuring Buy-In Payments

Buy-in payments may take any of the following forms: (i) lump sum payments; (ii) installment payments; and (iii) royalties.[1] Notwithstanding their form, however, buy-in payments ordinarily are subject to § 482's "commensurate with income" standard.

*Commensurate With Income & Periodic Adjustments*

Carefully structured license agreements and strong documentation should preclude periodic adjustments under the commensurate with income standard.

Treas. Reg. § 1.482-4(f)(2)(i) provides that if an intangible is transferred for a period of more than one year, the consideration in each tax year may be adjusted (subject to certain enumerated exceptions) to ensure it is commensurate with the income attributable to the intangible. However, the adjustment must be consistent with the arm's-length standard and the provisions of Treas. Reg. § 1.482-1. Treas. Reg. § 1.482-1(d)(3)(iii)(B) states, in part, that an allocation of risk specified or

---

[1] Reg. § 1.482-7(g)(7).

**Government Exhibit 41**

implied by the taxpayer's contractual terms will be respected if it is consistent with economic substance. Most taxpayers believe that this means that no periodic adjustment may be made if the parties to the license agreement have substance and clearly document the risks that each is to bear.

Taxpayers that want to shift profit or cost-savings risk as part of their license agreement (thus precluding a periodic adjustment contrary to their agreement) should (a) clearly document their agreement to allocate risk in their license agreement, etc., (b) document that various outcomes of such risk were contemplated at the time the agreement was entered into[2], and (c) be prepared to document that each party was economically and operationally capable of bearing the risk so allocated.

## II.  Effectively Connected Income

Foreign corporations are taxed on an net basis on income that is effectively connected with a U.S. trade or business. A foreign corporation does not have effectively connected income unless it is first engaged in a USTB. To determine whether a foreign corporation's activities rise to the level of a United States trade or business, the courts and the IRS ask whether the taxpayer was "regularly and continuously transacting a substantial portion of its ordinary business in the United States."[3] The test is both a "quantitative and a qualitative one."[4] A foreign corporation may be engaged in a USTB by virtue of its direct activities in the United States or because of "regular," "substantial," and "continuous" activities of its agents. The activities of a dependent agent that regularly, continuously, and substantially undertakes sales activities in the United States for a foreign principal will be imputed to the foreign principal, creating a USTB for the foreign principal,[5] if the

---

[2] For example, preparing sophisticated risk-weighted projections to demonstrate that the potential outcomes were contemplated and that the parties considered those outcomes in establishing the arm's-length royalty to satisfy the IRS that their license arrangements properly allocated profit and cost-savings risks and therefore should not be subject to periodic adjustments

[3] *Comm'r v. Spermacet Whaling & Shipping Co.*, 281 F.2d 646, 651 (6th Cir. 1960) (management of a whaling expedition "took place almost entirely on the high seas or in Norway" and thus did not constitute a United States trade or business).

[4] *The Linen Thread Co. v. Comm'r,* 14 T.C. 725, 736 (1950) (two isolated sale transactions did not represent "continuity" or "sustained activity" sufficient to constitute a United States trade or business).

[5] See, e.g., *Handfield v. Commr,* 23 T.C. 633 (1955) at 638 (court found a Canadian nonresident alien individual to be engaged in a United States trade or business by virtue of a contract of consignment with a United States company whereby that company acted as the exclusive distributor in the United States for products of the Canadian principal); Revenue Ruling 70-424, 1970-2 C.B. 150 (foreign corporation's arrangement with a United States corporation for the exclusive sale of the foreign corporation's products is one of ordinary principal and agent, with the foreign principal therefore being engaged in a United States trade or business).

CONFIDENTIAL

agent's activities are subject to the foreign principal's control.[6] In addition, activities of an independent agent may be imputed to a foreign principal if the activities rise to the level of being regular, continuous, and substantial.[7]

*Source of Income*

Once a foreign corporation has a USTB, the determination of whether its income is ECI depends on the source of the income. In general, U.S. source income that is not fixed or determinable, annual or periodic income ("FDAP"), is treated as ECI.[8] U.S. source FDAP, generally passive income, is treated as ECI only if the income is derived from assets used in or held for use in the conduct of a U.S. trade or business, or the activities of such trade or business are a material factor in the realization of the income.[9] Finally, Only certain categories of foreign source income are treated as ECI.[11]

The following summarizes the relevant categories of income that may be treated as ECI.

---

[6] See, e.g., Revenue Ruling 70-424, 1970-2 C.B. 150 (United States corporation's activities constitute a trade or business for a foreign corporation where (i) United States corporation acted as the exclusive agent for the foreign corporation, (ii) United States corporation was required to secure foreign corporation's approval of contracts, (iii) United States corporation received commission based on a percentage of the products' selling price, and (iv) foreign corporation controlled certain strategic decisions of United States corporation). See also TAM 8147001 (United States person acting for Mexican corporation did not create United States trade or business for the Mexican corporation, since (i) United States person acted as an independent contractor, (ii) United States person did not act exclusively for the Mexican corporation, (iii) Mexican corporation had other United States contractors acting on its behalf, aside from the United States person, and (iv) Mexican corporation did not exercise any control over United States person's activities).

[7] See, e.g., *de Amodio v. Comm'r*, 34 T.C. 894 (1960), aff'd, 299 F.2d 623 (3d Cir. 1962) (Swiss nonresident alien who purchased real estate in the United States and managed it through real estate agents was found to be engaged in a United States trade or business; however, the court found that the taxpayer did not have a permanent establishment for purposes of the income tax convention between the United States and Switzerland because the real estate agents who managed the property were independent agents acting in the ordinary course of their business).

[8] § 864(c)(3).
[9] § 864(c)(2).
[11] § 864(c)(4).

CONFIDENTIAL                                                                                                    KPMG_MS IRS 0003051

*A.  Sales Income: Title to Goods Passes in the U.S.*

All such income is treated as U.S. source income that is ECI under the "force of attraction rule."[12]

*B. Sales Income: Title to Goods Passes outside the U.S.*

Generally, this income will be foreign source income that is not ECI unless:

1. The foreign corporation has a U.S. office;

2. Income from the sale of such inventory is attributable to the U.S. office; and

    a. Must be in the "ordinary course of business" of the office

    b. Soliciting orders

    c. Acceptance of sales orders

    d. Negotiating contracts

    e. Significant services necessary to consummate sales[13]

3. The inventory is sold for use outside the United States,[14] and the

foreign corporation has no foreign office that materially participated in the sale.[15]

*D.  Royalties for the Use of Intangibles in the United States.*

Royalties for the use of intangibles in the U.S. will be treated as U.S. source income. Such U.S. source royalties will be treated as ECI, and thus not subject to gross basis withholding, under the following circumstances: [I would cite and articulate some of standards in the authorities forwarded in the e-mail sent by Stephen Bates on April 19th. I will resend the e-mail]]

1. The foreign corporation conducts an active licensing business,[16] and

---

[12] § 864(c)(3).
[13] Reg. § 1.864-6(b)(2)(iii).
[14] § 865(e)(2).
[15] § 864(c)(4)(B)(iii).
[16] Reg. § 1.864-4(c)(3)(i).

    2. The foreign corporation's U.S. office performs all activities necessary in the day-to-day conduct of the business, including

        a. Marketing

        b. Promotion

        c. Sales negotiation

        d. Order acceptance and processing[17]

Where U.S. source license income is not treated as ECI, it is treated as FDAP subject to gross basis withholding tax.

*E. Royalties for the Use of Intangibles Outside the United States.*

Royalties for the use of the intangibles outside the U.S. will be treated as foreign source income. Such foreign source royalties will be treateds as ECI if the foreign corporation's U.S. office is a material factor in the production of the l royalty income and the income is realized in the ordinary course of the business carried on conducted through the U.S. office. These tests are met where the foreign corporation's U.S. office:

    1. actively participates in the soliciting or negotiating of the license from which the income is derived; and/or

    2. performs significant services incident to such license.[18]

## III. Buy-In Structures Under Consideration

### A. Base Case (Scenario 1)

The Base Case (Scenario 1) is a flat royalty rate over the primary life and lag (excluding the "tail period") of the intangibles.

The Buy-In Agreement should include the following features:

    1. Flat royalty rate for each year over the primary life and lag of the property

---

[17] Treas. Reg. § 1.864-4(c)(3)(ii) ex. 2.
[18] Treas. Reg. § 1.864-6(b)(2)(i).

CONFIDENTIAL

2. Substantially reduced royalty rate over the "tail period"

3. CWI Periodic Adjustments clause applicable to each year

|  | Expected Case | Worst Case |
|---|---|---|
| Estimated MOPR FY2006 Year Profit/(Loss) | 1,331,584,419 | 885,761,552 |

### B. Worst Case at "Break Even" (Scenario 2)

This Scenario 2 is (a) a fixed initial period(s) royalty rate, (b) a flat royalty rate over the remaining period of the primary life and lag (excluding the "tail period") of the intangibles, and (c) a substantially reduced royalty rate over the "tail period." MOPR is expected to "break even" in the initial period(s) under the "worst case" assumptions.

The Buy-In Agreement should include the following features:

1. Fixed royalty rate for initial period(s) (may be different rates for each period)

2. Flat royalty rate (which will be lower than the fixed royalty rates of the initial periods) for each subsequent year over the primary life and lag

3. Substantially reduced royalty rate over the "tail period"

4. CWI Periodic Adjustments clause applicable only to years after the "initial period(s)"

|  | Expected Case | Worst Case |
|---|---|---|
| Estimated MOPR FY2006 Year Profit/(Loss) | (287,363,112) | (6,559) |

### C. Expected Case at "Break Even" (Scenario 3)

This Scenario 3 is (a) a fixed initial period(s) royalty rate, (b) a flat royalty rate over the remaining period of the primary life and lag (excluding the "tail period") of the intangibles, and (c) a substantially reduced royalty rate over the "tail period." MOPR is expected to "break even" in the initial period(s) under the "expected case" assumptions.

The Buy-In Agreement should include the following features:

1. Fixed royalty rate for initial period(s) (may be different rates for each period)

2. Flat royalty rate (which will be lower than the fixed royalty rates of the initial periods) for each subsequent year over the primary life and lag

3. Substantially reduced royalty rate over the "tail period"

4. CWI Periodic Adjustments clause applicable only to years after the "initial period(s)"

|  | Expected Case | Worst Case |
|---|---|---|
| Estimated MOPR FY2006 Year Profit/(Loss) | (7,634) | 287,830,744 |

CONFIDENTIAL