| | |
|---|---|
| **From:** | Kevin Fay (LCA) |
| **To:** | Pat Harrell (TAX); Glenn Cogswell (TAX); Junie Schmidt (TAX); Tracy Neighbors (TAX) |
| **CC:** | Orndorff, Ben (SEA); LCA - Subsidiary Management Group |
| **Sent:** | 12/4/2003 2:48:27 AM |
| **Subject:** | Asia Cost Share Documents |
| **Attachments:** | Asia Cost Share Step Plan.doc; ACS8.0 Termination Letter for PSA (MO - MSFT).doc; ACS9.0 Contract Right Purchase and Sale Agreement.doc; ACS10.0 - APAC Cost Share.doc; ACS11 0 - Technology License Agreement.doc |

To ease your review, I attach current drafts of everything we've written to date:

- <u>Step Plan</u>. This has been revised to include the cash flows:


- <u>Docs. 8.0, 9.0, 10.0 and 11.0</u>:


**Kevin J. Fay**
Senior Attorney
**Microsoft Corporation**
One Microsoft Way
Redmond, Washington 98052
Direct: (425) 703-9176
Fax: (425) 706-7329
mailto: kevinfay@microsoft.com

**Government Exhibit**

51

MSTP1253319

**Asia Cost Share Project – Step Plan**
**December 3, 2003**

<u>Current Structure:</u>



| # | Action/Document | Parties | Drafter | Notes |
|---|---|---|---|---|
| 1.0 | Form Microsoft Singapore Holdings Pte Ltd, a Singapore corporation ("MSHPL") | | | To be owned by Microsoft Corporation. Can interpose Nevada holding company via stock contribution/capitalization at later date.<br><br>Capitalize with shares of MO |
| 1.1 | Memorandum and Articles of Association | | Rodyk | |
| 2.0 | Form Microsoft Asia Island Limited, a Bermuda corporation ("MAIL") | | | To be owned by MSHPL. |
| 2.1 | Memorandum and Articles of Association | | CD&P | |
| 3.0 | Stamp Duty Relief – Submission Letter | | Rodyk | |
| 3.1 | Contribution Agreement/Instrument of Transfer | | Rodyk | Necessary to demonstrate capitalization? |

MSTP1253320

| # | Action/Document | Parties | Drafter | Notes |
|---|---|---|---|---|
| 3.2. | Graphical Representation of structure | | LCA | |
| 3.3 | Assistant Secretary's Certificate – Resolutions of Microsoft Corporation for transfer | | LCA | |
| 3.4 | Resolutions of MSHPL | | Rodyk | |
| 3.5 | Statutory Declaration that transfer of shares qualifies under Section 15 of Stamp Duties Act | | Rodyk | |
| 3.5.1 | Share Capital of Microsoft Corporation, MO and MSHPL | | | |
| 3.5.2 | Audited Financials of Microsoft Corporation | | | Latest SEC Report? |
| 3.5.3 | Description of restructuring | | | |
| 4.0 | Check the Box election for MO | MO | MSTax | |
| 5.0 | Check the Box election for MAIL | MAIL | MSTax | |
| 6.0 | Technology License Agreement ("Buy In" non-exclusive License Agreement between MAIL and GraceMac for existing Retail IP within the APAC territory.) | MAIL GraceMac | LCA | MAIL to buy rights to existing IP. Will contain amortization schedule – prepayment under separate agreement (see step 7). |
| 7.0 | Buy-In Prepayment Agreement | MAIL GraceMac | B&M | |
| 8.0 | Termination Agreement | MSFT MO | LCA | Terminates existing "other stuff" license (acknowledgement that nothing licensed thereunder historically) |
| 9.0 | Contract Right Purchase and Sale Agreement (with respect to GraceMac's right to license from MSFT updates and additions to MS Retail Products in the APAC territory) | GraceMac MECSLLC | LCA | Purchase Price = $100 |
| 10.0 | Agreement for Sharing Research and Development Costs for Retail Distribution (regarding future IP in the APAC territory) | MAIL MESCLLC | LCA | |
| 11.0 | Technology License Agreement (non-exclusive license regarding retail channel in APAC) | MAIL MO | LCA | True License |

Asia Cost Share Step Plan – Page 2

MSTP1253321

Final Structure – Cash Flows:

Note: Includes cash flows for EMEA prepayment



Legend:

E1     Prepayment of retail buy in royalty from MIOL to Grace Mac – approximately $518 million

E2     Prepayment of OEM royalty from MIOL to Flat Island Company Limited ("FICL") – approximately $1.15 billion

E3     Prepayment of OEM buy in royalty from FICL to Microsoft EMEA Licensing, LLC (single member Nevada LLC)

E4     Sweep of OEM buy in royalty cash to Microsoft Licensing GP

E5     Contribution of OEM buy in royalty cash from Microsoft Licensing GP to Microsoft Capital Group, LP

A1     Payment of buy in royalty from Microsoft Asia Island Limited ("MAIL"), Irish incorporated Bermuda resident company, to Grace Mac – approximately $2.9 billion.

A2     MECSLLC purchases future IP rights from GraceMac for nominal sum ($100)

A3     Cost share payment from MAIL to Microsoft EMEA Cost Share LLC.

A4     Payment of royalty from MO to MAIL for right to manufacture and distribute

Securities     Proposed transfer of securities from Microsoft Finance Company Limited ("MFCL") to Microsoft Capital Group, LP in payment of flows E1, E3 and A1.  Books will reflect the imposition of interest bearing loans between MFCL and the FICL, MIOL and MAIL and the prepayment of the various royalty amounts above.

Asia Cost Share Step Plan – Page 3

MSTP1253322

Formatted: Font color: Auto

December 1, 2003

Microsoft Operations Pte Ltd
4388 Alexandra Road #04-09/12
119968 Singapore

Re:  Termination of Parent-Subsidiary Agreement

Ladies and Gentlemen,

This letter is being written to confirm our agreement to terminate that certain Parent-Subsidiary Agreement between Microsoft Corporation and you, dated as of January 1, 1999, as amended (the "Parent-Subsidiary Agreement").  We acknowledge and agree that you have never engaged in any distribution or marketing of MSFT products pursuant to the Parent-Subsidiary Agreement and do not intend to do so in the future, as such distribution is adequately provided for under separate agreement.

If this is in accordance with your understanding of our agreement, please sign the enclosed copy of this letter agreement and return it to us.

Sincerely,

MICROSOFT CORPORATION

By: _____
John A. Seethoff
Assistant Secretary

Agreed to and accepted as of the
day and year first above written:

MICROSOFT OPERATIONS PTE LTD

By: _____
Patrick Tze Lung
Chief Executive

MSTP1253323

# CONTRACT RIGHT PURCHASE AND SALE AGREEMENT

**THIS CONTRACT RIGHT PURCHASE AND SALE AGREEMENT** (the **"Rights Purchase Agreement"**) is effective as of December 31, 2003 (the "Effective Date") by and between GRACEMAC CORPORATION, a Nevada corporation ("GraceMac"), and MICROOSFT EMEA COST SHARE LLC, a Nevada limited liability company ("MECSLLC").

**WHEREAS**, GraceMac wishes to transfer certain contract rights further described below to MECSLLC, solely in exchange for cash; and

**WHEREAS**, MECSLLC wishes to acquire from GraceMac the contract rights further described below in exchange for cash.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, receipt and sufficiency of which each party hereby acknowledges, the parties agree as follows:

1. **PURCHASE AND SALE OF CONTRACT RIGHTS.**

   GraceMac hereby assigns to MECSLLC all of its rights and interest to new and updated MS Retail Software Products and MS Retail Hardware Products (as defined) under the Parent-Subsidiary Agreement dated January 1, 1999, between Microsoft Corporation and GraceMac, as amended (the "Agreement") for and in respect of the region of Asia, South East Asia, and the South Pacific and worldwide for Japanese language products, but shall exclude China for products manufactured by Microsoft (China) Company Limited.

2. **PAYMENT.**

   In exchange for the rights assigned pursuant to Paragraph 1 above, MECSLLC shall pay to GRACEMAC the sum of _____ and No/100 U.S. Dollars ($_____.00).

3. **FURTHER COOPERATION; REASONABLE EFFORTS.**

   GRACEMAC and MECSLLC agree to execute whatever additional instruments either party may reasonably request to effectuate or evidence any of the transactions intended under this Retail Products Rights Agreement.

4. **MISCELLANEOUS.**

   4.1 <u>Successors and Assigns</u>. This Retail Products Rights Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party hereto may assign either this Retail Products Rights Agreement or any of its rights, interests or obligations hereunder without the prior written approval of each other party; <u>provided</u>, <u>however</u>, that an assignment of this Retail Products Rights Agreement shall be permitted without the other party's consent if (i) made in connection with any business combination transaction, whether carried out as a sale of assets, merger, sale of stock or any other combination thereof or similar transaction, by such party, or (ii) made to any person controlled by, controlling or under common control with such party.

ACS 9.0

MSTP1253324

4.2   <u>Governing Law</u>.   This Retail Products Rights Agreement shall be construed in accordance with and governed by the internal laws (without reference to choice or conflict of laws) of the State of Nevada.

4.3   <u>Entire Agreement</u>.   This Retail Products Rights Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the parties with respect to the subject matter of this Retail Products Rights Agreement. Neither this Agreement nor any provision hereof is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

4.4   <u>Counterparts</u>.  This Retail Products Rights Agreement may be executed in any number of counterparts, all of which together shall constitute one agreement binding on the parties hereto.

IN WITNESS WHEREOF, the parties have caused this Retail Products Rights Agreement to be executed as of the day and year first above written.

GRACEMAC CORPORATION                MICROSOFT EMEA COST SHARE LLC

By: _____        By: _____
    Monte Miller                           Lloyd Brenner
    General Manager                         Manager

Contract Right Purchase and Sale Agreement—Page 2                    ACS 9.0
\\ican\F&O\SubMan\_Asia Cost Share Project\ACS9.0 Contract Right Purchase and Sale Agreement.doc

MSTP1253325

**AMENDED AND RESTATED
AGREEMENT FOR SHARING
RESEARCH AND DEVELOPMENT COSTS
FOR RETAIL DISTRIBUTION**
Amended as of July 1, 2003

THIS AMENDED AND RESTATED AGREEMENT FOR SHARING RESEARCH AND DEVELOPMENT COSTS FOR RETAIL DISTRIBUTION (the "Cost Share Agreement"), effective as of the 31st day of January_December_, 2003 (the "Effective Date") and amended as of the 1st day of July, 2003, by and between MICROSOFT IRELAND OPERATIONS LIMITED_ASIA ISLAND LIMITED_, an Irish _Bermuda_ corporation ("MIOL_MAIL_"), MSLI, GP, a Nevada general partnership ("GP")_MICROSOFT EMEA COST SHARE LLC, a Nevada limited liability company ("MECSLLC")_, GRACEMAC CORPORATION, a Nevada corporation ("GraceMac") _and_, to the extent required to cause this Cost Share Agreement to constitute a qualified cost sharing arrangement under Treasury Regulations Section 1.482-7, MICROSOFT CORPORATION, a Washington corporation ("MSFT"). The term "Parties" shall refer to MIOL_MAIL_, GP_MECSLLC_, and GraceMac, and whenever necessary to cause this Cost Share Agreement to constitute a qualified cost sharing agreement, to MIOL_MAIL_, GP_MECSLLC_, GraceMac, and MSFT. The term "Party" shall refer to MIOL_MAIL_, GP_MECSLLC_, or GraceMac individually, and whenever necessary to cause this Cost Sharing Agreement to constitute a qualified cost sharing agreement, to MIOL_MAIL_, GP_MECSLLC_, GraceMac and MSFT individually.

## W I T N E S S E T H :

WHEREAS, MSFT is engaged in the business of developing, manufacturing, marketing, distributing, selling and licensing certain products;

WHEREAS, MSFT will own all worldwide rights, titles and interests in and to all Covered Intangibles which are utilized, embodied, or incorporated in Microsoft Products and Services, such ownership rights arising upon the creation of such Covered Intangibles by MSFT and certain parties related to MSFT;

WHEREAS, GP holds the right to acquire the exclusive license to manufacture and distribute all future Covered Intangibles utilized, embodied, or incorporated into Microsoft Products and Services within MIOL's Territory;

WHEREAS, MIOL_MAIL_ is engaged in the business of developing, manufacturing, marketing, distributing, selling, leasing and/or licensing the existing Covered Intangibles utilized, embodied, or incorporated into the same Microsoft Products and Services in the MIOL_MAIL_ Territory;

WHEREAS, GraceMac has entered into a Technology License Agreement with MIOL_MAIL_ effective as of May 1, 1999, under which GraceMac has granted certain rights to MIOL_MAIL_, including the right to use certain existing intangible property rights existing on May 1, 1999 to undertake the Research Program (the "GraceMac Technology License Agreement");

WHEREAS, MECSLLC holds the right to acquire the exclusive license to manufacture and distribute all future Covered Intangibles utilized, embodied, or incorporated into Microsoft Products and Services within MAIL's Territory;

Formatted: Right

Formatted: Font: 8 pt

MSTP1253326

WHEREAS, MIOL and MSFT have previously entered into an Agreement for Sharing Research and Development Costs (the "Initial Cost Sharing Agreement") effective as of May 1, 1999 (the "Initial Effective Date") and amended July 1, 2001, and wish to amend the Initial Cost Sharing Agreement to reflect the changes in the Parties' businesses since July 1, 2001 (*e.g.* to reflect GP's right to acquire the exclusive license to manufacture and distribute all future Covered Intangibles utilized, embodied, or incorporated into Microsoft Products and Services within MIOL's Territory), MIOL and MSFT agree pursuant to Section 12.2 of the Initial Cost Sharing Agreement to modify and continue the Initial Cost Sharing Agreement with the modifications incorporated into the body of the Agreement herewith;

WHEREAS, MSFT, GPMECSLLC, and MIOLMAIL wish to pool their respective resources from the Effective Date of this Cost Share Agreement forward, for the purpose of combining their research and development efforts relating to the Covered Intangibles that will be utilized, embodied, or included in the Microsoft Products and Services, and the manufacturing processes therefor, and the Parties wish to share the costs and risks of research and development for all such Covered Intangibles developed by a Party hereto on the basis of the benefits anticipated to be derived from such intellectual property rights, technology and/or other intangible property rights;

WHEREAS, each Party intends to exploit in its territory the Covered Intangibles utilized, embodied, or incorporated into the Microsoft Products and Services developed in accordance with this Cost Share Agreement in their respective businesses, but acknowledge that the legal title to all Covered Intangibles utilized, embodied, or incorporated into Microsoft Products and Services will be held solely in the name of MSFT for purposes of protecting any such Covered Intangibles;

WHEREAS, due to the uncertainty of the applicable law regarding the requirement to share the cost of stock based compensation at the time this Cost Share Agreement is entered into, the Parties wish to provide that their agreement to pool their respective resources from the Effective Date of this Cost Share Agreement forward, is conditional upon their understanding that under the applicable law as of the Effective Date, the R&D Costs do not include the cost of stock based compensation whether in an amount equal to the spread at exercise (*e.g.*, the amount deducted under I.R.C. Section 83), the valuation at grant (*e.g.*, as determined under FASB rules), or any other methodology;

WHEREAS, if subsequently, applicable law would determine that the cost of stock based compensation in an amount equal to the spread at exercise (*e.g.*, the amount deducted under I.R.C. Section 83), the valuation at grant (*e.g.*, as determined under FASB rules), or an amount determined under any other methodology must be prospectively or retrospectively included into R&D Costs, each of the Parties will have the option to terminate the Cost Share Agreement as provided below;

WHEREAS, the Parties furthermore wish to provide that their agreement to pool their respective resources from the Initial Effective Date of this Cost Share Agreement forward is conditional upon their understanding that the application of the best method rule under I.R.C. Section 482 with respect to the pre-existing intangibles licensed under the GraceMac Technology License Agreement entered into by MIOLMAIL and GraceMac effective as of the Initial Effective Date, does not require the valuation of the pre-existing intangibles under the market capitalization method;

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 2

MSTP1253327

WHEREAS, MSFT and MIOLMAIL further acknowledge that for state law purposes, GPMECSLLC will acquire the exclusive legal right to manufacture and distribute within the MIOLMAIL Territory the Covered Intangibles utilized, embodied, or incorporated in the Microsoft Products and Services, and that GPMECSLLC and MIOLMAIL intend that pursuant to this Cost Share Agreement GPMECSLLC grant to MIOLMAIL a non-exclusive license to such Covered Intangible in the MIOLMAIL Territory in exchange for the payment received hereunder; and

WHEREAS, MSFT, MIOLMAIL and GPMECSLLC acknowledge (i) that for state law purposes the payments received by GPMECSLLC from MIOLMAIL under Article 4 shall constitute consideration for the use of intangible property, i.e., the non-exclusive license in the Covered Intangible included in or incorporated in the Microsoft Products and Services in the MIOLMAIL Territory and (ii) that for U.S. federal income tax purposes, the payments received by GPMECSLLC from MIOLMAIL under Article 4 shall constitute intangible development payments in respect to a qualified cost sharing agreement under Treasury Regulations Section 1.482-7(f).

NOW, THEREFORE, in consideration of the foregoing, and of the mutual covenants and conditions set forth herein, the Parties to this Cost Share Agreement hereby agree as follows:

1.     **DEFINITIONS**

For purposes of this Cost Share Agreement, the following terms shall have the following meanings:

1.1    "Affiliate" shall mean any legal entity that directly or indirectly owns, is owned or controlled by, or is under common control with, GPMECSLLC, MSFT, GraceMac or MIOLMAIL.

1.2    "Allocable R&D Costs" shall mean the sum of the R&D Costs incurred by GPMECSLLC, MSFT and MIOLMAIL (or on their behalf) for an R&D Fiscal Year, less Territory Specific R&D Costs (if any) for that R&D Fiscal Year that are related to the Research Program.

1.3    "Confidential Information" shall mean and include all of the Covered Intangibles, and all other information, not in the public domain, that relates to (i) the design, development, production, manufacture, operation or repair of any Microsoft Products and Services; or (ii) the business, plans, products, services, finances or affairs of the Parties hereto. All information disclosed or revealed by a Party hereunder orally, electronically, in writing or in other tangible form, shall be deemed to be Confidential Information if (i) it has been marked "confidential"; (ii) the recipient of such information has been placed on notice, orally or in writing, of its confidential nature; or (iii) due to its character or nature or the circumstances surrounding its disclosure, a reasonable person under similar circumstances would treat such information as confidential.

1.4    "Cost Share" of GPMECSLLC or MIOLMAIL shall mean the Allocable R&D Costs allocated to such person pursuant to Article 3 and characterized (a) for state law purposes as consideration for the use of intangible property paid by MIOLMAIL to GPMECSLLC (or an adjustment in such payment) in exchange for the grant of a license as set out in Section 5.2, and (b) for U.S. federal income tax purposes, the sum of (i) the Territory Specific R&D Costs

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 3

MSTP1253328

assigned to such Party under this Cost Share Agreement, and (ii) the portion of the Allocable R&D Costs allocated to a Party under this Cost Share Agreement.

1.5    "Covered Intangibles" shall mean and include any and all developments, improvements, inventions, patents, copyrights, rights in and to data and databases, programs (in source code and object code form), flow charts, pseudo-code, design and product documentation, formulae, enhancements, updates, translations, adaptations, information, specifications, designs, process technology, manufacturing requirements, quality control standards, know-how and other technical information, global marketing intangibles (e.g., trademarks, trade names, copyrights, designs, service marks, applications and registrations therefor, packaging, global market strategies, customer lists, global advertising, non-routine world-wide marketing initiatives, and other similar marketing intangible property relating to any of the Microsoft Products and Services) and other intangible property rights arising from or developed as a result of the Research Program.

1.6    "Gross Profits" shall mean (taking into account Treas. Reg. Section 1.482-7(c)(3), which treats MSFT and all the members of its affiliated group as a single taxpayer) sales less cost of sales and revenue adjustments and shall consist of gross profits attributable to (i) sales; (ii) services; (iii) royalties and/or rents from third parties; (iv) royalties and/or rents from Affiliates ; and (v) royalties and/or rents from OEMs.

1.7    "Microsoft Products and Services" shall mean and include all products and services which currently do, or in the future will, utilize, embody or incorporate Covered Intangibles and that are or will be, generally made available by MSFT or Affiliates (excluding those products and services that are distributed to original equipment manufacturers that are, or will be, generally made available by MSFT, GPMECSLLC or their Affiliates for distribution through the OEM channel) from time to time.

1.8    "MIOLMAIL Territory" shall mean and include the countries of the Asia, South East Asia and the South Pacific regions, but excluding China for product manufactured by Microsoft (China) Company LimitedEurope, Middle East and Africa regions.

1.9    "Quarterly Payment Date" shall mean on or about each of January 1, April 1, July 1 and September 1.

1.10    "R&D Costs" of a Party shall mean the following research and development costs incurred by a Party:

(i)    Direct costs incurred by that Party during the term of this Cost Share Agreement for the conduct by it of the Research Program as determined under United States generally accepted accounting principles; provided, however, that such direct costs shall not include any depreciation or amortization expenses incurred by such Party and are subject to the optional termination provision in Section 10.5;

(ii)    Indirect costs incurred by that Party properly allocable to the research and development activities, as determined under United States generally accepted accounting principles;

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 4

MSTP1253329

provided, however, that such indirect costs shall not include any depreciation or amortization expenses incurred by such Party and are subject to the optional termination provision in Section 10.5;

    (iii)    A reasonable rental charge for each item of tangible property used by that Party in connection with the Research Program;

    (iv)    Amounts properly chargeable to that Party by an Affiliate that is not a Party to this Cost Share Agreement with respect to assistance rendered by such Affiliate in connection with the Research Program; and

    (v)    Amounts paid or accrued by that Party for the cash or equity acquisition, by purchase, license, or otherwise, of intangible property as provided in Section 2.2.

1.11    "R&D Fiscal Year" shall mean each twelve-month period ending on June 30.

1.12    "Research Program" shall mean all research and development activity and process development activity as defined in Article 2 of this Cost Share Agreement.

1.13    "Territory Specific Development" shall mean any research and development activity, which applies exclusively to the territory exploited by only one of the Parties hereto. The Parties acknowledge that the research and development activity of each broadly applies to all Microsoft Products and Services, and that localization activities do not constitute Territory Specific Developments.

1.14    "Territory Specific R&D Costs" shall mean the sum of the R&D Costs of each of the Parties for an R&D Fiscal Year incurred with respect to any particular Territory Specific Development.

**2.    RESEARCH PROGRAM**

2.1    <u>Scope of Research Program</u>.  The Research Program shall include all research and development activities performed by the Parties hereto after the Effective Date of this Cost Share Agreement, including but not limited to research and development activities performed by Microsoft Research, all product development groups, or any research and development.  The scope of the Research Program includes, but is not limited to, costs associated with (i) development of new software source code or other similar intangible property; (ii) hardware and hardware device concepts; (iii) creation of improvements, updates, adaptations, translations, tools or other modifications to existing intangible property; and (iv) development and implementation of significant non-routine, worldwide marketing initiatives.

2.2    <u>Acquired Intangibles</u>.  In the event that a Party after the Effective Date of this Cost Share Agreement secures any intangible property or rights therein described in Section 2.1 above from a non-Affiliate by means of a license, fee and/or similar transaction, that intangible property shall be added to the Research Program unless the Parties mutually agree otherwise and memorialize such agreement.  In that case, the portion of the consideration paid by the acquiring

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 5

12

MSTP1253330

Party with respect to such intangible property shall be treated as an R&D Cost of that Party. Consideration which is measured by the productivity or use of acquired intangible property, or are otherwise determined by a variable measure, shall be treated as an R&D Cost of a Party as such expense is periodically incurred. The Parties are free to mutually decide whether they want to share in the technology acquired in equity acquisitions.

2.3     <u>All R&D Activity as Single Research Program</u>. For purposes of this Cost Share Agreement, all research and development within the scope of Article 2 shall be treated as a single Research Program.

2.4     <u>Contributed Affiliate Intangibles</u>. The Parties acknowledge that neither Party has made available to the Research Program any valuable intangible property, other than MIOLMAIL's obtaining the rights to use certain pre-existing intangibles in the Research Program pursuant to the GraceMac Technology License Agreement with GraceMac effective as of May 1, 1999.

**3.     R&D COST ALLOCATION**

3.1     <u>Allocation Based on Benefits Anticipated To Be Derived by Parties</u>. The Parties intend that all costs of the Research Program shall be borne by the Parties in accordance with the relative benefits anticipated to be derived by each such Party from the Covered Intangibles (the measure of such relative benefits taking into account Treas. Reg. Section 1.482-7(c)(3), which treats MSFT and all the members of its affiliated group as a single taxpayer).

3.2     <u>Establishment of Cost Sharing Methodology</u>. The Parties have determined that the most reliable estimate of reasonably anticipated benefits to be derived by the Parties from the Covered Intangibles developed during a particular R&D Fiscal Year is (i) the respective Gross Profits derived by each Party for that R&D Fiscal Year from commercial exploitation of Microsoft Products and Services divided by (ii) world-wide Gross Profits derived by MSFT and its Affiliates for that R&D Fiscal Year; provided, however, that the allocation of R&D Costs under this Article 3 shall be adjusted to reflect special circumstances, including, but not limited to, the commercial release by one of the Parties of products or services covered under the Research Program that utilize, embody or incorporate any of the Covered Intangibles substantially before such Microsoft Products and Services are commercially released by the other Party.

3.3     <u>Amendments to Cost Sharing Methodology</u>. At least annually, the Parties shall review the actual and projected revenues from commercial exploitation of the Microsoft Products and Services, and shall amend the cost sharing methodology as necessary on a prospective basis to reflect changes in the shares of reasonably anticipated benefits to be derived by the Parties from the Covered Intangibles and/or the reliability of Gross Profits as the most reliable estimate of these benefits. In determining whether revisions to the cost sharing methodology are necessary, the Parties shall take into account changes in economic conditions, their business operations and practices of the Parties, and the ongoing development of the Covered Intangibles and other changes necessary to conform this Cost Share Agreement to the tax laws applicable to the Parties.

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 6

MSTP1253331

3.4 <u>Significant Divergence</u>.  If a comparison of projected benefit shares and actual benefit shares results in a greater than twenty (20) percent divergence for any Party, within the meaning of Treas. Reg. Section 1.482-7(f)(3)(iv)(B), and such divergence is not due to an extraordinary event beyond the control of the Party that could not reasonably have been anticipated at the time the costs were shared, the Party shall make a payment as necessary to achieve a retrospective adjustment to the prior cost shares to reflect the actual benefit shares for the years in which the costs were incurred together with a time value of money adjustment reflecting an arm's length rate of interest.  No adjustment will be made with respect to cost shares for any year more than three (3) fiscal years prior to the year in which the Parties determine that an adjustment under this section is required.

**4.      PAYMENT OF COST SHARE**

4.1 <u>Year End Statements</u>.  After the close of each R&D Fiscal Year, GP<u>MECSLLC</u> shall furnish MIOL<u>MAIL</u> and MIOL<u>MAIL</u> shall furnish GP<u>MECSLLC</u> with a written statement, setting forth the R&D Costs incurred by each during the R&D Fiscal Year.

4.2 <u>Determination and Payment of Final Cost Share</u>.  Within a reasonable period of time following receipt of the report made to it by MIOL<u>MAIL</u> pursuant to Section 4.1, GP<u>MECSLLC</u> shall (with the assistance of MSFT):

> (i)      allocate the Allocable R&D Costs between GP<u>MECSLLC</u> and MIOL<u>MAIL</u> in accordance with the cost allocation percentages determined under Article 3; and
>
> (ii)     submit these calculations to MIOL<u>MAIL</u> for approval.

4.3 <u>Invoicing</u>.  Upon approval by MIOL<u>MAIL</u>, GP<u>MECSLLC</u> shall submit an invoice (or make payment) together with supporting detail, to MIOL<u>MAIL</u> for the Cost Share allocated to MIOL<u>MAIL</u>, to the extent such allocated Cost Share exceeds (or is less than) the sum of: (i) R&D Costs incurred by MIOL<u>MAIL</u> during the R&D Fiscal Year; and (ii) interim payments made by MIOL<u>MAIL</u> to GP<u>MECSLLC</u> for the R&D Fiscal Year pursuant to Section 4.4.

4.4 <u>Interim Payments</u>.  On each Quarterly Payment Date commencing with September April 1, 2003<u>4</u>, GP<u>MECSLLC</u> or MIOL<u>MAIL</u>, as the case may be, shall pay to the other an estimated cost sharing amount with respect to costs incurred by such Parties during the fiscal quarter ending prior to the Quarterly Payment Date.  This estimated quarterly payment will be based on:  (i) the good faith estimates of GP<u>MECSLLC</u> and MIOL<u>MAIL</u> of R&D Costs incurred by such party (including in GP<u>MECSLLC</u>'s R&D Costs such costs of MSFT) since the last Quarterly Payment Date; and (ii) the good faith estimates of GP<u>MECSLLC</u> and MIOL<u>MAIL</u> of the relative Gross Profits of such party (including in GP<u>MECSLLC</u>'s Gross Profit the Gross Profits of MSFT) for the current R&D Fiscal Year.  The amount payable pursuant to this Section 4.4 on a Quarterly Payment Date may be adjusted if appropriate to reflect the results of interim calculations of actual R&D Costs incurred and/or a cost sharing ratio based on actual relative Gross Profits from the marketing, distribution, sale, lease and/or licensing and/or provision of services related to Microsoft Products and Services during the current R&D Fiscal

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 7

MSTP1253332

Year through the quarter ending before the Quarterly Payment Date. Payments made by GPMECSLLC or MIOLMAIL to the other party pursuant to this Section 4.4 shall be an advance payment of the amount ultimately determined to be payable by one of the Parties to the other Party hereto pursuant to Section 4.2 for that R&D Fiscal Year. Any interim quarterly payment made later than thirty (30) calendar days after the Quarterly Payment Date shall incur interest at the minimum applicable federal rate required under United States federal income tax laws.

4.5     Reallocation after Governmental Adjustment.  Notwithstanding the provision of Section 3.4, in the event the Cost Share of GPMECSLLC or MIOLMAIL (for any year) is adjusted by any governmental body, GPMECSLLC and/or MIOLMAIL shall make a payment as necessary to achieve a retrospective adjustment to the prior Cost Share determined under this Article 4.

4.6     Research Program as Integral Part of Business.  The Parties acknowledge and agree that participation in the Research Program pursuant to this Cost Share Agreement is an integral part of each Party's business, and that Cost Share expense of GPMECSLLC and MIOLMAIL will be borne from revenue derived from the marketing, distribution, sale, lease and/or licensing of and/or the provision of services related to Microsoft Products and Services produced by that Party (treating GPMECSLLC and MSFT collectively for this purpose).

5.      **OWNERSHIP OF COVERED INTANGIBLES**

The Parties acknowledge that it is their intent that each of the Parties enjoys the economic benefits arising from the exploitation of the Covered Intangibles in Microsoft Products and Services in each Party's territory.  The Parties acknowledge, however, that on occasion that each Party may enter into transactions whereby Microsoft Products and Services will be installed or otherwise used in the other Party's territories. The Parties further acknowledge that a Party hereto may be compensated for securing a customer transaction, and such compensation is separate and distinct from the benefits arising from the exploitation of the Covered Intangibles enjoyed by a Party.  The Parties further acknowledge that the allocation of rights between the Parties, as a legal matter, must provide for flexibility to adapt to changing business models.  In consideration of the mutual undertakings hereunder, the respective rights of ownership of, and interest in and to, any and all Covered Intangibles arising during the continuance of this Cost Share Agreement shall be as follows:

5.1     Title to Intellectual Property Rights. MSFT holds legal title (or license, as the case may be) to all intellectual property rights embodied in, or relating to the Covered Intangibles.  As the owner of legal title to or the license of such intellectual property rights, MSFT has  sole right to, and shall be solely responsible, in its sole discretion, for (i) filing all applications, and obtaining and maintaining all registrations, for all such intellectual property rights; (ii) initiating and prosecuting all judicial and administrative actions to protect all such intellectual property rights; and (iii) taking all other actions necessary or appropriate to perfect, protect and enforce all such intellectual property rights throughout the world.  MIOLMAIL shall provide GPMECSLLC and MSFT with timely written notice of any and all infringements and threatened infringements of any such intellectual property rights within MIOLMAIL's Territory that come to its attention

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 8

MSTP1253333

during the continuance of this Cost Share Agreement, and shall provide GPMECSLLC and MSFT with all assistance reasonably requested in connection with any judicial or administrative action initiated by MSFT or GPMECSLLC to prevent or enjoin any such infringement or threatened infringement or otherwise to protect and enforce any or all such intellectual property rights.

5.2   <u>MIOLMAIL's Rights</u>.   GPMECSLLC hereby grants to MIOLMAIL the nonexclusive and perpetual right within MIOLMAIL's Territory to manufacture, market, use, and authorize others to use Microsoft Products and Services, utilizing, embodying or incorporating the Covered Intangibles, including further research into similar technology.

5.3   <u>Confidentiality</u>.   MIOLMAIL hereby expressly undertakes to retain in confidence and to require its employees at all levels, to retain in confidence all information and know-how, including Confidential Information, transmitted to it by GPMECSLLC or MSFT as proprietary or confidential, or that by its nature or by the circumstances surrounding its disclosure ought to be treated as proprietary or confidential, and will make no use of such information and know-how except under the terms and during the existence of this Cost Share Agreement.

5.4   <u>Survival of Obligations</u>.   The obligations of the Parties under this Article 5 shall survive the termination of this Cost Share Agreement for any reason whatsoever.   MIOLMAIL's obligation under this Section 5.4 shall survive any termination or expiration of this Cost Share Agreement and shall extend to the earlier of such time as the information and know-how protected hereby is in the public domain through no fault of MIOLMAIL, or ten (10) years following the termination or expiration of this Cost Share Agreement, or earlier if agreed to in writing by GPMECSLLC and MSFT.

**6.   EXCHANGE OF DEVELOPED TECHNOLOGY**

6.1   <u>Disclosure for Purposes of the Research Program</u>.   During the continuance of this Cost Share Agreement, each Party hereto shall make available to the other Party all Covered Intangibles, developed by that Party in connection with, or as part of the Research Program.   Covered Intangibles may be furnished in documentary, other tangible form and/or consultative form at such time, and in such manner, as may be mutually convenient to the Parties.

6.2   <u>No Waiver or Release</u>.   The disclosure of Covered Intangibles under Section 6.1 shall not constitute any release or waiver of any rights of a Party in its Covered Intangibles.   To the extent required or appropriate to establish ownership of Covered Intangibles in accordance with Article 5, documents and instruments of conveyance for such Covered Intangibles shall be executed and exchanged between the Parties; provided, however, that the absence of a written document shall not limit the rights of a Party, as the case may be, to such Covered Intangibles.

6.3   <u>No Limit on Rights</u>.   The provisions of this Article 6 shall not be construed as limiting any of the rights of a Party in and to any intellectual property rights, technology or other intangible property rights which have been acquired by such Party outside of this Cost Share Agreement.

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 9

MSTP1253334

**7. RISKS**

The Parties shall each bear their respective risks undertaken in this Cost Share Agreement. Each Party shall bear its Cost Share regardless whether any Covered Intangibles are in fact produced by the Research Program, and regardless whether that Party realizes any profit or other benefit from any Covered Intangibles.

**8. RECORDS**

Each Party shall maintain written records, as prescribed by Treasury Regulation Section 1.482-7(j)(2), for a period of seven (7) years, in sufficient detail to permit verification of the computation of R&D Costs and the allocation of such costs in accordance with this Cost Share Agreement. Such records shall be made available for inspection, audit and certification by the other Parties as may be reasonably requested by that Party. In the event that any such inspection, audit or certification shows that an adjustment in the amounts and allocations determined under Article 4 is required settlement of the amounts resulting from such adjustment shall be made within thirty (30) days of receipt of notice thereof.

**9. ACCOUNTING**

9.1    <u>Accounting Method</u>.  Where the terms of this Cost Share Agreement require the application of accounting principles, United States generally accepted accounting principles ("USGAAP") shall apply.  However, the Parties agree that irrespective of USGAAP treatment of stock options, restricted stock units, or similar stock based compensation that may result in a USGAAP charge for financial statement purposes, such charges shall not be included in any element of this Cost Share Agreement.

9.2    <u>Currency</u>.  In determining R&D Costs hereunder, any revenues received, and any expenses incurred, in currencies other than United States dollars shall be translated into United States dollars at the prevailing bookkeeping rate of exchange used by MSFT's Treasury department during the period in which such revenues and expenses accrued.

**10. TERM AND TERMINATION**

10.1    <u>Initial Period</u>.  The initial term of this Cost Share Agreement shall be five (5) years from the Effective Date, and shall be automatically renewed for successive one-year terms thereafter, unless a Party gives sixty (60) days written notice to the other Parties hereto prior to the end of the term, or any renewal term hereof, of its intent to terminate this Cost Share Agreement; provided, however, that this Cost Share Agreement may be terminated at any time by mutual agreement between the Parties.

10.2    Failure to Perform.  In the event that a Party hereto (the "Breaching Party") shall commit any material breach or default of any of its obligations under this Cost Share Agreement, the other Parties hereto (the "Non-breaching Parties") may give the Breaching Party written notice of such breach or default and demand that such breach or default be cured immediately.  In the event that the Breaching Party fails to cure such breach or default within thirty (30) days

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 10

17

MSTP1253335

after the date of a Non-breaching Party's written notice hereunder, a Non-breaching Party may terminate this Cost Share Agreement, immediately upon providing written notice of termination to the Breaching Party and the other Non-breaching Parties.  Termination of this Cost Share Agreement in accordance with this Section 10.2 shall not affect or impair the Non-breaching Parties' right to pursue any legal remedy, including the right to recover damages for all harm suffered or incurred as a result of the Breaching Party's breach or default hereunder.

10.3    Immediate Termination.  GPMECSLLC may terminate this Cost Share Agreement by written notice, to take effect immediately upon receipt thereof by MIOLMAIL and MSFT, in the event that:

    (i)    MIOLMAIL initiates any voluntary bankruptcy proceedings, is named as debtor in any involuntary bankruptcy proceeding which is not judicially dismissed within thirty (30) days of the date of filing, suffers involuntary dissolution, suffers the appointment of a receiver or trustee over all or a substantial part of its assets or business, makes an assignment for the benefit of its creditors, fails to pay its debts as they fall due, or is placed under trusteeship; or

    (ii)    any law, regulation or governmental order is enacted or issued, which, in the reasonable opinion of GPMECSLLC, jeopardizes or impairs MSFT's intellectual property rights in any of the Covered Intangibles in any country where any of the Covered Intangibles is used, unless MIOLMAIL, upon written request from GPMECSLLC, agrees to refrain from using the Covered Intangibles in such country.

10.4    Change in Control or Substantial Encumbrance.  In the event that the issued and outstanding shares of MIOLMAIL undergo an involuntary change in control such that its status as an Affiliate to MSFT ceases, or in the event that a substantial portion of MIOLMAIL's assets or the conduct of MIOLMAIL's business shall be substantially encumbered by extraordinary governmental action or by operation of law, GPMECSLLC may, at its option and in its sole discretion, terminate this Cost Share Agreement, effective immediately upon giving written notice of termination to MIOLMAIL.   For purposes of this Section 10.4, notice shall be effective when sent.

10.5    Optional Termination Upon Notice Within 30 Days of Change in Law.  In the event of (i) or (ii) below, a Party may terminate this Cost Share Agreement by written notice, if the notice is issued within 30 (thirty) days from the date of (i) or (ii) below, as the case may be, with the termination to take effect beginning on any date on or after the date of (i) or (ii) below, as the case may be, as long as such effective date for the termination is specified in the notice of termination, and if no date is specified in the notice of termination then on the date of issuance of the notice of termination:

    (i)    A final determination of law is made that would require the inclusion of the cost of stock based compensation, in an amount equal to spread at exercise, the valuation at grant, or an amount determined under any other methodology, into R&D Costs. A final determination or declaration of law shall include a final decision in a court

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 11

MSTP1253336

of law involving any taxpayer, including a U.S. Supreme Court decision; a decision by a U.S. Court of Appeals for any circuit, for which *certiorari* has been denied; a decision by a U.S. Court of Appeals for any circuit, for which both the time to file a motion for rehearing and the time to file a petition for *certiorari* has run; or a final decision by the U.S. Tax Court for which the time to file notice of appeal has run.

(ii)   Legislation is enacted or final Treasury Regulations are promulgated that would require the inclusion of the cost of stock based compensation in an amount equal to the spread at exercise, the valuation at grant or an amount determined under any other methodology into R&D Costs.

10.6   <u>Ownership of Rights upon Termination</u>.   Immediately upon termination of this Cost Share Agreement pursuant to Sections 10.3 or 10.4, all rights acquired hereunder by MIOLMAIL in the Covered Intangibles shall revert to GPMECSLLC, without requirement of notice or judicial or administrative action of any kind.   In the event termination under Section 10.3 or 10.4 occurs, the Parties agree to negotiate in good faith an appropriate payment for the rights acquired by MIOLMAIL prior to the effective date of termination of the Agreement.   In the event of any other termination of this Cost Share Agreement, including, but not limited to termination by mutual agreement between the Parties or termination under Section 10.5, MIOLMAIL shall retain those rights in the Covered Intangibles which it had acquired pursuant to the Agreement prior to the effective date of termination.

10.7   <u>Return of Materials and Documents</u>.   In the event of termination of this Cost Share Agreement, each Party shall in a timely manner return to the other Parties all records, notes and other documents and materials that contain or embody any of the other Parties' Confidential Information in its possession as of the effective date of termination.

10.8   <u>Final Payment</u>.   Upon termination of this Cost Share Agreement for any reason whatsoever, GPMECSLLC and MIOLMAIL shall provide each other with all information necessary to determine the Cost Share for such Party, as of the effective date of termination pursuant to the provisions of Article 4, and shall make or receive payments as determined by GPMECSLLC in accordance with Article 4.

**11.   COMPLIANCE WITH APPLICABLE LAWS**

11.1   <u>In General</u>.   In the exercise of their respective rights, and the performance of their respective obligations, under this Cost Share Agreement, each Party shall comply with all applicable laws, regulations and governmental orders.   Without limiting the generality of this Section 11.1, each Party shall obtain, and shall maintain in full force and effect throughout the continuance of this Cost Share Agreement, all licenses, permits, authorizations, approvals and government filings and registrations necessary or appropriate for the exercise of its rights and the performance of its obligations hereunder.

11.2   <u>United States Export Controls</u>.   MIOLMAIL agrees that it does not intend to and will not, directly or indirectly, knowingly export or reexport any Microsoft Products and Services

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 12

MSTP1253337

except in compliance with rules and procedures that may be established by MSFT from time to time.

**12.    GENERAL PROVISIONS**

12.1    Prior Agreements.    Excluding (i) the existing Parent-Subsidiary Agreement between MSFT and MIOL and (ii) the Agreement for Sharing Research and Development Costs between MSFT and MIOL dated May 1, 1999, and amended as of July 1, 2001, which is continued as modified herein; tThis Cost Share Agreement supersedes and terminates, as of the Effective Date, any and all prior agreements or contracts, oral or written, entered into between the GPMECSLLC and MIOLMAIL and between MSFT and MIOLMAIL relating to the subject matter hereof.

12.2    Amendments.    This Agreement shall not be amended or otherwise modified except by a written agreement dated subsequent to the date of this Cost Share Agreement and signed on behalf of the Parties by their respective duly authorized representatives.

12.3    Authority.    Unless otherwise authorized herein, MIOLMAIL shall not have, nor represent itself as having, any authority to make agreements or licenses in the name of, or binding on GPMECSLLC, MSFT, or pledge GPMECSLLC's or MSFT's credit or to extend credit on behalf of GPMECSLLC or MSFT.

12.4    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada, U.S.A.

12.5    Policies and Procedures.    MIOLMAIL shall comply with all MSFT policies and procedures relating to the subject matter of this Cost Share Agreement.

12.6    Withholding Taxes.    In the event that amounts payable by MIOLMAIL to GPMECSLLC pursuant to this Cost Share Agreement are taxable by any government in the territory or territories defined herein and taxes are required to be withheld and paid from such amounts by MIOLMAIL, MIOLMAIL shall withhold and pay such taxes on behalf of itself or GPMECSLLC and transmit to GPMECSLLC the appropriate tax receipts evidencing the payment of such taxes.

12.7    No Assignment.    This Agreement shall not be assigned by MIOLMAIL without the prior written consent of GPMECSLLC.

12.8    Severability.    If any provision of this Cost Share Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect.

12.9    No Waiver.    No waiver of any breach of any provision of this Cost Share Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving Party.

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 13

MSTP1253338

12.10   Further Assurances.  Each Party agrees to take such further action and execute, deliver and/or file such documents or instruments as are necessary to carry out the purposes of this Cost Share Agreement.

12.11   Counterparts.  This Cost Share Agreement may be executed in several counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

*[Remainder of page intentionally left blank]*

Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 14

MSTP1253339

IN WITNESS WHEREOF, the Parties have executed this Cost Share Agreement as the date which appears in the first paragraph hereof.

MIOLMAIL:
~~ISLAND~~ LIMITED                MICROSOFT IRELAND OPERATIONSASIA

By: _____
    Kevin Fay
    Director

GPMECSLLC:                        MSLI, GPMICROSOFT    EMEA    COST
~~SHARE, LLC~~                        SHARE, LLC

                                  by  MICROSOFT MANAGEMENT, LLC,
                                      its Managing Partner

                                  By: _____
                                      Lloyd Brenner
                                      Assistant TreasurerManager          ◄── [ Formatted: Indent: Left: 2.75" ]

GRACEMAC                          GRACEMAC CORPORATION

                                  By: _____
                                      Monte Miller
                                      General Manager

MSFT:                             MICROSOFT CORPORATION

                                  By: _____
                                      John Seethoff
                                      Assistant Secretary

Amended and Restated Agreement for Sharing
Research and _____ACS10.0
Development Costs for Retail Distribution – Page 15

MSTP1253340

## SCHEDULE A

Participants in the Cost Sharing Arrangement:

Microsoft Ireland Operations Asia Island Limited
MSLI GP Microsoft EMEA Cost Share, LLC
GraceMac Corporation
Microsoft Corporation



Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 16

MSTP1253341

**SCHEDULE B**

Members of the Controlled Group Potentially
Benefiting from the Cost Sharing Arrangement

Due to the ambiguity of Treasury Regulation Section 1.482-7(b)(4)(i) as to the definition of other members of the controlled group that could potentially benefit from the use of intangibles developed under the cost sharing arrangement, the following is an all inclusive list of members of the controlled group.  Note that many of these entities are either (i) marketing subsidiaries with limited rights to manufacture software for internal use only with no rights to further commercially exploit the software, or (ii) subsidiaries whose rights to exploit the benefits of this Cost Sharing Agreement are obtained only through and after the grant of an appropriate license from Microsoft These controlled subsidiaries have been included solely to provide a comprehensive listing with the intention of full compliance with the requirement of Treasury Regulation Section 1.482-7(b)(4)(i).

The controlled entities referred to above include the Parties and all other subsidiaries and affiliates of Microsoft Corporation.



Amended and Restated Agreement for Sharing
Research and _____ ACS10.0
Development Costs for Retail Distribution – Page 17

MSTP1253342

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is entered into as of the 31st day of December, 2003 (the "Effective Date) by and between MICROSOFT ASIA ISLAND LIMITED, a Bermuda corporation, ("MAIL"), and MICROSOFT OPERATIONS PTE. LTD., a Singapore corporation ("MOPL").

WHEREAS, MAIL and MOPL are both affiliated with Microsoft Corporation, a Washington corporation ("MSFT"); and

WHEREAS, through one or more intermediary affiliated entities, MSFT has licensed various rights to MAIL, including the right to sublicense such rights, and MAIL now desires to sublicense certain of such rights to MOPL;

NOW, THEREFORE, the parties hereby agree as follows in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows::

1.   **DEFINITIONS**

Unless otherwise defined, capitalized terms shall have the following meanings:

"Distribution" shall include distribution in all channels, excluding the Original Equipment Manufacturer ("OEM") channel, *provided, however*, that the OEM channel shall not include (i) product for the pre-installed PC business and (ii) online software product and related documentation, each of which is acknowledged to be Distribution hereunder.

"Documentation" shall mean MSFT's standard documentation for the applicable version(s) of Microsoft Hardware Products.

"Driver" shall mean the driver software for the applicable version(s) of Microsoft Hardware Products

"Hardware" shall mean the hardware components of the applicable version(s) of the Microsoft Hardware Products.

"Microsoft Hardware Products" shall mean the Microsoft Mouse, Microsoft Natural Keyboard and similar hardware products as are then available for acquisition from MSFT, its affiliates and/or approved vendors including, if applicable, the Documentation, Drivers and/or Hardware.

"Microsoft Products" shall mean all MSFT products generally made available by MSFT and its affiliates for Distribution anywhere in the world.

"Microsoft Software Products" shall mean all Microsoft Products other than Microsoft Hardware Products.  Microsoft Software Products shall include MSFT's standard documentation for the applicable version(s) of such products.

"Territory" shall mean Asia, South East Asia and the South Pacific.

25

MSTP1253343

2.    **MICROSOFT PRODUCTS**

2.1.   <u>Marketing and Distribution Rights</u>.  MOPL shall have a non-exclusive right to market and distribute Microsoft Products within the Territory in accordance with the terms and conditions of this Agreement.

2.2.   <u>MOPL's Duties</u>.  MOPL will use its best efforts to further the interests of MAIL and to maximize the markets for, and distribution of, Microsoft Products covered by this Agreement.

2.3.   <u>MAIL's Duties</u>.  MAIL will use its best efforts to assist MOPL with technical matters in connection with the distribution of Microsoft Products.

3.    **MANUFACTURING, MARKETING AND DISTRIBUTION OF MICROSOFT PRODUCTS.**

3.1.   <u>License Grant</u>.  MAIL hereby grants MOPL a non-exclusive license during the term of this Agreement to manufacture in the Territory and distribute such manufactured Microsoft Software Products as are from time to time designated by MAIL in the Territory, including any distribution to MSFT and/or any other MSFT affiliate.  MAIL hereby grants MOPL a non-exclusive right within the Territory during the term of this Agreement to directly grant third parties the right to reproduce the software portion of Microsoft Products, including the right to directly, or indirectly through any MSFT affiliate, license independent software vendors and developers in the Territory the right to copy and modify Microsoft Software Products for the purposes of integrating the same into their products and subsequently distributing the integrated product under such independent software vendors' and developers' own end user license agreement.

3.2   <u>Manufacturing, Marketing and Distribution</u>.

3.2.1   MAIL and/or its affiliate(s) (including but not limited to MSFT) shall provide MOPL with a master copy for the appropriate product(s) and the camera ready or other materials for product packaging and documentation.  MOPL shall have the right to copy the product(s) in object code form from the master copy provided by MAIL, prepare the product documentation and packaging based on the materials provided by MAIL provided that all documentation remains complete and accurate, and assemble the final package.  MOPL may subcontract all or any portion of the manufacturing of Microsoft Software Products.  MOPL shall market and sell the Microsoft Software Products it manufactures only in the Territory; provided, however, that MOPL may sell Microsoft Software Products to MSFT and/or any other MSFT affiliate for distribution outside the Territory on such terms and conditions as they may agree on from time to time.

3.2.2   Any Microsoft Software Products produced by MOPL will be packaged in approved MSFT packaging and comply with all requirements for use of MSFT's trademarks.  Each product package will include MSFT's standard end user license agreement appropriate for the jurisdiction where the product is to be distributed.  The documentation and/or diskette label prepared by MOPL shall contain the following information:

Technology License Agreement – Page 2                                      ACS11.0

MSTP1253344

(i)      "Microsoft Corporation" and the MSFT product name and MSFT logo type;

(ii)     Appropriate MSFT trademark notices as requested by MSFT;

(iii)    MSFT copyright notice; and

(iv)    MSFT product version number.

The documentation or diskette label shall also state:

(x)     System requirements for the product;

(y)     Name of the computer(s) on which the product can be used; and

(z)     MOPL's name.

3.2.3    All master copies provided by MAIL to MOPL shall at all times remain the sole property of MSFT.  MOPL agrees to return to MAIL the master copies and any other materials supplied by MAIL immediately upon termination of this Agreement.

3.2.4.   MOPL agrees that any Microsoft Software Products it manufactures will meet the quality provisions set forth by MSFT in its written specifications.  It is the parties' intention that the quality of the software produced by MOPL will be equivalent in quality to the software products manufactured by MSFT.

3.2.5    If and when MSFT updates products which have been previously manufactured by MOPL or under its direction, MAIL may provide MOPL with updated master copies.

3.2.6    MOPL shall handle warranty claims relating to the Microsoft Software Products it manufactures.  MOPL shall have no right to return any Microsoft Software Products ~~MOPL~~ manufactured by MOPL or manufactured under its direction to MAIL for credit.  In the event a product manufactured by MOPL or under its direction is defective, MOPL is authorized to replace the defective product.

3.2.7    In order to protect its rights with respect to the subject Microsoft Software Products, (including specifically but without limitation interests in copyrights, patents, trademarks and/or trade names), MAIL may require MOPL to include certain additional terms and conditions in customer agreements.  MOPL agrees to comply with any and all such requirements as may be communicated to it by MAIL from time to time.

## 4.    MICROSOFT HARDWARE PRODUCTS

4.1    <u>License Grant</u>.  MAIL hereby grants MOPL a non-exclusive license:  (i) to manufacture the Drivers (including all updates as developed from time to time) in the Territory in object code form; and (ii) to distribute Microsoft Hardware Products which include Drivers so manufactured as part thereof in the Territory, *provided, however*, that the foregoing license grant <u>does</u> not extend to Driver source code.  All rights not expressly

Technology License Agreement – Page 3                                 ACS11.0

MSTP1253345

granted in this Section 4.21, including without limitation translation rights, are reserved by MAIL to the extent granted to it by MSFT, and otherwise are reserved by MSFT.

4.2     MAIL shall use its best efforts to ensure that MOPL may purchase Hardware directly from MSFT's vendors for Hardware on comparable terms to those obtained by MSFT.

**5.      TRADEMARK LICENSING FOR COLLATERAL GOODS**

5.1     <u>Trademarks, Service Marks and Trade Names.</u>

   5.1.1   In connection with MOPL's activities authorized pursuant to this Agreement, MOPL is granted a non-transferable, non-exclusive right to use the trademarks and service marks "MICROSOFT", "WINDOWS", "WINDOWS" logo and such other marks as MAIL has the authority to sublicense and specifies from time to time on Schedule A. [Do we want to do this as a Schedule A?] Further MOPL is granted a non-transferable, non-exclusive right to use the designation "MICROSOFT," and/or "MSFT" as a component of its trade name(s). Except as expressly provided in this Agreement or as otherwise permitted by MAIL and MSFT in writing, MOPL shall not sublicense MSFT trademarks, service marks or trade names.

   5.1.2   The nature and quality of all products and services with which such marks are associated, the business with which such trade name(s) are associated, and the form and manner of use of the marks and trade name(s) shall be subject to the control of MAIL and MSFT  The products shall be of good workmanship and quality, the services shall be performed in a good workmanlike manner and the business shall be operated in a good businesslike manner and each shall meet the standards specified by MAIL and MSFT from time to time.  MAIL and MSFT shall have the right to inspect the facilities where such products are made, to inspect such product in-process and in finished form, to examine the manner in which such services are being rendered and to examine the business and the manner in which the business is being conducted for the purpose of compliance with such standards.

   5.1.3   MOPL agrees to use its best efforts to make MSFT's trademarks, service marks and trade names well known in the Territory.  MOPL agrees to take such steps as MAIL or MSFT requests to establish or confirm MSFT's ownership and MOPL as an authorized user.

5.2     <u>Marketing Rights.</u>

   5.2.1   MOPL shall have a non-exclusive right to license third parties to manufacture and/or distribute goods bearing MSFT-owned trademarks in the Retail Territory. MOPL shall also have the right to distribute such goods which have been manufactured for MOPL under contract.

   5.2.2   The rights granted in this Section 5.2 shall not include the right to license MSFT owned trademarks for use in connection with computer software or hardware products but shall be strictly limited to clothing and novelty-type goods (both useful and decorative), including but not limited to shirts, jackets, coffee cups, sports equipment, pens and pencils.

Technology License Agreement – Page 4                                    ACS11.0

MSTP1253346

5.2.3   MOPL shall not have any right to nor shall it license the MSFT owned trademarks for use in connection with any goods which might call the reputation and goodwill of MSFT into disrepute or disrespect.

5.3   Sublicense Restrictions.  MOPL shall ensure that the following minimum conditions are met in any license entered into by MOPL pursuant to this Article 5:

5.3.1   the agreement shall be in writing;

5.3.2   the license shall provide that MSFT's sole ownership in any MSFT owned trademark not be interfered with or diminished in any way by any action or failure to act on the part of licensee, and the licensee and shall agree to cooperate in any necessary efforts against third parties to ensure this result;

5.3.3   the goods that bear any MSFT-owned trademark shall be of the same high quality of similar goods marketed with the MSFT-owned trademarks;

5.3.4   proper attribution for the ownership of the trademark shall be of the same high quality of similar goods marketed with the MSFT owned trademarks; and

5.3.5   all other necessary and reasonable safeguards for the protection of the MSFT owned trademarks, including provisions for the termination of any such license and forfeiture of the right to manufacture and distribute the goods, are included in each license.

## 6.   ROYALTIES

6.1   Manufacturing, Marketing and Distribution of Microsoft Products.  MOPL shall pay MAIL royalties equal the percentages provided in the following schedule of the "net selling price" of all Microsoft Products manufactured and distributed by MOPL:

|  | Full Packaged Product and Subscriptions | Hardware | Volume Licensing Programs |
|---|---|---|---|
| Japan | 67% | 20% | 70% |
| Mature Markets (Australia, New Zealand, Singapore, Malaysia, Korea, Hong Kong) | 47% | 20% | 52% |
| Growing Markets (Thailand, Philippine, Indonesia, India, Vietnam, China) | 35% | 20% | 40% |
| Taiwan | 47% | 20% | 55% |

Formatted Table

Markets are defined based on location of the customer (i.e., the Distributor or Large Account Reseller).

Technology License Agreement – Page 5                                          ACS11.0

MSTP1253347

6.1.1   For Microsoft Products distributed through Microsoft Regional Sales Corporation, "net selling price" shall mean the price that Microsoft Regional Sales Corporation charges its customer or other MSFT affiliates for the Microsoft Product(s) in question, but shall not include taxes, freight, insurance, handling fees or interest.

6.1.2   For ~~MS Retail~~ Microsoft Products sold directly by MOPL to other MSFT affiliates, the "net selling price" shall mean the price charged by MOPL to the affiliate.

~~[Payment of royalties under this Section 6.1 shall be made to MAIL on a monthly basis within ninety (90) days following the end of each month. Royalties shall be payable in U.S. dollars.] Kevin, do you want to go with our standard language for this section and the second paragraph under Section 6.2?~~

~~[Standard Language]. [The parties agree that the payment for services provided under this Agreement will be due in full ninety (90) days from the date of receipt of the invoice. For purposes of this Agreement an invoice shall be deemed to be duly received: (i) on the date of delivery if personally delivered by hand, (ii) upon the third day after such invoice is deposited in the mail, (iii) on the next business day, if sent by a nationally recognized overnight express courier, (iv) on the date of transmittal, if sent by facsimile and confirmation is received from the recipient's facsimile machine or (v) on the date of transmittal, if sent electronically.]~~

6.2   Trademark Licensing for Collateral Goods. MOPL shall pay MAIL a royalty equal to eight-five percent (85%) of the royalties paid to MOPL each quarter under each license MOPL executes with a third party pursuant to Article 5. Should MOPL resell goods bearing the MSFT-owned trademarks, then the royalty shall be equal to five (5%) of MOPL's net sales revenues. "Net sales revenue" shall mean the revenues received by MOPL from the sale of logoed goods or the licensing of others to produce logoed goods, but shall not include taxes, freight, insurance, handling fees or interest.

~~[Royalty reports shall be made to MAIL on a quarterly basis. Each report shall specify the royalties subsidiary is entitled to from third parties and the net sales revenue from he resale of goods bearing the MSFT-owned trademarks, and shall be signed by a duly authorized representative of MOPL. Upon receipt of such report, MAIL shall invoice MOPL for amounts due MAIL, and MOPL shall make payment within thirty (30) days after the end of the quarter to which the report applies.]~~

6.3   Accounting Principles. Where the terms of this Agreement require the application of accounting principles, United States Generally Accepted Accounting Principles shall apply to the extent they are not in conflict with local accounting principles.

6.4   Rate of Interest for Overdue Accounts. The rate of interest applicable for overdue accounts shall be the local rate of interest for the country in which MOPL's principal offices are located, unless the amounts are denominated in United States dollars whereby the applicable United States interest rate will prevail. These interest rates will be provided by the MSFT Treasury Department. The interest rate used will be based on the applicable currency and time period that the invoice(s) is (are) past due.

Technology License Agreement – Page 6                                    ACS11.0

MSTP1253348

6.5   <u>Currency</u>.  All monetary amounts set forth herein are stated in United States dollars.  The accounting and budgeted foreign currency exchange rates shall be published from time to time by the MSFT Treasury Department, with both MOPL and MAIL in agreement that said foreign exchange rates will represent a fair and equitable exchange rate although they may not represent exact market rates.  The currency of any payments referred to herein shall be United States dollars unless as otherwise agreed to by the parties from time to time.

6.6   <u>Computation of Remuneration</u>.  The specific computation of the amounts set forth in this Agreement, including the management of true-ups, the method of payment and the costs included or excluded in a cost plus basis, shall be uniformly administered under principles established and published from time to time by the MSFT International Accounting Department, which principles shall adhere to the spirit of this Agreement.

6.7   <u>Payment logistics</u>.  MOPL  may from time to time hire a third party (which may or may not be a MSFT affiliate) to make physical payment on its behalf of amounts owed by MOPL to MAIL pursuant to this Agreement.

**7.   INTERCOMPANY SERVICES**

7.1   <u>Services</u>.  MAIL and MOPL acknowledge that MAIL may from time to time provide corporate and other services to MOPL and MOPL may from time to time provide corporate and other services to MAIL.

7.2   <u>Compensation</u>.  In the event other services and/or sales are provided pursuant to this Article 67, then the provider shall invoice the recipient of the services for such services at a price as may be agreed between the parties from time to time, provided, however, that any amount so invoiced shall be consistent with the arm's length standard (as defined in the OECD transfer pricing guidelines and relevant national legislation).  The invoice shall contain a general description of the sales or services and the cost of the sales and/or services to be paid.

**8.   GENERAL PROVISIONS**

8.1.   <u>Term and Termination</u>.  This Agreement shall be effective as of the Effective Date, subject to all necessary government approvals, and continue for an initial term ending on June 30, 20004.  Thereafter this Agreement shall be automatically renewed for successive renewal terms of one (1) year each, unless written notice of termination is given by a party to the other party ninety (90) days prior to expiration of the initial term or any succeeding term (i.e., ninety (90) days prior to June 30 of the then current year).  Upon expiration or termination of this Agreement, neither party shall be entitled to any compensation, statutory or otherwise, arising out of or in any way connected with such expiration or termination.

8.2   <u>Prior Agreements</u>.  This Agreement supersedes and terminates any and all prior agreements or contracts, oral or written, entered into between the parties relating to the subject matter hereof.

8.3   <u>Amendments</u>.  This Agreement shall not be amended or otherwise modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of MOPL and MAIL by their respective duly authorized representatives.  Notwithstanding

Technology License Agreement – Page 7                                                    ACS11.0

MSTP1253349

the preceding sentence, MAIL and MOPL agree that MAIL may revise or alter the applicable commission rates, prices, pricing policies, payment terms and other terms and conditions upon written notice to MOPL. Further, such terms and conditions may be revised as required of MAIL by U.S. tax authorities. MOPL acknowledges that it shall not be entitled to receive any compensation by reason of any such revision. MAIL may at any time, with or without prior notice to MOPL, add or delete particular products and services to or from its products and services categories. MAIL and MOPL recognize that such changes may occur due to competitive conditions, costs of development or manufacture and other factors.

8.4    Product Samples, Internal Use. MAIL shall provide MOPL, free of charge, with such number of Microsoft Products as MAIL shall deem necessary for MOPL to perform its obligations under the terms of this Agreement. MOPL shall use the samples for demonstration purposes only, and shall not make any copies of any components except as specifically authorized herein. MOPL may duplicate Microsoft Products for its internal business use.

8.5    Warranty Claims. MOPL will handle warranty claims made by its customers.

8.6    Preventing Unauthorized Copying. MOPL shall upon MAIL's or MSFT's request, assist MAIL and/or MSFT in preventing, investigating, and prosecuting any unauthorized copying of any MSFT products by any party. MOPL agrees to promptly inform MAIL and MSFT of any unauthorized copying or copies of any MSFT products which come to MOPL's attention. To facilitate coordination of enforcement activities, MOPL shall consult with MAIL and MSFT and receive permission prior to undertaking any actions to prevent unauthorized copying of MSFT products.

8.7    Confidentiality. MOPL hereby expressly undertakes to retain in confidence and to require its employees at all levels, to retain in confidence all information and know-how transmitted to it by MAIL as has been identified by MAIL or MSFT as proprietary or confidential, or that by the nature of the circumstances surrounding the disclosure ought to be treated as proprietary or confidential, and will make no use of such information and know-how except under the terms and during the existence of this Agreement. MOPL's obligation under this Section 8.7 shall survive any termination or expiration of this Agreement and shall extend to the earlier of such time as the information and know-how protected hereby is in the public domain through no fault of MOPL, or ten (10) years following the termination or expiration of this Agreement, or earlier if agreed to in writing by MAIL and MSFT.

8.8    Authority. Unless otherwise authorized herein, MOPL shall not have, nor represent itself as having, any authority to make agreements or licenses in the name of, or binding on MAIL or MSFT, or pledge MAIL's or MSFT's credit or to extend credit on MAIL's or MSFT's behalf.

8.9    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, U.S.A[Singapore].

8.10   Compliance. MOPL shall comply with all applicable laws, rules and relations and shall comply with all MAIL and MSFT policies and procedures relating to the subject matter of this Agreement.

Technology License Agreement – Page 8                                    ACS11.0

MSTP1253350

8.11   <u>Withholding Taxes</u>.  In the event that amounts payable by MOPL to MAIL pursuant to this Agreement are taxable by any government in the MOPL Territory or by the United States and taxes are required to be withheld and paid from such amounts by MOPL, MOPL shall withhold and pay such taxes on behalf of itself or MAIL and transmit to MAIL the appropriate tax receipts evidencing the payment of such taxes.

8.12   <u>United States Export Controls</u>.  MOPL agrees that it does not intend to and will not, directly or indirectly, knowingly export or reexport any Microsoft Products except in compliance with the rules and procedures that may be established by MSFT from time to time.

8.13   <u>Prohibition on Assignment</u>.  This Agreement shall not be assigned by MOPL without the prior written consent of MAIL.  MAIL may assign its rights in this Agreement to any <u>MSFT Aaffiliate</u>.

8.14   <u>No Waiver</u>.  No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

8.15   <u>Severability</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect.

8.16   <u>Further Assurances</u>.  Each party agrees to take such further action and execute, deliver and/or file such documents or instruments as are necessary to carry out the purposes of this Agreement.

8.17   <u>Counterparts.  This Agreement may be executed in several counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.</u>

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

| MICROSOFT ASIA ISLAND LIMITED | MICROSOFT OPERATIONS PTE LTD |
|---|---|
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |

MSTP1253351